## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, and JANE DOE 5, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.   17-cv-1597 |
| v. | ) ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; the UNITED STATES DEPARTMENT OF THE ARMY; RYAN D. MCCARTHY, in his official capacity as Secretary of the Army; the UNITED STATES DEPARTMENT OF THE AIR FORCE; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; the UNITED STATES COAST GUARD; ELAINE C. DUKE, in her official capacity as Secretary of Homeland Security; and the UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | ) ) | |

## INTRODUCTION

1.     This is a constitutional and equitable challenge to President Donald J. Trump's decision to reverse the current policy of the United States Armed Forces by prohibiting transgender servicemembers from "serv[ing] in any capacity in the U.S. military."

2.     In June 2016, the United States Department of Defense announced after an exhaustive review process that it would allow transgender people to serve openly in the United States Armed Forces.

3.     Since that time, Plaintiffs, along with thousands of servicemembers, have followed protocol in informing their chain of command that they are transgender.  They did so in

1

reliance on the United States' express promises that it would permit them to continue to serve their country openly.  These servicemembers, like many others, have built their lives around their military service.

4.      On July 26, 2017, President Trump announced in a series of tweets that he would reverse the Department of Defense's policy on transgender servicemembers, stating that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  The President's announcement, which upon information and belief was made without consulting the Joint Chiefs of Staff, upset the reasonable expectations of Plaintiffs and thousands of other transgender servicemembers and the men and women with whom they serve and fight.

5.      Upon information and belief, the White House turned that decision into official guidance, approved by the White House counsel's office, to be communicated to the Department of Defense.

6.      Plaintiffs here are five servicemembers who collectively have served this nation for decades in various branches of the United States military.

7.      Execution of the President's directive will result in an end to service by openly transgender service members and has already resulted in immediate, concrete injury to Plaintiffs by unsettling and destabilizing plaintiffs' reasonable expectation of continued service.

8.      The directive to reinstate a ban on open service by transgender people violates both the Equal Protection component of the Fifth Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.  Additionally, Defendants are estopped from terminating the continued service of Plaintiffs and other active duty transgender servicemembers.

9.      This lawsuit seeks declaratory and permanent injunctive relief against implementation of the President's directive to prohibit transgender individuals from serving in the Armed Forces.

## JURISDICTION AND VENUE

10.     This court has jurisdiction over the claims under 28 U.S.C. §§ 1331 and 1343.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the acts described in this Complaint occurred in this judicial district.

## PLAINTIFFS

12.     Plaintiffs are active duty servicemembers in the United States military who serve openly as transgender people.  They proceed under pseudonyms here for fear of retribution.

13.     Jane Doe 1 has served with distinction in the United States Coast Guard for more than a decade.

14.     In or around June 2016, in reliance on the issuance of the policy permitting open service by transgender servicemembers, Jane Doe 1 notified her command that she is transgender.

15.     Since that time, she has continued to serve without incident and has furthered her gender transition in reliance on the Department of Defense's policy permitting open service by transgender servicemembers.

16.     Following President Trump's tweets, Jane Doe 1 submitted a prospective letter of resignation stating that she would resign rather than be involuntarily terminated on account of her transgender status.  Were the Department of Defense to retreat from the policy announced by President Trump, Jane Doe 1 would withdraw her resignation and continue to serve.

17.     Jane Doe 2 has been enlisted in the National Guard since 2003 and has been on active duty in the United States Army since 2006.

18.     Jane Doe 2 notified her command that she is transgender after the United States
Department of Defense announced in June 2016 that it would allow transgender servicemembers
to serve openly in the military.

19.     In reliance on the Department's promise to allow transgender servicemembers to
serve openly, Jane Doe 2 began to seek medical treatment relating to her gender transition in
September 2016.

20.     Since informing her command that she is transgender, Jane Doe 2 has continued
serving in her post without incident.

21.     Jane Doe 2's current contract with the military extends through November 2018.
She is counting on the compensation and benefits accrued during that time to pay for further
education and training to begin a civilian career, but she fears that the ban may result in early
termination of her contract.

22.     Jane Doe 3 has served in the United States Army since 2015.  She has previously
been deployed to Afghanistan and expects to be deployed to Iraq soon.

23.     In or around June of 2016, in reliance on the Department of Defense policy
permitting transgender people to serve openly in the military, Jane Doe 3 notified her command
that she is transgender.  Since then, she has continued serving her post without incident.

24.     Jane Doe 3's current contract with the military extends through December 2018.
She plans to renew her contract, but fears that she will not be allowed to do so because of the
ban.

25.     Jane Doe 4 has served in the United States Army since 2000.

26.     In or around June of 2016, in reliance on the Department of Defense policy
permitting transgender people to serve openly in the military, Jane Doe 4 met with her

commanding officer to identify herself as transgender. She began receiving medical treatment related to her gender transition in September 2016.

27.     Since coming out as transgender, Jane Doe 4 continued serving in her post without incident.

28.     Jane Doe 4's current contract with the military extends through June 2018. She plans to renew her contract to complete two additional years of service following the expiration of her current contract so that she can reach twenty years of service and receive retirement benefits. She fears that the President's directive banning transgender people from military service will result in her discharge from the military before she can reach this twenty-year benchmark, thus leading to a substantial decrease in her retirement payments.

Jane Doe 5 has been an active duty member of the United States Air Force for nearly twenty years, serving multiple tours of duty abroad, including two in Iraq.

29.     After June 2016, in reliance on the announcement that transgender people would be permitted to serve openly, she notified her superiors that she is transgender. She has served in the intervening time without incident.

30.     Jane Doe 5's livelihood depends on her military service. Separation from the military would have devastating financial and emotional consequences for her.

## **DEFENDANTS**

31.     Defendant Donald J. Trump is President of the United States and Commander in Chief of the Armed Forces. On July 26, 2017, President Trump stated on Twitter that transgender people would not be permitted to serve "in any capacity in the U.S. military." Upon information and belief, President Trump subsequently directed that decision to be turned into official guidance to be transmitted for implementation to the Department of Defense.

32.     Defendant James N. Mattis is the United States Secretary of Defense.  He is the leader of the Department of Defense.

33.     Defendant Joseph F. Dunford, Jr. is a United States Marine Corps General and services as the current Chairman of the Joint Chiefs of Staff.

34.     Defendant Department of the Army is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Army.

35.     Defendant Ryan D. McCarthy is the Acting United States Secretary of the Army. He is the leader of the Department of the Army.

36.     Defendant Department of the Air Force is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Air Force.

37.     Defendant Heather A. Wilson is the United States Secretary of the Air Force.  She is the leader of the Department of the Air Force.

38.     Defendant United States Coast Guard is one of the five branches of the United States Armed Forces.

39.     Defendant Elaine C. Duke is the Acting United States Secretary of Homeland Security.  She is the leader of the Department of Homeland Security.  The Department of Homeland Security is responsible for the administration and operation of the United States Coast Guard.

40.     Defendant United States of America includes all federal government agencies and departments responsible for the implementation of the President's decision.

41.     All of the Defendants are sued in their official capacities.

## STATEMENT OF FACTS

**Background on Transgender People Serving Openly In the Military**

42.     In May 2014, then-Secretary of Defense Chuck Hagel, a decorated U.S. Army combat veteran, recommended that the military conduct a review of whether transgender people should be permitted to serve openly in the Armed Forces.

43.     In August 2014, the Department of Defense issued a new regulation that eliminated its categorical ban on open service by transgender persons and instructed each branch of the Armed Forces to reassess whether maintaining a service-wide ban on service by openly transgender persons was justified.

44.     Secretary Hagel explained that "[e]very qualified American who wants to serve our country should have an opportunity to do so if they fit the qualifications and can do it."

45.     Secretary Hagel was succeeded as Secretary of Defense by Ashton B. Carter, who had previously served many years within the Department, including as Deputy Secretary of Defense, Under Secretary of Defense for Acquisition, Technology and Logistics, Assistant Secretary of Defense for International Security Policy, and as a member of the Defense Policy Board and the Defense Science Board.  In July 2015, Secretary Carter announced that the military would begin a comprehensive analysis of whether to maintain the prohibition on military service by transgender people.

46.     Over the course of a year, Secretary Carter oversaw a comprehensive review of this issue by the leadership of the Armed Services, the Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and medical specialists from across the Department of Defense.

47.     That year-long process examined all the data available on the issue, including but not limited to existing studies and research and input from transgender servicemembers, outside expert groups, and medical professionals.

48.     This process also included a careful review of the eighteen other countries that permit military service by openly transgender people.

49.     This process also included consultation with doctors, employers, and insurance companies regarding the provision of medical care to transgender people.

50.     The Department of Defense also commissioned the RAND Corporation, an organization formed after World War II to connect military planning with research and development decisions and which now operates as an independent think tank financed by the U.S. government, to analyze relevant data and studies to determine the impact of permitting transgender servicemembers to serve openly.

51.     The study, titled "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Study"), concluded that allowing transgender people to serve openly would "cost little and have no significant impact on unit readiness."

52.     The RAND Study concluded that health care costs for transgender servicemembers would represent "an exceedingly small proportion of [the Department of Defense's] overall health care expenditures."  The RAND Study also concluded that this minimal incremental cost would likely be offset by savings through diminished rates of other health care costs that would be achieved by providing servicemembers with necessary transition-related medical care.

53. Based on the results of this comprehensive, year-long review process, the Department of Defense concluded that the needs of the military would be best served by permitting openly transgender people to serve.

54. As laid out by Secretary Carter in remarks delivered on June 30, 2016, that conclusion was based on a number of considerations, including: the need to recruit and retain the most highly qualified people to serve in our nation's Armed Forces; the fact that thousands of transgender people are already serving and that the military has already invested thousands of dollars to train each servicemember; the benefits to the military of retaining individuals who are already trained and who have already proven themselves; the need to provide both transgender servicemembers and their commanders with clear guidance on questions such as deployment and medical treatment; and the principle that "Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so."

55. On June 30, 2016, Secretary Carter announced that "[e]ffective immediately, transgender Americans may serve openly.  They can no longer be discharged or otherwise separated from the military just for being transgender."

56. Also on June 30, 2016, Secretary Carter issued Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service Members."  The memorandum states: "The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness.  Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.  These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness,

uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity."

57.     In September 2016, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military." The 71-page document set forth guidance and instructions to both military servicemembers and commanders about how to implement and understand the new policies enabling open service of transgender servicemembers.

58.     On October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members." The instruction set forth further guidance to ensure open service by transgender servicemembers, including details regarding revisions to medical treatment provisions. This instruction was further implemented by a memorandum issued by the Acting Assistant Secretary of Defense for Health Affairs entitled "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members."

59.     On November 29, 2016, the Department of Defense revised "DoD Directive 1020.02E—Diversity Management and Equal Opportunity in the DoD" to prohibit discrimination and harassment on the basis of gender identity.

60.     In 2016, the United States Coast Guard adopted policies and procedures for service by transgender servicemembers that are substantially the same as the Department of Defense policies described above.

**The Ban on Transgender Servicemembers**

61.     Early in the morning of July 26, 2017, without any prior indication that he would address military transgender policy, President Trump announced in a series of tweets that the military would no longer permit the service of transgender Americans.

62.     His tweets read: "After consultation with my generals and military experts, please be advised that the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail."

63.     Shortly following the announcement, the new policy met with substantial criticism from members of Congress belonging to both political parties.  These critics included Senator John McCain, chairman of the Senate Armed Services Committee, who said in a statement that "there is no reason to force servicemembers who are able to fight, train, and deploy to leave the military—regardless of their gender identity."  Senator Joni Ernst, another Republican member of the Senate Armed Services Committee, also publicly expressed opposition to the new policy.

64.     Upon information and belief, the President did not consult either the Joint Chiefs of Staff or the Department of Defense before making his announcement.

65.     Shortly after the announcement, fifty-six former generals and admirals issued a public statement denouncing the new policy.

66.     Commandant Admiral Paul Zukunft of the United States Coast Guard criticized the proposed policy and expressly reached out to all openly transgender members of the Coast Guard, vowing not to "turn [his] back" on transgender servicemembers.  Commandant Admiral

Zukunft has arranged for Judge Advocate General's Corps officers to assist transgender Coast Guard members affected by the change in policy.

67.     Upon information and belief, the White House outlined a plan to end the active service of transgender servicemembers to be transmitted to the Department of Defense for implementation.

## COUNT I

### (Fifth Amendment – Equal Protection)

68.     All previous paragraphs are incorporated as though fully set forth herein.

69.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

70.     President Trump's directive to exclude transgender people from military service discriminates against Plaintiffs based on their sex and transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

71.     The categorical exclusion of transgender people from military service lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

72.     Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT II

### (Fifth Amendment – Due Process)

73.     All previous paragraphs are incorporated as though fully set forth herein.

74.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their property or liberty interests without due process of law.

75.     The Due Process Clause of the Fifth Amendment requires, at a minimum, that government action have some rational basis.

76.     The President's directive to exclude transgender people from military service is arbitrary and capricious and lacks any rational basis.

77.     Defendants' 2016 policy permitting transgender people to serve openly in the military, together with Plaintiffs' reliance on that policy in notifying their superiors of their transgender status, created a protected interest in Plaintiffs' ability to continue serving in the military as openly transgender servicemembers.

78.     Defendants' arbitrary reversal of the United States' June 2016 policy threatens to exclude Plaintiffs from continued military service because they are transgender, thus depriving Plaintiffs of those interests without due process of law.

79.     Defendants' arbitrary reversal of the United States' June 2016 policy also impermissibly burdens Plaintiffs' fundamental rights to autonomy and privacy.

80.     Through the actions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

## COUNT III
### (Estoppel)

81.     All previous paragraphs are incorporated as though fully set forth herein.

82.     By virtue of its June 2016 policy allowing transgender servicemembers to serve openly in the United States Armed Forces, Defendants promised Plaintiffs that they could serve openly and continue to serve openly, subject to the same rights, responsibilities, benefits, and opportunities as other servicemembers.

83.    From the implementation of its June 2016 policy until the President's June 26, 2017 announcement, Defendants provided Plaintiffs with ongoing support for their continued service in the military as openly transgender persons.

84.    In reliance upon that promise from Defendants, Plaintiffs informed their commanding officers that they are transgender.

85.    In reliance upon that promise from Defendants, Plaintiffs have undergone medical treatment for the purpose of gender transition.

86.    Because they identified themselves as transgender in reliance on Defendants' earlier promise, Plaintiffs have lost the stability and certainty they had in their careers and benefits, including post-military and retirement benefits that depend on the length of their service.

87.    Plaintiffs have served honorably and successfully in the military since coming out as transgender, and their transgender status has not had any detrimental effect on their ability to serve or to fulfill their duties.

88.    Through the actions above, Defendants are estopped from rescinding the rights, benefits, and protections promised to Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs ask the Court to grant the following relief:

1.    Issue a declaratory judgment that the President's directive to categorically exclude transgender people from military service is unconstitutional;

2.    Issue a preliminary injunction prohibiting the categorical exclusion of transgender people from military service;

3.    Issue a permanent injunction prohibiting the categorical exclusion of transgender people from military service;

4.      Award Plaintiffs their reasonable costs and attorneys' fees;

5.      Issue any other relief the Court deems appropriate.

August 9, 2017

Respectfully submitted,

  /s/ Paul R.Q. Wolfson

Claire Laporte (*pro hac vice* forthcoming)
Matthew E. Miller (*pro hac vice* forthcoming)
Daniel McFadden (*pro hac vice* forthcoming)
Rachel C. Hutchinson (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Jennifer Levi (*pro hac vice* forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
30 Winter St., Ste. 800
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Shannon P. Minter (*pro hac vice* forthcoming)
Amy Whelan (*pro hac vice* forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

Paul R.Q. Wolfson (D.C. Bar No. 414759)
WILMER CUTLER PICKERING HALE & DORR
    LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Alan E. Schoenfeld (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
    HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Adam M. Cambier (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
    HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

Attorneys for Plaintiffs