**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JOHN DOE 1, REGAN V. KIBBY, and DYLAN KOHERE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; the UNITED STATES DEPARTMENT OF THE ARMY; RYAN D. MCCARTHY, in his official capacity as Secretary of the Army; the UNITED STATES DEPARTMENT OF THE NAVY; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE AIR FORCE; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; the UNITED STATES COAST GUARD; ELAINE C. DUKE, in her official capacity as Secretary of Homeland Security; the DEFENSE HEALTH AGENCY; RAQUEL C. BONO, in her official capacity as Director of the Defense Health Agency; and the UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No. 17-cv-1597 (CKK)

## PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65(c), and supported by the Memorandum and Declarations submitted herewith, Plaintiffs move for a preliminary injunction prohibiting Defendants from implementing President Trump's ban on transgender people serving in the Armed Forces.  The specific relief sought herein is described in the accompanying Memorandum.

1

For the reasons set forth in the Amended Complaint, the Memorandum in Support of Plaintiffs' Application for a Preliminary Injunction and the Notice of Request for Expedited Hearing and Statement of Facts Making Expedition Essential, Plaintiffs request that an oral hearing be held on an expedited basis pursuant to Local Civil Rules 7(f) and 65.1(d).

A proposed order granting injunctive relief is submitted with this motion.

August 31, 2017

Respectfully submitted,

*/s/ Kevin M. Lamb*

Claire Laporte (*pro hac vice* forthcoming)
Matthew E. Miller (*pro hac vice* forthcoming)
Daniel McFadden (*pro hac vice* forthcoming)
Kathleen M. Brill (*pro hac vice* forthcoming)
Michael Licker (*pro hac vice* forthcoming)
Rachel C. Hutchinson (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Paul R.Q. Wolfson (D.C. Bar No. 414759)
Kevin M. Lamb (D.C. Bar No. 1030783)
WILMER CUTLER PICKERING HALE & DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Jennifer Levi (*pro hac vice* forthcoming)
Mary L. Bonauto (*pro hac vice* forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
30 Winter St., Ste. 800
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Alan E. Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Shannon P. Minter (*pro hac vice* forthcoming)
Amy Whelan (*pro hac vice* forthcoming)
Chris Stoll (*pro hac vice* forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

Christopher R. Looney (*pro hac vice* forthcoming)
Harriet Hoder (*pro hac vice* forthcoming)
Adam M. Cambier (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

Nancy Lynn Schroeder (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE & DORR LLP
350 S. Grand Ave., Ste. 2100
Los Angeles, California 90071
Telephone: 213-443-5300
Fax: 213-443-5400

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JOHN DOE 1, REGAN V. KIBBY, and DYLAN KOHERE,　　　　　　　　　　　Plaintiffs,　　v.　　DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; the UNITED STATES DEPARTMENT OF THE ARMY; RYAN D. MCCARTHY, in his official capacity as Secretary of the Army; the UNITED STATES DEPARTMENT OF THE NAVY; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE AIR FORCE; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; the UNITED STATES COAST GUARD; ELAINE C. DUKE, in her official capacity as Secretary of Homeland Security; the DEFENSE HEALTH AGENCY; RAQUEL C. BONO, in her official capacity as Director of the Defense Health Agency; and the UNITED STATES OF AMERICA,　　　　　　　　　　　Defendants. | Civil Action No. 17-cv-1597 (CKK) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

    A.    Background On Transgender Military Service ....................................................... 2

    B.    President Trump's Ban And Its Implementation .................................................... 7

    C.    Plaintiffs' Military Service ..................................................................................... 9

ARGUMENT ....................................................................................................................... 11

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
CONSTITUTIONAL AND EQUITABLE CLAIMS ....................................................... 12

    A.    The Ban Violates Plaintiffs' Right To Equal Protection Under The
Law ...................................................................................................................... 13

        1.    The ban warrants strict scrutiny because it discriminates
based on transgender status ...................................................................... 13

        2.    At a minimum, the ban warrants intermediate scrutiny
because it is also a sex-based classification .............................................. 15

        3.    The ban cannot satisfy any level of review ............................................... 16

    B.    The Ban Violates Plaintiffs' Right To Due Process ............................................ 20

        1.    The ban lacks any rational basis ............................................................... 21

        2.    The ban impermissibly burdens Plaintiffs' fundamental
right to autonomy ...................................................................................... 22

        3.    The ban unconstitutionally penalizes Plaintiffs for conduct
encouraged by the 2016 policy ................................................................. 23

    C.    Estoppel Precludes Enforcement Of The Ban Against Plaintiffs ......................... 26

II.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT AN
INJUNCTION ............................................................................................................... 29

III.    THE BALANCE OF THE EQUITIES FAVORS AN INJUNCTION ............................... 34

IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION ................................................ 36

CONCLUSION............................................................................................................................39

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)..................................................11

*Able v. United States*, 968 F. Supp. 850 (E.D.N.Y. 1997).............................................31

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ...............................14

*American Freedom Defense Initiative v. Washington Metropolitan Area Transit
    Authority*, 898 F. Supp. 2d 73 (D.D.C. 2012).........................................................37

*ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104 (D.C. Cir. 1988) ...............................26

*Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986) ............................23

*Bartko v. SEC*, 845 F.3d 1217 (D.C. Cir. 2017) .........................................................26

*Board of Education of Highland Local School District v. U.S. Department of
    Education*, 208 F. Supp. 3d 850 (S.D. Ohio 2016)................................................14

*Bonds v. Heyman*, 950 F. Supp. 1202 (D.D.C. 1997)..................................................33

*Bowen v. Gilliard*, 483 U.S. 587 (1987) ....................................................................13

*Brocksmith v. United States*, 99 A.3d 690 (D.C. 2014)..............................................14

*Carcano v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) .......................................23

*Caspar v. Snyder*, 77 F. Supp. 3d 616 (E.D. Mich. 2015) ..........................................30

*Chalk v. U.S. District Court Central District of California*, 840 F.2d 701 (9th Cir.
    1988) .....................................................................................................................30

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).........29

*Chappell v. Wallace*, 462 U.S. 296 (1983) ...............................................................12

*Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883 (11th Cir. 2016) ............15

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) .........................13, 25

*Collins v. Brewer*, 727 F. Supp. 2d 797 (D. Ariz. 2010) ............................................17

*ConverDyn v. Moniz*, 68 F. Supp. 3d 34 (D.D.C. 2014)..............................................34

*Cooney v. Dalton*, 877 F. Supp. 508 (D. Haw. 1995).................................................30

*Corniel-Rodriguez v. Immigration & Naturalization Service*, 532 F.2d 301 (2d Cir. 1976)..........................................................................................28

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)............................................20, 23

*Cox v. Louisiana*, 379 U.S. 559 (1965) ....................................................................24, 25

*Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1976) ............................................12, 19

*Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) .................22

*Dahl v. Secretary of U.S. Navy*, 830 F. Supp. 1319 (E.D. Cal. 1993) ..........................12

*Dragovich v. U.S. Department of Treasury*, 848 F. Supp. 2d 1091 (N.D. Cal. 2012) ...........................................................................................................21

*DynaLantic Corp. v. U.S. Department of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012) ...........................................................................................................29

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 2017 WL 3141907 (D.D.C. July 24, 2017) .........................11

*Elzie v. Aspin*, 841 F. Supp. 439 (D.D.C. 1993) ....................................12, 30, 33, 36, 37

*Emory v. Secretary of Navy*, 819 F.2d 291 (D.C. Cir. 1987).........................................12

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .......................................25

*Evancho v. Pine-Richland School District*, 237 F. Supp. 3d 267 (W.D. Pa. 2017)......................14

*Fabian v. Hospital of Central Connecticut*, 172 F. Supp. 3d 509 (D. Conn. 2016) .....................16

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...........................................25

*Finkle v. Howard County*, 12 F. Supp. 3d 780 (D. Md. 2014) ......................................16

*Fisher v. University of Texas at Austin*, 133 S. Ct. 2411 (2013) ..................................16

*Frontiero v. Richardson*, 411 U.S. 677 (1973) .............................................................13

*General Accounting Office v. General Accounting Office Personnel Appeals Board*, 698 F.2d 516 (D.C. Cir. 1983) ...........................................................28

*Genesis Health Ventures, Inc. v. Sebelius*, 798 F. Supp. 2d 170 (D.D.C. 2011) ..........................26

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ..................................................15, 16

*Goings v. Court Services & Offender Supervision Agency for District of Columbia*, 786 F. Supp. 2d 48 (D.D.C. 2011) ................................................29

*Goldman v. Weinberger*, 475 U.S. 503 (1986) ............................................................12

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ................................................29, 36

*Graham v. Richardson*, 403 U.S. 365 (1971) ...........................................................17

*Grumman Ohio Corp. v. Dole*, 776 F.2d 338 (D.C. Cir. 1985).................................28

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966)..........................23

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51
    (1984) .................................................................................................................27

*Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000) ................................14, 22

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013)....................36

*INS v. St. Cyr*, 533 U.S. 289 (2001)..........................................................20, 25, 26

*Investors Research Corp. v. SEC*, 628 F.2d 168 (D.C. Cir. 1980) ...........................26

*Johnson v. Williford*, 682 F.2d 868 (9th Cir. 1982)..................................................28

*Keating v. FERC*, 569 F.3d 427 (D.C. Cir. 2009)......................................................26

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994)....................................24, 25, 26

*Larsen v. U.S. Navy*, 486 F. Supp. 2d 11 (D.D.C. 2007) ..........................................12

*Lawrence v. Texas*, 539 U.S. 558 (2003)....................................................12, 21, 22, 23

*Log Cabin Republicans v. United States*, 2012 WL 12952732 (C.D. Cal. Mar. 15,
    2012) ...................................................................................................................30

*Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015)........................................15

*Lyng v. Castillo*, 477 U.S. 635 (1986) ......................................................................13

*Macy v. Holder*, 2012 WL 1435995 (EEOC Apr. 20, 2012) .....................................16

*Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976).......................13

*Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, 861 F.3d 206
    (D.C. Cir. 2017) .................................................................................................26

*Matlovich v. Secretary of Air Force*, 591 F.2d 852 (D.C. Cir. 1978)........................12

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).............................................22, 24

*McVeigh v. Cohen*, 983 F. Supp. 215 (D.D.C. 1998) ...............................................32, 34

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)...................................................37

*Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974) .....................................17

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009).....................................29

*Minney v. U.S. Office of Personnel Management*, 130 F. Supp. 3d 225 (D.D.C. 2015) ..........................................................................................................32

*Moser v. United States*, 341 U.S. 41 (1951) ............................................................28

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)...........................................21, 22, 23

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) ...................22

*Plyler v Doe*, 457 U.S. 202 (1982)..........................................................................13

*Powell v. Marsh*, 560 F. Supp. 636 (D.D.C. 1983)......................................................28

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ...................................................16

*Raley v. Ohio*, 360 U.S. 423 (1959).........................................................................25

*Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1 (D.D.C. 2002)..............................32

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ..........................................................22

*Rochin v. California*, 342 U.S. 165 (1952) ..........................................................23, 25

*Romer v. Evans*, 517 U.S. 620 (1996)........................................17, 20, 22, 29

*Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000) ..............................16

*Rostker v. Goldberg*, 453 U.S. 57 (1981) .................................................................12

*Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008)...........................................15

*Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000) .................................................16

*Selland v. Aspin*, 832 F. Supp. 12 (D.D.C. 1993) ......................................................35

*Simms v. D.C.*, 872 F. Supp. 2d 90 (D.D.C. 2012) .....................................................29

*Singh v. Carter*, 168 F. Supp. 3d 216 (D.D.C. 2016) .....................................12, 34, 36

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) ................................................16

*Strauder v. West Virginia*, 100 U.S. 303 (1879).........................................................31

*United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655 (1973)...........................25

*United States v. Virginia*, 518 U.S. 515 (1996) .......................................................17, 32

*United States v. Windsor*, 133 S. Ct. 2675 (2013) .........................................21

*Village or Arlington Heights v.Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)......................................................................................20

*Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) ....................................28

*Wayte v. United States*, 470 U.S. 598 (1985)...............................................12

*Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017) ................................................14, 16

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)...............................34, 35

*Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008) .......................12

## STATUTORY PROVISIONS

10 U.S.C.
      § 111.......................................................................................................3
      § 113.......................................................................................................3
      § 5063.....................................................................................................3

14 U.S.C. § 3 .......................................................................................................3

## OTHER AUTHORITIES

117 Cong. Rec. 35,311 (1971).............................................................................31

## INTRODUCTION

In June 2016, the United States Department of Defense ("DOD") announced that it would allow transgender people to serve openly in the United States Armed Forces.  That policy was the result of a lengthy review process by high-ranking military personnel, who concluded that permitting transgender people to serve would have no adverse effect on military readiness or effectiveness.  Relying on that announcement, Plaintiffs in this case and many other service members identified themselves as transgender to their commanding officers.

On July 26, 2017, President Trump reversed course and announced that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  In the wake of that announcement, Plaintiffs and other transgender service members began to experience a variety of harms, including denials of medical care, reenlistment, promotions, commissions, and deployments.  On August 25, the President confirmed that, effective March 23, 2018, the Armed Forces would "return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016," no longer "permitting transgender individuals to serve openly in the military," and no longer "authorizing the use of the Departments' resources to fund sex-reassignment surgical procedures"  The President's directive also continued indefinitely DOD's delay in implementing the June 2016 open service policy on accessions.  As a result of that memorandum, transgender people are indefinitely barred from accession (entry into the military), and currently serving transgender service members will no longer be eligible for service as of March 23, 2018.

The President's directive broke faith with transgender men and women who counted on their government's promise that they could serve openly.  It is an unprecedented attack on service members who have committed their lives to serve the United States.  It is also

unconstitutional, violating Plaintiffs' Fifth Amendment rights to equal protection and due process. And it tramples bedrock estoppel principles that preclude the government from inducing reasonable reliance on its policies and then penalizing those who do so.

Plaintiffs seek a preliminary injunction barring enforcement of the President's directive. The unconstitutionality of the ban on military service by transgender people coupled with the irreparable injuries Plaintiffs have suffered—and will continue to suffer—warrant injunctive relief. The President's directive has diminished the service of capable, honorable service members based on a characteristic that has nothing to do with their ability to serve. The ban marks transgender service members as unequal and dispensable, stigmatizing them in the eyes of their fellow service members and depriving them of the unique honor and status associated with uniformed service to their country. Because the public has no interest in enforcing an unconstitutional policy and has every interest in the continued service of capable and dedicated service members, both the balance of the equities and the public interest weigh in favor of granting an injunction here.

## STATEMENT OF FACTS

### A.    Background On Transgender Military Service

Before 2014, DOD operated under a series of medical and administrative regulations that had the effect of barring transgender people from entering the military and authorizing them to be discharged.[1]  Specifically, DOD listed "current or history of … transsexualism" and "change of sex" as disqualifying conditions for accession, and "sexual gender and identity disorders" as conditions triggering separation from the military.  Declaration of Kevin M. Lamb ("Lamb

---

[1]     DOD is an executive department of the United States composed of, among other divisions, the Department of the Army, Department of the Navy, and the Department of the Air Force.  10 U.S.C. § 111.  The Secretary of Defense "is the principal assistant to the President in all matters relating to the Department of Defense."  *Id.* § 113. The Marine Corps is part of the Department of the Navy.  *Id.* § 5063.  The Coast Guard is a service in the Department of Homeland Security, except when operating as a service in the Navy.  14 U.S.C. § 3.

Decl.") Ex. B at 7-9.  It became clear by 2014, however, that every branch of the military had highly valued members who were transgender but who did not disclose their transgender status due to DOD's regulations.  Declaration of Secretary of the Air Force Debra Lee James ("James Decl.") ¶ 7; Declaration of Secretary of the Army Eric K. Fanning ("Fanning Decl.") ¶ 11.  In August 2014, DOD issued a new regulation that eliminated a department-wide list of conditions that would disqualify people from retention in military service, including the categorical ban on open service by transgender people.  James Decl. ¶ 8; Fanning Decl ¶ 12.  This new regulation instructed each branch of the Armed Forces to reassess whether disqualification based on these conditions, including the ban on service by transgender individuals, was justified.  James Decl. ¶ 8; Fanning Decl. ¶ 12.  As of August 2014, there was no longer a DOD-wide position on whether transgender people should be disqualified for retention.  James Decl. ¶ 8; Fanning Decl. ¶ 12.

In July 2015, Secretary of Defense Ashton Carter ordered Brad Carson, Acting Under Secretary of Defense for Personnel and Readiness, to convene a working group to identify the practical issues related to transgender Americans serving openly in the Armed Forces, and to develop an implementation plan that addressed those issues with the goal of maximizing military readiness (the "Working Group").  *See* Declaration of Acting Under Secretary of Defense for Personnel and Readiness Brad Carson ("Carson Decl.") ¶ 8 & Ex. A; James Decl. ¶ 9; Fanning Decl. ¶ 15; Declaration of Secretary of the Navy Ray Mabus ("Mabus Decl.") ¶ 8.  The Working Group included both senior uniformed officers and senior civilian officers from each military department.  *See* Carson Decl. ¶ 9 & Ex. A; *see also* James Decl. ¶ 12.  The proceedings of the Working Group were regularly reported to and reviewed by senior DOD personnel at meetings attended by the Joint Chiefs of Staff, the Chairman, the Vice Chairman, the Service Secretaries,

the Secretary of Defense, and the Assistant Secretary of Defense.  Mabus Decl. ¶ 20.  For the

duration of the Working Group's proceedings, DOD also directed that no service member "be

involuntarily separated or denied reenlistment or continuation of active or reserve service on the

basis of their gender identity, without the personal approval of the Under Secretary of Defense

for Personnel and Readiness."  Carson Decl. Ex. A.

      As part of its comprehensive review, the Working Group sought to identify and address

all relevant issues relating to service by openly transgender individuals, including those related to

military readiness, operational effectiveness, and the cost of medical care.  Carson Decl. ¶¶ 22-

26; James Decl. ¶ 11; Fanning Decl. ¶¶ 18-22; Mabus Decl. ¶¶ 15-19.  The Working Group

considered information provided by medical and other experts, senior military personnel who

supervised transgender service members, and transgender service members on active duty.

Carson Decl. ¶ 10; James Decl. ¶ 12; Fanning Decl. ¶ 17; Mabus Decl. ¶ 12.  The Working

Group consulted with representatives from the armed forces of other nations that permit openly

transgender people to serve.  James Decl. ¶ 17; Mabus Decl. ¶ 17.  The Working Group also

commissioned the RAND Corporation—an organization formed after World War II to connect

military planning with research and development decisions and which now operates as an

independent think tank financed by the U.S. government—to study the impact of permitting

transgender service members to serve openly.  Carson Decl. ¶¶ 11-21; *see id.* Ex. B ("RAND

Report").

      The RAND Report reviewed all of the relevant scholarly literature and empirical data,

including the extensive medical literature, actuarial data, and research and reports from the

eighteen other countries that permit open service by transgender personnel.  It concluded that

allowing transgender people to serve openly would have no adverse impact on unit cohesion,

operational effectiveness, or readiness.  RAND Report at xiii, 39-47.  In addition, the RAND

Report concluded that healthcare costs for transgender service members would represent "an

exceedingly small proportion" of overall DOD healthcare expenditures and that even this *de*

*minimis* incremental cost would likely be offset by savings through diminished rates of other

healthcare costs that would be achieved by providing service members with necessary transition-

related medical care.  *Id.* at xi; Carson Decl. ¶ 16.

Following its review, the Working Group concluded that prohibiting transgender people

from military service would undermine military effectiveness and readiness.  The Working

Group concluded that "banning service by openly transgender persons would require the

discharge of highly trained and experienced service members, leaving unexpected vacancies in

operational units and requiring the expensive and time-consuming recruitment and training of

replacement personnel."  Carson Decl. ¶ 25; *see also* James Decl. ¶ 20; Fanning Decl. ¶ 21;

Mabus Decl. ¶ 18.  The Working Group also concluded "that banning service by openly

transgender persons would harm the military by excluding qualified individuals based on a

characteristic with no relevance to a person's fitness to serve."  Carson Decl. ¶ 26; *see also*

James Decl. ¶ 46; Fanning Decl. ¶ 58; Mabus Decl. ¶¶ 45-46.  The Working Group, including all

senior uniformed military personnel, thus agreed that transgender people should be permitted to

serve openly in the United States Armed Forces.  Carson Decl. ¶ 27; James Decl. ¶ 22; Fanning

Decl. ¶ 26; Mabus Decl. ¶ 21.

On June 30, 2016, Secretary Carter announced that the needs of the military would be

best served by permitting openly transgender people to serve and that "[e]ffective immediately,

transgender Americans may serve openly and they can no longer be discharged or otherwise

separated from the military just for being transgender."  Lamb Decl. Ex. F ("Carter Remarks") at

4.  Secretary Carter set forth in detail the reasons for the policy.  He observed that transgender service members are "talented and trained Americans who are serving their country with honor and distinction.  We invest hundreds of thousands of dollars to train and develop each individual, and we want to take the opportunity to retain people whose talent we've invested in and who have proven themselves."  *Id.* at 1.  He noted that providing medical care for transgender individuals "is becoming common and normalized—in both public and private sectors alike." *Id.* at 3.  Secretary Carter also cite the RAND Corporation's findings that there would be "minimal readiness impacts from allowing transgender servicemembers to serve openly," and that "the health care costs would represent … 'an exceedingly small proportion' of DoD's overall health care expenditures."  *Id.* at 3-4.

The same day, Secretary Carter issued Directive-Type Memorandum 16-005 ("DTM 16-005"), which set forth the policy "that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness," and that, "[c]onsistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military."  Fanning Decl. ¶ 30 & Ex. C; James Decl. ¶ 25 & Ex. B; Mabus Decl. ¶ 23 & Ex. C ("DTM 16-005").  Secretary Carter gave DOD 90 days to "complete and issue both a commander's guidebook … for leading currently serving transgender service members, and medical guidance to doctors for providing transition-related care, if required, to currently-serving transgender servicemembers."  Carter Remarks at 6.  Within one year, the military was required to "begin accessing transgender individuals who meet all standards, holding them to the same physical and mental fitness standards as everyone else who wants to join the military."  *Id.*  Each of the military departments undertook the steps necessary to implement DTM 16-005 in their respective service branches, *see* James Decl ¶ 27; Fanning Decl.

¶ 41; Mabus Decl. ¶ 25, and DOD issued a 71-page implementation handbook setting forth guidance to both military service members and commanders about how to implement and understand the new policies enabling open service of transgender service members, *see* Mabus Decl. Ex. F ("DOD Handbook").

### B.       President Trump's Ban And Its Implementation

On July 26, 2017, President Trump announced in a series of tweets that he would reverse DOD's policy on transgender service members, stating that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military," citing the purportedly "tremendous medical costs and disruption that transgender in the military would entail."

The President's announcement was quickly condemned by high-ranking retired military officers.  In an open letter, a group of fifty-six retired generals and admirals decried the ban, stating that it would "deprive the military of mission-critical talent … [and] would degrade readiness even more than the failed 'don't ask, don't tell' policy."  Lamb Decl. Ex. E.

The President's announcement caused immediate concern among service members. Declaration of John Doe 1 ("John Doe 1 Decl.") ¶ 23; Declaration of Regan V. Kibby ("Kibby Decl.") ¶ 31.  Transgender service members began to face adverse treatment, including denials of promotions and commissions and delays in medical treatment.  John Doe 1 Decl. ¶ 24; Declaration of Jane Doe 1 ("Jane Doe 1 Decl.") ¶¶ 24, 27.  On August 16, 2017, the DOD Defense Health Agency circulated a memo stating that "[s]urgery related to gender transition is to be held at this time, effective now, pending further guidance."  Jane Doe 1 Decl. ¶ 25.  It also indicated that "any planned surgeries for gender transition must be cancelled at this time."  *Id.*  It specifically referred to the need for "additional guidance from DoD in response to forthcoming guidance from the administration in respect to transgender service."  *Id.*  Consistent with that

announcement, medical consultations and procedures relating to gender transition have been canceled.  John Doe 1 Decl. ¶ 24; Jane Doe 1 Decl. ¶ 24.

On August 25, 2017, the President issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security banning transgender people from military service.  Lamb Decl. Ex. A ("Pres. Mem.").  The President stated, "In my judgment, the previous Administration failed to identify a sufficient basis to conclude that terminating the [military's] longstanding policy and practice [forbidding service by transgender service members] would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and there remain meaningful concerns that further study is needed to ensure that continued implementation of last year's policy changes would not have those negative effects."  *Id.* § 1(a).

The President's directive has three components.  First, it imposes a blanket and indefinite ban on accession.  Secretary Carter announced on June 30, 2016 that enlistment of transgender applicants would begin July 1, 2017.  Fanning Decl. ¶ 37 & Ex. C at 4.  Secretary Mattis postponed the enlistment policy until January 1, 2018.  Lamb Decl. Ex. C.  The President's directive continues the accession ban indefinitely.  Second, the President's directive bans the retention of transgender service members and requires their separation from the military by directing that, as of March 23, 2018, military policy shall "return" to the pre-June 2016 rules that excluded transgender people from enlisting or serving openly.  Pres. Mem. § 1(b).  It directs the Secretaries of Defense and Homeland Security to develop a plan by February 21, 2018 to implement the ban, including with respect to "transgender individuals currently serving in the United States military."  *Id.* § 3.  Finally, the directive halts the use of military resources as of March 23, 2018 to "fund sex reassignment surgical procedures for military personnel," subject to limited exceptions.  *Id.* § 2(b).

On August 29, 2017, Secretary Mattis issued Release No. NR-312-17, stating that DOD "will carry out the president's policy direction, in consultation with the Department of Homeland Security." Lamb Decl. Ex. D at 1.

### C.    Plaintiffs' Military Service

Plaintiffs include six transgender service members who collectively have served decades in the U.S. Army, Air Force, and Coast Guard. Jane Doe 1 Decl. ¶ 1; Declaration of Jane Doe 2 ("Jane Doe 2 Decl.") ¶¶ 3, 5; Declaration of Jane Doe 3 ("Jane Doe 3 Decl.") ¶ 2; Declaration of Jane Doe 4 ("Jane Doe 4 Decl.") ¶ 1; John Doe 1 Decl. ¶ 1. They serve as infantry soldiers, drivers, medical administrators, information technology specialists, and human resources specialists. Jane Doe 3 Decl. ¶¶ 4-5; Jane Doe 2 Decl. ¶ 6; John Doe 1 Decl. ¶ 16; Jane Doe 1 Decl. ¶ 10; Jane Doe 4 Decl. ¶¶ 8, 10. They have deployed to Afghanistan and Iraq, Jane Doe 3 Decl. ¶ 4; Jane Doe 4 Decl. ¶ 6, Jane Doe 2 Decl. ¶ 7, hold "secret"-level security clearances, Jane Doe 1 Decl. ¶ 11, have been designated as team leaders due to the leadership they displayed in the field, Jane Doe 3 Decl. ¶ 5, and have served as executive officers for their units, John Doe 1 Decl. ¶¶ 8, 16. Plaintiffs have received strong evaluations for the work they have done and for their leadership performance, *see, e.g.*, *id.* ¶¶ 12, 15, and in recognition of their exemplary service, the military has awarded them an array of medals, commendations, and ribbons, Jane Doe 1 Decl. ¶ 11.

Plaintiffs also include two prospective service members who are transgender, one who enrolled in the Naval Academy, and the other who has entered the Army Reserve Officers' Training Corps ("ROTC"). Kibby Decl. ¶ 8; Declaration of Dylan Kohere ("Kohere Decl.") ¶¶ 3-4. Both chose to come out as transgender to their command and peers in reliance on the June 2016 announcement that transgender individuals will be permitted to enter military service. Kibby Decl. ¶¶ 14-15; Kohere Decl. ¶ 15. Based on the newly issued directive, they are

ineligible for military service upon graduation, and absent this Court's intervention face irreparable harm as a result of their exclusion from accession.  Kibby Decl. ¶ 33; Kohere Decl. ¶ 15.

The United States has invested significant amounts of time and money in training Plaintiffs, including by paying their tuition at service academies and graduate schools, training them to fulfill specialized job functions, and sending them to officer leadership courses.  *See, e.g.*, Jane Doe 1 Decl. ¶¶ 3, 6; John Doe 1 Decl. ¶¶ 5, 12.  Plaintiffs in turn have invested in the military:  Each feels a strong sense of duty to their mission and to their role in maximizing military effectiveness and readiness.  *See, e.g.*, Jane Doe 1 Decl. ¶ 36; Jane Doe 3 Decl. ¶¶ 10, 12, 17.  Some belong to families with proud histories of serving in the military and have spent their entire lives aspiring to serve.  *See, e.g.*, John Doe 1 Decl. ¶ 3; Kibby Decl. ¶ 3; Kohere Decl. ¶ 2.  Plaintiffs have built their lives and careers around their military service.  *See, e.g.*, Jane Doe 1 Decl. ¶ 30; Jane Doe 4 Decl. ¶¶ 15-16.  They have put the needs of the Armed Forces ahead of their personal needs, working with their command to make sure that medical treatments do not interfere with trainings, field exercises, and deployment.  *See, e.g.*, John Doe 1 Decl. ¶ 17; Jane Doe 3 Decl. ¶ 12.

Plaintiffs relied on the military's commitment that transgender people could serve openly. Jane Doe 2 Decl. ¶ 10; Jane Doe 4 Decl. ¶ 13; Kibby Decl. ¶¶ 13-15; Kohere Decl. ¶ 15; *see also* Jane Doe 1 Decl. ¶¶ 18-20; John Doe 1 Decl. ¶¶ 13-14.  The recently announced ban has caused them serious, immediate harms.  One faces dismissal from the Naval Academy and loss of a naval career, Kibby Decl. ¶¶ 36-39; another faces dismissal from his ROTC program just as he begins a lifelong dream of military service, Kohere Decl. ¶¶ 15-19; another faces inability to reenlist less than eighteen months before hitting her twenty year service mark, Jane Doe 4 Decl.

¶¶ 16-17; two Plaintiffs have been denied medical care, John Doe 1 Decl. ¶ 24; Jane Doe 1 Decl.

¶ 24; and all face direct financial consequences and loss of healthcare for themselves and their

families, *e.g.*, Jane Doe 3 Decl. ¶ 16; Jane Doe 1 Decl. ¶¶ 27, 30-32; Jane Doe 2 Decl. ¶¶ 16-18;

John Doe 1 Decl. ¶¶ 27-29.

Plaintiffs view the ban on transgender service members as a betrayal, having been told

that they would be allowed to serve openly, and having come out to their command as

transgender in reliance on this promise. *E.g.*, John Doe 1 Decl. ¶ 27; Jane Doe 1 Decl. ¶¶ 16, 28.

They are each gravely injured by the President's announced ban, which officially relegates them

to an inferior, stigmatized status among their fellow service members, degrades them in the eyes

of the world, and declares them unfit solely because they are transgender—despite the fact that

they have dedicated their lives to military service and that the ban has nothing to do with their

individual capabilities. *See, e.g.*, Jane Doe 2 Decl. ¶¶ 19-20; Kibby Decl. ¶ 41.  Being a service

member has been a fundamental and defining aspect of Plaintiffs' lives, according them the

unique status, meaning, leadership experience, and reputation that military service entails. *See,*

*e.g.*, Jane Doe 1 Decl. ¶ 36; Jane Doe 4 Decl. ¶ 15; Kibby Decl. ¶¶ 37-41.  Depriving them of

their ability to serve is tantamount to depriving them of equal citizenship.

## ARGUMENT

This Court should enjoin the President's ban on military service by transgender

individuals because it is unconstitutional and because Plaintiffs have suffered serious and

irreparable harms that will continue absent this Court's intervention.  *See Aamer v. Obama*, 742

F.3d 1023, 1038 (D.C. Cir. 2014) (standard for preliminary injunction); *Electronic Privacy Info.*

*Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1320-CKK, 2017 WL

3141907, at *4 (D.D.C. July 24, 2017) (same).  As this Court has repeatedly recognized, military

personnel policy that runs afoul of basic constitutional protections is subject to ordinary federal

court review and ought to be enjoined. *See, e.g., Singh v. Carter*, 168 F. Supp. 3d 216, 219 (D.D.C. 2016) (enjoining specialized training for Sikh service member alleged to violate his rights to religious freedom); *Elzie v. Aspin*, 841 F. Supp. 439, 442 (D.D.C. 1993) (granting preliminary injunction barring separation of gay service member, and rejecting government's argument that court should "defer to the 'considered professional judgment' of military officials as to who is fit to serve their country in the armed forces"). The public has no interest in the enforcement of this unconstitutional directive, particularly when it will serve only to deprive the United States of the loyal and capable service of thousands of transgender service members.

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL AND EQUITABLE CLAIMS

The President has directed the military to discriminate against a single named group in one of the Nation's cornerstone civic institutions. This categorical targeting of transgender individuals violates equal protection and due process.[2] And it breaks faith with the representations the government made under DTM 16-005—representations on which Plaintiffs reasonably relied in planning their lives, their careers, and their healthcare. Thus, Plaintiffs' claims are likely to succeed on the merits.

---

[2]     Although "constitutional review" of military regulations is often "more deferential than [such] review of similar … regulations designed for civilian society," *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), military personnel decisions are subject to equal protection and due process constraints. *See, e.g., Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (applying due process review dictated by *Lawrence v. Texas*, 539 U.S. 558 (2003), to "Don't Ask, Don't Tell" policy); *Emory v. Sec'y of Navy*, 819 F.2d 291, 294, 260 (D.C. Cir. 1987) ("The military has not been exempted from constitutional provisions that protect the rights of individuals. It is precisely the role of the courts to determine whether those rights have been violated." (citation omitted)); *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("[T]he military is subject to the Bill of Rights and its constitutional implications."); *Matlovich v. Sec'y of Air Force*, 591 F.2d 852, 859 (D.C. Cir. 1978) ("the federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution"); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 18-19 (D.D.C. 2007) (rejecting Navy's contention "its personnel decisions are immune from judicial scrutiny where constitutional wrongs are alleged"); *Dahl v. Sec'y of U.S. Navy*, 830 F. Supp. 1319, 1328 (E.D. Cal. 1993) ("the essence of individual constitutional rights … remain[s] intact" in military). In any event, none of the traditional justifications for deference applies to the President's directive, which disregards and reverses the considered judgment of military experts. *Cf. Wayte v. United States*, 470 U.S. 598, 611-612 (1985) (military necessity); *Chappell v. Wallace*, 462 U.S. 296, 300, 305 (1983) (institutional competence; separateness of military community); *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981) (separation of powers).

## A.      The Ban Violates Plaintiffs' Right To Equal Protection Under The Law

This status-based enactment barring all and only transgender people from serving in the military is overt discrimination.  Such discrimination against transgender people is inherently suspect and therefore triggers strict scrutiny.  At a minimum, it is discrimination based on a person's sex—which is subject to intermediate review.  And here, where there is no rational relationship between transgender status and any of the President's asserted justifications, the ban fails even the most deferential equal protection review.

### 1.      The ban warrants strict scrutiny because it discriminates based on transgender status.

Policies that expressly target transgender people meet all of the traditional criteria for a suspect classification that warrants strict scrutiny.  The Supreme Court has recognized that certain classifications are inherently suspect because they single out discrete groups that have historically and unjustifiably been oppressed.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (looking to "a 'history of purposeful unequal treatment' … on the basis of stereotyped characteristics not truly indicative of [group members'] abilities"); *Massachusetts Board of Retirees v. Murgia*, 427 U.S. 307, 312-313 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).  In determining whether a particular classification is suspect, the Court has considered—beyond past discrimination that is unrelated to the abilities and performance of group members—the group's relative political powerlessness and the immutability or centrality of its defining characteristics.  *See, e.g.*, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *Plyler v Doe*, 457 U.S. 202, 216 n.4 (1982).

Transgender status is a quintessential suspect classification.  Transgender people have been "'saddled with … disabilities, … subjected to … a history of purposeful unequal treatment, [and] relegated to … a position of political powerlessness.'"  *Murgia*, 427 U.S. at 312-313.  "The

hostility and discrimination [they] face in our society today is well-documented," *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014), including by staggering rates of harassment, discrimination, and other mistreatment at school and at work, as well as in access to employment, housing, and healthcare, *see Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).  And while discrimination against transgender people exacts a toll on them, no "data or argument suggest[s] that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F. Supp. 3d at 139.  As the military contributions of Plaintiffs and thousands of other transgender service members make clear, transgender status has no bearing on aptitude or performance. *Highland*, 208 F. Supp. 3d at 874; *see, e.g.*, Jane Doe 1 Decl. ¶¶ 4-9, 11; Jane Doe 2 Decl. ¶ 20; John Doe 1 Decl. ¶¶ 6, 15.

For transgender individuals, their transgender status is "inherent in who they are as people," *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017), and is "so fundamental" to their identity that they "should not be required to abandon" it, *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc).  Transgender people have "immutable [and] distinguishing characteristics that define them as a discrete group." *Board of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *see also* Declaration of Dr. George Brown ("Brown Decl.") ¶¶ 13-15.  And "as a tiny minority of the population, whose members are stigmatized," they have limited recourse through the political process to correct the kind of injury—a ban on military service—that brands them with a stamp of inferiority and denies them equal citizenship.  *Highland*, 208 F. Supp. 3d at 874.

###### 2.      At a minimum, the ban warrants intermediate scrutiny because it is also a sex-based classification.

A ban on military service by transgender people also classifies service members based on sex because being transgender can only be understood relative to a person's sex.  *See, e.g.*, *Love v. Johnson*, 146 F. Supp. 3d 848, 850-851 (E.D. Mich. 2015).  The definition of being transgender rests on there being a difference between a person's gender and the sex assigned to them at birth.  *Id.*; Brown Decl. ¶ 13.  Both characteristics are sex-related.  Plaintiff John Doe 1, for example, is a man who was assigned female at birth.  Had he been assigned male rather than female at birth, he would not now be facing separation from the military.  In the 2016 policy, DOD itself acknowledged that "discrimination based on gender identity is a form of sex discrimination."  DTM 16-005, Attach. at 2.

The ban likewise targets a sex-based medical procedure for denial of treatment:  gender transition.  Treating individuals differently because of a past or future gender transition is "*literally* discrimination 'because of … sex."  *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008).  The medical process of gender transition is defined by changes to one's sex characteristics.  Brown Decl. ¶ 24; *see Schroer*, 577 F. Supp. 2d at 306; *see also Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 890-892 (11th Cir. 2016); *Glenn v. Brumby*, 663 F.3d 1312, 1320-1321 (11th Cir. 2011) (transgender woman was fired based on employer's "perception" she was "'a man dressed as a woman'").  Discrimination that targets gender transition is therefore inherently sex-based, just as discrimination when someone faces hostile treatment because they have changed their religion is religion-based.  As this Court explained, if an employer had nothing against Catholics or Jews, but disapproved of converting from one faith to the other, that would surely be religious discrimination.  *Schroer*, 577 F. Supp. 2d at 306-307;

*see Macy v. Holder*, 2012 WL 1435995, at *11 (EEOC Apr. 20, 2012).  The same analysis

applies here.

Discrimination against transgender individuals is also impermissible sex stereotyping—

another form of sex discrimination, as explained in *Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989).  "A person is defined as transgender precisely because of the perception that his or her

behavior transgresses stereotypes."  *Glenn*, 663 F.3d at 1316; *see Hopkins*, 490 U.S. at 250-252

(plurality); *Whitaker*, 858 F.3d at 1047-1051; *Smith v. City of Salem*, 378 F.3d 566, 572-575 (6th

Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-216 (1st Cir. 2000); *Schwenk

v. Hartford*, 204 F.3d 1187, 1200-1203 (9th Cir. 2000).  As these and other decisions make clear,

because transgender individuals' "outward behavior and inward identity do not meet social

definitions" associated with their sex assigned at birth, *Schwenk*, 204 F.3d at 1201, there is

inherently "a congruence between discriminating against transgender … individuals and

discrimination on the basis of gender-based behavioral norms," *Glenn*, 663 F.3d at 1316.  In

targeting transgender people, the ban is discriminating against those "who, by definition, do not

conform to gender stereotypes."  *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014);

*see Fabian v. Hospital of Cent. Conn.*, 172 F. Supp. 3d 509, 526-527 (D. Conn. 2016).

Regardless of the particular doctrinal framework applied, the result is the same:  The ban

necessarily entails "a form of sex-based discrimination … subject to heightened scrutiny."

*Glenn*, 663 F.3d at 1319.

### 3.      The ban cannot satisfy any level of review.

The asserted justifications for the ban do not survive even rational basis review, much

less the heightened scrutiny required by this case.  Under strict scrutiny, the ban must be

"'narrowly tailored to further compelling governmental interests.'"  *Fisher v. University of Texas

at Austin*, 133 S. Ct. 2411, 2419 (2013).  Under the "heightened review standard" applied to

policies that discriminate based on sex, the ban must be "substantially related" to an

"exceedingly persuasive" justification.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).

And "even in the ordinary equal protection case calling for the most deferential of standards, we

insist on knowing the relation between the classification adopted and the object to be attained."

*Romer v. Evans*, 517 U.S. 620, 632-633 (1996).  As explained below, the ban fails even this most

basic test.

The President's directive cites three justifications:  (1) military effectiveness; (2) unit

cohesion; and (3) cost.  Pres. Mem. § 1(a).  While military effectiveness and unit cohesion are

important governmental interests, and considerations related to cost may be legitimate,[3] the

required connection between the ban and these asserted interests simply does not exist under any

level of review.  DOD's own comprehensive review established precisely the opposite—that

permitting transgender people to serve openly would not adversely impact any of these, and that

banning them would.  Although the President disparaged that review, his own directive had *no*

basis in any factual inquiry at all.  And there is no rational connection—much less a substantial

one, as required under heightened review—between the President's asserted concerns and the

categorical exclusion of transgender service members.

*First*, the ban does not rationally, much less narrowly or substantially, further the

government's interest in military effectiveness.  Like thousands of other transgender service

members, Plaintiffs are serving their country with distinction.  Their transgender status has no

negative impact on "operational effectiveness or readiness."  Carson Decl. ¶ 17; Fanning Decl.

---

[3]     Under well-settled law, even where cost is a legitimate factor, the government "may not protect the public fisc by drawing an invidious distinction between classes of its citizens."  *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-375 (1971); *Collins v. Brewer*, 727 F. Supp. 2d 797, 805 (D. Ariz. 2010) ("cost savings of limiting benefits" cannot justify "invidious distinction between heterosexual and homosexual State employees who are similarly situated"), *aff'd*, 656 F.3d 1008 (9th Cir. 2011).

¶¶ 51, 55; James Decl. ¶ 38; Mabus Decl. ¶¶ 37, 42-43; *id.* Ex. B, at xiii, 39-47.   The President's

memorandum offers no reasons to reject that conclusion.

The comprehensive evidence reviewed by the Working Group, and which formed the

basis of the DOD policy, showed that the impact of transition-related care on deployable

transgender service members "is negligible," amounting to only a minuscule fraction of non-

deployable labor hours.   RAND Report 46.   The RAND Report concluded that based even on the

most aggressive estimates of utilization, "we expect the annual gender transition-related health

care to be an extremely small part of overall health care provided to the [Active Component]

population."   *Id.* at 31.   In addition, as the Working Group found, there is no reason to treat this

minuscule impact any differently from the far more significant impact of other common medical

conditions that require short-term gaps in deployability, such as "pregnancy, orthopedic injuries,

obstructive sleep apnea, appendicitis, gall bladder disease, infectious disease, and myriad other

conditions."   Carson Decl. ¶ 22; *see* Declaration of Deputy Surgeon General for Mobilization,

Readiness and Army Reserve Affairs Margaret C. Wilmoth ("Wilmoth Decl.") ¶¶ 14-20.

In fact, the ban would degrade military effectiveness.   The evidence gathered and

analyzed by the Working Group showed that barring transgender personnel "would require the

discharge of highly trained and experienced service members, leaving unexpected vacancies in

operational units and requiring the expensive and time-consuming recruitment and training of

replacement personnel."   Carson Decl. ¶ 25.

*Second*, the comprehensive evidence reviewed by the Working Group similarly revealed

"no evidence that permitting openly transgender people to serve in the military would disrupt

unit cohesion."   Carson Decl. ¶ 19.   To the contrary, the available evidence, including the

experience of foreign militaries who permit openly transgender personnel to serve, showed that

the opposite is true.  *See id.* ¶ 20; Fanning ¶ 24; James Decl. ¶¶ 12-13, 17; Mabus Decl. ¶ 17.

Similar concerns were raised about policy changes permitting open service by gay and lesbian

personnel and allowing women to serve in ground combat positions; in neither case were these

concerns borne out by subsequent experience.  *See* Carson Decl. ¶ 19; Mabus Decl. ¶ 42.

*Finally*, the President's directive cites the supposedly burdensome costs of transition-

related healthcare despite DOD's conclusion, based on the Working Group's rigorous review of

all available relevant evidence, that the cost of such care is *de minimis*—mere "budget dust," as

Secretary of the Navy Ray Mabus explained.  Mabus Decl. ¶ 41.  Given the minuscule cost, it is

impossible to see a cost-based justification as anything other than pretext for invidious

discrimination, especially when the Military Health System regularly provides the same or

similar care, including hormone therapy and similar surgeries, to non-transgender service

members.  Carson Decl. ¶ 14; Wilmoth ¶¶ 14-20; Mabus Decl. Ex. C, at 8.

Even more fundamentally, this asserted rationale disregards that the purpose behind the

June 2016 policy of open service was to eliminate the differential treatment of gender dysphoria

as compared to other medical conditions and to ensure that the fitness of transgender individuals

for purposes of both accession and service was evaluated under the same medical standards

applied to all enlistees and service members.  *See* Wilmoth Decl. ¶¶ 14-20; Brown Decl. ¶¶ 25,

35.  The June 2016 policy also provided that transgender service members should receive

medical treatment based on the same standards applied to others—including being eligible for

medical services, such as hormone therapy and surgeries, that the military already provided for

non-transgender service members.  *Cf. Crawford v. Cushman*, 531 F.2d 1114, 1121-1125 (2d

Cir. 1976) (striking down a Marine Corps regulation requiring automatic discharge of pregnant

soldiers and holding the Corps had no rational basis for treating pregnant soldiers differently from soldiers with other temporary disabilities).

Because of its "sheer breadth" and its "discontinu[ity] with the reasons offered for it," the categorical ban "seems inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S. at 632.  Like the state law invalidated in *Romer*, which rescinded "protected status" for sexual orientation, the ban imposes "a broad and undifferentiated disability on a single named group." *Id*.  As *Romer* explains, "requiring that the classification bear a rational relationship to an independent and legitimate [governmental] end … ensure[s] that classifications are not drawn for the *purpose* of disadvantaging the group burdened by the law." *Id.* at 633 (emphasis added).  This inference of animus is also bolstered by the fact that the ban here constitutes an abrupt reversal of the protections previously granted to the group without any of the usual formality or process that attends the development and announcement of important military policy decisions.  Mabus Decl. ¶¶ 50-52; James Decl. ¶ 45.  The decision to target transgender people—suddenly, with no deliberative process, and for no legitimate reason—cannot withstand constitutional scrutiny under any standard of review.  *See, e.g.*, *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977) (anomalies or irregularities in how a policy is enacted may be relevant to whether it was enacted for an improper purpose).

### B.        The Ban Violates Plaintiffs' Right To Due Process

Due process requires that government act on a rational basis, not impermissibly burden the exercise of a fundamental right, and not arbitrarily upset settled expectations and commitments, especially when those expectations and commitments have been undertaken with its own express encouragement.  *INS v. St. Cyr*, 533 U.S. 289, 323 (2001); *County of Sacramento v. Lewis*, 523 U.S. 833, 845-846 (1998).  The ban fails all of these basic requirements.

*First*, as explained above, the ban lacks a rational basis.  Rather than reflecting legitimate military concerns, the only stated rationales for the ban are the very same factors that the military just two years ago comprehensively studied and found did not justify discriminatory treatment of transgender service members.  President Trump's sudden reversal of that policy was not based on new evidence or information, but simply on a desire to exclude a disfavored class of people whose defining characteristic has no relevance to fitness for military service.  *Second*, the ban impermissibly burdens Plaintiffs' exercise of the fundamental right to autonomy—a substantive due process guarantee that protects Plaintiffs' right to be transgender.  *Finally*, the ban unfairly disturbs Plaintiffs' settled expectations and commitments under DTM 16-005, a policy on which Plaintiffs Kibby and Kohere reasonably relied in notifying their superiors in the Naval Academy and ROTC of their transgender status.  For each of these reasons, Plaintiffs are likely to succeed on the merits of their due process claim.

### 1.  The ban lacks any rational basis.

Where, as here, government action "exhibits a desire to harm a politically unpopular group," "a more searching form of rational basis review" applies, *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring), incorporating both due process and equal protection principles, *see, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602-2603 (2015); *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013); *Lawrence*, 539 U.S. at 575 ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests."); *Dragovich v. U.S. Dep't of Treasury*, 848 F. Supp. 2d 1091, 1103, 1105 (N.D. Cal. 2012).  Thus, for the same reasons the ban lacks a rational basis and violates the requirement of equal protection, as explained in Part I.A.3, it also violates the requirement of due process:  The ban "is a status-based enactment divorced from any factual context from which [this Court]

could discern a relationship to legitimate state interests." *Romer*, 517 U.S. at 635.  It is rooted in "animosity" toward transgender people, *id.* at 634, and has no rational relationship to the justifications offered for it.

> **2.     The ban impermissibly burdens Plaintiffs' fundamental right to autonomy.**

Being able to live in accord with one's gender is "fundamental," *Hernandez-Montiel*, 225 F.3d at 1093; Brown Decl. ¶¶ 14-15, and is thus protected by the fundamental right to autonomy recognized by the Supreme Court under substantive due process.  The Court has consistently held that "the ability independently to define one's identity" is "central to any concept of liberty." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984); *see McDonald v. City of Chicago*, 561 U.S. 742, 879-880 (2010) (Stevens, J., dissenting) ("Self-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity and respect—these are the central values we have found implicit in the concept of ordered liberty."); *Lawrence*, 539 U.S. at 562 ("Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."); *Obergefell*, 135 S. Ct. at 2593 (holding that the liberty protected by due process "allow[s] persons, within a lawful realm, to define and express their identity").  By declaring transgender identity incompatible with military service, the President's directive prevents transgender persons—and only transgender persons—from the exercise of this most basic and comprehensive of all rights.

The right to live in accord with one's gender identity falls within the same core protection of bodily integrity and personal decision making established by these precedents.  As with abortion and life support, exercising the right may require forms of medical intervention.  *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 869 (1992); *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1992).  And as with consensual adult intimacy and marriage,

the government may not restrict the right or demean those who exercise it merely on the basis of history or tradition or the majority's views of morality or of appropriate gender behavior. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2594 (rejecting denial of rights based on sincerely held view of majority that "timeless institution" is defined by "gender-differentiated union of man and woman"); *Lawrence*, 539 U.S. at 577.  The concept of liberty that embraces these other privacy rights therefore logically extends to transgender identity.  *Cf. Carcano v. McCrory*, 203 F. Supp. 3d 615, 651 (M.D.N.C. 2016) ("transgender individuals are not exempted from … privacy … rights").

The President's ban does not affect this fundamental right for the great majority of those serving in our Nation's Armed Forces.  Because they are not transgender, their right to live in accord with their gender identity is unaffected.  But for the minority of those serving whose gender identity is not aligned with their assigned sex—transgender people—they are denied that right under the President's ban.  When a law selectively denies a protected liberty,  heightened scrutiny applies.  *See*, *e.g.*, *Obergefell*, 135 S. Ct. at 2603; *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 672 (1966).  As set forth above, *supra* Part I.A.3, the President's ban cannot survive that exacting review.

### 3.   The ban unconstitutionally penalizes Plaintiffs for conduct encouraged by the 2016 policy.

The ban also offends "canons of decency and fair play" that are fundamental to the Fifth Amendment's Due Process Clause.  *Rochin v. California*, 342 U.S. 165, 173 (1952).  The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government.'"  *Lewis*, 523 U.S. at 845-846.  The Court has also long recognized that due process does not permit the government to use

actions it permitted or (as here) encouraged as a ground to punish a party who takes them.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994).  Invoking "familiar considerations of

fair notice, reasonable reliance, and settled expectations," the Court has thus barred application

of changes in law to prior conduct, *e.g.*, *id.* at 286, and overturned convictions where a party

reasonably relied on the government's own representations about the lawfulness of the conduct,

*e.g.*, *Cox v. Louisiana*, 379 U.S. 559, 569-570 (1965).

Many transgender service members publicly identified themselves as transgender,

undertook medical treatment, and changed their gender markers in reliance on DTM 16-005.  In

addition, Plaintiffs Kibby and Kohere relied on the official policy in notifying superiors of their

transgender status at a service academy and in the ROTC, respectively—in Kibby's case,

developing a medical treatment plan based on the requirement under DTM 16-005 that

transgender individuals have eighteen months of stability in their gender identity prior to

accession.  Kibby Decl. ¶ 33; *see also* Kohere Decl. ¶ 15.  By breaking the promise that

transgender service members would be treated no differently from other service members, the

President's directive "pointlessly infringes settled expectations" and is therefore subject "to

judicial invalidation."  *McDonald*, 561 U.S. at 879 (Stevens, J., dissenting).

This due process guarantee against unjustly penalizing those who reasonably rely on the

government's representations has deep roots in the precedents of the Supreme Court.  The Court

has, among other things, repeatedly held that the government may not impose civil liability or

other adverse legal consequences on the basis of past events where, as here, the government

itself induced or authorized the relevant conduct.[4]  Rather, "the Due Process Clause[] may constrain the extent to which government can upset settled expectations when changing course." *City of Cleburne*, 473 U.S. at 471 n.22.  For example, in *INS v. St. Cyr*, 533 U.S. 289 (2001), the Court held that a statute eliminating the Attorney General's discretion to waive deportation of undocumented immigrants who were removable by reason of a criminal conviction could not be applied to those who had entered guilty pleas—and who thereby became eligible for such a waiver—before the enactment of the statute.  *Id.* at 326.  Undocumented immigrants in that situation, the Court explained, had "almost certainly relied upon th[e] likelihood [of a waiver] in deciding whether to forgo their right to a trial," and there was consequently grave "potential for unfairness" in the statute's retroactive application to their case.  *Id.* at 325; *see also Landgraf*, 511 U.S. at 286 (barring retroactive application of statutory amendments making compensatory and punitive damages available for certain federal civil rights violations).

Under these precedents, due process is not a formula applied by rote; rather, it "demands a commonsense, functional judgment about whether the new [policy or regulation] attaches new legal consequences to events completed before" that policy or regulation was adopted.  *St. Cyr*, 533 U.S. at 321 (internal quotation marks omitted); *see Landgraf*, 511 U.S. at 269-271; *Rochin*, 342 U.S. at 171-172.  Plaintiffs came out as transgender to their chain of command in reliance on official policy.  The profound unfairness of now penalizing them for doing so—including through loss of employment and healthcare and the stigma of being discharged for their transgender status—is no different from the acknowledged "unfairness" of penalizing

---

[4]     The Court has likewise repeatedly held that due process bars criminal liability for actions taken in reliance on agency regulations or statements by officials about the lawfulness of otherwise proscribed conduct. *See, e.g.*, *United States v. Pennsylvania Indus. Chem. Corp.* (*PICCO*), 411 U.S. 655, 674 (1973); *Cox*, 379 U.S. at 569-570; *Raley v. Ohio*, 360 U.S. 423, 438 (1959).  It has also required that agencies, in changing positions, take into account whether the prior policy "'engendered serious reliance interests.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

undocumented immigrants who pled guilty "[r]elying on the settled practice" of deportation

waivers. *St. Cyr*, 533 U.S. at 323. And all of the "special concerns" with statutory retroactivity

are equally implicated by the executive policymaking here, which likewise "'sweep[s] away

settled expectations suddenly and without individualized consideration'" in evident "'respons[e]

to political pressures'" and "'as a means of retribution against [an] unpopular group[].'" *Id.* at

315 (quoting *Landgraf*, 511 U.S. at 266).

### C.     Estoppel Precludes Enforcement Of The Ban Against Plaintiffs

Estoppel also bars Defendants from reversing course and discharging or denying

accession to Plaintiffs based on their transgender status. As the D.C. Circuit has made clear, the

"fundamental principle of equitable estoppel applies to government agencies, as well as private

parties." *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (quoting

*Investors Research Corp. v. SEC*, 628 F.2d 168, 174 n.34 (D.C. Cir. 1980)). The only additional

requirement for a claim against the government is that Plaintiffs must prove—beyond the

traditional elements of equitable estoppel—that the government "behave[d] in ways that … will

cause an egregiously unfair result." *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206,

225 (D.C. Cir. 2017); *see also Keating v. FERC*, 569 F.3d 427, 434 (D.C. Cir. 2009). Here,

where the government has failed to treat Plaintiffs with even the "minimum standard of decency,

honor, and reliability," *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017), the case for

estoppel could not be clearer.

*First*, DTM 16-005 constituted a definite representation to Plaintiffs that they would be

able to serve openly. *See, e.g.*, *Genesis Health Ventures, Inc. v. Sebelius*, 798 F. Supp. 2d 170,

185 (D.D.C. 2011) (finding that a Medicare intermediary's verbal agreement, and its subsequent

actions honoring that agreement, were "definite statements" giving rise to detrimental reliance).

DTM 16-005 stated in no uncertain terms that (1) "no otherwise qualified Service member may

be involuntarily separated, discharged or denied reenlistment or continuation of service, solely

on the basis of their gender identity"; (2) "[t]ransgender Service members will be subject to the

same standards as any other Service member of the same gender"; and (3) "[a] Service member

whose ability to serve is adversely affected by a medical condition or medical treatment related

to their gender identity should be treated, for purposes of separation and retention, in a manner

consistent with a Service member whose ability to serve is similarly affected for reasons

unrelated to gender identity or gender transition." DTM 16-005, Attach. at 1. DTM 16-005 also

extended the military's equal opportunity policy to transgender service members, guaranteeing

them "an environment free from sexual harassment and unlawful discrimination" on the basis of

their transgender status. *Id.* at 2. In addition, Secretary Carter announced on June 30, 2016 that

enlistment of transgender applicants would begin July 1, 2017. Fanning Decl. ¶ 37 & Ex. C at 4.

Unquestionably, this was a "definite statement" of the government's views.

*Second*, in accordance with and reliance on this official policy, Plaintiffs informed their

commanding officers of their transgender status. *See, e.g.*, Kibby Decl. ¶¶ 14-15; Kohere Decl.

¶ 15; John Doe 1 Decl. ¶ 27; Jane Doe 1 Decl. ¶¶ 16, 28; *accord* DOD Handbook 18 ("*Notify*

*your commander* of the diagnosis and medical treatment plan indicating that gender transition is

medically necessary." (emphasis added)). Plaintiffs have thus plainly "suffered [an] adverse

change in … status," the definition of detrimental reliance. *Heckler v. Community Health Servs.*

*of Crawford Cty., Inc.*, 467 U.S. 51, 62 (1984). By acting on the military's unequivocal

assurance that no transgender service member would be separated for being transgender and that

transgender people would be eligible to enlist, Plaintiffs less than two years later face separation

on that basis, with all of its collateral consequences. Not only did Plaintiffs rely on the military's

representations, but having come out as transgender, they are now exposed under the President's

directive to grave harms—including the end of military careers, the loss of healthcare, and the stigma of being discharged.  *See, e.g.*, *Powell v. Marsh*, 560 F. Supp. 636, 640 (D.D.C. 1983).

*Third*, such reliance was entirely reasonable.  What the military promised transgender individuals like Plaintiffs was not a gratuitous favor casually bestowed, but an official commitment of non-discriminatory treatment after a lengthy, highly deliberative and public review process.  *Cf. Moser v. United States*, 341 U.S. 41, 46 (1951) (finding "justifiable reliance" where alien sought "guidance from the highest authority to which he could turn" and acted on reasonable belief "he would not … lose his rights to citizenship" by signing an exemption form).

*Finally*, the circumstances here amply demonstrate affirmative governmental misconduct that "'will cause an egregiously unfair result.'"  *Grumman Ohio Corp. v. Dole*, 776 F.2d 338, 347 (D.C. Cir. 1985) (quoting *General Accounting Office v. General Accounting Office Personnel Appeals Bd.*, 698 F.2d 516, 526 & n.57 (D.C. Cir. 1983)).  It is difficult to imagine anything more unfair than discharging people from service after inviting them to make the disclosure that is then used as a rationale for dismissing them.  *See Watkins v. U.S. Army*, 875 F.2d 699, 708 (9th Cir. 1989) (finding affirmative misconduct where "the Army did not stand aside while [Plaintiff] reenlisted or accepted a promotion [but] plainly acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting [Plaintiff]"); *see also, e.g.*, *Johnson v. Williford*, 682 F.2d 868, 872-873 (9th Cir. 1982) (government was estopped where its "active misadvice" to parolee that he was eligible for parole led to reintegration into community); *Corniel-Rodriguez v. INS*, 532 F.2d 301, 302 (2d Cir. 1976) (affirmative misconduct of consular officers precluded deportation of alien who married before admission to United States).  To withhold judicial relief in these exceptional circumstances would repudiate "elementary fairness" in favor of governmental "entrap[ment]."  *Moser*, 341 U.S. at 47.

II.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION

Without a preliminary injunction, Plaintiffs will suffer irreparable harms.  In this Circuit, harm is irreparable where it is "of such imminence that there is a clear and present need for equitable relief," and is "beyond remediation."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  That standard is amply met here.

*First*, the announced bar on transgender service in military imposes an immediate and irreparable constitutional harm by stigmatizing Plaintiffs and branding them as less capable and worthy of enlisting or serving in the Armed Forces solely because of their transgender status.  Such a "status-based enactment divorced from any factual context" violates the equal protection guarantee of the Constitution, which prohibits the government from labelling a group as "unequal to everyone else" based simply upon their status.  *Romer*, 517 U.S. at 635.  And that stigmatization has a constitutional dimension that, in this Circuit, establishes a *per se* irreparable harm.  *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("'[A] prospective violation of a constitutional right constitutes irreparable injury.'"); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012) (equal protection violation constitutes irreparable harm); *Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (procedural due process violation constitutes irreparable harm); *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 78 (D.D.C. 2011) (substantive due process violation constitutes irreparable harm).

Every day that these service members continue to serve under the pall of this ban, their stature within their units, and within the military more broadly, erodes.  The ban already labels them as officially unfit and places them into a legally inferior class of people who, because of

their transgender status, have been deemed ineligible for continued service.  *See* Kibby Decl.

¶ 34; Jane Doe 4 Decl. ¶ 15; Jane Doe 2 Decl. ¶ 15.  Absent this Court's immediate intervention,

their military careers and paths will be irreparably harmed.  The military requires strong bonds

among unit members to maintain the trust and morale necessary to survive the stresses of

military discipline, deployment, and combat.  So too, students in the military academies and

ROTC depend on the bonds they form during their education and training to build the foundation

of relationships that determine their future military careers.  By dictating that certain members

are not fit to serve based solely on their status as transgender people, the Commander in Chief of

the Armed Forces has significantly undermined that cohesion and trust, which Plaintiffs may be

unable to rebuild absent an order from this Court enjoining enforcement of the ban.  *Cf. Log*

*Cabin Republicans v. United States*, 2012 WL 12952732, at *2 (C.D. Cal. Mar. 15, 2012)

("evidence at trial showed that the Don't Ask, Don't Tell Act harmed military readiness and unit

cohesion, and irreparably injured servicemembers").

　　　Where the government discriminatorily or arbitrarily deprives a class of people of equal

dignity and status, the harm is irreparable.  *See, e.g.*, *Elzie*, 841 F. Supp. at 443 ("Plaintiff did not

become any less of a Marine on the day he announced his sexual orientation."); *see also Caspar*

*v. Snyder*, 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015) (state officials' refusal to recognize same-

sex marriages caused irreparable harm, including "loss of dignity and status"); *Chalk v. U.S.*

*Dist. Court Cent. Dist. of California*, 840 F.2d 701, 710 (9th Cir. 1988) (school's reassignment

of teacher diagnosed with AIDS caused irreparable harm, including because it was the product of

"society's accumulated myths and fears about disability and disease"); *Cooney v. Dalton*, 877 F.

Supp. 508, 515 (D. Haw. 1995) (irreparable harm from discharge "brand[ing]" plaintiff as a drug

user without due process).  This stigmatic harm is serious and immediate, and can be remedied only by an injunction.

Barring otherwise qualified transgender people from an equal opportunity to serve in the military ensures that they will be "denied the status of full citizenship, and the respect that goes with that status."  117 Cong. Rec. 35,311 (1971) (statement of Rep. Abzug).  Military service has long been one of the hallmarks of equal citizenship and full participation in the civic life of this country.  *See Able v. United States*, 968 F. Supp. 850, 864 (E.D.N.Y. 1997) ("Voting, taking public office, serving on juries, and serving in the military are the primary acts of public citizenship."), *rev'd* 155 F.3d 628 (2d Cir. 1998).  Relatedly, "in the Congress of the United States and in the political life of this Nation, political choices and debate often reflect a belief that men who have fought for their country have a special right to wield political power and make political decisions."  117 Cong. Rec. 35,311 (statement of Rep. Abzug).  In short, "[f]or the [President's directive] to single out [transgender] service members denies them, without legitimate reason, the right openly to participate as equals in the defense of the nation and imposes 'practically a brand upon them, affixed by law, an assertion of their inferiority, and a stimulant [to] prejudice,' the very prejudice undergirding the [directive]."  *Able*, 968 F. Supp. at 864 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)).  Barring Plaintiffs from military services brands them with a clear badge of inferiority.

Plaintiffs are also irreparably injured by their exclusion from enlistment and by impending separation from military service on the basis of a characteristic that has no bearing on their ability to serve.  For example, Regan Kibby is currently enrolled in the Naval Academy with the expectation of commissioning as an officer in 2020.  Kibby Decl. ¶ 8.  If the ban goes into effect, he will be ineligible to be commissioned as a Navy officer and as a result will no

longer be eligible to attend the Naval Academy.  *Id.* ¶ 36.  The Naval Academy provides a unique educational opportunity that cannot be replicated in any civilian context.  *Id.* ¶ 37; *cf. Virginia*, 518 U.S. at 519 (recognizing constitutional injury where government "reserv[es] exclusively to men … unique educational opportunities").  Similarly, Kohere will be unable to continue in ROTC, foreclosing a career serving his country.  Kohere Decl. ¶ 15.  These losses are irreparable.

The impending separation for currently serving Plaintiffs also creates irreparable injury. The announced ban has imposed serious personal and financial hardships on Plaintiffs, who are facing imminent loss of employment.  Plaintiffs and their families will lose medical and other benefits as a result of separation from the military, a loss courts recognize as irreparable harm. *See* Jane Doe 1 Decl. ¶ 31; Jane Doe 4 Decl. ¶ 16; John Doe 1 Decl. ¶ 28; *see also McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (plaintiff, who had served seventeen years in the Navy, would suffer irreparable harm from separation, because he would "lose his job, income, pension, health and life insurance, and all the other benefits attendant with being a Naval officer"); *Elzie*, 841 F. Supp. at 443 (irreparable harms faced by Marine include "los[ing] his medical benefits, his opportunity to participate in the VSI/SSB program, and a portion of his retirement pay").  Indeed, loss of medical benefits alone may constitute irreparable harm, *see Minney v. U.S. Office of Pers. Mgmt.*, 130 F. Supp. 3d 225, 230 (D.D.C. 2015) (blind veteran's loss of medical benefits irreparable), and this harm is particularly likely to be irreparable when coupled with the financial stresses of unemployment, *see Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) ("The loss of health insurance benefits—particularly for those who are unemployed—constitutes irreparable harm for purposes of a preliminary injunction.").

For Plaintiffs, service in the military is not a job; it is a calling that demands loyalty, honor, and sacrifice in the name of the greater good.  It is fundamental to their sense of self and personhood.  They have constructed their entire lives around their military service.  The ban has had a devastating impact on their very sense of personhood.  *See, e.g.*, Jane Doe 1 Decl. ¶¶ 36-37; Jane Doe 2 Decl. ¶ 19; Jane Doe 4 Decl. ¶ 15; Kibby Decl. ¶ 41.  Absent an order affirming that Plaintiffs will not be separated from the military, plaintiffs will suffer.  *See Elzie*, 841 F. Supp. at 443; *cf. Bonds v. Heyman*, 950 F. Supp. 1202, 1215 (D.D.C. 1997) (Smithsonian employee would suffer irreparable emotional and mental distress from layoff, given "how much of her life is tied to her career"), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

*Finally*, for certain Plaintiffs, the President's directive has already interfered with their medical care.  For example, the announced ban landed, unexpectedly, during the period of Jane Doe 1's medical transition.  She was scheduled to undergo surgery in September of this year, but as a result of the directive, her medical treatment has been halted.  Jane Doe 1 Decl. ¶¶ 24-25.  Like Jane Doe 1, John Doe 1 was scheduled for transition-related medical procedures, pursuant to a medical plan authorized by his commanding officer on April 27, 2017.  John Doe 1 Decl. ¶ 18.  He was recently informed by his military medical care provider, however, that all transgender surgeries had been suspended and that his surgery consult scheduled for September 5, 2017 was canceled.  *Id.* ¶ 24.

Thus, President Trump's ban has already subjected Plaintiffs to serious and escalating hardships that, absent an order enjoining its enforcement during the pendency of this case, will continue to cause irreparable harm.

III.     THE BALANCE OF THE EQUITIES FAVORS AN INJUNCTION

The balance-of-equities factor directs the Court to "'balance the competing claims of

injury and … consider the effect on each party of the granting or withholding of the requested

relief.'" *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014) (quoting *Winter v. Natural*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also Singh*, 168 F. Supp. 3d at 234 (in

making the "balance of equities" assessment, the Court considers "whether the requested

injunctive relief would 'substantially injure other interested parties.'").  Here, the balance of

equities strongly favors granting the preliminary injunction.

Defendants will not suffer any harm if a preliminary injunction is issued; in contrast, the

harm inflicted on Plaintiffs is already significant, and with every day that goes by, as the March

23, 2018 full implementation date looms closer, those injuries deepen in ways that cannot be

remedied by a final judgment in their favor—including through the permanent and irreversible

loss of stature, reputation, continuity of service, and medical care.  Absent an injunction making

clear that the ban cannot be enforced either now or in the future, transgender service members

must perform their duties knowing that they have no viable future in the military, that their peers

and commanders are aware of that as well, and that this will almost certainly affect the

assignments and responsibilities entrusted to them while they remain in the military.  And, in the

meantime, Plaintiffs and other transgender service members are facing adverse consequences

that began shortly after the first announcement of the ban in July 2017 and that continue to this

day.  These include denials of healthcare, reenlistment, promotions, commissions, deployments,

and more—all irreparable.  Jane Doe 1 Decl. ¶¶ 27, 30-32; Jane Doe 2 Decl. ¶¶ 16-18; Jane Doe

3 Decl. ¶ 16; Jane Doe 4 Decl. ¶¶ 16-17; John Doe 1 Decl. ¶¶ 24, 27-29; Kibby Decl. ¶¶ 36-39;

Kohere Decl. ¶¶ 15-19; *see McVeigh*, 983 F. Supp. at 221 (finding that the discharge of a naval

service member would cause him "serious injury" while there would be "no appreciable harm to

the Navy if [the sailor were] permitted to remain in active service."); *Selland v. Aspin*, 832 F.

Supp. 12, 16 (D.D.C. 1993) (finding "no equity" to support denying injunction to prevent Navy

from separating a plaintiff from the Navy based upon homosexual orientation); *Elzie*, 841 F.

Supp. at 443 ("Granting a preliminary injunction keeping plaintiff on active duty … will result in

no discernible injury to defendants.").

> For Defendants, grant of a preliminary injunction would require the military simply to

follow the rules and procedures that have already been implemented and about which extensive

training has already taken place that permit transgender service members to serve openly.  Every

branch of the military had already implemented and been following those rules and procedures

for over a year before President Trump's recent orders.  In addition, it would impose no hardship

for the military to implement the accessions policy it already adopted in June 2016, and which

was scheduled to take effect on July 1, 2017.  Under the August 25, 2017 Memorandum,

transgender people will be barred from accession indefinitely, resulting in Plaintiff Kibby's

dismissal from the Naval Academy and Plaintiff Kohere's dismissal from ROTC.  For these two

young men embarking on their life's path, stripping away their life's dreams of a military career

will harm them in ways that can never be undone.

> The circumstances created by the President's directive are a far cry from those in other

cases addressing issues of military readiness or national security, such as *Winter*.  In *Winter*, the

Supreme Court explained that the proposed injunction in that case would "forc[e] the Navy to

deploy an inadequately trained antisubmarine force," "jeopardize[] the safety of the fleet," and

undermine the President's "determin[ation] that training with active sonar is 'essential to national

security.'"  555 U.S. at 26.  The Court thus concluded "that the balance of equities and

consideration of the overall public interest" weighed "strongly in favor of the Navy."  *Id.* at 14,

26; *see Singh*, 168 F. Supp. 3d at 235 (distinguishing *Winter* on ground that granting injunctive

relief prohibiting Army from requiring an officer to undergo specialized training "would not

have an impact on the national defense or the Army's ability to protect our nation's security").

There is no plausible claim here that enjoining the ban from taking effect on March 23,

2018 will have any negative effect on military readiness or lethality.  Plaintiffs currently serving

in the military are highly trained—the same as other service members in their situations—and

those seeking accession are undergoing the same training as others similarly situated.  Denying

an injunction will have the harmful effect of requiring the discharge or separation of those highly

trained, capable, and decorated service members and of preventing the accession of highly

qualified individuals who are already in military academies and ROTC programs.  *See, e.g.*,

Kibby Decl. ¶ 39; Jane Doe 1 Decl. ¶ 35.  This loss of capable service members would *reduce*

military readiness and capacity.  James Decl. ¶ 44 ("[B]anning current transgender service

members from enlisting or serving in the military will result in the loss of qualified recruits and

trained personnel, reducing readiness and operational effectiveness."); *Elzie*, 841 F. Supp. at

443-444 ("[I]n considering the public interest, it might well be argued that to deprive our armed

forces of the intellectual and physical prowess of some extraordinarily talented individuals

strictly because of their sexual orientation would be doing a great disservice to this nation.").  In

sum, the balance of equities tips sharply in favor of granting preliminary injunctive relief.

Denial of the injunction would impose severe harm on Plaintiffs, while granting it would not

harm Defendants in any way.

## IV.   THE PUBLIC INTEREST FAVORS AN INJUNCTION

The public interest in this case weighs strongly in favor of Plaintiffs, foremost because

"enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon*, 721

F.3d at 653; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)

(en banc) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."), *aff'd*, 134 S.Ct. 2751 (2014); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same); *American Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (same).  Because, as discussed above (*see supra* Part I.A-B), Plaintiffs are likely to succeed on the merits of their equal protection and due process claims, the public interest weighs heavily in their favor for that reason.

The public interest also weighs in favor of an injunction for additional reasons.

*First*, as discussed above, implementation of the President's directive would degrade military readiness and capabilities.  James Decl. ¶¶ 40-41 ("[B]anning current transgender service members from enlisting or serving in the military will result in the loss of qualified recruits and trained personnel, reducing readiness and operational effectiveness."); Fanning Decl. ¶ 58 ("[C]ommanders must now deal with the prospect that key personnel may not be able to continue their service, thus impeding military readiness."); Mabus Decl. ¶ 45 ("[B]anning transgender service members will produce vacancies in the Services, creating an immediate negative impact on readiness."); Carson Decl. ¶ 31 ("Many military units include transgender service members who are highly trained and skilled and who perform outstanding work. Separating these service members will deprive our military and our country of their skills and talents."); *see also Elzie*, 841 F. Supp. at 443-444.

*Second*, the training and professional development of transgender service members "has required a significant investment of taxpayer dollars, an investment whose return depends on their continued service."  Fanning Decl. ¶ 57.  The public and military's investment of time and money, and the skills and capacity built by those investments, would be lost if the President's directive were implemented and transgender service members were separated.  *See, e.g.*, Jane

Doe 1 Decl. ¶ 35; James Decl. ¶¶ 40-41; Carson Decl. ¶ 31.  Not only would the Armed Forces lose investments in training and professional development, it would also incur the additional costs of training and recruiting replacements.  Carson Decl. ¶ 32 (describing study estimating that "separating transgender service members currently serving in the military would cost $960 million, based on the costs of recruiting and training replacements"); Fanning Decl. ¶ 48 ("In addition to losing the benefit of that investment in training and leadership development, taxpayers would bear the cost of recruiting and training replacement personnel."); Mabus Decl. ¶ 45 ("Banning transgender service members will cause the loss of competent and experienced individuals, who will be difficult to replace.  The Navy has invested in their education and training.  In addition to losing any return on that investment, taxpayers will bear the cost of identifying, recruiting, and training replacement personnel.").

*Third*, "the President's abrupt reversal of policy is harmful to military readiness because it erodes service members' trust in their command structure and its professionalism…. That trust, and the prompt following of commands, is essential to the unit cohesion and rapid response required to address unexpected crises or challenges."  James Decl. ¶ 43; *see also* Carson Decl. ¶ 33 ("This policy bait-and-switch, after many service members disclosed their transgender status in reliance on statements from the highest levels of the chain of command, conveys to service members that the military cannot be relied upon to follow its own rules or maintain consistent standards."); Fanning Decl. ¶ 59 ("The President's reversal of policy is deeply harmful to morale because it impairs service members' trust in their command structure and their ability to rely on established policy."); Mabus Decl. ¶¶ 47-52.  This is echoed in the testimonials of Plaintiffs themselves, who viewed the reversal of DTM 16-005 as "a betrayal of trust," and a "repudiation of the values and ideals" the military is constituted to protect.  Jane Doe 1 Decl.

¶¶ 28, 33.  Plaintiffs and other transgender service members relied on commitments that they could continue to serve in the military while disclosing their transgender status.  Implementation of the President's directive is a violation of the trust they placed in the military, and it will work to erode the trust on which the effectiveness of the military depends.  James Decl. ¶ 43; *see also id.* ¶¶ 44-45.

## CONCLUSION

For the foregoing reasons, this Court should issue an injunction prohibiting the categorical exclusion of transgender people from the military, including ordering that:

1.      Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and John Doe 1 may not be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise receive adverse treatment or differential terms of service on the basis that they are transgender;

2.      Plaintiff Regan V. Kibby may not be denied the opportunity to continue his attendance at the U.S. Naval Academy on the basis that he is transgender, and may not be denied the opportunity to accede to military service thereafter, or be denied promotion, reenlistment, or any other equal terms of service on the basis that he is transgender.

3.      Plaintiff Dylan Kohere may not be denied the opportunity to continue his participation in the Reserve Officers' Training Corps program on the basis that he is transgender, and may not be denied the opportunity to accede to military service thereafter, or be denied promotion, reenlistment, or any other equal terms of service on the basis that he is transgender.

Dated:  August 31, 2017

Claire Laporte (*pro hac vice* forthcoming)
Matthew E. Miller (*pro hac vice* forthcoming)
Daniel McFadden (*pro hac vice* forthcoming)
Kathleen M. Brill (*pro hac vice* forthcoming)
Michael Licker (*pro hac vice* forthcoming)
Rachel C. Hutchinson (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Jennifer Levi (*pro hac vice* forthcoming)
Mary L. Bonauto (*pro hac vice* forthcoming)
GLBTQ LEGAL ADVOCATES & DEFENDERS
30 Winter St., Ste. 800
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Shannon P. Minter (*pro hac vice* forthcoming)
Amy Whelan (*pro hac vice* forthcoming)
Chris Stoll (*pro hac vice* forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

Respectfully submitted,

     */s/ Kevin M. Lamb*
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Kevin M. Lamb (D.C. Bar No. 1030783)
WILMER CUTLER PICKERING
     HALE & DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Alan E. Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
     HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Christopher R. Looney (D.C. Bar No. 998730)
Harriet Hoder (*pro hac vice* forthcoming)
Adam M. Cambier (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
     HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

Nancy Lynn Schroeder (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
     HALE & DORR LLP
350 S. Grand Ave., Ste. 2100
Los Angeles, California 90071
Telephone: 213-443-5300
Fax: 213-443-5400

*Attorneys for Plaintiffs*