IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOE, et al., | ) |
|     *Plaintiffs*, | ) |
| v. | ) Civil Action No. 17-cv-1597 (CKK) |
| DONALD TRUMP, et al., | ) |
|     *Defendants*. | ) |

**DECLARATION OF BRAD R. CARSON**

I, Brad Rogers Carson, declare as follows:

1. I served as the Acting Under Secretary of Defense for Personnel and Readiness ("USD P&R") from April 2, 2015 to April 8, 2016. In that capacity, and at the direction of the Secretary of Defense, I led a group of senior personnel drawn from all of the armed services to develop, over many months of information collection and analysis, a Department-wide policy regarding service by transgender people, all as more fully described below.

**PROFESSIONAL BACKGROUND**

2. I attended Baylor University and obtained an undergraduate degree in history in 1989. After college, I attended Trinity College in Oxford, England on a Rhodes Scholarship and earned a Master's degree in Politics, Philosophy, and Economics. When I returned to the United States, I attended the University of Oklahoma College of Law, graduating with a law degree in 1994.

3. After I graduated law school, I practiced as an attorney at the law firm Crowe & Dunlevy. From 1997 to 1998 I served as a White House Fellow, where I worked as a Special

1

Assistant to the Secretary of Defense.  From 2001 to 2005, I served in Congress as the Representative for the State of Oklahoma's 2nd District.

4.  In addition to my civilian career, I am also a commissioned officer in the United States Navy Reserve.  I currently serve in the Individual Ready Reserve.  I deployed to Iraq in 2008 as Officer-in-Charge of intelligence teams embedded with the U.S. Army's 84th Explosive Ordnance Disposal Battalion.  In Iraq, our teams were responsible for investigation of activities relating to improvised explosive devices and the smuggling of weapons and explosives.  For my service in Iraq, I was awarded the Bronze Star Medal and other awards.

5.  I have held several leadership positions within the Department of Defense ("DoD").  In 2011, I was nominated by the President to serve as General Counsel to the United States Army and unanimously confirmed by the U.S. Senate.  As General Counsel, my duties included providing legal advice to the Secretary, Under Secretary, and Assistant Secretaries of the Army regarding the regulation and operation of the U.S. Army.  I also assisted in the supervision of the Office of the Judge Advocate General.  I served as General Counsel to the United States Army until March 2014.

6.  In late 2013, while serving in that position, I was nominated by the President to serve as Under Secretary of the Army.  I was unanimously confirmed by the U.S. Senate in February 2014 and sworn in on March 27, 2014.  As Under Secretary of the Army, I was the second ranking civilian official in the Department of the Army.  My responsibilities included the welfare of roughly 1.4 million active and reserve soldiers and other Army personnel, as well as a variety of matters relating to Army readiness, including oversight of installation management and weapons and equipment procurement.  With the assistance of two Deputy Under Secretaries, I directly supervised the Assistant Secretaries of the Army for Manpower and Reserve Affairs;

Acquisition, Logistics and Technology; Financial Management and Comptroller; Installations, Energy and Environment; and Civil Works.  My responsibilities involved the management and allocation of an annual budget amounting to almost $150 billion.

7.  I was appointed by the President to serve as acting USD P&R in April 2015.  In that capacity, I functioned as the principal staff assistant and advisor to the Secretary and Deputy Secretary of Defense for Total Force Management with respect to readiness; National Guard and Reserve component affairs; health affairs; training; and personnel requirements and management, including equal opportunity, morale, welfare, recreation, and quality of life matters.  My responsibilities over these matters extended to more than 2.5 million military personnel.

**DEVELOPMENT OF POLICY REGARDING TRANSGENDER SERVICE MEMBERS**

8.  On July 28, 2015, then-Secretary of Defense Ashton B. Carter ordered me, in my capacity as USD P&R, to convene a working group to formulate policy options for DoD regarding transgender service members (the "Working Group").  Secretary Carter ordered the Working Group to present its recommendations within 180 days.  In the interim, transgender service members were not to be discharged or denied reenlistment or continuation of service on the basis of gender identity without my personal approval.  A true and accurate copy of the July 28, 2015 order is attached hereto as Exhibit A.

9.  The Working Group included roughly twenty-five members.  Each branch of military service was represented by a senior uniformed officer (generally a three-star admiral or general), a senior civilian official, and various staff members.  The Surgeons General and senior representatives of the Chaplains for each branch of service also attended the Working Group meetings.

10. The Working Group formulated its recommendations by collecting and considering evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members.

## THE FINDINGS OF THE RAND REPORT

11. On behalf of the Working Group, I requested that RAND, a nonprofit research institution that provides research and analysis to the Armed Services, complete a comprehensive study of the health care needs of transgender people, including potential health care utilization and costs, and to assess whether allowing transgender service members to serve openly would affect readiness.

12. In 2016, RAND presented the results of its exhaustive study in a report entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report"), a true and accurate copy of which is attached as Exhibit B.

13. The RAND Report explained that according to the American Psychiatric Association, the term transgender refers to "the broad spectrum of individuals who identify with a gender different from their natal sex." The RAND Report also explained that "transgender status alone does not constitute a medical condition," and that "only transgender individuals who experience significant related distress are considered to have a medical condition called *gender dysphoria* (GD)." For those individuals, the recognized standard of care includes some combination of psychosocial, pharmacological, and/or surgical care. "Not all patients seek all forms of care." "While one or more of these types of treatments may be medically necessary for

some transgender individuals with GD, the course of treatment varies and must be determined on an individual basis by patients and clinicians."

14. The RAND Report evaluated the capacity of the military health system (MHS) to provide necessary care for transgender service members. The RAND Report determined that necessary psychotherapeutic and pharmacological care are available and regularly provided through the MHS, and that surgical procedures "quite similar to those used for gender transition are already performed within the MHS for other clinical indications." In particular, the MHS already performs reconstructive surgeries on patients who have been injured or wounded in combat. "The skills and competencies required to perform these procedures on transgender patients are often identical or overlapping." In addition, the RAND Report noted that "performing these surgeries on transgender patients may help maintain a vitally important skill required of military surgeons to effectively treat combat injuries."

15. The RAND Report also examined all available actuarial data to determine how many transgender service members are likely to seek gender transition-related medical treatment. The RAND Report concluded that "we expect annual gender transition-related health care to be an extremely small part of overall health care provided to the AC [Active Component] population."

16. The RAND Report similarly concluded that the cost of extending health care coverage for gender transition-related treatments is expected to be "an exceedingly small proportion of DoD's overall health care expenditure."

17. The RAND Report found no evidence that allowing transgender people to serve openly would negatively impact unit cohesion, operational effectiveness, or readiness.

18. The RAND Report found that the estimated loss of days available for deployment due to transition-related treatments "is negligible." Based on estimates assuming the highest utilization rates, it concluded that the number of nondeployable man-years due to gender transition-related treatments would constitute 0.0015 percent of all available deployable labor-years across both the Active Component and Select Reserves.

19. The RAND Report also found no evidence that permitting openly transgender people to serve in the military would disrupt unit cohesion. The RAND Report noted that while similar concerns were raised preceding policy changes permitting open service by gay and lesbian personnel and allowing women to serve in ground combat positions, those concerns proved to be unfounded. The RAND Report found no evidence to expect a different outcome for open service by transgender persons.

20. The RAND Report examined the experience of eighteen other countries that permit open service by transgender personnel—including Israel, Australia, the United Kingdom, and Canada. The Report found that all of the available research revealed no negative effect on cohesion, operational effectiveness, or readiness. Some commanders reported that "increases in diversity led to increases in readiness and performance."

21. The Rand Report also identified significant costs associated with separation and a ban on open service, including "the discharge of personnel with valuable skills who are otherwise qualified."

**ISSUES CONSIDERED BY THE WORKING GROUP**

22. The Working Group sought to identify and address all relevant issues relating to service by openly transgender persons, including deployability. In addition to taking into consideration the conclusions of the RAND Report, the Working Group discussed that while

some transgender service members might not be deployable for short periods of time due to their treatment, this is not unusual, as it is common for service members to be non-deployable for periods of time due to medical conditions such as pregnancy, orthopedic injuries, obstructive sleep apnea, appendicitis, gall bladder disease, infectious disease, and myriad other conditions. For example, the RAND Report estimated that at the time of the report, 14 percent of the active Army personnel—or 50,000 active duty soldiers—were ineligible to deploy for legal, medical, or administrative reasons.

23.     The Working Group also addressed the psychological health and stability of transgender people.  In addition to taking into account the conclusions of the RAND Report, the Working Group concluded, based on discussions with medical experts and others, that being transgender is not a psychological disorder.  While some transgender people experience gender dysphoria, that condition is resolved with appropriate medical care.  In addition, the Working Group noted the positive track record of transgender people in civilian employment, as well as the positive experiences of commanders with transgender service members in their units.

24.     The Working Group also concluded that transgender service members would have ready access to any relevant necessary medication while deployed in combat settings.  It determined that military policy and practice allows service members to use a range of medications, including hormones, while in such settings.  The MHS has an effective system for distributing prescribed medications to deployed service members across the globe, including those in combat settings.

25.     The Working Group also concluded that banning service by openly transgender persons would require the discharge of highly trained and experienced service members, leaving

unexpected vacancies in operational units and requiring the expensive and time-consuming recruitment and training of replacement personnel.

26.     The Working Group also concluded that banning service by openly transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve.

27.     I concluded my service as USD P&R on April 8, 2016.  By that time, the Working Group was unanimously resolved that transgender personnel should be permitted to serve openly in the military.

## RECENT REVERSAL OF POLICY

28.     On July 26, 2017, President Donald Trump issued a statement that transgender individuals will not be permitted to serve in any capacity in the Armed Forces.  On August 25, 2017, President Trump issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security to reverse the policy adopted in June 2016 that permitted military service by openly transgender persons.  That memorandum stated:  "In my judgment, the previous Administration failed to identify a sufficient basis to conclude that terminating the Departments' longstanding policy and practice would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and there remain meaningful concerns that further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."

29.     President Trump's stated rationale for a ban on military service by openly transgender service members is unfounded and refuted by the comprehensive investigation and review performed by the Working Group.

30. In addition to contravening the Working Group's conclusions and the exhaustive supporting evidence that was collected, I believe that prohibiting transgender individuals from serving openly in the military is harmful to the public interest for several reasons. My belief is based on my experience as USD P&R and in other leadership positions within DoD, and upon my active duty experience in Iraq.

31. First, a prohibition on service by openly transgender individuals would degrade military readiness and capabilities. Many military units include transgender service members who are highly trained and skilled and who perform outstanding work. Separating these service members will deprive our military and our country of their skills and talents.

32. Second, banning military service by openly transgender persons would impose significant costs that far outweigh the minimal cost of permitting them to serve. A study authored in August 2017 by the Palm Center and professors associated with the Naval Postgraduate School estimated that separating transgender service members currently serving in the military would cost $960 million, based on the costs of recruiting and training replacements. A true and correct copy of the August 2017 Palm Center study is attached hereto at Exhibit C.

33. Third, the sudden and arbitrary reversal of the DoD policy allowing openly transgender personnel to serve will cause significant disruption and thereby undermine military readiness and lethality. This policy bait-and-switch, after many service members disclosed their transgender status in reliance on statements from the highest levels of the chain of command,

conveys to service members that the military cannot be relied upon to follow its own rules or maintain consistent standards.

34.   Fourth, in addition to the breach of transgender service members' trust resulting in the deprivation of their careers and livelihood, the President's policy reversal will cause other historically disadvantaged groups in the military, including women and gay and lesbian service members, to question whether their careers and ability to serve as equal members of the military may also be sacrificed.

35.   Fifth, those serving in our Armed Forces are expected to perform difficult and dangerous work. The President's reversal of policy puts tremendous additional and unnecessary stress on transgender service members, their command leaders, and those with whom they serve.

36.   In short, the President's reversal of the policy permitting military service by openly transgender individuals has had, and will continue to have, a deleterious effect on readiness, force morale, and trust in the chain of command in the Armed Services.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED: August 28, 2017

/s/ Brad R. Carson
Brad R. Carson