IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOE, et al., | ) |
|     *Plaintiffs*, | ) |
| v. | ) Civil Action No. 17-cv-1597 (CKK) |
| DONALD TRUMP, et al., | ) |
|     *Defendants*. | ) |

**DECLARATION OF GEORGE RICHARD BROWN, MD, DFAPA
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, George R. Brown, declare as follows:

1. I make this declaration based on my own personal knowledge.

**PROFESSIONAL BACKGROUND**

2. I am a Professor of Psychiatry and the Associate Chairman for Veterans Affairs in the Department of Psychiatry at the East Tennessee State University, Quillen College of Medicine. My responsibilities include advising the Chairman, contributing to administrative, teaching, and research missions of the Department of Psychiatry, consulting on clinical cases at the University and at Mountain Home Veterans Health Administration ("VHA") Medical Center, where I also hold an appointment, and acting as a liaison between the VHA Medical Center and the East Tennessee State University Department of Psychiatry. The majority of my work involves research, teaching, and consulting about transgender health in military and civilian populations.

3. I also hold a teaching appointment related to my expertise with transgender healthcare and research at the University of North Texas Health Services Center ("UNTHSC"). My

responsibilities include teaching and consultation with UNTHSC and the Federal Bureau of Prisons staff regarding transgender health issues.

    4. I graduated from the University of Rochester in Rochester, New York in 1979 Summa Cum Laude with a double major in biology and geology. I earned my Doctor of Medicine degree with Honors from the University of Rochester School of Medicine in 1983. From 1983-1984, I served as an intern at the United States Air Force Medical Center at Wright-Patterson Air Force Base in Ohio. From 1984-1987, I worked in and completed the United States Air Force Integrated Residency Program in Psychiatry at Wright State University and Wright-Patterson Air Force Base in Dayton, Ohio. A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit A.

    5. I began seeing patients in 1983, and I have been a practicing psychiatrist since 1987 when I completed my residency. Over the last 33 years, I have evaluated, treated, and/or conducted research with between 600 and 1000 individuals with gender disorders in person, and over 5100 patients with Gender Dysphoria during the course of research-related chart reviews. The vast majority of those patients have been active duty military personnel or veterans.

    6. For three decades, my research and clinical practice has included extensive study of transgender health and care of transgender individuals, including three of the largest studies focused on the health-care needs of transgender service members and veterans. Throughout that time, I have done research with, taught on, and published peer-reviewed professional publications specifically addressing the needs of transgender military service members. *See* Brown Ex. A (CV).

    7. I have authored or coauthored 38 papers in peer-reviewed journals and 19 book chapters on topics related to Gender Dysphoria and transgender healthcare, including the chapter

on Gender Dysphoria in Treatments of Psychiatric Disorders (3d ed. 2001), a definitive medical text published by the American Psychiatric Association.

      8. In 2014, I coauthored a study along with former Surgeon General Joycelyn Elders and other military health experts, including a retired General and a retired Admiral, entitled "Medical Aspects of Transgender Military Service." Elders J, Brown GR, Coleman E, Kolditz TA, *Medical Aspects of Transgender Military Service*. Armed Forces and Society, 41(2): 199-220, 2015; published online ahead of print, DOI: 10.1177/0095327X14545625 (Aug. 2014) ("2014 Report"). The study was published in the military peer-reviewed journal, Armed Forces and Society. A true and correct copy of that report is attached hereto as Exhibit B.

      9. I have served for more than fifteen years on the Board of Directors of the World Professional Association for Transgender Health ("WPATH"), the leading international organization focused on transgender health care. WPATH has over 2,000 members throughout the world and is comprised of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of Gender Dysphoria.

      10. I was a member of the WPATH committee that authored Version 7 of the Standards of Care, published in 2011, which is the current version, and I am on the committee to revise the Standards of Care (Version 8).

      11. I have been an active member of WPATH since 1987 without interruption and I have presented original research work on topics relating to Gender Dysphoria and the clinical treatment of transgender people nationally and internationally frequently over the past 3 decades. I have testified or otherwise served as an expert on transgender health issues in cases heard by numerous federal district courts and a federal tax court. I have provided and continue to provide

trainings on transgender health issues for the VHA as well as throughout the Department of Defense.

12. After the Department of Defense announced the change in policy towards transgender servicemembers in 2016, I conducted the first two large military trainings on the provision of health care to transgender service members. The first was for the Marine Corp in the spring of 2016. The second was for a tri-service meeting of several hundred active duty military clinicians and commanders in the fall of 2016. Since the issuance of Department of Defense Instruction 1300.28 in October 2016, which, among other things, implemented the policies and procedures in Directive-type Memorandum 16-005 and established a construct by which transgender service members may transition gender while serving, I have also conducted trainings for a national group of military examiners (MEPSCOM) and for Army clinicians at Fort Knox, Kentucky. I have been centrally involved in the development, writing, and review of all national directives in the VHA relating to the provision of transgender health care for veterans. Finally, I coauthored the national formulary that lists the medications provided by the VHA for the treatment of Gender Dysphoria in veterans.

**GENDER DYSPHORIA**

13. The term "transgender" is a term used to describe someone who experiences any significant degree of misalignment between their gender identity and their assigned sex at birth.

14. Gender identity describes a person's internalized, felt sense of who they are as male or female. For most people, their gender identity is consistent with their assigned birth sex. Most individuals assigned female at birth, grow up, develop, and manifest a gender identity typically associated with girls and women. Most individuals assigned male at birth, grow up, develop, and manifest a gender identity typically associated with boys and men. For transgender

people, that is not the case. Transgender women are individuals assigned male at birth who have a persistent gender identification associated with female identity. Transgender men are individuals assigned female at birth who have a persistent gender identification associated with male identity.

15. Experts agree that gender identity has a major biological component. Experts also agree that gender identity is set early in life, is deep-seated, and impervious to external influences. Gender identity is often referred to as a person's brain sex. This is, in part, because studies focused on determining the origins of a person's gender identity have shown that the human brain is significantly influenced by exposure to hormone levels before birth. Brain studies that correlate brain patterns of transgender individuals with non-transgender individuals who have the same gender identity further contribute to a body of research that supports a biological basis for gender identity and transgender identities.

16. The Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM-5") (2013) is the current, generally recognized authoritative handbook on the diagnosis of mental disorders relied upon by mental health professionals in the United States, Canada, and other countries. The content of the DSM-5 reflects a science-based, peer-reviewed process by experts in the field.

17. According to the DSM-5, transgender identity is not a mental disorder. Gender dysphoria is a diagnostic term that refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex.

18. Gender Dysphoria is mental distress or discomfort based on the experience of discordance between the sex assigned at birth and a person's gender identity or brain sex. Because of the inflexibility of the brain sex, the experience of being transgender is sometimes

described as having, or being born in, the wrong body.  The emotional distress experienced as a result of being in the wrong body is the hallmark symptom associated with Gender Dysphoria.

19. Only the subset of transgender people who have clinically significant distress or impairment qualify for a diagnosis of Gender Dysphoria.

20. Gender dysphoric persons may live for a significant period of their lives in denial of those symptoms.  Some transgender people may not initially understand the emotions associated with gender dysphoria and not have the language or resources to find support for the distress as experienced as a result of them until well into adulthood.  Younger people in increasing numbers have access to medical and mental health resources that help them understand their experience and allow them to obtain medical support at an earlier age.

## TREATMENT FOR GENDER DYSPHORIA

21. Gender Dysphoria is understood as a condition that is amenable to treatment. Commission Report at 9; WPATH Standards of Care, Version 7; William Byne, et al., *Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder* (2012).[1]  With appropriate treatment, individuals with a Gender Dysphoria diagnosis can be fully cured of all symptoms.

22. Treatment of Gender Dysphoria is well-established and highly effective.  The protocol is set forth in the WPATH Standards of Care and in the Endocrine Society Guidelines.[2] The WPATH Standards of Care were first developed in 1979.  Currently in their seventh version, the Standards of Care set forth the authoritative protocol for the evaluation and treatment of

---

[1] *Available at* https://www.researchgate.net/publication/228071071_Report_of_the_American_Psychiatric_Association_Task_Force_on_Treatment_of_Gender_Identity_Disorder.

[2] *Available at* https://www.endocrine.org/guidelines-and-clinical-practice/clinical-practice-guidelines.

Gender Dysphoria. This is the approach followed by clinicians caring for transgender veterans with Gender Dysphoria nationally in the VHA. As stated above, I was a member of the WPATH committee that authored Version 7 of the Standards of Care, published in 2011. That document is attached hereto as Exhibit C.

23. Depending on the individual, a treatment plan for persons diagnosed with Gender Dysphoria may involve psychotherapeutic, pharmacological, and surgical components. The goal in all cases for which there is a treatment plan is to enable the individual to live all aspects of one's life consistent with his or her gender identity or brain sex.

24. Pharmacological care, when needed, typically includes hormonal reassignment. Surgical care, often referred to as either sex reassignment or gender confirmation surgery, includes a range of procedures that conform the person's body to be consistent with persons of the same gender identity. There is a wide range in the treatment sought by those suffering from Gender Dysphoria. Some need both hormone therapy and surgery, while others need both or neither.

25. The care and treatment necessary for transgender individuals in the military is already provided to non-transgender individuals, whether therapy, hormonal treatments, or surgeries. Accordingly "[t]ransgender medical care should be managed in terms of the same standards that apply to all medical care, and there is no medical reason to presume transgender individuals are unfit for duty." 2014 Report at 14.

## PRE-2016 MILITARY POLICY

26. Prior to 2016, military policy treated Gender Dysphoria inconsistently with other curable conditions. Department of Defense instructions contain an extensive list of physical and mental conditions that disqualify a person from enlisting in the military and which can be used as

the basis to separate someone from service. For instance, persons with autism, schizophrenia and delusional disorders (or a history of treatment for these conditions) are excluded from enlistment. Prior to 2016, that list also contained conditions relating to Gender Dysphoria, such as change of sex and transsexualism.

27. The purpose of disqualifying applicants based on certain physical and mental conditions is to ensure that service members are free of contagious diseases that endanger others, free of conditions or defects that would result in excessive duty-time lost and would probably result in separation, able to perform without aggravating existing conditions, and capable of completing training and adapting to military life.

28. Because Gender Dysphoria is a treatable and curable condition, unlike other excluded conditions, its inclusion on the list of disqualifying conditions was inappropriate. Despite having a treatable condition, persons who had a change of sex were disqualified from joining the military.

29. This was inconsistent with how persons with other curable medical conditions were treated. The result of this inconsistency was that transgender personnel were excluded or singled out for disqualification even when they were mentally and physically healthy.

30. For example, persons with certain illnesses, such as Attention Deficit Hyperactivity Disorder and simple phobias, could be admitted when their conditions could be managed without imposing undue burdens on others. Individuals with Attention Deficit Hyperactivity Disorder are prohibited from enlisting unless they meet five criteria including documenting that they maintained a 2.0 grade point average after the age of 14. Similarly, individuals with simple phobias are banned from enlisting unless they meet three criteria including documenting that they have not required medication for the past 24 continuous months. Likewise, members with

mood and anxiety disorders treated by medication were not categorically barred from deployment despite the well-known high rates of recurrence of these psychiatric disorders.

31. In short, even though the Defense Department allowed those with manageable conditions to serve, the former regulation barred transgender service without regard to its treatability and the person's ability to serve.

## JUNE 2016 POLICY CHANGE

32. The military lifted the ban on open service by transgender military personnel following a June 30, 2016 announcement made by then Secretary of Defense Ashton B. Carter.

33. Under new accessions procedures – which were adopted but never put into effect – transgender individuals whose condition was stable for 18 months at the time of enlistment would be eligible to enlist. As the procedures describe, a "history of gender dysphoria" as well as a "history of medical treatment associated with gender transition" are disqualifying *unless*, as to the former, a licensed medical provider certifies that the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months, and as to the latter, that "the applicant has completed all medical treatment associated with the applicant's gender transition; and the applicant has been stable in the preferred gender for 18 months." DTM-16-005 Memorandum and Attachment (June 30, 2016). Finally, for applicants presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months. *Id.*

34. In other words, the procedures require those seeking to enlist who had any therapy or surgeries to have medical confirmation that they have been stable for the last 18 months. Similarly, those applicants taking cross-sex hormones as follow-up to their transition would also need certification that they had been stable on such hormones for 18 months.

**MEDICAL JUSTIFICATIONS FOR THE TRANSGENDER BAN ARE UNFOUNDED**

35. Based on my extensive research and experience treating transgender people, most of whom have served this country in uniform, my experience reviewing the medical implications of a ban on transgender service members, and my involvement in implementing the 2016 policies allowing transgender individuals to serve openly, it is my opinion that the medical objections to open service by transgender service members are wholly unsubstantiated.

36. Similarly, in a unanimous resolution published on April 29, 2015, the American Medical Association announced its support for lifting the ban on transgender service in the military.[3]

**MENTAL HEALTH**

37. Arguments based on mental health of transgender persons are completely inadequate to justify prohibiting transgender individuals from serving in the military. Being transgender is not a mental defect or disorder. Scientists have long abandoned psychopathological understandings of transgender identity, and do not classify the incongruity between a person's brain sex and one's assigned sex as a mental illness. To the extent a person's incongruity between their brain sex and their birth sex creates clinically significant distress (Gender Dysphoria), that distress is curable through appropriate medical care. The availability of a cure distinguishes Gender Dysphoria from other mental health conditions such as autism, bipolar disorder, or schizophrenia for which there are no cures. There is no reason to single out transgender personnel for separation or even limitation of service based only on the diagnosis or

---

[3] *Available at* http://archive.palmcenter.org/files/A-15%20Resoultion%20011.pdf.

treatment of Gender Dysphoria.  Rather, determinations should be made on a case-by-case basis depending on the individual's fitness to serve, as is done with other treatable conditions.

38. Moreover, the military already provides mental health evaluation services and counseling, which is the first component of treatment for Gender Dysphoria.  RAND Corporation, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report") at 79, attached as Exhibit D.

39. Sixty years of clinical experience have demonstrated the efficacy of treatment of the distress resulting from Gender Dysphoria.  *See* 2014 Report at 6 ("a significant body of evidence shows that treatment can alleviate symptoms among those who do experience distress").  Moreover, "empirical data suggest that many non-transgender service members continue to serve despite psychological conditions that may not be as amenable to treatment as gender dysphoria." *Id.* at 7.

40. Concerns about suicide and substance abuse rates among transgender individuals are also irrelevant.  At accession, all prospective military servicemembers undergo a rigorous examination to identify any pre-existing mental health diagnoses that would preclude accessions.  Once someone is serving in the military, they must undergo an annual mental and physical health screen, which includes a drug screen.  If one of these screenings indicates that a person suffers from a mental illness or substance abuse, then that would be the potential impediment to joining or remaining in the military.  The mere fact that a person is transgender, however, does not mean that person has a mental health issue, substance abuse problem, or is suicidal.

## HORMONE TREATMENT

41. The argument that cross-sex hormone treatment is too risky and complicated for military medical personnel to administer and monitor is unsubstantiated and illogical.  The risks

associated with cross-sex hormone treatment are low and not any higher than for the hormones that many non-transgender personnel currently take.

42. The military has vast experience with accessing, retaining and treating non-transgender individuals who need hormone therapies or replacement. These include gynecological conditions such as dysmenorrhea, endometriosis, menopausal syndrome, chronic pelvic pain, hysterectomy or oophorectomy and genitourinary conditions like renal or voiding functions, any of which are referred for a fitness evaluation only when they affect duty performance.

43. In addition, when service members develop hormonal conditions during service whose remedies are biologically similar to cross-sex hormone treatment, those members are not discharged and may not even be referred for a medical evaluation board. Examples include male hypogonadism, menstrual disorders and current, or history of, pituitary dysfunction.

44. Military policy also allows service members to take a range of medications, including hormones, while deployed in combat settings. 2014 Report at 9. Whether anabolic steroids or antipsychotic drugs, Department of Defense policy provides "few medications are inherently disqualifying for deployment." *Id.* (quoting Dept. of Defense, Policy Guidance for Deployment-Limiting Psychiatric Conditions and Medications, 2006 at para. 4.2.3). Access is predictable, as "[t]he Military Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide." *Id.* As to cross-sex hormones at least, clinical monitoring for risks and effects is not complicated, and with training and/or access to consultations, can be performed by a variety of medical personnel in the Department of Defense, just as is the case in the VHA.

45. A study done by the RAND Corporation, an independent, nonpartisan, military think tank confirms the conclusions I draw from my experience with the military and in the 2014 Report. *See* RAND Report. Specifically, the RAND Report noted that Military Health Services maintains and supports all of the medications used for treatment of Gender Dysphoria and has done so for treatment of non-transgender service members. In other words, all of the medications used by transgender service members for treatment of Gender Dysphoria are used by other service members for conditions unrelated to Gender Dysphoria. *See* RAND Report at 8 ("Both psychotherapy and hormone therapies are available and regularly provided through the military's direct care system, though providers would need some additional continuing education to develop clinical and cultural competence for the proper care of transgender patients."). Part of my role with the Department of Defense over the past 18 months has been to provide this continuing education.

## SURGERY

46. Nor is there any basis for the argument that a transgender servicemember's potential need for transition surgery presents unreasonable risks or burden. The risks associated with gender-confirming surgery are low.

47. Critics have also cited non-deployability, medical readiness, and constraints on fitness for duty as reasons to exclude transgender individuals from service. Such arguments are also unsubstantiated and illogical. As a general matter, transgender servicemembers are just as medically fit for service and deployable as non-transgender servicemembers.

48. Even prior to the 2016 transgender policy change, military surgeons were called upon to perform surgeries, such as those for blast victims, whose core procedures are the same as or similar to surgeries needed for transgender health. RAND Report at 8 ("Surgical procedures

quite similar to those used for gender transition are already performed within the MHS for other clinical indications."). The RAND Report noted the benefit of military coverage of transgender surgeries because of the contribution it can make to surgical readiness and training. *Id.* ("performing these surgeries on transgender patients may help maintain a vitally important skill required of military surgeons to effectively treat combat injuries during a period in which fewer combat injuries are sustained.").

## CONCLUSION

49. There is no evidence that being transgender alone affects military performance or readiness and there is no medical justification for the categorical exclusion of transgender individuals from the Armed Forces.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 30, 2017

_____
George R. Brown, MD