## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JANE DOE 1** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 17-cv-1597 (CKK) |
| **DONALD J. TRUMP** *et al.*, | |
| **Defendants.** | |

## DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

For the reasons set forth in the attached Memorandum of Points and Authorities and the accompanying declarations, Defendants hereby move to dismiss Plaintiffs' First Amended Complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Defendants have also included in their Memorandum their Opposition to Plaintiffs' application for a Preliminary Injunction. In addition to their Memorandum of Points and Authorities, Defendants have filed a proposed order with this motion.

Dated: October 4, 2017                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan B. Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

Counsel for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE DOE 1** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-cv-1597 (CKK)** |
| **DONALD J. TRUMP** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS'**
**APPLICATION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 4

   A.  History of the Military's Accessions Policy Regarding Transgender Individuals .............. 4

   B.  Plaintiff's Initial Complaint and the President's Subsequent Memorandum...................... 6

   C.  Plaintiffs' Amended Complaint and the Interim Guidance .................................................. 8

STANDARD OF REVIEW FOR MOTION TO DISMISS ........................................................ 13

ARGUMENT ............................................................................................................................. 14

   I.   The Court Should Grant Defendants' Motion to Dismiss for Lack of Jurisdiction ........... 14

      A.  The Court's Standing Inquiry Should Be Especially Rigorous...................................... 14

      B.  Plaintiffs Have Not Met Their Burden of Showing an Injury-in-Fact ........................... 15

      C.  Plaintiffs' Claims Are Not Ripe for Adjudication ........................................................ 18

   II.  Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.................................. 20

      A.  Plaintiffs Have Not Shown that They Are Likely to Suffer an Irreparable Harm
         Absent the Entry of a Preliminary Injunction ............................................................... 21

      B.  Plaintiffs Are Unlikely To Succeed on the Merits ........................................................ 22

         1.  Plaintiffs Have Not Challenged Defendants' Operative Policy for Enlisted
            Transgender Service Members, and any such Challenge Would Fail to State
            an Equal Protection Claim ...................................................................................... 23

         2.  Plaintiffs' Challenge to the Accession Policy is Unlikely to Succeed.................... 25

         3.  In any Event, an Equal Protection Challenge to Defendants' Longstanding
            Accession Policy Would Not Succeed..................................................................... 27

            a.   The military's longstanding accessions policy is subject to a highly
               deferential form of review ............................................................................ 27

            b.   Plaintiffs are unlikely to succeed on their challenge to the military's
               longstanding accessions policy ...................................................................... 31

         4.  Plaintiffs Are Unlikely To Succeed on Their Due Process Claim........................... 34

5.  Plaintiffs Are Unlikely To Succeed on Their Estoppel Claim................................. 37

C.  The Balance of Equities and the Public Interest Weigh Strongly against the Entry of a Preliminary Injunction .......................................................................... 40

D.  The Injunctive Relief Plaintiffs Seek Is Inappropriate .................................................. 41

CONCLUSION.................................................................................................................................... 44

## INTRODUCTION

Plaintiffs ask this Court to prejudge the constitutionality of a future Government policy regarding military service by transgender individuals and issue the extraordinary relief of a worldwide preliminary injunction. That challenge is premature several times over. To start, while Plaintiffs initially filed suit on August 9, 2017, challenging statements in the President's tweets, the President later issued a memorandum on August 25, 2017, setting forth his policy directive to the Secretary of Defense and the Secretary of Homeland Security, *see* Am. Compl., ECF No. 9 at ¶ 5, and ordering a further study of policies concerning military service by transgender individuals. The President's memorandum states that no policy changes to the status quo will be effective until at least after January 2018. The President further directed the Secretary of Defense to determine how to address transgender individuals currently serving in the military and that *no action* be taken against such individuals until *after a policy review is completed*.

Following receipt of the President's directive, the Secretary of Defense issued Interim Guidance on September 14, 2017. That guidance reaffirms that for now, no current service member will be involuntarily separated, discharged, or denied reenlistment solely on the basis of a gender dysphoria diagnosis or transgender status, and service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition. This is the policy in effect today.

Plaintiffs' current complaint and motion account for none of this. The Amended Complaint does not even mention, let alone challenge, the Interim Guidance in effect today. Similarly, Plaintiffs declined to bring the Interim Guidance to the Court's attention in connection with their pending motion, even though the Guidance plainly constitutes a significant development that negates their demand for emergency relief.

1

Nor do any of the Plaintiffs face a current or imminent threat of injury during the interim period while the policy is being studied.  The six Pseudonym Plaintiffs, who are currently serving in the U.S. military, seek a preliminary injunction that they may not be separated from the military, denied reenlistment, demoted, denied promotion, or denied medically necessary treatment on the basis that they are transgender.  *See* Am. Compl., ECF No. 9 at ¶ 1.  But none of those alleged injuries are occurring, or will occur, under the Interim Guidance.  And beyond that, it is unclear whether those currently serving members will be affected by the future policy regarding service by transgender individuals once it is finalized and implemented.  The remaining two named Plaintiffs, a student serving at the U.S. Naval Academy and another participating in the Reserve Officers' Training Corps, likewise face no imminent threat of injury, as they will not be in a position to apply for an officer's commission until after they complete their respective courses of study in 2020, at the earliest.  Without such injury, Plaintiffs lack standing and their claims are not ripe for adjudication.  The Court should therefore dismiss this case for lack of jurisdiction.

Were the Court to address Plaintiffs' motion for a preliminary injunction, it should deny them the drastic and extraordinary relief they seek.  To establish that preliminary relief is appropriate, Plaintiffs must show that they will suffer irreparable harm if an injunction is not entered, that they are likely to succeed on the merits, that the balance of equities tips in their favor, and that an injunction is in the public interest.  Plaintiffs have not made any of those showings.

To begin, for the same reasons that the Court presently lacks jurisdiction, Plaintiffs cannot establish that they will suffer irreparable harm absent a preliminary injunction.  The speculative harms that Plaintiffs believe may occur in the future, once the policy is formulated and implemented, cannot be redressed by the Court's equitable powers at this stage.

Nor can Plaintiffs show that they are likely to succeed on the merits of their claims.  Even if Plaintiffs could somehow establish jurisdiction at this stage, the policy currently in place—which maintains the status quo for transgender persons currently serving in the military—has not been challenged and, in any event, is plainly lawful.  Moreover, to the extent Plaintiffs assail the President's directive to study the policy questions at issue and to develop a new policy in accordance with his memorandum, they likewise have no meritorious claim.  Plaintiffs cannot show a likelihood of success on their equal protection, due process, or estoppel claims given that the Department of Defense has not completed its review or adopted a final policy.

Even if Plaintiffs could somehow challenge the military's longstanding accession policy concerning transgender individuals, that challenge would fail because the policy withstands the highly deferential review required here.  Federal courts owe the utmost deference to the political branches in the field of national defense and military affairs, both because the Constitution commits military decisions exclusively to those branches and because courts "have less competence" to second-guess military decisionmaking.  *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).  Decisions concerning the composition of a military force and the requisite conditions attendant to that service are at the core of these constitutionally committed powers.

Finally, the balance of equities and the public interest weigh against injunctive relief.  While Plaintiffs are not suffering any injury during the interim period when the policy is being examined—and may never be injured by the policy finally adopted—the Government is convening a panel of experts to study the policy, analyze the data, and provide recommendations.  The public interest would be significantly harmed if an injunction precluded the President and Secretary of Defense from receiving expert advice on important issues of military personnel policy and acting

in light of the results of that study.  And even if Plaintiffs somehow hurdle every problem with their challenge, there is no basis for the worldwide injunction against the military they request.

## BACKGROUND

### A.  History of the Military's Accessions Policy Regarding Transgender Individuals

The U.S. military has long required individuals to satisfy rigorous standards in order to serve.  The military presumptively excludes individuals who suffer from particular physical and mental conditions, although individualized waivers may be available.  DOD Instruction 6130.03 at 7 (Apr. 28, 2010) (DODI 6130.03).  These exclusions are necessary to ensure, *inter alia*, that service members are "capable of performing duties," free of conditions that "may require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without the necessity of geographical area limitations."  *Id.* at 2.

For decades, these conditions have included "transsexualism."  *Id.* at 48; *see also, e.g.*, DOD Directive 6130.3 at ¶ 2–34(b) (Mar. 31, 1986) ("[t]ranssexualism and other gender identity disorders"); Army Regulation 40–501 at ¶ 6–32(b) (May 17, 1963) ("behavior disorders[] as evidenced by … transvestism").  This condition, like others, is subject to a medical waiver process.  DODI 6130.03 provides that the military shall "[a]uthorize the waiver of the standards [for entry] in individual cases for applicable reasons and ensure uniform waiver determinations," and service-specific implementing rules set forth the waiver process for each military branch, *see, e.g.*, Army Reg. 40-501, Standards of Medical Fitness at ¶ 1-6(b).

In July 2015, former Secretary of Defense Ashton Carter ordered the creation of a working group "to study … the policy and readiness implications of welcoming transgender persons to serve openly" and instructed the group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness."  Statement by

Former Secretary of Defense Ash Carter, Release No. NR-272-15.[1]  The Defense Department also commissioned the RAND Corporation to study the matter, which in turn issued a report concluding that the proposed policy change would impose burdens on the military, but that such costs were "negligible" or "marginal."  RAND Report 33, 46, 69, 70.[2]

On June 30, 2016, former Secretary Carter issued a directive setting forth a new policy on service by transgender individuals.  Defense Department Directive-Type Memorandum ("DTM") 16-005.[3]  The directive allowed transgender individuals currently in the military to begin serving openly and authorized the Departments of Defense and Homeland Security to fund sex-reassignment surgeries.  *Id.*  It also ordered the revision of the military's accession policy by July 1, 2017.  *Id.*  That revision would provide that a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" were all presumptively "disqualifying."  *Id.*  Under the proposed revision, however, the applicant could overcome that presumption by proving that: (i) in the case of gender dysphoria, he had "been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months"; (ii) in the case of a medical gender transition, he had completed all medical treatment and had "been stable in the preferred gender for 18 months"; and (iii) in the case of surgery, he had waited 18 months since the operation and "no functional limitations or complications persist, nor is any additional surgery required."  *Id.*

---

[1] Statement by Former Secretary of Defense Ash Carter, Release No. NR-272-15, is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/statement-by-secretary-of-defense-ash-carter-on-dod-transgender-policy/ (last visited Oct. 4, 2017).

[2] The RAND Report is available online at: https://www.rand.org/pubs/research_reports/RR1530.html (last visited Oct. 4, 2017).

[3] Defense Department Directive-Type Memorandum 16-005 is available online at: https://www.defense.gov/Portals/1/features/2016/0616_policy/DTM-16-005.pdf (last visited Oct. 4, 2017).

On June 30, 2017, Secretary of Defense James Mattis extended the deadline for revising the accession policy by six months, until January 1, 2018.  Department of Defense, Release No. NR-250-17 (June 30, 2017).[4]  Nearly a month later, on July 26, 2017, the President stated on Twitter that "the United States Government will not accept or allow transgender service members to serve in any capacity in the U.S. military," citing the "medical costs and disruption that transgender in the military would entail."  Am. Compl., ECF No. 9 at ¶ 81.

### B.  Plaintiffs' Initial Complaint and the President's Subsequent Memorandum

Before the President issued official policy guidance to military leaders, Plaintiffs filed this action on August 9, 2017, purporting to challenge the constitutionality of the President's tweets. Compl., ECF No. 1.  Over two weeks later, on August 25, the President issued a memorandum to the Secretaries of Defense and Homeland Security regarding military service by transgender individuals.  Presidential Memorandum, 82 FR 41319.  The Presidential Memorandum explains that, until June 2016, longstanding policies and practices "generally prohibited openly transgender individuals from accession into the United States military and authorized the discharge of such individuals." *Id.*, § 1.  In his role as Commander in Chief, the President found that former Secretary Carter had failed to identify a sufficient basis to conclude that ending these longstanding policies and practices "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." *Id.*  Accordingly, he determined, "further study is needed to ensure that implementation of last year's policy change would not have those negative effects." *Id.*

The President directed the military to maintain its longstanding policies and practices regarding service by transgender individuals that were in place before June 2016.  Those policies

---

[4] The Department of Defense Release is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/1236145/statement-by-chief-pentagon-spokesperson-dana-w-white-on-transgender-accessions/ (last visited Oct. 4, 2017).

would remain in place until there existed a sufficient basis to conclude that ending them would not cause the harms identified by the President. The President also stated that the Secretary of Defense, in consultation with the Secretary of Homeland Security, should advise him at any time if a change in policy is warranted. *Id.* § 1(b).

The President then directed the Secretaries of Defense and Homeland Security to maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018—when the revision on accession policy announced in June 2016 was set to take effect—until such time as the Secretary of Defense, in consultation with the Secretary of Homeland Security, provides a recommendation to the contrary that the President finds convincing. *Id.* § 2(a). The President also directed the Departments of Defense and Homeland Security to halt the use of resources to fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his sex. *Id.* § 2(b).

Other than the provision regarding accessions, the Memorandum's provisions take effect on March 23, 2018. This delayed implementation date was adopted so that the two Cabinet Secretaries can study the issues addressed in the Memorandum and submit an implementation plan to the President by February 21, 2018. *Id.* § 3.

The Memorandum also addresses transgender individuals who are currently serving in the military. It provides that "[a]s part of the implementation plan, the Secretary of Defense, in consultation with the Secretary of Homeland Security, shall determine how to address transgender individuals currently serving in the United States military." *Id.* In addition, "[u]ntil the Secretary has made that determination, no action may be taken against such individuals under the policy set forth in Section 1(b) of this memorandum." *Id.*

7

On August 29, 2017, Secretary Mattis issued a statement explaining that the Department of Defense had received the Presidential Memorandum and would develop a study and implementation plan.  Statement of Secretary Jim Mattis, Release No: NR-312-17.[5]  Secretary Mattis promised to "establish a panel of experts serving within the Departments of Defense and Homeland Security to provide advice and recommendations on the implementation of the president's direction."  *Id.*  According to Secretary Mattis, the "[p]anel members will bring mature experience, most notably in combat and deployed operations, and seasoned judgment to this task," and "will assemble and thoroughly analyze all pertinent data, quantifiable and non-quantifiable." *Id.*  Secretary Mattis also stated that he expected to issue interim guidance on the issue of military service by transgender individuals "to ensure the continued combat readiness of the force until our final policy on this subject is issued."  *Id.*

### C.  Plaintiffs' Amended Complaint and the Interim Guidance

Rather than waiting for Secretary Mattis to issue interim guidance, Plaintiffs amended their complaint on August 31, 2017, ECF No. 9, and filed a motion for a preliminary injunction, Pls. Mem., ECF No. 13.  Two weeks later, on September 14, 2017, Secretary Mattis issued Interim Guidance regarding military service by transgender individuals.  Interim Guidance, Exhibit 1.[6] The Interim Guidance states, "first and foremost," that the military "will continue to treat every Service member with dignity and respect."  *Id.*  It then confirms that the military's longstanding accessions policy, "which generally prohibit[s] the accession of transgender individuals into the Military Services, remain[s] in effect because current or history of gender dysphoria or gender

---

[5] The August 29, 2017 Statement of Secretary Jim Mattis, Release No: NR-312-17, is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/1294351/ (last visited on Oct. 4, 2017).

[6] By agreement with the Acting Secretary of Homeland Security, this Interim Guidance also applies to the U.S. Coast Guard.  Interim Guidance, Exhibit 1.

transition does not meet medical standards." *Id.*  It emphasizes, however, that this "general[]" prohibition remains "subject to the normal waiver process." *Id.*

The Interim Guidance also addresses potential harms alleged by the Plaintiffs who are current service members.  On the issue of involuntary discharges, it states that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status."  *Id.*  The Interim Guidance also addresses reenlistment into military service, providing that  "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be reenlisted in service under existing procedures."  *Id.*  Finally, it directs that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition."  *Id.*

When the Interim Guidance was issued, Defendants' counsel provided it to Plaintiffs' counsel and asked Plaintiffs to amend their complaint and withdraw or, at least narrow, their motion for a preliminary injunction to account for arguments and allegations that have been overcome by the current operative policy regarding military service by transgender individuals. Plaintiffs refused to do so.  Their current complaint and motion for a preliminary injunction therefore fail to address the current state of the Government's policy regarding military service by transgender individuals.  Given the way this litigation has unfolded, many of the allegations in Plaintiffs' amended complaint and motion for a preliminary injunction have been overcome by events or are not factually accurate.  This is true for each of the eight Plaintiffs.

Jane Doe 1 serves in the U.S. Coast Guard and has notified her command that she is transgender.  Am. Compl., ECF No. 9 ¶¶ 13–14.[7]   She alleges that, after the President's tweets, she had a transition-related medical procedure canceled and has submitted a prospective letter of resignation out of fear of being involuntarily discharged from the Coast Guard due to her transgender status.  Id. ¶¶16–17.  But Defendants have submitted the declaration of Brian Judge ("Judge Decl."), Chief of the Coast Guard's Office of Claims and Litigation, stating that, "the Coast Guard has taken no action to attempt to separate Jane Doe 1 from the service nor has there been any communication to Jane Doe 1 indicating that separation is being contemplated."  Judge Decl., ¶4.  Mr. Judge also states in his declaration that Jane Doe 1's application for the supplemental health care waiver necessary to receive a transition-related surgery is currently being processed by the Defense Health Agency.  Id. ¶ 6.

Jane Doe 2 serves in the U.S. Army and has notified her command that she is transgender. Am. Compl., ECF No. 9 ¶¶ 18–19.  She allegedly fears being involuntarily discharged before her current service contract ends in November 2018.  Id. ¶ 22.  But Defendants have submitted a sealed declaration stating that she will not be separated or discharged due to transgender status or gender dysphoria absent a change in policy.  See Sealed Declaration relating to Jane Doe 2.

Jane Doe 3 serves in the U.S. Army and has notified her command that she is transgender. Am. Compl., ECF No. 9 ¶¶ 23–24.  She alleges in her declaration that she fears she will not be permitted to deploy with her unit and that her medical transition plan will not be approved.  Id. ¶¶ 10, 13–14.  She also alleges in the complaint that she fears that she will not be able to renew her contact with the Army when it expires in in December 2018.  Id. ¶ 25.  But Defendants have

---

[7] In this memorandum and related documents, the Government uses Plaintiffs' choice of pronouns for purposes of consistency and for the convenience of the Court.

submitted a sealed declaration explaining that Jane Doe 3 faces no current threat of discharge and, as the sealed declaration explains, has not been otherwise harmed. *See* Sealed Declaration relating to Jane Doe 3.

Jane Doe 4 serves in the U.S. Army and has notified her command that she is transgender. Am. Compl., ECF No. 9 ¶¶ 26–27. She allegedly fears the Army will bar her from renewing her contract when it expires in June 2018. *Id.* ¶ 29. But Defendants have submitted a sealed declaration stating that "effective August 24, 2017," she "reenlisted in the Army National Guard and extended her commitment" until February 2020. Sealed Declaration relating to Jane Doe 4.

Jane Doe 5 serves in the U.S. Air Force and has notified her command that she is transgender. Am. Compl., ECF No. 9 ¶¶ 26–27. She alleges that she fears being involuntarily separated from the military. *Id.* ¶ 29. But Defendants have submitted a declaration stating that the "United States Air Force is not taking any action to involuntarily separate or discharge an otherwise qualified member of the United States Air Force solely on the basis of a gender dysphoria diagnosis or transgender status." *See* Sealed Declaration relating to Jane Doe 5.

John Doe 1 serves in the U.S. Army and has notified his command that he is transgender. Am. Compl., ECF No. 9 ¶¶ 33–34. He alleges in the complaint and in his declaration that his surgery consult was canceled and that he fears being involuntarily discharged from the Army. *Id.* ¶ 36; John Doe 1 Decl., ECF No. 40-5 ¶ 24. But Defendants have submitted a declaration stating that John Doe 1 had a surgical consultation on September 5, 2017, and is currently scheduled for transition-related surgery on January 4, 2018. *See* Sealed Declaration relating to John Doe 1. In addition, under the Interim Guidance, "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status." Interim Guidance, Exhibit 1.

11

Plaintiff Regan V. Kibby is a midshipman at the U.S. Naval Academy and has notified the Academy that he is transgender.  Am. Compl., ECF No. 9 ¶ 37.  Kibby alleges that he has been granted medical leave from the Naval Academy and fears that he will not be permitted to return to the Academy or to be commissioned as an officer in the U.S. Navy upon graduation from the Academy.  *Id.* ¶ 29.  But Defendants have submitted the Declaration of Navy Captain Robert B. Chadwick ("Chadwick Decl."), Commandant of the United States Naval Academy, stating that Kibby is on medical leave, and there is currently no impediment to his returning to the Academy when his leave ends in May 2018.  Chadwick Decl. ¶¶ 9, 12.  Captain Chadwick also states that the timing of Kibby's leave was intended to allow him to return to the Academy, complete his course of study, and accept a commission as an officer in the U.S. Navy in May 2020.  *Id.*

Plaintiff Dylan Kohere is a first year college student and member of his school's Reserve Officers' Training Corps ("ROTC").  Am. Compl., ECF No. 9 at ¶ 39.  He has notified the Sergeant of his ROTC program that he is transgender.  *Id.* ¶ 29.  Kohere alleges that he fears that he will "be barred from enlisting in the military and, as a result, will no longer be eligible to participate in his ROTC program or receive an ROTC scholarship."  *Id.* ¶ 40.  But Defendants have submitted the declaration of Robert O. Burns ("Burns Decl."), Deputy Chief of Staff for Personnel, G1, for the United States Army Cadet Command, stating that Kohere is currently a participating student in the ROTC program, and noting that he did not apply for an ROTC scholarship in a timely fashion. Burns Decl. ¶¶ 9, 12.  Burns also states that, based on Kohere's current timeline, he would be ineligible to receive an appointment to the military until he graduates, which based on a four-year program, would be in Spring 2021.

## STANDARD OF REVIEW FOR MOTION TO DISMISS

When assessing standing at the motion to dismiss stage, the Court will "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but will "not assume the truth of legal conclusions, nor ... accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal quotation marks and citations omitted). "Nevertheless, threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice." *Id.* (internal quotation marks and citation omitted). "Moreover, because subject-matter jurisdiction relates to the Court's power to hear the claim, the Court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion." *Am. Fed'n Gov't Emps. v. Sec'y Air Force*, 841 F. Supp. 2d 233, 235–36 (D.D.C. 2012) (citing *Uberoi v. EEOC*, 180 F. Supp. 2d 42, 44 (D.D.C. 2001))

A court may consider materials outside the pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, *Fed. Prac. & Pro., Civil* § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (D.C. Cir. 2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In these circumstances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al–Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

13

**ARGUMENT**

## I.    The Court Should Grant Defendants' Motion to Dismiss for Lack of Jurisdiction

Plaintiffs' claims should be dismissed for two related reasons.  First, they have not suffered the kind of concrete injury necessary to establish standing, nor do they face an imminent threat of future injury.  Second, and in the alternative, Plaintiffs' claims are not ripe, as the issues presented are not fit for judicial decision, no actual discharge or denial of accession has occurred, and they will not suffer a hardship if the Court withholds consideration until after the policies challenged in this case are implemented and are found to impact Plaintiffs.  The Court lacks jurisdiction and should dismiss Plaintiffs' claims under Rule 12(b)(1).

### A.    The Court's Standing Inquiry Should Be Especially Rigorous

Article III of the Constitution confines federal courts to adjudicating only "actual cases or controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "No principle is more fundamental to the judiciary's proper role in our system of government than [this] constitutional limitation."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  Federal courts therefore have "neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them," and must resolve only "real and substantive controvers[ies] admitting of specific relief through a decree of a conclusive character."  *Preister v. Newkirk*, 422 U.S. 395, 401 (1975).

One aspect of this case-or-controversy limitation is the requirement of standing.  To establish standing, Plaintiffs must satisfy three elements: (1) they must have suffered an injury-in-fact, *i.e.*, a judicially cognizable injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly … trace[able] to the challenged action of the defendant;" and (3) "it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560-61 (1992).  To satisfy the first requirement, Plaintiffs must establish they have suffered a "distinct and palpable injury," *Warth v. Seldin*, 422 U.S. 490, 500–01 (1975); a "generally available grievance about government" is insufficient.  *Lujan*, 504 U.S. at 573–74.

By limiting the judicial power to instances where specific individuals have suffered concrete injuries, standing requirements "serve[] to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  A court's standing inquiry thus should be "especially rigorous when reaching the merits of the dispute" would compel it "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Id.* at 408.  Here, Plaintiffs have brought a constitutional challenge to the President's policy directive to conduct further study before the military changes its longstanding policies regarding service by transgender individuals.  The Court thus should conduct an "especially rigorous" inquiry into whether Plaintiffs have standing.  *Id.*

### B.    Plaintiffs Have Not Met Their Burden of Showing an Injury-in-Fact

Each of the Plaintiffs bear the burden of establishing that they have standing in their own right to pursue their claims.  *See Klayman v. Obama*, 142 F. Supp. 3d 172, 184 (D.D.C. 2015) (noting "the requirement that each plaintiff demonstrate adequate standing to press their claims in federal court.").  An examination of the facts of this case, however, shows that none of the Plaintiffs have standing and, at the very least, that they have brought this action prematurely.

Plaintiffs allege two types of injuries.  First, they allege injuries that they are suffering now, while the policy concerning service by transgender individuals is being studied, formulated, and implemented.  But none of these alleged injuries are occurring under the Interim Guidance issued by Secretary Mattis.  Second, they allege injuries that they might suffer after the policy is studied,

formulated, and implemented.  As shown below, these allegations are obviously speculative and do not support standing at this stage and, at the very least, do not present ripe claims.

The Interim Guidance issued on September 14, 2017, establishes that no current service member will be involuntarily discharged or denied the right to reenlist solely because of their transgender status, or denied medical treatment for gender dysphoria, during the interim period. Interim Guidance, Exhibit 1.  Plaintiffs never address the Interim Guidance—the operative policy concerning military service by transgender individuals—in their amended complaint or preliminary injunction motion.

As discussed, Defendants have submitted declarations showing that Plaintiffs have not suffered the injuries they have alleged during the interim period.  Consistent with the Interim Guidance, none of the Plaintiffs currently serving have been discharged or had their applications for reenlistment denied.  In fact, Jane Doe 4's application for reenlistment has been processed and approved.  John Doe 1 has scheduled a transition-related surgery, and none of the other current service member Plaintiffs have been denied transition-related medical care based on the Interim Guidance.  Plaintiff Kibby currently is on medical leave and faces no impediment to returning to the Naval Academy when that leave ends in May 2018.  And Plaintiff Kohere is still a participating student in the ROTC program at his college and will not be eligible to apply for an officer's commission until 2021.  Accordingly, Plaintiffs have not established that they are presently suffering a concrete personal injury or that they face an imminent threat of future injury, particularly where future policy on the accession of transgender service members or the treatment of current transgender service members has not been resolved.

Plaintiffs' allegations that they may be harmed by future policy concerning transgender military service are based on multiple levels of speculation.  The Secretaries of Defense and

Homeland Security are currently studying and developing policy on military service by transgender individuals.  As the policy is still being formulated, Plaintiffs can only speculate on what that policy might be or how it might affect them in the future.  Such speculation about possible future injury is insufficient to establish injury in fact.  *See, e.g.*, *Amnesty Int'l USA*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.").

Addressing the allegations of the Pseudonym Plaintiffs that they might ultimately be involuntarily discharged under the final policy would require the Court to assume the content of a military policy that is still being studied before it is formulated and implemented, and would ultimately result in an advisory opinion on a legal issue that may never arise.  Similarly, adjudicating the claims of Plaintiffs Kibby and Kohere would require the Court to assume the content of future policies related to the Military Service Academies and ROTC program.

Nor can Plaintiffs contend that they are presently suffering a concrete injury on the theory that Defendants actions have been "stigmatizing."  Pls. Mem., ECF No. 13 at 29.  Stigmatic injury inflicted by allegedly unconstitutional discrimination "accords a basis for standing only to those persons who are personally denied equal treatment."  *Allen*, 468 U.S. at 755.  Plaintiffs have not shown that they themselves have been subject to discriminatory treatment, and they cannot rely upon a claim of stigmatic injury to establish standing.  Instead, "stigmatic injury… requires identification of some concrete interest with respect to which respondents are personally subject to discriminatory treatment," and "[t]hat interest must independently satisfy the causation requirement of standing doctrine."  *Id.* at 757 n.22.

What Plaintiffs claim is "stigmatic" and harms them now is "the announced ban on transgender military service."  Pls. Mem., ECF No. 13 at 28.  They further allege that they

"continue to serve under the pall of this ban" and that "[t]he ban already labels them as officially unfit and places them into a legally inferior class of people who, because of their transgender status, have been deemed ineligible for continued service." *Id.* at 29–30.  But Plaintiffs have not been deemed ineligible for military service under either the Presidential Memorandum or the Interim Guidance.  The current policy in place—the Interim Guidance—provides that currently serving transgender persons will be neither denied medically necessary care nor subject to discharge or denied reenlistment on basis of their transgender status.  Thus, Plaintiffs are seeking a preliminary injunction based in part on the alleged stigmatic effect of possible *future* restrictions on military service that have not gone into effect and where any impact on current service members has not yet been resolved.  Under these circumstances, Plaintiffs' claims of a *current* stigmatic injury do not suffice to establish concrete harm today or imminent future harm.

## C.      Plaintiffs' Claims Are Not Ripe for Adjudication

Plaintiffs' claims are also unripe.  The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  "Prudentially, the ripeness doctrine exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements, and, where, as here, other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their effects felt in a concrete way by the challenging parties."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996).  To decide whether a claim is prudentially ripe, a court must evaluate both (1) "the fitness of the issues for judicial decision" and (2) "the hardships to the parties of withholding court consideration."  *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967).  Both considerations demonstrate that Plaintiffs' challenge is premature.

First, the issues presented by Plaintiffs' challenge are not fit for judicial decision. No Plaintiff has been discharged or denied accession, so there is no actual decision affecting a Plaintiff, which would be the usual focus of judicial review. The general policy they assail is still being studied, developed, and implemented, and judicial review at this stage would entangle the Court in an abstract disagreement over a rule that has not yet been formulated or had any concrete effect on Plaintiffs. Concerns regarding whether issues are fit for judicial decision apply with special force here, where Plaintiffs ask this Court to interfere in an area that is constitutionally committed to the discretion of the political branches.

Under these well-settled principles, the Court should defer to the policymaking process presently underway concerning military service by transgender persons in the military. Plaintiffs cannot establish, nor should this Court attempt to predict, the effect that future policies will have on overall military needs when the military is exploring these issues. While Plaintiffs seek to rely at this stage on the views of former officials and military leaders regarding the policy on military service by transgender individuals,[8] these submissions only underscore that different views exist as to a policy debate now underway—not that a possible future policy would be unlawful.

Second, due to the protections afforded by the Interim Guidance, Plaintiffs are not being harmed and will not suffer hardships if the Court withholds consideration. As for Plaintiffs' allegations that they will be harmed in the future, it is unclear both how the policy regarding military service by transgender individuals will be developed and implemented and whether that policy will even have any effect on Plaintiffs. Plaintiffs' speculation about future events is

---

[8] *See* Declaration of former Acting Under Secretary of Defense for Personnel and Readiness Brad Rogers Carson, ECF No. 13-3; Declaration of Former Secretary of the United States Air Force Deborah Lee James, ECF No. 13-5; Declaration of former Secretary of the Army Eric K. Fanning, ECF No. 13-7; and Declaration of former Secretary of the Navy Raymond Edwin Mabus, Jr., ECF No. 13-9.

insufficient to show that they will be harmed if this Court withholds its consideration.  After all, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

The Court does not have before it the final policy, justifications for that final policy, or allegations of concrete, particularized injuries to Plaintiffs that have arisen from application of a final policy.  The Court should therefore decline to issue an advisory opinion on possible constitutional theories, and dismiss Plaintiffs' claims until they become ripe.

## II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied

Because Plaintiffs lack standing and their claims are not ripe, the Court should not consider Plaintiffs' motion for a preliminary injunction but simply dismiss the current amended complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").  But if the Court decides to reach Plaintiffs' motion, it should still deny them the extraordinary and drastic remedy they seek.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  A plaintiff cannot prevail without some showing on each of these four factors. *See id.* at 23–24, 31– 32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success).

And that showing must be especially strong to obtain an injunction from an Article III court that runs to internal operations of the military.  Here, Plaintiffs have not made that showing.

A.    **Plaintiffs Have Not Shown that They Are Likely to Suffer an Irreparable Harm Absent the Entry of a Preliminary Injunction**

The Court's review of Plaintiffs' preliminary injunction motion should begin and end with a consideration of whether they are likely to suffer irreparable injury.  To show that a preliminary injunction is warranted, Plaintiffs must demonstrate "that irreparable injury is *likely* in the absence of an injunction," regardless of the likelihood of success on the merits of their claims.  *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("[T]he *Winter* Court rejected the idea that a strong likelihood of success could make up for showing only a possibility (rather than a likelihood) of irreparable harm. In other words, the Court ruled that the movant always must show a likelihood of irreparable harm."); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").  They cannot do so.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  To qualify as irreparable, an injury must be both (i) "'certain and great,'" *i.e.*, "'actual and not theoretical,'" as well as (ii) "beyond remediation." *Id.* (citation omitted).  Plaintiffs' alleged injuries are neither.  First, for much the same reasons they lack standing, Plaintiffs cannot show that they will suffer certain, great, or any actual injuries if the Court does not enter an injunction.  *See supra* Part I.  Second, even if Plaintiffs could establish

such an injury, they cannot show that it would be beyond remediation.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."  *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Id.*  Accordingly, "given the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury."  *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006).  As Plaintiffs' potential injuries are all employment-related, they could be remedied by the Court at a later date and are thus not irreparable.  *See Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016) (Kollar-Kotelly, J.) (concluding that separation from the military did not constitute an irreparable harm).

### B.      Plaintiffs Are Unlikely To Succeed on the Merits[9]

Plaintiffs also cannot establish that they are likely to succeed on the merits.  To begin, Plaintiffs' failure to clear the standing and ripeness thresholds forecloses any conclusion that they are likely to prevail on the merits of this lawsuit.  *See supra* Part I; *see also, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction.  It says nothing about the 'likelihood of success on the merits,' other than making such success more *unlikely* due to potential impediments to even reaching the merits.").  But even if Plaintiffs could somehow establish jurisdiction at this stage, their challenge would founder for several reasons.  First, the policy currently in place—which maintains the status quo

---

[9] For the same reasons that Plaintiffs cannot establish a likelihood of success on the merits, they also fail to state a claim as a matter of law.  Accordingly, Plaintiffs' Amended Complaint is also subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

for transgender persons currently serving in the military during an interim period while the need for possible changes is studied—has not been challenged in this case and, in any event, is plainly lawful.  Second, to the extent Plaintiffs seek to attack the ongoing policy-making process, their claims similarly lack merit.  The President's decision that the complex issues presented by the policy on military service by transgender individuals warrant additional study before changes are made to longstanding policies passes constitutional muster under any standard.  Third, even if the Court could somehow review the military's current maintenance of its longstanding accessions policy, the policy would withstand constitutional challenge.  Likewise, until the future policy concerning transgender service is resolved and implemented, Plaintiffs cannot show they are likely to succeed on their due process or estoppel claims.

>1.      **Plaintiffs Have Not Challenged Defendants' Operative Policy for Enlisted Transgender Service Members, and any such Challenge Would Fail to State an Equal Protection Claim**

Plaintiffs' claims fail to mention, let alone address, the military policy on service by transgender individuals that is currently in effect.  For that reason alone, they cannot show a likelihood of success on the merits of their claims.  While Plaintiffs say much about the potential impact of the President's August 25 Memorandum, Pls. Mem., ECF No. 13 at 1, they never address the operative Interim Guidance issued on September 14, 2017, which bars any disparate treatment of current transgender service members.  Under the operative policy:

>[N]o action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status.  Transgender Service members are subject to the same standards as any other Service member of the same gender; they may be separated or discharged under existing bases and processes, but not on the basis of gender dysphoria diagnosis or transgender status.

Interim Guidance, Exhibit 1.  The operative policy further provides that transgender service members "who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition."  *Id.*  And it makes clear that "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be re-enlisted in service under existing procedures."  *Id.*[10]

Under this operative policy, Plaintiffs' claims fail on their face.  Plaintiffs ask this Court to order that transgender service members "may not be separated from the military, denied reenlistment, demoted, denied promotion, [or] denied medically necessary treatment on a timely basis."  Pls. Mem., ECF No. 13 at 39.  But the Interim Guidance *already* does that.  The Equal Protection Clause does not apply under these circumstances.  "A denial of equal protection entails, at a minimum, a classification that treats individuals unequally."  *Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 707 (9th Cir. 1997).  Here, the current operative policy does not impermissibly classify service members based on transgender status, but rather *prohibits* disparate treatment of existing service members based on transgender status.  A law that forbids disparate treatment cannot violate the Equal Protection Clause.

---

[10] The policy also states that "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, *except to the extent necessary to protect the health of the individual who has already begun a course of treatment to reassign his or her sex*."  *Id.* (emphasis added).  There are thus no restrictions on sex-reassignment surgery at present.  In addition, this provision confirms that medically necessary procedures will be accommodated in the future.

**2.   Plaintiffs' Challenge to the Accession Policy is Unlikely to Succeed**

To the extent Plaintiffs seek to challenge Defendants' current policy for the accession of transgender persons into the military, they also cannot establish a likelihood of success on the merits and have failed to state a valid claim challenging that policy for several reasons.

First, neither the President's Memorandum nor the operative Interim Guidance establishes a new restriction that has been imposed on Plaintiffs with respect to accession to military service. Even before the President took action, the policy on accession by transgender individuals announced in June 2016 had not gone into effect. Originally scheduled to be implemented on July 1, 2017, Secretary Mattis had deferred implementation of a revised accession policy until January 1, 2018, before the President made issued his memorandum. *See* Presidential Memorandum § 1(a). The President's Memorandum merely "extends the deadline to alter the currently effective accession policy beyond January 1, 2018, while [the relevant Departments] continue to study the issue." *Id.* The "currently effective" accession policy is set forth in DODI 6130.03, and was most recently modified in September 2011. *See* DODI 6130.03. The Interim Guidance thus maintains the status quo by continuing the longstanding procedures set forth in DODI 6130.03 to permit further review by a panel of experts before any change in policy occurs. Thus, with respect to accession, Plaintiffs cannot claim that the President imposed a new requirement; instead, he declined to relax longstanding policy without further study. All the President has done is preserve the status quo "until such time as a sufficient basis exists upon which to conclude" that ending the accessions policy would not result in harm to the military. Presidential Memorandum § 1(b). The President has the authority to insist on further study before a significant change to military personnel policy, and Plaintiffs cannot show otherwise, let alone obtain an injunction to halt such

a study.  And certainly no Plaintiff can credibly sustain a claim for emergency relief as to a policy whose current version has been in place without modification for nearly six years.

Second, Plaintiffs cannot show a likelihood of success on the merits of any challenge to the accession policy because it applies to none of them.  The six Plaintiffs who are currently serving in the military are not subject to the accessions policy, but to the policy set forth in the Interim Guidance under which they may reenlist and obtain promotions.  And the two student Plaintiffs are not presently subject to the accessions policy because they are still at their respective schools and will not be in a position to apply for an officer's commission until after they complete their respective courses of study in 2020 at the earliest.

Third, even if Plaintiffs were ready to accede into the military at this time, the Interim Guidance expressly confirms that the accession policy, which "generally" bars the accession of transgender individuals into the military, is "subject to the normal waiver process."   Interim Guidance, Exhibit 1.  Accordingly, Plaintiffs could only be injured if they sought and were denied individualized waivers.  Given that there is no way of knowing whether the military would deny such requests, Plaintiffs cannot claim that the accessions policy bars their entry into the military.

Finally, even if the accession policy did apply to Plaintiffs, the President has concluded only that the analysis undertaken thus far does not provide "a sufficient basis to conclude that terminating the Departments' longstanding policy and practice would not hinder military readiness and lethality, disrupt union cohesion, or tax military resources" and that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."  Presidential Memorandum § 1(a).  It is plainly reasonable for the Defense Department to study conditions that could have an adverse effect on military readiness and budgetary constraints,

and Plaintiffs cannot state a valid claim, let alone support preliminary injunctive relief, on the ground that it is unlawful to do so.

In these circumstances, the Court need not—and should not—address the constitutionality of accession policy at this stage. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944). This avoidance principle is particularly applicable here, where Plaintiffs' claims seek to delve into the judgment of military authorities. *See infra* Part II.B.3.

### 3. In any Event, an Equal Protection Challenge to Defendants' Longstanding Accession Policy Would Not Succeed

Although there is no basis for this Court to address the issue, Plaintiffs' equal protection challenge to the accession policy regarding transgender individuals is unlikely to succeed.

#### a. The military's longstanding accessions policy is subject to a highly deferential form of review

**i.** Courts have accorded substantial deference to Congress and the President on the development and regulation of military personnel policy. That is not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10. Accordingly, there is "perhaps … no other area" where the Supreme Court has shown the political branches "greater deference." *Rostker v. Goldberg*, 453 U.S. 57, 64–65 (1981).

None of this is to say that the Constitution may be disregarded when military affairs are at stake, *see, e.g.*, *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987) (per curiam), but "the tests and limitations to be applied may differ because of the military context," *Rostker*, 453 U.S.

at 61.  For instance, judicial "review of regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations destined for civilian society."  *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986).   In the military context, the government may ban political speeches and the distribution of leaflets, *Greer v. Spock*, 424 U.S. 828 (1976), or even impose prior restraints on circulating petitions, *Brown v. Glines,* 444 U.S. 348, 355 (1980).   And even during an era when the Court applied a more rigorous standard for free-exercise claims, it still allowed the Air Force to prohibit a Jewish officer from wearing a yarmulke while working as a clinical psychologist in an Air Force base hospital.  *Weinberger*, 475 U.S. 503.

The same principle applies to "'[t]he complex, subtle, and professional decisions as to the composition … of a military force.'"  *Rostker*, 453 U.S. at 65 (quoting *Gilligan*, 413 U.S. at 10). These "'are essentially professional military judgments, subject always to the civilian control of the Legislative and Executive Branches,'" and thus are particularly ill-suited to judicial second-guessing.  *Id.* at 65–66 (emphasis omitted). That is in part because choices about the composition of the armed forces "are based on judgments concerning military operations and needs, and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well."  *Id.* at 68 (internal citation omitted).

Courts consequently have upheld exclusionary policies in the military while at the same time invalidating similar policies in the civilian sphere.  *Compare, e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976), *Reed v. Reed*, 404 U.S. 71 (1971); and *Massachusetts v. HHS*, 682 F.3d 1, 9–10 (1st Cir. 2012), *with Rostker*, 453 U.S. 57, *Schlesinger v. Ballard*, 419 U.S. 498 (1975); and *Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008).  Of course, there are limits: no amount of deference could save the military's decision to exclude a race or religion from being considered under the strict scrutiny standard.  *See Steffan v. Perry*, 41 F.3d 677, 689 & n.9 (D.C. Cir. 1994) (en banc).  But

outside those extreme examples, the military's policies are entitled to a "healthy deference" their civilian counterparts do not enjoy.

**ii.** While the Supreme Court has yet to provide a precise explanation of how this deference interacts with traditional tiers of scrutiny, *see Rostker* 453 U.S. at 69–70, at least three features of the highly deferential review applied to military regulations are significant. First, courts defer to the judgments of the political branches even in the face of contrary evidence. In *Weinberger*, for instance, the plaintiff provided "expert testimony that religious exceptions" to the Air Force's dress code "will increase morale by making the Air Force a more humane place," and pointed out "that the Air Force's assertion" that such exceptions "would threaten discipline" was "mere *ipse dixit*, with no support from actual experience or a scientific study in the record." 475 U.S. at 509. The Court dismissed the "views of expert[s]" as "quite beside the point," because "military officials … are under no constitutional mandate to abandon their considered professional judgment." *Id.* Similarly, in *Rostker*, the Supreme Court rejected the lower court's conclusion that the available evidence showed that "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'" 453 U.S. at 63 (citation omitted). As the Court explained, judges could not substitute their "own evaluation of evidence for a reasonable evaluation" by the political branches. *Id.* at 68.

Second, the political branches enjoy a significant latitude to choose "among alternatives" in developing military policy, including among alternatives supported by different government officials and military experts. *Id.* at 72. In *Rostker*, for example, President Carter recommended that Congress "permit the registration and conscription of women as well as men," *id.* at 60, and secured "testimony of members of the Executive Branch and the military in support of that decision," *id.* at 79. That side of the debate stressed that women inducted into the army could "be

used to fill noncombat positions, freeing men to go to the front." *Id.* at 81.  The Supreme Court rejected the lower court's reliance on this testimony, explaining that the policy question of participation of women in the selective service was appropriately left to Congress and the military rather than the courts.  *See id.*

Third, arguable inconsistencies that result from line-drawing have not rendered military policies invalid.  The Court in *Weinberger*, for instance, acknowledged that the Air Force both had an "exception … for headgear worn during indoor religious ceremonies" and allowed commanders "in their discretion" to allow "visible religious headgear … in designated living quarters and nonvisible items generally."  475 U.S. at 509.  But the fact that "Air Force has drawn the line essentially between religious apparel that is visible and that which is not" did not trouble the Court, for the regulations challenged in that case "reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity."  *Id.*

**iii.** Plaintiffs ignore all of this, treating their premature challenge as if it were a run-of-the-mill civilian case.  They first insist that the military's accessions policy is subject to a conventional strict-scrutiny analysis, but fail to identify a single court that has applied this exacting standard to laws bearing on transgender individuals in any context.  Pls. Mem., ECF No. 13 at 13–14.  This Court should not be the first to do so with respect to a military judgment.  Indeed, applying strict scrutiny here would mean that transgender status receives far greater protection than core First Amendment freedoms, *see Weinberger*, 475 U.S. 503; *Brown*, 444 U.S. 348; *Greer*, 424 U.S. 828, sexual orientation, *see, e.g.*, *Steffen*, 41 F.3d 677, and even gender itself, *see Rostker*, 453 U.S. 57.

In the alternative, Plaintiffs insist that the military's policy warrants intermediate scrutiny because it is a sex-based classification or sex stereotyping.  PI Mem. 15–16.  But the D.C. Circuit has never applied a heightened level of scrutiny to any claim of transgender discrimination and, to

our knowledge, no court has ever applied heightened scrutiny to a claim of transgender discrimination in the military. *See, e.g., Doe v. Alexander*, 510 F. Supp. at 902, 905 (D. Minn. 1981) (declining to review medical fitness determination policy for service member who had undergone sex change procedure under heightened review). In any event, every case Plaintiffs cite involves distinctions in the civilian context—typically, employment—and thus are distinguishable. There is consequently no need for this Court to weigh in on how to apply equal protection doctrine to transgender individuals when it comes to civilian affairs. *Compare, e.g.*, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *cert. pending*, No. 17-301, *with Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007). *See generally* Pls. Mem., ECF No. 13 at 13–16 (collecting cases).

### b. Plaintiffs are unlikely to succeed on their challenge to the military's longstanding accessions policy.

In light of the considerable deference due to military personnel decisions, Plaintiffs cannot show that they are likely to succeed on their challenge to the decades-long accessions policy. As the President explained, there were significant concerns that abandoning this policy could "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." Presidential Memorandum § 1(a). Plaintiffs concede that these interests are legitimate, and instead contend only that maintaining the status quo does not further them. Pls. Mem., ECF No. 13 at 17. That argument does not withstand closer examination.

First, the military's longstanding accessions policy rests on the reasonable concern that at least some transgender individuals suffer from medical conditions that could impede the performance of their duties. *See* DODI 6130.03. The new accessions policy announced in 2016 acknowledged the legitimacy of this concern by providing that a history of gender dysphoria, medical treatment associated with gender transition, and sex reassignment surgery were

31

disqualifying unless an applicant could prove that he had avoided complications for an 18 month

period. DTM 16-005, Exhibit 4. Whether those medical conditions and treatments are sufficiently

correlated with transgender status or gender dysphoria as to warrant a broader disqualification is

one of the questions that the Defense Department's expert panel will study, and in the interim it

was not irrational for the President to maintain the status quo pending that panel's review. For

example, the current edition of the World Health Organization's *International Classification of

Diseases* likewise classifies "transsexualism" as a "disorder[] of adult personality and behavior,"

and there is no reason to think that this judgment is somehow driven by animus. *International

Classification of Diseases* F64.0 (2016) (ICD).

Second, the accessions policy rests on the reasonable conclusion that these conditions may

limit the deployability of transgender individuals as well as impose additional costs on the armed

forces. For decades, military professionals indicated that one basis for the policy was that

complications associated with hormone therapy and sex-change procedures could impair soldiers

from serving around the globe. *See, e.g.*, *DeGroat v. Townsend*, 495 F. Supp. 2d 845, 850–52

(S.D. Ohio 2007) (discussing testimony of military doctor); *Doe*, 510 F. Supp. at 905 (discussing

affidavit of Brigadier General). Plaintiffs of course dispute this conclusion, relying on the RAND

Report and their own declarations. Pls. Mem., ECF No. 13 at 17–18. The RAND Report

acknowledges, however, that medical complications would limit deployment capabilities, RAND

Report 39–42; it simply concludes that this burden would be "negligible," *id.* at 46. But there is

room for the military to think otherwise and, in any event, cases such as *Weinberger* and *Rostker*

teach that it is not this Court's role to resolve a battle of the experts in reviewing a military policy.

Similarly, no one disputes that abandoning the longstanding accessions policy would

impose costs on the military. Instead, Plaintiffs isolate one of those costs—"transition-related

healthcare"—and dismiss it as "*de minimis*." Pls. Mem., ECF No. 13 at 19. But that ignores other costs associated with their desired policy change, and in any event the military's freedom to choose "among alternatives," *Rostker*, 453 U.S. at 72, includes the ability to decide how best to spend its money. At a minimum, the military is entitled to make the reasonable judgment that spending the millions of dollars necessary to accommodate transgender individuals on other endeavors would more effectively accomplish its "primary business"—*i.e.*, "to fight or be ready to fight wars should the occasion arise." *Id.* at 70 (citation omitted); *see* RAND Report 70 (estimating some costs).

Third, the President could reasonably conclude that the accessions policy furthers "unit cohesion." Presidential Memorandum § 1(a). Plaintiffs dismiss this rationale as well, invoking their own declarations as well as the experience of foreign militaries. Pls. Mem., ECF No. 13 at 18–19. But the RAND study on which Plaintiffs heavily rely noted that "[a] key concern in allowing transgender personnel to serve openly is how this may affect unit cohesion—a critical input for unit readiness," RAND Report 44, and specifically noted that it did "not have direct survey evidence or other data to directly assess the impact on the U.S. military." *Id.* RAND also acknowledged that its assessment of experience in foreign militaries was based on "fairly low numbers of openly serving transgender personnel." *Id.* at 45. Additionally, although the RAND study found that transgender service members were less deployable when seeking treatment, it did not appear to consider whether an impact in deployability in itself would affect unit cohesion. *See id.* at 40, 44-45. Given the limited information presently available, which the RAND study itself acknowledges, it is certainly reasonable for the President to have concluded that maintaining the accessions policy could rationally further unit cohesion, and that the matter warranted further study. And in any event it is not the role of the judiciary to second-guess a Commander in Chief's judgment in this regard. After all, "the Supreme Court has indicated" that "military decisions and

assessments of morale, discipline, and unit cohesion … are well beyond the competence of judges." *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring).

Ultimately, Plaintiffs' theory reduces to the accusation that any justification for the accessions policy is a pretext for animus toward transgender individuals because the military accommodates other soldiers with supposedly similar medical conditions. *See* Pls. Mem., ECF No. 13 at 18–20. But in the civilian context, the political branches are ordinarily free to engage in "line-drawing," even where, unlike here, "some persons who have an almost equally strong claim to favored treatment" are "placed on different sides of the line." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315–16 (1993). That freedom is even more important when it comes to deciding who may serve in the armed forces. For instance, a variety of physical and mental conditions presumptively bar entry into the armed forces, including asthma, DODI 6130.03 at § 11(d); history of severe migraines, *id.* § 27(c); discrepancies in leg-length resulting in a limp, *id.* § 19(a)(2); or any curvature of the spine that would prevent one from wearing a uniform properly, *id.* § 17(c)(2). Reasonable people could disagree over whether these individuals should be able to serve. But that does not mean that the President or military leadership harbors animus towards these individuals.

### 4.     Plaintiffs Are Unlikely To Succeed on Their Due Process Claim

Nor are Plaintiffs likely to prevail on their due process claim, in either its substantive or procedural form. Plaintiffs' substantive due process challenge fails for essentially the same reasons as their equal protection claim. And their procedural due process claim fails because it is entirely speculative that they will ever be deprived of a liberty or property interest and it is unknown what process would be employed to effectuate that hypothetical deprivation.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the

Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). There are "[t]hree basic elements … required for a procedural due process claim: (1) deprivation by the government, (2) of life, liberty, or property, (3) without due process of law." *Chamness v. McHugh*, 814 F.Supp.2d 7, 16 (D.D.C. 2011). "The first inquiry in every due process challenge is whether plaintiff has been deprived of a protected interest in 'liberty' or 'property.' Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process." *Gen. Elec. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (citation omitted).

It is well established that "there is no protected property interest in continued military service." *Spadone v. McHugh*, 842 F. Supp. 2d 295, 304 (D.D.C. 2012) (quoting *Wilhelm v. Caldera*, 90 F. Supp. 2d 3, 8 (D.D.C. 2000)).[11] Thus, no Plaintiff can maintain his due process claim based on the alleged uncertainty as to his future employment status with the military. *See, e.g.,* Am. Compl., ECF No. 9 at ¶¶ 22, 29, 36; Pls. Mem., ECF No. 13 at 25.

Accordingly, Plaintiffs would have to allege a stigmatizing characterization of service upon discharge in order to establish a liberty interest. For example, an other-than-honorable discharge from the military can be stigmatizing because it can cause reputational injury and affect a service member's future employment prospects. *See, e.g., Holley v. United States*, 124 F.3d 1462, 1470 (Fed. Cir. 1997); *Kauffman v. Sec'y of Air Force*, 415 F.2d 991, 995 (D.C. Cir. 1969). But Plaintiffs do not allege that they will receive such a stigmatizing characterization of service, and any such allegation would rest on multiple layers of speculation.

---

[11] *See also Hanson v. Wyatt*, 552 F.3d 1148, 1158 (10th Cir. 2008); *Guerra v. Scruggs*, 942 F.2d 270 (4th Cir. 1991); *Christoffersen v. Wash. State Air Nat'l Guard*, 855 F.2d 1437, 1443 (9th Cir. 1988); *MacFarlane v. Grasso*, 696 F.2d 217, 222 (2d Cir. 1982); *Woodard v. Marsh*, 658 F.2d 989 (5th Cir. 1981); *Ampleman v. Schlesinger*, 534 F.2d 825 (8th Cir. 1976); *Pauls v. Sec'y of the Air Force*, 457 F.2d 294, 297 (1st Cir. 1972).

To start, it is highly speculative that Plaintiffs will even be discharged.  The Interim Guidance states that current service members will not be separated from the military based on their transgender status, and the ultimate treatment of current service members under any final policy has not been resolved.  But even if Plaintiffs were to face separation at a later date, their characterization of service upon discharge would again be speculative.  If, for example, one of the Plaintiffs receives a characterization of service of Honorable or General (Under Honorable Conditions) upon discharge, that discharge would not involve a liberty interest.  *Golding v. United States*, 48 Fed. Cl. 697 (Fed. Cl. 2001) (ruling there is no liberty interest in a general discharge).

It is also highly speculative to assume that any procedures Defendants may prescribe to effectuate a future discharge and characterization of service would fail to meet the minimum concepts of fairness required by the Constitution.  Currently, military separations, whether administrative, putative, or medical, are heavily regulated by detailed instructions both at the Defense Department and service level.  *See, e.g.,* Department of Defense Instruction 1332.14 (providing detailed procedures for the current types of enlisted administrative separations);[12] Department of Defense Manual 1332.18 Vol. 1–3 (providing detailed procedures for current medical separations).[13]  Each type of military discharge has procedures tailored to meet due process requirements.  If, for example, the military seeks to impose a stigmatizing characterization of service, it will provide additional safeguards such as the opportunity for a formal hearing before

---

[12]  Available  at  http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133214p.pdf last visited Sept. 27, 2017.

[13]  Available  at  http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218m_ vol1.pdf; http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218m_vol2.pdf ; http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218vol3.pdf last visited at Sept. 27, 2017.

a separation board.  *See, e.g.,* Army Reg. 635-200 ¶ 3-7.[14]   Here, whatever procedures will govern

Plaintiffs' speculative discharge and characterization of service have not even been created yet,

rendering it impossible for this Court to review them for constitutional sufficiency.

### 5.    Plaintiffs Are Unlikely To Succeed on Their Estoppel Claim

Plaintiffs' estoppel claims also are unlikely to succeed for several reasons.  Plaintiffs claim

that they relied, to their detriment, on former Secretary Carter's statements about allowing openly

transgender individuals to serve in the military.  Specifically, they point to DTM 16-005 and claim

that it "constituted a definite representation to Plaintiffs that they would be able to serve openly."

Pls. Mem., ECF No. 13 at 26.  Plaintiffs' theory is that due process considerations and estoppel

theories "bar[] Defendants from reversing course and discharging or denying accession to

Plaintiffs based on their transgender status."  *Id.* That argument cannot withstand serious scrutiny.

As a threshold matter, Plaintiffs' estoppel claim fails because they have not identified a

valid waiver of sovereign immunity and there is no recognized federal cause of action for

estoppel.  "[P]rivate rights of action to enforce federal law must be created by Congress,"

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and Congress has created no cause of action for

estoppel.  To the contrary, the Federal Rules of Civil Procedure recognize estoppel as an

affirmative defense, not a cause of action.  Fed. R. Civ. P. 8(c).

Even then, the *remedy* of estoppel does not apply in this context.  Assuming *arguendo* that

this remedy could be applied to the federal government, it certainly is not available here.  *See OPM*

*v. Richmond*, 496 U.S. 414, 419, 423 (1990) (noting that "equitable estoppel will not lie against

the Government as it lies against private litigants," and leaving open the possibility that "no

---

[14]Available at http://www.apd.army.mil/epubs/DR_pubs/DR_a/pdf/web/AR635-200_Web_FINA
L_18JAN2017.pdf last visited at Sept. 27, 2017.

estoppel will lie against the Government in any case").  At a minimum, estoppel does not apply to policy changes by the federal Government.  *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (estoppel cannot be justified against the government where it would "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation.").  All of the cases cited by Plaintiffs involve isolated instances of promises made by the Government to particular individuals, which relate only to those individuals' personal circumstances, Pls. Mem., ECF No. 13 at 26–28.  Plaintiffs do not cite any case in which a court has held that a federal agency is estopped from changing its generally applicable policies.  Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with the applicable procedures.  *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015).[15]  Here, the President issued a directive setting forth his policy decision to further study the issue of military service by transgender individuals, before the military departs from longstanding policies and practices.  The decision to issue this directive falls squarely within his discretion as Commander in Chief.

Finally, even assuming *arguendo* that a cause of action for estoppel were available here, Plaintiffs could not satisfy the elements of that claim.  Even in situations where a court has concluded that an estoppel claim against the government might be available—such as

---

[15] As explained in *Perez*, a federal agency's policy position is subject to change, as long as it satisfies the constraints of the Administrative Procedure Act ("APA"), 5 U.S.C. § *et seq*.  135 S. Ct. at 1210.  The APA does not contemplate claims based on estoppel.  To the contrary, the APA does not require that an agency action changing a prior policy satisfy a heightened level of review.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

individualized challenges to non-policy actions—courts "invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980). In the rare circumstances in which equitable estoppel may apply against the government, a party must show that: "(1) there was a 'definite' representation to the party claiming estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his position for the worse, (3) the party's reliance was reasonable and (4) the government engaged in affirmative misconduct." *Morris Comm's, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009) (internal quotation marks omitted). None of those factors is present here.

First, DTM 16-005 did not "definitely" represent to Plaintiffs that the policy it set forth was permanent and could not be subject to change. Government policies may be changed for any number of reasons, and the likelihood of such a shift was especially possible—perhaps, even foreseeable—here given that the prior policy was put in place through a Directive-Type Memorandum that itself provided that it was set to expire on June 30, 2017. DTM 16-005. Under these circumstances, Plaintiffs' purported reliance on the "definitive" nature of DTM 16-005, and any expectation that the policy could not change, were unreasonable.

Second, Plaintiffs' purported reliance on DTM 16-005 has not changed their position for the worse. Plaintiffs claim that, having come out as transgender, they are now at risk of "the end of military careers, the loss of healthcare, and the stigma of being discharged." Pls.' Mem., ECF No. 13 at 28. But, as detailed above, Defendants' operative policy for enlisted transgender service members makes clear that transgender service members may not be separated from the military, denied reenlistment, demoted, or denied promotion, on the basis of transgender status. Interim Guidance, Exhibit 1. The operative policy also provides that transgender service members may not be denied medically necessary treatment. *Id.*

Third, keeping the military's longstanding accession policy in place does not change the position of any of the Plaintiffs at all, much less do so for the worse.  Six of the Plaintiffs are currently serving in the military and thus not subject to any accessions policy.  And the other two are not yet subject to the accessions policy since they are still in their respective schools.  *See* Chadwick Decl. ¶ 10.; Burns Decl. ¶1.  Moreover, since the President's directive merely *delays* relaxation of the accession policy for transgender persons, *pending further study*, the policy may change before any accession policy would apply to the student Plaintiffs at all.

Fourth, there is no evidence suggesting that Defendants engaged in the "affirmative misconduct" necessary to sustain a claim of estoppel against the government.  *See Masters Pharm. Inv. v. DEA*, 861 F.3d 206, 225 (D.C. Cir. 2017) (citation omitted).  The bar for establishing "affirmative misconduct" is high, requiring a showing of "misrepresentation or concealment, or, at least, behav[ior] ... that ... will cause an egregiously unfair result." *GAO v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516, 526 (D.C. Cir. 1983).  Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct.

### C.     The Balance of Equities and the Public Interest Weigh Strongly against the Entry of a Preliminary Injunction

Plaintiffs likewise cannot show the balance of equities tips in their favor.  In weighing the equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).  Plaintiffs are not being harmed by the Interim Guidance, which is the operative rule, and it is unclear whether they will ultimately be harmed by the final policy once it has been studied, developed and implemented.  Plaintiffs therefore have not—and cannot—show that they will be harmed if the Court denies their motion for extraordinary preliminary relief.  The military, on the other hand, is in the process of gathering a panel of experts who will "bring mature

experience, most notably in combat and deployed operations, and seasoned judgment" to the task of providing advice and recommendations on the development and implementation of the policy on military service by transgender individuals.  Statement of Secretary Jim Mattis, Release No: NR-312-17.  Granting Plaintiffs their requested relief would directly interfere with the panel's work and the military's ability to thoroughly study a complex and important issue regarding the composition of the armed forces.  The balance of equities thus tips strongly against issuing a preliminary injunction in this case.

Nor can Plaintiffs show that a preliminary injunction here would be in the public interest. The public has a strong interest in national defense, *see Winter*, 555 U.S. at 7, and, here, both the President and Secretary of Defense have directed that the policy on military service by transgender individuals be subject to further study.  The public interest, therefore, weighs strongly against judicial interference with the military's study of its policy on transgender military service.

### D.     The Injunctive Relief Plaintiffs Seek Is Inappropriate

Finally, even if Plaintiffs had standing and had made the showing required for extraordinary preliminary relief, the worldwide injunction they seek would still be inappropriate. Plaintiffs' request for a sweeping "injunction prohibiting the categorical exclusion of transgender people from the military," Pls. Mem., ECF No. 13 at 39, suffers from at least three major flaws.

First, that desired injunction would, in large measure, simply require Defendants to comply with the Interim Guidance that the Secretary of Defense has already put in place.  The Interim Guidance directs that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status."  Interim Guidance, Exhibit 1.  It also provides that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed

medical condition." *Id.*   In addition to being unnecessary, the "obey the law" injunction Plaintiffs

seek is particularly inappropriate in a suit against the government, where it could subject the

government defendants to contempt proceedings for every alleged legal failing, supplanting the

civil remedies Congress has provided. *Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004).

Second, Plaintiffs seek an injunction that would in theory apply to service members

worldwide.   Both constitutional and equitable principles, however, require that injunctive relief be

limited to redressing a plaintiff's own cognizable injuries.   Article III demands that "a plaintiff

must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe

Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).   "The remedy" sought thus must "be

limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis*

v. *Casey*, 518 U.S. 343, 357 (1996).   "The actual-injury requirement would hardly serve [its]

purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once

a plaintiff demonstrated harm from one particular inadequacy in government administration, the

court were authorized to remedy all inadequacies in that administration." *Id*.   And equitable

principles independently require that an injunction "be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512

U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so

they could not seek to enjoin such an order on the ground that it might cause harm to other parties").

These constitutional and equitable limits apply with special force to injunctions concerning

military policies.   For example, in *Meinhold v. United States Department of Defense*, 808 F. Supp.

1455 (C.D. Cal. 1993), a district court enjoined the Defense Department, with limited exceptions,

"from discharging or denying enlistment to any person based on sexual orientation" in a

constitutional challenge brought by a single serviceman. *Id.* at 1458. The Supreme Court stayed the injunction to the extent it conferred relief on anyone other than the plaintiff, *U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993), and the Ninth Circuit vacated the injunction except to the extent it applied to him as well, *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994).

The entry of the worldwide injunction sought by Plaintiffs would be similarly indefensible. To the extent that Plaintiffs have cognizable injuries, those injuries would be fully addressed through an injunction concerning their ability either to accede into or continue serving in the military or to access medical treatment. *See* Pls. Mem., ECF No. 13 at 39. To the extent that other service members or applicants believe they are injured by any of the policies at issue, they are free to bring their own challenges—and a few have done so. *See, e.g.*, Dkt. 30, *Karnoski v. Trump*, No. 2:17-cv-01297-MJP (W.D. Wash. Sept. 14, 2017). In all events, any injunction here should be limited to Plaintiffs and not extend to other members or applicants not before this Court.

Third, the military personnel decisions that Plaintiffs speculate they will one day face— separation, denial of reenlistment, demotion, denial of promotion, denial of medical treatment, and denial of commission—are ordinarily reviewed by a district court in the APA context. *See, e.g., Stewart v. Stackley*, No. CV 14-0479 (ABJ), 2017 WL 1653147, at *16 (D.D.C. May 1, 2017). That review, of course, occurs *after* the military decision has been made and is subject to the APA's arbitrary and capricious standard. *See, e.g., Reinhard*, 209 F. Supp. 3d 207. A plaintiff also has the opportunity to raise a constitutional challenge then or through intra-military procedures such as the military corrections boards. *See Chappell* v. *Wallace,* 462 U.S. 296, 303 (1983) ("[Appellant's] claims based on [the] Constitution, executive orders and Army regulations could readily have been made within the framework of this intramilitary procedure"). Here, however, Plaintiffs ask for the extraordinary remedy of a preliminary injunction to prevent certain adverse

personnel actions that have not been taken against them and may never occur.  If those actions

ever do occur, the ordinary administrative framework will provide a more orderly avenue of relief

than the premature intrusion into military affairs they currently seek.

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion to dismiss for

lack of jurisdiction and for failure to state a claim upon with relief can be granted.  The Court

should also deny Plaintiffs' motion for a preliminary injunction.

Dated: October 4, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan B. Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

Counsel for Defendants