**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JANE DOE 1, et al.,

        Plaintiffs,

   v.

DONALD J. TRUMP,
in his official capacity as President of the United
States, et al.,

        Defendants.

CIVIL ACTION
NO. 17-cv-1597 (CKK)

**BRIEF OF *AMICI* STATES MASSACHUSETTS, CALIFORNIA, CONNECTICUT,
DELAWARE, HAWAII, ILLINOIS, IOWA, MARYLAND, NEW MEXICO,
NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT,
AND THE DISTRICT OF COLUMBIA IN SUPPORT OF
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

MAURA HEALEY
 *Attorney General of Massachusetts*

 GENEVIEVE C. NADEAU
 SARA A. COLB
 KIMBERLY A. PARR
  *Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
Genevieve.Nadeau@state.ma.us
Sara.Colb@state.ma.us
Kimberly.Parr@state.ma.us

(Additional Counsel Listed on Signature Page)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF *AMICI* STATES .........................................................................1

ARGUMENT .........................................................................................................2

I.     A BAN ON TRANSGENDER PEOPLE OPENLY SERVING IN THE
MILITARY IS IRRATIONAL AND UNCONSTITUTIONAL............................ 2

      A.    Transgender People Are a Vital Part of the *Amici* States'
Communities, Yet Remain a Historically Marginalized Group.................. 2

      B.    The Military Lifted Historical Prohibitions on Service by
Transgender Individuals After a Lengthy, Deliberative Process. ............... 4

      C.    President Trump's Abrupt Reversal of the Military's Open Service
Policy Is Unsupported by Any Defensible Rationale. ................................ 8

II.    REINSTATING A BAN ON MILITARY SERVICE BY
TRANSGENDER PEOPLE WILL HARM THE *AMICI* STATES AND
OUR RESIDENTS................................................................................ 13

      A.    The Ban Will Entangle the *Amici* States in Invidious
Discrimination Harmful to Our National Guard...................................... 13

      B.    The Ban Will Entangle the *Amici* States in Harmful Discrimination
Limiting Opportunities at Our Public Institutions of Higher
Education. ................................................................................................ 17

      C.    The Ban Will Harm the *Amici* States' Veterans, Active Service
Members, and Those Who Wish to Serve. ............................................... 19

      D.    The Ban Will Harm Our Transgender Communities More Broadly. ....... 22

CONCLUSION.....................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ................................................3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ..........................23

*Ass'n of Civilian Technicians, Inc. v. United States*,
    603 F.3d 989 (D.C. Cir. 2010) ...............................................................................13, 14, 15

*Log Cabin Republicans v. United States*, Case No. CV 04-08425-VAP,
    2010 U.S. Dist. LEXIS 93612 (C.D. Cal. Sept. 9, 2010) .................................................20

*Romer v. Evans*, 517 U.S. 620 (1996) ..........................................................................................12

**Federal Statutes**

10 U.S.C. § 983 ..............................................................................................................................18

10 U.S.C. § 2031(a)(2) ...................................................................................................................17

10 U.S.C. § 2103 ............................................................................................................................17

**State Statutes**

Cal. Civil Code § 51(b), (e)(5) .........................................................................................................4

Cal. Gov. Code § 12940(a) ...............................................................................................................4

Cal. Gov. Code § 12955 ....................................................................................................................4

Cal Mil. & Vet. Code § 146(a) ........................................................................................................14

Haw. Rev. Stat. § 368-1 .....................................................................................................................4

Haw. Rev. Stat. § 378-2 .....................................................................................................................4

Haw. Rev. Stat. § 489-3 .....................................................................................................................4

Haw. Rev. Stat. § 515-16 ...................................................................................................................4

Mass. Gen. Laws ch. 33, § 41(a) .....................................................................................................14

Mass. Gen. Laws ch. 151B, § 4 ........................................................................................................4

Mass. Gen. Laws ch. 272, § 92A ......................................................................................................4

Mass. Gen. Laws ch. 272, § 98 ..................................................................................................4

N.M. Stat. Ann. § 28-1-7 .........................................................................................................4

N.Y. Mil. Law § 6 ...................................................................................................................14

N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13 ........................................................................4

Vt. Stat. Ann. tit. 9 §§ 4500 et seq. ..........................................................................................4

Vt. Stat. Ann. tit. 6 § 1-11(26)(B)(iii) ......................................................................................4

Vt. Stat. Ann. tit. 21 § 5-495 ....................................................................................................4

**Periodicals and Professional Articles**

Aaron Belkin, *Caring for Our Transgender Troops –The Negligible Cost of
    Transition-Related Care*, 373:12 New Eng. J. Med. 1089 (Sept. 17, 2015) .......................9

Agnes Gereben Schaefer et al., *Assessing the Implications of Allowing
    Transgender Personnel to Serve Openly*, RAND Corp. (2016), *available at*
    https://www.rand.org/pubs/research_reports/RR1530.html ................................6, 9, 10,11

Allison Ross, Note, *The Invisible Army: Why the Military Needs to Rescind
    Its Ban on Transgender Service Members*, 23 S. Cal. Interdisc. L. J. 185
    (2014) ..............................................................................................................5, 9, 11, 21

Am. Psychol. Ass'n, *Answers to Your Questions about Transgender People,
    Gender Identity, and Gender Expression* (2014 update)
    http://www.apa.org/topics/lgbt/transgender.pdf;  ...................................................... 2, 3-4

Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and
    Gender Nonconforming People,* 70 Am. Psychol. Ass'n 832 (2015) ......................... 2-3, 4

Andrew R. Flores et al., *How Many Adults Identify as Transgender in the United
    States?,* The Williams Inst. (June 2016),
    https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-
    Adults-Identify-as-Transgender-in-the-United-States.pdf .................................................2

Bonnie Moradi, *Sexual Orientation Disclosure, Concealment, Harassment, and
    Military Cohesion: Perceptions of LGBT Military Veterans*, 21 Mil.
    Psychol. 513 (2009) ........................................................................................................21

Gary J. Gates & Jody L. Herman, *Transgender Military Service in the United States,* The Williams Inst. (May 2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf (estimating 134,300 transgender veterans and 15,500 members in active service, the National Guard, or Reserves) ...................2, 14

Joycelyn Elders & Alan M. Steinman, *Report of the Transgender Military Service Commission*, The Palm Ctr. (March 2014), http://archive.palmcenter.org/files/Transgender%20Military%20Service%20Report.pdf;  ................................................................................................5, 20, 21

Matthew F. Kerrigan, *Transgender Discrimination in the Military: The New Don't Ask, Don't Tell*, 18 Psychol. Pub. Pol'y & L. 500 (2012) ..............................4, 5, 21

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey,* Nat'l Ctr. for Transgender Equality (Dec. 2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF ........................................................................................................2, 3, 5

Walter O. Bockting et al., *Stigma, Mental Health, and Resilience in an Online Sample of the US Transgender Population,* 103(5) Am. J. Public Health 943 (2013)..................................................................................................................3, 4

William V. Padula et al., *Societal Implications of Health Ins. Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, Journal of General Internal Medicine (April 16, 2016), *available at* https://www.ncbi.nlm.nih.gov/pubmed/26481647 ......................10

**News, Press Releases, and Other Authorities**

Amanda Erickson, *Trump Said Transgender Troops Cause 'Disruption.' These 18 Militaries Show Otherwise*, Wash. Post (July 26, 2017) https://www.washingtonpost.com/news/worldviews/wp/2017/07/26/trump-said-transgender-troops-cause-disruption-these-18-militaries-show-otherwise/?utm_term=.a04643d1b8b8 ...........................................................11

Barbara Starr et al., *US Joint Chiefs blindsided by Trump's transgender ban*, CNN (July 27, 2017), http://www.cnn.com/2017/07/27/politics/trump-military-transgender-ban-joint-chiefs/index.html.................................................9

Cal. Dep't of Ins., *Economic Impact Assessment of Gender Nondiscrimination in Health Insurance* 1−2, Reg. File No. REG-2011-00023 (Apr. 13, 2012), *available at* http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf....................................................................10

*Cities and Counties with Non-Discrimination Ordinances that Include Gender Identity*, Human Rights Campaign (last updated Jan. 28, 2017), https://www.hrc.org/resources/cities-and-counties-with-non-discrimination-ordinances-that-include-gender .................................................................4

Cornelius L. Bynum, *How a Stroke of the Pen Changed the Army Forever*, Wash. Post (July 26, 2017), https://www.washingtonpost.com/news/made-by-history/wp/2017/07/26/how-a-stroke-of-the-pen-changed-the-army-forever/ ...........................................................................................................22

Declaration of Former Chairman of Joint Chiefs of Staff, Admiral Michael Mullen, ¶ 14, *Karnoski v. Trump*, No. 2:17-cv-01297 (W.D. Wa.) (ECF No. 49), *available at* https://www.lambdalegal.org/sites/default/files/legal-docs/downloads/049._declaration_of_admiral_michael_mullen_2017-09-14.pdf ...................................................................................................... 20-21

Directive-Type Memorandum (DTM) 16-005, Military Service of Transgender Service Members, United States Secretary of Defense (June 30, 2016), *available at* https://www.defense.gov/Portals/1/features/2016/0616_policy/DTM-16-005.pdf...........................................................................7

General John R. Allen et al., *Statement of Fifty-Six Retired Generals and Admirals Warn That President Trump's Anti-Transgender Tweets, If Implemented, Would Degrade Military Readiness*, The Palm Ctr. (August 1, 2017), http://www.palmcenter.org/fifty-six-retired-generals-admirals-warn-president-trumps-anti-transgender-tweets-implemented-degrade-military-readiness.................................................................... 7-8, 11, 16

Katie Keith, *15 States and DC Now Prohibit Transgender Insurance Exclusions*, CHIRblog (Mar. 30, 2016), http://chirblog.org/15-states-and-dc-now-prohibit-transgender-insurance-exclusions/ ........................................................10

Major General Timothy J. Lowenberg, *The Role of the National Guard in National Defense and Homeland Security*, The National Guard Ass'n of the United States (last visited Oct. 16, 2017), https://www.ngaus.org/sites/default/files/pdf/primer%20fin.pdf .....................................13

Maritime Administration, United States Department of Transportation (last visited Oct. 16, 2017), https://www.marad.dot.gov/education/maritime-academies/ ............................................18

Memorandum from Attorney General to United States Attorneys Heads of Department Components (Oct. 4, 2017), *available at* https://thinkprogress.org/wp-content/uploads/2017/10/20171005-doj-memo-title-vii.pdf (reversing Department of Justice policy interpreting Title VII to prohibit discrimination based on gender identity)..........................................23

*New York National Guard Economic Impact 2015*, New York State Division of
        Military and Naval Affairs (Jan. 15, 2016), *available at*
        https://dmna.ny.gov/NYNG_Economic_Impact.pdf ..........................................................14

*NGAUS Fact Sheet: Understanding the Guard's Duty Status*, The National Guard
        Ass'n of the United States (last visited Oct. 16, 2017),
        https://www.ngaus.org/sites/default/files/Guard%20Statues.pdf ....................................14

Presidential Memorandum, 82 FR 41319 (Aug. 25, 2017), *available at*
        https://www.whitehouse.gov/the-press-office/2017/08/25/presidential-
        memorandum-secretary-defense-and-secretary-homeland.  ...........................................8, 9

*Safe Zone Program,* California Maritime Academy (lasted visited Oct. 16, 2017),
        https://www.csum.edu/web/diversity/home/safe-zone-program .....................................12

Secretary Ashton Carter, United States Department of Defense, Remarks on
        Ending the Ban on Transgender Service in the U.S. Military (June 30,
        2016), *available at* https://www.defense.gov/News/Speeches/Speech-
        View/Article/821833/remarks-on-ending-the-ban-on-transgender-service-
        in-the-us-military/ ............................................................................................................6

Secretary of Defense, Military Service by Transgender Individuals – Interim
        Guidance (Sept. 14, 2017), *available at*
        https://www.defense.gov/Portals/1/Documents/PDFs/Military-Service-By-
        Transgender-Individuals-Interim-Guidance.pdf ..............................................................8

Statement by Chief Pentagon Spokesperson Dana M. White on Transgender
        Accessions, Release No. NR-250-17 (June 30, 2017) *available at*
        https://www.defense.gov/News/News-Releases/News-Release-
        View/Article/1236145/statement-by-chief-pentagon-spokesperson-dana-
        w-white-on-transgender-accessions/...............................................................................16

Statement by Secretary of Defense Ashton Carter on DOD Transgender Policy,
        Release No. NR 272-15 (July 13, 2015) *available at*
        https://www.defense.gov/News/News-Releases/News-Release-
        View/Article/612778/ .................................................................................................5, 11

*Statement of Inclusion*, University of Massachusetts Lowell (last visited Oct. 16,
        2017), https://www.uml.edu/docs/Inclusion%20Statement_tcm18-
        167589.pdf ......................................................................................................................17

*Strategic Midshipman Program*, Massachusetts Maritime Academy
        (last visited Oct. 16, 2017), https://www.maritime.edu/strategic-sealift-
        midshipman-program ......................................................................................................18

Tech. Sgt. Erich B. Smith et al., *Guard Members Ready For New DOD*
   *Transgender Policy*, National Guard Bureau (June 15, 2017),
   http://www.nationalguard.mil/News/Article/1215104/guard-members-
   ready-for-new-dod-transgender-policy/ ..........................................................................15

*Trans Inclusion Policy*, Massachusetts Maritime Academy (last visited Oct. 16,
   2017), https://www.maritime.edu/trans-inclusion-policy ...............................................12

*Transgender Service in the U.S. Military: An Implementation Handbook*, United
   States Dep't of Defense (Sept. 30, 2016),
   https://www.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHa
   ndbook_093016.pdf ...........................................................................................................7

## INTEREST OF *AMICI* STATES

The Commonwealth of Massachusetts, together with California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont and the District of Columbia[1] (the "*Amici* States"), respectfully submit this *amicus curiae* brief in support of Plaintiffs' Application for a Preliminary Injunction pursuant to Local Rule 7(o).

The *Amici* States share a strong interest in the readiness and effectiveness of our national defense, including an interest in ensuring that our Armed Forces and related institutions recruit, train, retain, and promote qualified service members. The *Amici* States also strongly support the rights of transgender people to live with dignity, to be free from discrimination, and to participate fully and equally in all aspects of civic life. These interests are all best served by allowing transgender people to serve openly in the military.

Many of the *Amici* States have enacted and enforce explicit civil rights protections for transgender people in areas such as employment, housing, health care, education, and public accommodations. We also command National Guard units, support Reserve Officer Training Corps programs, and run maritime academies that embrace principles of nondiscrimination and equality. Our collective experience demonstrates that the full inclusion of transgender people strengthens our communities, our state and federal institutions, and our nation as a whole. Discriminatory prohibitions on participation in civic life, on the other hand, impose significant harms on the *Amici* States and our residents. The *Amici* States therefore have a strong interest in ensuring that our Armed Forces move forward, not backward, and continue to allow transgender people to serve openly in all branches.

---

[1] For ease of reference, the District of Columbia shall be referred to herein as a "State."

For these reasons, as discussed more fully herein, the *Amici* States urge the Court to enjoin the Trump Administration's plans to reinstate an unconstitutional, unjustified and discriminatory ban on open military service by transgender people.

## ARGUMENT

I.   **A BAN ON TRANSGENDER PEOPLE OPENLY SERVING IN THE MILITARY IS IRRATIONAL AND UNCONSTITUTIONAL.**

A.   **Transgender People Are a Vital Part of the *Amici* States' Communities, Yet Remain a Historically Marginalized Group.**

Nationwide, nearly 1.5 million people identify as transgender.[2]  They live in the *Amici* States (as well as every other State, American Samoa, Guam, and Puerto Rico)[3] and contribute to our communities in countless ways – as parents, educators, students, firefighters, police officers, musicians, writers, nurses, and doctors, to name a few.  Approximately 150,000 veterans, active-duty service members, and members of the National Guard or Reserves identify as transgender, and transgender individuals volunteer to serve and protect our country through the Armed Forces at approximately twice the rate of other adults in the general population.[4]  Nothing about being transgender inhibits a person's ability to serve in the military or otherwise contribute to society.[5]

---

[2] Andrew R. Flores et al., *How Many Adults Identify as Transgender in the United States?,* The Williams Inst., 3 (June 2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf.

[3] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey,* Nat'l Ctr. for Transgender Equality, 53, 244 (Dec. 2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

[4] Gary J. Gates & Jody L. Herman, *Transgender Military Service in the United States,* The Williams Inst., 1 (May 2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf (estimating 134,300 transgender veterans and 15,500 members in active service, the National Guard, or Reserves).

[5] *See* Am. Psychol. Ass'n, *Answers to Your Questions about Transgender People, Gender Identity, and Gender Expression*, 3 (2014 update), http://www.apa.org/topics/lgbt/transgender.pdf; Am. Psychol. Ass'n, *Guidelines for*

To the contrary, the experience of the *Amici* States shows that transgender individuals are just as capable as their non-transgender counterparts and make a meaningful positive impact in our schools, workplaces, and communities.

Still, the transgender community has suffered "a history of persecution and discrimination" that persists into the present day. *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). According to the 2015 United States Transgender Survey ("2015 USTS"), transgender individuals face verbal harassment and physical violence at home, in school, and in their communities; grapple with mistreatment in the workplace and a higher rate of unemployment than the general United States population; confront homelessness and difficulty obtaining and maintaining housing; and endure myriad other forms of discrimination in education, employment, housing, and access to health care due to their gender identity.[6] Such discrimination and the associated stigma often cause severe emotional and psychological distress and lead to disproportionately high rates of depression and anxiety in the transgender population.[7]

---

*Psychological Practice with Transgender and Gender Nonconforming People,* 70 Am. Psychol. Ass'n 832, 834 (2015). With research and medical advances, the medical professions recognize that a person's internal sense of gender may differ from the sex the person was assigned at birth, and that the incongruity has a "major biological component," is "set early in life," and is "deep-seated, and impervious to external influences." Declaration of George Brown, ECF No. 13-11, ¶¶ 13-15.

[6] 2015 USTS, *supra* note 3, at 8-16; *see* Walter O. Bockting et al., *Stigma, Mental Health, and Resilience in an Online Sample of the US Transgender Population,* 103(5) Am. J. Public Health 943, 943 (2013) ("Transgender people face systematic oppression and devaluation as a result of social stigma attached to their gender nonconformity.").

[7] *See* Bockting, *supra* note 6, at 949 (noting that these mental health outcomes "were not merely a manifestation of gender dysphoria" and were associated "with enacted and felt stigma"); Am. Psychol. Ass'n, *Answers to Your Questions about Transgender People*, *supra* note 5, at 3 (explaining that "lack of acceptance within society, direct or indirect experiences with discrimination, or assault . . . may lead many transgender people to suffer with anxiety,

To combat such discrimination, twenty States – including many *Amici* States – have

enacted civil rights protections for transgender people in education, employment, health care,

housing, and/or public accommodations.[8]  And about 225 local governments prohibit

discrimination based on gender identity or expression by public and private employers in their

jurisdictions.[9]  As the experiences of the *Amici* States and these other jurisdictions show,

transgender-inclusive policies help to ease the stigma on transgender people, thereby mitigating

the negative impact on their educational, work, and health outcomes.  Such policies also foster a

more just and productive society for all our residents.

**B.    The Military Lifted Historical Prohibitions on Service by Transgender Individuals After a Lengthy, Deliberative Process.**

As in other aspects of society, transgender individuals who volunteered to fight for our

country were long met with discrimination and excluded from military service in the Armed

Forces through a patchwork of medical and administrative regulations.[10]  To join and advance in

the military, thousands of individuals were thus forced to conceal their gender identity or risk

---

depression or related disorders at higher rates than nontransgender persons"); Am. Psychol. Ass'n, *Guidelines*, *supra* note 5, at 840.

[8] *See, e.g.*, Mass. Gen. Laws ch. 151B, § 4; Mass. Gen. Laws ch. 272, §§ 92A, 98; Cal. Civil Code § 51(b), (e)(5); Cal. Gov. Code § 12940(a); Cal. Gov. Code § 12955; Haw. Rev. Stat. § 368-1; Haw. Rev. Stat. § 378-2; Haw. Rev. Stat. § 489-3; Haw. Rev. Stat. § 515-16; N.M. Stat. Ann. § 28-1-7; N.Y. Comp. Codes R. & Regs. tit. 9 § 466.13 (interpreting N.Y. Exec. Law § 296 (Human Rights Law) definition of "sex" to include gender identity); Vt. Stat. Ann. tit. 9 §§ 4500 et seq.; Vt. Stat. Ann. tit. 6 § 1-11(26)(B)(iii); Vt. Stat. Ann. tit. 21 § 5-495.

[9] *Cities and Counties with Non-Discrimination Ordinances that Include Gender Identity*, Human Rights Campaign (last updated Jan. 28, 2017), https://www.hrc.org/resources/cities-and-counties-with-non-discrimination-ordinances-that-include-gender.

[10] *See e.g.*, Matthew F. Kerrigan, *Transgender Discrimination in the Military: The New Don't Ask, Don't Tell*, 18 Psychol. Pub. Pol'y & L. 500, 506-508 (2012).

discharge.[11]  Many other transgender recruits were unable to enlist in the first place.  This was

the reality for decades – unchanged by the adoption of "Don't Ask, Don't Tell" ("DADT") in the

1990s and the subsequent repeal of that policy in 2011 (which ushered in the era of open service

by gay, lesbian, and bisexual individuals).[12]  After the DADT repeal, however, the public and the

military began to reexamine the categorical prohibition against transgender individuals serving in

the military – and determined that it was not only untenable, but counterproductive.[13]

Ultimately, in July 2015, then-Secretary of Defense Ashton Carter publicly

acknowledged that Department of Defense regulations regarding transgender service members

were "outdated," "contrary to our value of service and individual merit," and harmful to

"transgender soldiers, sailors, airmen, and Marines – real, patriotic Americans."[14]  Secretary

Carter established a working group to study "the policy and readiness implications of welcoming

transgender persons to serve openly" (the "DOD Working Group").[15]  As the Plaintiffs cogently

explain (and their supporting affidavits show), the DOD Working Group executed its mission in

a systematic and thoughtful manner: it sought to consider all issues that might arise from

---

[11] *Id.* at 502; 2015 USTS, *supra* note 3, at 170-171; Statement by Secretary of Defense Ashton Carter on DOD Transgender Policy, Release No. NR 272-15 (July 13, 2015) *available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/ ("[T]ransgender men and women in uniform have been there with us, even as they often had to serve in silence alongside their fellow comrades in arms.").

[12] *See* Kerrigan, *supra* note 10, at 501, 503-504.

[13] *See* Joycelyn Elders & Alan M. Steinman, *Report of the Transgender Military Service Commission*, The Palm Ctr., 3-5 (March 2014), http://archive.palmcenter.org/files/Transgender%20Military%20Service%20Report.pdf; Allison Ross, Note, *The Invisible Army: Why the Military Needs to Rescind Its Ban on Transgender Service Members*, 23 S. Cal. Interdisc. L. J. 185 (2014).

[14] Statement by Secretary Carter, No. NR-272-15, *supra* note 11.

[15] *Id.*

including openly transgender individuals in the military (including those related to readiness, operational effectiveness, and cost); consulted with experts, active transgender service members, and military personnel from inside and outside of the United States; and commissioned the RAND National Defense Research Institute ("RAND") to analyze the potential health care needs of transgender service members, the potential readiness implications of allowing transgender individuals to serve openly, and the experience of foreign militaries that permit open service by transgender individuals.[16]  *See, e.g.,* Memorandum of Law in Support of Plaintiffs' Application for Preliminary Injunction, ECF No. 13, at 2-7.

As a result of this year-long process, the DOD Working Group concluded that excluding transgender people from military service undermined effectiveness and readiness, *id.* at 5; and, on June 30, 2016, Secretary Carter declared an end to the ban.[17]  On the same day, the Secretary laid out plans to implement the military's new, inclusive policies, under which: (i) otherwise qualified service members could no longer be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of gender identity; (ii) current transgender service members were allowed to serve openly and have access to gender-related medical care; and (iii) within one year, the military would begin accessing transgender

---

[16] *See* Secretary Ashton Carter, United States Department of Defense, Remarks on Ending the Ban on Transgender Service in the U.S. Military (June 30, 2016), *available at* https://www.defense.gov/News/Speeches/Speech-View/Article/821833/remarks-on-ending-the-ban-on-transgender-service-in-the-us-military/; Agnes Gereben Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corp., xi-xii, 39-47 (2016), *available at* https://www.rand.org/pubs/research_reports/RR1530.html (hereinafter "RAND Report").

[17] Remarks of Secretary Carter (June 30, 2016), *supra* note 16.

individuals who met all physical and fitness standards.[18]  Three months later, the Department of

Defense issued a 71-page handbook to guide service members and commanders through these

changes.[19]  Among other things, this handbook outlined a framework for bringing gender-related

medical care into the Military Health System and specified that the open service policy extended

to admission to accession programs, like the Reserve Officers Training Corps ("ROTC").[20]

By late 2016, each of the military branches had taken steps necessary to implement the

new open service policy, and transgender service members, National Guard members, and

ROTC cadets in the *Amici* States and across the country were finally freed to disclose – and

many did disclose – their gender identity to their command and to their fellow service

members.[21]  Although a comprehensive study of the policy's first year has not yet been

conducted, there is no evidence that it has disrupted military readiness, operational effectiveness,

or morale.  To the contrary, anecdotal accounts indicate that the military's new inclusive policies

were quickly beginning to have a positive effect, as capable and well-qualified individuals who

were already serving finally were able to do so authentically.[22]

---

[18] *See* Directive-Type Memorandum (DTM) 16-005, Military Service of Transgender Service Members, United States Secretary of Defense (June 30, 2016), *available at* https://www.defense.gov/Portals/1/features/2016/0616_policy/DTM-16-005.pdf.

[19] *Transgender Service in the U.S. Military: An Implementation Handbook*, United States Dep't of Defense (Sept. 30, 2016), https://www.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHandbook_093016.pdf.

[20] *Id.* at 18, 31, 40

[21] *See, e.g.*, Declaration of Regan V. Kibby, ECF No. 13-14, ¶ 15; Declaration of Dylan Kohere, ECF No. 13-15, ¶ 9.

[22] *See, e.g.,* Declaration of Erin K. Fanning, ECF No. 13-7, ¶¶ 51-53; Declaration of Edwin Mabus, ECF No. 13-9, ¶ 37, 43; Declaration of Regan V. Kibby, ECF No. 13-14, ¶ 26; Declaration of Dylan Kohere, ECF No. 13-15, ¶ 9; *see also* General John R. Allen et al.*, Statement of Fifty-Six Retired Generals and Admirals Warn That President Trump's Anti-Transgender Tweets, If Implemented, Would Degrade Military Readiness*, The Palm Ctr. (August 1, 2017), http://www.palmcenter.org/fifty-six-retired-generals-admirals-warn-president-trumps-

C.    **President Trump's Abrupt Reversal of the Military's Open Service Policy Is Unsupported by Any Defensible Rationale.**

On July 26, 2017, President Trump abruptly changed course, announcing in a series of Twitter posts that "the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military. . . Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail."  The President expanded on this announcement one month later in a memorandum directing the Secretaries of Defense and Homeland Security: (i) to indefinitely refrain from accessing transgender individuals into the military; (ii) to halt "all use of DOD or DHS resources to fund sex reassignment surgical procedures [as of March 22, 2018], except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex"; and (iii) to "return" to the pre-June 2016 practice of excluding and separating transgender service members from the military by March 23, 2018.[23]  In an effort to justify this abrupt step backward –

---

anti-transgender-tweets-implemented-degrade-military-readiness (hereinafter "Statement of Retired Military Leaders") ("[T]ransgender troops have been serving honorably and openly for the past year, and have been widely praised by commanders.").

[23] Presidential Memorandum, 82 FR 41319 §§ 1, 2 (Aug. 25, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/08/25/presidential-memorandum-secretary-defense-and-secretary-homeland. The fact that the Department of Defense has issued interim guidance allowing current transgender service members to remain in their posts and to reenlist until the Defense Secretary issues "final guidance" in March 2018 is cold comfort to transgender service members whose service and personhood the President devalued in a series of tweets and who are, at best, left in a state of uncertainty or sidelined for the next five months.  *See* Secretary of Defense, Military Service by Transgender Individuals – Interim Guidance (Sept. 14, 2017), *available at* https://www.defense.gov/Portals/1/Documents/PDFs/Military-Service-By-Transgender-Individuals-Interim-Guidance.pdf.

apparently announced without any consultation with top military leaders[24]– the President has

cited to the allegedly negative impact that open service by transgender individuals would have on

the military's budget and effectiveness and raised concerns about unit cohesion among the

troops.[25]  But each of these claims was discredited by the DOD Working Group, as well as by

other researchers and scholars.  They are also contradicted by the experience of the *Amici* States.

      RAND and other researchers have already dispelled the myth that transition-related

health care costs would strain military budgets.[26]  To the contrary, they have concluded that –

because only a small proportion of service members are statistically likely to seek transition-

related treatment each year – the associated costs would  "have little impact on and represent[] an

exceedingly small proportion" of the military's overall health care expenditures.[27]  This

conclusion comports with the experience of many *Amici* States in extending comprehensive

health care coverage to transgender individuals, as several States have done so without incurring

---

[24] Barbara Starr et al., *US Joint Chiefs blindsided by Trump's transgender ban*, CNN (July 27, 2017), http://www.cnn.com/2017/07/27/politics/trump-military-transgender-ban-joint-chiefs/index.html.

[25] *See* Presidential Memorandum, *supra* note 23, at § 3; Donald Trump (@realDonaldTrump), Twitter posts (July 26, 2017).

[26] RAND Report, *supra* note 16, at xi-xii, 33-38, 70; Aaron Belkin, *Caring for Our Transgender Troops –The Negligible Cost of Transition-Related Care*, 373:12 New Eng. J. Med. 1089, 1090-1091 (Sept. 17, 2015).

[27] RAND Report, *supra* note 16, at xi-xii; *see id.* at 31-32, 70 (estimating that transition-related healthcare costs would  increase military healthcare costs by $2.4 million to $8.4 million or – at most – 0.13%); Belkin, *supra* note 26, at 1090 (estimating that transition-related care will cost the military $5.6 million annually and predicting that "under any plausible estimation method, the cost amounts to little more than a rounding error in the military's $47.8 billion annual health care budget"); Ross, *supra* note 13, at 210-212 (arguing that cost objections to open transgender military serve are "exaggerated" and "speculative" in light of the experience of other countries, the small percentage of transgender service members who would seek gender affirmation surgery, and the cost of such surgery relative to the cost of surgery for common military injuries).

heightened financial costs or increased premiums.[28]  In California, for example, the Insurance

Commissioner conducted an extensive cost-benefit analysis of prohibiting private insurers from

denying coverage for transition-related services and found that such a prohibition would not only

have an "immaterial" impact on premium costs, but would actually benefit individuals,

employers, and insurance carriers because it would ultimately improve health outcomes for

transgender individuals.[29]

Likewise, RAND's research for the DOD Working Group showed that allowing

transgender people to serve openly would have no adverse impact on unit cohesion, operational

effectiveness, or readiness.[30]  As the RAND Report explained, transition-related constraints on

the deployability of transgender service members would be "negligible" and have a "minimal

impact on readiness."[31]  Existing data also indicate that allowing transgender individuals to serve

openly would have a minimal impact – if any – on unit cohesion, and may actually improve the

---

[28] *See* Katie Keith, *15 States and DC Now Prohibit Transgender Insurance Exclusions*, CHIRblog (Mar. 30, 2016), http://chirblog.org/15-states-and-dc-now-prohibit-transgender-insurance-exclusions/ ("[T]he removal of transgender exclusions [from health plans] does not impose significant costs."); William V. Padula et al., *Societal Implications of Health Ins. Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, Journal of General Internal Medicine (April 16, 2016), *available at* https://www.ncbi.nlm.nih.gov/pubmed/26481647 ("Health insurance coverage for the U.S. transgender population is affordable and cost-effective, and has a low budget impact on U.S. society.").

[29] Cal. Dep't of Ins., *Economic Impact Assessment of Gender Nondiscrimination in Health Insurance* 1−2, Reg. File No. REG-2011-00023 (Apr. 13, 2012), *available at* http://transgenderlawcenter.org/wp-content/uploads/2013/04/Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf.  The Commissioner based this determination in part on existing data from the City and County of San Francisco, the University of California, and a study of Fortune 500 companies demonstrating that "extremely low utilization result[ed] from elimination of gender discrimination [in health care plans], as would be expected with such a small population."  *Id.* at 4-5.

[30] RAND Report, *supra* note 16, at xiii, 39-47.

[31] *Id.* at 46-47.

bond among troops by removing stressors that decrease performance ability.[32]  For example, of the eighteen foreign nations – including Australia, Britain, Canada, Israel, and Sweden – that allow transgender individuals to serve openly, none has reported any ill effects.[33]  Indeed, an extensive inquiry into Canada's decision to open military service to transgender individuals revealed that "the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges."[34]  The historical experience of the United States military bolsters this finding: each time our country has diversified the Armed Forces – whether it be through racial integration, expanding combat opportunities for women, or allowing openly gay, lesbian, and bisexual individuals to serve – the military grappled with unit cohesion objections, rejected them, and grew stronger.[35]

The experience of the *Amici* States contradicts the President's stated rationale for reinstating a ban on openly transgender service members on this point as well.  For years, transgender individuals have served in the National Guard and have done so with honor and distinction.  After the ban was lifted in 2016, some of these Guard members came out to their

---

[32] *Id.* at xii; Ross, *supra* note 13, at 204-206, 209-211.

[33] *See* Ross, *supra* note 13, at 206-208; Amanda Erickson, *Trump Said Transgender Troops Cause 'Disruption.'  These 18 Militaries Show Otherwise*, Wash. Post (July 26, 2017) https://www.washingtonpost.com/news/worldviews/wp/2017/07/26/trump-said-transgender-troops-cause-disruption-these-18-militaries-show-otherwise/?utm_term=.a04643d1b8b8; Statement of Retired Military Leaders, *supra* note 22 ("Eighteen foreign nations, including the UK and Israel, allow transgender troops to serve, and none has reported any detriment to readiness.").

[34] RAND Report, *supra* note 16, at 45.

[35] *See* Ross, *supra* note 13, at 205-206; Statement by Secretary Carter, No. NR-272-15, *supra* note 11 ("Over the last fourteen years of conflict, the Department of Defense has proven itself to be a learning organization. This is true . . . with respect to institutional activities, where we have learned from how we repealed 'Don't Ask, Don't Tell,' from our efforts to eliminate sexual assault in the military, and from our work to open up ground combat positions to women.").

superiors and peers, and the *Amici* States are unaware of any adverse consequences for the

Guard.  Transgender cadets in ROTC programs supported by many of our colleges and

universities similarly disclosed their gender identities – also with no known adverse

consequences.  In addition, three *Amici* States are proud to support maritime academies that are

designed to prepare students for military or civilian careers in maritime-related fields.[36]  These

academies welcome transgender students.[37]  The *Amici* States' experience with the National

Guard, ROTC programs, and maritime academies is consistent with the broader lessons we have

learned from implementing transgender-inclusive laws and policies: welcoming transgender

individuals to live and participate openly in society not only improves their lives, but also makes

our communities stronger as a whole.

   In sum, the Trump Administration has made an affirmative, irrational decision to reverse

recent progress and reinstitute formal discrimination against transgender individuals in the

military.  The Administration's purported justifications for reinstating the ban are contradicted

by research, reason, and experience.  Where, as here, a government action discriminates against a

disadvantaged class and the action is "so discontinuous with the reasons offered for it" that it

"seems inexplicable by anything but animus toward the class it affects," that action cannot

withstand even minimal scrutiny.  *Romer v. Evans*, 517 U.S. 620, 632 (1996).

---

[36] Massachusetts operates the Massachusetts Maritime Academy; California, the California
Maritime Academy; and New York, the State University of New York Maritime College.  New
York is also home to the federally administered U.S. Merchant Marine Academy.

[37] *See, e.g., Trans Inclusion Policy*, Massachusetts Maritime Academy (last visited Oct. 16,
2017), https://www.maritime.edu/trans-inclusion-policy; *Safe Zone Program,* California
Maritime Academy (lasted visited Oct. 16, 2017),
https://www.csum.edu/web/diversity/home/safe-zone-program.

## II.     REINSTATING A BAN ON MILITARY SERVICE BY TRANSGENDER PEOPLE WILL HARM THE *AMICI* STATES AND OUR RESIDENTS.

National security and emergency and disaster management are not simply matters of federal concern.  All States play important roles – both direct and indirect – in providing for our collective security and have an interest in ensuring the strongest, most inclusive military possible.  We also share an interest in avoiding becoming entangled in discriminatory federal policies.  The Administration's decision to reinstitute a ban on open service by transgender individuals harms all of these interests.  It also harms the *Amici* States' veterans, active service members, and those who wish to serve, and our transgender communities more broadly.

### A.     The Ban Will Entangle the *Amici* States in Invidious Discrimination Harmful to Our National Guard.

Reinstituting the ban will impede the *Amici* States' administration and control of the National Guard and undermine the efficacy of those forces in protecting our communities.  The National Guard is a reserve component of the United States Armed Forces, yet remains a "hybrid entity that carefully combines both federal and state characteristics."  *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 992 (D.C. Cir. 2010) (quoting *Lipscomb v. Fed. Labor Relations Auth.*, 333 F.3d 611, 614 (5th Cir. 2003)).  While the National Guard is primarily funded by the federal government and subject to federal requirements for service, the state National Guards and their individual units generally operate under state control.[38]  As a result, state actors oversee recruitment efforts, exercise day-to-day command over service

---

[38] Indeed, the only time the National Guard is under the exclusive control of the federal government is when activated under Title 10 to supplement the regular components of the federal ground and air forces.  *See* Major General Timothy J. Lowenberg, *The Role of the National Guard in National Defense and Homeland Security*, The National Guard Ass'n of the United States, 3 (last visited Oct. 16, 2017), https://www.ngaus.org/sites/default/files/pdf/primer%20fin.pdf.

members in training and most forms of active duty,[39] and deploy the Guard in response to natural

or man-made disasters in their own States and across the country.[40]  Each of the *Amici* States

funds and supports its National Guard forces to ensure that its citizen-soldiers are highly trained

and ready to perform a range of critical state missions and to support national defense operations

as needed.  For example, the California National Guard – which comprises over 18,000 members

– receives approximately $50 million in state funds annually and is regularly deployed to assist

with firefighting and law enforcement efforts, search and rescue missions, disaster response,

homeland defense, and cyber-defense and -security.[41]

     Over the years, transgender individuals have ably served *Amici* States – and many States

across the country – through the National Guard.[42]  After the Department of Defense lifted

restrictions on service by transgender members, *see supra* Part I.B, the *Amici* States had to act

swiftly to comply with the Department's new policies and ensure that these individuals could

---

[39] Under Title 32 of the United States Code, whenever not called to "federal duty by the President . . . a state National Guard is under the command of the state Governor and State Adjutant General, who is appointed by the Governor." *Ass'n of Civilian Technicians*, 603 F.3d at 993.

[40] In accordance with state law and policy, state governors are empowered to activate National Guard personnel to "State Active Duty."  During such times, "[s]oldiers and airmen remain under the command and control of the [state] Governor." *NGAUS Fact Sheet: Understanding the Guard's Duty Status*, The National Guard Ass'n of the United States (last visited Oct. 16, 2017), https://www.ngaus.org/sites/default/files/Guard%20Statues.pdf; *see, e.g.*, Mass. Gen. Laws ch. 33, § 41(a); Cal Mil. & Vet. Code § 146(a); N.Y. Mil. Law § 6.

[41] Similarly, in 2015 the New York National Guard, with over 15,000 members, received more than $66 million in state funds to cover salaries, supplies, facilities, and education. *See New York National Guard Economic Impact 2015*, New York State Division of Military and Naval Affairs (Jan. 15, 2016), *available at* https://dmna.ny.gov/NYNG_Economic_Impact.pdf.

[42] Gates & Herman, *supra* note 4, at 1 (estimating 15,500 members in active service, the National Guard, or Reserves).

<div align="center">14</div>

serve openly, without fear of discharge.[43]   These efforts did not disrupt the operation of the

National Guard.  To the contrary, by empowering our individual members and diversifying our

ranks, these initiatives further enhanced the capability and effectiveness of our state-sited

defense and security forces.

Because of the hybrid nature of the National Guard, however, the *Amici* States are

required to comply with any directive the Trump Administration issues with respect to

transgender service members, or risk losing much-needed funding for our National Guard units.

*See Ass'n of Civilian Technicians*, 603 F.3d at 993; 32 U.S.C. §§ 106-108.  Most immediately,

that means enforcing the prohibition on accepting openly transgender recruits.  If fully

implemented, the ban also may require National Guard leadership in the *Amici* States to renege

on assurances made to existing transgender service members who came out in reliance on the

2016 open service policy; to pass over qualified transgender individuals for promotion; or to

discharge them from service altogether.

In effect, the Administration's policy reversal threatens to require the *Amici* States to

undo our efforts to provide an inclusive environment for current transgender service members,

and instead foist upon us the discriminatory policies of the past.  It will entangle the *Amici* States

– once again – in a federal scheme that requires us to differentiate National Guard recruits and

service members based on a characteristic that has been demonstrated to have nothing to do with

their ability to serve.  Such discrimination is in direct conflict with the policies of the *Amici*

States, including our prohibitions on discrimination based on gender identity in public or private

---

[43] *See* Tech. Sgt. Erich B. Smith et al., *Guard Members Ready For New DOD Transgender Policy*, National Guard Bureau (June 15, 2017), http://www.nationalguard.mil/News/Article/1215104/guard-members-ready-for-new-dod-transgender-policy/.

employment and our laws extending civil rights protections to transgender residents in other aspects of civic life (such as housing and public accommodations). *See supra* note 8.

Equally important, excluding transgender individuals will diminish the effectiveness of the National Guard and thus hamper the *Amici* States' emergency and disaster response efforts. As described above, National Guard members are largely under state control and devoted to state-based missions, such as disaster relief and search and rescue operations. The *Amici* States are already restricted by the Trump Administration's decision to extend the prohibition on transgender recruits,[44] which limits the pool of otherwise qualified candidates who wish to join our National Guard units. If forced to reinstate a complete ban on transgender service members, the *Amici* States could also lose the aggregate skills and knowledge of our many transgender service members and – with them – the value of the training and experience *Amici* States provided through the Guard. Because the *Amici* States maintain and rely on the National Guard to assist us in times of emergency, a reduction in those forces inflicts a direct and significant harm upon us.[45]

---

[44] *See* Statement by Chief Pentagon Spokesperson Dana M. White on Transgender Accessions, Release No. NR-250-17 (June 30, 2017) *available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/1236145/statement-by-chief-pentagon-spokesperson-dana-w-white-on-transgender-accessions/.

[45] *See* Statement of Retired Military Leaders, *supra* note 22 ("The proposed ban, if implemented, would cause significant disruptions, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie, as well as non-transgender peers who would be forced to choose between reporting their comrades or disobeying policy. As a result, the proposed ban would degrade readiness even more than the failed 'don't ask, don't tell policy.'").

**B.      The Ban Will Entangle the *Amici* States in Harmful Discrimination Limiting Opportunities at Our Public Institutions of Higher Education.**

The harmful effects of reinstating a ban on transgender service members extend beyond the Armed Forces and National Guard to the *Amici* States' public colleges and universities that support ROTC programs and to state-run maritime academies.

ROTC programs are designed to train commissioned officers of the Armed Forces; they are located on and supported by college campuses but subject to federal entry requirements.[46] Many public colleges and universities in the *Amici* States host ROTC programs, provide them with physical space, and, in some instances, financial support in the form of a budget or scholarship funds.  For example, one public university in Massachusetts provides its Army and Air Force ROTC programs with a total annual budget of approximately $30,000 and designates an additional $200,000-$300,000 per year for scholarships available only to ROTC cadets. Reinstating the ban on open service by transgender individuals will render these ROTC programs – together with the scholarship and career opportunities they provide – actually or effectively unavailable to transgender students, who will not be eligible to serve openly in the Armed Forces upon graduation.  The ban will thus harm the *Amici* States' public colleges and universities by limiting their ability to extend the same opportunities to all of their students, in direct contravention of many schools' own transgender-inclusive policies and the *Amici* States' broader anti-discrimination laws.[47]

---

[46] *See* 10 U.S.C. § 2103.  Similarly, many elementary and secondary schools in the *Amici* States host the Junior Reserve Officers' Training Corps ("JROTC").  JROTC is a program for high school and middle school students that aims to "instill in students . . . the values of citizenship, service United States, and personal responsibility and a sense of accomplishment."  10 U.S.C. § 2031(a)(2).

[47] *See supra* note *8; Statement of Inclusion*, University of Massachusetts Lowell (last visited Oct. 16, 2017), https://www.uml.edu/docs/Inclusion%20Statement_tcm18-167589.pdf.  These public

The ban also works a distinct set of harms on one subset of state-run educational institutions: the specialized maritime academies operated by Massachusetts, California, and New York that serve as pathways for students interested in pursuing maritime professions or becoming commissioned officers in the Coast Guard or other branches of the Armed Forces.  *See supra* note 36.  In addition to the state-of-the-art training and curriculum they offer all students, maritime academies extend special benefits to those who intend to join the military, including funding conditioned on subsequent military service[48] and programs that enable students to obtain military commissions after graduation.  For example, the maritime academies all offer a "Strategic Sealift Midshipman [or Officer] Program," which allows students earning Coast Guard Licenses to be commissioned as officers in the Navy Reserve upon graduation and provides stipends to help pay for school.[49]  As with the ROTC programs (and against these academies' own anti-discrimination policies), reinstating a ban on transgender service members will effectively require these public institutions to offer different opportunities to their students based solely on their gender identity.  That is, while non-transgender students will be eligible for the full range of services, scholarships, and programs at the academies, transgender students will be unable to take advantage of a number of benefits – those that depend on a future military career.   In light of the more limited opportunities that will be available to transgender students

---

institutions also have no real recourse, as Congress has barred institutions of higher education that receive federal funding from preventing the Armed Forces from establishing or operating ROTC programs on campus.  10 U.S.C. § 983.

[48] The Student Incentive Payment (SIP) Program is offered for students of all the academies.  Following graduation, SIP students must either enter the U.S. Armed Forces on active duty or must be in a reserve unit for at least six years, along with other requirements.  *See* Maritime Administration, United States Department of Transportation (last visited Oct. 16, 2017), https://www.marad.dot.gov/education/maritime-academies/.

[49] *See, e.g., Strategic Midshipman Program*, Massachusetts Maritime Academy (last visited Oct. 16, 2017), https://www.maritime.edu/strategic-sealift-midshipman-program.

after graduation, the overall education these academies provide will be of significantly lesser value.  Both students and the maritime academies themselves will therefore be worse off as a result of the ban.

   C.   **The Ban Will Harm the *Amici* States' Veterans, Active Service Members, and Those Who Wish to Serve.**

   The Trump Administration's irrational decision to reinstate the ban on openly transgender people from military service will also directly harm the residents of the *Amici* States: our veterans, our active service members, and those who wish to serve.

   The harm to the dignity of transgender veterans and soldiers alone is significant.  The ban degrades the service of the 150,000 veterans, active-duty service members, and members of the National Guard and Reserves who identify as transgender, as well as the intentions of those who wish to serve.  Reinstating the ban serves no purpose but to deny this particular group – deemed less worthy by the Administration – equal opportunity and equal treatment under the law.  It relegates them to second-class status, sending the unmistakable message that they are unfit to serve or that their service is not valued, simply due to their gender identity.

   The ban also harms the many transgender residents of the *Amici* States who relied upon the assurance of the federal government that they were welcome to serve openly.  Many service members in the National Guard and other branches of the military came out as transgender to their command based upon that assurance, believing that they would not thereby be deprived of their opportunity to serve (or their livelihoods).  The Trump Administration has broken that promise to the grave detriment of these individuals.  Openly transgender service members may now be targeted for discharge or other adverse action.  Even if current transgender service members may be permitted to reenlist for the time being, *see supra* note 23, the Administration's intent – to ultimately bar all transgender individuals from serving by mid-March 2018 – is clear.

Case 1:17-cv-01597-CKK   Document 50   Filed 10/16/17   Page 28 of 34


And in the meantime, these service members must continue their service in limbo and with a shadow cast over them.

Similarly, transgender residents of the *Amici* States who took steps to prepare for careers in the military, by joining ROTC or enrolling in maritime academies, for example, did so in reliance on the promise that they would be able to serve openly.  They too face losing the opportunity to serve, and along with it the investment they have made in their careers thus far and other opportunities foregone.

Finally, transgender service members who have not yet revealed their gender identities, together with those who wish to pursue careers in the military, now face the Hobson's choice of being honest about who they are and being discharged or denied accession outright, or hiding their identities and serving in fear of being discovered.[50]  Denying otherwise qualified transgender individuals the opportunity to serve denies them equal participation in a core civic activity.  And forcing transgender individuals to hide their identities in order to enlist or continue serving is extremely harmful to their health and wellbeing[51]– a reality evidenced by the experiences of the thousands of gay, lesbian, and transgender service members who have served under previous discriminatory policies.[52]  Concealing core aspects of one's identity has a

---

[50] *Cf. Log Cabin Republicans v. United States*, Case No. CV 04-08425-VAP, 2010 U.S. Dist. LEXIS 93612, *29-65 (C.D. Cal. Sept. 9, 2010) (recounting testimony of service members describing experience of serving under a "cloud of fear" during Don't Ask Don't Tell).

[51] *See* Elders & Steinman, *supra* note 13, at 4 ("We determined not only that there is no compelling medical reason for the ban, but also that the ban itself is an expensive, damaging and unfair barrier to health care access for the approximately 15,450 transgender personnel who serve currently in the active, Guard and reserve components. . . . Research shows that depriving transgender service members of medically necessary health care poses significant obstacles to their well-being.")

[52] *See, e.g.*, Declaration of Former Chairman of Joint Chiefs of Staff, Admiral Michael Mullen, ¶ 14, *Karnoski v. Trump*, No. 2:17-cv-01297 (W.D. Wa.) (ECF No. 49) ("When I led our armed forces under [Don't Ask Don't Tell] I saw firsthand the harm to readiness and morale when we

negative impact on mental health.[53]  The need to hide their gender identity causes transgender service members to be less likely to seek necessary mental health and medical care; because there is limited confidentiality for communications with doctors and therapists in the military, these service members cannot be candid with their health care providers and are thus more likely to avoid treatment.[54]

Further, prohibiting open service estranges transgender service members from their fellow troops, undermining the group's ability to trust and bond.[55]  "Concealment leads to . . . stress and isolation, which can lead to decreased performance ability."[56]  The negative repercussions of concealment are especially pertinent in the military, where "interpersonal connection, support, and trust among unit members are thought to be paramount to unit cohesion and effectiveness."[57]  Thus, depriving transgender service members of the trust and bonding with

---

fail to treat all service members according to the same standards.  There are thousands of transgender Americans currently serving and there is no reason to single them out[,] to exclude them[,] or deny them the medical care that they require."), *available at* https://www.lambdalegal.org/sites/default/files/legal-docs/downloads/049._declaration_of_admiral_michael_mullen_2017-09-14.pdf.

[53] Ross, *supra note 13*, at 209 (citing Moradi, *infra note 55*, at 514).

[54] *See* Kerrigan, *supra note 10*, at 513-14; Elders & Steinman, *supra note 13*, at 4 ("According to one recent study, 'Mental health, medical and substance abuse services obtained outside the military are supposed to be communicated back to the military, so transgender people who seek these services elsewhere will risk exposure . . . This leads individuals to go without treatment, allowing symptoms to exacerbate, and causing some to treat symptoms with alcohol or drugs, which could lead to substance abuse or dependence.'").

[55] A study conducted on the impact of concealment versus disclosure of sexual orientation in the military found that concealment relates negatively to unit social and task cohesion and conversely that disclosure positively impacts cohesion.  *See* Bonnie Moradi, *Sexual Orientation Disclosure, Concealment, Harassment, and Military Cohesion: Perceptions of LGBT Military Veterans*, 21 Mil. Psychol. 513 (2009).  The same can be expected to be true of gender identity. *See Ross*, *supra note 13*, at 209.

[56] *Id.* at 209.

[57] *Id.*

fellow service members that is so fundamental to the military experience not only harms them individually, it also undermines military readiness and effectiveness generally.

### D.      The Ban Will Harm Our Transgender Communities More Broadly.

The consequences of the Trump Administration's reversal on transgender service members are not limited to the Armed Forces and may be felt across society at large.  The military is among our country's most integrated and diverse institutions.  Historically, though progress has been slow and imperfect, when the military has accepted previously-excluded or marginalized groups into its ranks – African-Americans, women, immigrants, and gay and lesbian individuals – it has helped to lay the groundwork for broader social integration and acceptance.[58]  So too here, at a time when – despite continued stigma, discrimination, and violence – acceptance of transgender individuals is on the rise, the military's open service policy was an important step forward, both practically and symbolically.  Now, worse than never having permitted them to serve openly in the first place, the Trump Administration has singled out transgender individuals for renewed exclusion, sending a message that threatens to slow

---

[58] *See, e.g.*, Cornelius L. Bynum, *How a Stroke of the Pen Changed the Army Forever*, Wash. Post (July 26, 2017), https://www.washingtonpost.com/news/made-by-history/wp/2017/07/26/how-a-stroke-of-the-pen-changed-the-army-forever/ (discussing the broader impact on the civil rights movement of President Harry Truman's Executive Order 9981, which desegregated the military) ("Though the pace of full-scale change was slow, the executive order was one of the most significant steps toward equal justice since the Emancipation Proclamation in 1863 and the ratification of the 13th Amendment to the U.S. Constitution that abolished slavery in 1865.  Indeed, when considered alongside other milestone civil rights achievements, E.O. 9981 is remarkable for its effectiveness and durability . . . Even the momentous civil rights actions that we collectively recognize as modern landmarks of racial progress fail to match the fundamental and lasting institutional change wrought by E.O. 9981.").

recent progress and that will be heard and felt throughout our communities.  Indeed, it seems that

may be the point.[59]

      The military has already concluded that allowing transgender individuals to serve openly

is in the nation's best interest.  Reinstating the ban simply cannot be justified by reference to

costs, unit cohesion, or overall readiness.  Rather, the Administration seeks to ban otherwise

qualified people from service simply because of who they are.  In doing so, the Administration

would harm both the *Amici* States and our residents in profound ways.  *See, e.g.*, *Alfred L. Snapp*

*& Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982) ("This Court has had too

much experience with the political, social, and moral damage of discrimination not to recognize

that a State has a substantial interest in assuring its residents that it will act to protect them from

these evils.").  Reinstating the ban on open service would be a step backward for transgender

people, for civil rights, and for the country as a whole.

---

[59] *See, e.g.*, Memorandum from Attorney General to United States Attorneys Heads of
Department Components (Oct. 4, 2017), *available at* https://thinkprogress.org/wp-
content/uploads/2017/10/20171005-doj-memo-title-vii.pdf (reversing Department of Justice
policy interpreting Title VII to prohibit discrimination based on gender identity).

## CONCLUSION

For the foregoing reasons, the *Amici* States join in asking the Court to grant the Plaintiffs'

Application for a Preliminary Injunction.

Respectfully submitted,

MAURA HEALEY
   *Attorney General of Massachusetts*

 */s/ Sara A. Colb*
 Genevieve C. Nadeau
 Sara A. Colb
 Kimberly A. Parr
   *Assistant Attorneys General*
 One Ashburton Place
 Boston, Massachusetts 02108
 (617) 727-2200
 Genevieve.Nadeau@state.ma.us
 Sara.Colb@state.ma.us
 Kimberly.Parr@state.ma.us

(Counsel listing continues on next page)

XAVIER BECERRA
Attorney General of California
1300 I St.
Sacramento, CA 95814

GEORGE JEPSEN
Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106

MATTHEW P. DENN
Attorney General of Delaware
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
Attorney General of the District of Columbia
One Judiciary Square
441 4th Street, N.W.
Washington, D.C 20001

DOUGLAS S. CHIN
Attorney General of Hawaii
425 Queen Street
Honolulu, Hawaii 96813

LISA MADIGAN
Attorney General of Illinois
100 West Randolph Street, 12th Floor
Chicago, IL 60601

TOM MILLER
Attorney General of Iowa
1305 E. Walnut Street
Des Moines, Iowa 50319

BRIAN E. FROSH
Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

HECTOR BALDERAS
Attorney General of New Mexico
408 Galisteo St.
Santa Fe, NM 87501

ERIC T. SCHNEIDERMAN
Attorney General of New York
120 Broadway
New York, NY 10271

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
Attorney General of Pennsylvania
16th Fl., Strawberry Sq.
Harrisburg, PA 17120

PETER F. KILMARTIN
Attorney General of Rhode Island
150 S. Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
109 State Street
Montpelier, Vermont 05609

## CERTIFICATE OF SERVICE

I, Sara A. Colb, hereby certify that a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on this date.


                         */s/ Sara A. Colb*
                         Sara A. Colb

DATED: October 16, 2017

26