**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JOHN DOE 1, REGAN V. KIBBY, and DYLAN KOHERE, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; the UNITED STATES DEPARTMENT OF THE ARMY; RYAN D. MCCARTHY, in his official capacity as Secretary of the Army; the UNITED STATES DEPARTMENT OF THE NAVY; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE AIR FORCE; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; the UNITED STATES COAST GUARD; ELAINE C. DUKE, in her official capacity as Secretary of Homeland Security; the DEFENSE HEALTH AGENCY; RAQUEL C. BONO, in her official capacity as Director of the Defense Health Agency; and the UNITED STATES OF AMERICA, )<br><br>Defendants. ) | Civil Action No. 17-cv-1597 (CKK) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ......................................................................................................... 1

SUPPLEMENTAL STATEMENT OF FACTS .......................................................... 1

    A.    The Interim Guidance Does Not And Cannot Mitigate The Vast Majority
of Harms Being Experienced by Transgender Service Members Or Those
Who Wish To Enlist Or Commission .................................................................. 2

    B.    Plaintiffs Are Being Harmed by the Ban .............................................................. 3

ARGUMENT ................................................................................................................ 5

I.    The Court Should Deny Defendants' Motion To Dismiss ......................................... 5

    A.    Plaintiffs Have Standing To Challenge The Ban ................................................... 5

        1.    Plaintiffs have standing to challenge a policy that facially targets
them for separation from military service and excludes them from
military programs ........................................................................................ 7

        2.    Plaintiffs are suffering injuries because of the ban now. .......................... 10

        3.    Plaintiffs are personally affected by the ban. ........................................... 11

        4.    Plaintiffs easily satisfy the remaining standing requirements ................... 12

    B.    Plaintiffs' Challenge To The Ban Is Ripe ............................................................ 13

        1.    Plaintiffs raise purely legal issues fit for judicial review ......................... 13

        2.    Postponing judicial review would impose an undue burden on
Plaintiffs. .................................................................................................. 17

II.    The Court Should Grant Plaintiffs' Application For A Preliminary Injunction .............. 18

    A.    Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction ............ 18

    B.    Plaintiffs Are Likely To Succeed On The Merits .................................................. 21

        1.    The ban violates equal protection. ............................................................ 21

        2.    Plaintiffs are likely to succeed on their due process claim. ...................... 32

        3.    Plaintiffs are likely to succeed on their estoppel claim ............................. 36

    C.    The Balance Of The Equities And The Public Interest Favor An Injunction ........ 40

    D.    The Court Should Order The Relief Sought In The Application .............................. 41

CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelfattah v. U.S. Department of Homeland Security,*
    787 F.3d 524 (D.C. Cir. 2015) ............................................................................................33

*Able v. United States,*
    968 F. Supp. 850 (E.D.N.Y. 1997), *rev'd,* 155 F.3d 628 (2d Cir. 1998) ................................19

*Action Alliance of Senior Citizens v. Heckler,*
    789 F.2d 931 (D.C. Cir. 1986) ............................................................................................13

*Adair v. England,*
    183 F. Supp. 2d 31 (D.D.C. 2002) .....................................................................................45

*Allen v. Wright,*
    468 U.S. 737 (1984) ...........................................................................................................11

*American Petroleum Institute v. Johnson,*
    541 F. Supp. 2d 165 (D.D.C. 2008) ...................................................................................17

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) .............................................................................14, 15, 16

*AT&T Corp. v. FCC,*
    349 F.3d 692 (D.C. Cir. 2003) ............................................................................................17

*ATC Petroleum, Inc. v. Sanders,*
    860 F.2d 1104 (D.C. Cir. 1988) .........................................................................................36

*Attias v. CareFirst, Inc.,*
    865 F.3d 620 (D.C. Cir. 2017) ..........................................................................................6, 7

*Beach Communications, Inc. v. F.C.C.,*
    959 F.2d 975 (D.C. Cir. 1992) ............................................................................................14

*Board of Trustees of the University of Alabama v. Garrett,*
    531 U.S. 356 (2001) .......................................................................................................26, 29

*Bostic v. Schaefer,*
    760 F.3d 352 (4th Cir. 2014) ..............................................................................................29

*Brandt v. Hickel,*
    427 F.2d 53 (9th Cir. 1970) ................................................................................................39

*Bresgal v. Brock,*
    843 F.2d 1163 (9th Cir. 1987) ........................................................41

*Brown v. Glines,*
    444 U.S. 348 (1980)........................................................................24

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006)........................................................21

*Chappell v. Wallace,*
    462 U.S. 296 (1983)........................................................................45

*Cinciarelli v. Reagan,*
    729 F.2d 801 (D.C. Cir. 1984)........................................................39

*City of Chicago v. Sessions,*
    No. 17-C-5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017)..............41

*City of Chicago v. Sessions,*
    No. 17-C-5720, 2017 WL 4572208 (N.D. Ill. Oct. 13, 2017) .................42

*City of Cleburne v. Cleburne Living Center,*
    473 U.S. 432 (1985)................................................................26, 30, 31

*City of Los Angeles v. Patel,*
    135 S. Ct. 2443 (2015).....................................................................27

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013)..........................................................................6

*Columbus Board of Education v. Penick,*
    443 U.S. 449 (1979)........................................................................42

*ConverDyn v. Moniz,*
    68 F. Supp. 3d 34 (D.D.C. 2014) ....................................................40

*Cook v. Gates,*
    528 F.3d 42 (1st Cir. 2008)..........................................................24, 30

*Crawford v. Cushman,*
    531 F.2d 1114 (2d Cir. 1976)..........................................................26

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998)....................................................................33, 35

*Dayton Board of Education v. Brinkman,*
    433 U.S. 406 (1977)........................................................................41

*Doe v. Rumsfeld*,
    341 F. Supp. 2d 1 (D.D.C. 2004) ..........................................................................................44

*DynaLantic Corp. v. U.S. Department of Defense*,
    885 F. Supp. 2d 237 (D.D.C. 2012) ....................................................................................18

*Elzie v. Aspin*,
    841 F. Supp. 439 (D.D.C. 1993) ...........................................................................19, 20, 37

*Emery Mining Corp. v. Secretary of Labor*,
    744 F.2d 1411 (10th Cir. 1984) ...........................................................................................37

*Evancho v. Pine-Richland School District*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017) ................................................................................12

*FCC v. Beach Communications Inc.*,
    508 U.S. 307 (1993) ......................................................................................................28, 30

*George Washington University v. District of Columbia*,
    391 F. Supp. 2d 109 (D.D.C. 2005) ....................................................................................33

*Goings v. Court Services & Offender Supervision Agency for D.C.*,
    786 F. Supp. 2d 48 (D.D.C. 2011) ......................................................................................18

*Goldman v. Weinberger*,
    475 U.S. 503 (1986) ............................................................................................................24

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ............................................................................................18

*Greer v. Spock*,
    424 U.S. 828 (1976) ............................................................................................................24

*Griswold v. Connecticut*,
    381 U.S. 479 (1965) ............................................................................................................34

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ............................................................................................41

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015) ................................................................................................12

*Heckler v. Mathews*,
    465 U.S. 728 (1984) ............................................................................................................12

*Heller v. Doe*,
    509 U.S. 312 (1993) ................................................................................................26, 27, 30

*Hernandez-Montiel v. INS*,
    225 F.3d 1084 (9th Cir. 2000) ............................................................34

*Hoeber v. D.C. Redevelopment Land Agency*,
    483 F. Supp. 1356 (D.D.C. 1980), *aff'd* 672 F.2d 894 (D.C. Cir. 1981)................................40

*Holley v. United States*,
    124 F.3d 1462 (Fed. Cir. 1997)..........................................................36

*Huynh v. Carlucci*,
    679 F. Supp. 61 (D.D.C. 1988) ..........................................................44

*In re Naval Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ........................................................8, 9

*International Refugee Assistance Project v. Trump*,
    857 F.3d 554 (4th Cir. 2017), *cert. granted*, 137 S. Ct. 2080 (2017), *vacated*,
    No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017)....................................41, 42

*Kauffman v. Secretary of Air Force*,
    415 F.2d 991 (D.C. Cir. 1969) ..........................................................36

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994)....................................................................35

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011) ...........................................................8

*Lawrence v. Texas*,
    539 U.S. 558 (2003)....................................................................34

*Lewis v. Casey*,
    518 U.S. 343 (1996)....................................................................43

*Locke v. Davey*,
    540 U.S. 712 (2004)....................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).....................................................................5

*Madsen v. Women's Health Center, Inc.*,
    512 U.S. 753 (1994)....................................................................43

*McVeigh v. Cohen*,
    983 F. Supp. 215 (D.D.C. 1998) ..............................................19, 20, 40

*Mead v. Holder*,
    766 F. Supp. 2d 16 (D.D.C. 2011) ................................................13, 17

*Meinhold v. U.S. Department of Defense*,
  34 F.3d 1469 (9th Cir. 1994) ................................................................................44

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ...........................................................................18

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)..............................................................................................44

*Morris Communications, Inc. v. FCC*,
  566 F.3d 184 (D.C. Cir. 2009) .............................................................................38

*National Ass'n of Broadcasters v. FCC*,
  789 F.3d 165 (D.C. Cir. 2015) ...............................................................................7

*National Ass'n of Home Builders v. U.S. Army Corps of Engineers*,
  417 F.3d 1272 (D.C. Cir. 2005) ......................................................................15, 16

*Nattional Ass'n of Home Builders v. U.S. Army Corps of Engineers*,
  440 F.3d 459 (D.C. Cir. 2006) ....................................................................14, 15, 17

*National Coalition for Men v. Selective Service System*,
  640 F. App'x 664 (9th Cir. 2016) ........................................................................15

*National Mining Ass'n v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998) ...........................................................................41

*National Treasury Employees Union v. Chertoff*,
  452 F.3d 839 (D.C. Cir. 2006) .............................................................................14

*Nicopure Labs, LLC v. FDA*,
  2017 WL 3130312 (D.D.C. July 21, 2017)...........................................................15

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ..........................................................................................34

*Palmore v. Sidoti*,
  466 U.S. 429 (1984)..............................................................................................31

*Perez v. Mortgage Bankers Association*,
  135 S. Ct. 1199 (2015) ..........................................................................................37

*Philips v. Perry*,
  106 F.3d 1420 (9th Cir. 1997) ..............................................................................30

*Planned Parenthood Federation of America, Inc. v. Heckler*,
  712 F.2d 650 (D.C. Cir. 1983) .............................................................................41

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
  505 U.S. 833 (1992)..........................................................................................34

*Raines v. Byrd,*
  521 U.S. 811 (1997)............................................................................................6

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984)..........................................................................................34

*Romer v. Evans,*
  517 U.S. 620 (1996)....................................................................................22, 32

*Rostker v. Goldberg,*
  453 U.S. 57 (1981)..............................................................................22, 23, 24

*Santos v. Franklin,*
  493 F. Supp. 847 (E.D. Pa. 1980) ....................................................................38

*Schlesinger v. Ballard,*
  419 U.S. 498 (1975)..........................................................................................24

*Schlesinger v. Reservists Committee to Stop the War,*
  418 U.S. 208 (1974)............................................................................................6

*Simms v. D.C.,*
  872 F. Supp. 2d 90 (D.D.C. 2012) ....................................................................18

*Skinner v. Oklahoma,*
  316 U.S. 535 (1942)..........................................................................................34

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016)........................................................................................6

*State National Bank of Big Spring v. Lew,*
  795 F.3d 48 (D.C. Cir. 2015) ............................................................................13

*Steffan v. Perry,*
  41 F.3d 677 (D.C. Cir. 1994)..............................................................22, 23, 24

*Susan B. Anthony List v. Dreihaus,*
  134 S. Ct. 2334 (2014)...................................................................................7, 14

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015), *aff'd by equally divided Court,* 136 S. Ct. 2271 (2016) ..........41

*Town of Chester v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017)......................................................................................44

*United States v. Lazy FC Ranch*,
   481 F.2d 985 (9th Cir. 1973) ................................................................37

*United States v. Owens*,
   54 F.3d 271 (6th Cir. 1995) .................................................................37

*United States v. Virginia*,
   518 U.S. 515 (1996)....................................................................25, 30

*U.S. Department of Agriculture v. Moreno*,
   413 U.S. 528 (1973)................................................................................32

*U.S. Department of Defense v. Meinhold*,
   510 U.S. 939 (1993)................................................................................44

*U.S. House of Representatives v. U.S. Department of Commerce*,
   11 F. Supp. 2d 76 (D.D.C. 1998) ..........................................................16

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982)..................................................................................6

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977)................................................................................32

*Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*,
   259 F.2d 921 (D.C. Cir. 1958) ..............................................................21

*Watkins v. U.S. Army*,
   551 F. Supp. 212 (W.D. Wash. 1982), *aff'd*, 875 F.2d 699 (9th Cir. 1989) ...........................36

*Watkins v. U.S. Army*,
   875 F.2d 699 (9th Cir. 1989) .........................................................30, 37

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................40

*Witt v. Department of Air Force*,
   527 F.3d 806 (9th Cir. 2008) ................................................................34

**Statutes, Codes & Regulations**

10 U.S.C. § 1071....................................................................................23

10 U.S.C. § 1074(a)(1)...........................................................................23

82 Fed. Reg. 41,319 (Aug. 30, 2017).....................................................10

## INTRODUCTION

On July 26, 2017, President Trump launched an unprecedented attack on service members by ordering that transgender troops will no longer be allowed to serve.  Despite their decades of exemplary service, the President declared that transgender troops "hinder military effectiveness," "disrupt unit cohesion," and "tax military resources."  Since then, Plaintiffs' service has been diminished and their military futures foreclosed.  While they await discharges beginning as early as March 23, 2018, courageous, dedicated airmen, soldiers, and sailors continue to serve their country bearing the weight of being deemed unfit.  At the same time, talented ROTC and military academy students are excluded from their programs.

Defendants would have this Court believe that, despite these extraordinary actions, nothing has changed and no one has been harmed.  Defendants' argument is based on the fanciful notion that Interim Guidance issued to paper over the wreckage caused by the ban somehow insulates the President's order from judicial review.  Only with this sleight of hand can the Defendants ignore the devastation wreaked on the lives of transgender service members and their families.  As a result of the ban, Plaintiffs face irreparable harm to their military careers, their reputations, their futures, and their status as equal members of society.  As set forth below, Plaintiffs have standing to bring their claims, the issue is ripe for adjudication, and the standards for issuance of preliminary relief have been met.

## SUPPLEMENTAL STATEMENT OF FACTS

Defendants concede facts critical to this Court's consideration of Plaintiffs' Application and Defendants' Motion.  *First*, Defendants do not dispute that the President has reinstated the pre-June 2016 ban on transgender military service members and that the reversal of the current policy permitting open service takes effect on March 23, 2018.  Defs.' Mot. Dismiss & Opp'n Pls.' Application Preliminary Injunction ("Opp.") 6-7.  *Second*, Defendants agree that

1

transgender people are prohibited from joining the military and will be prohibited from joining indefinitely, unless and until the Secretaries provide "a recommendation to the contrary that the President finds convincing." *Id.* at 7.  Nothing in the Interim Guidance issued by the Department of Defense changes these critical facts.  As the former Service Secretaries and a military personnel expert explain in declarations submitted with this brief, while the Interim Guidance partially mitigated a small subset of harms, both the Plaintiffs and all other transgender service members and transgender individuals who are in (or wish to be in) military programs are being harmed in multiple ways.

  **A.**  **The Interim Guidance Does Not And Cannot Mitigate The Vast Majority of Harms Being Experienced by Transgender Service Members Or Those Who Wish To Enlist Or Commission**

On September 14, 2017, Secretary Mattis issued "Military Service by Transgender Individuals – Interim Guidance."  Opp. Ex. 1 ("Interim Guidance").  The cover memorandum confirms that "DoD will carry out the President's policy and directives." *Id.* at 1.  It also states Secretary Mattis's intent to "present the President with a plan to implement the policy and directives in the [August 25] Presidential Memorandum" no later than February 21, 2018. *Id.*

The Interim Guidance reiterates that the accessions ban "remain[s] in effect," and "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex."  Interim Guidance 2.  It states that between now and March 23, 2018, transgender people who are already serving in the military may continue to do so, transgender service members must be permitted to reenlist and provided with medical care during the interim period, and DoD will "continue to treat every Service

2

member with dignity and respect." *Id.*[1]

### B.    Plaintiffs Are Being Harmed by the Ban

Transgender service members have faced continuing adverse treatment since President Trump first announced the ban in a series of tweets on July 26, 2017.  Only a day after the tweets, the Office of the Surgeon General ("OTSG") suspended surgical procedures for transgender service members.  Patel Decl. ¶ 4.  On August 17, more than a week before President Trump issued his formal Memorandum on August 25, OTSG and the Defense Health Agency issued further directives to cancel any scheduled surgeries and not to reschedule any procedures until further notice.  Patel Decl. ¶ 4; Jane Doe 1 Decl. ¶ 25; John Doe Decl. ¶ 24.  On September 14, Secretary Mattis reversed course, instructing in the Interim Guidance that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition."  Interim Guidance 2.

These conflicting instructions have caused significant ongoing stigma, confusion, delay, and uncertainty in the provision of health care to transgender service members, both before and after issuance of the Interim Guidance.  *See, e.g.*, Patel Decl. ¶¶ 6-7 (describing sequence of conflicting instructions about whether transition-related surgeries could be provided to Plaintiff John Doe 1); John Doe 1 Decl. ¶ 24 (citing medical provider's statement that cancellation of scheduled surgery "is incredibly frustrating and pretty terrible in my opinion"); Judge Decl. ¶¶ 6-7 (acknowledging delay in processing waiver request for surgery due to prior policy cancelling transition-related surgeries and that no decision regarding the waiver request has yet been made); Jane Doe 1 Decl. ¶¶ 24-25 (describing cancellation of surgery due to change of policy by Coast Guard health administrator in wake of July 26 tweets).

---

[1]    On September 6, 2017, Plaintiff Jane Doe 4 received notice that her request for reenlistment was granted.

Even with the issuance of the Interim Guidance, Plaintiffs are being harmed by the ban in numerous ways, including that it:

- "[C]reates a sub-class of service members, placing transgender people on unequal footing as compared to their non-transgender peers for reasons having nothing to do with their capabilities or past performance, and suggesting that transgender Airmen are unworthy of their comrades' trust and support."  Supplemental Declaration of Deborah Lee James ("James Supp. Decl.") ¶ 8.

- "[E]rodes the value that members serving with them place on their contributions or performance" and "legitimizes any bias or prejudice that may have existed among non-transgender members prior to training."  Declaration of Mark J. Eitelberg ("Eitelberg Decl.") ¶ 11.  This is especially harmful to service members in active combat locations, including Jane Doe 3, who is currently on deployment in Iraq.  Keeler Decl. ¶ 3.

- "Serves to substantially limit [transgender service members'] advancement and promotion opportunities in the military; and undermines their standing with superiors and peers."  Supplemental Declaration of Eric K. Fanning ("Fanning Supp. Decl.") ¶ 5.

- Affects command decisions about deployments and permanent change of station (PCS) moves, which results in lost opportunities relating to assignment, advancements, and promotions.  Supplemental Declaration of Raymond Edwin Mabus, Jr. ("Mabus Supp. Decl.") ¶¶ 4-7.

- Causes Plaintiffs to be "stashed," maintained in dead-end assignments, given "make-work," or held in "holding pattern positions."  Eitelberg Decl. ¶ 8; Jane Doe 2 Decl. ¶ 15 (stating she has been assigned to a detail that requires her to drive far from base and keeps her from supervising soldiers she is assigned to mentor and train).

For Plaintiffs Regan Kibby and Dylan Kohere, both the President's August 25 Memorandum and the Interim Guidance make clear that they are not eligible to be commissioned as officers in the armed services, and that the ban on accessions continues indefinitely. Defendants' own supporting evidence confirms that Plaintiff Kohere cannot enroll as a cadet in the ROTC program now and will not be able to do so in the future.  Burns Decl. ¶ 6.  For that reason, he is barred from participating in ROTC physical training and other activities reserved for cadets.  *Id.* ¶ 2(b).  Because he cannot enroll in ROTC, he is ineligible to apply for ROTC scholarships that would otherwise be available to him, or to be commissioned as an officer in the

Army upon graduation.  *Id.* ¶ 3.  Plaintiff Kibby is similarly barred from continuing at the Naval

Academy, because the transgender service ban makes him ineligible for military service.  Kibby

Decl. ¶ 36; Mabus Supp. Decl. ¶ 10.  The Interim Guidance changes none of these facts; indeed,

it expressly reaffirms them.

## ARGUMENT

## I.    The Court Should Deny Defendants' Motion To Dismiss

Defendants' argument that Plaintiffs are not harmed by the ban is patently incorrect.

Plaintiffs are seeking preliminary relief both for the irreparable harms they are suffering now and

for the additional irreparable harms they will suffer beginning in March, when reinstatement of

the pre-June 2016 policy banning open service takes effect.  Defendants' motion to dismiss rests

entirely on the erroneous claim that the Interim Guidance redresses Plaintiffs' injuries, deprives

them of standing, and renders this dispute unripe for adjudication.  Defendants' claim that the

Interim Guidance is the "operative policy" (Opp. 16) is wrong.  The operative policy is the ban

on transgender people being able to serve in the military.  The Interim Guidance does nothing—

and *can do nothing*—to change the fact that the ban takes effect on a date certain only five

months from now, nor does it abate the harms that the ban is currently wreaking.  Under well

settled law, Plaintiffs have standing and their claims are ripe.

### A.    Plaintiffs Have Standing To Challenge The Ban

To establish standing, Plaintiffs must demonstrate (1) that they have suffered an injury-

in-fact, (2) that there is a causal connection between that injury and the conduct complained of,

and (3) that a decision by the court in their favor would be likely to redress their injury.  *See,*

*e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  An injury in fact must be both

concrete and particularized and "actual or imminent."  *Attias v. CareFirst, Inc.*, 865 F.3d 620,

626 (D.C. Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).

Plaintiffs easily meet these requirements.  Plaintiffs are concretely injured by the ban, both because they are being facially targeted for separation from military service and exclusion from military programs, and because the announcement of the ban—along with its pejorative rationales—has already subjected Plaintiffs to stigma and inequality.  They are being harmed now, and they face the certainty of additional harm when the ban takes full effect.  All of these injuries are caused by the ban, and a decision by this Court enjoining it would redress them.

The government argues that the Court's standing inquiry ought to be "especially rigorous" because Plaintiffs ask the Court to "decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  Opp. 15 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).  But this "especially rigorous" standard has never been used to deny standing to plaintiffs who are themselves the direct and actual targets of a discriminatory policy.  The cases elaborating this principle involved claims by plaintiffs with an undifferentiated and attenuated connection to the policy challenged as unconstitutional.  *See, e.g.*, *Clapper*, 568 U.S. at 408-10 (challenge by attorneys, journalists, and human rights organizations to policy authorizing surveillance of people outside the United States); *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) (challenge by members of Congress to statute granting line item veto power); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473-74 (1982) (challenge by taxpayers to transfer of property to religious organization); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221-22 (1974) (challenge by ordinary citizens to membership of members of Congress in armed forces reserves).  Where Plaintiffs are directly targeted by a policy, ordinary standing principles apply.

1.    **Plaintiffs have standing to challenge a policy that facially targets them for separation from military service and excludes them from military programs.**

Plaintiffs have standing because, as Defendants do not dispute, Plaintiffs will be subject to separation as of March 23, 2018, and because transgender people have already been prohibited from accessions.  *See* Opp. 6.  As transgender individuals in active service or in ROTC or in the Naval Academy, Plaintiffs are in the very group expressly targeted and affected by the reinstatement of the ban.  The injuries they face are both concrete—being subject to separation and excluded from military programs—and particularized, since the ban inflicts these harms only on transgender people.

Under settled standing law, these injuries are also sufficiently actual and imminent. *Susan B. Anthony List v. Dreihaus*, 134 S. Ct. 2334, 2341 (2014).  In *Attias v. CareFirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017), the D.C. Circuit explained that the prevailing standard for showing injury-in-fact in a case involving future harm is satisfied *either* by the "certainly impending" test *or* by the "substantial risk" test.  *Id.* at 626-27.  The Court explained that "the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm"—in this case, separation from the military or exclusion from military programs—"as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes."  *Id.* at 627. Here, where the ban targets Plaintiffs for exclusion and takes effect on a date certain, the injury Plaintiffs face is "certainly impending."  At a minimum, Plaintiffs face a "substantial" risk of future injury.

The fact the ban does not take effect for another five months does not deprive Plaintiffs of standing.  *See Nat'l Ass'n of Broad. v. FCC*, 789 F.3d 165, 180-81 (D.C. Cir. 2015) (holding that broadcaster had standing to challenge FCC order based on its "reasoned prediction" that

agency action would impact its stations at some point during 39-month period established in the order); *LaRoque v. Holder*, 650 F.3d 777, 788 (D.C. Cir. 2011) (finding standing to challenge government action concerning election where "when plaintiffs filed their complaint, the election in which Nix planned to run was only nineteen months away").

Despite this well settled law, Defendants argue that even though the President has directed the military to ban transgender people from service, Plaintiffs' injuries are not sufficiently certain because the Secretaries of Defense and Homeland Security are currently "studying and developing policy" (Opp. 17) to implement the ban and could "advise him at any time if a change to policy is warranted" (Opp. 7). Thus, they contend, Plaintiffs do not have standing because they "can only speculate on what that policy might be or how it might affect them in the future." Opp. 17. But that is not true. Plaintiffs are not deprived of standing by the mere possibility of an alteration in course, particularly where the text on which Defendants hang their promise of an alteration authorizes no departure from the President's word at all. In addition, although the details of how the ban will be implemented—including when transgender service members will face discharge—are not yet fully known, Plaintiffs nonetheless face "certainly impending" harm or, at the very least, a "substantial risk" of harm.

Plaintiffs' risk of discharge here is less attenuated than was the risk for military chaplains that they would not be promoted in *In re Naval Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012). In that case, the government unsuccessfully argued that plaintiff clergy lacked standing to challenge the constitutionality of alleged religious bias in promotion proceedings because they had not yet participated in such proceedings, much less been denied promotion. The D.C. Circuit was unpersuaded by the government's argument that the plaintiffs in that case would face possible bias in those proceedings only at some speculative time in the future; instead, the court found

standing because the challenged policy was alleged to "facilitate or exacerbate discrimination." *Id.* at 1177. Here, where the ban already bars enlistment and will soon authorize the discharge of transgender service members as well, the injuries Plaintiffs face are sufficiently certain and impending to establish their standing.

Defendants also contend that the mere existence of Interim Guidance makes the ultimate injury of being barred from enlistment and subject to discharge too attenuated to establish standing. Plainly, however, the interim guidance is set to expire upon the effective date of the transgender ban. That is what makes it "interim." Whatever limited impact it may have between the date of its issuance and March 23, it does nothing to diminish the force and effect of the ban upon its effective date.

Nor does the Interim Guidance affect the current ban on enlistment in any way. Plaintiffs Kohere's and Kibby's injuries are not just imminent but immediate and actual, and Defendants scarcely dispute their standing beyond averring that adjudication of their claims "would require the Court to assume content of future policies." Opp. 17. That is incorrect. Defendants admit that, right now, Kohere cannot enroll as a cadet in his university ROTC program even though he is permitted to take ROTC military science classes as any student may do, whether enrolled in ROTC or not. Burns Decl. ¶ 6. That the government cites liability concerns (*id.* ¶ 2(b)) as the reason for Kohere's exclusion only underscores the point. Defendants will not let Kohere participate in physical training exercises because he lacks health coverage for injury, but he lacks insurance because his transgender status precludes his enrollment in ROTC. And Defendants' contention that Kohere "missed a deadline" to apply for a scholarship is plainly meritless, given that he cannot enroll in ROTC in the first place—a prerequisite for any such application. *Id.* ¶ 3. Kibby's injury is just as plain and immediate. Absent an order from this Court, he will never be

able to return from his leave to the Naval Academy, because the President's ban declares him ineligible for military service.  Kibby Decl. ¶ 36; Mabus Supp. Decl. ¶ 10.

Defendants also suggest that because the ban on accessions by transgender people "is subject to the normal waiver process … Plaintiffs could only be injured if they sought and were denied individualized waivers."  Opp. 26 (internal quotation marks omitted).  But under the pre-June 2016 policy, transgender people were not "subject to the normal waiver process," which applies to medical disabilities; discharge on account of being transgender is treated as an administrative discharge for which no accessions waiver is granted.  *See* Brown Decl. ¶ 26.  Indeed, Plaintiffs have found no evidence that any transgender person has ever received such a waiver.  Fanning Supp. Decl. ¶ 10; James Supp. Decl. ¶ 10; Mabus Supp. Decl. ¶ 11; Brown Supp. Decl. ¶ 13.  In any case, even if some waiver theoretically exists, the remote possibility that it would be available to Plaintiffs Kohere and Kibby does not erase the injuries they currently face:  Kohere cannot enroll in ROTC, and Kibby cannot return to the Naval Academy.

### 2.      Plaintiffs are suffering injuries because of the ban now.

In addition to the harms described above, Plaintiffs are also harmed by being deemed unfit for service.  The White House Memorandum states a presumption that Plaintiffs and other transgender service members "hinder military effectiveness and lethality," "disrupt unit cohesion," and "tax military resources."  *See* Pres. Mem. § 1(a), 82 Fed. Reg. 41,319, 41,319 (Aug. 30, 2017).  That presumption causes Plaintiffs immediate, non-speculative injury.  As set forth in the Plaintiffs' Supplemental Statement of Facts, the ban has immediately harmed them in numerous ways that are not remedied by the Interim Guidance, including by placing transgender service members on unequal footing with their peers; substantially limiting their opportunities for assignments, promotion, training, and deployment; and putting them in harm's way by eroding the bonds of trust upon which service members critically depend.  *See supra* at 4.

Although the Interim Guidance directs military personnel to "continue to treat every Service member with dignity and respect" (Interim Guidance 2), that promise rings hollow in light of the debilitating stigma imposed by the President's pronouncement of transgender service members' unfitness and the impact of that pronouncement on the relationship between transgender service members and their peers and commanders.  That the Secretary of Defense felt it necessary to make such a statement only underscores the immediate impact the ban has had and the harms it wreaks on transgender troops.

### 3.      Plaintiffs are personally affected by the ban.

Defendants' reliance (Opp. 17) on *Allen v. Wright*, 468 U.S. 737 (1984), for the principle that Plaintiffs' standing cannot be based upon the inequality and stigma inflicted by the ban is misplaced.  In that case, parents of black students at public schools sought to sue the Internal Revenue Service for failing to adopt sufficient standards to ensure that racially discriminatory private schools were denied tax-exempt status.  The Supreme Court held that plaintiffs lacked standing because they were not themselves the target of discriminatory government conduct and effectively complained instead "simply that their Government is violating the law."  *Id.* at 755. At the same time, the Supreme Court specifically affirmed that those actually subject to discriminatory government classification suffered concrete and cognizable injuries that were sufficient to confer Article III standing.  *Id*. at 757 n.22 ("[S]tigmatic injury, though not sufficient for standing in the abstract form in which [the *Allen* plaintiffs'] complaint asserts it, is judicially cognizable to the extent that respondents are personally subject to discriminatory treatment.").  Unlike the plaintiffs in *Allen*, Plaintiffs here are directly the targets of the policy they challenge.

In addition to the immediate, concrete, and specific injuries described above, *see supra* at 3-5, Plaintiffs and other transgender service members are also injured simply by being subject to

this overt governmental discrimination.  Under settled law, when a government policy facially

singles out and demeans a disfavored class, that discrimination in and of itself constitutes an

injury sufficient to confer standing to challenge that policy.  As the Supreme Court has

explained:

> [D]iscrimination itself, by perpetuating "archaic and stereotypic notions" or by
> stigmatizing members of the disfavored group as "innately inferior" and therefore
> as less worthy participants in the political community, can cause serious non-
> economic injuries to those persons who are personally denied equal treatment
> solely because of their membership in a disfavored group.

*Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984); *see also, e.g.*, *Hassan v. City of New York*,

804 F.3d 277, 289-90 (3d Cir. 2015) ("'discriminatory classification is itself a penalty' … and

thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment

is at stake"); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 293, 294 n.44 (W.D. Pa.

2017) ("[S]ettled precedent provides that impermissible distinctions by official edict cause

tangible Constitutional harm" and "a bare equal protection violation is sufficient to constitute an

injury in fact for the purposes of establishing Article III standing because unequal treatment

under the law is harm unto itself.").[2]

## 4.     Plaintiffs easily satisfy the remaining standing requirements.

Defendants do not contend that Plaintiffs fail to meet the other requirements of standing

(Opp. 14-18), nor could they.  There is a clear causal chain between the transgender service ban

and harms to the Plaintiffs.  And a favorable court decision here declaring that such a ban

violates the Constitution and enjoining Defendants from excluding Plaintiffs from the military

---

[2]     *Cf. Locke v. Davey*, 540 U.S. 712, 731 (2004) (Scalia, J., dissenting) ("The indignity of
being singled out for special burdens on the basis of one's religious calling is so profound that
the concrete harm produced can never be dismissed as insubstantial.  The Court has not required
proof of 'substantial' concrete harm with other forms of discrimination, and it should not do so
here.").

solely because they are transgender would redress the alleged injury. Left in force, the ban creates a presumption and perception that Plaintiffs and other transgender people "hinder military effectiveness," "disrupt unit cohesion," and "tax military resources." An injunction prohibiting enforcement of the ban and an order permitting enlistment will reverse those presumptions, permitting Plaintiffs once again to serve or participate in military programs on equal terms, and thus redressing the injuries Plaintiffs are suffering.

> **B.      Plaintiffs' Challenge To The Ban Is Ripe**

Because, as demonstrated above, Plaintiffs' injuries are "sufficiently imminent to establish standing," the constitutional requirement of ripeness is satisfied. *Mead v. Holder*, 766 F. Supp. 2d 16, 26 (D.D.C. 2011) (internal citations and quotation marks omitted). Defendants offer no independent argument against the constitutional ripeness of Plaintiffs' claims. Rather, their arguments focus solely on prudential ripeness. Prudential ripeness turns on "the fitness of the issue for judicial decision and the hardship to the parties of withholding court considerations." *Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986) (internal citations and marks omitted). Both of these factors weigh heavily in favor of judicial review.

> **1.      Plaintiffs raise purely legal issues fit for judicial review.**

Defendants contend that Plaintiffs' challenge is not fit for judicial review because the ban has not yet been applied to discharge or deny accession to any Plaintiff. *See* Opp. 19. That argument conflicts with settled law. Ripeness does not require affected parties to show that the government has actually enforced a challenged policy against them. If that were the law, no pre-enforcement challenge would ever be ripe, and yet the justiciability of pre-enforcement challenges has long been established. *See State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53-54 (D.C. Cir. 2015) (holding that the Supreme Court's "landmark decision in *Abbott*

13

*Laboratories* largely resolved the ripeness issues for many [pre-enforcement] challenges to agency action"). Instead of requiring such a showing, courts "look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 463-464 (D.C. Cir. 2006). Plaintiffs' challenge satisfies these criteria.

Plaintiffs' claims are purely legal and arise in the context of a facial challenge; as such, they are ripe for resolution now. *See Nat'l Ass'n of Homebuilders*, 440 F.3d at 464. The policy that Plaintiffs challenge rests upon a facial classification that sweeps in the entire class of transgender people. The legality of that categorical exclusion "will not change from case to case or become clearer in a concrete setting." *Id.* "[A] purely legal claim in the context of a facial challenge … is presumptively reviewable." *Id.* (internal citations and quotation marks omitted); *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854-55 (D.C. Cir. 2006); *Beach Commc'ns, Inc. v. F.C.C.*, 959 F.2d 975, 986-87 (D.C. Cir. 1992) (finding equal protection claim to be "purely legal"); *cf. Susan B. Anthony List*, 134 S. Ct. at 2347 (questioning the continuing vitality of the prudential ripeness doctrine and noting that "a federal court's obligation to hear and decide cases within its Article III jurisdiction is virtually unflagging" (internal citations and quotation marks omitted)).

Defendants' claim that the ban lacks sufficient finality is unavailing. A policy is sufficiently final if it is definitive rather than "tentative or interlocutory" and determines "legal rights and obligations." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 & n.15 (D.C. Cir. 2000). Here, the President's order to reinstate the ban is definitive, not "merely tentative or interlocutory." *Id.* On the question whether the Secretaries of Defense and Homeland Security

must reinstate the pre-June 2016 ban, the President's Memorandum "is unequivocal—[they] must do so."  *Id.*  The Secretary of Defense likewise has issued formal guidance stating his intention "to carry out the President's policies and directives."  Interim Guidance 1; *see also* Opp. 6 ("The President directed the military to maintain … policies and practices regarding service by transgender individuals that were in place before June 2016[.]").  Similarly, the ban plainly determines "legal rights and obligations."  *Appalachian Power Co.*, 208 F.3d at 1022 & n.15 (internal citations and quotation marks omitted).  As Defendants agree, the pre-June 2016 policy bars transgender persons from enlisting or serving.  Opp. 6-7.

The fact that the Secretary of Defense has not yet promulgated a written plan to implement the ban does not affect its finality.  Rather, as in other facial challenges presenting purely legal claims, "the ripeness doctrine is inapplicable because [Plaintiffs'] claim rests not on the assumption that [the government] will exercise its discretion unlawfully … but on whether its *faithful* application" of the pre-June 2016 policy would violate the Constitution.  *Nat'l Ass'n of Home Builders*, 440 F.3d at 465 (emphasis in original).  Even when the government contends that it will consider whether to enforce a regulation on a "case-by-case basis," "the D.C. Circuit has rejected the notion that a future exercise of agency discretion makes a purely legal claim unripe."  *Nicopure Labs, LLC v. FDA*, 2017 WL 3130312, at *21 (D.D.C. July 21, 2017) (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005)).  Moreover, where the government has announced a definite policy, as it has here, "some uncertainty" as to how the policy will be implemented does not defeat ripeness.  *Nat'l Coal. for Men v. Selective Serv. Sys.*, 640 F. App'x 664, 665 (9th Cir. 2016) (holding that challenge to gender-based limits on military draft was ripe where "the Secretary of Defense [] announced that the military intends to open all formerly closed [combat] positions to women," despite the fact

that no specific plan for the implementation of that policy had yet been announced); *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282 (purely legal challenge to an agency rule is not unripe merely because application of the disputed rule remains within the agency's discretion).

Defendants also contend that the Court ought to stay its hand because it does not have before it the "justifications for [the] final policy" Defendants will adopt.  Opp. 20.  That argument turns the ripeness doctrine on its head.  The Government cannot adopt a policy that is alleged to violate a constitutional right, as it has done here, and then evade judicial review on the ground that it has not yet determined how to justify the policy.  Plaintiffs are challenging the policy that exists now, the ban on transgender military service, and the Government's inability to identify its justifications for that policy only underscores the need for immediate judicial review.

Defendants' argument that the President might revoke the ban at some time in the future is equally misplaced.  "[A]ll laws [and policies] are subject to change." *Appalachian Power Co*, 208 F.3d at 1022.  "[T]he fact that a law [or policy] may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *National Ass'n of Home Builders*, 417 F.3d at 1282 (internal citations and quotation marks omitted).  "[I]f the possibility … of further revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any [] rule … would ever be final as a matter of law." *Id.* (internal citations and quotation marks omitted); *U.S. House of Reps. v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 92 (D.D.C. 1998) (the mere hypothetical possibility of a change in law or policy does not affect ripeness and is not a proper basis for asking a court "to stay its hand").  Thus, although it is theoretically possible that the President might rescind or alter the ban at some future time, Plaintiffs' challenge to the *current* ban is ripe now.

### 2.    Postponing judicial review would impose an undue burden on Plaintiffs.

Plaintiffs' claims are also prudentially ripe because "postponing judicial review would impose an undue burden" on Plaintiffs. *Nat'l Ass'n of Home Builders*, 440 F.3d at 464. Without this Court's review, the harms caused by the ban will worsen. Further, the Doe Plaintiffs should not have to wait until they are subject to discharge on March 23, 2018, or until they are actually discharged, to challenge the ban. Absent the Court's review, each will be forced to choose whether to leave the military now to find another means of support in anticipation of the ban's effective date, or whether to risk being left with no means of support while a post-enforcement challenge proceeds. Similarly, Plaintiffs Kohere and Kibby will be forced to choose whether to abandon ROTC and the Naval Academy now or to risk being harmed by having foregone the opportunity to seek out other options if a post-enforcement challenge fails. *See, e.g.*, *Mead*, 766 F. Supp. 2d at 27 (finding undue hardship where delaying judicial review would force plaintiffs "to choose between using their money for other purposes now and risking their inability to pay future penalties under the Affordable Care Act, or needlessly saving money in the interim that could have been put to different uses"). These burdens are particularly acute for Plaintiffs Kohere and Kibby, whose entire futures rest on educational decisions they make now. Plaintiffs have thus demonstrated "immediate and significant" hardship to satisfy the second prudential ripeness concern and "secur[e] immediate review." *Am. Petrol. Inst. v. Johnson*, 541 F. Supp. 2d 165, 178 (D.D.C. 2008).

In addition, "where there are no institutional interests favoring postponement of review, a petitioner need not satisfy the hardship prong." *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003). Here, Defendants have no institutional interest in delaying review. The only interest Defendants assert—that this Court's review would somehow impede their ability to engage in

further study—has no merit.  This Court's ruling would not prevent or interfere with any such

study, but rather would serve only to clarify the limits of a constitutionally permissible policy.

Similarly, to the extent Defendants claim that permitting transgender people to join or serve in

the military would in itself impose some hardship, that claim is belied by the reality that

Plaintiffs and other transgender people are already serving and must already meet the same

fitness and retention standards as others.

## II.      The Court Should Grant Plaintiffs' Application For A Preliminary Injunction

### A.       Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction

Defendants contend that "for much the same reasons they lack standing, Plaintiffs cannot

show that they will suffer certain, great, or any actual injuries if the Court does not enter an

injunction."  Opp. 21.  But like Defendants' standing arguments, this argument fails because

Plaintiffs are being irreparably harmed.

Just as unlawful discrimination is itself an injury sufficient to confer standing upon

Plaintiffs, *see supra* Section I.A, it also constitutes irreparable harm, as the D.C. Circuit and this

Court have repeatedly held.  *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir.

2009) ("[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably

constitutes irreparable injury.'"); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("'[A]

prospective violation of a constitutional right constitutes irreparable injury.'"); *DynaLantic Corp.

v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012); *Simms v. D.C.*, 872 F. Supp. 2d

90, 105 (D.D.C. 2012); *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F.

Supp. 2d 48, 78 (D.D.C. 2011).

In addition to that constitutional injury, the ban irreparably harms Plaintiffs in additional

ways.  *First*, the ban irreparably harms the Plaintiffs who are currently serving because it sends a

clear message—both to transgender service members and to others—that transgender people are

outsiders, unfit to serve, unworthy of being subject to the same enlistment and service standards as all others, and thus not full members either of either the military or the citizenry. *See McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (separation from military and being labeled "unfit for service" constitutes irreparable harm); *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (being "labeled as unfit for service solely on the basis of … sexual orientation, a criterion which has no bearing on [plaintiff's] ability to perform his job," constituted irreparable harm); *Able v. United States*, 968 F. Supp. 850, 864 (E.D.N.Y. 1997) ("Voting, taking public office, serving on juries, and serving in the military are the primary acts of public citizenship."), *rev'd*, 155 F.3d 628 (2d Cir. 1998).

This demeaning treatment irreparably harms Plaintiffs' ability to serve on equal terms with other members of the military. Certainly the ban irrevocably changes the terms of their military service. Because of the ban, commanders cannot be confident that transgender service members will be able to serve out the terms of their contracts. As a result, Plaintiffs face limited opportunities for assignments, training, advancement, and promotion. *See* Mabus Supp. Decl. ¶¶ 4-7 (because of the ban "command lacks the requisite certainty that transgender service members will be able to complete the terms of their deployments"); Eitelberg Decl. ¶ 8 (commanders are reluctant to invest in training or development of persons who might leave in "the near future, or to entrust them with important assignments"); Fanning Supp. Decl. ¶ 5 (ban serves to limit advancement and promotion opportunities). In addition, by labeling transgender service members as unworthy to serve, the ban disrupts the mutual respect and reliance among Plaintiffs and their peers and commanders that is essential to effective service. "Strong bonds among service members are important in undertaking a mission and are particularly apparent in smaller military units, among persons on deployments, and among those who serve in dangerous

19

conditions." Eitelberg Decl. ¶ 13. The ban strains those bonds by suggesting that Plaintiffs "are unworthy of their comrades' trust and support." James Supp. Decl. ¶ 8. Particularly for service members on active deployment such as Plaintiff Jane Doe 3, being part of "a sub-class of service members" who are deemed less capable than others compromises their safety and creates barriers to effective service. *Id.*

*Second*, the ban also makes it certain that Plaintiffs will suffer further concrete and irreparable harm when it takes effect and they are subject to involuntary separation. *See McVeigh*, 983 F. Supp. at 221; *Elzie*, 841 F. Supp. at 443. As explained in Plaintiffs' Application (App. 31), military service confers unique value and respect. And as Defendants agree (Opp. 35), discharge from military service has serious consequences for future civilian employment and opportunities. Being subjected to involuntary, stigmatizing discharge inflicts irreparable harm.

*Finally*, Plaintiffs Kibby and Kohere are already facing irreparable harm because their ineligibility to enter military service means that they are unable to return to the Naval Academy, or to enroll as a cadet in ROTC, respectively. Burns Decl. ¶ 6; Kibby Decl. ¶ 36; Mabus Supp. Decl. ¶ 10. For these idealistic young men, the loss of an opportunity to pursue their dreams of a military career is an irreparable blow. In addition, every day they forego alternative career paths and educational opportunities, they alter their futures in ways that can never be undone.

The Interim Guidance changes none of this. It states that the Secretary of Defense will study and formulate *how* to implement the ban, not *whether* to implement it. Its command that all service members be treated with "dignity and respect" acknowledges that effective military service turns on those values being both extended to and earned by military personnel. But no mere exhortation can remedy the ban's denial of dignity and respect to transgender service

members and the accompanying injuries it creates.  The limited requirements that health care needs be met in the interim and that reenlistments not be denied fall far short of remedying the full scope of harm Plaintiffs experience.

Defendants claim that because "Plaintiffs' potential injuries are all employment related, they could be remedied by the Court at a later date and are thus not irreparable."  Opp. 22.  That argument ignores the serious constitutional harm inflicted by the ban.  The cases the Government cites, which address only "[m]ere injuries … in terms of money, time and energy," *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958), are inapposite to this case, which involves a deprivation of constitutional rights.  Indeed, one of the cases that the Government invokes makes clear that while an impediment to a military promotion did not constitute irreparable injury, the Government's *unconstitutional* "policy or practice" did—specifically in that case because the Government's policy relating to military chaplains "sends a message to nonadherents [of the favored denomination] that they are outsiders [and] not full members of the political community."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006).

## B.     Plaintiffs Are Likely To Succeed On The Merits

### 1.     The ban violates equal protection.

The ban violates Plaintiffs' rights to equal protection, as Plaintiffs have already shown. *See* App. 13-20.  Rather than rebutting that claim, Defendants defend the constitutionality of the Interim Guidance, which Plaintiffs do not challenge.  *See* Opp. 23-24.  For the reasons stated below, Plaintiffs are likely to succeed on the merits of their equal protection claim.

### a)   The scrutiny applied to the ban should not be lowered simply because this case relates to military policy.

The President cannot discriminate invidiously against transgender people when making decisions about military policy because no institution in the United States is above the law.  This case addresses the exclusion of people who meet the physical, psychological, and other standards for military service but now find themselves targeted for exclusion because they are transgender. Although a policy is suspect when the "adverse impact" on a group is the "apparent aim" of the measure, *Romer v. Evans*, 517 U.S. 620, 633 (1996), Defendants argue the Court need not even consider "how to apply equal protection doctrine to transgender individuals" because a president's military policies are entitled to near-absolute deference even when they facially discriminate against a disfavored group (other than on the basis of race or religion), Opp. 27-31. That extreme argument has no support in controlling precedent.

There is no "military exception" to the requirement of equal protection.  Both the Supreme Court and the D.C. Circuit have rejected the argument that facially discriminatory classifications should receive a lower level of judicial review simply because the discrimination is based on a military policy.  The Government is not "free to disregard the Constitution when it acts in the area of military affairs."  *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981).  In *Rostker*, the Court expressly declined to adopt a lowered standard of review for sex-based classifications in military cases; instead, the Court subjected the sex-based policy there to a careful and searching review.  *Id.* at 79-83.  Similarly, in *Steffan v. Perry*, the D.C. Circuit likewise made clear that discriminatory classifications in military policies are subject to ordinary equal protection review, including the application both of heightened scrutiny to suspect classifications and of meaningful rational basis review even to non-suspect classifications based on irrelevant personal characteristics.  41 F.3d 677, 689 (D.C. Cir. 1994) (stating that "it would not pass even rational

basis review for the military to reject service members because of characteristics—such as race or religion or the lack of inherited wealth—that have absolutely no bearing on their military service"); *see also id.* at 689 n.9 ("Classifications based on race or religion, of course, would trigger strict scrutiny.").  These holdings require the application of heightened scrutiny.

Similarly, while courts give the considered judgment of military professionals considerable deference when evaluating the justifications for military policies, they do not reflexively defer to government decisions simply because they relate to the military.  Rather, as the case law makes plain, military judgments warrant deference when they are the product of a deliberative process that draws upon relevant evidence and the experience and expertise of military professionals.  *See, e.g.*, *Rostker*, 453 U.S. at 61 (reviewing exclusion of women from registration for the draft by the Military Selective Service Act, noting "Congress considered the question at great length," held hearings, and made findings).  By contrast, President Trump has, abruptly and without any evident study or factual inquiry, reversed a policy that was based on the very due diligence, deliberation, and exercise of military judgment that have warranted deference in other cases.[3]

The cases on which Defendants rely do not support their contention that any deference to "professional military judgment" is required here.  Opp. 28.  The policies upheld in those cases were developed through an extensive deliberative process.  For example, in *Rostker*, the Supreme

---

[3]       In addition, the portion of the President's policy that denies certain types of health care to transgender service members directly conflicts with a federal law that every service member "is entitled to medical and dental care in any facility of any uniformed service."  10 U.S.C. §§ 1071, 1074(a)(1).  The President's order to halt the provision of medically necessary care for transgender service members thus undermines Congress's deliberative decision making in this arena and countermands Congress's expressed intent to provide a "uniform" health care program for service members.  In July 2017, the House of Representative voted down an amendment to the 2018 NDAA that would have prohibited the Department of Defense from paying for transition-related surgeries or hormone therapy.

Court did not rely on an abstract or reflexive notion of deference, but rather on the extensive deliberative process that had led Congress to conclude that women could be exempted from the draft because, at that time, they were barred from serving in combat positions.  453 U.S. at 61; *see also Schlesinger v. Ballard*, 419 U.S. 498, 501-02, 510 (1975) (upholding law based on careful congressional deliberation over how to compensate for female exclusion from combat positions in setting standards for retirement); *Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008) (noting "substantial deference owed *Congress'* assessment" (emphasis added)).  No such deliberative process (or congressional assessment) preceded the President's issuance of the ban.

The First Amendment cases on which Defendants rely also involved challenges to regulations that represented the "considered professional judgment" of the armed services.  *See Goldman v. Weinberger*, 475 U.S. 503, 508 (1986); *see also Greer v. Spock*, 424 U.S. 828, 831 (1976); *Brown v. Glines*, 444 U.S. 348, 349 (1980).  Beyond that, the First Amendment cases uniquely involve the military's need to "foster instinctive obedience, unity, commitment, and esprit de corps," *Goldman*, 475 U.S. at 507, an interest that in some cases may justify restrictions on speech in the military context but has no relevance to the equal protection and due process claims at issue here.  Indeed, Defendants concede as much when they admit that strict scrutiny would apply to the exclusion of individuals from the military on racial or religious grounds. Opp. 28.  Applying a more deferential standard of review than the strict or intermediate scrutiny applicable to the discrimination at issue here is no more justified by military necessity than it would be in the case of racial or religious discrimination.  *See Steffan*, 41 F.3d at 689.

In addition, Plaintiffs have presented substantial evidence that it is the reversal of the policy, not the policy itself, that undermines the military's need for trust in the chain of command and among unit members.  James Decl. ¶ 43; Mabus Decl. ¶ 47.  Defendants have

provided no evidence to the contrary.  Thus, to the extent that the military's needs as a

specialized society are relevant here, they support Plaintiffs' claims.

### b)      Facial discrimination against transgender people requires heightened scrutiny.

For the reasons set forth in Plaintiffs' Application (App. 15-16), discrimination based on

transgender status requires heightened scrutiny.  Defendants do not address Plaintiffs' arguments

that the ban is subject to strict scrutiny because transgender people meet all the traditional

criteria for a suspect classification (*id.* at 13-14), or that, at a minimum, the ban should be subject

to intermediate scrutiny because it is a sex-based classification (*id.* at 15-16).  Rather,

Defendants rely on their erroneous argument, addressed above, that the Court must accord

special deference to the ban and on the absence of any D.C. Circuit case directly holding that

discrimination based on transgender status requires heightened scrutiny.  Opp. 30-31.  As

Plaintiffs demonstrated in their opening brief, numerous circuits have held that transgender

discrimination is a form of sex-based discrimination that warrants heightened judicial review,

and this Court should do so here.  App. 15-16.

### c)      The government's defense of the ban fails under any level of scrutiny.

The timeline of events here—the President's announcement of the ban, accompanied by

stated justifications that had been rejected after comprehensive review, *followed* by a study—

reveals the speciousness of any *post hoc* justifications Defendants advance to defend the ban.

The process itself shows that any justifications offered were not established or evaluated before

the abrupt policy announcement.  The results of any study now being undertaken can only be

understood as manufactured for the purpose of justifying the ban.  Such *post hoc* evidence, if it

comes to be, is irrelevant when heightened scrutiny applies.  *See United States v. Virginia*, 518

U.S. 515, 535-36 (1996).

In any case, the classification "must find some footing in the realities of the subject addressed" by the new policy, *Heller v. Doe*, 509 U.S. 312, 321 (1993), and the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) (a policy that makes "no sense in light of how the [government] treat[s] other groups similarly situated in relevant respects" fails even rational basis review).  An examination of Defendants' justifications for the ban confirms the conclusion that the ban lacks a rational connection to any legitimate military needs.

> ### (i) There is no medical basis for excluding transgender people from service.

First, the government seeks to justify the ban by arguing that "transgender individuals suffer from medical conditions that *could* impede the performance of their duties."  Opp. 31 (emphasis added).  This justification ignores the prohibition against the military singling out a group of people, here transgender people, and treating them differently from all others where there is no connection between the trait and the professed military-based reason.  *Garrett*, 531 U.S. at 366 n.4.  Any service member *could* suffer from a medical condition that *could* impede the performance of their duties.  Women may (and do) "suffer" from pregnancy that can and does impede the performance of their duties, and yet that association alone does not justify discharge based on pregnancy.  *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114, 1121-25 (2d Cir. 1976); Brown Decl. ¶¶ 30, 42-43 (discussing variety of medical conditions that can temporarily impede duties but are not disqualifying conditions).

The point here is that any level of equal protection review requires not just a legitimate military reason for the ban, but a demonstration that there is at least a rational relationship

between the ban and some justification with a "footing in the realities of the subject." *Heller*,

509 U.S. at 321.   That relationship is entirely lacking here.  The military already has generally

applicable standards and procedures for assessing the medical fitness and deployability of all

service members, and for discharging those who are not fit to serve.  Wilmoth Decl. ¶ 12.  Before

the reinstatement of the ban, transgender service members were, and until March 23, 2018 will

be, held to those same standards, and are dischargeable on the same basis as others if they fail to

meet them.

The military also has an effective system for distributing prescribed medications,

including hormones, to deployed service members across the globe, even in combat settings.  *Id.*

¶¶ 14-16.  Only a few medications "are inherently disqualifying for deployment," and none of

them are used to treat gender dysphoria.  Brown Decl. ¶ 44.  The only people affected by the

President's categorical ban are transgender service members who would otherwise qualify as

medically fit and deployable under generally applicable standards.  *See City of L.A. v. Patel*, 135

S. Ct. 2443, 2451 (2015) ("The proper focus of the constitutional inquiry is the group for whom

the law is a restriction, not the group for whom the law is irrelevant.").

To the extent that Defendants simply assume or assert that transgender service members

would be less deployable than their non-transgender peers, that assumption has no basis in fact.

Under the accessions policy that had been set to go into effect on July 1, 2017, transgender

enlistees must have completed all transition-related treatments 18 months before initial

enlistment, eliminating any foreseeable need for additional treatments other than continuing to

take prescribed medications that have no impact on deployability.  Fanning Decl. Ex. C (DTM

16-005).  Some transgender service members who have already enlisted may require medically

necessary treatments, but any impact on availability for deployment is "negligible and

27

significantly smaller than the lack of availability due to [other] medical conditions." Fanning

Decl. Ex. B (RAND Report) at 46. The guiding principle behind the policy to permit accessions

by transgender applicants was to ensure that the medical conditions and treatments associated

with gender transition were treated based on the same standards applied to other similarly

treatable medical conditions. Wilmoth Decl. ¶ 12.

There is no "battle of the experts" (Opp. 32) on the questions of whether and how

transgender people's medical conditions limit deployability or whether gender dysphoria is a

disqualifying medical condition. There are only the expert conclusions already drawn by the

military that supported open accessions and service by transgender people, conclusions that are

consistent with the consensus of medical professionals. Brown Supp. Decl. ¶¶ 8-9; Br. Amicus

Curiae Medical, Nursing, Mental Health, & Other Health Care Orgs. 15-16. Many of the

military leaders who reached the reasoned conclusion that transgender people should be eligible

for military service are still serving in the same positions.[4]

This is not an instance of "line-drawing" where people with "almost equally strong

claim[s]" are placed on different sides of the line or where the government approaches a problem

incrementally. *FCC v. Beach Commcn's Inc.*, 508 U.S. 307, 315-16 (1993). There also is no

"almost equally strong claim" to be made that gender dysphoria is similar to other disqualifying

---

[4]      These individuals are Gen. Joseph F. Dunford Jr., Chairman, Joint Chiefs of Staff;
General Paul J. Selva, Vice Chairman, Joint Chiefs of Staff; Command Sgt. Major John Wayne
Troxell, Senior Enlisted Advisor to the Chairman of the Joint Chiefs of Staff; Maj. Gen. Phillip
M. Churn, Assistant to the Chairman of the Joint Chiefs of Staff for Reserve Matters; Brig. Gen.
Steven L. Basham, Deputy Director of Requirements, J8; Rear Adm. Edward Cashman, Director
of Joint Integrated Air and Missile Defense Organization; Maj. Gen. Richard D. Clarke, Director,
Strategic Plans and Policy; Brig. Gen. Kyle J. Kremer, Director for Manpower and Personnel;
Teresa M. Salazar, Vice Director, Deputy CIO; and Rear Adm. Hugh D. Wetherald, Deputy
Director for Resources and Acquisition.

conditions—there is *no* claim.  There is no claim because the government points to no evidence and no conclusions of any study that supports the government's position.

To the extent that Defendants identify any factual grounds to argue that gender dysphoria is comparable to other disqualifying conditions, they are mistaken.  They cite the World Health Organization's (WHO) International Classification of Diseases' inclusion of "transsexualism" as a "disorder of adult personality and behavior."  The WHO has itself rejected that classification as lacking any medical or scientific basis.  Brown Supp. Decl. ¶¶ 3-9.

### (ii)    Neither deployment restrictions nor cost justify the ban.

Defendants' deployment and cost justifications suffer from the same flaws as their attempted reliance on a medical rationale.  Defendants offer not a shred of support for the claim that transgender people are less deployable or have higher health care costs than other service members.  Like any other service members, transgender people serving in the military may have periods where they are not deployable, and their health care needs may require medication or treatment which are not free of cost.  But the government fails to show or even assert that these deployment limits or medical costs are any different from the deployment limits and medical costs experienced by other service members for conditions that are not deemed categorically disqualifying.

A military that accepts individuals with myriad conditions limiting deployability cannot cite the negligible limits on deployability that transgender service members may experience as even a legitimate justification for banning them.  *Cf. Cleburne*, 473 U.S. at 450 ("[T]he expressed worry about fire hazards, the serenity of the neighborhood, and the avoidance of danger to other residents fail rationally to justify singling out a home [for people with disabilities] for the special use permit, yet imposing no such restrictions on the many other uses freely permitted in the neighborhood."); *Garrett*, 531 U.S. at 366 n.4; *Bostic v. Schaefer*, 760

F.3d 352, 382 (4th Cir. 2014) (rejecting justification that is "so underinclusive" that its real

motivation "must have 'rest[ed] on an irrational prejudice'" (quoting *Cleburne*, 473 U.S. at

450)).  A "reasonably conceivable state of facts," *Beach Commc'ns*, 508 U.S. at 313, still

demands that the claimed factual basis for categorization have "some footing in … realit[y],"

*Heller*, 509 U.S. at 321.  But Defendants present nothing other than unsupported speculation to

counter the conclusions of the Working Group.  Shorn of Defendants' conjecture and professed

intent to study these topics, their sole remaining argument is that, despite the conclusions drawn

by the Department of Defense after its year-long comprehensive evaluation, "there is room for

the military to think otherwise."  Opp. 32.  That unsupported assertion does not provide a

legitimate basis for banning transgender people from service, particularly where the military has

already studied the issue at length.

> ### (iii) Unit cohesion, a thinly veiled appeal to bias, does not justify the ban.

Defendants also seek to justify the ban by arguing that excluding transgender people from

service furthers unit cohesion.  "Unit cohesion" and related concerns such as "discipline" and

"morale" are, of course, the same rationales that have been used regularly in the past to justify

invidious discrimination against historically disfavored groups.  *See, e.g.*, *Cook*, 528 F.3d at 59

(explaining that Don't Ask, Don't Tell "expressly identified its purpose as preserving 'high

standards of morale, good order and discipline, and unit cohesion'"); *Philips v. Perry*, 106 F.3d

1420, 1434-35 (9th Cir. 1997) (Fletcher, J., dissenting) ("The primary justification proffered for

the 'don't ask/don't tell' policy is 'unit cohesion.'"); *Watkins v. U.S. Army*, 875 F.2d 699, 729

(9th Cir. 1989) (Norris, J., concurring) ("As recently as World War II both the Army chief of

staff and the Secretary of the Navy justified racial segregation in the ranks as necessary to

maintain efficiency, discipline, and morale."); *Virginia*, 518 U.S. at 542 n.11, 544 n.13

(describing "[f]orecasts" that "admission of women to the federal military academies" would erode their "vital" or "Spartan" atmospheres; recognizing that since their admission "[w]omen cadets have graduated at the top of their class at every federal military academy").

Here, the government has provided no basis for concluding that the rationale of "unit cohesion" provides any more compelling basis for the categorical discrimination against transgender individuals than for the historical discrimination against African-Americans, women, or gay, lesbian, and bisexual people based upon the same reasoning. Indeed, in this instance unit cohesion is an even less persuasive rationale because the reasoned conclusion of military professionals is that there is "no evidence that permitting openly transgender people to serve in the military would disrupt unit cohesion," Carson Decl. ¶ 19; *see also id.* Ex. B (RAND Report) at xiii, 39-47 (concluding that allowing transgender people to serve openly would have no adverse impact on unit cohesion), and because transgender service members have already served openly and honorably without any evidence of deterioration of unit cohesion for more than a year.

Even if the military could point to bias or prejudice of non-transgender service members, that would not be a sufficient justification to exclude transgender people from service. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *Cleburne*, 473 U.S. at 448. The military operates at its best as a meritocracy where people contribute to the mission based on their performance, not their identities. Mabus Supp. Decl. ¶ 8; Eitelberg Decl. ¶ 13. To justify excluding a group of people from military service because of the bias and prejudice of others collides with core constitutional values and weakens military readiness. Fanning Decl. ¶ 60; Fanning Supp. Decl. ¶ 7; James Decl. ¶ 43; James Supp. Decl. ¶ 9; Mabus Supp. Decl. ¶ 8.

**(iv)** **The ban is inexplicable by anything other than animus.**

Under any level of scrutiny, government action violates equal protection when its "discontinu[ity] with the reasons offered for it" renders it "inexplicable by anything but animus toward the class it affects." *See, e.g.*, *Romer*, 517 U.S. at 632; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977) (holding that the context in which a policy is enacted, including any anomalies in the process, may be relevant to whether it was enacted for an improper purpose). As Plaintiffs have demonstrated in detail, the ban was announced in a highly irregular manner, with no apparent deliberation or investigation of the relevant facts, and abruptly reversed an earlier policy that was implemented following a lengthy process of careful study and review. A stark admission that a discriminatory policy has been adopted without any known justifications for doing so, based on the mere possibility that further "study" might uncover some basis for the discrimination, violates the requirements of equal protection in the most basic way. *Cf. Romer*, 517 U.S. at 632.

Viewed in this context, the President's abrupt announcement of the ban has no rational explanation other than mere disapproval or a bare desire to harm a disfavored minority group. *Id.* Government action undertaken for such an improper purpose fails under any standard of review. Plaintiffs have demonstrated a likelihood of success on the merits of their Equal Protection claim.

**2.** **Plaintiffs are likely to succeed on their due process claim.**

Plaintiffs have demonstrated a likelihood of success on their due process claim because the ban lacks any rational basis, impermissibly burdens Plaintiffs' fundamental rights, and

arbitrarily penalizes Plaintiffs for conduct the government previously encouraged.  Defendants

fail to rebut Plaintiff's *substantive* due process claim and summarily state that it "fails for

essentially the same reasons as their equal protection claim."  Opp. 34.  Instead, Defendants

rebut a *procedural* due process argument that Plaintiffs have not asserted.

### a)        The ban lacks any rational basis.

The due process requirement that every government action must have a "reasonable

justification in the service of a legitimate governmental objective" protects individuals against

the arbitrary and oppressive exercise of government power.  *Cty. of Sacramento v. Lewis*, 523

U.S. 833, 845-46 (1998) (internal quotations omitted); *Abdelfattah v. U.S. Dep't of Homeland

Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015).  The President's abrupt reversal of a policy that had

been carefully studied, implemented, and in place for more than a year altogether fails that test.

As explained in detail above, *see supra* Part II.B.1.c, the ban lacks any rational connection to a

legitimate governmental objective, and for this reason violates due process as well as equal

protection.  *See, e.g.*, *George Washington Univ. v. Dist. of Columbia*, 391 F. Supp. 2d 109, 114

(D.D.C. 2005) (noting that the rational basis tests under equal protection and due process "are

almost indistinguishable").

### b)        The ban violates Plaintiffs' fundamental rights and impermissibly punishes Plaintiffs for relying on the government's encouragement to disclose their gender identity.

The government fails even to respond to Plaintiffs' two other due process claims.

*First*, the ban impermissibly burdens Plaintiffs' fundamental rights to autonomy.  App.

22-23.  The right to live in accord with one's gender identity is an inherent aspect of the right to

personal autonomy.  As the Supreme Court has repeatedly explained, the liberty protected by the

Due Process Clause includes the right to make "certain personal choices central to individual

dignity and autonomy, including intimate choices that define personal identity and beliefs."

33

*Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015); *see also Griswold v. Connecticut*, 381 U.S. 479, 484-86 (1965); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992); *Lawrence v. Texas*, 539 U.S. 558, 562, 578-79 (2003); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-19 (1984) (explaining that the Constitution protects these decisions from "unwarranted state interference" in order to "safeguard[] the ability independently to define one's identity that is central to any concept of liberty").

Under these well established principles, the fundamental right to autonomy must include a person's right to be transgender, just as it includes a person's right to be lesbian, gay, bisexual, or heterosexual.  Like a person's sexual orientation or other central aspects of personhood, gender identity is "inherent to one's very identity as a person."  *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093-94 (9th Cir. 2000) (internal citations and quotation marks omitted).  The ban intrudes upon the right of transgender men and women to live as who they are, consistent with this core aspect of their identity.  Thus it is subject to heightened review.  *See Witt v. Dep't of Air Force*, 527 F.3d 806, 819 (9th Cir. 2008) (holding that heightened scrutiny applies "when the government attempts to intrude upon … the rights [of personal autonomy] identified in *Lawrence*").

Moreover, as explained in the Application (App. 15-16), the ban is also subject to heightened due process review because it burdens this fundamental right selectively, only for transgender people.  "Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects." *Lawrence*, 539 U.S. at 575.  Subjecting one group of persons to adverse treatment based solely on a characteristic that is so central, immutable, and deep-seated violates that prohibition unless supported by a sufficient governmental interest.  *See id.*  Defendants have failed to show—or

even assert—any such interest here.

*Second*, Plaintiffs have a right not to be discharged on account of their gender identity after having relied upon Defendants' explicit promise that they could serve openly.  Contrary to Defendants' argument, Plaintiffs do not assert a protected property interest in "continued military service." Opp. 35.  Rather, the President's ban offends canons of decency and fair play fundamental to the Due Process Clause because it punishes Plaintiffs for disclosing their transgender identities, something the government encouraged.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265-66 (1994) (due process does not permit government to use actions it permitted or encouraged as a ground for punishment); *see also Lewis*, 523 U.S. at 845-46 ("[T]he substantive due process guarantee protects [the individual] against government power arbitrarily and oppressively exercised[.]").  Defendants offer no response to these authorities.

### c) The ban violates due process regardless of what procedures are used to separate Plaintiffs from the military.

The government argues that "whatever procedures will govern Plaintiffs' speculative discharge and characterization of service have not even been created yet, rendering it impossible for this Court to review them for constitutional sufficiency." Opp. 37.  This argument misses the mark because Plaintiffs' claim is not directed to the particular procedures that will be used to separate them from military service.  Rather, Plaintiffs claim that, regardless of the process involved, the President's ban violates substantive due process because it denies them the liberty and equality guaranteed by the Fifth Amendment.  *See Lewis*, 523 U.S. at 840 (due process "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them" (internal quotation marks omitted)).

Although Defendants mischaracterize Plaintiffs' due process claim, they concede that a due process violation arises in cases where stigma attaches to the discharge of a service member.

35

Opp. 35 (citing *Kauffman v. Sec'y of Air Force*, 415 F.2d 991, 995 (D.C. Cir. 1969) ("In terms of its effects on reputation, the stigma experienced by the recipient of a discharge under other than honorable conditions is very akin to the concept of infamy.")); *see also Holley v. United States*, 124 F.3d 1462, 1470 (Fed. Cir. 1997) (finding a liberty interest implicated in a less-than-honorable discharge and stating "[w]e entirely agree that stigma cannot be imposed by government without due process of law").  Plaintiffs are likely to succeed on their due process claim for this reason as well.  Their separation from the military pursuant to the President's ban—no matter when or how it happens—will be associated with the President's degrading tweets and subsequent statements.  As set forth above, the ban tarnishes Plaintiffs' service with the stain of unfitness now, *see supra* at 4, and, no matter the formal character of their discharge, causes reputational injury and threatens future employment prospects, Eitelberg Decl. ¶ 15.

### 3.    Plaintiffs are likely to succeed on their estoppel claim.

Defendants argue that Plaintiffs' estoppel claim fails because it is an affirmative defense, not a cause of action, and there is no valid waiver of sovereign immunity.  But "equitable estoppel is not, in itself, either a claim or a defense."  *ATC Petrol., Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988).  Instead, "it is a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct."  *Id*.  Here, Plaintiffs seek to prevent the military from discharging them on the sole basis of their transgender status.  *See Watkins v. U.S. Army*, 551 F. Supp. 212, 218 (W.D. Wash. 1982) ("Plaintiff's argument is not that he has a right to reenlist.  His argument is that the Army cannot deny him reenlistment because of his homosexuality. … Accordingly, plaintiff seeks to estop defendants from relying on the regulation as a *bar* to his eligibility for reenlistment." (emphasis in original)), *aff'd*, 875 F.2d 699 (9th Cir. 1989).  Instead of waiting for Defendants to discharge them from the military (an action that Plaintiffs would have the legal

right to challenge, on both administrative and constitutional grounds, *see, e.g.*, *Elzie*, 841 F.

Supp. at 444), Plaintiffs have brought a pre-separation suit to enjoin Defendants from taking such

action in the future.  Under these circumstances, it is appropriate for the Court to consider

Plaintiffs' defenses to discharge—including estoppel—in determining whether to grant relief.

Defendants also argue that estoppel is not applicable here, because it cannot be used to

prevent a federal agency from changing its generally applicable policies.  But estoppel *can*

prevent application of those policies to individuals who reasonably relied on the government to

their detriment.  *See, e.g.*, *Watkins v. U.S. Army*, 875 F.2d 699, 707-08, 711 (9th Cir. 1989)

(estopping the Army from relying on regulation to deny reenlistment to plaintiff on the basis of

homosexuality); *United States v. Lazy FC Ranch*, 481 F.2d 985, 987-90 (9th Cir. 1973)

(estopping the United States from enforcing revised "maximum payment" regulations against

partnership organized to acquire and operate agricultural and pasture land).[5]  This principle is

particularly vital where the policies at issue have not only prospective application, but also the

effect of retroactively punishing Plaintiffs for actions taken in reliance on prior policy (*i.e.*,

publicly disclosing their transgender status).  Moreover, there is no public policy reason to

---

[5]       The cases cited by Defendants are not to the contrary.  *United States v. Owens*, 54 F.3d
271, 274-75 (6th Cir. 1995) is not on point, as it addresses the availability of judicial, not
equitable, estoppel against the government, a doctrine which the court recognized serves a
"different function from other forms of estoppel."  *Perez v. Mortgage Bankers Association*, 135
S. Ct. 1199 (2015), likewise does not address estoppel, but rather simply holds that an agency is
not required to undergo notice-and-comment rule-making when changing an interpretive rule
(*i.e.*, rule which advises the public of an agency's construction of regulations or statute, and
which does not have the force of law).  *Perez* does not discuss whether an agency might be
estopped from applying the revised rule against an individual, nor does it consider whether an
individual may be entitled to reasonably rely on a regulation that has the force of law (such as
DTM 16-005).  In *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416-1417 (10th
Cir. 1984), the plaintiff allegedly relied on agency officials' guidance that was contrary to
regulation.  Here, Plaintiffs were not given faulty advice, but rather were led by official policy
and pronouncements to believe that they would not face consequences for disclosing their
transgender status.

foreclose estoppel here, where Plaintiffs have served honorably and with distinction for years. *See Santos v. Franklin*, 493 F. Supp. 847, 854 (E.D. Pa. 1980) (holding that it "would not significantly impair an important public policy" to estop Navy from calling reservist to active duty for failure to attend requisite number of training drills, where his service provides assurance of his "military preparedness").

Finally, Defendants dispute that Plaintiffs have satisfied the requirements for estoppel, which when sought against the government, include that the moving party show a "definite" representation, reasonable detrimental "reliance," and "affirmative misconduct" by the government. *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009). Each of Defendants' arguments fails.

*Definite representation*. Defendants argue that DTM 16-005 did not represent that its policy "was permanent and could not be subject to change." Opp. 39. But that is true of any government policy, and it is clear from the text of DTM 16-005 that the policy change was intended to be immediate and permanent, as demonstrated by the detailed schedule set forth in DTM 16-005 for the identification, revision, and drafting of new issuances and procedures to implement the policy.

*Reasonable Reliance*. Defendants do not dispute that Plaintiffs disclosed their transgender status in reliance on DTM 16-005, but argue that this disclosure has not changed Plaintiffs' position for the worse, claiming that Plaintiffs remain protected from discharge by the Interim Guidance and that none of the Plaintiffs are currently affected by the accessions policy. Defendants' effort to paper over the President's ban by pointing to the language of the Interim Guidance should be rejected; as discussed in Part II.A *supra*, Plaintiffs are already suffering

substantial and irreparable harm, and face further imminent harm when the policies implementing the President's ban go into effect.

Moreover, Plaintiffs had reason to believe they could rely on the guarantees in DTM 16-005 because it was the end product of a lengthy and public deliberative process, and supported by the Secretary's unambiguous conclusion that "open service by transgender Service members … is consistent with military readiness and with strength through diversity."  DTM 16-005 at 2. Defendants point out that DTM 16-005 indicates it "was set to expire on June 30, 2017," but that is only because that is the point at which all of the implementing issuances and procedures were expected to be in place—that is, the DTM was set to expire *because* the policy change was meant to be permanent.  Opp. 39; *see also* DTM 16-005 at 1 (providing for update of DoD Instruction 6130.30, relating to accessions, no later than July 1, 2017).

*Affirmative misconduct*.  On this element, Defendants simply make the conclusory assertion that "Plaintiffs have not identified any governmental misconduct."  Opp. 40.  But Plaintiffs have shown that the government's change in policy "will cause an egregiously unfair result," which—consistent with the quoted standard in Defendant's own brief—is sufficient to establish affirmative misconduct.  App. 28.  It is manifestly unfair to entrap transgender service members into disclosing their status and then immediately subject them to discharge when they no longer have the option of concealing their identity.  This egregious and unexplained reversal readily establishes the type affirmative misconduct necessary for equitable estoppel to apply. *See, e.g.*, *Cinciarelli v. Reagan*, 729 F.2d 801, 807-08 (D.C. Cir. 1984) (estopping government from disclaiming agreement that protected plaintiff from involuntary release from active duty); *Brandt v. Hickel*, 427 F.2d 53, 56-57 (9th Cir. 1970) (estopping Secretary of the Interior from disclaiming representation made to prospective oil-and-gas lessees that their bid would not lose

priority); *Hoeber v. D.C. Redev. Land Agency*, 483 F. Supp. 1356, 1365-66 (D.D.C. 1980) (estopping city officials from reversing interpretation of statute after private developers invested large amounts of capital), *aff'd* 672 F.2d 894 (D.C. Cir. 1981) (table).

### C.    The Balance Of The Equities And The Public Interest Favor An Injunction

Defendants have not identified any credible way in which either the military or the public interest would be harmed by an order granting the relief Plaintiffs seek.  Defendants contend that the balance of equities weighs in their favor because the Plaintiffs "are not being harmed by the Interim Guidance," and because granting injunctive relief "would directly interfere" with the work of a panel of experts that the military is purportedly "in the process of gathering" to "provid[e] advice and recommendations on the development and implementation of the policy on military service by transgender individuals."  Opp. 40-41.  Defendants are wrong on both counts.

The ban inflicts serious, ongoing harms on each of the Plaintiffs for the reasons set forth above.  *See supra* at 3-5.  Defendants cannot and do not explain how the requested injunction will interfere with any future study and policy development concerning transgender service members.  "'[B]alanc[ing] the competing claims of injury and … consider[ing] the effect on each party of the granting or withholding of the requested relief'" therefore strongly weigh in favor of issuance of the requested injunction.  *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *McVeigh*, 983 F. Supp. at 221 (finding "no appreciable harm to the Navy if Senior Chief McVeigh is permitted to remain in active service").

Defendants' invocation of a general interest in "national defense" (Opp. 41) likewise cannot withstand scrutiny in light of the substantial evidence submitted by Plaintiffs demonstrating that it is *implementation* of the President's ban that would degrade military readiness and capabilities, result in a significant lost investment in money and time in developing

military capacity, and erode service members' trust in the military chain of command.  *See* App.

4-7, 9-11, 36-39; *supra* at 4; Eitelberg Decl. ¶¶ 10-11.

### D.     The Court Should Order The Relief Sought In The Application

Plaintiffs have requested a preliminary injunction prohibiting defendants from

categorically excluding transgender people from the military.  When challenging a rule of

general applicability, such as the President's August 25, 2017 Memorandum, the "ordinary

result" is to enjoin the unlawful policy, not to limit its "application to the individual petitioners."

*Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *Nat'l Mining Ass'n v. U.S.*

*Army Corps of Eng'rs*, 145 F.3d 1399, 1410 (D.C. Cir. 1998) (enjoining enforcement of

regulation regarding discharge of dredged material); *Bresgal v. Brock*, 843 F.2d 1163, 1170-72

(9th Cir. 1987) (requiring Secretary of Labor to apply Migrant and Seasonal Agricultural

Workers Protection Act to commercial forestry workers); *Planned Parenthood Fed'n of Am.,*

*Inc. v. Heckler*, 712 F.2d 650, 651 (D.C. Cir. 1983) (enjoining regulations imposing financial

eligibility requirement for provision of family planning services).  The court's equitable power is

not limited simply because it will have broad geographic reach and because it may benefit non-

parties: "if there has been a systemwide impact … there [may] be a systemwide remedy."

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977); *see also, e.g.*, *Int'l Refugee*

*Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) (granting nationwide preliminary

injunction against enforcement of President's travel ban), *cert. granted*, 137 S. Ct. 2080 (2017),

*vacated*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017); *Texas v. United States*, 809 F.3d

134, 188 (5th Cir. 2015) (granting nationwide preliminary injunction against implementation of

program providing legal status to certain illegal immigrants), *aff'd by equally divided Court*, 136

S. Ct. 2271 (2016); *City of Chicago v. Sessions*, No. 17-C-5720, 2017 WL 4081821, at *14 (N.D.

Ill. Sept. 15, 2017) (granting nationwide preliminary injunction against enforcement of grant

conditions penalizing "sanctuary cities"); *City of Chicago v. Sessions*, No. 17-C-5720, 2017 WL 4572208, at *2-5 (N.D. Ill. Oct. 13, 2017) (denying Attorney General's motion to stay nationwide application of preliminary injunction).

Moreover, systemwide relief is particularly appropriate here, where the constitutional harms suffered by Plaintiffs would not be remedied by an injunction limited to Plaintiffs. *See* App. 29-31 (discussing constitutional and stigmatic harms). Even if protected from discharge, Plaintiffs will remain branded as part of an inferior class of people as long as the ban remains in place. *Int'l Refugee Assistance Project*, 857 F.3d at 605 ("[C]ontinued enforcement against similarly situated individuals would only serve to reinforce the 'message' that Plaintiffs 'are outsiders, not full members of the political community.'"). Indeed, singling out Plaintiffs as the only transgender service members entitled to serve, while the military develops its policy to carry out the ban, only adds to the weight they bear due to the policy and further puts into relief its arbitrary and inequitable nature.

Defendants' arguments to the contrary should be rejected. *First*, Defendants argue that the requested relief would simply require them to continue "comply[ing] with the Interim Guidance that the Secretary of Defense has already put in place." Opp. 41. But the relief requested by Plaintiffs is not simply a vague "obey the law" injunction, as Defendants argue. Plaintiffs seek specific relief for a specific constitutional violation—an injunction prohibiting the categorical exclusion of transgender people from the military. *See, e.g.*, *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 454 (1979) (affirming injunction prohibiting defendants from discriminating on the basis of race in operating public school system). In addition, the requested injunction will protect Plaintiffs for as long as this litigation remains pending, including after the Interim Guidance expires and Plaintiffs become subject to separation and ineligible for necessary

medical care as ordered in the President's Memorandum.  *See* Interim Guidance 1 ("Not later

than February 21, 2018, I will present the President with a plan to implement the policy and

directives in the Presidential Memorandum."); *id.* at 2 ("[N]o new sex reassignment surgical

procedures for military personnel will be permitted after March 22, 2018.").  Plaintiffs' requested

relief must be granted if the harm from implementation of the ban is to be avoided.

      *Second*, Defendants argue that relief should be limited to redressing Plaintiffs' own

cognizable injuries.  As discussed above, plaintiff-specific relief is not appropriate in a suit

challenging a policy of general applicability, particularly where implementation of the policy

with respect to non-plaintiffs will cause constitutional and consequential stigmatic harms to

plaintiffs.  Defendants' reliance on *Lewis v. Casey*, 518 U.S. 343, 357 (1996), is misplaced, as

the policy there did not involve systemwide constitutional harms.  In *Lewis*, the court vacated a

broad injunction requiring the defendant prison system to provide more extensive access to its

law library and provide assistance to illiterate and non-English-speaking inmates.  Critically,

unlike in this case, there was no showing that the prison's policies were facially unconstitutional

or systemically inadequate; instead, plaintiffs simply demonstrated two instances in which

illiterate prisoners were unable to file legal claims.  *Id.* at 359-60 & n.7.  Likewise, Defendants

cite *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994), for the proposition that

an injunction should be no more burdensome than necessary to provide relief to plaintiffs.  But

*Madsen* involved an injunction seeking to establish buffer zones against protesters around an

abortion clinic.  Courts are required to draw injunctions restraining speech narrowly to avoid

intruding on the First Amendment; here, however, a broad injunction would affirmatively

promote the Equal Protection and Due Process clauses, and there is no impact on the constitutional rights of other parties.[6]

Defendants also claim that this Court's power to issue an injunction is restricted here because of the military context. But courts have the power to enjoin, on a nationwide basis, the enforcement of military policies that violate constitutional and statutory rights, and have done so in appropriate cases. *See, e.g.*, *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17-19 (D.D.C. 2004) (preliminarily enjoining enforcement of Department of Defense's involuntary anthrax inoculation program); *Huynh v. Carlucci*, 679 F. Supp. 61, 67 (D.D.C. 1988) (preliminarily enjoining Department of Defense from enforcing rule that would deny security clearances to certain recently naturalized U.S. citizens based on country of origin). Defendants point to the Supreme Court's and Ninth Circuit's narrowing of the district court's nationwide injunction against discharge on the basis of sexual orientation in *U.S. Department of Defense v. Meinhold*, 510 U.S. 939 (1993), and *Meinhold v. U.S. Department of Defense*, 34 F.3d 1469, 1480 (9th Cir. 1994). But this narrowing of the injunction was simply a product of different conclusions on the merits: unlike the district court, the Ninth Circuit held that the Department of Defense's regulations were facially constitutional, and that the plaintiff was only entitled to relief because his discharge was not consistent with the regulations. *Meinhold*, 34 F.3d at 1479-80. The Ninth Circuit did not indicate that if the regulations had been unconstitutional on their face, it would have enjoined enforcement of the regulations against plaintiff alone.

---

[6]     Defendants suggest that Plaintiffs do not have standing to enjoin enforcement of the ban, citing *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). *Town of Chester* is not on point; it held that an intervenor must independently establish Article III standing if it wants relief of its own. As is the case here, however, plaintiffs who have been injured by a government policy have standing to seek an injunction against that policy. *See supra* Part I.A.1. Defendants also cite *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010). That case stands for the irrelevant proposition that plaintiffs cannot seek to enjoin an order based on harm to other parties, where they fail to establish irreparable injury to themselves.

*Third*, Defendants argue that the military personnel decisions Plaintiffs may face can be challenged administratively and reviewed in an APA challenge.  But this is no basis to deny a preliminary injunction in a constitutional challenge to a government policy where Plaintiffs have met the four-factor test for injunctive relief.  Notably, none of the cases cited by Defendants involves a denial of injunctive relief because of the availability of alterative administrative remedies.  *Chappell v. Wallace*, 462 U.S. 296, 303-04 (1983), for example, concerned the availability of a *Bivens* action to recover damages against military superiors, not the propriety of a preliminary injunction.  Because the President has issued a clear policy that transgender people not be permitted to serve in the military, a policy that is unconstitutional on its face, Plaintiffs should not be required to wait until they have been discharged to obtain preliminary relief.  *See Adair v. England*, 183 F. Supp. 2d 31, 55 (D.D.C. 2002) (holding that, in case challenging Navy's promotion policy, "'[r]esolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board'").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied and Plaintiffs' application for a preliminary injunction should be granted.

October 16, 2017

Claire Laporte (*pro hac vice*)
Matthew E. Miller (*pro hac vice*)
Daniel L. McFadden (*pro hac vice*)
Kathleen M. Brill (*pro hac vice*)
Michael J. Licker (*pro hac vice*)
Rachel C. Hutchinson (*pro hac vice*)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Jennifer Levi (*pro hac vice*)
Mary Bonauto (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
30 Winter St., Ste. 800
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
Christopher F. Stoll (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

Respectfully submitted,

/s/ Paul R.Q. Wolfson
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Kevin M. Lamb (D.C. Bar No. 1030783)
WILMER CUTLER PICKERING
    HALE & DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Alan E. Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Christopher R. Looney (*pro hac vice*)
Harriet Hoder (*pro hac vice*)
Adam M. Cambier (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

Nancy Lynn Schroeder (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
350 S. Grand Ave., Ste. 2100
Los Angeles, California 90071
Telephone: 213-443-5300
Fax: 213-443-5400

Attorneys for Plaintiffs