**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE DOE 1,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 17-cv-1597 (CKK) |
| **DONALD J. TRUMP,** *et al.*, | |
| **Defendants.** | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

   I.   THE COURT LACKS JURISDICTION. ........................................................................... 2

      A.  Plaintiffs' Amended Complaint Fails to Address the Operative Policy ..................... 2

      B.  Plaintiffs Ask this Court for an Advisory Opinion ..................................................... 3

      C.  Plaintiffs Do Not Allege a Legally Cognizable Injury ................................................ 5

         1.  Plaintiffs Are Not Currently Being Harmed. ....................................................... 5

         2.  Speculative Claims of Future Injury Are Insufficient to Establish Standing ....... 9

   II.  PLAINTIFFS HAVE FAILED TO STATE CLAIMS UPON WHICH RELIEF
       CAN BE GRANTED. ...................................................................................................... 13

      A.  Plaintiffs Have Failed to State an Equal Protection Claim. ...................................... 13

      B.  Plaintiffs Have Failed to State a Due Process Claim. ............................................... 20

      C.  Plaintiffs Have Failed to State an Estoppel Claim. ................................................... 21

CONCLUSION ....................................................................................................................... 24

## <u>INTRODUCTION</u>

Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 55)[1] brings into focus two fundamental problems with their Amended Complaint.  First, their suit is premature. Plaintiffs challenge a notional policy regarding military service by transgender individuals, but as they concede, that policy is currently being studied and has not been implemented or applied to anyone, let alone Plaintiffs.  Second, while that review is ongoing, Secretary of Defense Mattis has put in place Interim Guidance that, by its terms, maintains the status quo for both current service members and those who seek to access into the military.  Plaintiffs not only fail to address this operative policy in their Amended Complaint, but their claims of present injury are either belied by that policy or are otherwise unfounded.  For these reasons, Plaintiffs lack standing and their claims are not ripe.

Plaintiffs' Opposition illustrates their true aim, *viz.*, to obtain an advisory opinion that (they hope) will influence the military's ongoing review.  Specifically, they assert that, "[t]his Court's ruling would not interfere with [the military's] study, but rather would serve only to clarify the limits of a constitutionally permissible policy."  ECF No. 55 at 18.  That is why Plaintiffs opt, rhetorically, to challenge a "ban" that bears no resemblance to the actual policy prescribed by Secretary Mattis.  But Article III of the Constitution confines courts to adjudicating actual cases or controversies, thus prohibiting precisely this kind of judicial action to "clarify" the constitutional limits of a potential future policy.  Because the Court may not issue a ruling based on a hypothetical set of future circumstances, it should dismiss Plaintiffs' Amended Complaint for lack of jurisdiction.

---

[1] Plaintiffs' filing was also a reply in support of their motion for a preliminary injunction.  *See* ECF No. 55.  Defendants' reply is in support of its motion to dismiss under Rules 12(b)(1) and (b)(6).

Finally, even if the Court had jurisdiction, Plaintiffs have failed to state claims on which relief can be granted. They have not stated an equal protection claim for the reasons set forth in Defendants' opening brief, including because currently serving transgender individuals are subject to the same standards as other service members under the Interim Guidance. Indeed, the two student Plaintiffs have not been excluded from the Naval Academy or the Reserve Officer Training Corps. How, if at all, the military's eventual policy will affect them is plainly unresolved. Plaintiffs' substantive due process claim fails because they have not alleged the deprivation of a property or liberty interest. And Plaintiffs have not stated a viable estoppel claim because the Government cannot be estopped from studying and making broad policy changes and, even if it could, Plaintiffs have not stated a plausible claim that Defendants have engaged in affirmative misconduct.

The Court should, therefore, grant Defendants' motion to dismiss.

## ARGUMENT

## I.   THE COURT LACKS JURISDICTION.

### A.   Plaintiffs' Amended Complaint Fails to Address the Operative Policy.

Defendants' motion to dismiss established that the Court lacks jurisdiction for several reasons, including most notably because Plaintiffs' Amended Complaint ignores the Interim Guidance, which serves as the operative policy regarding military service by transgender individuals. ECF No. 45 at 9. Plaintiffs' rhetorical response that "the operative policy is the ban on transgender people being able to serve in the military," ECF No. 55 at 5, is wrong.

Secretary Mattis's September 14, 2017 Memorandum issuing the Interim Guidance stated unequivocally that, "the attached Interim Guidance takes effect immediately and will remain in effect until I promulgate DoD's final policy in this matter." ECF No 45-1. Secretary Mattis's

Memorandum is unambiguous: The Interim Guidance is the operative policy and will remain so until he promulgates DoD's final policy regarding military service by transgender individuals. *Id.* That Interim Guidance is equally clear. Transgender service members, including the service member Plaintiffs, continue to serve fully in the military. *See* ECF No. 45-2, 56-1 – 56-6. That fact alone refutes Plaintiffs' characterization of the operative policy as a "ban on transgender people being able to serve in the military." ECF No. 55 at 5. The long-standing policy on accession to the military, which does not apply as yet to any Plaintiff, likewise is not a "ban on transgender military service." ECF No. 45-1 (stating that the current accession policy, which generally prohibits transgender individuals from joining the military because they do not meet medical standards, is "*subject to the normal waiver process*").

Plaintiffs' disregard of the actual, operative policy and reliance on a hypothetical future policy on transgender military service requires dismissal of their Amended Complaint.

**B.     Plaintiffs Ask this Court for an Advisory Opinion.**

Dismissal is also appropriate because, as Plaintiffs' Opposition effectively concedes, Plaintiffs seek an advisory opinion. ECF No. 45 at 20. Despite recognizing the military's ongoing review of its future policy on military service by transgender individuals, Plaintiffs ask this Court for a ruling that "would not prevent or interfere with any such study, but rather *would serve only to clarify the limits of a constitutionally permissible policy*." ECF No. 55 at 18 (emphasis added). Such a request for the Court's "clarif[ication]" on the constitutional limits of a hypothetical future policy on transgender military service is a hornbook example of an advisory opinion that this Court is without power to issue. *Muskrat v. United States*, 219 U.S. 346, 362 (1911); *Hayburn's Case*, 2 U.S. 408 (1792). "'[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'" *Pub.*

*Serv. Elec. & Gas Co. v. F.E.R.C.*, 783 F.3d 1270, 1274 (D.C. Cir. 2015) (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)).  "Courts may not [] give opinions advising what the law would be upon a hypothetical state of facts."  *TNA Merch. Projects, Inc. v. Fed. Energy Regulatory Comm'n,* 857 F.3d 354, 362 (D.C. Cir. 2017).

Plaintiffs likewise request that the Court issue a "preliminary and permanent injunction prohibiting the categorical exclusion of transgender people from military service."  ECF No. 55 at 41; *see* ECF No. 9 at 18.  But the current policy does not "categorically exclude" *any* of the Plaintiffs from military service – their claim is that they may be excluded in the future.  The Court lacks authority to render an opinion about the constitutional limits of a hypothetical military service policy untethered from a current controversy or even a discrete Government action where no such action has been taken or threatened against any Plaintiff.

The authority Plaintiffs rely on to argue that their claims are ripe is plainly inapposite.  Plaintiffs cite primarily to pre-enforcement challenges to federal regulations.  ECF No. 55 at 13-14.  In these cases, however, the regulations at issue were final, and the plaintiffs were clearly subject to them.  *See State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 54 (D.C. Cir. 2015) (bank's challenge to constitutionality of agency that regulated banking was ripe even though the bank had not been the subject to an enforcement action); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 440 F.3d 459, 464 (D.C. Cir. 2006) (plaintiffs' challenge to EAP regulation was ripe where the regulation was final but there remained questions regarding how it would be applied).  In this case, Plaintiffs are attempting to challenge a policy that is still being studied and implemented before it is clear whether the final policy will apply to them.

*National Coalition for Men v. Selective Service*, 640 F. App'x 664 (9th Cir. 2016), is similarly distinguishable.  In that case, the District Court found that the plaintiffs' challenge to

the selective service laws was not ripe because it was unclear which military positions would be opened up to women. *Id.* at 665. By the time the case was on appeal, however, the uncertainty had passed because the Secretary of Defense had announced that all formerly closed positions would be open to women, and the Ninth Circuit concluded that the case was then ripe for adjudication. *Id.* In this case, the uncertainty has not passed. The military is still studying its policy on military service by transgender individuals, and it remains unclear whether the policy that is ultimately implemented will have any effect on Plaintiffs. As Plaintiffs lack standing and their claims are not ripe, the Court should dismiss their Amended Complaint for lack of standing.

**C.      Plaintiffs Do Not Allege a Legally Cognizable Injury.**

**1.      Plaintiffs Are Not Currently Being Harmed.**

In their Amended Complaint, filed before Secretary Mattis issued the Interim Guidance, Plaintiffs claimed standing based primarily on an alleged fear of immediate discharge and loss of military benefits, an alleged inability to re-enlist, and an alleged inability to receive medical treatment related to gender dysphoria and transition. The Interim Guidance demonstrates that these alleged harms are illusory as to current service members. Indeed, the Interim Guidance could not be clearer that:

- "[N]o action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status[]," which addresses the currently-serving Plaintiffs' claimed fear of discharge. ECF No 45-1.

- "An otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be reenlisted in service under existing procedures,[]" which address the alleged fears regarding re-enlistment.[2] *Id.*

---

[2] Indeed, Plaintiffs acknowledged in their Opposition that Plaintiff Jane Doe 4 received notice that her request for reenlistment was granted. ECF No. 55 at 3 n.1.

- "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition[]," which addresses concerns over medical treatment.  *Id.*

Consistent with this Guidance, Defendants showed that none of the currently serving Plaintiffs allege the legally cognizable injury necessary to establish standing. ECF No. 45 at 15-18.

The two student Plaintiffs, Midshipman (MIDN) Kibby and Mr. Kohere, premised their standing a fear that they would be unable to commission as officers in 2020 and 2021, respectively, ECF No. 9 ¶¶ 37-30, that Plaintiff Kibby would be unable to return to the Naval Academy, *id.* ¶ 38, and that Plaintiff Kohere "will no longer be eligible to participate in his ROTC program or to receive an ROTC scholarship," *id.* ¶ 40.  Yet a declaration from the Commandant of the Naval Academy established that Plaintiff Kibby is currently on a pre-planned medical leave of absence that began in June 2017 and is not scheduled to resume his studies at the Naval Academy until May 2018 – after the implementation date of revised the policy concerning service by transgender individuals.  ECF No. 45-2 ¶¶10, 12.  Further, Defendants showed that Plaintiff Kohere is currently participating in ROTC classes, that he did not apply for a ROTC scholarship before the spring 2017 deadline, and that the next opportunity to apply for a scholarship would be the summer of 2018.  ECF No. 45-3 ¶8.  Thus, the two student Plaintiffs face no imminent threat of being unable to serve in the military and, indeed, it is unclear how the future policy might impact them.  In these circumstances, the student Plaintiffs have also failed to allege legally cognizable injuries.

Plaintiffs do not seriously claim to have suffered injuries related to discharges, denials of re-enlistment or accession, or allege they have been refused medical treatment.[3]  Instead, they

---

[3] Contrary to Plaintiffs' contention (*see* ECF No. 55 at 3), prior delays in medical treatment that is presently available to Plaintiffs would not give rise to standing to pursue injunctive relief.  *See City of Los Angeles* v. *Lyons*, 461 U.S. 95, 102 (1983).

rest their standing on stigmatic injury, the stress and anxiety of uncertainty regarding how future policies will affect transgender service members, the impact of that uncertainty on their ability to receive favorable assignments or to deploy, and speculation that they will face separation after March 2018. Similarly, the student Plaintiffs rely primarily on stigmatic injuries and speculation that Plaintiff Kibby will be unable to return to the Naval Academy in May 2018, that Plaintiff Kohere will not be permitted to apply for an ROTC scholarship next summer, and that neither will be allowed to commission as an officer after completing their studies.[4] None of these theories presents an injury sufficient to establish standing.

Lacking any cognizable injury, Plaintiffs instead argue that the Presidential Memorandum "sends a clear message—both to transgender service members and to others—that transgender people are outsiders, unfit to serve, unworthy of being subject to the same enlistment and service standards as all others" and thus imposes a stigmatic injury. ECF No. 55 at 18-19. But the D.C. Circuit rejected a similar claim of injury brought by Navy chaplains who alleged that non-liturgical Protestant chaplains were being denied benefits and opportunities on account of their religion. *See In re Navy Chaplaincy,* 534 F.3d 756, 760-61 (D.C. Cir. 2008). There, the named plaintiffs conceded that they had not been denied such benefits, but argued that the "Navy's 'message' of religious preference" toward Catholic chaplains conferred standing on them as non-liturgical Protestant chaplains. *Id.* The court rejected their stigmatic standing

---

[4] Plaintiffs claim for the first time in their Opposition that Mr. Kohere is injured because he cannot enroll in ROTC even though he is currently a participating student. ECF No. 55 at 4-5. This allegation was not raised in Plaintiffs' Amended Complaint or their Motion for Preliminary Injunction. But in any event, his inability to enroll cannot establish standing because enrollment (or even participation) in ROTC during the Basic Course is not required or necessary in order to receive a commission. *See* Declaration of Robert O. Burns ("Burns Decl."), ECF No.# ¶ 4 (describing multiple entry options for students who do not participate in the Basic Course but can still commission).

theory, holding that "their exposure to the Navy's alleged 'message' of religious preference" did not confer standing. *Id.*   Plaintiffs' assertion that the Presidential Memorandum sends a "clear message" that they are "unfit to serve," *see* ECF 55 at 18-19, is likewise insufficient to establish standing. *See In re Navy Chaplaincy*, 534 F.3d at 760-61.

Plaintiffs seek to bolster their stigmatic-standing argument by invoking *Heckler v. Mathews*, 465 U.S. 728 (1984), *see* ECF No. 55 at 12, but their reliance on that decision is misplaced.   In *Heckler*, a male plaintiff alleged that the Social Security Act denied him Social Security benefits that were afforded to similarly-situated women, in violation of his equal protection rights. *Heckler,* 465 U.S. at 735.   The plaintiff's injury at the hands of the agency was concrete: "as a nondependent man, he receive[d] fewer benefits than he would if he were a similarly situated woman." *Id.* at 738.   Accordingly, *Heckler* "clearly [did] not dispense with the injury requirement" of Article III. *Biszko v. RIHT Fin. Corp.*, 758 F.2d 769, 773 (1st Cir. 1985). To be sure, Heckler includes "broad language concerning the stigmatizing injuries suffered by a denial of equal protection," but that language "appears in response to the defendant's argument that the plaintiff in Heckler lacked standing because one possible outcome of his suit would have been to strike down the discriminatory benefits provision entirely, denying benefits to everyone including the plaintiff." *NAACP v. Horne*, No. CV 13-01079, 2013 WL 5519514, at *5 (D. Ariz. Oct. 3, 2013).   Heckler "explained that such a possibility did not deprive the plaintiff of standing because he was in fact 'personally denied equal treatment' in the benefits awards." *Id.*   In short, alleged "stigmatic" injuries alone are insufficient to establish standing; rather a party must still establish the he is suffering an actual concrete injury.[5]

---

[5] Plaintiffs reliance on the non-binding Third Circuit case *Hassan v. City of New York,* 804 F.3d 277 (3d Cir. 2015), also misses the mark.   The plaintiffs in *Hassan* did not rely on a theory of stigmatic injury alone, but rather claimed that an alleged police surveillance program had broadly

Perhaps trying to avoid relying solely on stigmatic injury to establish standing, Plaintiffs rely on speculation from three prior service secretaries concerning how uncertainty surrounding a future policy regarding transgender military service might cause harm. But such speculation is likewise insufficient to establish standing. First, Plaintiffs never claim to have suffered such harm, and speculation by nonparties that Plaintiffs might face harm cannot confer standing. But even taken at face value, the former service secretaries' opinions offer only conjecture as to injuries that might occur with respect to future discharges, future assignments, and future deployments. In the absence of evidence of a concrete injury or imminent threat of injury, the speculative opinions of the former services secretaries regarding possible future injury cannot establish standing.

Courts consistently have recognized in military cases that speculation about future harm is insufficient to establish an injury courts can address. *See, e.g.*, *Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016); *Singh v. McConville*, 187 F. Supp. 3d 152 (D.D.C. 2016). If a future policy harms Plaintiffs, they can bring suit at that time to challenge that policy. Until then, however, they lack the injury-in-fact necessary to establish standing.

## 2. Speculative Claims of Future Injury Are Insufficient to Establish Standing.

Plaintiffs' claims that they have standing based on speculative future injuries also fall flat. As to the current service members, this argument rests on the assumption that they will be

---

infiltrated their communities, by having officers collect photographs and videos, record license plate numbers, and pose as members of community organizations. *Id.* at 285-86. The *Hassan* plaintiffs further alleged that because this surveillance program was widely publicized, it caused them financial harm by decreasing the value of their homes, scaring customers away from their businesses, and interfering with the organizational plaintiffs' fundraising efforts. *Id.* at 287-88. In short, unlike the Plaintiffs in this case, the *Hassan* plaintiffs alleged direct, personal, and concrete harms as a result of the governmental conduct being challenged.

immediately discharged "beginning as early as March 23, 2018[.]" ECF No. 55 at 1. There is, however, no basis for such an assumption. The Presidential Memorandum specifically leaves any decision as to current service members open ended and directs the Secretary of Defense in consultation with the Secretary of Homeland Security to "determine how to address transgender individuals currently serving in the United States military." Presidential Memorandum, 82 Fed. Reg. 41319.

Even if Plaintiffs could establish that they will ultimately be discharged under future policy, it does not follow that such discharges would begin "as early as March 23, 2018[.]" ECF no. 55 at 1. Military discharges are not effectuated immediately by the stroke of a pen; both the Department of Defense and the services heavily regulate them to ensure procedural due process. And each type of military discharge – administrative or medical – has individually tailored procedures. *See, e.g.*, Department of Defense Instruction 1332.14 (providing detailed procedures for the current types of enlisted administrative separations);[6] Department of Defense Manual 1332.18 Vol. 1–3 (providing detailed procedures for current medical separations).[7]

For example, while Plaintiffs contend that they may receive stigmatizing "Other Than Honorable" (OTH) discharges, *see* ECF no. 55. at 35-36, they offer no support for their speculation. Moreover, separation with an OTH discharge involves extensive procedures which include an in-person hearing, the right to present evidence and cross examine witnesses, and in

---

[6]Available at: http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/133214p.pdf (last visited Oct. 20, 2017).

[7] Available at: http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218m_vol1.pdf; http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218m_vol2.pdf; and http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/133218vol3.pdf (last visited at Oct. 20, 2017).

most circumstance, personal representation at no cost by a uniformed attorney. *See, e.g.*, Army Reg. 635-200 ¶¶ 3-7.[8]

Here, Plaintiffs seek a preliminary injunction before it is even clear whether they will be subject to discharge proceedings at all.  If Plaintiffs are involuntarily discharged in the future, they can challenge their discharge at that time.[9]  The posture of the case now finds Plaintiffs seeking to challenge an assumed future discharge based purely on speculation regarding the outcome of the Department of Defense's internal deliberative process.  That cannot support the Court's exercise of jurisdiction at this stage.

As to the student Plaintiffs' claims of future injury, they are also entirely speculative.  First, as with the current service members, the student Plaintiffs' claims rest on similar assumptions as to what the future policy will entail for both Naval Academy Midshipman and ROTC Cadets.  Although former Secretary Mabus states that he is unaware of a Midshipman who was allowed to complete his or her education when rendered ineligible for commission two years prior, he does not speculate that Plaintiff Kibby will be "barred from continuing at the Naval Academy" as Plaintiffs argue in their Opposition.  ECF No. 55 at 4-5; Mabus Supp. Decl. ¶ 10.  In contrast, the Commandant of the Naval Academy attests that the current plan calls for MIDN Kibby to resume his studies in May 2018.  ECF No 45-2 ¶ 12.  Moreover, like the current service member Plaintiffs, if MIDN Kibby were barred from returning to the Naval Academy in

---

[8]Available at: http://www.apd.army.mil/epubs/DR_pubs/DR_a/pdf/web/AR635-200_Web_FINAL_18JAN2017.pdf (last visited at Oct. 20, 2017).

[9] This Court recently reviewed military discharge proceedings in *Reinhard v. Johnson*, 209 F. Supp. 3d 207 (D.D.C. 2016) (Kollar-Kotelly, J.).  After extensive administrative proceedings, the plaintiff in *Reinhard* brought a motion for a preliminary injunction to prevent his discharge from the military. *Id.* at 210-214.  The Court ultimately denied the plaintiff's motion because he did not establish a likelihood of success on the merits and because the Court concluded that his pending separation from the military and the associated stigma did not constitute irreparable harm. *Id.* at 219-220.

May 2018, he could bring his suit to challenge that action at that time.  Similarly, while it is

unclear how future policy changes may affect ROTC scholarships, at this point Plaintiff Kohere

has not even submitted an application for a scholarship, and will not have another opportunity to

do so until the summer of 2018.  Moreover, as explained in Defendants' motion to dismiss,

MIDN Kibby is not scheduled to complete his studies and become eligible to apply for a

commission until 2020.  And Mr. Kohere is not scheduled to graduate from college, so that he

can apply to commission as an officer, until 2021.  Speculation about military accession policies

in 2020 and 2021 is plainly insufficient to establishing standing to bring claims today.

      For all these reasons, the record demonstrates that none of the alleged future injuries to

any of the Plaintiffs are "certainly impending" or that there is even a "substantial risk"[10]

sufficient to confer standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

("[W]e have repeatedly reiterated that threatened injury must be certainly impending to

constitute injury in fact, and that allegations of possible future injury are not sufficient.").  Thus,

Plaintiffs claims must be dismissed for lack of subject matter jurisdiction.

---

[10] Plaintiffs base their "substantial risk" argument on *Attias v. CareFirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017), a financial data breach case, but that case is inapplicable to the present litigation.  In *Attias*, the D.C. Circuit concluded that, under *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), a plaintiff could establish an injury-in-fact with respect to harm that would allegedly occur in the future by plausibly alleging a "substantial risk" of "the ultimate alleged harm," which in that case was future identity theft.  *Id.* at 626-27.  The D.C. Circuit concluded that, because plaintiffs' information including names, birth dates, email addresses, subscriber identification numbers, credit cards, and social security numbers, had been subject to the breach they faced a "material risk of identity theft."  *Id.* at 628.  The D.C. Circuit found that this risk allowed plaintiffs to pursue their claims for money damages to compensate them for the reasonable costs to mitigate and avoid harm, such as the purchase of identity theft protection and monitoring.  *Id.* at 629.  Not only are the facts of this case decidedly different, Plaintiffs here do not claim a similar injury and are pursuing only prospective injunctive relief.

## II.   PLAINTIFFS HAVE FAILED TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

### A.   Plaintiffs Have Failed to State an Equal Protection Claim.

Plaintiffs have failed to state a viable equal protection claim for several reasons.  As an initial matter, Plaintiffs have not shown that they have been subjected to unequal treatment under the Interim Guidance.  The Interim Guidance, in fact, states specifically that transgender service members "are subject to the same standards as any other Service member of the same gender." ECF No. 45-1.  Similarly, neither of the student Plaintiffs has alleged that he has applied to the military, let alone had his application denied because of his transgender status.  As none of the Plaintiffs has been treated unequally, Plaintiffs have failed to state an equal protection claim.

In their motion to dismiss, Defendants explained why Plaintiffs could not advance a viable equal protection challenge to the military's longstanding accessions policy.  Rather than squarely address this analysis, Plaintiffs devote their Opposition to assailing an alleged "ban" on transgender service.  *See* ECF No. 55 at 21.  But that rhetoric is not responsive to Defendants' substantive argument.  The actual accession policy does not violate the Equal Protection Clause of the Constitution.

Notwithstanding the Supreme Court and D.C. Circuit precedent, Plaintiffs begin their argument by asserting that "classifications in military policies are subject to ordinary equal protection review."  *Id.* at 22.  That is not the law.  *See, e.g.*, *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981) ("Congress remains subject to the limitations of the [equal protection component of the] Due Process Clause, but the tests and limitations to be applied may differ because of the military context."); *Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) ("It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference to the 'considered

13

professional judgment' of 'appropriate military officials.'" (citation omitted)).  Of course, the military is not "above the law," ECF No. 55 at 22; *see* ECF No. 45 at 27, 28–29, but its unique role under the Constitution requires unique – and more deferential – constitutional scrutiny.

Plaintiffs next try to distinguish cases granting deference to military judgments by pointing out that they involved "*Congress*[]" or "military professionals," and characterize the accessions policy as the product of presidential whim.  ECF No. 55 at 23, 24 (emphasis in original).  But "'courts have traditionally shown the utmost deference to Presidential responsibilities'" in the field of "military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 529–30 (1988) (citation omitted); *see also Loving v. United States*, 517 U.S. 748, 768 (1996) (it "would be contrary to the respect owed the President as Commander in Chief to hold that he may not be given wide discretion and authority.").  After all, "[t]he complex[,] subtle, and professional decisions as to the composition … of a military force are … subject *always* to civilian control of the Legislative and Executive Branches"; indeed, "[i]t is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis in original).[11]

The well-established principles of military deference by courts flow necessarily from this constitutional structure, namely, that the Constitution vests power over military affairs in the

---

[11] The well-established principles of military deference by courts flow necessarily from this constitutional structure, namely, that the Constitution vests power over military affairs in the political branches, not to the Judiciary.  *See Gilligan v. Morgan*, 413 U.S at 10.  Here, deference to the ongoing policymaking process directed by the Commander-in-Chief and Secretary Mattis would be faithful to the role the Constitution gives the Judiciary over military affairs.  And, consistent with the courts' constitutional power to consider cases and controversies, there will be ample opportunity, after the military completes its review, for courts to consider the possible impact of a future, albeit final, policy.

14

political branches, not to the Judiciary. *See id.* Here, this Court's deference to the ongoing

policymaking process directed by the Commander-in-Chief and Secretary Mattis would be

faithful to role the Constitution gives this Court over military affairs. And, consistent with the

Court's constitutional power to consider cases and controversies, there will be ample

opportunity, after the military completes its review, for the Court to consider the possible impact

of a future, albeit final, policy.

In any event, the accessions policy long predated the current President: The military has

presumptively excluded transgender individuals for decades, based in part on the judgment of

military professionals that complications associated with hormone therapy and sex-change

procedures could impair them from serving around the world. *See* ECF No. 45 at 4, 32. Of

course, former Secretary Carter came to a different conclusion in 2016, after ordering a study on

the issue that was to "'start with the presumption that transgender persons can serve openly

without adverse impact on military effectiveness and readiness.'" *Id.* at 4 (citation omitted). But

that conclusion from last year does not entitle courts to regard a decades-old accessions policy as

mere caprice.[12]

---

[12] Plaintiffs try to raise a new argument—namely, that DoD's policy on health care for
transgender individuals violates 10 U.S.C. § 1074, which provides generally that members of the
uniformed services are entitled to medical and dental care in any facility of any uniformed
service. *See* ECF No. 55 at 23 n.3. This unpreserved theory is beside the point, as the Interim
Guidance already provides that "[s]ervice members who receive a gender dysphoria diagnosis
from a military medical provider will be provided with treatment for the diagnosed medical
condition." And even if Plaintiffs had standing to challenge the health care policy that is
scheduled to take effect on March 22, 2018, which they do not, that policy does not contravene
§ 1074. As explained in the Interim Guidance, "no new sex reassignment surgical procedures for
military personnel will be permitted after March 22, 2018, *except to the extent necessary to
protect the health of an individual who has already begun a course of treatment to reassign his
or health.*" *Id.* (emphasis added). Plaintiffs apparently assume that there could be future
situations in which a service member is entitled to medical care under § 1074 but prohibited from
receiving it by the policy regarding transition-related health care. But it is unclear whether this
situation could actually arise, and it is certainly not presented at time by these Plaintiffs.

Plaintiffs also argue that "First Amendment cases" involving deference to the military have "no relevance to [their] equal protection and due process claims," because those decisions "involve the military's need to 'foster instinctive obedience, unity, commitment, and esprit de corps.'" ECF No. 55 at 24 (citation omitted). But that need is implicated by the concerns over unit cohesion justifying the accession policy, *see* ECF No. 45 at 33–34, as well as Plaintiffs' own argument that this policy intrudes on their purported due process "right to live in accord with one's gender identity," ECF No. 55 at 33. *Compare, e.g.*, *id.* (insisting that this right is an "aspect of the right to personal autonomy"), *with Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("[W]ithin the military community there is simply not the same individual autonomy as there is the larger civilian community" (citation and brackets omitted)). In any event, the D.C. Circuit has relied on the deference applied in these First Amendment cases in resolving equal protection challenges to military policies. *See Steffan*, 41 F.3d at 685 (applying *Weinberger*). That makes eminent sense, as the Constitution does not treat the First Amendment as any less important than the Fifth.

Ultimately, Plaintiffs' approach would give transgender status far more constitutional protection than core First Amendment freedoms, sexual orientation, or even gender itself. ECF No. 45 at 30. Plaintiffs say nothing in response to that point, and have cited no authority that would support such a result.

Plaintiffs likewise come up short when addressing the accessions policy under the appropriately deferential form of review. First, Plaintiffs dismiss as irrational any concern that the medical conditions associated with transgender individuals could impede the performance of their duties as irrational "because the government points to no evidence and no conclusions of any study that supports the government's position." ECF No. 55 at 29. This ignores the

deference due the military in this matter:  even if a military policy is "mere *ipse dixit*, with no

support from actual experience or a scientific study in the record, and is contradicted by expert

testimony," Defendants are "under no constitutional mandate to abandon their considered

professional judgment."  *Weinberger*, 475 U.S. at 509-10.  In any event, Defendants *did* point to

explanations from military officials for why these concerns justified the accessions policy.  *See*

ECF No. 45 at 32.

At bottom, Plaintiffs simply disagree with where the military "has drawn the line."

*Weinberger*, 475 U.S. at 510.  Plaintiffs prefer former Secretary Carter's proposed accessions

policy, which itself would have presumptively excluded transgender individuals unless they

could show that they had avoided medical complications for an 18-month period.  *See* ECF No.

55 at 27.  But the challenged longstanding accessions policy likewise presumptively excludes

transgender individuals unless they apply for and receive a waiver.  *See* DODI 6130.03.  In other

words, Plaintiffs' objection here reduces to a desire for a categorical exception rather than an

individualized one.  But such policy decisions about whether to adopt rules or standards or where

to draw the line are matters of military discretion.  *See, e.g.*, *Weinberger*, 475 U.S. at 509 (fact

that "military commanders may in their discretion permit visible religious headgear and other

such apparel in designated living quarters" did not render its prohibition on wearing such

headgear indoors on an Air Force base hospital illegitimate).  Absent extraordinary

circumstances, military policies do not need to satisfy the exact tailoring required by

conventional strict scrutiny.

Second, Plaintiffs concede that transgender individuals have "deployment limits or

medical costs," but dismiss those burdens on the military as irrelevant because other service

members impose similar constraints.  ECF No. 55 at 29.  Under that approach, however, most, if

not all, of the military's many presumptive exclusions for physical and mental conditions would be open to judicial invalidation, as excluded applicants will often be able to point to current service members that are arguably similarly situated in this regard. "But judges are not given the task of running the Army," and "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953).

Plaintiffs seek to avoid this problem by arguing that future military discretion is foreclosed because "the military has already studied the issue at length," and there is no more room for debate. ECF No. 55 at 30. Effectively, Plaintiffs ask this Court to conclude that the decision by previous military leaders to revisit and ultimately change a long-standing military policy cannot itself be revisited by current military leaders. But policymakers cannot bind their successors to a decision simply by conducting a study, and Plaintiffs are not being harmed merely because current military officials are revisiting an issue that was studied by previous officials. Even in the civilian context, an agency's decision "is not instantly carved in stone. On the contrary, the agency must consider … the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (internal citation, quotations, and ellipsis omitted). That flexibility is even more important when it comes to "[t]he complex[,] subtle, and professional decisions as to the composition … of a military force" committed "always to civilian control" by the "branches of the government which are periodically subject to electoral accountability." *Gilligan*, 413 U.S. at 10.

Third, Plaintiffs dismiss concerns about "unit cohesion," "discipline," and "morale" as a "thinly veiled appeal to bias." ECF No. 55 at 30. But that argument conflicts with both the

RAND Report—which concludes that "unit cohesion" is "a critical input for unit readiness," RAND Report 44—and with ample precedent invoking these considerations in a host of other contexts.[13]  At bottom, Plaintiffs' complaint appears to be that there is no "evidence of deterioration of unit cohesion" in the "more than a year" in which already-serving transgender service members have served openly, but while the military's longstanding accessions policy was in place.  ECF No. 55 at 31.  But that is one of the issues Defendants are currently studying, and it is perfectly reasonable to maintain the long-standing accessions policy while the study continues.

Finally, Plaintiffs offer a new argument for why the accessions policy is the product of "animus"—namely, that former Secretary Carter's proposed change to that policy was "abruptly reversed."  ECF No. 55 at 32.  But almost a month before the President made the statements on Twitter to which the Plaintiffs object, Secretary Mattis "approved a recommendation by the services to defer accessing transgender applicants into the military" until January 1, 2018, so that the services could "review their accession plans and provide input on the impact to the readiness and lethality of our forces."  Department of Defense, Release No. NR-250-17 (June 30, 2017); *see* ECF No. 45 at 6.  The Presidential Memorandum simply extends that deadline indefinitely unless and until there appears a sufficient basis to abandon the longstanding accessions policy.

---

[13] *See, e.g.*, *Weinberger*, 475 U.S. at 507 ("[T]o accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."); *Brown v. Glines*, 444 U.S. 348, 360 (1980) ("[T]he special character of the military requires civilian authorities to accord military commanders some flexibility in dealing with matters that affect internal discipline and morale."); *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 53 (1820) (Story, J.) (invoking "that unity of command and action, on which the success of all military operations must essentially depend"); *Steffan*, 41 F.3d at 686 ("military is entitled to deference with respect to" its views on "military discipline"); *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("[P]laintiff's suggestion that the Judiciary micro-manage advertising selection by military newspapers" would "involve the courts in … assessments of morale, discipline, and unit cohesion that the Supreme Court has indicated are well beyond the competence of judges.").

Presidential Memorandum, § 1(b).  That reasonable, non-disruptive decision to maintain a longstanding policy while the issue is under consideration cannot fairly be characterized as evidence of "a bare desire to harm a disfavored minority group."  ECF No. 55 at 32.

**B.      Plaintiffs Have Failed to State a Due Process Claim.**

In their Amended Complaint, Plaintiffs brought a count under the Due Process Clause of the Fifth Amendment but did not specify whether they were asserting a substantive or procedural due process claim.  *See* ECF No. 9 at 16-17.  In their Opposition, Plaintiffs now assert that they are only bringing a substantive due process claim.  ECF No. 55 at 32-33.  That claim fails, however, because they have not been deprived of a cognizable liberty or properly interest.  *See*, e.g., *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (concluding that the plaintiff's substantive due process claim fails because he "has not alleged facts suggesting he has been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest.").  As Defendants showed in their motion to dismiss, Plaintiffs have not been discharged from the military, denied the right to reenlist, or refused transition-related health care.

*Witt v. Department of the Air Force*, 527 F.3d 806, 819 (9th Cir. 2008), a case that Plaintiffs cite in support of their substantive due process claim, ECF No. 55 at 34, provides a helpful contrast with the facts of this case.  Unlike the Plaintiffs here, the plaintiff in *Witt* brought her substantive due process claim *after* the Air Force initiated discharge proceedings against her. *Witt*, 527 F.3d at 810.  Plaintiffs have not alleged a similarly concrete harm, and their vague and formulaic allegation that Defendants have, somehow, burdened the Plaintiffs' right to autonomy and privacy, ECF No. 9 at ¶100, is insufficient to establish a deprivation of a cognizable liberty or property interest.  The Court should, therefore, dismiss Plaintiffs' substantive due process count for failure to state a claim.

Even if Plaintiffs had suffered the deprivation of a cognizable right or liberty, Plaintiffs' argument that the Court should apply a heightened level of scrutiny, ECF No. 55 at 33-35, is misplaced.  To establish that a heightened level of scrutiny applies, a Plaintiff must provide a "'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  Plaintiffs have not met that burden here.  As mentioned above, Plaintiffs allege only that Defendants have somehow "burden[ed] Plaintiffs' fundamental right to privacy and autonomy."  ECF No. 9 ¶100.  The Supreme Court has counseled, however, that "vague generalities …will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 776 (2003). Plaintiffs have not shown, therefore, that their substantive due process claim would trigger a heightened level of scrutiny.

In any event, the President's decision to maintain the status quo while the military studies the policy on military service by transgender individuals easily passes constitutional muster. ECF No. 45 at 26–27.  And to the extent Plaintiffs raise a substantive due process challenge to the accessions policy, that challenge should be dismissed on the same grounds as their equal protection claim—viz., that policy is constitutional under the highly deferential form of review applied to military policies.  As Plaintiffs acknowledge, the "tests under equal protection and due process 'are almost indistinguishable,'" and there is no apparent reason why their substantive due process challenge should succeed while their equal protection one fails.  ECF No. 55 at 33 (quoting *George Washington Univ. v. Dist. of Columbia*, 391 F. Supp. 2d 109, 114 (D.D.C. 2005)).

## C.        Plaintiffs Have Failed to State an Estoppel Claim.

As also explained in Defendants' motion to dismiss, estoppel does not apply to policy changes by the Federal Government.  ECF 45 at 38.  In their Opposition, Plaintiffs do not refute

this indisputable point but, instead, argue only that "estoppel *can* prevent application of those policies to individuals who reasonably relied on the government to their detriment," ECF No. 55 at 37, and then cite to cases involving isolated instances of promises made by the Government to particular individuals.  *See id.*[14]  But this case is not a challenge to particularized instances of detrimental reliance.  To the contrary, it is a programmatic challenge to the President's directive setting forth his policy decision to further study the issue of military service by transgender individuals, before the military departs from longstanding policies and practices.  Equitable estoppel cannot be used to prevent the Executive Branch from making policy decisions that fall squarely within its discretion.

Even if the doctrine of estoppel applied here, which it does not, Plaintiffs could not satisfy the elements of that claim.  First, contrary to Plaintiffs assertions, nothing in the prior administration's Directive-Type Memorandum suggested that the policies therein would be "immediate and permanent."  ECF No. 55 at 38.  To the contrary, DTM 16-005 provided that it

---

[14] Plaintiffs rely principally on two decisions from the Ninth Circuit, *Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) and *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973), which only further demonstrate the important distinction here.  In *Watkins*, the Ninth Circuit held that estoppel applied where the army had repeatedly let the plaintiff reenlist throughout his fourteen-year military career, despite knowing about his homosexuality and despite the fact that, throughout the entire period, his reenlistment was *contrary* to its longstanding policy that homosexuality was a nonwaivable disqualification for reenlistment at the time.  *Id.*  In applying the doctrine of estoppel to these specific facts, the Court explained that Ninth Circuit law permitted it to apply "estoppel principles to decide a case on its particular facts when the application of a statute or regulation is challenged as to one individual."  *Id.* at 706.  In *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973), the Ninth Circuit found that the United States was estopped from avoiding further payments under a contract, where Defendants had been given erroneous advice by government employees which caused them to enter into and continue under the contract at issue.  *Id.* at 989-90.  That is obviously different from the situation here.

was set to expire on June 30, 2017, and set forth a *future* schedule to figure out how it may be implemented going forward.[15]

Second, Plaintiffs have not relied on DTM 16-005 to their detriment.  As detailed above, under the operative guidance, current service members may not be discriminated against based on their transgender status.  And maintaining the military's longstanding accession policy has not changed the position of any of the Plaintiffs, since all of them are either currently serving in the military or otherwise remain in their respective schools and, thus, currently ineligible for accession.  And, since the President's directive delays relaxation of the accession policy for transgender persons, *pending further study*, the policy may change before any accession policy would apply to the student Plaintiffs at all.

Finally, there is no evidence that Defendants engaged in the extraordinary misconduct necessary to meet the heightened standard for a claim of estoppel against the Government. Plaintiffs' opposition continues to sidestep this requirement, instead merely emphasizing their adamant disagreement with the imagined substance of the future policy.  *See* ECF No. 55 at 39. A change in Government policy cannot be "government misconduct."  Moreover, as detailed above, the Government's decision to maintain the status quo regarding military service by transgender individuals, pending further study of the policies, is reasonable and well-within the discretion of the Executive Branch.  Plaintiffs have, therefore, failed to state a plausible estoppel claim.

---

[15] Defense Department Directive-Type Memorandum 16-005 is available online at: https://www.defense.gov/Portals/1/features/2016/0616_policy/DTM-16-005.pdf (last visited Oct. 20, 2017).

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim upon with relief can be granted.

Dated: October 20, 2017                          Respectfully submitted,

                                                 CHAD A. READLER
                                                 Acting Assistant Attorney General
                                                 Civil Division

                                                 BRETT A. SHUMATE
                                                 Deputy Assistant Attorney General

                                                 JOHN R. GRIFFITHS
                                                 Branch Director

                                                 ANTHONY J. COPPOLINO
                                                 Deputy Director

                                                 */s/ Ryan Parker*
                                                 RYAN B. PARKER
                                                 Senior Trial Counsel
                                                 ANDREW E. CARMICHAEL
                                                 Trial Attorney
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 Telephone: (202) 514-4336
                                                 Email: ryan.parker@usdoj.gov

                                                 Counsel for Defendants