**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 1, *et al*., | |
|     Plaintiffs | |
|        v. | Civil Action No. 17-1597 (CKK) |
| DONALD J. TRUMP, *et al*., | |
|     Defendants | |

**MEMORANDUM OPINION**
(October 30, 2017)

On July 26, 2017, President Donald J. Trump issued a statement via Twitter announcing that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military." A formal Presidential Memorandum followed on August 25, 2017. Before the Presidential Memorandum, the Department of Defense had announced that openly transgender individuals would be allowed to enlist in the military, effective January 1, 2018, and had prohibited the discharge of service members based solely on their gender identities. The Presidential Memorandum reversed these policies. First, the Memorandum indefinitely extends a prohibition against transgender individuals entering the military, a process formally referred to as "accession" (the "Accession Directive"). Second, the Memorandum requires the military to authorize, by no later than March 23, 2018, the discharge of transgender service members (the "Retention Directive").

The Department of Defense is required to submit a plan implementing the directives of the Presidential Memorandum by February 21, 2018. On September 14, 2017, Secretary of Defense James Mattis promulgated Interim Guidance establishing Department of Defense policy toward transgender service members until the directives of the Presidential Memorandum take effect. Pursuant to the Presidential Memorandum and the Interim Guidance, the protections afforded to transgender service members against discharge lapse early next year.

Plaintiffs are current and aspiring service members who are transgender.  Many have years of experience in the military.  Some have decades.  They have been deployed on active duty in Iraq and Afghanistan.  They have and continue to serve with distinction.  All fear that the directives of the Presidential Memorandum will have devastating impacts on their careers and their families.  They have moved the Court to enjoin the directives of the Presidential Memorandum, believing that these directives violate the fundamental guarantees of due process afforded by the Fifth Amendment to the United States Constitution.  Defendants have moved to dismiss this case, principally on the basis that the Court lacks jurisdiction.  Although highly technical, these jurisdictional arguments reduce to a few simple points: the Presidential Memorandum has not effected a definitive change in military policy; rather, that policy is still subject to review; until that review is complete, transgender service members are protected; and any prospective injuries are too speculative to require judicial intervention.

These arguments, while perhaps compelling in the abstract, wither away under scrutiny.  The Memorandum unequivocally directs the military to prohibit indefinitely the accession of transgender individuals and to authorize their discharge.  This decision has already been made.  These directives must be executed by a date certain, and there is no reason to believe that they will not be executed.  Plaintiffs have established that they will be injured by these directives, due both to the inherent inequality they impose, and the risk of discharge and denial of accession that they engender.  Further delay would only serve to harm the Plaintiffs.  Given these circumstances, the Court is in a positon to preliminarily adjudicate the propriety of these directives, and it does so here.

The Court holds that Plaintiffs are likely to succeed on their Fifth Amendment claim.  As a form of government action that classifies people based on their gender identity, and disfavors a

class of historically persecuted and politically powerless individuals, the President's directives are subject to a fairly searching form of scrutiny.  Plaintiffs claim that the President's directives cannot survive such scrutiny because they are not genuinely based on legitimate concerns regarding military effectiveness or budget constraints, but are instead driven by a desire to express disapproval of transgender people generally.  The Court finds that a number of factors— including the sheer breadth of the exclusion ordered by the directives, the unusual circumstances surrounding the President's announcement of them, the fact that the reasons given for them do not appear to be supported by any facts, and the recent rejection of those reasons by the military itself—strongly suggest that Plaintiffs' Fifth Amendment claim is meritorious.

Accordingly, following an exhaustive review of the record, the pleadings,[1] and the relevant authorities, the Court GRANTS-IN-PART and DENIES-IN-PART Plaintiffs' Motion

---

[1] The Court's consideration has focused on the following documents: Pls.' App. for Preliminary Injunction, ECF No. 13 ("Pls.' Mem."); Defs.' Mot. to Dismiss and Opp'n to Pls.' App. for Preliminary Injunction, ECF No. 45 ("Defs.' Mem."); Pls.' Opp'n to Defs.' Mot. to Dismiss and Reply in Support of App. for Preliminary Injunction, ECF No. 55 ("Pls.' Reply"); and Defs.' Reply in Support of Mot. to Dismiss, ECF No. 57 ("Defs.' Reply").  The Court has also considered the declarations attached to these pleadings, including: Decl. of Kevin M. Lamb, ECF No. 13-1 ("Lamb Decl."); Decl. of Brad R. Carson, ECF No. 13-3 ("Carson Decl."); Decl. of Deborah L. James, ECF No. 13-5 ("James Decl."); Decl. of Eric K. Fanning, ECF No. 13-7 ("Fanning Decl."); Decl. of Raymond E. Mabus, Jr., ECF No. 13-9 ("Mabus Decl."); Decl. of George R. Brown, MD, ECF No. 13-11 ("Brown Decl."); Decl. of Margaret C. Wilmoth, ECF No. 13-13 ("Wilmoth Decl."); Decl. of Regan V. Kibby, ECF No. 13-14 ("Kibby Decl."); Decl. of Dylan Kohere, ECF No. 13-15 ("Kohere Decl."); Decl. of Christopher R. Looney, ECF No. 40 ("Looney Decl."); Decl. of Robert B. Chadwick, ECF No. 45-2 ("Chadwick Decl."); Decl. of Robert O. Burns, ECF No. 45-3 ("Burns Decl."); Supp. Decl. of Raymond E. Mabus, Jr., ECF No. 51-1 ("Mabus Supp. Decl."); Supp. Decl. of Deborah L. James, ECF No. 51-2 ("James Supp. Decl."); Supp. Decl. of Eric K. Fanning, ECF No. 51-3 ("Fanning Supp. Decl."); Decl. of Mark J. Eitelberg, ECF No. 51-4 ("Eitelberg Decl."); Supp. Decl. of George R. Brown, MD, ECF No. 51-5 ("Brown Supp. Decl."); Decl. Pertaining to Jane Doe 1, ECF No. 56-1 ("Decl. re Jane Doe 1"); Decl. Pertaining to Jane Doe 2, ECF No. 56-2 ("Decl. re Jane Doe 2"); Decl. Pertaining to Jane Doe 3, ECF No. 56-3 ("Decl. re Jane Doe 3"); Decl. Pertaining to Jane Doe 4, ECF No. 56-4 ("Decl. re Jane Doe 4"); Decl. Pertaining to Jane Doe 5, ECF No. 56-5 ("Decl. re Jane Doe 5"); Decl. Pertaining to John Doe 1, ECF No. 56-6 ("Decl. re John Doe 1").

for Preliminary Injunction.  Defendants shall be preliminarily enjoined from enforcing the Accession and Retention Directives, corresponding with sections 1(b) and 2(a) of the Presidential Memorandum, until further order of the Court or until this case is resolved.  The effect of the Court's Order is to revert to the *status quo* with regard to accession and retention that existed before the issuance of the Presidential Memorandum—that is, the retention and accession policies established in a June 30, 2016 Directive-type Memorandum and later modified by Secretary of Defense James Mattis on June 30, 2017.

The Court also GRANTS-IN-PART and DENIES-IN-PART Defendants' Motion to Dismiss.  The Court has jurisdiction over and reaches the merits of Plaintiffs' Fifth Amendment claim as it pertains to the Accession and Retention Directives.  Plaintiffs have also challenged the Presidential Memorandum's prohibition against the expenditure of military resources on sex reassignment surgeries.  Because no Plaintiff has established a likelihood of being impacted by that prohibition, the Court lacks jurisdiction to adjudicate the propriety of this directive.  Finally, Plaintiffs have also claimed relief under a theory of estoppel.  At this time, that claim will be dismissed without prejudice because the Amended Complaint lacks allegations of the sort of particularized representations, reliance, or government misconduct that could justify estoppel against the government.  Plaintiffs may file a further amended complaint with respect to estoppel.

---

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

# I. BACKGROUND

## A.  The Military's Policy Toward Transgender Service

### 1.  Military Policy Prior to 2014

*Accession*

Prior to 2014, Department of Defense Instruction ("DODI") 6130.03 "contain[ed] a list of disqualifying physical and mental conditions that preclude[d] applicants from joining the military . . . ."  Lamb Decl., Ex. B (Palm Center Report of the Transgender Service Commission), at 7.  Disqualifying conditions included "defects of the genitalia including but not limited to change of sex," and "[c]urrent or history of psychosexual conditions, including but not limited to transsexualism, . . . transvestism, . . . and other paraphilias."  *Id.*; *see also* Defs.' Mem. at 4 ("For decades, [disqualifying] conditions [under DODI 6130.03] have included 'transsexualism.'").

DODI 6130.03 also requires that the "Secretaries of the Military Departments and Commandant of the Coast Guard shall . . . [a]uthorize the waiver of the standards in individual cases for applicable reasons and ensure uniform waiver determinations."  Lamb Decl., Ex. B, at 7.  Service-specific implementing rules set forth the waiver process for each branch of the military.  For example, under the applicable Army regulations, "[e]xaminees initially reported as medically unacceptable by reason of medical unfitness . . . may request a waiver of the medical fitness standards in accordance with the basic administrative directive governing the personnel action."  Army Reg. 40-501 (Standards of Medical Fitness), ¶ 1-6(b); *see also* Lamb Decl., Ex. B, at 7.  Although Defendants contend that transgender-related conditions were and remain subject to waiver, *see* Defs.' Mem. at 4, evidence in the record suggests otherwise.  At least under the pertinent regulations as they existed prior to 2014, "because some conditions related to

transgender identity [were] grounds for discharge, and because recruiters [could not] waive a condition upon enlistment that would be disqualifying for retention, transgender individuals [could not] obtain medical waivers for entrance into the military."  Lamb Decl., Ex. B, at 8.  A March 2014 report was unable to find "any instances in which transgender-related conditions have been waived for accession[,]" *id.*, and Defendants have adduced no evidence of waivers ever being granted for this purpose.

*Retention*

Pertinent regulations prior to 2014 also appear to have provided military commanders with discretion to separate enlisted personnel for transgender-related conditions.  In particular, DODI 1332.14, which "controls administrative separations for enlisted persons," provided that a "service member may be separated for the convenience of the government and at the discretion of a commander for 'other designated physical or mental conditions,' a category defined to include 'sexual gender and identity disorders.'"  Lamb Decl., Ex. B, at 8.  Furthermore, DODI 1332.38, "which contains rules for retiring or separating service members because of physical disability" provided that "service members with conditions 'not constituting a physical disability' . . . can be separated administratively from military service at a commander's discretion, without the opportunity to demonstrate medical fitness for duty or eligibility for disability compensation."  *Id.*  This category of conditions, under prior iterations of the instruction, included "Sexual Gender and Identity Disorders, including Sexual Dysfunctions and Paraphilias."  *Id*.

### 2.  August 2014 Regulation and July 28, 2015 Memorandum

At least with respect to retention, changes to this regulatory scheme were first enacted in August 2014, when "the Department of Defense issued a new regulation, DODI 1332.18,

*Disability Evaluation System* (DES)."  Fanning Decl. ¶ 12.  According to Former Secretary of the Army Eric K. Fanning and Former Secretary of the Air Force Deborah Lee James, the new regulation

> eliminated a DoD-wide list of conditions that would disqualify persons from retention in military service, including the categorical ban on open service by transgender persons. This new regulation instructed each branch of the Armed Forces to reassess whether disqualification based on these conditions, including the ban on service by transgender persons, was justified. *As of August 2014, there was no longer a DoD-wide position on whether transgender persons should be disqualified for retention.*

*Id.* (emphasis added); James Decl. ¶ 8.

Subsequently, on July 28, 2015, then-Secretary of Defense Ash Carter issued a memorandum to the secretaries of the military departments directing that "[e]ffective as of July 13, 2015, no Service member shall be involuntarily separated or denied reenlistment or continuation of active or reserve service on the basis of their gender identity, without the personal approval of the Under Secretary of Defense for Personnel and Readiness."  Carson Decl., Ex. A.  The memorandum further ordered the Undersecretary of Defense for Personnel and Readiness to "chair a working group composed of senior representatives from each of the Military Departments, Joint Staff, and relevant components from the Office of the Secretary of Defense to formulate policy options for the DoD regarding the military service of transgender Service members."  *Id.*

### 3.  The Working Group and the RAND Report

The working group convened by the Undersecretary ("the Working Group") consisted of senior uniformed officers and senior civilian officers from each department of the military. Carson Decl. ¶ 9.  The Working Group sought to identify any possible issues related to open military service of transgender individuals.  *Id.* ¶ 22.  It considered a broad range of information

provided by senior military personnel, various types of experts, health insurance companies, civilian employers, transgender service members themselves, and representatives from the militaries of other nations who allow open service by transgender people.  *Id.* ¶ 10.  Finally, the Working Group commissioned the RAND Corporation's National Defense Research Institute to conduct a study on the impact of permitting transgender service members to serve openly.  *Id.* ¶ 11.  RAND is a nonprofit research institution that provides research and analysis to the Armed Services.  *Id.*

The RAND Corporation subsequently issued a 91-page report entitled "Assessing the Implications of Allowing Transgender Personnel to Serve Openly."  Carson Decl., Ex. B ("RAND Report").  The RAND Report found no evidence that allowing transgender individuals to serve would have any effect on "unit cohesion," and concluded that any related costs or impacts on readiness would be "exceedingly small," "marginal" or "negligible."  *Id.* at xi–xii, 39–47, 69–70.  The RAND Report also found that "[i]n no case" where foreign militaries have allowed transgender individuals to serve "was there any evidence of an effect on the operational effectiveness, operational readiness, or cohesion of the force."  *Id.* at xiii.

Based on all of the information it collected, the Working Group unanimously concluded that transgender people should be allowed to serve openly in the military.  Not only did the group conclude that allowing transgender people to serve would not significantly affect military readiness or costs, it found that *prohibiting* transgender people from serving undermines military effectiveness and readiness because it excludes qualified individuals on a basis that has no

relevance to one's fitness to serve, and creates unexpected vacancies requiring expensive and time-consuming recruitment and training of replacements.[2]

The Working Group communicated its conclusion to the Secretary of Defense, along with detailed recommendations for policies and procedures for open transgender service.

### 4.  June 30, 2016 Directive-Type Memorandum 16-005

On June 30, 2016, the Secretary of Defense Ash Carter issued a Directive-type Memorandum ("DTM") establishing a policy, assigning responsibilities, and prescribing procedures for "the retention, accession, separation, in-service transition and medical coverage for transgender personnel serving in the Military Services."  James Decl., Ex. B, at 1.  The DTM took effect immediately.  *Id.*  In the DTM, the Secretary of Defense stated his conclusion that open service by transgender Americans was "consistent with military readiness and with strength

---

[2] *See generally* Carson Decl. ¶¶ 26–27 ("The Working Group . . . concluded that banning service by openly transgender persons would harm the military" and "unanimously resolved that transgender personnel should be permitted to serve openly in the military."); James Decl. ¶ 22 ("The Working Group did not find that permitting transgender soldiers to serve would impose any significant costs or have a negative impact on military effectiveness or readiness," but did find "that barring transgender people from military service causes significant harms to the military, including arbitrarily excluding potential qualified recruits based on a characteristic with no relevance to their ability to serve."); Fanning Decl. ¶¶ 25–26 ("At the conclusion of its discussion and analysis, the members of the Working Group did not identify any basis for a blanket prohibition on open military service of transgender people. Likewise, no one suggested to me that a bar on military service by transgender persons was necessary for any reason, including readiness or unit cohesion. The Working Group communicated its conclusions to the Secretary of Defense, including that permitting transgender people to serve openly in the United States military would not pose any significant costs or risks to readiness, unit cohesion, morale, or good order and discipline."); Mabus Decl. ¶ 21 (stating that "all members of the Working Group . . . expressed their agreement that transgender people should be permitted to serve openly in the United States Armed Forces" and that "President Trump's stated rationales for reversing the policy and banning military service by transgender people make no sense," "have no basis in fact and are refuted by the comprehensive analysis of relevant data and information that was carefully, thoroughly, and deliberately conducted by the Working Group"); Wilmoth Decl. ¶ 23 ("The Working Group concluded that there were no barriers that should prevent transgender service members from serving openly in the military.").

through diversity." *Id*. at 2.  Accordingly, the DTM stated that it was the policy of the Department of Defense that "service in the United States military should be open to all who can meet the rigorous standards for military service and readiness" and that, "consistent with the policies and procedures set forth in [the DTM], transgender individuals shall be allowed to serve in the military." *Id*.

*Retention*

The DTM set forth procedures for the retention and accession of transgender military service members.  It stated that "[e]ffective immediately, no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity," or on their "expressed intent to transition genders." James Decl., Ex. B, Attach. (Procedures), at 1.  The DTM stated that "Transgender Service members will be subject to the same standards as any other Service member of the same gender; they may be separated, discharged, or denied reenlistment or continuation of service under existing processes and basis, but not due solely to their gender identity or an expressed intent to transition genders." *Id*.

*Accession*

With respect to accession procedures, the DTM stated that by no later than July 1, 2017, DODI 6130.03 would be updated to allow for the accession of (i) individuals with gender dysphoria, (ii) individuals that have received medical treatment for gender transition, and (iii) individuals that have undergone sex reassignment surgeries.  *Id*. at 1–2.  The policies and procedures generally provided that these conditions would be disqualifying *unless* the acceding service member was medically stable in their chosen gender for at least 18 months.  *Id*.  The DTM also provided that, effective October 1, 2016, the Department of Defense would

"implement a construct by which transgender Service members may transition gender while serving."  *Id*. at 2.

*Equal Opportunity*

Finally, the DTM stated that it is "the Department's position, consistent with the U.S. Attorney General's opinion, that discrimination based on gender identity is a form of sex discrimination."  *Id*. at 2.

### 5.  June 30, 2016 Remarks by Secretary of Defense Ash Carter

On June 30, 2016, then-Secretary of Defense Ash Carter announced from the Pentagon briefing room that "we are ending the ban on transgender Americans in the United States military."  Lamb Decl., Ex. F.  He stated that "[e]ffective immediately, transgender Americans may serve openly, and they can no longer be discharged or otherwise separated from the military just for being transgender."  *Id.*  Secretary Carter also announced that he had "directed that the gender identity of an otherwise qualified individual will not bar them from military service, or from any accession program."  *Id.*  The Secretary stated that on June 30, 2017, after a year-long implementation period, "the military services will begin acceding transgender individuals who meet all standards—holding them to the same physical and mental fitness standards as everyone else who wants to join the military."  *Id.*

Secretary Carter gave three reasons for the Department's decision.  First, he stated that "the Defense Department and the military need to avail ourselves of all talent possible in order to remain what we are now—the finest fighting force the world has ever known."  *Id*.  He added that "[w]e invest hundreds of thousands of dollars to train and develop each individual, and we want to take the opportunity to retain people whose talent we've invested in and who have proven themselves."  *Id*.  Second, he stated that "the reality is that we have transgender service

members serving in uniform today," and they and their commanders need "clearer and more consistent guidance than is provided by current policies."  *Id.*  And third, he stated that, as a matter of principle, "Americans who want to serve and can meet our standards should be afforded the opportunity to come to do so."  *Id.*

### 6. September 30, 2016 Publication of "Transgender Service in the U.S. Military: An Implementation Handbook" and Military Department Policies

Consistent with the directives of Secretary Carter in his July 2015 memorandum and June 2016 memorandum and policy announcement, Acting Undersecretary of Defense for Personnel and Readiness Peter Levine published an "implementation handbook" entitled "Transgender Service in the U.S. Military."  Mabus Decl., Ex. F; *see also* James Decl., Ex. D.  The document was "the product of broad collaboration among the Services" and was intended to serve as a "practical day-to-day guide" to assist Service members and commanders to understand and implement the policy of open transgender military service.  James Decl., ¶ 34.  The handbook is a lengthy, exhaustive document, providing an explanation of the basics of what it means to be transgender and to undergo gender transition; guidance on how transgender service members can request an in-service transition and communicate with their leadership about their transition process; and guidance for commanders interacting with transgender service members.  It also includes extensive question-and-answer and hypothetical scenario sections, as well as a "roadmap" for gender transition for military personnel.

Individual implementing memoranda were subsequently issued by the branches of the Armed Forces.  On November 4, 2016, the Secretary of the Navy issued SECNAV Instruction 1000.11, the stated purpose of which was to "establish Department of Navy . . . policy for the accession and service of transgender Sailors and Marines, to include the process for transgender Service Members to transition gender in-service."  Mabus Decl., Ex. D, at 1.  The memorandum

stated that "transgender individual shall be allowed to serve openly in the [Department of the Navy]." *Id*. at 2.

The Air Force issued a Policy Memorandum on October 6, 2016, which stated that "[i]t is Air Force policy that service in the United States Air Force should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies set forth in this memorandum, transgender individuals shall be allowed to serve in the Air Force." James Decl., Ex. C.

The Army issued Directive 2016-30 (Army Policy on Military Service of Transgender Soldiers) on July 1, 2016. Fanning Decl., Ex. D. The Directive stated that

> it is Army policy to allow open service by transgender Soldiers. The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender. An otherwise qualified Soldier shall not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity.

*Id*. at 1.

Army Directive 2016-35 was promulgated on October 7, 2016. Fanning Decl., Ex. E. It stated that "The Army allows transgender Soldiers to serve openly." *Id*. at 1.

### 7. June 30, 2017 Press Release by Secretary James Mattis

On June 30, 2017, Secretary of Defense James Mattis deferred acceding transgender applicants into the military until January 1, 2018, stating that the "services will review their accession plans and provide input on the impact to the readiness and lethality of our forces." Lamb Decl., Ex. C.

### 8.   July 26, 2017 Statement by President Donald J. Trump

On July 26, 2017, President Donald J. Trump issued a statement via Twitter, in which he

announced that[3]



---

[3] The full text reads: "After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail.  Thank you."  Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2017, 5:55 AM), https://twitter.com/realDonaldTrump/status/890193981585444864; Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2017, 6:04 AM), https://twitter.com/realDonaldTrump/status/890196164313833472; Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2017, 6:08 AM), https://twitter.com/realDonaldTrump/status/890197095151546369.

### 9. August 25, 2017 Presidential Memorandum

On August 25, 2017, President Trump issued a memorandum entitled "Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security." Lamb Decl., Ex. A (the "Presidential Memorandum"). The memorandum begins by stating that until "June 2016, the Department of Defense (DoD) and the Department of Homeland Security (DHS) (collectively, the Departments) generally prohibited openly transgender individuals from accession into the United States military and authorized the discharge of such individuals." Presidential Memorandum § 1(a). According to the memorandum, "[s]hortly before President Obama left office, . . . his Administration dismantled the Departments' established framework by permitting transgender individuals to serve openly in the military, authorizing the use of the Departments' resources to fund sex-reassignment surgical procedures, and permitting accession of such individuals after July 1, 2017." *Id*. The President stated that "the previous Administration failed to identify a sufficient basis to conclude that terminating the Departments' longstanding policy and practice would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and there remain meaningful concerns that further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects." *Id*.

The memorandum has two operative sections, one general, and the other more specific. Section 1(b) directs "the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016 until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice would not have the negative effects discussed above." *Id*. § 1(b). As already stated, the memorandum

defines the pre-June 2016 policy as one under which the military "generally prohibited openly transgender individuals from accession into the United States military and authorized the discharge of such individuals." *Id*. § 1(a). The directive set forth in section 1(b) takes effect on March 23, 2018. *Id*. § 3. The memorandum provides that the "Secretary of Defense, after consulting with the Secretary of Homeland Security, may advise [the President] at any time, in writing, that a change to this policy is warranted." *Id*. § 1(b).

Section 2 contains two specific directives to the Secretary of Defense and the Secretary of Homeland Security. First, section 2(a) directs the Secretaries to "maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018, until such time as the Secretary of Defense, after consulting with the Secretary of Homeland Security, provides a recommendation to the contrary that [the President finds] convincing . . . ." *Id*. § 2(a). This section takes effect on January 1, 2018. *Id*.

Second, section 2(b) directs the Secretaries to "halt all use of DoD or DHS resources to fund sex reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." *Id*. § 2(b). This section, like section 1(b), takes effect on March 23, 2018. *Id* § 3.

By February 21, 2018, the Secretaries must submit a plan to the President "for implementing both the general policy set forth in section 1(b) of this memorandum and the specific directives set forth in section 2 of this memorandum." *Id*. § 3. This implementation plan must "determine how to address transgender individuals currently serving in the United States military." *Id*. Until that determination is made—and it must be made as part of the implementation plan, which must be submitted by February 21, 2018—"no action may be taken against such individuals under the policy set forth in section 1(b) of this memorandum." *Id*.

That is, only after February 21, 2018, may the Secretaries take actions toward reverting to the pre-June 2016 policy, which by the terms of the memorandum is a policy under which the military "generally prohibited openly transgender individuals from accession into the United States military and authorized the discharge of such individuals." *Id*. § 1(a).

*Retention Directive*

In sum, by March 23, 2018, the Secretaries *are required* by the plain text of the President's directive to revert to a policy under which the military "authorized the discharge of [transgender] individuals." *Id*. §§ 1(a), 1(b), 3. The protections of the memorandum with respect to discharge and other adverse action expire on February 21, 2018. *Id*. § 3.

*Accession Directive*

With respect to accession, the memorandum indefinitely delays the implementation of the accession policy of the June 2016 DTM, which was previously set for implementation on January 1, 2018, and by March 23, 2018, requires the Secretaries to revert to a policy by which the military "generally prohibit[s] openly transgender individuals from accession . . . ." *Id*. §§ 1(a), 1(b), 2(a), 3.

**10. August 29, 2017 Statement by Secretary Mattis**

On August 29, 2017, Secretary Mattis issued a statement concerning the Presidential Memorandum. Lamb Decl., Ex. D. He wrote that "[t]he [Department of Defense] will carry out the president's policy direction, in consultation with the Department of Homeland Security," and that "[a]s directed," the Department of Defense will "develop a study and implementation plan, which will contain the steps that will promote military readiness, lethality, and unit cohesion, with due regard to budgetary constraints and consistent with applicable law." *Id.* The plan, Secretary Mattis wrote, "will address accessions of transgender individuals and transgender

17

individuals currently serving in the United States military." *Id.*  Secretary Mattis stated that he

would "establish a panel of experts serving within the Departments of Defense and Homeland

Security to provide advice and recommendations on the implementation of the president's

direction." *Id.*  After the "panel reports its recommendations and following . . . consultation with

the secretary of Homeland Security," Secretary Mattis "will provide [his] advice to the president

concerning implementation of his policy direction." *Id.*  In the interim, "current policy with

respect to currently serving members will remain in place." *Id.*

### 11. September 14, 2017 Interim Guidance

On September 14, 2017, Secretary Mattis issued interim guidance that took "effect

immediately and will remain in effect until [he] promulgate[s] DoD's final policy in this matter."

Defs.' Mem., ECF No. 45, Ex. 1 ("Interim Guidance").  The Interim Guidance states that "[n]ot

later than February 21, 2018, [Secretary Mattis] will present the President with a plan to

implement the policy and directives in the Presidential Memorandum." *Id*. at 1.  The

"implementation plan will establish the policy, standards and procedures for transgender

individuals serving in the military." *Id*.

*Accession*

With respect to accession, the Interim Guidance provides that the procedures previously

set forth in a 2010 policy instruction, "which generally prohibit the accession of transgender

individuals into the Military Services, remain in effect . . . ." *Id*. at 2.

*Medical Care and Treatment*

With respect to medical care and treatment, the Interim Guidance provides that "[s]ervice

members who receive a gender dysphoria diagnosis from a military medical provider will be

provided treatment for the diagnosed medical condition," but that "no new sex reassignment

surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." *Id.*

*Retention*

With respect to the separation or retention of transgender service members, the Interim Guidance provides that "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, *may*, at the Service member's request, be re-enlisted in service under existing procedures." *Id.* (emphasis in original).

Finally, the Interim Guidance states that "[a]s directed by the [Presidential] Memorandum, no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status." *Id.*

## B. The Plaintiffs

### 1. Jane Doe 1

Plaintiff Jane Doe 1 has served in the Coast Guard since 2003.  Looney Decl., Ex. A ("Redacted Jane Doe 1 Decl."), ¶ 1.  Jane Doe 1 is transgender.  The Coast Guard has made a substantial investment in educating and training Jane Doe 1, and she has done her "best to be hardworking, faithful, and loyal to the Coast Guard." *Id.* ¶ 11.  She is married and is the primary wage earner for her family.  She and her spouse receive health insurance coverage, called TRICARE, based on her enlisted status. *Id.* ¶ 12.  When she came to the realization of her transgender identity, Jane Doe 1, with her spouse's support, sought professional help. *Id.* ¶ 14.  She paid for this help herself, fearing that she may be separated from the Coast Guard if she went through military health channels. *Id.*  She was diagnosed with gender dysphoria and has

received medical treatment for this condition. *Id.* ¶ 15. However, because TRICARE does not provide comprehensive gender transition healthcare, following the issuance of the June 2016 DTM, she was required to obtain waivers from the Defense Health Agency to obtain treatment. Because this process often led to delays, Jane Doe 1 has continued to pay for her care herself, including surgical care. *Id.* ¶ 21.

Following the President's statement regarding transgender service members, issued via Twitter, Commandant of the Coast Guard Paul F. Zukunft stated, with respect to transgender service members, that "[w]e have made an investment in you and you have made an investment in the Coast Guard and I will not break faith." *Id.* ¶ 23.

According to Jane Doe 1, the Presidential Memorandum has disrupted her medical care, and has had "serious consequences for [her] financial future." *Id.* ¶¶ 29–30. For one, separation from the Coast Guard would mean loss of substantial pension benefits, and health insurance for her and her family. *Id.* ¶¶ 30–31. Separation also means the loss of "a central part of [her] identity." *Id.* ¶ 36. In her own words: "As much as the Coast Guard has invested in me, I have invested in the Coast Guard. I love serving, . . . I had expected to continue serving as a Coast Guard officer for many years." *Id.*

**2. Jane Doe 2**

Jane Doe 2 joined the Army National Guard in 2003, when she was 17. Looney Decl., Ex. B ("Redacted Jane Doe 2 Decl."), ¶ 3. She met her wife while serving, who soon became pregnant. Jane Doe 2 then "made the decision to go on active duty with the U.S. Army so [she] could obtain health care benefits to support [her] growing family." *Id.* ¶ 5. She now has three children. *Id.* While on active duty, she served in South Korea and was deployed to Kandahar in Afghanistan. *Id.* ¶ 7.

During active duty, Jane Doe 2 came out to her wife as transgender. *Id.* ¶ 9. She felt more connected to her wife and she stopped drinking. *Id.* After the Department of Defense promulgated new regulations in late 2015, she made a public post on Facebook stating that she was transgender. Redacted Jane Doe 2 Decl. ¶ 10. Her company commander was very supportive. *Id.* ¶ 11. She began to see an Army therapist, and following the June 2016 DTM, she obtained a formal gender dysphoria diagnosis which permitted her to receive transition treatment from military healthcare providers, and she began receiving hormone treatment. *Id.* ¶ 13.

Following the President's statement and the Presidential Memorandum, Jane Doe 2 believes that she has received an unfavorable work detail to keep her "separated from the rest of [her] unit because [she is] transgender and because of the President's ban, as [she] never had any problems with this kind of treatment in [her] old unit and [does] not know of any other reason [why] she would be treated this way." *Id.* ¶ 15. She also fears the loss of retirement benefits, which accrue following 20 years of service, and access to "health care services for [her] family on base." *Id.* ¶ 16. She has already accrued 12 to 13 years of service toward these benefits. *Id.* ¶¶ 16, 18. The directives of the Presidential Memorandum have "left [her] feeling excluded, and it hurts [her] that people like [her] are being singled out and told that [they] aren't good enough to serve our country based on a characteristic that has no relevance at all to our abilities or fitness to serve." *Id.* ¶ 19.

Jane Doe 2 "loves this country and [has] served it faithfully and well." *Id.* For her, to "be told that [she is] no longer worthy to serve is a terrible blow. It affects how [she sees herself] . . . ." *Id.* "All [she wants] is to be allowed to serve [her] country and to be evaluated based on [her] job performance rather than on [her] status as a transgender person." *Id.* ¶ 20.

### 3. Jane Doe 3

Jane Doe 3 serves in the Army. After completing her basic training, she was deployed to Afghanistan for six months. Looney Decl., Ex. C ("Redacted Jane Doe 3 Decl."), ¶ 4. She is currently scheduled to deploy again to Iraq, where she will be going as a team leader, with soldiers reporting to her. *Id.* ¶ 6.

Jane Doe 3 has received a gender dysphoria diagnosis from an Army therapist. *Id.* ¶ 7. Although she has developed a transition plan in coordination with medical professionals, she has not begun any of the treatment steps, which include surgery. *Id.* ¶ 9.

Before the President's statement regarding transgender individuals, Jane Doe 3 "had not come out to anyone in [her] chain of command." *Id.* ¶ 10. However, after the statement, she had a conversation with her company commander, believing that she would receive support based on the June 2016 DTM. *Id.* She told her company commander that she was worried that she would not be deployed, and that she was committed to being deployed. *Id.*

The commander was not supportive—expressing shock and surprise—but she has received support from her squad leader, the platoon sergeant, and another friend in her unit. *Id.* ¶ 11. Since that conversation, she has continued to prepare for deployment, with the understanding that she will not be able to begin her treatment until she returns. *Id.* ¶ 12. In her words, she "will not put [her] personal needs ahead of the needs of the mission and [her] fellow soldiers." *Id.*

Jane Doe 3 has "not told anyone else at [her] rank or below that [she] is transgender." *Id.* ¶ 15. As a result, she "was able to hear an unfiltered reaction to the President's announcement right after he tweeted it." *Id.* "Some made ugly remarks about transgender service members, while others remarked [that] people who kill transgender people should not be punished." *Id.*

According to Jane Doe 3, after "the tweets, people seemed emboldened to express hostility to transgender people." *Id*. ¶ 15.

### 4. Jane Doe 4

Jane Doe 4 serves in the Army National Guard, but was previously on active duty with the Army. After basic training, she served in South Korea, and subsequently served a tour in Iraq after the 9/11 terrorist attacks. Looney Decl., Ex. D ("Redacted Jane Doe 4 Decl."), ¶¶ 5–6. After she returned from Iraq, Jane Doe 4 enlisted in the Army National Guard, and then joined the Active Guard Reserve. *Id*. ¶ 7. In that capacity, she has been employed as a specialist by the Department of Defense. *Id*. ¶ 10.

Following the June 2016 DTM, Jane Doe 4 decided to come out as transgender to her chain of command. *Id*. ¶ 13. She first spoke to the senior non-commissioned officer of her unit, who said she supported her decision "100%." She then spoke with her commanding officer, a Major, "who acknowledged that he was not very knowledgeable about the experiences of transgender people, but told [her] that he and the rest of [her] unit would support and work with [her] through the process . . . ." *Id*. According to Jane Doe 4, the "change in policy allowing transgender soldiers to serve openly . . . changed [her] life in the military." *Id*. ¶ 14. Her "fellow soldiers in [her] unit and [her] senior leaders . . . told [her] that they . . . noticed how much happier [she was]." *Id*.

The President's statement regarding transgender service members has been "devastating" to her, making her feel "ashamed" and "deeply saddened that he was ordering the Army, which [she] had been a part of for so long and which [she] loved so much, to stop treating [her] with respect." *Id*. ¶ 15. She "went to work each day wondering whether [she] would be discharged,

not because of any problem with [her] job performance or [her] commitment to serve this country, but solely because of [her] gender identity." *Id.*

Jane Doe 4 reenlisted effective August 24, 2017, and has extended her commitment to the Army until February 2020. *See* Defs.' Mem. at 11 (citing Sealed Decl. relating to Jane Doe 4, ECF No. 56-4).

### 5. Jane Doe 5

"Jane Doe 5 has been an active duty member of the United States Air Force for nearly twenty years, serving multiple tours of duty abroad, including two in Iraq." Am. Compl., ECF No. 9, ¶ 30. After June 2016, she notified her superiors that she is transgender. *Id.* ¶ 31. Her "livelihood depends on her military service[,]" and "[s]eparation from the military w[ould] have devastating financial and emotional consequences for her." *Id.* ¶ 32.

### 6. John Doe 1

John Doe 1 serves in the Army. His family has "a proud history of serving in the Armed Forces." Looney Decl., Ex. E ("Redacted John Doe 1 Decl."), ¶ 3. His great grandfather served in Europe in World War II. *Id.* His father served in the Air Force and was awarded the Bronze Star for valor. His uncle was a United States Marine who was wounded and paralyzed by an improvised explosive during Operation Desert Storm. His aunt served in the military as well. *Id.* John Doe 1 has idolized military service since childhood. *Id.*

John Doe 1 entered college on a full academic scholarship. *Id.* ¶ 4. After graduating magna cum laude, he entered the Army Reserve Officers' Training Corps ("ROTC") program while pursuing a master's degree. *Id.* ¶ 5. His fellow cadets in the program knew that he was transgender and were supportive, and his superiors were generally supportive as well. *Id.* ¶ 6. He was ranked third in his ROTC class, and was allowed to wear a male dress uniform as part of

his duties for the ROTC Color Guard. *Id.* ¶ 6. While serving in the ROTC program, John Doe 1 also joined the National Guard. *Id.* ¶ 7. He met his future wife, with whom he has a two-year-old son. *Id.* ¶ 9. He graduated in the top 20% of his ROTC class. *Id.* ¶ 12.

Following the June 2016 DTM, John Doe 1 began training at the Basic Officer Leadership Course ("BOLC"), at which time he came out to his platoon instructors, who were very supportive and treated him as male despite his official gender designation. *Id.* ¶¶ 14–15. After the BOLC, John Doe 1 was stationed as the executive officer for his unit, performing administrative tasks on behalf of and reporting directly to his commanding officer. *Id.* ¶ 16. He serves as both the maintenance and supply officer for his unit. *Id.* He is also in charge of preparing his unit for deployment. *Id.* Until recently, John Doe 1 was preparing to deploy to the Middle East with his unit in mid-2018. *Id*; Am. Compl. ¶ 33.

During his first meeting with his commanding officer, John Doe 1 came out as transgender. Redacted John Doe 1 Decl. ¶ 17. He stressed that his "first priority was being a solider, and that in crafting an approved plan for medical treatment under the new policy, it was extremely important to [him] to make sure that [his] plan would not interfere with [his] duties." *Id.* Both his company and battalion commanders have been very supportive "beyond [his] greatest expectations." *Id.*

John Doe 1 has received an approved treatment plan, which includes a planned surgery. The surgery was "encouraged and supported by [his] command team at every level up to and including [his] Brigade Commander." *Id.* ¶ 18. His official gender designation has been changed to male. *Id.* ¶ 19. John Doe 1 is scheduled for transition-related surgery on January 4, 2018. Defs.' Mem. at 11 (citing Sealed Declaration relating to John Doe 1).

John Doe 1 has been "devastated by the President's cancellation of the policy [he] had relied upon to notify command of the fact that [he is] transgender and to take steps forward in treatment for gender transition."  Redacted John Doe 1 Decl. ¶ 26.  If he is discharged, he fears serious financial and medical consequences for him and his family.  *Id*. ¶¶ 27–28.

### 7.  Regan Kibby

Plaintiff Regan Kibby is a 19-year-old midshipman at the United States Naval Academy. Kibby Decl. ¶ 1.  Kibby's father served in the Navy, and Kibby has wanted to follow in his footsteps from an early age.  *Id.* ¶¶ 2–3.  He spent his summers in high school attending seminars at military academies.  *Id.* ¶ 5.  Despite being accepted with full scholarships to other schools, Kibby immediately decided to enroll at the Naval Academy when he was accepted.  *Id.* ¶¶ 7–8. He has now successfully completed his first two years of school and hopes to become a Surface Warfare Officer in the Navy after graduation.  *Id.* ¶ 9.

Kibby is transgender.  *Id.* ¶ 1.  After Secretary of Defense Carter announced that transgender people could not be separated on the basis of their gender identity during his first year at the Naval Academy, Kibby began to come out.  *Id.* ¶¶ 13–14.  Kibby's Company Officer was very accepting and supportive, and put Kibby in contact with the Brigade Medical Officer to begin the process of preparing a medical treatment plan.  *Id.* ¶¶ 16–19.  The first step was to receive an official diagnosis, which Kibby did.  *Id.* ¶ 20.

Working with the Brigade Medical Officer, Kibby determined that in order to comply with the 18 month stability requirement of the recently announced accession policy for transgender service members, he would have to take a year off from the Naval Academy to ensure that he had completed his transition plan prior to graduating and acceding.  *Id.* ¶ 24.  His Commandant and the Superintendent officially approved Kibby's medical transition plan and his

26

request for a year-long medical leave of absence. *Id.* ¶ 26. Kibby is now on medical leave undergoing his medical transition and plans to return to the Academy in the fall of 2018. *Id.* ¶ 28.

When Plaintiff Kibby saw the President's Tweet he "was devastated" and felt that "[t]he entire future [he] had been planning for [himself] was crumbling around [him]." *Id.* ¶ 31. When Kibby came out, he was relying on the recent pronouncements by the Secretary of Defense and the Navy that he would be able to enlist despite being transgender. *Id.* ¶ 33. He is now living in a state of uncertainty and great distress because if the Presidential Memorandum is allowed to stand, he will never be able to serve in the Armed Forces—something he has strived for since he was a child. *Id.* ¶¶ 33–34.

### 8. Dylan Kohere

Plaintiff Dylan Kohere is an 18-year-old student and member of the Army ROTC at the University of New Haven. Kohere Decl. ¶ 1. Both of Dylan's grandfathers served in the military, and Dylan has wanted to serve since he was a young child. *Id.* ¶ 2. He entered the ROTC program to obtain the career opportunities that come with being a commissioned officer. *Id.* ¶ 2.

Dylan is transgender, and has come out as such to his Sergeant. *Id.* ¶ 9. He has started to work with medical professionals to begin a treatment plan for his transition. *Id.* ¶ 10. When the President declared on Twitter that transgender service members would no longer be allowed to serve in the military in any capacity, Dylan felt that the plan he had made for his life had been "thrown out the window." *Id.* ¶¶ 12–13. He had come out as transgender in the ROTC in reliance on the military's announcement that transgender people could serve openly. *Id.* ¶¶ 11, 15. He feels disheartened that if the Presidential Memorandum remains in force, he will "be

denied an opportunity to serve based on something that has nothing to do with [his] ability or performance." *Id.* ¶ 15.  If he is prevented from serving or completing ROTC because of his transgender status, he will lose educational and career opportunities, as well as the opportunity to apply for an ROTC scholarship.  *Id.* ¶ 18.[4]

## II. LEGAL STANDARDS

### A.  Motion to Dismiss for Lack of Jurisdiction

When a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) is filed, a federal court is required to ensure that it has "the 'statutory or constitutional power to adjudicate [the] case[.]'" *Morrow v. United States*, 723 F. Supp. 2d 71, 77 (D.D.C. 2010) (emphasis omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). "Federal courts are courts of limited jurisdiction" and can adjudicate only those cases or controversies entrusted to them by the Constitution or an Act of Congress.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  In determining whether there is jurisdiction on a motion to dismiss, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted).  "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations omitted).

---

[4] Plaintiffs' Motion for Leave to File Declarations Under Seal, ECF No. 51, is GRANTED for the reasons set forth in the Court's prior Order regarding sealing.

**B.  Motion to Dismiss for Failure to State a Claim**

Under Rule 12(b)(6), a party may move to dismiss a pleading on the grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Rather, a complaint, or counterclaim, must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

**C.  Motion for Preliminary Injunction**

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)).  When seeking such relief, "'the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'"  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  "The four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291 (citation

omitted).  Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Id.* at 1291–92.[5]

## III. DISCUSSION

The Court's Opinion will be divided into three parts.  The first part of the Opinion assesses the Court's jurisdiction and addresses Defendants' arguments that Plaintiffs lack standing and that their claims are not ripe.  The second part of the Opinion dismisses Plaintiffs' estoppel cause of action for failure to state a claim.  Finally, in the third part of the Opinion, the Court addresses Plaintiffs' motion for preliminary injunction.

### A.  Subject Matter Jurisdiction

Article III of the Constitution limits the jurisdiction of this Court to the adjudication of "Cases" and "Controversies."  U.S. Const., Art. III, § 2.  "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing [and] ripeness."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)).  Defendants challenge the Court's jurisdiction on the basis of standing and ripeness.

---

[5] The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*.  *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)).  However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis.  *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.  In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that each of the preliminary injunctive factors favors awarding relief on the pending motion.

Plaintiffs bear the burden of establishing jurisdiction, and each "element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) ("*SBA List*") (internal quotation marks omitted). On a motion for preliminary injunction, the plaintiff "must show a substantial likelihood of standing[,]" while on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff must merely "state a plausible claim that they have suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks and alterations omitted). Although Defendants have pressed their jurisdictional arguments in a motion to dismiss, the Court also has an independent duty to assess its jurisdiction for purposes of Plaintiffs' pending motion for preliminary injunction. Consequently, the Court proceeds by applying the higher burden necessitated by a motion for preliminary injunction.

For the reasons stated below, the Court concludes that it has jurisdiction to adjudicate the propriety of the directives of the Presidential Memorandum with respect to the accession and retention of transgender individuals for military service, which corresponds with sections 1(b) and 2(a) of the Presidential Memorandum (*i.e.*, the Accession and Retention Directives). The Court does not have jurisdiction over section 2(b), which prohibits the use of military resources to fund sex reassignment surgical procedures, because no Plaintiff has demonstrated that they are substantially likely to be impacted by this directive (the "Sex Reassignment Surgery Directive").

### 1. Standing

Standing is an element of the Court's subject-matter jurisdiction, and requires, in essence,

that a plaintiff have "a personal stake in the outcome of the controversy . . . ." *Warth v. Seldin*,

422 U.S. 490, 498 (1975).  A plaintiff cannot be a mere bystander or interested third-party, or a

self-appointed representative of the public interest; he or she must show that the defendant's

conduct has affected them in a "personal and individual way." *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 561 (1992).  "The law of Article III standing, which is built on separation-of-powers

principles, serves to prevent the judicial process from being used to usurp the powers of the

political branches." *SBA List*, 134 S. Ct. at 2341–42 (internal quotation marks omitted).

Consequently, the standing analysis is "especially rigorous when reaching the merits of the

dispute would force [the court] to decide whether an action taken by one of the other two

branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 408 (2013).

The familiar requirements of Article III standing are:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion
> of a judicially cognizable interest which is (a) concrete and
> particularized and (b) actual or imminent, not conjectural or
> hypothetical; (2) that there be a causal connection between the injury
> and the conduct complained of—the injury must be fairly traceable
> to the challenged action of the defendant, and not the result of the
> independent action of some third party not before the court; and (3)
> that it be likely, as opposed to merely speculative, that the injury will
> be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan*, 504 U.S. at 560–61); *see also Spokeo,*

*Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The parties disagree only over the first element of standing: injury in fact.  For the

reasons stated below, Plaintiffs have carried their burden of demonstrating a substantial

likelihood of standing on the basis of at least two distinct injuries.  *First*, Plaintiffs are subject to

a competitive barrier that violates equal protection.  *Second*, they are subject to a substantial risk

of being denied accession, or being discharged from the military, due to their transgender status. Furthermore, Plaintiffs have demonstrated satisfactorily that both of these injuries are caused by the directives of the Presidential Memorandum, and that they are redressable by this Court.

### a. The Import of the Presidential Memorandum

Before turning to the legal basis of the two injuries that support Plaintiffs' standing, the Court first addresses the crux of Defendants' arguments regarding standing, and indeed, this Court's subject-matter jurisdiction more generally.

According to Defendants, the Court lacks subject-matter jurisdiction with respect to the directives of the Presidential Memorandum because Plaintiffs have merely "brought a constitutional challenge to the President's policy directive to conduct further study before the military changes its longstanding policies regarding service by transgender individuals." Defs.' Mem. at 15. According to Defendants, Plaintiffs "challenge a notional policy regarding military service by transgender individuals, but as they concede, that policy is currently being studied and has not been implemented or applied to anyone, let alone Plaintiffs." Defs.' Reply at 1. Defendants also highlight the protections afforded by the Interim Guidance: "Secretary of Defense Mattis has put in place Interim Guidance that, by its terms, maintains the status quo for both current service members and those who seek to accede into the military." *Id*. In Defendants' view, the Court is being asked "to prejudge the constitutionality of a future Government policy regarding military service by transgender individuals and issue the extraordinary relief of a worldwide preliminary injunction." Defs.' Mem. at 1. They further contend that "it is unclear whether those currently serving members will be affected by the future policy regarding service by transgender individuals once it is finalized and implemented." *Id*. at 2.

According to Defendants, the President has only "directed the Secretary of Defense to determine how to address transgender individuals currently serving in the military and that *no action* be taken against such individuals until *after a policy review is completed*."  *Id*. at 1 (emphasis in original).  In their words: "Secretary Mattis's Memorandum is unambiguous: The Interim Guidance is the operative policy and will remain so until he promulgates DoD's final policy regarding service by transgender individuals."  Defs.' Reply at 3. "The Interim Guidance is equally clear: Transgender service members, including the service member Plaintiffs, continue to serve fully in the military."  *Id*.  With respect to accession, Defendants contend that the operative policy is not a "ban" because transgender individuals are "subject to the normal waiver process."  *Id*. (internal quotation marks omitted).  In sum, Defendants argue that Plaintiffs disregard the actual policy regarding transgender service members, and instead rely "on a hypothetical future policy on transgender military service."  *Id*.

Ultimately, all of these contentions can be summarized into a few overarching points: the Presidential Memorandum merely commissioned an additional policy review; that review is underway; nothing is set in stone, and what policy may come about is unknown; and regardless, Plaintiffs are protected by the Interim Guidance.  And while accession by transgender individuals is not permitted, they may obtain waivers.  In the Court's view, the government's jurisdictional arguments are a red herring.

The President controls the United States military.  The directives of the Presidential Memorandum, to the extent they are definitive, are the operative policy toward military service by transgender service members.  The Court must and shall assume that the directives of the Presidential Memorandum will be faithfully executed.  *See Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (assessing "faithful" application of

agency rule).  Consequently, the Interim Guidance must be read as implementing the directives

of the Presidential Memorandum, and any protections afforded by the Interim Guidance are

necessarily limited to the extent they conflict with the express directives of the memorandum.

Finally, to the extent there is ambiguity about the meaning of the Presidential Memorandum, the

best guidance is the President's own statements regarding his intentions with respect to service

by transgender individuals.  To recount: On July 26, 2017, the President issued a statement

announcing that the "United States government will not accept or allow transgender individuals

to serve in any capacity in the U.S. military."  On August 25, 2017, the President issued the

Presidential Memorandum.  There, the President states that until "June 2016, the [military]

generally prohibited openly transgender individuals from accession into the United States

military and authorized the discharge of such individuals."  Finding subsequent changes to that

policy unjustified, in section 1(b), the President directs the military "to return to the longstanding

policy and practice on military service by transgender individuals that was in place prior to June

2016 . . . ."  Accordingly, the military has been directed by section 1(b) to return to a policy

under which: (i) transgender individuals are generally prohibited from accession; and (ii) the

military is authorized to discharge individuals who are transgender.

This change in policy must occur by March 23, 2018, except that the prohibition on

accession is extended indefinitely as of January 1, 2018.  Likewise, as of March 23, 2018, the

military is expressly prohibited from funding sex reassignment surgeries, except as necessary to

protect the health of an already transitioning individual.  The Memorandum provides that "[a]s

part of the implementation plan, the Secretary of Defense . . . shall determine how to address

transgender individuals currently serving in the United States military."  "Until the Secretary has

made that determination, no action may be taken against such individuals under the policy set

forth in section 1(b)"—that is, the directive that requires a return to the policy under which

transgender individuals could not accede, and could be discharged.  As these two clauses make

clear, transgender individuals are immunized only until the Secretary of Defense makes the

"determination"; the "determination" must be made "as part of the implementation plan"; and the

"implementation plan" must be submitted to the President by February 21, 2018.  This means

that the "determination" must be made by February 21, 2018, and because the protections

afforded to transgender individuals last only until the "determination" is made, those protections

necessarily lapse by February 21, 2018, unless the "determination" is made earlier.

Consequently, as of January 1, 2018, transgender individuals are prohibited from acceding to the

military "until such time [that the President receives] a recommendation to the contrary that [he]

find[s] convincing;" and as of March 23, 2018, the military must authorize the discharge of

transgender service members.  The protections afforded to these individuals by the terms of the

Presidential Memorandum lapse, at the latest, by February 21, 2018.

    Nothing in the August 2017 Statement by Secretary Mattis, or the Interim Guidance, can

or does alter these realities.  The Statement provides that Secretary Mattis will establish a panel

of experts "to provide advice and recommendations on the implementation of the president's

direction."  After the "panel reports its recommendations and following . . . consultation with the

secretary of Homeland Security," Secretary Mattis will "provide [his] advice to the president

concerning implementation of his policy direction."  Put differently, the military is studying how

to implement the directives of the Presidential Memorandum.  Such a policy review and

implementation plan are likely necessitated by the fact that—as borne out by the RAND Report

and the declarations submitted by the Pseudonym Plaintiffs—transgender service members

occupy a variety of crucial positions throughout the military, including active duty postings in

war zones.  Presumably, the removal and replacement of such individuals during a time of war cannot occur overnight.  Accordingly, Defendants are correct that policy decisions are still being made.  But the decisions that must be made are how to best implement a policy under which transgender accession is *prohibited*, and discharge of transgender service members is *authorized*. Unless the directives of the Presidential Memorandum are altered—and there is no evidence that they will be—military policy toward transgender individuals must fit within these confines.

Similarly, the Interim Guidance provides that "[n]ot later than February 21, 2018, [Secretary Mattis] will present the President with a plan to implement the policy and directives in the Presidential Memorandum[,]" and that the "implementation plan will establish the policy, standards and procedures for transgender individuals serving in the military."  True, the exact details of the plan to carry out the directives are unknown.  But what is known, and what is the bedrock of Plaintiffs' constitutional challenge, is that the implementation plan must prohibit transgender accession and authorize the discharge of transgender service members.  Otherwise, the plan would be out of compliance with the requirements of the Presidential Memorandum, and the Court shall not presume the military to be unfaithful to the orders of the President. Consequently, while the Court cannot presently adjudicate the merits of the yet-undecided details of how the directives will be carried out, it can adjudicate the constitutionality of the directives themselves, which are definite, and *must* be implemented by the military.

Finally, although Defendants make much of the protections afforded by the Interim Guidance to transgender individuals, that protection is necessarily qualified by the Presidential Memorandum.  The Interim Guidance provides that: "*As directed by the [Presidential] Memorandum*, no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender

status." (Emphasis added). The protections afforded by the Presidential Memorandum lapse by February 21, 2018, and discharge must be authorized by March 23, 2018. The Interim Guidance can do nothing to obviate these facts. Nor is standing vitiated by the mere possibility that the President may alter the directives of the Presidential Memorandum. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[A]ll laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."). Nor is there evidence that such a change may occur, given the President's unequivocal pronouncement that "the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military." Accordingly, for purposes of its standing analysis, the Court concludes that there is a substantial likelihood that transgender individuals will be indefinitely prevented from acceding to the military as of January 1, 2018, and that the military shall authorize the discharge of current service members who are transgender as of March 23, 2018.

### b. Equal Protection Injury

#### i. Relevant Case Law

The primary injury alleged by Plaintiffs, and which forms the basis of the Court's decision on the merits, is that the directives of the Presidential Memorandum violate the guarantee of equal protection afforded by the Due Process Clause of the Fifth Amendment. For purposes of the standing analysis, the Court assumes *arguendo* that these directives are, in fact, violative of equal protection. *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) ("[T]he Supreme Court has made clear that when considering whether a plaintiff has Article III

standing, a federal court must assume arguendo the merits of his or her legal claim." (internal

quotation marks omitted)).

The Supreme Court and this Circuit have made clear that the "injury in fact element of

standing in an equal protection case is the denial of equal treatment resulting from the imposition

of the barrier." *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 51 (D.C. Cir. 2016) (citing *Ne.*

*Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S.

656, 666 (1993) (Thomas, J.)), cert. denied, 137 S. Ct. 1069 (2017).  In *City of Jacksonville*, the

Supreme Court assessed a city ordinance that "required that 10% of the amount spent on city

contracts be set aside each fiscal year for so-called 'Minority Business Enterprises' (MBE's)."

508 U.S. at 658.  "Once projects were earmarked for MBE bidding by the city's chief purchasing

officer, they were deemed reserved for minority business enterprises only."  *Id.*  (internal

quotation marks omitted).  Plaintiff was an association of individuals and firms in the

construction industry who did business in the city and most of whom did not qualify under the

ordinance.  *Id.* at 659.  The members of the association alleged that they "regularly bid on and

perform[ed] construction work for the City of Jacksonville," and that they "would have bid on

designated set aside contracts but for the restrictions imposed by the ordinance."  *Id.*  (internal

quotations marks and alterations omitted).  In assessing the members' standing to challenge the

ordinance under these circumstances, the Court held that:

> When the government erects a barrier that makes it more difficult
> for members of one group to obtain a benefit than it is for members
> of another group, a member of the former group seeking to challenge
> the barrier need not allege that he would have obtained the benefit
> but for the barrier in order to establish standing. The "injury in fact"
> in an equal protection case of this variety is the denial of equal
> treatment resulting from the imposition of the barrier, not the
> ultimate inability to obtain the benefit. . . . And in the context of a
> challenge to a set-aside program, the "injury in fact" is the inability
> to compete on an equal footing in the bidding process, not the loss

> of a contract. . . . To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is *able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.

*Id*. at 666 (emphasis added) (citations omitted).

In *Adarand*, the Court assessed a requirement that federal agency contracts for general contractors contain a clause providing for additional compensation if the general contractor hired subcontractors "certified as small businesses controlled by socially and economically disadvantaged individuals," where socially and economically disadvantaged individuals were deemed to include "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities . . . ." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205 (1995) (internal quotation marks omitted). Plaintiff submitted a lower bid, but lost to a competing subcontractor that qualified the general contractor for additional compensation under the clause. *Id*. In assessing Plaintiff's standing for purposes of prospective injunctive relief—that is, with respect to *future* injuries—the Court held that the "concrete and particularized" element of injury in fact was readily satisfied by Plaintiff's "claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws . . . ." *Id*. at 211. The Court was less certain, however, "that the future use of subcontractor compensation clauses will cause [the plaintiff] 'imminent' injury[,]" and consequently required a "showing that sometime in the relatively near future [the plaintiff] will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Id*. The plaintiff made a sufficient showing by demonstrating that it was "very likely" to bid on an affected contract at least once per year, and that in so bidding, the plaintiff often competed against small disadvantaged businesses. *Id*. at 212.

In *Gratz*, the plaintiffs, two students who were denied entrance to the University of Michigan, brought suit challenging the University's consideration of race as part of its undergraduate admissions process as violative of equal protection. *Gratz v. Bollinger*, 539 U.S. 244, 251 (2003) (Rehnquist, C.J.). The Court considered whether one of the plaintiffs had standing to seek prospective injunctive relief given his statement that he would not apply for admission as a transfer student until the race-based admissions policy was terminated. *Id*. at 261. Relying on *City of Jacksonville*, the Court found that the plaintiff had standing because "the University had denied him the opportunity to compete for admission on an equal basis." *Id*. at 262. In particular, "[a]fter being denied admission, [the plaintiff] demonstrated that he was 'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions. He therefore [had] standing to seek prospective relief with respect to the University's continued use of race in undergraduate admissions." *Id*.

More recently, in *Parents Involved*, the Supreme Court assessed the use by several school districts of "student assignment plans that rely upon race to determine which public schools certain children may attend." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 709–10 (2007) (Roberts, C.J.). "In Seattle, this racial classification [was] used to allocate slots in oversubscribed high schools." *Id*. at 710. Consequently, Seattle argued that the members of the plaintiff organization would "only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive[,]" which in Seattle's view was "too speculative a harm to maintain standing." *Id*. at 718. The Court disagreed, finding that plaintiff had standing because its members had "children in the district's elementary, middle, and high schools[,]" and injunctive relief was sought on behalf of members whose children "may be denied admission to the high schools of their choice when

they apply for those schools in the future . . . ."  *Id*. (internal quotation marks omitted).  The injury was not eliminated merely because it was "possible that children of group members will not be denied admission to a school based on their race—because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage . . . ." *Id*.

This line of authority was summarized by the D.C. Circuit in *Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006) (Tatel, J.).  There, the plaintiff challenged written and unwritten employment policies by the Department of Housing and Urban Development ("HUD") that allegedly discriminated on the basis of gender and race, and claimed standing for purposes of prospective injunctive relief by alleging that he intended "to apply for new positions and promotions at HUD on a regular basis in the future," and that HUD would "violate his equal protection and civil rights" when he did so.  *Id*. at 858 (internal quotation marks and alteration omitted).  Reviewing *City of Jacksonville* and *Adarand*, the D.C. Circuit found no reason to distinguish "between contractors and job applicants[,]" and held that the source of the challenged policy—"whether a statute, a regulation, or agency guidelines"—did not control the standing inquiry.  *Id*. at 859.  Rather, according to the Circuit, "*Adarand* rests on the common-sense notion that when a contractor depends for its livelihood on competing for government contracts, and when the government has committed itself to doling out those contracts on a race-conscious basis, it stands to reason that the contractor will soon be competing on an uneven playing field." *Id*. at 859.  "Under *Adarand*, then, the relevant consideration is whether the agency is sufficiently committed to a particular race-conscious policy that the plaintiff will likely face a career impediment."  *Id*.

42

### ii. Application to Plaintiffs

For purposes of the standing analysis, Plaintiffs fall into two groups: Named Plaintiffs—who have yet to accede—and the Pseudonym Plaintiffs—who are currently in the military and fear that they will be discharged.  These two groups challenge the two fundamental directives of the Presidential Memorandum as unconstitutional: a reversion of accession and retention policy with respect to transgender individuals (i.e., the Accession and Retention Directives).  For the following reasons, the Court concludes that: (i) the Accession and Retention Directives of the Presidential Memorandum impose a competitive barrier that the Named and Pseudonym Plaintiffs are substantially likely to encounter, and (ii) that this barrier constitutes an injury in fact sufficient to imbue the Named and Pseudonym Plaintiffs with standing to challenge the propriety of the Accession and Retention Directives of the Presidential Memorandum.

*The Accession Directive*

Plaintiff Kibby—one of the Named Plaintiffs—has demonstrated a substantial likelihood that he is able and ready to accede to the military in the relatively near future, and consequently, that he is in a position to challenge the Accession Directive to the extent it imposes a barrier on him from acceding based on his transgender status.

Plaintiff Kibby was inducted into the United States Naval Academy in Annapolis, Maryland as a midshipman on July 1, 2017, and has completed his first two years of education, out of four.  Kibby Decl. ¶ 1.  "[A]ll midshipmen are members of the military, [but] are still considered part of an accessions program since [they] do not receive [their] commission until graduation."  *Id*. ¶ 22.  After graduation, Plaintiff Kibby hopes "to perform [his] service as a Surface Warfare Officer aboard a Navy ship."  *Id*. ¶ 9.  Plaintiff Kibby informed his chain of command that he was transgender in early 2016.  *Id*. ¶ 16.  At the end of his last school year, in

May 2017, the Commandant and Superintendent "officially approved [Plaintiff's] medical transition plan and the request for a year-long medical leave of absence." *Id*. ¶ 26. The transition plan was created in coordination with the Brigade Medical Officer and the Transgender Care Team at Portsmouth's Naval Medical Center." *Id*. ¶¶ 24–25. The medical year of absence was taken to comply with the requirement under the June 2016 DTM that acceding transgender service members be fully transitioned to their chosen gender for at least 18 months prior to accession. *Id*. ¶ 24. Defendants represent that "Plaintiff Kibby currently is on medical leave and faces no impediment to returning to the Naval Academy when that leave ends in May 2018." Defs.' Mem. at 16. The Commandant of Midshipmen at the Naval Academy, Robert B. Chadwick, has represented that Plaintiff Kibby "was afforded much support from the Brigade Medical Unit, his chain of command, and [the Commandant's] legal advisors in developing his [transition] plan and submitting his request [for medical leave]." Chadwick Decl. ¶ 4. According to the Commandant, the "purpose of the [medical] leave is to allow MIDN Kibby to undergo hormone treatment, and to [obtain] a period of gender stability of sufficient length under current policy and guidance to ensure his eligibility to accept a commission in May 2020 if he successfully completes the course of instruction upon return to [the Naval Academy]." *Id*. ¶ 10.

Upon his return, Plaintiff Kibby will be required to meet the male fitness requirements, which are more difficult than their female counterpart, as well as the Academy's academic standards. *Id*. ¶¶ 15-16. Plaintiff Kibby has represented that during the medical year of absence, he is "completing a rigorous exercise and training regimen so that [he] will be able to meet the male fitness standards upon [his] return[,]" and that he "can already meet the male standards for push-ups and sit-ups and will be working hard on [his] run time." Kibby Decl. ¶ 28. Given his

prior academic success at the Naval Academy, Kibby Decl. ¶ 39, the support afforded to his transition plan by senior officials, and his representations regarding his fitness training, the Court finds that Plaintiff Kibby has demonstrated a substantial likelihood that he will be able to meet the graduation requirements of the Naval Academy. Following graduation, he will be in a position to accede to the Navy or Marine Corps. Chadwick Decl. ¶ 16. Defendants have not argued or presented any evidence that Plaintiff Kibby will be unable to graduate from the Naval Academy—an unsurprising position, given that dismissal stemming from the inability of transgender individuals to accede would itself likely be an injury sufficient to confer standing to challenge the constitutionality of the Presidential Memorandum.

Consequently, Plaintiff Kibby has demonstrated that he is "able and ready" to apply for accession. Using the words of *Adarand*, he is "very likely" to apply for accession in the "relatively near future." Indeed, Plaintiff Kibby has demonstrated a greater likelihood of his being subject to the competitive barrier than many of the plaintiffs in the equal protection cases discussed above. In *Parents Involved*, the members of the plaintiff organization had standing even though it was possible that they would not even apply to an affected high school—and nothing was said of the possibility that the students could fail to graduate from elementary or middle school. In *Gratz*, the plaintiff merely stated an intention to apply as a transfer student— surely it was possible that academic failures at his current institution, or other hardships, would have prevented him from applying. Here, Plaintiff Kibby is on a defined track toward graduation from the Naval Academy and accession to the military. The track has been approved and supported by his chain of command. Like any student at the Naval Academy, there are potential impediments to his graduation. But Plaintiff Kibby has provided affirmative evidence of his ability to overcome these impediments, and it is unlikely that his chain of command would have

45

adopted a transition plan if they doubted his ability to meet the Academy's graduation requirements. It is accordingly likely that he will graduate and attempt to accede. Anything else is the product of mere speculation.[6]

The remaining question is whether Plaintiff Kibby is substantially likely to "hit" a barrier when he applies for accession to the military. As of January 2018, transgender individuals shall be prohibited entry to the military, until such time that the President receives a recommendation to the contrary that he finds convincing. Given the President's pronouncement that "the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military," there is no reason to believe that this directive will change by the time Plaintiff Kibby is ready to apply for accession in May 2020. Chadwick Decl. ¶ 17. In short, the only basis from which to conclude that the directive may change is the ever-present reality that every law is subject to change. But that is insufficient to deprive the Court of subject-matter jurisdiction. *Appalachian Power*, 208 F.3d at 1022. Nor does the potential availability of a waiver change this conclusion. First, Defendants have presented no evidence that waivers are actually made available to transgender individuals, or that they will be; and the only record evidence on this point suggests that transgender individuals are not entitled to waivers for accession purposes. *See supra* at 5–6. Second, even if a bona fide waiver process were made available, Plaintiff Kibby would still be subject to a competitive barrier due to his transgender

---

[6] Because the Court concludes that Plaintiff Kibby has a substantial likelihood of attempting to accede, the Court need not and does not decide whether Plaintiff Kohere has also demonstrated a likelihood of accession sufficient to stake out an equal protection claim based on the Accession Directive. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 (2006) ("the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement").

status.  For accession purposes, he would be presumptively disqualified because of his

transgender status, *unless* he obtains a waiver.  Those who are not transgender are not subject to

the same blanket proscription.  Consequently, a waiver process would not vitiate the barrier that

Plaintiff Kibby claims is violative of equal protection.  Accordingly, Plaintiff Kibby has

demonstrated that he is substantially likely to attempt to accede, and to encounter a competitive

barrier at the time of his accession due to his status as a transgender individual, which he claims

is violative of equal protection.  This is sufficient to confer standing to challenge the Accession

Directive at this preliminary stage.

    With respect to the Pseudonym Plaintiffs, there is no real doubt that they will remain in

the military for long enough to hit the "barrier" that they claim is violative of equal protection.

Each has submitted a declaration stating, and/or alleged, their intention to remain in military

service, and Defendants have submitted declarations for each Pseudonym Plaintiff stating that

they shall not be discharged until the military's new policy regarding transgender service

members takes effect.  *See supra* at 19–28; Defs.' Mem at 10–12.  There is also no real doubt

that they will face a competitive barrier to their continued retention by the military.  As of March

23, 2018, the military is required to effect a policy by which these service members can be

discharged solely due to their transgender status.  This barrier to their continued retention is

imposed upon them, but not other service members.  And Plaintiffs claim that this competitive

barrier is violative of equal protection.  Accordingly, at this preliminary stage, the Pseudonym

Plaintiffs have demonstrated a substantial likelihood of standing to challenge the Presidential

Memorandum's Retention Directive.  *See Worth*, 451 F.3d at 859 ("Under *Adarand*, . . . the

relevant consideration is whether the agency is sufficiently committed to a particular race-

conscious policy that the plaintiff will likely face a career impediment.").

### iii. Substantial Risk of Injury

Plaintiffs have also established a substantial risk of two future injuries: denial of accession and discharge from military service.  The substantial risk of these two future injuries is sufficient to constitute an injury in fact.  As explained by the Supreme Court, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *SBA List*, 134 S. Ct. at 2341 (internal quotation marks omitted; citing *Clapper*, 133 S. Ct. at 1147, 1150, n.5).  Here, even assuming that the future injuries are not "certainly impending," there is a "substantial risk" of their occurrence.

The D.C. Circuit has explained that "the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm . . . as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently imminent for standing purposes."  *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (internal quotation marks omitted).  In some circumstances, the chain of events that is necessary for the putative future harm to occur is too attenuated to constitute a substantial risk of that harm and to render that harm imminent.  Consequently, in *Clapper*, the Supreme Court declined to find standing because the plaintiffs' "theory of standing [relied] on a highly attenuated chain of possibilities . . . ."  568 U.S. at 410.  "Several links in this chain would have required the assumption that independent decisionmakers charged with policy discretion . . . and with resolving complex legal and factual questions . . . would exercise their discretion in a specific way. . . . With so many links in the causal chain, the injury that the plaintiffs feared was too speculative to qualify as 'injury in fact.'"  *Attias*, 865 F.3d at 626 (citation omitted).  Meanwhile, in *Attias*, a personal data theft case, the D.C. Circuit found standing where the plaintiffs plausibly alleged that "an unauthorized party has already accessed personally

identifying data on [the] servers, and it [was] much less speculative . . . to infer that this party [had] both the intent and the ability to use that data for ill." *Id*. at 628. Here, there is no doubt that the denial of accession and discharge from the military constitute concrete and particularized injuries. Whether these are also imminent, based on the reasoning of *Clapper* and *Attias*, requires an analysis of the degree to which these future harms are separated from the present by a "series of contingent events . . . ." *Id*.

In *Navy Chaplaincy*, the plaintiffs, military chaplains who were "non-liturgical Protestants," alleged that "the Navy systematically discriminate[d] against members of their religious denominations in the awarding of promotions in violation" of the Establishment Clause. *In re Navy Chaplaincy*, 697 F.3d 1171, 1173 (D.C. Cir. 2012). The plaintiffs claimed standing for purposes of prospective injunctive relief on the basis that "they face[d] future injury because they [would] likely suffer discrimination on the basis of their religious denomination when they are considered for promotion . . . ." *Id*. at 1176. In the court's view, the plaintiffs' assertion of future injury depended on "two subsidiary premises: that plaintiffs will be considered for promotion by future selection boards and that selection boards will discriminate against them on the basis of their religious denomination." *Id*. The court found that the plaintiffs had satisfactorily established both premises. With respect to the first, because the "Navy concede[d] that future selection boards may very well consider the promotion of at least some plaintiffs." *Id*. With respect to the second, because "plaintiffs challenge[d] specific policies and procedures . . . . that they claim[ed] resulted in denominational discrimination . . . ." *Id*.

Plaintiffs have demonstrated a chain of causation leading to concrete and particularized injuries in which there are few links and each link is substantially likely to occur. With respect to the Accession Directive, Plaintiff Kibby will suffer an injury in fact if he: (i) graduates from

the Naval Academy; (ii) applies for accession; and (iii) is denied accession due to his transgender status.  The first two links in this chain are substantially likely to occur for the reasons already stated.  *See supra* at 43–46.  The third is likely to occur because the Presidential Memorandum indefinitely delays the accession of transgender individuals, and the President has unequivocally stated that transgender individuals shall not be permitted to serve in the military.  Given this actuality, it is speculative to assume that transgender individuals *will be permitted to accede* by May 2020.  At present, there is a substantial risk that accession will remain forbidden, and Plaintiff Kibby will be precluded from military service.

For the Pseudonym Plaintiffs, the chain of causation is even shorter.  They will suffer an injury in fact if: (i) they remain in the military; and (ii) are discharged based on their transgender status after March 23, 2018 due to the Retention Directive.  On the first point, there is no disagreement that the Pseudonym Plaintiffs are qualified service members who desire to remain in military service.  *See supra* at 19–28.  On the second point, the available evidence is that the President—who ultimately controls the military—issued a statement that "the United States government will not . . . allow transgender individuals to serve in any capacity in the U.S. military," and shortly thereafter, issued a Presidential Memorandum that requires the military to authorize the discharge of transgender service members by March 23, 2018.  True, it is conceivable that the Pseudonym Plaintiffs will not be discharged from the military, despite the head of the military stating that they will be.  But in the absence of a crystal ball, and in light of these unequivocal factual circumstances, at the present time, the Pseudonym Plaintiffs face a substantial risk of discharge.  This confers upon them an injury in fact.

### iv.  Plaintiffs Have Standing to Challenge the Accession and Retention Directives

For the foregoing reasons, Plaintiffs have established two injuries in fact with respect to the Accession and Retention Directives.  First, they have demonstrated a substantial likelihood that they will face a competitive barrier with respect to accession and retention due to their transgender status.  Second, they have demonstrated a substantial risk that they will be denied accession or discharged from the military due to their transgender status.  Defendants do not contest that these injuries are caused by the Accession and Retention Directives of the Presidential Memorandum, or that they are redressable by judicial intervention, and the Court finds that the causation and redressability elements of standing have been satisfied.  Were it not for the Presidential Memorandum, the blanket prohibition against accession by transgender individuals would have expired on January 1, 2018.  Because of the Presidential Memorandum, that prohibition is extended indefinitely.  Furthermore, the Presidential Memorandum requires the reversion of military policy to one where individuals can be discharged solely based on their transgender status.  Previously, such action was prohibited by the June 2016 DTM.  The accession and retention injuries are caused by the Presidential Memorandum, and they would be redressed to the extent the Court invalidates the directives of the memorandum.  Accordingly, Plaintiffs have standing to challenge the Accession and Retention Directives.

### v.  Plaintiffs Do Not Have Standing to Challenge the Sex Reassignment Surgery Directive

Although the Court concludes that Plaintiffs have standing to challenge the Accession and Retention Directives, none of the Plaintiffs have demonstrated an injury in fact with respect to the Sex Reassignment Surgery Directive.  First, only some Plaintiffs are implicated by the provision at all.  For those that are, the risk of being impacted by the Sex Reassignment Surgery Directive is not sufficiently great to confer standing.

51

Jane Doe 1 alleges that "a transition-related procedure Jane Doe 1 was scheduled for was summarily canceled by the Defense Health Agency."  Am. Compl. ¶ 16.  However, Defendants have submitted a declaration representing that "Jane Doe 1's application for the supplemental health care waiver necessary to receive a transition-related surgery is currently being processed by the Defense Health Agency."  Defs.' Mem. at 10.  Accordingly, Jane Doe 1 has not demonstrated that she will not receive the surgery prior to the effective date of the Sex Reassignment Surgery Directive.

Jane Doe 3 has developed a transition treatment plan, but will not begin her treatment until after she returns from active deployment in Iraq.  *See supra* at 22.  Given the possibility of discharge, the uncertainties attended by the fact that she has yet to begin any transition treatment, and the lack of certainty on when such treatment will begin, the prospective harm engendered by the Sex Reassignment Surgery Directive is too speculative to constitute an injury in fact with respect to Jane Doe 3.  Furthermore, John Doe 1 is scheduled for transition related-surgery on January 4, 2018, and Defendants have represented that this date remains unaffected by the Presidential Memorandum.  Defs.' Mem. at 11.  Finally, the Named Plaintiffs are not currently in the military and it is speculative whether they will need surgery while in military service.  Plaintiff Kibby, in particular, has stated that he will transition prior to applying for accession.  *See supra* at 26–27.  Accordingly, no Plaintiffs have demonstrated that they are substantially likely to be impacted by the Sex Reassignment Surgery Directive, and none have standing to challenge that directive.

**2.  Ripeness**

Defendants also challenge the Court's subject-matter jurisdiction on the basis of ripeness.  "Determining whether administrative action is ripe for judicial review requires [the Court] to

evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). On the first prong, the Court must consider: "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 440 F.3d 459, 463–64 (D.C. Cir. 2006) (internal quotation marks omitted). On the second prong, the Court must consider "whether postponing judicial review would impose an undue burden on [the Plaintiffs] or would benefit the court." *Id.* (internal quotation marks omitted).

A facial equal protection challenge is a purely legal question. *See Beach Commc'ns, Inc. v. FCC*, 959 F.2d 975, 986 (D.C. Cir. 1992). To the extent the Court considers factual issues with respect to the equal protection analysis, they are only those facts that are already established: namely, those going to the basis for the issuance of the Presidential Memorandum. Future factual development does not alter that basis, and is consequently irrelevant to the equal protection analysis. Defendants do not contest this point. *See XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 58 (D.D.C. 2015) (finding Fifth Amendment challenge to be a purely legal inquiry).

To a large extent, Defendants' ripeness arguments have already been addressed in the standing context. The Court reiterates its conclusion here. While there is present uncertainty regarding the exact details of the military's future policy towards transgender service members, there is no uncertainty regarding two directives of the Presidential Memorandum: the military must authorize the discharge of transgender service members, and accession by transgender individuals is prohibited, indefinitely. The Court does not adjudicate the details of that future policy, but rather, only assesses whether these directives in-and-of-themselves violate the

53

Constitution.  The directives are known, and so are the circumstances under which they were issued.  They cannot be more concrete, and future policy by the military—absent action from the President—cannot change what the directives require.  There is no reason to believe that the President will alter these directives, and the Court must assume that they will be faithfully executed by the military.  *See National Mining Association*, 145 F.3d at 1408; *Appalachian Power*, 208 F.3d at 1022. Consequently, the constitutionality of the Accession and Retention Directives is a matter fit for judicial resolution.

Furthermore, the nature of the equal protection analysis in this case, which assesses the facial validity of the Presidential Memorandum, means that the Court would not benefit from delay—the salient facts regarding the issuance of the Presidential Memorandum are not subject to change.  This contrasts with the burden that delay would impose upon Plaintiffs, who must continue to serve or strive toward service, expending resources and declining other opportunities, while faced with the prospect of discharge and preclusion of military service, and the stigma that the Presidential Memorandum attaches to service by transgender individuals.  *See supra* at 19–28.  Accordingly, the propriety of the Accession and Retention Directives is a matter ripe for adjudication.

Because Plaintiffs have established standing and ripeness with respect to the Accession and Retention Directives of the Presidential Memorandum, the Court turns to the merits.

**B.  Defendants' Motion to Dismiss for Failure to State a Claim**

Plaintiffs assert two overarching claims in this case.  Plaintiffs' first broad claim is that, for a variety of reasons, the Presidential Memorandum violates the guarantees of the Due Process Clause of the Fifth Amendment.  Plaintiffs' second distinct claim is for estoppel.  Defendants move to dismiss both claims under Federal Rule 12(b)(6).  For the same reasons the Court concludes that Plaintiffs are likely to succeed on the merits of their Due Process Clause

challenge for the purposes of their motion for preliminary injunction—discussed below—the Court will not dismiss Plaintiffs' Due Process Clause claims.

However, the Court will dismiss, without prejudice, Plaintiffs' estoppel claim. The Supreme Court has expressed substantial skepticism with respect to government estoppel, noting that when "the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984). Nonetheless, the Court has refused to adopt "a flat rule that estoppel may not in any circumstances run against the Government," noting that "the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Id.* at 60–61; *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990) ("From our earliest cases, we have recognized that equitable estoppel will not lie against the Government as it lies against private litigants.").

Defendants contend that Plaintiffs' estoppel claim fails because there is no recognized federal cause of action for estoppel. Defs.' Mem. at 37. The Court declines to dismiss Plaintiffs' claim on this basis, however, because although judicial hostility has been expressed with respect to government estoppel, neither the Supreme Court or the D.C. Circuit have definitively ruled out the claim. In fact, recent decisions by the D.C. Circuit have at least assessed the claim on the merits. *See Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 225 (D.C. Cir. 2017); *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009); *Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000). Accordingly, at least by implication, the D.C. Circuit has recognized that

an estoppel claim may be brought against agency defendants—here, the Departments of Defense and Homeland Security—under certain circumstances.

The elements of a government estoppel claim are that "(1) the government made a 'definite representation'; (2) on which the entity 'relied in such a manner as to change its position for the worse'; (3) the entity's reliance was reasonable; and (4) 'the government engaged in affirmative misconduct.'" *Masters Pharm.*, 861 F.3d at 225 (citations and alterations omitted). The affirmative misconduct element requires a showing "that government agents engage[d]—by commission or omission—in conduct that can be characterized as misrepresentation or concealment, or, at least, behave[d] in ways that have or will cause an egregiously unfair result." *GAO v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516, 526 (D.C. Cir. 1983).

Based on the allegations in the Amended Complaint, the Court concludes that the facts of this case are not actionable under an "estoppel" theory. Plaintiffs claim that the June 2016 DTM "constituted a definite representation to Plaintiffs that they would be able to serve openly." Pls.' Mem. at 26. However, the DTM was not a definite representation to any of the individuals Plaintiffs, but rather constituted a broad policy decision by the government that affected scores of individuals. The DTM did not specifically represent to any particular individual that he or she would be permitted to serve. The cases that Plaintiffs cite are distinguishable on this basis. For example, in *Watkins*, the Ninth Circuit estopped the Army from refusing to reenlist the plaintiff "on the basis of his homosexuality" because "the Army affirmatively acted in violation of its own regulations when it repeatedly represented that [the plaintiff] was eligible to reenlist, as well as when it reenlisted him time after time." *Watkins v. U.S. Army*, 875 F.2d 699, 707–08, 731 (9th Cir. 1989). These representations were directed at the plaintiff, because on "the one

occasion when the record was unclear, [the plaintiff] sought clarification and his classification

was immediately changed from 'unknown' to 'eligible for reentry on active duty.'" *Id*. at 707.

Similarly, in *Johnson*, the Ninth Circuit estopped the government from rescinding the plaintiff's

parole "after his parole computation had passed successfully through as many as eight

administrative reviews . . . ." *Johnson v. Williford*, 682 F.2d 868, 872 (9th Cir. 1982).

  It may be that some Plaintiffs have detrimentally relied upon specific representations

from their chain of command that could more plausibly support a government estoppel claim, but

if that is the case, those instances are not adequately alleged; only generalized assertions of

reliance are asserted in the complaint. *See, e.g.,* Am. Compl. ¶ 3 ("Plaintiffs, along with many

other service members, have followed protocol in informing their chain of command that they

are transgender.  They did so in reliance on the United States' express promises that it would

permit them to continue to serve their country openly."); ¶ 14 ("In or around June 2016, in

reliance on the issuance of the policy permitting open service by transgender service members,

Jane Doe 1 notified her command that she is transgender."); ¶ 31 ("After June 2016, in reliance

on the announcement that transgender people would be permitted to serve openly, she notified

her superiors that she is transgender.  She has served in the intervening time without incident.").

Allowing estoppel claims to go forward based on such generalized theories of reliance would

seem to implicate the reasonable concerns other courts have raised about government estoppel.

  Furthermore, Plaintiffs have not plausibly alleged that government agents have engaged

in specific instances of "affirmative misconduct."  No affirmative instances of misrepresentation

or concealment have been plausibly alleged.  While Plaintiffs point to the revocation of the June

2016 DTM—via the Presidential Memorandum—as "egregiously unfair," they fail to articulate

how that unfairness is the product of "misconduct" as the Court understands that term in this

context.  *See* Pl.'s Mem. at 28.  Because these specific facts have not been plausibly alleged, the Court shall not permit the estoppel claim to proceed at this time.  Accordingly, the claim is dismissed without prejudice.

## C.  Plaintiffs' Motion for Preliminary Injunction

Having determined that Plaintiffs have standing to challenge the Accession and Retention Directives and that their claims are ripe, the Court moves on to consider Plaintiffs' motion for preliminary injunction.  Plaintiffs ask the Court to enjoin the enforcement of the Accession and Retention Directives pending the final resolution of this lawsuit.  The Court will grant Plaintiffs' motion.  The Court finds (1) that Plaintiffs have a likelihood of succeeding on their claim that the Accession and Retention Directives violate the Fifth Amendment, (2) that Plaintiffs would suffer irreparable injury in the absence of an injunction, and (3) that the balance of equities and the public interest favor granting injunctive relief.

### 1.  Likelihood of Success on the Merits

Although Plaintiffs' estoppel claim has been dismissed, the Court is convinced that Plaintiffs are likely to succeed in this lawsuit under the Fifth Amendment.  The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Although Plaintiffs have suggested a number of different analytical frameworks for considering whether the Accession and Retention Directives violate this guarantee, the Court finds the framework applicable to the Due Process Clause's equal protection component most relevant.  "In numerous decisions, [the Supreme Court] 'has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws.'"  *Davis v. Passman*, 442 U.S. 228, 234 (1979) (quoting *Vance v. Bradley*, 440 U.S. 93, 94 n.1 (1979)); *see also United States v.*

*Windsor*, 133 S. Ct. 2675, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). To determine whether the Accession and Retention Directives violate the Due Process Clause's guarantee because they deny the equal protection of the laws to transgender Americans, the Court must decide (a) the level of scrutiny applicable, and (b) whether the Accession and Retention Directives are likely to survive that level of scrutiny.[7]

### a. Level of Scrutiny

The general rule is that government action that treats certain classes of people differently "is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). However, this general rule does not apply where the government action draws distinctions between individuals based on certain suspect or quasi-suspect classifications. *Id.* at 440–41. In those instances, the Court must apply a heightened degree of scrutiny. *Id.*

At this preliminary stage of the case, the Court is persuaded that it must apply a heightened degree of scrutiny to the Accession and Retention Directives. The Court reaches this conclusion for two reasons. First, on the current record, transgender individuals—who are alone targeted for exclusion by the Accession and Retention Directives—appear to satisfy the criteria of at least a quasi-suspect classification. "The Supreme Court has used several explicit criteria to identify suspect and quasi-suspect classifications." *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987). The Court has observed that a suspect class is one that has "experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped

---

[7] At the threshold, Defendants argue that Plaintiffs' claims are unlikely to succeed on the merits because Plaintiffs lack standing and their claims are not ripe. The Court has already found that Plaintiffs have standing and ripe claims.

characteristics not truly indicative of their abilities." *Massachusetts Bd. of Ret. v. Murgia*, 427

U.S. 307, 313 (1976) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28

(1973)).  Also relevant is whether the group has been "relegated to such a position of political

powerlessness as to command extraordinary protection from the majoritarian political process."

*Id.*  Finally, the Supreme Court has also considered whether the group "exhibit[s] obvious,

immutable, or distinguishing characteristics that define them as a discrete group."  *Lyng v.*

*Castillo*, 477 U.S. 635, 638 (1986).

        The transgender community satisfies these criteria.  Transgender individuals have

immutable and distinguishing characteristics that make them a discernable class.  *See*, *e.g.*,

Medical *Amici* Brief at 3-13 (describing what it means to be transgender).[8]  As a class,

transgender individuals have suffered, and continue to suffer, severe persecution and

discrimination.  *See, e.g.*, State *Amici* Brief at 3 (describing the discrimination the transgender

community suffers); Trevor Project *Amici* Brief at 10-12, 15-16 (discussing the harmful effects

of discrimination against transgender youth); *see also Whitaker By Whitaker v. Kenosha Unified*

*Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (holding that "[t]here is no

denying that transgender individuals face discrimination, harassment, and violence because of

their gender identity," and noting report by the National Center for Transgender Equality finding

---

        [8] The Motions for Leave to File Amici Curiae Briefs in Support of Plaintiffs filed by
Medical, Nursing, Mental Health, and other Health Care Organizations, ECF No. 44 ("Medical
*Amici* Brief"), The Trevor Project, ECF No. 49 ("Trevor Project *Amici* Brief"), Massachusetts,
California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland, New Mexico, New York,
Oregon, Pennsylvania, Rhode Island, Vermont, and the District of Columbia, ECF No. 50 ("State
*Amici* Brief"), and the National Center for Transgender Equality, the Tennessee Transgender
Political Coalition, TGI Network of Rhode Island, the Transgender Allies Group, the
Transgender Legal Defense & Education Fund, TransOhio, the Transgender Resource Center of
New Mexico, and the Southern Arizona Gender Alliance, ECF No. 52, are GRANTED.  These
amici briefs have assisted the Court in reaching its decision.

that 78% of students who identify as transgender or as gender non-conformant report being

harassed while in grades K-12).  Despite this discrimination, the Court is aware of no argument

or evidence suggesting that being transgender in any way limits one's ability to contribute to

society.  *See* State *Amici* Brief at 2; Medical *Amici* Brief at 2; Trevor Project *Amici* Brief at 9.

The exemplary military service of Plaintiffs in this case certainly suggests that it does not.

Finally, transgender people as a group represent a very small subset of society lacking the sort of

political power other groups might harness to protect themselves from discrimination.  *See*

Medical *Amici* Brief at 4 (noting that recent estimates suggest that transgender individuals make

up approximately 0.6 percent of the adult population in the United States); *see also Adkins v.*

*City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015) (noting that there is "no indication

that there have ever been any transgender members of the United States Congress or the federal

judiciary").

     Although the Court is aware of no binding precedent on this issue, it has taken note of the

findings and conclusions of a number of other courts from across the country that have also

found that discrimination on the basis of someone's transgender identity is a quasi-suspect form

of classification that triggers heightened scrutiny.  *See Evancho v. Pine-Richland Sch. Dist.*, 237

F. Supp. 3d 267, 288 (W.D. Pa. 2017) (holding that "all of the indicia for the application of the

heightened intermediate scrutiny standard are present" for transgender individuals); *Bd. of Educ.*

*of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872–74

(S.D. Ohio 2016) (finding that "transgender status is a quasi-suspect class under the Equal

Protection Clause"); *Adkins*, 143 F. Supp. 3d at 140 ("[T]he Court concludes that transgender

people are a quasi-suspect class" and "[a]ccordingly, the Court must apply intermediate scrutiny

to defendants' treatment of plaintiff").

Second, the Court is also persuaded that the Accession and Retention Directives are a form of discrimination on the basis of gender, which is itself subject to intermediate scrutiny. It is well-established that gender-based discrimination includes discrimination based on non-conformity with gender stereotypes. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group"). The Accession and Retention Directives' exclusion of transgender individuals inherently discriminates against current and aspiring service members on the basis of their failure to conform to gender stereotypes. The defining characteristic of a transgender individual is that their inward identity, behavior, and possibly their physical characteristics, do not conform to stereotypes of how an individual of their assigned sex should feel, act and look. *See* Medical *Amici* Brief at 3-13. By excluding an entire category of people from military service on this characteristic alone, the Accession and Retention Directives punish individuals for failing to adhere to gender stereotypes. *See Whitaker,* 858 F.3d at 1051 (holding that heightened scrutiny used for sex-based classifications applied to school policy requiring transgender student to use bathroom of sex listed on his birth certificate because it "treat[ed] transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently. . . . These students are disciplined under the School District's bathroom policy if they choose to use a bathroom that conforms to their gender identity"); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (holding that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination"); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004) (holding that the facts alleged by transsexual plaintiff to support his claims of gender discrimination on the basis of sex stereotyping "easily constitute a claim of sex discrimination

grounded in the Equal Protection Clause of the Constitution"). A service member who was born a male is punished by the Accession and Retention Directives if he identifies as a woman, whereas that same service member would be free to join and remain in the military if he was born a female, or if he agreed to act in the way society expects males to act. The Accession and Retention Directives are accordingly inextricably intertwined with gender classifications.

For these two reasons, the Court will apply an intermediate level of scrutiny to Defendants' exclusion of transgender individuals from the military, akin to the level of scrutiny applicable in gender discrimination cases. Before moving on to that analysis, however, the Court pauses to note that meaningful scrutiny of the constitutionality of the Accession and Retention Directives is appropriate despite the fact that they pertain to decisions about military personnel. Although the Court recognizes that deference to the Executive and Congress is warranted in the military context, the Court is not powerless to assess whether the constitutional rights of America's service members have been violated. The D.C. Circuit has explained that although "the operation of the military is vested in Congress and the Executive, and . . . it is not for the courts to establish the composition of the armed forces[,] . . . constitutional questions that arise out of military decisions regarding the composition of the armed forces are not committed to the other coordinate branches of government." *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987). "Where it is alleged, as it is here, that the armed forces have trenched upon constitutionally guaranteed rights through the promotion and selection process, the courts are not powerless to act." *Id.* "The military has not been exempted from constitutional provisions that protect the rights of individuals" and, indeed, "[i]t is precisely the role of the courts to determine whether those rights have been violated." *Id.*; *see also Chappell v. Wallace*, 462 U.S. 296, 304 (1983) ("This Court has never held, nor do we now hold, that military personnel are barred from

all redress in civilian courts for constitutional wrongs suffered in the course of military service."); *Matlovich v. Sec'y of the Air Force*, 591 F.2d 852, 859 (D.C. Cir. 1978) ("It is established, of course, that the federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution.").

### b. Application of Intermediate Scrutiny

Having determined that an intermediate level of heightened scrutiny should apply to the Accession and Retention Directives' discrimination against transgender individuals, the Court moves on to assessing whether Plaintiffs are likely to succeed when that level of scrutiny is actually applied. Under intermediate scrutiny, the government must demonstrate an "exceedingly persuasive justification" for its actions. *United States v. Virginia*, 518 U.S. 515, 531 (1996). "The burden of justification is demanding and it rests entirely on" the government. *Id.* at 533. The government "must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724 (1982) (internal quotations omitted)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* Finally, it is well established that "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 133 S. Ct. at 2693 (quoting *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1973)).

Applying these standards, the Court finds that Plaintiffs are likely to succeed in demonstrating that the Accession and Retention Directives' exclusion of transgender individuals

from the military is unconstitutional.  At the outset, the Court reiterates precisely what is at issue

in this case: a policy banning the accession, and allowing the discharge, of an entire category of

individuals from the military solely because they are transgender, despite their ability to meet all

of the physical, psychological, and other standards for military service.  Defendants argue that

this policy is necessary for three reasons.  First, Defendants argue that "at least some transgender

individuals suffer from medical conditions that could impede the performance of their duties."

Defs.' Mem. at 31.  Second, Defendants argue that "there is room for the military to think" that

certain medical conditions "may limit the deployability of transgender individuals as well as

impose additional costs on the armed forces."  *Id.* at 32.  Third, Defendants argue that "the

President could reasonably conclude" that the presence of transgender individuals in the military

would harm "unit cohesion."  *Id.* at 33.[9]

      Plaintiffs do not dispute that maximizing military effectiveness, lethality and unit

cohesion, and even budgetary considerations, are all important or at least legitimate government

interests.  Pls.' Mem. at 17.  They do challenge, however, whether Defendants can satisfy their

burden of demonstrating that the discriminatory means that have been employed in the

Presidential Memorandum—the Accession and Retention Directives—are "substantially related"

to the achievement of these objectives.  Based on the combined effect of a number of unusual

factors, the Court finds it likely that Plaintiffs will succeed on this claim.

      First, the reasons given for the decision to exclude transgender service members appear to

be hypothetical and extremely overbroad.  For instance, Defendants cite concerns that "some"

transgender individuals "could" suffer from medical conditions that impede their duties, and

---

[9] Plaintiffs note that similar arguments were proffered in support of prior policies
precluding service members from being openly gay, maintaining racially segregated ranks and
excluding women from military colleges.

assert that "there is room for the military to think" that transgender people may be limited in their deployability at times. As an initial matter, these hypothetical concerns could be raised about *any* service members. Moreover, these concerns do not explain the need to discharge and deny accession to *all* transgender people who meet the relevant physical, mental and medical standards for service. The Accession and Retention Directives are accordingly extremely overbroad when considered in the light of their proffered justifications. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that law's "sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects"). The breadth of the Accession and Retention Directives is also discontinuous with the purported concern about costs, which, in addition to having been found to be minimal or negligible, apparently are primarily related to a surgical procedure that only a subset of transgender individuals will even need. Similarly, Defendants provide practically no explanation at all, let alone support, for their suggestion that the presence of transgender individuals may be harmful to "unit cohesion."[10] Indeed, Defendants themselves highlight the absence of any prior studies or evaluations supporting the proffered justifications by arguing that they must *now* conduct studies regarding transgender military service before they can adequately defend the President's decision. At *most*, Defendants' reasons appear therefore to be based on unsupported, "overbroad generalizations about the different talents, capacities, or preferences," of transgender people. *Virginia*, 518 U.S. at 533.

---

[10] To the extent this is a thinly-veiled reference to an assumption that other service members are biased against transgender people, this would not be a legitimate rationale for the challenged policy. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

Nonetheless, given the deference owed to military personnel decisions, the Court has not based its conclusion solely on the speculative and overbroad nature of the President's reasons. A second point is also crucial. As far as the Court is aware at this preliminary stage, all of the reasons proffered by the President for excluding transgender individuals from the military in this case were not merely unsupported, but were actually *contradicted* by the studies, conclusions and judgment of the military itself. As described above, the effect of transgender individuals serving in the military had been studied by the military immediately prior to the issuance of the Presidential Memorandum. In connection with the working group chaired by the Under Secretary of Defense for Personnel and Readiness, the RAND National Defense Research Institute conducted a study and issued a report largely debunking any potential concerns about unit cohesion, military readiness, deployability or health care costs related to transgender military service. The Department of Defense Working Group, made up of senior uniformed officers and senior civilian officers from each military department, unanimously concluded that there were no barriers that should prevent transgender individuals from serving in the military, rejecting the very concerns supposedly underlying the Accession and Retention Directives. In fact, the Working Group concluded that prohibiting transgender service members would undermine military effectiveness and readiness. Next, the Army, Air Force and Navy each concluded that transgender individuals should be allowed to serve. Finally, the Secretary of Defense concluded that the needs of the military were best served by allowing transgender individuals to openly serve. In short, the military concerns purportedly underlying the President's decision had been studied and rejected by the military itself.[11] This highly unusual

---

[11] This differentiates this case from *Goldman v. Weinberger*, 475 U.S. 503, 508 (1986), a case cited by Defendants, in which the court deferred to a decision that was based on the "considered professional judgment of the Air Force."

situation is further evidence that the reasons offered for the Accession and Retention Directives were not substantially related to the military interests the Presidential Memorandum cited.

Third, the Court has also considered the circumstances surrounding the announcement of the President's policy. "In determining whether a law is motived by an improper animus or purpose, '[d]iscriminations of an unusual character' especially require careful consideration." *Windsor*, 133 S. Ct. at 2693 (quoting *Romer*, 517 U.S. at 633). The discrimination in this case was certainly of an unusual character. As explained above, after a lengthy review process by senior military personnel, the military had recently determined that permitting transgender individuals to serve would not have adverse effects on the military and had announced that such individuals were free to serve openly. Many transgender service members identified themselves to their commanding officers in reliance on that pronouncement. Then, the President abruptly announced, via Twitter—without any of the formality or deliberative processes that generally accompany the development and announcement of major policy changes that will gravely affect the lives of many Americans—that all transgender individuals would be precluded from participating in the military in any capacity. These circumstances provide additional support for Plaintiffs' claim that the decision to exclude transgender individuals was not driven by genuine concerns regarding military efficacy. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (holding that "[t]he specific sequence of events leading up to the challenged decision . . . may shed some light on the decisionmaker's purposes" and "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role").

In sum, even if none of the reasons discussed above alone would be sufficient for the Court to conclude that Plaintiffs were likely to succeed on their Fifth Amendment claim, taken

together they are highly suggestive of a constitutional violation.  The likelihood of success factor accordingly weighs in favor of granting preliminary injunctive relief.  For the same reasons, the Court will deny Defendants' motion to dismiss Plaintiffs' claims under the Due Process Clause.

Defendants make a few additional points regarding the merits of Plaintiffs' claims that must be addressed.  First, Defendants argue that Plaintiffs cannot demonstrate a likelihood of success on the merits regarding the Presidential Memorandum's policy for enlisted service members in particular because Secretary Mattis' Interim Guidance is the "operative policy," and that guidance "does not impermissibly classify service members based on transgender status, but rather prohibits disparate treatment of existing service members based on transgender status." Defs.' Mem. at 24.  This may be true, but the focus of Plaintiffs' Amended Complaint is not the Interim Guidance, but the Presidential Memorandum.  The Accession and Retention Directives of the Presidential Memorandum require the return to a policy that "generally prohibit[s] openly transgender individuals from accession into the United States military and authorize[s] the discharge of such individuals."  Presidential Memorandum § 1(a).  This overt disparate treatment, which will become effective when Secretary Mattis' Interim Guidance elapses early next year, is the subject of Plaintiffs' lawsuit.

Second, Defendants cite a number of cases for the proposition that the Presidential Memorandum "is subject to a highly deferential form of review."  Defs.' Mem. at 27.  The Court has reviewed those cases and determined that none of them require the Court to apply a different level of scrutiny than has been applied here.  Of primary importance is the Supreme Court's opinion in *Rostker v. Goldberg*, 453 U.S. 57 (1981).  The Supreme Court in *Rostker* expressly declined to hold that the intermediate scrutiny applicable to gender discrimination did not apply in the military personnel context.  *Id.* at 69.  Instead, the Court reviewed the particular facts

before it and found that the district court in that case had not sufficiently deferred to the reasoned

decision of Congress in the context of a particular military personnel-related decision.

The facts of that case are *strikingly* different than those presented here.  In *Rostker*, the

Court noted that "Congress did not act unthinkingly or reflexively and not for any considered

reason," when it passed the challenged policy.  *Id.* at 72 (internal quotations omitted).  To the

contrary, the Court noted Congress' "studied choice of one alternative in preference to another,"

and relied on the fact that the policy at issue in that case had been "extensively considered by

Congress in hearings, floor debate, and in committee."  *Id.*  In other words, Congress had

received extensive evidence on the issue, and simply chose one of two competing alternatives.

The Supreme Court found that "[t]he District Court was quite wrong in undertaking an

independent evaluation of this evidence, rather than adopting an appropriately deferential

examination of *Congress'* evaluation of that evidence."  *Id.* at 82-83.

The study and evaluation of evidence that the *Rostker* Court found warranted judicial

deference is completely absent from the current record.  Contrary to Defendants' assertion, this

does not appear to be a case where the Court is required to pick sides in a "battle of experts."

Defs.' Mem. at 32.  To the contrary, the record at this stage of the case shows that the reasons

offered for categorically excluding transgender individuals were not supported and were in fact

contradicted by the only military judgment available at the time.  Accordingly, unlike the district

court in *Rostker*, the Court's analysis in this Opinion has not been based on an independent

evaluation of evidence or faulting of the President for choosing between two alternatives based

on competing evidence.

Third, Defendants seem to argue that they are free of the obligation of rationalizing the

Accession and Retention Directives because the directives are a mere continuation of a long-

standing policy.  This is false.  The Accession and Retention Directives constituted a *revocation* from transgender people of rights they were previously given.  Before the Accession and Retention Directives, transgender people had already been given the right to serve openly and the right to accede by a date certain in early 2018.  The Accession and Retention Directives took those rights away from transgender people and transgender people only.  The targeted revocation of rights from a particular class of people which they had previously enjoyed—for however short a period of time—is a fundamentally different act than not giving those rights in the first place, and it will be the government's burden in this case to show that *this* act was substantially related to important government objectives.  *See Perry v. Brown*, 671 F.3d 1052, 1079-80 (9th Cir. 2012), *vacated and remanded sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) ("Withdrawing from a disfavored group the right to obtain a designation with significant societal consequences is different from declining to extend that designation in the first place, regardless of whether the right was withdrawn after a week, a year, or a decade.").  Targeted revocations of rights are a factor that has been present in a number of cases finding equal protection violations.  *See Romer*, 517 U.S. at 627 (holding that law that "withdr[ew] from homosexuals, but no others, specific legal protection . . . and . . . forb[ade] reinstatement of these laws and policies" was unconstitutional); *Windsor*, 133 S. Ct. at 2695–96 (holding that the purpose of a law that "impose[d] a disability on [a] class by refusing to acknowledge a status" previously granted was to "disparage and to injure those" in that class).

Finally, Defendants argue that the military's previous study of transgender service cannot forever bind future administrations from looking into the issue themselves.  The Court fully agrees with this point.  The Court by no means suggests that it was not within the President's authority to order that additional studies be undertaken and that this policy be reevaluated.  If the

President had done so and then decided that banning all transgender individuals from serving in the military was beneficial to the various military objectives cited, this would be a different case. But as discussed above, that is not the case before the Court. The Court can only assess Plaintiffs' equal protection claim based on the facts before it. At this time, it appears that the rights of a class of individuals were summarily and abruptly revoked for reasons contrary to the only then-available studies. As explained above, based on the cumulative effect of various unusual facts, the Court is convinced that Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim. This finding in no way should be interpreted to prevent Defendants from continuing to study issues surrounding the service of transgender individuals in the military, as they have asserted that they intend to do.

The Court concludes this portion of its Memorandum Opinion with a caveat. This case comes before the Court on Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss. It is accordingly still at its very earliest stages, and the record is necessarily limited. The Court's task at this time is to determine whether Plaintiffs have stated plausible claims and demonstrated a *likelihood*—not a certainty—of success based on the present record. The Court is persuaded that Plaintiffs have made these fairly modest showings, but this is not a final adjudication of the merits of Plaintiffs' claims.

## 2.  Irreparable Injury

Next, the Court finds that Plaintiffs have demonstrated that they would suffer irreparable injury in the absence of preliminary injunctive relief. In order to satisfy the irreparable injury requirement, "[f]irst, the injury 'must be both certain and great; it must be actual and not theoretical.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). "Second, the injury must be beyond remediation." *Id.*

72

These elements are met here.  Defendants argue that "for much the same reasons they lack standing, Plaintiffs cannot show that they will suffer certain, great, or any actual injuries if the Court does not enter an injunction."  Defs.' Mem. at 21.  The Court has already rejected those arguments in the context of finding that Plaintiffs have standing, at least with respect to the Accession and Retention Directives, and rejects them again in this context.  Absent an injunction, Plaintiffs will suffer a number of harms that cannot be remediated after that fact even if Plaintiffs were to eventually succeed in this lawsuit.  The impending ban brands and stigmatizes Plaintiffs as less capable of serving in the military, reduces their stature among their peers and officers, stunts the growth of their careers, and threatens to derail their chosen calling or access to unique educational opportunities.  *See Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (holding that plaintiff would suffer irreparable injury in the absence of preliminary injunctive relief because "plaintiff faces the stigma of being removed from active duty as a sergeant in the Marine Corps—a position which he has performed in a sterling fashion for eleven years—and labeled as unfit for service solely on the basis of his sexual orientation, a criterion which has no bearing on his ability to perform his job").  Money damages or other corrective forms of relief will not be able to fully remediate these injuries once they occur.  Moreover, these injuries are also imminent, in that they are either ongoing or, at the latest, will begin when the Accession and Retention Directives take effect early next year.

These injuries are irreparable for the additional reason that they are the result of alleged violations of Plaintiffs' rights to equal protection of the laws under the Fifth Amendment.  "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Gordon v.*

*Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("'[A] prospective violation of a constitutional right

constitutes irreparable injury.'") (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346

(D.C. Cir. 1998)); *Chaplaincy*, 454 F.3d at 305 ("By alleging that Appellees are engaging in

conduct that violates the Establishment Clause, Appellants have satisfied the irreparable injury

prong of the preliminary injunction framework.").  Under this line of authority, Plaintiffs'

allegation of constitutional injury is sufficient to satisfy the irreparable injury requirement for

issuance of a preliminary injunction.

### 3.  Balance of Equities and Public Interest

Finally, the Court finds that Plaintiffs have shown that the public interest and the balance

of hardships weigh in favor of granting injunctive relief.  "A party seeking a preliminary

injunction must demonstrate both 'that the balance of equities tips in [its] favor, and that an

injunction is in the public interest.'"  *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C.

2015) (quoting *Winter*, 555 U.S. at 20) (alteration in original).  "These factors merge when the

Government is the opposing party."  *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

As already established, the Presidential Memorandum is causing Plaintiffs serious

ongoing harms and will cause them further harms in the near future absent an injunction.  On this

record, there are no countervailing equities or public interest in precluding transgender service

members from the military that outweigh those harms.  Defendants argue that "[t]he public has a

strong interest in national defense."  Defs.' Mem. at 41.  They also argue that the military "is in

the process of gathering a panel of experts" to provide advice and recommendations regarding

"the development and implementation of the policy on military service by transgender

individuals," and that "[g]ranting Plaintiffs their requested relief would directly interfere with the

panel's work and the military's ability to thoroughly study a complex and important issue regarding the composition of the armed forces." *Id.* at 40–41.

Neither point passes muster. A bare invocation of "national defense" simply cannot defeat every motion for preliminary injunction that touches on the military. On the record before the Court, there is absolutely no support for the claim that the ongoing service of transgender people would have *any* negative effective on the military at all. In fact, there is considerable evidence that it is the *discharge* and *banning* of such individuals that would have such effects. The Court also notes that fifteen States have filed an *amici* brief indicating that they and their residents will be harmed by the Presidential Memorandum if it is not enjoined. *See* State *Amici* Brief at 13-22. Moreover, the injunction that will be issued will in no way prevent the government from conducting studies or gathering advice or recommendations on transgender service. The balance of equities and public interest accordingly weigh in favor of granting Plaintiffs' motion.

## IV. CONCLUSION

For the reasons set out above, the Court will GRANT-IN-PART and DENY-IN-PART Defendants' Motion to Dismiss and GRANT-IN-PART and DENY-IN-PART Plaintiffs' Motion for Preliminary Injunction. The Court will grant Defendants' motion to dismiss Plaintiffs' claims to the extent they are based on the Sex Reassignment Surgery Directive, as well as Plaintiffs' estoppel claim. Defendants' motion to dismiss is DENIED in all other respects. Plaintiffs' motion for preliminary injunction is DENIED with respect to the Sex Reassignment Surgery Directive. Plaintiffs' motion for preliminary injunction is GRANTED, however, in that the Court will preliminarily enjoin enforcement of the Accession and Retention Directives. The effect of the Court's Order is to revert to the *status quo* with regard to accession and retention

that existed before the issuance of the Presidential Memorandum—that is, the retention and accession policies established in the June 30, 2016 Directive-type Memorandum as modified by Secretary of Defense James Mattis on June 30, 2017.  An appropriate Order accompanies this Memorandum Opinion.

　　　　　　　　　　　　　　　　   /s/
　　　　　　　　　　　　　　　　COLLEEN KOLLAR-KOTELLY
　　　　　　　　　　　　　　　　United States District Judge