# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

JANE DOE 1, *et al.*,

      Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

      Defendants.

Civil Action No. 17-cv-1597 (CKK)

---

## DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

For the reasons set forth in the attached Memorandum of Points and Authorities, Defendants move pursuant to Rule 26(c)(1) of the Federal Rules of Civil Procedure for a protective order to: (1) preclude Plaintiffs from seeking discovery from the President of the United States; (2) excuse the President from having to provide substantive information in response to Plaintiffs' interrogatories; (3) excuse the President from having to provide information in responses to Plaintiffs' interrogatories solely for the Court's *in camera* review.  In addition to their Memorandum of Points and Authorities, Defendants have filed a proposed order with this motion.  Pursuant to Rule 26(c), Defendants' counsel have met and conferred with Plaintiffs' counsel in an effort to resolve the dispute without Court action, but have been unable to do so.

February 27, 2018

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE

Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

 /s/ *Ryan Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Email: ryan.parker@usdoj.gov

Counsel for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE 1,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 17-cv-1597 (CKK) |
| **DONALD J. TRUMP,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR A PROTECTIVE ORDER</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

STANDARD OF REVIEW ........................................................................................... 10

SUMMARY OF THE ARGUMENT ........................................................................... 10

ARGUMENT ................................................................................................................ 12

    I.      Discovery of the President Should Be Precluded on Separation-of-Powers
           Grounds ................................................................................................. 13

    II.     Any Civil Discovery Directed At The President Must Be Strictly Circumscribed
           To Comply With The Separation Of Powers ......................................... 18

    III.    *In Camera* Review of Substantive Interrogatory Responses by the President Fails
           To Address Separation-of-Powers Concerns ......................................... 22

    IV.    The President Should Not Be Required to Formally Invoke Privilege Until the
           Court Rules that Plaintiffs Have Met Their Initial, Heavy Burden ...................... 26

        A.    Background on Presidential Communications Privilege .............................. 26

        B.    The Presidential Communications Privilege Applies to Factual Information
             About Communications That Would Reveal Presidential Deliberations ....... 27

        C.    Plaintiffs Have Not Met Their Initial Burden to Demonstrate Heightened
             Need for the Privileged Information, and Thus the Burden Has Not Shifted
             to the White House to Formally Invoke the Presidential Communications
             Privilege Through An Affidavit .................................................................... 34

        D.    Even If and When A Formal Claim of Privilege Were Required, Plaintiffs
             Could Not Meet Their Ultimate Heavy Burden in Showing a "Focused
             Demonstration of Need" Sufficient to Overcome The Presidential
             Communications Privilege ............................................................................ 37

CONCLUSION ............................................................................................................. 40

## INTRODUCTION

Plaintiffs have issued multiple, burdensome discovery requests directly to the President of the United States seeking information that goes to the heart of presidential deliberations about the formulation of military policy.  Specifically, Plaintiffs have served interrogatories, requests for production of documents, and requests for admission on the President that seek not only documents and information that the President considered concerning military service by transgender individuals, but also the identities of individuals within the Department of Defense ("DoD") and the Armed Forces that the President consulted in considering military policy. These discovery requests are extraordinary, as they are directed to the sitting President himself in a civil suit brought against the President in his official capacity.  For purposes of this motion, Plaintiffs have sought to put at issue just one aspect of the broad discovery they seek— interrogatory requests directed to the President—and the Court has specifically inquired whether information responsive to those interrogatory requests could be submitted for *in camera* review.[1]

Discovery directed at the President—especially discovery concerning his deliberations as Commander-in-Chief—should not be permitted at this time because it raises serious separation-of-powers concerns.  The law is clear that the President cannot be subject to direct injunctive relief, *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), and that courts should strictly circumscribe discovery directed to the President, *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 388 (2004).  These separation-of-powers considerations dictate that, before the Court requires the President to respond to discovery requests or formally assert the

---

[1]  Accordingly, this motion deals solely with the only ripe issue for this Court's consideration—Plaintiffs' challenge to Defendants' objections to the interrogatories, as raised in Plaintiffs' pre-motion letter.  *See* Pls.' Letter Br., ECF No. 86-1.  Although the arguments set forth below are applicable broadly to all discovery served on the President, Defendants reserve the right to move separately for appropriate relief if Plaintiffs challenge Defendants' objections to the requests for production of documents or requests for admission.

presidential communications privilege, it should narrow the broad scope of these discovery requests and require that Plaintiffs first seek other forms of discovery from alternative sources. *See Cheney*, 542 U.S. at 388. These same separation-of-powers concerns also would be implicated by an order requiring *in camera* review of the President's responses to Plaintiffs' interrogatories. More fundamentally, *in camera* review is unnecessary here because the Court can conclude as a matter of law that the type of substantive information Plaintiffs seek goes to the heart of the presidential communications privilege. And *in camera* review also is premature because Plaintiffs have not yet met their heavy initial burden of demonstrating particularized need for the challenged information.

For all of these reasons, set forth further below, the Court should grant the Defendants' motion for a protective order and preclude discovery directed towards the President.

## BACKGROUND

Plaintiffs filed this action on August 9, 2017, raising constitutional challenges to what they contend is a ban on the service of transgender individuals in the military. Compl., ECF No. 1. The complaint named, in their official capacities, the President, the Secretary of Defense, each of the service Secretaries, the Coast Guard, the Secretary of the Department of Homeland Security, and the United States.[2]

On August 25, 2017, the President issued a memorandum to the Secretaries of Defense and Homeland Security regarding military service by transgender individuals. Presidential Memorandum, 82 Fed. Reg. 41,319 (Aug. 25, 2017). The Presidential Memorandum, *inter alia*, directs further study by the Secretary of Defense, in consultation with the Secretary of Homeland

---

[2] On February 14, 2018, the parties filed a stipulation voluntarily dismissing the Coast Guard and the Secretary of the Department of Homeland Security from the lawsuit. *See* ECF No. 82.

Security, before the implementation of policy changes put in place by the prior administration. *Id.* § 3.  In addition, the memorandum directs "the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016 until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice would not have the negative effects discussed above." *Id.* § 1(b) (the retention directive).  The memorandum further directs the Secretary of Defense to "maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018, until such time as the Secretary of Defense, after consulting with the Secretary of Homeland Security, provides a recommendation to the contrary that [the President finds] convincing." *Id.* § 2(a) (the accession directive).  Finally, the memorandum directs the Department of Defense to "halt all use of DoD or DHS resources to fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." *Id.* § 2(b) (the surgery directive).

On August 29, 2017, Secretary of Defense James Mattis announced the establishment of a Department of Defense review process to provide advice and recommendations on the implementation of the President's direction.  Plaintiffs amended their complaint on August 31, 2017, ECF No. 9, and moved to preliminarily enjoin "the categorical exclusion of transgender people from the military," Pls.' Mem., ECF No. 13, at 39–40.  Defendants opposed Plaintiffs' motion for preliminary injunction and moved to dismiss the amended complaint on the ground that Plaintiffs lacked standing and had failed to state a claim.  Defs.' Mot., ECF No. 45.

In an order and memorandum opinion dated October 30, 2017, the Court granted in part Plaintiffs' motion for a preliminary injunction, and partially granted Defendants' motion to

3

dismiss.  Order, ECF No. 60.  The Court preliminarily enjoined the Presidential Memorandum's

accession and retention directives, finding that Plaintiffs were likely to succeed on their claims

that the accession and retention directives violated the equal protection component and Due

Process Clause of the Fifth Amendment.  Mem. Op., ECF No. 61, at 64–72.  The Court

dismissed Plaintiffs' claims to the extent they were based on the surgery directive, as well as

Plaintiffs' estoppel claim.  *Id.* at 75.

Following the Court's rulings, the parties began discovery.  Plaintiffs directed

extraordinary, broad discovery against the President, including 22 interrogatories, 12 requests for

admission, and 25 document production requests.  *See, e.g.*, Ex. 1, Pls.' First Set of Interrogs.

(Dec. 15, 2017); Ex. 2, Pls.' First Set of Reqs. for Admis. (Dec. 15, 2017); Ex. 3, Pls.' First Set

of Reqs. for Produc. (Dec. 15, 2017).  Each of Plaintiffs' discovery requests seeks information

concerning the President's deliberations and decisionmaking process.  Plaintiffs' interrogatories,

which are discussed in more detail below, purport to require the President to identify all

communications, documents, data, facts, information, and research that the President reviewed,

relied upon, or considered in formulating policy regarding military service by transgender

individuals.  Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017).[3]

---

[3] Plaintiffs seek directly from the President similar information about his communications in other discovery requests that they have not put at issue in the instant dispute raised with the Court concerning interrogatory responses.  For example, their requests for admission request that the President admit that "between January 20, 2017, and July 26, 2017," Secretary Mattis, General Joseph Dunford, and Lieutenant General H.R. McMaster "did not recommend that President Trump adopt a policy that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. military" and admit that he did not inform Secretary Mattis, General Dunford, or Lieutenant General McMaster "that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. military" prior to the President's statement on July 26, 2017.  *See* Ex. 2, Pls.' First Set of Reqs. for Admis. (Dec. 15, 2017), at 4–6.  Plaintiffs also issued wide-ranging request for documents to all Defendants, including the President—again, which they have not put at issue in the present dispute before the Court—seeking documents related to presidential communications and deliberations.  Ex. 3, Pls.' First Set of Reqs. for Produc. (Dec. 15, 2017).

The President objected to Plaintiffs' requests and did not provide responses to the interrogatory requests.  Defendants objected to any discovery directed to the President, on several grounds, including that such discovery should be foreclosed based on separation-of-powers principles and because virtually all of the specific discovery sought is subject to executive privilege, and in particular, the presidential communications privilege.  Ex. 4, Defs.' Objs. to Pls.' First Set of Interrogs. to Def. Donald J. Trump (Feb. 6, 2018).

 Nevertheless, Defendants have collected and reviewed hundreds of thousands of pages of non-privileged records in response to Plaintiffs' document requests, producing to Plaintiffs more than 80,000 pages of documents to date on an expedited, rolling basis from the Department of Defense, Joint Chiefs of Staff, Defense Health Agency, and the Departments of the Army, Air Force, and Navy.

The discovery dispute that is the subject of the instant motion arose from the President's objections to Plaintiffs' interrogatories seeking information concerning the President's deliberations and decisionmaking process.[4]  At issue is information responsive to 22

---

For example, Plaintiffs requested: (1) all "documents reflecting or memorializing any oral communication identified in the responses to Plaintiffs' interrogatories"; (2) all documents "constituting, summarizing, reflecting, or evidencing communications from, to, between, or among any" defendant concerning the policy and policy decisions; (3) all "documents concerning military service by transgender people provided to President Trump"; and (4) all "documents relied on by President Trump." *Id.* at 3, 4, 6, 17.  Because Plaintiffs have raised objections solely to the President's interrogatory responses at this stage, this motion focuses on those discovery requests.

[4]  The President objected to the requests for admission on the same grounds raised in this motion and on other privilege grounds.  Ex. 5, Defs.' Objs. to Pls.' First Set of Reqs. for Admis. to Def. Donald J. Trump (Feb. 6, 2018).  In raising the pending discovery dispute with the Court, Plaintiffs have not challenged Defendants' objections to the requests for admission. Additionally, Defendants objected to the interrogatories and requests for admission directed to the President based on the deliberative process privilege, attorney-client privilege, and work product privilege.  *See* Ex. 4, Defs.' Objs. to Pls.' First Set of Interrog. To Def. Donald J. Trump (Feb. 6, 2018); Ex. 5, Defs.' Objs. to Pls.' First Set of Reqs. for Admis. To Def. Donald J. Trump (Feb. 6, 2018).  Plaintiffs have not challenged Defendants' assertions of those privileges.

interrogatories propounded to the President related to his substantive communications concerning the development of military policy (and interrogatories for the same information related to presidential communications served on the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Secretaries of the Army, Navy, and Air Force). Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017). The interrogatories are intended to elicit information about the President's deliberations and decisionmaking process in formulating military policy. Indeed, Plaintiffs acknowledge that the interrogatories are intended to require the disclosure of deliberative information so that Plaintiffs, and presumably the Court, can "assess[ ] any process" that the President took in making policy decisions related to the military. *See* Pls.' Letter Br., ECF No. 86-1, at 1, 2. The interrogatories purport to require the President and other Defendants to catalog and disclose the totality of the President's deliberations—who was involved, when they were involved, how they were involved, and what advice was communicated to the President—under oath. Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017), at 5–7 (Interrogatories 1 through 10 directed to the President), 7 (Interrogatory 13 directed to Secretary of Defense), 8–9 (Interrogatories 14 through 18 directed to the President, the Secretary of Defense, and the Chairman of the Joint Chiefs of Staff), 9–10 (Interrogatories 19 through 25 directed to all Defendants); *see also* Fed. R. Civ. P. 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath"). Plaintiffs' interrogatories seek, among other things:

- The disclosure of all communications between the President (or immediate presidential advisors and their staff) and any individual from the Department of Defense, Department of Homeland Security, Armed Forces, Congress, or "any other person," concerning military service by transgender individuals (Interrogatories 4, 5, 17, 18, 19, 20, and 21);

- A catalog of all documents "reviewed, relied upon, and/or considered by" the President (Interrogatories 2, 10, and 14);

- The disclosure of "all information, facts, data, and research reviewed, relied upon, and/or considered by" the President (Interrogatory 3);

- The identification of all individuals involved in drafting the President's Twitter statement (Interrogatory 15); and

- The disclosure of whether the President received advice from any attorney related to military service by transgender individuals, and the dates, subject matter, and communications containing or transmitting such advice (Interrogatory 8).

Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017).

The President objected to Plaintiffs' interrogatories directed to him "on several grounds, including that such discovery should be foreclosed in this case based on separation of powers principles and that virtually all of the specific discovery sought is subject to executive privilege, and in particular, the presidential communications privilege." Ex. 4, Defs.' Objs. to Pls.' First Set of Interrogs. to Def. Donald J. Trump (Feb. 6, 2018).[5]

Plaintiffs notified the Court on Friday, February 9, 2018, that the parties were engaged in a discovery dispute concerning "[w]hether the Defendants should be compelled to provide privilege-log type information (*e.g.*, the existence of a communication, its date, and the identity of the participants) for communications with the President and/or the Executive Office of the President about transgender military service (including the identity of the "Generals and military experts" disclosed in the tweets), or whether such disclosure is blocked by the assertion of the qualified presidential communications privilege."[6] Ex. 7, Email from Daniel McFadden to

---

[5] The remaining Defendants also objected to providing information concerning presidential communications in response to Plaintiffs' interrogatories. *See, e.g.*, Ex. 6, Defs.' Objs. and Resps. to Pls.' First Set of Interrogs. to Secretary Mattis (Feb. 6, 2018).

[6] Plaintiffs also stated that the parties disputed "[w]hether the Defendants should be compelled to produce Department of Defense communications concerning transgender military service between the date the President announced his decision to ban transgender individuals from service, July 26, 2017, and his issuance of implementing guidance in a Presidential Memorandum on August 25, 2017, or whether such disclosure is blocked by the assertion of the qualified deliberative process privilege." Ex. 7, Email from Daniel McFadden to chambers (Feb.

chambers (Feb. 9, 2018).  That same day, the Court directed the parties to submit letter briefs

"setting forth their positions and any legal support for those positions, by no later than Monday,

February 12, 2018 at noon," and scheduled a telephone conference.  Ex. 8, Email from chambers

to counsel for the parties (Feb. 9, 2018).

Plaintiffs' letter brief put at issue and specifically identified 12 interrogatories directed to

the President to which Defendants objected.  Pls.' Letter Br., ECF No. 86-1, at 1 (citing Pls.'

Interrogs. 2, 4, 5, 8, 10, 14, 15, 17–21).  Plaintiffs argued that they propounded interrogatories

"to discover what process actually preceded the tweets" and to have "a basis for evaluating any

claim of privilege."[7]  *Id.*

In their letter brief, Defendants argued that discovery directed at the President should be

prohibited on separation-of-powers grounds based on Supreme Court precedent.  *See* Defs.'

Letter Br., ECF No. 86, at 1 (citing *Mississippi*, 71 U.S. at 501; *Franklin v. Massachusetts*, 505

U.S. 788, 802–03 (1992); *Cheney*, 542 U.S. at 385).  Defendants also argued that the specific

information sought by Plaintiffs about the President's communications was protected by the

presidential communications privilege because that "information plainly 'reflect(s) presidential

---

9, 2018)*.  Defendants' assertion of deliberative process privilege over communications among
DoD personnel is not at issue in this motion.  *See* Ex. 10, Tr. of Telephone Conference at 3:12–
5:7 (Feb. 16, 2018) (discussing the parties' agreement to have further discussions regarding the
documents withheld for deliberative process privilege).

[7]  Plaintiffs also asserted that "the Executive Office of the President has provided a
privilege log in response to Plaintiffs' document requests that is devoid of any useful
information" because "[i]t addresses written communications at such a high level of
generality . . . that it is impossible to discern what, if any process resulted in the President's
announcement, or whether any privilege applies."  Pls.' Letter Br., ECF No. 86-1, at 2.
However, the adequacy of the privilege log is not presently at issue because Plaintiffs chose to
limit the instant dispute to interrogatory responses.  Moreover, any dispute about the privilege
log is not ripe because Plaintiffs have not identified the specific entries over which they have
objections, and therefore the meet and confer process has not begun, much less been completed,
on this issue.

decisionmaking and deliberations,' and disclosure of this information would intrude on presidential deliberations and impede the President's ability to perform his constitutional duty." *Id.* at 2 (citing *In re Sealed Case*, 121 F.3d 729, 744, 751 (D.C. Cir. 1997)).  Finally, given the importance of the constitutional and privilege issues addressed in the letter brief, Defendants requested the opportunity to fully brief these matters.  *Id.* at 1.

After the parties' submission of letter briefs, the Court held a telephone conference on February 13, 2018.  *See* Ex. 9, Tr. of Telephone Conference (Feb. 13, 2018).  The Court indicated that Defendants had not provided enough information for the Court to adequately determine whether information about communications responsive to Plaintiffs' interrogatories is properly protected by the presidential communications privilege.  *See id.* at 7:14–21.  The Court described the President's decision not to provide information about his communications as an assertion of "absolute" privilege.[8]  *See id.* at 6:1–8:4.  The Court inquired whether the Government would be willing to submit for *in camera* review the substantive responses to Plaintiffs' interrogatory requests, that is, with whom the President or his senior advisors and their staff communicated, when the communication occurred, and the subject of the communication. *See id.* at 15:12–15, 27:2–10.  The Court permitted counsel an opportunity to confer with Defendants concerning the Court's proposal, and in lieu of a written response, continued the telephone conference.  *See id.* at 28:14–29:6.

The Court reconvened the telephone conference on February 16, 2018.  *See* Ex. 10, Tr. of Telephone Conference (Feb. 16, 2018).  Defendants advised the Court that they were not amenable to preparing and submitting for *in camera* review the substantive responses to

---

[8]  As discussed below, Defendants do not contend that the presidential communications privilege is an "absolute" privilege that cannot be overcome by a significant showing of need, among other things.  *See infra* Section IV.

Plaintiffs' interrogatory requests.  *See id.* at 5:11–16.  At Defendants' request, the Court set a

briefing schedule on whether Plaintiffs are entitled to discovery into substantive information

about the communications of the President and his senior advisors concerning military service by

transgender individuals.  *See id.* at 5:17–6:14.

## STANDARD OF REVIEW

Rule 26(b) of the Federal Rules of Civil Procedure allows the parties to "obtain discovery

regarding any nonprivileged matter that is relevant to any party's claim or defense and

proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Rule 26(c) provides that the

Court has broad discretion, for good cause shown, to "issue an order to protect a party or person

from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P.

26(c)(1); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984) (stating that "Rule

26(c) confers broad discretion on the trial court to decide when a protective order is appropriate

and what degree of protection is required").  This discretion includes orders forbidding the

requested discovery altogether.  Fed. R. Civ. P. 26(c)(1)(A); *see also St. John v. Napolitano*, 274

F.R.D. 12, 16 (D.D.C. 2011) (stating that a protective "order may forbid disclosure altogether").

## SUMMARY OF THE ARGUMENT

Plaintiffs have directed burdensome, far-reaching discovery to the President concerning

his deliberations on military policy in his role as Commander-in-Chief.  The Court should

preclude Plaintiffs from requesting such discovery and excuse the President from having to

provide substantive information in response to Plaintiffs' interrogatories, even for *in camera*

review, based on separation-of-powers principles.  The Supreme Court has repeatedly recognized

that a court order directed at the President should not be issued because the President, like

Congress, is a coequal branch of government, and for the President to be ordered to perform

particular official acts could violate the separation of powers.  Thus, as a threshold matter, the

Court should find that the President should not be subject to discovery because he cannot be subject to direct injunctive relief for his official, discretionary actions in this case.  Moreover, separation-of-powers concerns dictate that before the Court requires the President to formally assert the presidential communications privilege, it must narrow the broad scope of these discovery requests and require Plaintiffs to exhaust other sources of discovery.

*In camera* submission of information responsive to the interrogatory requests about presidential communications would not adequately resolve these broad separation-of-powers concerns.  First, an order compelling the President to submit to discovery in this case, even if limited to *in camera* review, would still conflict with the separation-of-powers principles reflected in *Mississippi*, *Franklin*, and *Cheney*.  Further, preparing the requested information for *in camera* review would subject the President and his staff to the same heavy burdens as would producing the information to Plaintiffs, which is clearly the sort of "distract[ion] [] from the energetic performance of [the President's] constitutional duties" that *Cheney* sought to prevent.  542 U.S. at 382.  Moreover, even if *in camera* review were appropriate under *Cheney* (which it is not), such review would not assist the Court in resolving the legal question of whether the type of information at issue here—information concerning presidential deliberations—is subject to the presidential communications privilege as a matter of law.  The presidential communications privilege applies to factual information that is revelatory of the President's decisionmaking process and confidential communications, such as factual information that would reveal details about presidential communications concerning the development of military policy.  Disclosure of such information would intrude on the President's decisionmaking process, disrupt the President's performance of his responsibilities, and undermine the confidentiality needed "to ensure that presidential decisionmaking is of the highest caliber." *In re Sealed Case*, 121 F.3d at 750.  While *Cheney* makes clear that the Executive should not be forced to formally assert

11

privilege at this stage, the Court need not review the actual information at issue to decide that it would be subject to the privilege.

In addition, *in camera* review is premature because Plaintiffs have not yet even attempted to meet their heavy, initial burden of establishing a heightened, particularized need for the specific information sought before requiring the President to formally invoke the privilege. *See Dairyland Power Co-op. v. United States*, 79 Fed. Cl. 659, 660 (2007). Until Plaintiffs have met their initial burden of satisfying the "exacting standards" of "relevancy," "admissibility," and "specificity," pursuant to the Supreme Court's analysis of this issue in *Cheney*, 542 U.S. at 386, the burden does not shift to the White House to undertake the time-consuming process of formally invoking the presidential communications privilege and the Court need not—and should not—engage in *in camera* review of the substantive responses to Plaintiffs' interrogatories.

For all of these reasons, the Court should grant Defendants' motion for a protective order and preclude discovery directed at the President.

## ARGUMENT

### I.   Discovery of the President Should Be Precluded on Separation-of-Powers Grounds.

As a threshold matter, because Plaintiffs may not obtain—and the Court may not order—injunctive or declaratory relief directly against the President for his official conduct, Plaintiffs likewise should not be permitted to request—and the Court should not order—the President to respond to discovery.

To maintain the constitutional separation of powers, courts have long recognized that the non-ministerial conduct of the President when he acts in his official capacity cannot be enjoined. In *Mississippi v. Johnson*, the Supreme Court held that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." 71 U.S. at 501. In that case, the State of

Mississippi sought to enjoin President Andrew Johnson from executing the Reconstruction Acts, which Mississippi claimed were unconstitutional.  *See id.* at 497.  In barring injunctive relief against the President, the Court reasoned that when presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion."  *Id.* at 499.  Just as courts cannot enjoin Congress in exercising its legislative function, they cannot enjoin the President in exercising the executive function.  *Id.* at 500 ("Neither can be restrained in its action by the judicial department . . . .").  To do so, the Court observed, would be "without a precedent."  *Id.*

A "majority of the Justices" in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), reaffirmed these fundamental principles.  *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). In *Franklin*, a district court issued an injunction requiring the President to take certain actions related to the census.  *See* 505 U.S. at 791.  Writing for the plurality, Justice O'Connor explained that "the District Court's grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows."  *Id.* at 802 (citation omitted).  The plurality reiterated that "in general, '[the] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"  *Id.* at 802–03 (quoting *Mississippi*, 71 U.S. at 501).  "At the threshold," it said, "the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether appellees' injuries were nonetheless redressable."  *Id.* at 803.

Concurring in *Franklin*, Justice Scalia explained that, under *Mississippi*, courts may impose neither injunctive nor declaratory relief against the President in his official capacity.  *Id.* at 827–28.  Therefore, just as the President is absolutely immune from official capacity damages suits, so too is he immune from efforts to enjoin him in his official capacity.  *Id.* at 827 ("Many of the reasons [the Court] gave in *Nixon v. Fitzgerald*, [457 U.S. 731, 749 (1982)], for

13

acknowledging an absolute Presidential immunity from civil damages for official acts apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions . . . .").  Justice Scalia reasoned that the principle that the President "may not be ordered to perform particular executive . . . acts at the behest of the Judiciary" is "implicit in the separation of powers" and is supported by Supreme Court precedent and historical practice.  *Id.* at 827–28.  "Permitting declaratory or injunctive relief against the President personally would not only distract him from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" but also "would produce needless head-on confrontations between district judges and the chief executive."  *Id.* at 828 (quoting U.S. Const., Art. II, § 3).  Based on these separation-of-powers concerns, Justice Scalia concluded that "[u]nless the other branches are to be entirely subordinated to the Judiciary, [the courts] cannot direct the President to take a specified executive act."  *Id.* at 829.

In line with *Mississippi* and *Franklin*, courts in this and other circuits have rejected plaintiffs' demands to enjoin the President in the performance of his official duties, regardless of the claim at issue.[9]  For example, in *Swan v. Clinton*, a former member of the National Credit

---

[9]  In *Newdow v. Roberts*, the D.C. Circuit stated that "[w]ith regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief."  603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi*, 71 U.S. at 501; *Franklin*, 505 U.S. at 827–29).  Other courts routinely have applied this principle.  *See, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated and remanded on other grounds*, 138 S. Ct. 377 (2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir. 2017), *vacated and remanded on other grounds sub. nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017); *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 632 (D. Md. 2017); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539–40 (N.D. Cal. 2017), *appeal docketed* No. 17-16886 (9th Cir. Sept. 18, 2017); *Settle v. Obama*, No. 3:15-cv-365, 2015 WL 7283105, at *6 (E.D. Tenn. Nov. 17, 2015); *Day v. Obama*, No. 1:15-cv-00671, 2015 WL 2122289, at *1 (D.D.C. May 1, 2015); *Willis v. Dep't of Health & Human Servs.*, 38 F. Supp. 3d 1274, 1277 (W.D. Okla. 2014); *McMeans v. Obama*, No. 11-cv-891, 2011 WL 6046634, at *3 (D. Del. Dec. 1, 2011); *Shreeve v. Obama*, No. 1:10-cv-71, 2010 WL 4628177, at *5 (E.D. Tenn. Nov. 4, 2010); *Anderson v. Obama*, No. CIV. PJM 10-17, 2010 WL 3000765, at *2 (D. Md. July 28, 2010); *Carlson v. Bush*, No. 6:07CV1129-ORL19UAM, 2007 WL 3047138, at *3 (M.D. Fla.

Union Administration ("NCUA") Board sued the President and two subordinates after the President removed him from his position. 100 F.3d at 975. The plaintiff sought to have his removal and his successor's appointment declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the NCUA Board. *Id.* In determining whether the plaintiff's injury was redressable, the D.C. Circuit considered "whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties." *Id.* at 976. The Court first recognized that the Supreme Court had "'left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely ministerial duty.'"[10] *Id.* at 977 (quoting *Franklin*, 505 U.S. at 802). Although the Court found that the President's duty to comply with the removal restrictions in the NCUA statute was "ministerial and not discretionary," it nonetheless determined that injunctive relief against the President was not appropriate. *Id.* The Court reiterated the Supreme Court's "stern admonition" from *Franklin* that "injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken." *Id.* at 978. The rationale behind this doctrine, the Court found, was "painfully obvious":

---

Oct. 18, 2007); *Comm. to Establish the Gold Standard v. United States*, 392 F. Supp. 504, 506 (S.D.N.Y. 1975); *Nat'l Ass'n of Internal Revenue Emps. v. Nixon*, 349 F. Supp. 18, 21–22 (D.D.C. 1972); *Reese v. Nixon*, 347 F. Supp. 314, 316–17 (C.D. Cal. 1972); *S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672, 672 (N.D. Cal. 1971); *Suskin v. Nixon*, 304 F. Supp. 71, 72 (N.D. Ill. 1969).

[10] A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion." *Mississippi*, 71 U.S. at 498; *see also Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) ("A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." (citing *Mississippi*, 71 U.S. at 498)). In contrast, "a duty is discretionary if it involves judgment, planning, or policy decisions." *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (citation omitted). There can be no question here that Plaintiffs seek to enjoin the President from performing a discretionary duty—the formation of military policy—that goes to the heart of his authority as Commander-in-Chief.

the President, like Congress, is a coequal branch of government, and for the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers.

*Id.* (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment)).  Because the plaintiffs could obtain an injunction against other executive officials, the Court ultimately avoided deciding whether it could order injunctive relief against the President, which "would require [the Court] to delve into complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch."  *Id.* at 981; *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996) (distinguishing between cases where the court is "reluctan[t] to bring judicial power to bear directly on the President" and cases where the "review of a claim is directed at a subordinate executive official").[11]

The principle derived from the *Mississippi v. Johnson* line of cases that the President himself may not be subject to judicial relief for his official actions underscores that the President should not be subject to discovery in this case.  It is undisputed that Plaintiffs brought suit against the President in his official capacity, challenging actions he took concerning military policy in his role as Commander-in-Chief.  *See* Am. Compl., ECF No. 9, ¶¶ 1, 41.  It is also undisputed that Plaintiffs seek declaratory and injunctive relief against the President.  *Id.* ¶ 9.  An order directing the President himself to respond to discovery, where he is not properly subject to declaratory or injunctive relief on the merits in this case, raises the same separation-of-powers concerns raised by the Supreme Court and D.C. Circuit in the *Mississippi* line of cases.  *See also*

---

[11]  Similarly, in *Newdow v. Bush*, the district court found that "issuing an injunction against the President raises serious separation of powers concerns," and that it would be an "extraordinary measure" to issue an injunction against the President.  355 F. Supp. 2d 265, 280, 282 (D.D.C. 2005).

*Fitzgerald*, 457 U.S. at 753 (recognizing the "President's constitutional responsibilities and status as factors counseling judicial deference and restraint").  Although the Supreme Court did not categorically foreclose discovery of the President in *United States v. Nixon*, 418 U.S. 683, 711–12 (1974), *Nixon* is distinguishable because it involved a subpoena in a criminal case and this case involves civil discovery.  *See Cheney*, 542 U.S. at 384 (explaining that "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions'" as a request for information in a criminal case) (quoting *Nixon*, 418 U.S. at 713); *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807) (subpoena against the President in a criminal case); *see also infra* Subsection IV(D) (contrasting the need for discovery in a civil case as compared to a criminal case).  Accordingly, the Court should not order the President to respond to Plaintiffs' discovery requests, including the interrogatory information at issue in the initial dispute raised by Plaintiffs.[12]

---

[12] This is not to say that Plaintiffs may not obtain discovery from the other Defendants in this case (subject, of course, to applicable privileges and prescribed scope) or that the Court may not enjoin the actions of subordinate officials in the Executive Branch.  Therefore, "[i]n most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."  *Swan*, 100 F.3d at 978–79 (citing *Franklin*, 505 U.S. at 803; *Reich*, 74 F.3d at 1328, 1331 n.4; *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982)).  Of course, as discussed in *infra* Section II and *infra* Section IV(B), where Plaintiffs seek confidential information regarding presidential communications from the other named Defendants, the separation-of-powers principles set forth in *Cheney*, 542 U.S. at 385, and the presidential communications privilege bar this discovery, just as these principles and privilege apply where Plaintiffs seek such confidential information directly from the President himself.  However, since Plaintiffs have challenged only the objections to the interrogatories directed to the President in the present dispute before the Court, *see* Pls.' Letter Br., ECF No. 86-1, the interrogatory objections and responses of the remaining named Defendants are not presently ripe for this Court's consideration.

II.     **Any Civil Discovery Directed At The President Must Be Strictly Circumscribed To Comply With The Separation Of Powers.**

The burdensome, far-reaching discovery requests that Plaintiffs have served on the President also should not be permitted for related separation-of-powers reasons, under which the Court should, at a minimum, require Plaintiffs to exhaust other sources of discovery before the President is required to respond to discovery or assert privilege.

Unlike other civil litigants, the President comes to court with unique "constitutional responsibilities and status." *Fitzgerald*, 457 U.S. at 753.  The President is "the chief constitutional officer of the Executive Branch," and is "entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id.* at 750.  As a result, the Supreme Court "has held, on more than one occasion, that '[t]he highest respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery.'" *Cheney*, 542 U.S. at 385 (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)); *see also Fitzgerald*, 457 U.S. at 753 ("Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint.").  The President's "communications and activities" also "encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual.'" *Cheney*, 542 U.S. at 381 (quoting *Nixon*, 418 U.S. at 715).  Indeed, as this Court has recognized, "'special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated.'" *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 182 (D.D.C. 2005) (Kollar-Kotelly, J.) (quoting *Cheney*, 542 U.S. at 385).

Accordingly, discovery directed against the President implicates weighty separation-of-powers issues. *Cheney*, 542 U.S. at 383.  The Executive has a powerful interest in protecting

confidential information, as well as in shielding itself from litigation demands "that might distract it from the energetic performance of its constitutional duties." *Id.* at 382. Discovery targeting the President threatens these interests, with the potential to upset the balance between the Judicial and Executive branches. *Id.*

In *Cheney*, the Supreme Court addressed how lower courts should handle civil discovery requests directed at the Executive Office of the President or Vice President, given these separation-of-powers concerns. The Court held that when discovery requests are submitted to the Executive, lower courts should not force the Executive to respond by invoking privilege. The Court explained:

> Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These 'occasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible.

*Id.* at 389–90 (quoting *Nixon*, 418 U.S. at 692). To prevent such clashes, the Court held that before the Executive is forced to "bear the burden" of formally asserting executive privilege, lower courts must consider whether "other avenues" exist for disposing of the discovery demands. *Cheney*, 542 U.S. at 388, 390; *see also id.* at 391 (rejecting the D.C. Circuit's "mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections").

The Court suggested that one such avenue was for lower courts to narrow the scope of requested discovery, thereby leaving the Executive with less material over which to consider asserting privilege. *Id.* at 390. The Court cited approvingly to *United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 1989), where the district court narrowed significantly a criminal

defendant's subpoena against former President Ronald Reagan, while rejecting the defendant's argument that the former President first had to assert executive privilege. *Id.* at 1503; *Cheney*, 542 U.S. at 390.

*Cheney* thus stands for the principle that the separation of powers compels lower courts to strictly circumscribe discovery requests made to the Executive Office of the President and Vice President. Such requests should be allowed only when plaintiffs can show that they are absolutely necessary to their case, and any requests should be limited in scope to only the necessary parts. *See Lardner v. U.S. Dep't of Justice*, No. CIV.A.03-0180(JDB), 2005 WL 758267, at *9 (D.D.C. Mar. 31, 2005) (citing *Cheney* for the proposition that "a court must screen a request for presidential documents to ensure that the discovery is essential to the proceedings"); *Citizens for Responsibility & Ethics in Washington v. Cheney*, 580 F. Supp. 2d 168, 180 (D.D.C. 2008) (Kollar-Kotelly, J.) (describing *Cheney* as "specifically distinguish[ing]" between broad discovery and "more narrow discovery requests that would safeguard against unnecessary intrusion into the operation of the Office of the President" (citation omitted)).

These considerations apply with even greater force with respect to discovery directed to the President himself. Accordingly, the Court should, at a minimum, require Plaintiffs to exhaust discovery from other sources before forcing the President to respond to burdensome discovery or formally assert executive privilege. As set out in detail above, the broad interrogatories Plaintiffs have served on the President would require him personally to identify communications that he had on various topics related to the development of policy concerning transgender military service with various high-level officials, members of Congress, and persons generally, as well as to identify numerous meetings, their participants, their topics, and all documents relating to those meetings, among other requests. *See* Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017). These far-reaching, burdensome interrogatories are similar in breadth to the discovery at issue in

*Cheney*, which, among other requests to the Vice President, sought "All documents concerning any communication relating to the activities of [a Presidential task force], the activities of any [sub-groups to the task force], or the preparation of the [task force's report]." *Cheney*, 542 U.S. at 387. The Court characterized the requests in *Cheney* as "overly broad," "anything but appropriate," and "unbounded in scope." *Id.* at 387–88. Plaintiffs' interrogatories here likewise seek "everything under the sky." *Id.* at 387.

During the telephone conference, Plaintiffs argued, and the Court appeared to initially accept, that their duty to exhaust alternatives to discovery of the President had been satisfied by Plaintiffs' efforts to seek precisely the *same* privileged information in the possession of other officials at the Department of Defense and in the Armed Forces. Respectfully, that is not the kind of alternative source of discovery that *Cheney* contemplates. The core purpose of the holding in *Cheney* is to avoid discovery that unnecessarily intrudes upon the President and to defer and ideally eliminate the need for a privilege assertion over presidential information—that is, to channel discovery away from such information. Thus, *Cheney* does not allow a litigant to seek precisely the same privileged presidential information from a source other than the President. Even as to such discovery, the President's interests and information would be at issue, and privilege would still apply to the same or similar information concerning presidential communications. If all that was necessary to avoid separation-of-powers concerns were for a party serving an interrogatory to seek such privileged presidential information by serving that same interrogatory on a federal agency, the principles set forth in *Cheney* would be rendered a nullity. Thus, Plaintiffs' apparent theory—that *Cheney* would permit them to obtained privileged information concerning presidential communications so long as it does not come directly from the President—has no basis in logic or the law. Clearly, then, the alternative approach to discovery contemplated in *Cheney* is discovery that would not seek, require, or intrude upon

21

presidential communications and deliberations, regardless of where the records or knowledge of those communications may be located.  *See id.*  Instead, consistent with *Cheney*, Plaintiffs should, at a minimum, be required to seek discovery relevant to their claims that does not concern the President's communications and from sources other than the President and his immediate White House advisors and their staff.

In this regard, Plaintiffs have already, and will continue to, receive substantial amounts of non-privileged information related to the merits of their claims from other defendants.  Plaintiffs have so far deposed three officials from DoD and the Armed Forces, and currently are scheduled to depose three more, including Anthony Kurta, Deputy Assistant Secretary of Defense for Military Personnel Policy, Office of the Under Secretary for Personnel and Readiness, who served as the Chair of the Panel of Experts for the Transgender Policy Review.  Defendants also have produced to Plaintiffs more than 80,000 pages of documents from DoD and the Armed Forces.  Only upon exhausting these alternative sources of discovery should the Court consider whether to force the President to invoke executive privilege.[13]  *See Cheney*, 542 U.S. at 390.

## III.   *In Camera* Review of Substantive Interrogatory Responses by the President Fails To Address Separation-of-Powers Concerns.

The Court has raised the prospect of submitting, for *in camera* review, the substantive responses to the interrogatories seeking information about presidential deliberations into the formulation of military policy.  Respectfully, this would not adequately resolve the broad separation-of-powers concerns outlined above.  Indeed, under the principles established in *Cheney*, the Court should not even reach the issue of *in camera* review until the Court, at a minimum, narrows the discovery at issue.  *See id.* at 388, 390.

---

[13]  The Court should also consider that Secretary of Defense Mattis has presented to the President an implementation plan that may alter the issues in this case and obviate any purported need for discovery directed to the President.

First, an order compelling the President to submit to discovery in this case, even if limited to *in camera* review, would still conflict with the separation-of-powers principles reflected in *Mississippi*, *Franklin*, and *Cheney*.  Such an order for *in camera* review still directs the President to identify and produce information in response to discovery requests.  And given that *Cheney* makes clear that the President should not be forced at this time to respond to discovery requests or formally assert privilege, an order for *in camera* review would provide little relief.  This is especially so if the Court's intent is to assess the potential applicability and merits of the presidential communications privilege over such information—precisely what *Cheney* found to be inappropriate.  *See* 542 U.S. at 402 (rejecting approach whereby the district court could entertain privilege claims and review allegedly privileged documents *in camera*).[14]

Likewise, preparing the requested information for *in camera* review (which is the substantive responses to the interrogatories) would subject the President and his staff to the same heavy burdens as would producing the information to Plaintiffs.  To formulate responses to the interrogatories, the President and his advisors would have to comb through their records, notes, and memories to track down every person the President or other top officials spoke with about the military's transgender polices, to determine every person present at meetings where those policies were discussed, and to identify countless documents and dates.  Doing so would require a substantial commitment of time and resources on the part of the President and his staff, and—

---

[14]  As discussed in *infra* Section IV, Defendants do not contend that the presidential communications privilege is "absolute" in the sense that it cannot be subject to judicial review or in the sense that it cannot be overcome by a strong showing of need.  But because *Cheney* makes clear that the Executive should not be forced to assert privilege at this stage, *in camera* review also would be inappropriate.  In addition, as discussed further below, *in camera* review of the substantive information responsive to the interrogatories at issue here would not aid the Court in resolving the legal question of whether the type of information at issue here—information about presidential communications—is subject to the presidential communications privilege when and if any such assertion becomes ripe for review.

because the requests focus so directly on interactions with the President—of the President himself.  This in itself is precisely the sort of "distract[ion] [] from the energetic performance of [the President's] constitutional duties" that *Cheney* sought to prevent.  542 U.S. at 369.[15]

Finally, even if the issue were ripe, *in camera* review would provide no benefit to the Court in determining whether the information would be properly subject to the presidential communications privilege.[16]  The substantive information responsive to the interrogatory requests at issue, concerning who communicated with the President and when about the development of military policy, is not needed to resolve whether this type of information is privileged as a matter of law.  Whether discovery of the President should proceed, or whether this kind of information is subject to the presidential communications privilege, are purely legal questions for which the Court does not need to review the particular information responsive to the interrogatory requests.  For example, independent of whether the President met with ten advisors in the month leading up to a policy decision or whether he met with twenty advisors two months prior, the type of information at issue here either is covered by the presidential communications privilege, as Defendants contend, or is not covered by the privilege, as Plaintiffs contend.  *Cf. Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ("In camera inspection

---

[15]  Although this motion concerns only Plaintiffs' interrogatories, Plaintiffs also have served 25 broad requests for production and 12 requests for admission directed to the President. If the President were obligated to respond to those requests *in camera* as well, the burden on his constitutional functions would be even greater.  Ordering the President to provide responses to all of these discovery requests, even for *in camera* review, would require the Executive Office of the President, and often the President himself, to search for thousands of documents and to review in immense detail the specifics of the President's decisionmaking process and deliberations.

[16]  Again, as *Cheney* makes clear, a formal assertion of privilege should not be required at this stage.  The potential applicability of the presidential communications privilege to the information at issue in this dispute over interrogatory responses is discussed further in *infra* Section IV.

requires effort and resources and therefore a court should not resort to it routinely on the theory that 'it can't hurt.'").

The situation at issue here can be distinguished from a discovery dispute about the production of allegedly privileged documents.  If the issue is whether a particular document is shielded by the presidential communications privilege, a privilege log or the submission of the document *in camera* potentially could assist the Court in determining relevant factual information, such as whether the document actually "reflect[s] presidential decisionmaking and deliberations," and whether the document was authored or solicited and received by the President or immediate White House advisors in the Executive Office of the President and their staff.  *See In re Sealed Case*, 121 F.3d at 744, 754.  In contrast, in the case at hand, such information is clear from the face of the interrogatories—which explicitly request information about communications that reflects presidential decisionmaking—and the "privilege-log type information" responsive to the interrogatories would not add anything to the Court's analysis, either before or after a formal invocation of the privilege. *See* Ex. 7, Email from Daniel McFadden to chambers.

Additionally, Defendants also have objected to the interrogatories directed to the President based on the deliberative process privilege, attorney-client privilege, and work product doctrine.  *See* Ex. 4, Defs.' Objs. to Pls.' First Set of Interrogs. to Def. Donald J. Trump (Feb. 6, 2018).  Therefore, because Plaintiffs are challenging *only* the presidential communications privilege, their challenge and any corresponding *in camera* review of substantive information responsive to the interrogatories would be futile to the extent that other privileges also apply. For this reason as well, even if it were appropriate for the Court to consider the applicability of the presidential communications privilege at this stage, which it is not under *Cheney*, *in camera*

review would not resolve the issue of whether this information is discoverable based on the applicability of other privileges.

Finally, in the event that the Court does order *in camera* review, Defendants must be permitted an opportunity to formally invoke the privilege prior to the provision of any information for the Court's *in camera* review. *See In re Sealed Case*, 121 F.3d at 741 (stating that the White House has no "obligation to formally invoke its privilege in advance of a motion to compel"); *Dairyland Power Co-op.*, 79 Fed. Cl. at 669 (concluding that because plaintiffs had met their initial burden, "the White House must be allowed the opportunity to submit an affidavit formally invoking the privilege and stating the reasons for the invocation, in the context of which the Court can review the subject documents in camera to determine if the privilege actually applies here"). For this reason as well, any *in camera* review at this stage would be improper.

## IV.    The President Should Not Be Required to Formally Invoke Privilege Until the Court Rules that Plaintiffs Have Met Their Initial, Heavy Burden.

The foregoing considerations should foreclose the requested discovery and *in camera* review of the information about presidential communications concerning the development of military policy that Plaintiffs seek in their interrogatory requests. However, to the extent the Court believes that discovery against the President is potentially available, it should first require Plaintiffs to meet their heavy, initial burden of establishing a heightened, particularized need for the specific information sought before requiring the President to formally invoke the privilege. *See Dairyland Power Co-op*, 79 Fed. Cl. at 660.

### A.    Background on Presidential Communications Privilege

The presidential communications privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708; *see In re Sealed Case*, 121 F.3d at 743 (describing the privilege's

26

"constitutional origins").  The privilege is broad, protecting the "confidentiality of Presidential communications in performance of the President's responsibilities," *Nixon*, 418 U.S. at 711, as well as "documents or other materials that reflect presidential decisionmaking and deliberations," *In re Sealed Case*, 121 F.3d at 744.  The privilege also extends to communications authored or solicited and received by immediate White House advisors in the Executive Office of the President and their staff.  *See id.* at 754.  The privilege "covers final and post-decisional material as well as pre-deliberative ones."  *Id.* at 745.

In assessing an assertion of presidential communications privilege, the Judiciary must be mindful of the "special considerations" affecting separation of powers that control when "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."  *Am. Historical Ass'n*, 402 F. Supp. 2d at 182 (quoting *Cheney*, 542 U.S. at 385); *see also Cheney*, 542 U.S. at 382 ("We have, in short, long recognized the 'unique position in the constitutional scheme' that [the Executive Office of the President] occupies.") (citation omitted); *id.* at 385 ("The [Supreme] Court has held, on more than one occasion, that '[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery,' . . . and that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it . . . .") (citation omitted).

### B.     The Presidential Communications Privilege Applies to Factual Information About Communications That Would Reveal Presidential Deliberations.

The presidential communications privilege applies to "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d at 744.  Unlike the deliberative process

privilege, the presidential communications privilege protects facts and "sources of information,"

in addition to the substance of deliberations. *See id.* at 745, 750; *Loving v. Dep't of Defense*, 550

F.3d 32, 38 (D.C. Cir. 2008) (contrasting the deliberative process privilege). Plaintiffs' contrary

assertion that they are entitled to be informed of the "existence" of such communications, as well

as the "content" of such communications, *see* Pls.' Letter Br., ECF No. 86-1, at 2, is,

accordingly, without merit. The privilege encompasses factual information that is revelatory of

the President's decisionmaking process and confidential communications. The presidential

communications privilege is not "absolute" in the sense of being outside the scope of judicial

review or in the sense of trumping a strong showing of need.[17] Nonetheless, it applies to the

category of information at issue here—factual information that would reveal details about

confidential presidential communications—which is at the heart of presidential decisionmaking

and deliberations.[18]

Such information is shielded by the presidential communications privilege because it

plainly "reflect[s] presidential decisionmaking and deliberations," and disclosure of this

information would intrude on presidential deliberations and impede the President's ability to

perform his constitutional duty. *See In re Sealed Case*, 121 F.3d at 744, 751. Indeed, Plaintiffs

readily admit that they seek the identities of the individuals the President communicated with and

---

[17] As discussed in *infra* Subsection IV(D), although a formal claim of privilege is not required at this stage, it should be apparent that Plaintiffs could not meet their ultimate burden to show a "focused demonstration of need" to overcome any privilege assertion. *See In re Sealed Case*, 121 F.3d at 746.

[18] The fact that the privilege would apply to this information does not necessarily mean that the President would choose to formally assert it. A decision about whether to formally assert the privilege would be premature at this juncture under *Cheney* and because, as discussed in Subsection IV(C) *infra*, Plaintiffs have not met their initial burden of establishing a heightened, particularized need for the specific information sought before requiring the President to formally invoke the privilege. *See Dairyland Power Co-op*, 79 Fed. Cl. at 660.

the dates of the communications for the purpose of Plaintiffs' "assessment of any process" that the President took in making policy decisions related to national security and the military. *See* Pls.' Letter Br., ECF No. 86-1, at 2; Ex. 9, Telephone Conference (Feb. 13, 2018), at 19:8–11 (Plaintiffs' Counsel: "[T]his information [sought in the interrogatories] is [ ] important to us [because] it sheds a light on the process by which the president arrives at his decision to ban transgender military service as reflected in the tweet.").

Discovery seeking information about the identities of those who communicated with the President would constitute a substantial intrusion on the Presidency. Disclosure of the kind of comprehensive information Plaintiffs seek about the timeline and scope of the President's decisionmaking process—including the intimate details about whom the President decided to meet, whom the President trusted to participate in these meetings, what topics were discussed, which advisors the President chose to consult with and rely on for advice, when each of these meetings and communications took place, as well as whom the President chose *not* to meet with or consult about a decision—would intrude on the President's decisionmaking process. Such discovery into the President's communications and decisionmaking process plainly would be disruptive of the President's performance of his constitutional responsibilities and would undermine the confidentiality needed "to ensure that presidential decisionmaking is of the highest caliber." *In re Sealed Case*, 121 F.3d at 750; *see Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("The ability to discuss matters confidentially is surely an important condition to the exercise of executive power. . . . In designing the Constitution, the Framers vested the executive power in one man for the very reason that he might maintain secrecy in executive operations.").

It is readily apparent why this is so. Disclosure of those with whom the President communicated on a particular matter and when, or with whom the President chose not to confer,

would plainly reveal the President's deliberative process—including what sources of advice and information he chose to call upon.  As just one example, disclosure of the names of individuals who met with the President about a Supreme Court vacancy would potentially identify the candidates the President is considering.  Similarly, disclosure of the President's meeting with a particular economist with well-known views or expertise during a time when the President was known to be considering economic initiatives could reveal the types of economic initiatives under consideration.  And disclosure of the identities of national security experts who met with the President or White House advisors at a certain time could expose the kinds of anti-terrorism measures under consideration, by virtue, for example, of an individual's known area of expertise. *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.*, 592 F. Supp. 2d 111, 119 (D.D.C. 2009) (acknowledging that disclosing the identities of individuals some of these hypothetical situations could "shed some degree of light on the deliberations of the President").  Accordingly, the presidential communications privilege properly shields the President and his immediate advisors and their staff from the discovery of this type of factual information that reflects presidential decisionmaking.

Compelling disclosure of this type of factual information would be especially intrusive in this context, in which the President, acting in his capacity as Commander-in-Chief, was deliberating on an issue involving national security and military concerns.  And disclosure of the same privileged information from the individuals with whom the President communicated—instead of obtaining the information from the President himself—would equally implicate the presidential communications privilege.  Regardless of who is being asked to disclose the

information, this type of information about presidential communications is protected by privilege.[19]

Additionally, because of the nature of the interrogatories, disclosure of such information would also tend to reveal the substantive content of the communications.  The interrogatories seek, for example, information concerning "every meeting attended by President Trump, Secretary Mattis and/or General Dunford between January 20, 2017, and August 25, 2017, at which military service by transgender people was discussed," including the date of the meeting, the identities of all participants in the meeting, the topics discussed, "all [d]ocuments distributed, considered, or discussed at such meeting," and "all [d]ocuments memorializing such meeting." Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017) (Interrogatory No. 17).[20]  A response to such

---

[19]  Analogously, "[t]he attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services."  *In re Lindsey*, 158 F.3d 1263, 1267 (D.C. Cir. 1998). Communications protected by the attorney-client privilege remain privileged, regardless of whether a party seeks to obtain the privileged information from the attorney or from the client.

[20]  *See also* Interrogatory No. 20, which purports to require the President to

[i]dentify all Communications between President Trump and Secretary Mattis, the Department of Defense, General Dunford, the Joint Chiefs of Staff, the Department of Homeland Security, and/or any Service Branch from January 20, 2017, to August 25, 2017, concerning military service by transgender individuals, including Communications concerning: (a) any evaluation(s) conducted by the Department of Defense on the impact of accessions of transgender applicants on readiness or lethality; (b) the issuance of or assessments or other responses provided in response to Accessions Readiness Memorandum; (c) the decision announced in the Accessions Deferral Memorandum; (d) the President's Twitter Statement; (e) the Presidential Memorandum; and/or (f) the Interim Guidance.

Ex. 1, Pls.' First Set of Interrogs. (Dec. 15, 2017) (Interrogatory No. 20).  Further, Plaintiffs' First Set of Requests for Admission to Defendant Donald J. Trump similarly seek admissions of information protected by the presidential communications privilege, including information regarding whether the President received certain policy recommendations from high-level government officials.  *See* Ex. 2, Pls.' First Set of Reqs. for Admis. (Dec. 15, 2017) (Request for Admission No. 9) ("Admit that, between January 20, 2017, and July 26, 2017, Secretary Mattis did not recommend that President

interrogatories would necessarily reveal substance about the communications because it would not only identify the individuals involved in the communications and the date of the communication, but it would also reveal the core subject of the communication and how the conversation may fit within the known timeline of events.

Protecting information about presidential communications plainly serves the purpose of the presidential communications privilege. As the D.C. Circuit has recognized, there is a "great public interest" in preserving "the confidentiality of conversations that take place in the President's performance of his official duties" because such confidentiality is needed to protect "the effectiveness of the executive decision-making process." *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973); *see In re Sealed Case*, 121 F.3d at 745–46 (noting the "concern that the President be given sufficient room to operate effectively," and explaining that "limit[ing] the President's ability to communicate . . . privately [would] interfer[e] with his ability to exercise control over the executive branch").

This case is distinguishable from *Citizens for Responsibility & Ethics in Washington v. Department of Homeland Security*, a Freedom of Information Act ("FOIA") case in which the Court determined that the White House visitor logs were not protected by the presidential communications privilege because the information contained in the logs "sheds no light on the content of communications between the visitor and the President or his advisors, whether the communications related to presidential deliberation or decisionmaking, or whether any substantive communications even occurred." 592 F. Supp. 2d at 118–19. In contrast, Plaintiffs here specifically demand information that identifies communications (including dates and the

Trump adopt a policy that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. military.").

identity of the participants) with the President and his immediate advisors and their staff

regarding military service by transgender individuals for the express purpose of "permitting an

assessment of any process that preceded the reversal of the policy." Pls.' Letter Br., ECF No.

86-1, at 1. Indeed, Plaintiffs candidly acknowledge that the purpose of their discovery requests

is to "discover the process, if any, that prompted the President's abruptly tweeted reversal of the

military policy permitting service by transgender people." *Id.* Unlike in *Citizens for*

*Responsibility & Ethics in Wash.*, disclosing the requested information in this case would reveal

information specifically about the President's own deliberations, including details regarding

communications between the President and those with whom he spoke. Moreover, it would be

clear that the communications related specifically to presidential deliberations and

decisionmaking about military service by transgender individuals. *See Citizens for*

*Responsibility & Ethics in Washington*, 592 F. Supp. 2d at 119 (acknowledging that factual

circumstances surrounding a visit with the President "might reveal the substance of presidential

deliberations.").

Further, the D.C. Circuit later held that FOIA requests for White House visitor logs, such

as the one in *Citizens for Responsibility & Ethics in Washington*, 592 F. Supp. 2d at 118, were

improper because White House visitor logs belong to the President, not the Secret Service, and

thus were not "agency records" within the meaning of FOIA. *See Judicial Watch, Inc. v. U.S.*

*Secret Serv.*, 726 F.3d 208, 226–227 (D.C. Cir. 2013). Otherwise, the Court reasoned, FOIA

would produce an unconstitutional intrusion into the President's decisionmaking. *See id.*

(analogizing to the presidential communications privilege and explaining that construing FOIA

"to extend to White House visitor logs—regardless of whether they are in the possession of the

White House or the Secret Service—could substantially affect the President's ability to meet

confidentially with foreign leaders, agency officials, or members of the public. And that could

render FOIA a potentially serious congressional intrusion into the conduct of the President's daily operations.").

For all the foregoing reasons, there should be little doubt that, as a threshold matter, the information responsive to Plaintiffs' interrogatory requests would be subject to an assertion of the presidential communications privilege.

C. **Plaintiffs Have Not Met Their Initial Burden to Demonstrate Heightened Need for the Privileged Information, and Thus the Burden Has Not Shifted to the White House to Formally Invoke the Presidential Communications Privilege Through An Affidavit.**

Because of the "unique position in the constitutional scheme" that the Executive Office of the President occupies, *Cheney*, 542 U.S. at 382, parties seeking discovery from the President must satisfy an initial burden of demonstrating a heightened, particularized need for the information they seek. Until Plaintiffs have met this initial burden, the burden does not shift to the White House to formally invoke the presidential communications privilege by means of affidavit. *See Dairyland Power Co-op.*, 79 Fed. Cl. at 662 ("The Court agrees with the Government that, in the case of a discovery request aimed at the President and his close advisors, the White House need not formally invoke the presidential communications privilege until the party making the discovery request has shown a heightened need for the information sought. This is the teaching of both *Cheney*[, 542 U.S. at 367] and *In re Sealed Case*[, 121 F.3d at 720]. Therefore, the issue here is whether [Plaintiff's] Statement of Need established such a heightened need."). In this case, Plaintiffs have not attempted to satisfy the "exacting standards" of "relevancy," "admissibility," and "specificity," pursuant to the Supreme Court's analysis of this issue in *Cheney*. *See* 542 U.S. at 386. Only after the Court has found that Plaintiffs have satisfied these standards should the White House be required to undertake the burdensome process of formally invoking the presidential communications privilege, and only then should the

Court balance the public interest served by protecting the President's confidentiality in this context against Plaintiffs' need for the privileged information.[21]

As discussed above, the Supreme Court has recognized that the White House is unlike other litigants and has emphasized the necessity of protecting the Executive Branch at its highest level from vexatious litigation that might distract it from the energetic performance of its constitutional duties. *See id.* at 382. In light of separation-of-powers considerations, which are discussed more fully in Section II *supra*, the Supreme Court in *Cheney* expressly rejected the notion that the Executive Branch at its highest level shall bear the initial burden of invoking executive privilege with specificity or making particular objections to discovery on a line-by-line basis to safeguard executive functions and maintain the separation of powers. *Id.* at 383, 388. The Court noted that the criminal subpoenas at issue in *United States v. Nixon* "were [first] required to satisfy exacting standards of '(1) relevancy; (2) admissibility; [and] (3) specificity.'" *Id.* at 386 (quoting *Nixon*, 418 U.S. at 700). This process served "as an important safeguard against unnecessary intrusion into the operation of the Office of the President," *id.* at 387, and was the means by which "the party requesting the information—the special prosecutor [in *Nixon*, 418 U.S. at 683]—had satisfied his burden of showing the propriety of the [subpoena] requests." *Id.* at 388.

These "exacting standards" apply *a fortiori* in this case where Plaintiffs are seeking *civil* discovery from the Executive Branch at its highest level. As noted by the Supreme Court in *Cheney*, "[t]he need for information for use in civil cases, while far from negligible, does not share the urgency or significance of the criminal subpoena requests in *Nixon*." *Id.* at 384.

---

[21] As discussed in Subsection IV(D) *infra*, the showing of need required to overcome a valid assertion of the presidential communications privilege is higher in a civil case than in the context of a criminal investigation or trial. *In re Sealed Case*, 121 F.3d at 743; *Cheney*, 542 U.S. at 384.

Because it is a "'primary constitutional duty of the Judicial Branch . . . to do justice in criminal prosecutions,'" the withholding of information "from a tribunal in an ongoing criminal case when the information is necessary to the court in carrying out its tasks 'conflict[s] with the function of the courts under Art[icle] III.'" *Id.* (citations omitted). "Such an impairment of the 'essential functions of [another] branch' . . . is impermissible." *Id.* (citation omitted). In contrast, the withholding of information in a civil case "does not hamper another branch's ability to perform its 'essential functions' in quite the same way." *Id.*

Moreover, "[a] party's need for information is only one facet of the problem." *Id.* at 385. The burden imposed on the White House by discovery orders is an "important factor" to be considered by the courts owing to the special deference and "'[t]he high respect that is owed to the office of the Chief Executive." *Id.* Preparing and executing an affidavit formally invoking the presidential communications privilege with specificity is a burdensome, time-consuming process that would detract from the many constitutional responsibilities of the White House. The Court also must be particularly cognizant of the fact that the Executive Office of the President is, because of its high visibility, an easily identifiable target for civil suits and corresponding discovery orders. *Id.* at 386. In contrast to the criminal justice system, where "there are various constraints, albeit imperfect, to filter out insubstantial legal claims, . . . there are no analogous checks in the civil discovery process." *Id.* Because of these considerations, the Court must hold Plaintiffs to their initial burden before shifting the burden to the White House to formally assert the presidential communications privilege.

Accordingly, if the Court declines to conclude outright that discovery of the President should be precluded on separation-of-powers grounds, *see supra* Section I, the Court should first require Plaintiffs to meet their initial heavy burden of heightened need for the interrogatory information at issue here by satisfying the "exacting standards of '(1) relevancy; (2)

36

admissibility; [and] (3) specificity.'" *Id.* (quoting *Nixon*, 418 U.S. at 700).  Only then should

Defendants be required to come forward with a formal invocation of the presidential

communications privilege.

> **D.      Even If and When A Formal Claim of Privilege Were Required, Plaintiffs Could Not Meet Their Ultimate Heavy Burden in Showing a "Focused Demonstration of Need" Sufficient to Overcome The Presidential Communications Privilege**.

Assuming, *arguendo*, the Court were to conclude that Plaintiffs have met their initial

burden of heightened need, it should decline to require the President to formally invoke the

presidential communications privilege, because Plaintiffs would not be able to meet their burden

to overcome the privilege and compel production of the privileged information.

Although the presidential communications privilege is not absolute, the bar to

overcoming the privilege is high; it is "more difficult to surmount" than the deliberative process

privilege.  *In re Sealed Case*, 121 F.3d at 746.  A party seeking otherwise privileged presidential

material must demonstrate a "focused demonstration of need."  *Id.*; *see also Judicial Watch, Inc.

v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004).  Courts will balance "the public

interests served by protecting the President's confidentiality in a particular context with those

furthered by requiring disclosure."  *In re Sealed Case*, 121 F.3d at 753.  To meet this heavy

burden of "specific need" in a criminal matter, the party seeking the privileged presidential

[communications] must first demonstrate "that each discrete group of the subpoenaed materials

likely contains important evidence"—that is, evidence "directly relevant to issues that are

expected to be central to the trial," and not evidence that is "only tangentially relevant or would

relate to side issues."  *Id.* at 753–55.  The party seeking the discovery must also "detail [its]

efforts" "to determine whether sufficient evidence can be obtained elsewhere," and "explain why

[notwithstanding other sources of information,] evidence covered by the presidential

communications privilege is still needed." *Id.* at 755 (explaining that this standard reflects the Supreme Court's "insistence that privileged presidential communications should not be treated as just another source of information").

Where privileged material is sought for use in a civil case, the burden to overcome the presidential communications privilege is even greater. The greater scrutiny is appropriate because "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions'" as a request for information in a criminal case. *Cheney*, 542 U.S. at 384 (quoting *Nixon*, 418 U.S. at 711); *see also U.S. Dep't of Treasury v. Black*, No. No. 17-5142, 2017 WL 6553628, at *2 (D.C. Cir. Dec. 8, 2017) (faulting district court for failing to "account for how the public interests in this [civil] case differ from those presented in our prior decisions," such as that "'the need for information in the criminal context is much weightier' than the need in the civil context.") (quoting *Cheney*, 542 U.S. at 384); *In re Sealed Case*, 121 F.3d at 754 (noting "the [*Nixon*] Court's repeated emphasis on the importance of access to relevant evidence in a criminal proceeding"); *Am. Historical Ass'n*, 402 F. Supp. 2d at 181 (explaining that the *Cheney* Court noted that "while withholding necessary materials in an ongoing criminal case constitutes an impermissible impairment of another branch's essential functions, the same could not be said of document requests in the civil context"); *cf. Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc) ("[T]he sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions." (emphasis added)).

In this case—a civil matter seeking discovery directly from the President, in his capacity as Commander-in-Chief, related to his decisionmaking process on a topic involving national security and military concerns—Plaintiffs face a significant burden in order to overcome a valid

assertion of the presidential communications privilege.  Plaintiffs cannot meet this burden, especially where the requested discovery seeks information that, on its face, is privileged (including information about presidential communications and drafts of presidential documents) and would plainly intrude on core presidential deliberations, or where the requested discovery seeks information that could be sought from other sources, including publicly available ones.

To overcome the presidential communications privilege, it is incumbent on Plaintiffs to explain in detail what evidence they have obtained in support of their legal claims and what the privileged material at issue might add—that is, to "explain why evidence covered by the presidential [communications] privilege is still needed." *In re Sealed Case*, 121 F.3d at 755.  It is not Defendants' burden to make this showing for Plaintiffs.  *See Black*, 2017 WL 6553628, at *2 (emphasizing that plaintiffs "bear the burden to demonstrate 'with specificity' 'that each discrete group of the subpoenaed materials likely contains important evidence,'" and that plaintiffs "bear the further burden of demonstrating" that they have "'first'" made diligent efforts "'to determine whether sufficient evidence can be obtained elsewhere'" (quoting *In re Sealed Case*, 121 F.3d at 754–55)).  As the D.C. Circuit recently made clear, a district court must "thoroughly analyze" whether plaintiffs have met this burden.  *Id.* (vacating and remanding order granting motion to compel where district court failed to adequately explain "how [plaintiffs] met their burden to demonstrate a need sufficient to overcome" the presidential communications privilege).

Accordingly, the Court should not require a formal claim of privilege at this stage because it should be apparent that Plaintiffs cannot meet their ultimate burden to show a focused demonstration of need to overcome any privilege assertion.

## CONCLUSION

For the foregoing reasons, the Court should enter a protective order to: (1) preclude Plaintiffs from seeking discovery from the President of the United States; (2) excuse the President from having to provide substantive information in response to Plaintiffs' interrogatories; (3) excuse the President from having to provide information in responses to Plaintiffs' interrogatories solely for the Court's *in camera* review.

February 27, 2018                    Respectfully Submitted,

                                     CHAD A. READLER
                                     Acting Assistant Attorney General
                                     Civil Division

                                     BRETT A. SHUMATE
                                     Deputy Assistant Attorney General

                                     JOHN R. GRIFFITHS
                                     Branch Director

                                     ANTHONY J. COPPOLINO
                                     Deputy Director

                                      /s/ *Ryan Parker*
                                     RYAN B. PARKER
                                     Senior Trial Counsel
                                     ANDREW E. CARMICHAEL
                                     Trial Attorney
                                     United States Department of Justice
                                     Civil Division, Federal Programs Branch
                                     Tel: (202) 616-8482
                                     Email: ryan.parker@usdoj.gov

                                     *Counsel for Defendants*