**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 2[1], JANE DOE 3, JANE DOE 4, JANE DOE 5, JANE DOE 6, JANE DOE 7, JOHN DOE 1, JOHN DOE 2, REGAN V. KIBBY, and DYLAN KOHERE, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; the UNITED STATES DEPARTMENT OF THE ARMY; MARK T. ESPER, in his official capacity as Secretary of the Army; the UNITED STATES DEPARTMENT OF THE NAVY; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE AIR FORCE; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; the UNITED STATES COAST GUARD; KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security; the DEFENSE HEALTH AGENCY; RAQUEL C. BONO, in her official capacity as Director of the Defense Health Agency; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. 17-cv-1597 (CKK) <br><br><br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This is a constitutional challenge to the ban on military service by transgender

individuals ("transgender military ban" or "ban").  That policy, first announced last July by

---

[1]      The parties agreed to the dismissal of the claims brought by Jane Doe 1, who is no longer in the Armed Forces.

President Trump and now more specifically set forth in a February 22, 2018 Memorandum for the President from Secretary of Defense James N. Mattis ("February 22 Memorandum"), excludes transgender people from military service, regardless of their fitness to serve.

2.      The transgender military ban, as originally articulated in tweets from the President and as set forth in the February 22 Memorandum, inflicts immediate, concrete injury upon Plaintiffs.  It violates both the Equal Protection component of the Fifth Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

3.      This lawsuit seeks declaratory, preliminary, and permanent injunctive relief against implementation of the ban.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over the claims under 28 U.S.C. §§ 1331 and 1343.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the acts described in this Complaint occurred in this judicial district.

## PLAINTIFFS

6.      Plaintiffs are five active duty servicemembers in the United States military who serve openly as transgender people; one active duty servicemember who has not yet disclosed her transgender status; and four transgender people who seek admission to the military, either through the process of enlistment or through an academic program that leads to a commission.  Some proceed under pseudonyms here to protect their privacy and for fear of retribution.

7.      Jane Doe 2 has been enlisted in the National Guard since 2003 and has been on active duty in the United States Army since 2006.

8.      Jane Doe 2 notified her command that she was transgender after the United States Department of Defense announced in June 2016 that it would allow transgender servicemembers to serve openly in the military.

9.      In reliance on the Department's promise to allow transgender servicemembers to serve openly, Jane Doe 2 began to seek medical treatment relating to her gender transition in September 2016.

10.      Since informing her command that she is transgender, Jane Doe 2 has continued serving in her post without incident.

11.      Jane Doe 2's current contract with the military extends through November 2018. Under the transgender military ban, she will be forced to serve under a cloud of uncertainty about continued service, promotions, and health care; and she will suffer harm because her continued service will be permitted only under a conditional and limited exception to a policy that deems transgender people unfit for service.

12.      Jane Doe 3 has served in the United States Army since 2015.  She has previously been deployed to Afghanistan and is currently deployed to Iraq.

13.      In or around June 2016, in reliance on the Department of Defense policy permitting transgender people to serve openly in the military, Jane Doe 3 notified her command that she was transgender.  Since then, she has continued serving in her post without incident.

14.      Jane Doe 3's current contract with the military extends through December 2018. She plans to renew her contract and is also interested in applying to become a warrant officer or making other career transitions that could be considered a new accession to the Army.  Under the transgender military ban, it is unclear whether Jane Doe 3 will be able to make these career transitions.  At a minimum, she will be forced to serve under a cloud of uncertainty about continued service and health care; and she will suffer harm because her continued service will be permitted only under a conditional and limited exception to a policy that deems transgender people unfit for service.

15.     Jane Doe 4 has served in the United States Army since 2000.

16.     In or around June 2016, in reliance on the Department of Defense policy permitting transgender people to serve openly in the military, Jane Doe 4 met with her commanding officer to identify herself as transgender.  She began receiving medical treatment related to her gender transition in September 2016.

17.     Since coming out as transgender, Jane Doe 4 has continued serving in her post without incident.

18.     Jane Doe 4's current contract with the military extends through June 2018.  She plans to renew her contract to complete two additional years of service following the expiration of her current contract so that she can reach twenty years of service and receive retirement benefits. Under the transgender military ban, Jane Doe 4 will be forced to serve under a cloud of uncertainty about continued service, promotions, and health care; and she will suffer harm because her continued service will be permitted only under a conditional and limited exception to a policy that deems transgender people unfit for service.

19.     Jane Doe 5 has been an active duty member of the United States Air Force for nearly twenty years, serving multiple tours of duty abroad, including two in Iraq.

20.     After June 2016, in reliance on the announcement that transgender people would be permitted to serve openly, she notified her superiors that she was transgender.  Since she made this disclosure, she has continued to serve without incident.

21.     Under the transgender military ban, Jane Doe 5 will be forced to serve under a cloud of uncertainty about continued service, promotions, and health care; and she will suffer harm because her continued service will be permitted only under a conditional and limited exception to a policy that deems transgender people unfit for service.

22.     Jane Doe 6 joined the Army in 2014.  She has received hundreds of hours of specialized training, above the basic training required for her position, in joint target development, joint battle assessment, unmanned aerial surveillance, and computer science.

23.     Jane Doe 6 is transgender.  She had made a behavioral health appointment to obtain a transition plan and begin her gender transition when President Trump tweeted his announcement that transgender people were no longer permitted to serve.  As a result, Jane Doe 6 never came out to her doctors or chain of command as transgender.

24.     Under the transgender military ban, if Jane Doe 6 notifies her command that she is transgender and seeks health care for the distress she experiences from having to serve in a manner inconsistent with her gender identity, she faces separation from the military.  Separation would have serious consequences for Jane Doe 6.  She would be ineligible for a military pension and other benefits upon which she relies.  A separation would also have serious negative repercussions for her career and livelihood.  In addition, the transgender military ban causes Jane Doe 6 the immediate harms of curtailing her access to health care and forcing her to live inconsistently with her gender identity to avoid separation from the military.

25.     Jane Doe 7 is a transgender woman who was seeking to join the Coast Guard when the Trump administration announced its implementation plan banning service by transgender people on March 23, 2018.  Jane Doe 7 went through the process of gender transition seven years ago.

26.     Under the transgender military ban, Jane Doe 7 will be unable to join the Coast Guard.  She will be deprived of the opportunity to serve her country and the many benefits that enlistment in the Coast Guard would afford her.

27.     John Doe 1 was a Reserve Officers' Training Corps ("ROTC") cadet from 2014 to 2016 and has served as a Second Lieutenant in the United States Army since July 2016.

28.     John Doe 1 advised his superiors in ROTC that he is transgender.  He was commissioned as a Second Lieutenant shortly after the Department of Defense announced that transgender people would be permitted to serve openly.  In reliance on that policy, John Doe 1 notified his command that he was transgender.  John Doe 1 has served since that time and has been praised for his commitment to excellence.

29.     After the President's tweets, John Doe 1's transition-related care was subject to prolonged delays and substantial disruption.  He did, however, undergo transition-related surgery in January 2018 and is currently ready to be deployed.  His unit is now on standby to deploy to PACOM (Pacific Command) and is scheduled for deployment to CENTCOM (Central Command) next spring.

30.     Under the transgender military ban, John Doe 1 will be forced to serve under a cloud of uncertainty about continued service and health care; and he will suffer harm because his continued service will be permitted only under a conditional and limited exception to a policy that deems transgender people unfit for service.

31.     John Doe 2 is a transgender man who was in the process of enlisting in the Army when the Trump administration announced its implementation plan banning service by transgender people on March 23, 2018, specifically prohibiting enlistment for anyone who has undergone gender transition.  John Doe 2 went through the process of gender transition almost a decade ago. He disclosed his transgender status to the recruiter when he began the enlistment process.

32.     Under the transgender military ban, John Doe 2 will be unable to join the Army. He will be deprived of the opportunity to serve his country, including the financial and career benefits that enlistment in the Army will afford him.

33.     Regan V. Kibby is a midshipman at the United States Naval Academy.  In reliance on the policy permitting transgender people to serve openly, he told the Naval Academy that he is transgender.  He was approved for a medical leave of absence so that his transition would be complete in time for him to receive his commission in the U.S. Navy upon graduation.

34.     Under the transgender military ban, it is unclear whether Plaintiff Kibby will be permitted to return to the Naval Academy or to join the U.S. Navy as a commissioned officer.  If he is permitted to return to the Naval Academy and join the U.S. Navy as a commissioned officer, he will be forced to serve under a cloud of uncertainty about continued service and health care; and he will suffer harm because his service will be permitted only under a conditional and limited exception to a policy that deems transgender people unfit for service.

35.     Dylan Kohere is a first-year college student who is taking academic ROTC classes at the university he attends.  He is also transgender.  After President Trump's announcement of a ban on transgender people serving in the military, he was barred from joining the ROTC Program, including being denied the ability to partake in physical training or ROTC labs.  While Plaintiff Kohere has continued to take ROTC academic classes, he never enrolled in the ROTC Program because of the ban.

36.     Under the transgender military ban, Plaintiff Kohere is barred from enlisting in the military and, as a result, is not permitted to enroll in the ROTC program or to receive an ROTC scholarship.

**DEFENDANTS**

37.     Defendant Donald J. Trump is President of the United States and Commander in Chief of the Armed Forces.  On July 26, 2017, President Trump stated on Twitter that transgender people would not be permitted to serve "in any capacity in the U.S. military."

38.     Defendant James N. Mattis is the United States Secretary of Defense and the leader of the Department of Defense.  Pursuant to a directive issued by President Trump on August 25, 2017, Secretary Mattis led an effort to develop a plan to implement the President's ban.  He transmitted that plan to the President in February 2017, and it was released to the public on March 23, 2018.

39.     Defendant Joseph F. Dunford, Jr. is a United States Marine Corps General and serves as the current Chairman of the Joint Chiefs of Staff.

40.     Defendant Department of the Army is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Army.

41.     Defendant Mark T. Esper is the United States Secretary of the Army.  He is the leader of the Department of the Army.

42.     Defendant Department of the Navy is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Navy.

43.     Defendant Richard V. Spencer is the United States Secretary of the Navy.  He is the leader of the Department of the Navy.

44.     Defendant Department of the Air Force is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Air Force.

45.     Defendant Heather A. Wilson is the United States Secretary of the Air Force.  She is the leader of the Department of the Air Force.

46.     Defendant United States Coast Guard is one of the five branches of the United States Armed Forces.

47.     Defendant Kirstjen M. Nielsen is the United States Secretary of Homeland Security.  She is the leader of the Department of Homeland Security.  The Department of Homeland Security is responsible for the administration and operation of the United States Coast Guard.

48.     Defendant Defense Health Agency is a Combat Support Agency that administers health care services for the U.S Army, U.S. Navy, and U.S. Air Force.  The Defense Health Agency exercises management responsibility for the TRICARE Health Plan, which is the health care program for all uniformed servicemembers in the U.S. Army, U.S. Navy, U.S. Air Force, U.S. Coast Guard, and certain other commissioned corps.

49.     Defendant Raquel C. Bono is a Vice Admiral and serves as Director of the Defense Health Agency.

50.     Defendant United States of America includes all federal government agencies and departments responsible for the implementation of the President's decision.

51.     All of the Defendants are sued in their official capacities.

## STATEMENT OF FACTS

### Adoption and Implementation of Open Service Policy

52.     In May 2014, then-Secretary of Defense Chuck Hagel, a decorated U.S. Army combat veteran, recommended that the military conduct a review of whether transgender people should be permitted to serve openly in the Armed Forces.

53.     In August 2014, the Department of Defense issued a new regulation that eliminated its categorical ban on open service by transgender people and instructed each branch of the Armed Forces to reassess whether maintaining a service-wide ban on service by openly transgender persons was justified.  *See* Department of Defense Instruction 1332.18.

54.     Secretary Hagel explained that "[e]very qualified American who wants to serve our country should have an opportunity to do so if they fit the qualifications and can do it."

55.     Secretary Hagel was succeeded as Secretary of Defense by Ashton B. Carter, who had previously served many years within the Department, including as Deputy Secretary of Defense, Under Secretary of Defense for Acquisition, Technology and Logistics, Assistant Secretary of Defense for International Security Policy, and as a member of the Defense Policy Board and the Defense Science Board.  In July 2015, Secretary Carter announced that the military would begin a comprehensive analysis of whether to maintain the prohibition on military service by transgender people.

56.     In an order establishing a working group to carry out this analysis, made effective as of July 13, 2015, Secretary Carter directed that no servicemember could be involuntarily separated or denied reenlistment or continuation of active or reserve status on the basis of his or her gender identity without the approval of the Under Secretary of Defense for Personnel and Readiness.

57.     Over the course of a year, Secretary Carter oversaw a comprehensive review of this issue by a working group of the military and civilian leadership of the Armed Services, the Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and medical specialists from across the Department of Defense.

58.     That year-long process examined copious data on the relevant issues, including but not limited to existing studies and research and input from transgender servicemembers and their commanders, outside expert groups, and medical professionals.

59.     The process also included a careful review of the eighteen other countries that permit military service by openly transgender people.

60.     The process also included consultation with doctors, employers, and insurance companies regarding the provision of medical care to transgender people.

61.     The Department of Defense also commissioned the RAND Corporation, an organization formed after World War II to connect military planning with research and development decisions and which now operates as an independent think tank financed by the U.S. government, to analyze relevant data and studies to determine the impact of permitting transgender servicemembers to serve openly.  Specifically, the RAND Corporation was tasked with (1) identifying the health care needs of the transgender population and the health care costs associated with providing transition-related care; (2) assessing the readiness implications of allowing transgender servicemembers to serve openly; and (3) reviewing the experiences of foreign militaries that permit transgender individuals to serve openly.

62.     The study, titled "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Study") and issued in May 2016, concluded that allowing transgender people to serve openly would "cost little and have no significant impact on unit readiness."

63.     The RAND Study noted that the Military Health System already provides the types of health care required by transgender servicemembers and concluded that health care costs for transgender servicemembers would represent "an exceedingly small proportion of [the

Department of Defense's] overall health care expenditures." The RAND Study also concluded that this minimal incremental cost would likely be offset by savings through diminished rates of other health care costs that would be achieved by providing servicemembers with necessary transition-related medical care.

64.     Based on the results of this comprehensive, year-long review process and on the RAND Study, the Department of Defense concluded that the needs of the military would be best met by permitting openly transgender people to serve.

65.     As laid out by Secretary Carter in remarks delivered on June 30, 2016, that conclusion was based on a number of considerations, including: the need to "recruit[] and retain[] the soldier, sailor, airman, or Marine who can best accomplish the mission" of our nation's Armed Forces; the fact that thousands of "talented and trained" transgender people are already serving and that the military has already invested "hundreds of thousands of dollars to train and develop each" transgender servicemember; the benefits to the military of retaining individuals who are already trained and who have already proven themselves; the need to provide both transgender servicemembers and their commanders with "clear[] and consistent guidance" on questions such as deployment and medical treatment; and the principle that "Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so."

66.     On June 30, 2016, Secretary Carter announced that "[e]ffective immediately, transgender Americans may serve openly. They can no longer be discharged or otherwise separated from the military just for being transgender."

67.     Also on June 30, 2016, Secretary Carter issued Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service Members." It states: "The policy of the Department of Defense is that service in the United States military should be open to all who can

meet the rigorous standards for military service and readiness.  Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.  These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity."

68.     The year-long review process by the Department of Defense also concluded that openly transgender people should be permitted to accede to the military so long as they had completed all medical treatment associated with their transitions and had been stable in their gender for eighteen months.  The accession policy was scheduled to take effect on July 1, 2017 to allow the branches of the Armed Forces additional time to develop necessary standards and policies.

69.     In September 2016, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military."  The 71-page document set forth guidance and instructions to both military servicemembers and commanders about how to implement and understand the new policies enabling open service of transgender servicemembers.

70.     On October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members."  The instruction set forth further guidance to ensure open service by transgender servicemembers, including details regarding revisions to medical treatment provisions.  This instruction was further implemented by a memorandum issued by the Acting Assistant Secretary of Defense for Health Affairs entitled "Guidance for Treatment of Gender Dysphoria for Active and

Reserve Component Service Members." The Department of Defense also issued medical guidance for providing transition-related care to transgender servicemembers.

71.     Over the next nine months, between October 2016 and June 2017, the services conducted training of the force based on detailed guidance and training materials regarding the policy change.

72.     On November 29, 2016, the Department of Defense revised "DoD Directive 1020.02E—Diversity Management and Equal Opportunity in the DoD" to prohibit discrimination and harassment on the basis of gender identity.

**The Ban on Transgender Servicemembers**

73.     On June 30, 2017, the day before the policy permitting transgender people to accede to the military was to take effect, Secretary Mattis extended the period for the development of relevant standards by six months.

74.     Early in the morning of July 26, 2017, without any prior indication that he would address military transgender policy, President Trump announced in a series of tweets that the military would no longer permit the service of transgender Americans.

75.     His tweets read: "After consultation with my generals and military experts, please be advised that the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail."

76.     This announcement met with substantial criticism from members of Congress belonging to both political parties.  These critics included Senator John McCain, Chairman of the Senate Armed Services Committee and a decorated combat veteran of the Navy, who said in a

statement that "there is no reason to force servicemembers who are able to fight, train, and deploy to leave the military—regardless of their gender identity."  Senator Joni Ernst, another Republican member of the Senate Armed Services Committee and a combat veteran who served in the Iowa National Guard, also publicly expressed opposition to the new policy.

77.     Upon information and belief, the President did not consult either the Joint Chiefs of Staff or the Department of Defense before making his announcement.  General Joseph Dunford, the Chairman of the Joint Chiefs of Staff and the President's most senior uniformed military advisor, wrote to the Joint Chiefs that the President's announcement was "unexpected" and that that he "was not consulted."

78.     Shortly after the announcement, fifty-six former generals and admirals issued a public statement denouncing the new policy.  Commandant Admiral Paul Zukunft of the United States Coast Guard also criticized the proposed policy and expressly reached out to all openly transgender members of the Coast Guard, vowing not to "turn [his] back" on transgender servicemembers.

79.     On August 25, 2017, the President released a memorandum ("August 25 Memorandum") containing a formal directive to the Secretary of Defense and the Secretary of Homeland Security.  It required the military to return to its pre-June 2016 policy forbidding transgender people from joining or serving in the military, effective March 23, 2018.

80.     The August 25 Memorandum also required the ban on accessions to be extended indefinitely beyond January 1, 2018; halted all use of government resources to "fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex," effective March 23, 2018; and required the Secretary of Defense, in consultation with

Homeland Security, to "submit to [the President] a plan for implementing" the ban within six

months.

81.     On September 14, 2017, Secretary of Defense Mattis issued a Memorandum

directing the implementation process.  Secretary Mattis affirmed that "DoD will carry out the

President's policy and directives" and will "comply with" the President's August 25 directive.

Secretary Mattis directed the Department of Defense to "develop[] an Implementation Plan on

military service by transgender individuals, to effect the policy and directives" issued by President

Trump on August 25.  Secretary Mattis also indicated that the implementation plan would be

released within the six months prescribed by the President.

82.     In a separate Memorandum entitled "Terms of Reference – Implementation of

Presidential Memorandum on Military Service by Transgender Individuals" ("Terms of

Reference"), also issued on September 14, 2017, Secretary Mattis "direct[ed] the Deputy Secretary

of Defense and the Vice Chairman of the Joint Chiefs of Staff to lead the [Department] in

developing an Implementation Plan on military service by transgender individuals, to effect the

policy and directives in Presidential Memorandum, Military Service by Transgender Individuals,

dated August 25, 2017."  The Terms of Reference required that, in carrying out the duties

delegated to them, the Deputy Secretary and Vice Chairman would be "supported by a panel of

experts," comprised of "the Military Department Under Secretaries, Service Vice Chiefs, and

Service Senior Enlisted Advisors" and chaired by the Under Secretary of Defense for Personnel

and Readiness.

83.     The panel was tasked with developing a plan to implement the President's policy

as announced in his tweets and promulgated to the Department of Defense in his August 25

Memorandum.  The Terms of Reference explained that "[t]he Presidential Memorandum directs

that the Department return to the longstanding policy and practice on military service by
transgender individuals that was in place prior to June 2016" and "also allows the Secretary to
determine how to address transgender individuals currently serving in the Armed Forces."  It
directed the Panel to "set forth, in a single policy document, the standards and procedures
applicable to military service by transgender persons, with specific attention to addressing
transgender persons currently serving."  The Terms of Reference also explained that "[t]he
Presidential Memorandum directs DoD to maintain the policy currently in effect, which generally
prohibits accession of transgender individuals into military service."

84.     On October 30, 2017, this Court issued a preliminary injunction that, among other
things, ordered Defendants to "revert to the status quo with regard to accession and retention that
existed before the [August 25, 2017] issuance of the Presidential Memorandum."  Pursuant to that
order, the Armed Forces began permitting openly transgender people to accede to the service
beginning on January 1, 2018.

85.     On February 22, 2018, Secretary Mattis sent a Memorandum to the President
endorsing policies set out in an attached report entitled "Department of Defense Report and
Recommendations on Military Service by Transgender Persons."  The February 22 Memorandum
and its attachment were released to the public on March 23, 2018.  The policy set forth in the
February 22 Memorandum and its attachment expressly targets transgender individuals; they do
not apply to non-transgender individuals at all.

86.     The policy prevents any transgender individual from serving consistent with their
gender identity, including by excluding anyone who "require[s] or ha[s] undergone gender
transition" and by requiring proof that applicants are "stable … in their biological sex."

87.     The policy also includes a limited and conditional provision permitting continued service by servicemembers "who were diagnosed with gender dysphoria by a military medical provider" during the period when open service by transgender servicemembers was allowed.  The policy also states that "should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption instead is and should be deemed severable from the rest of the policy."

88.     In addition, although the provision permitting continued service by some small number of transgender servicemembers states that they will "continue to receive all medically necessary treatment," the substance of what may be provided may fall short of servicemembers' actual medical needs.  The policy set forth in the February 22 Memorandum and its attachment rejects the established medical consensus confirming the safety and efficacy of gender-transition related medical care and instead concludes that the available scientific evidence is "unclear."  As a result, transgender servicemembers who remain in provisional and conditional service face the likely denial of surgical and other care for transgender health needs.

89.     The American Psychological Association responded to the February 22 Memorandum and its attachment, stating that it was "alarmed by the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care."  The American Medical Association also responded in a statement saying that "there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service" and denouncing the Memorandum because it "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care."  And the American

Psychiatric Association released a statement confirming that transgender people "suffer no impairment whatsoever in their judgment or ability to work."

## COUNT I

### (Fifth Amendment – Equal Protection)

90.     All previous paragraphs are incorporated as though fully set forth herein.

91.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

92.     The policies excluding transgender people from military service discriminate against Plaintiffs based on their sex and transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

93.     The exclusion of transgender people from military service lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

94.     Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT II[2]

### (Fifth Amendment – Due Process)

95.     All previous paragraphs are incorporated as though fully set forth herein.

96.     The Due Process Clause of the Fifth Amendment requires, at a minimum, that government action have some rational basis.

97.     The policies excluding transgender people from military service are arbitrary and capricious and lack any rational basis.

---

[2]     The Court has dismissed Count III.  Plaintiffs reserve all rights to appeal that dismissal but do not repeat the Count here.

98.     Defendants' 2016 policy permitting transgender people to serve openly in the military, together with Plaintiffs' reliance on that policy in notifying their superiors of their transgender status, created a protected interest in Plaintiffs' ability to continue serving in the military as openly transgender servicemembers.

99.     Defendants' arbitrary reversal of the United States' June 2016 policy threatens to exclude Plaintiffs from continued military service because they are transgender, thus depriving Plaintiffs of those interests without due process of law.

100.    Defendants' arbitrary reversal of the United States' June 2016 policy also impermissibly selectively burdens Plaintiffs' fundamental rights to autonomy and privacy.

101.    Through the actions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

Plaintiffs ask the Court to grant the following relief:

1.      Issue a declaratory judgment that the President's directive to categorically exclude transgender people from military service is unconstitutional;

2.      Issue a preliminary and permanent injunction, against all Defendants other than President Trump, prohibiting the categorical exclusion of transgender people from military service, including ordering that:

> a.      Defendants shall revert to the status quo with regard to accession and retention that existed before the August 25, 2017 issuance of the Presidential Memorandum.

> b.      Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, and John Doe 1 may not be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise receive adverse treatment or differential terms of service on the basis that they are transgender;

      c.      Plaintiff Regan V. Kibby may not be denied the opportunity to continue his attendance at the U.S. Naval Academy on the basis that he is transgender, and may not be denied the opportunity to accede to military service thereafter, or be denied promotion, reenlistment, or any other equal terms of service on the basis that he is transgender;

      d.      Plaintiff Dylan Kohere may not be denied the opportunity to fully enroll and participate in the Reserve Officers' Training Corps program on the basis that he is transgender, and may not be denied the opportunity to accede to military service thereafter, or be denied promotion, reenlistment, or any other equal terms of service on the basis that he is transgender; and

      e.      Plaintiffs Jane Doe 7 and John Doe 2 may not be denied the opportunity to accede to military service on the basis that they are transgender, and may not be denied promotion, reenlistment, or any other equal terms of service on the basis that they are transgender.

3.      Award Plaintiffs their reasonable costs and attorneys' fees;

4.      Issue any other relief the Court deems appropriate.

April 6, 2018

Claire Laporte (*pro hac vice*)
Matthew E. Miller (*pro hac vice*)
Daniel McFadden (*pro hac vice*)
Kathleen M. Brill (*pro hac vice*)
Michael Licker (*pro hac vice*)
Rachel C. Hutchinson (*pro hac vice*)
Lauren Godles Milgroom (*pro hac vice*)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Theresa M. Roosevelt (D.C. Bar No.
1021853)
FOLEY HOAG LLP
1717 K Street NW
Washington, DC 20006
Telephone: 202-223-1200
Fax: 202-785-6687

Jennifer Levi (*pro hac vice*)
Mary L. Bonauto (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont St., Ste. 950
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
Chris Stoll (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

Respectfully submitted,

/s/ Paul R.Q. Wolfson
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Kevin M. Lamb (D.C. Bar No. 1030783)
WILMER CUTLER PICKERING
    HALE & DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Alan E. Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Christopher R. Looney (*pro hac vice*)
Harriet Hoder (*pro hac vice*)
Adam M. Cambier (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

Nancy Lynn Schroeder (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
350 S. Grand Ave., Ste. 2100
Los Angeles, California 90071
Telephone: 213-443-5300
Fax: 213-443-5400

*Attorneys for Plaintiffs*