**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 2 *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>    Defendants. | Civil Action No. 17-cv-1597 (CKK) |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, OR, IN THE ALTERANTIVE, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants move pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for the Court to dismiss Plaintiffs' Second Amended Complaint. In the alternative, Defendants move pursuant to Rule 56 for the Court to grant summary judgment in their favor. In support of this motion, the Court is respectfully referred to Defendants' accompanying memorandum of points and authorities and statement of material facts pursuant to Local Rules 7(a) and 7(h)(1).

April 20, 2018

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

BRINTON LUCAS
Counsel to the Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Ryan Parker*

RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 514-4336
Email: ryan.parker@usdoj.gov


*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JANE DOE 2** *et al.*,

      **Plaintiffs,**

v.

**DONALD J. TRUMP** *et al.*,

      **Defendants.**

Civil Action No. 17-cv-1597 (CKK)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 1

ARGUMENT ................................................................................................................................. 2

    I.   The Court Should Dismiss Plaintiffs' Second Amended Complaint for Lack of Jurisdiction . 2

       A.  Plaintiffs' Challenge to the President's Directive is Moot. ...................................................... 2

       B.  Plaintiffs Have Not Met Their Burden to Establish Standing to Challenge the New DoD
            Policy. ................................................................................................................................ 5

           1.  Plaintiffs Have Not Met Their Burden of Showing an Injury in Fact that is Fairly
               Traceable to Any Action by Defendants ............................................................................ 6

           2.  Plaintiffs' Claims Against the President Are Not Redressable ...................................... 14

   II.  Because Plaintiffs Have Failed to State a Plausible Claim for Relief, the Court Should
      Dismiss the Second Amended Complaint ..................................................................................... 17

       A.  The Department's New Policy is Subject to Highly Deferential Review. .......................... 17

       B.  The Department's New Policy Survives Highly Deferential Scrutiny. ............................... 22

           1.  Military Readiness ............................................................................................................ 23

           2.  Order, Discipline, Leadership, and Unit Cohesion ........................................................ 27

           3.  Disproportionate Costs .................................................................................................... 32

       C.  The New Policy Does Not Violate Due Process. ............................................................... 35

       D.  The New Policy Addresses This Court's Prior Reasoning. ................................................ 36

       E.  The New Policy is Not the Final Version of a "Transgender Service Ban." ...................... 39

CONCLUSION .............................................................................................................................. 45

## INTRODUCTION

Although the President expressly revoked the 2017 Presidential Memorandum and any preceding directives concerning military service by transgender individuals, Plaintiffs refuse to recognize that the circumstances of this case have changed since they filed their original complaint in August 2017.  Military officials within the Department of Defense (DoD) and the Services have conducted an extensive study, exercised their independent judgment, and developed a new policy that replaced the alleged categorical exclusion of transgender individuals from military service with a more nuanced regime based on the medical condition of gender dysphoria.  Rather than acknowledge this fact, however, Plaintiffs continue to allege that there is a "transgender military ban."

The Court should reject Plaintiffs' characterization of the policy and dismiss their second amended complaint, or, in the alternative, grant summary judgment for Defendants for several reasons.  First, Plaintiffs' continued challenge to the revoked 2017 Presidential Memorandum and statements on Twitter is moot.  Second, none of the Plaintiffs have standing to challenge the new policy because they will not suffer an imminent injury.  Finally, even if Plaintiffs can surpass these jurisdictional thresholds, the new policy withstands constitutional scrutiny.

## BACKGROUND[1]

Following the revocation of the prior policy and a teleconference with the Court, *see* Dkt. 101, Plaintiffs filed their second amended complaint, Dkt. 106.  Plaintiffs are six current service members, five of whom have been diagnosed with gender dysphoria (Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and John Doe 1) and one of whom has not (Jane Doe 6), one midshipman at the U.S. Naval Academy (Regan Kibby), two prospective service members who have undergone gender transition (Jane Doe 7 and John Doe 2), and one college student taking classes in the Reserve Officers' Training

---

[1] For additional background information, Defendants respectfully refer the Court to Defendants' Statement of Material Facts filed concurrently with this motion pursuant to Local Rule 7(h).

Corps (ROTC) program (Dylan Kohere).  *See* Second Am. Compl. ¶¶ 6–36.  Plaintiffs allege that the "transgender military ban," as was "first announced last July by President Trump and [is] now more specifically set forth in [the Mattis Memorandum]," violates "both the Equal Protection component of the Fifth Amendment and the Due Process Clause of the Fifth Amendment."  *Id.* ¶¶ 1, 3.

## ARGUMENT

### I.   The Court Should Dismiss Plaintiffs' Second Amended Complaint for Lack of Jurisdiction.

Plaintiffs' second amended complaint should be dismissed for lack of jurisdiction for two related reasons.  First, their challenge to the 2017 Presidential Memorandum and any preceding statements made by the President is moot.  Second, they have not suffered the kind of concrete injury necessary to establish standing, nor do they face an imminent threat of future injury.  The Court lacks jurisdiction and should dismiss the case in its entirety under Rule 12(b)(1).  But even if the Court finds that Plaintiffs' claims are not moot and that Plaintiffs have established an injury in fact, the Court should nevertheless dismiss Plaintiffs' claims against the President because any alleged injury caused by the President is not redressable.

### A.   Plaintiffs' Challenge to the President's Directive is Moot.

To start, Plaintiffs' Second Amended Complaint should be dismissed because their claims are moot.  A case is moot "when it is impossible for a court to grant any effectual relief to the prevailing party," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013), and that is true here.  Because the President has revoked the 2017 Memorandum, Plaintiffs are no longer suffering any alleged injury from that Memorandum.  Granting their requested relief—a declaration that the 2017 Memorandum is unconstitutional and an injunction against its enforcement—would therefore amount to an impermissible advisory opinion.

That is true even where Plaintiffs have now challenged DoD's new policy.  Any of their asserted future injuries from that policy would stem from the independent actions of the Secretaries

of Defense and Homeland Security in implementing that policy, not the 2017 or 2018 Memoranda. And even if some Plaintiffs have standing to challenge the new policy, *but see infra* Part I.B, enjoining the enforcement of the 2017 Memorandum would not redress any of their alleged harms.

In an attempt to escape this problem, Plaintiffs suggest that the new policy is insufficiently different from the 2017 Memorandum to moot the case. *See* Second Am. Compl. ¶¶ 1–2, 79–89. In doing so, they attempt to seek refuge in the doctrine that "a defendant's voluntary cessation of a challenged practice" does not always moot the case, an exception designed to prevent manipulation of the judicial process. *City of Mesquite v. Aladdin's Castle Inc.*, 455 U.S. 283, 289 (1982).

At the outset, precedent forecloses this Court from applying the voluntary cessation doctrine against the President. As the *en banc* D.C. Circuit has observed, "[a]lthough the doctrine has more recently been applied to legislative bodies," there appears to be "no case applying the doctrine to Congress," and "[w]e have serious doubts whether it could be." *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990). That is because "[a]t least in the absence of overwhelming evidence (and perhaps not then), it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose." *Id.* That reasoning should apply with equal force to the President's decision to revoke a Memorandum. *See Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 353 (D.C. Cir. 1997). After all, the presumption of regularity—*i.e.*, the rule that "[e]very public officer is presumed to act in obedience to his duty, until the contrary is shown"—applies "*a fortiori*" to the President. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 33 (1827) (Story, J.); *accord Phila. & Trenton R.R. Co. v. Stimpson*, 39 U.S. (14 Pet.) 448, 458 (1840) (Story. J.); *Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727–28 (D.C. Cir. 1989). It would be inconsistent with that heightened presumption, and inappropriate under the separation of powers, for courts to imply that the Head of the Executive Branch has revoked an order simply to avoid judicial review, especially where, as here, there is no

evidence to support such a charge. That is particularly true here given that the 2017 Memorandum itself presumed that the military would study the issue and develop its own policy.

In all events, this doctrine would provide no help to Plaintiffs. When a law is repealed and replaced, the relevant question is "whether the new [policy] is sufficiently similar to the repealed [one] that it is permissible to say that the challenged conduct continues," or, put differently, whether the policy "has been 'sufficiently altered so as to present a substantially different controversy from the one … originally decided.'" *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993). When a new policy has "changed substantially," the original controversy is moot, as there is "no basis for concluding that the challenged conduct [is] being repeated." *Id.*

Plaintiffs' objection to DoD's new policy "present[s] a substantially different controversy" than their challenge to the President's 2017 Memorandum. *Id.* In the litigation over the 2017 Memorandum, Plaintiffs' target was "[t]he President's categorical exclusion of transgender people from enlisting or serving openly in the military" in the face of contrary conclusions by former military leadership following what Plaintiffs described as "an exhaustive review process." Am. Compl. ¶¶ 2, 8, Dkt. 9. Likewise, this Court's preliminary injunction rested on "the sheer breadth of the exclusion" it believed the President had ordered—*i.e.*, a policy "categorically excluding transgender individuals"— and "the recent rejection of [his] reasons by the military itself." Op. 3, 70, Dkt. 61. The new policy, by contrast, is the product of independent military judgment following an extensive study of the issue. And far from a categorical exclusion of transgender individuals, this policy contains several exceptions allowing some transgender individuals, including almost every Plaintiff here, to serve.

Those differences are sufficient to moot the original challenge. At a minimum, the replacement of the alleged categorical exclusion with a more nuanced regime presents a substantially different controversy. In *Department of Treasury v. Galioto*, 477 U.S. 556 (1986) (per curiam), a lower court held that a federal statute barring all former mental patients who were involuntarily committed

from purchasing firearms was unconstitutional on the ground that it created an "'irrebuttable presumption'" that anyone involuntarily committed was permanently a threat "no matter the circumstances." *Id.* at 559 (citation omitted).  During the appeal, Congress amended the law to allow anyone prohibited from purchasing firearms to seek individualized relief from the Treasury Department. *Id.*  Concluding that "no 'irrebuttable presumption' now exists since a hearing is afforded to anyone subject to firearms disabilities," the Supreme Court held that the issue was moot without ever mentioning voluntary cessation.  *Id.*; *see also Clarke*, 915 F.2d at 705 (discussing *Galioto*).  This case is no different.   Because Plaintiffs sought an injunction against the enforcement of the 2017 Memorandum—and thereby to effectively maintain the policy put into effect by former Secretary of Defense Ashton Carter, *see* DTM 16-005, Dkt. 13-6, Exh. B, which, like the new policy, treats gender dysphoria as presumptively disqualifying, Op. 10—the heart of their challenge was necessarily limited to the allegedly categorical nature of that Memorandum.  With that issue gone, Plaintiffs' challenge to the 2017 Presidential Memorandum is moot.

**B.      Plaintiffs Have Not Met Their Burden to Establish Standing to Challenge the New DoD Policy.**

To establish standing, Plaintiffs must satisfy three elements: (1) they must have suffered an injury in fact, *i.e.*, a judicially cognizable injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly . . . trace[able] to the challenged action of the defendant;" and (3) "it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "[A] plaintiff must demonstrate standing for each claim" and "'for each form of relief sought.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quotation and citation omitted).

A court's standing inquiry thus should be "especially rigorous when reaching the merits of the dispute" would compel it "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

5

Because Plaintiffs have brought a constitutional challenge to DoD's policy concerning military service by transgender individuals, *see* Second Am. Compl. ¶¶ 90–101, the Court should conduct an "especially rigorous" inquiry into whether Plaintiffs have standing, *Clapper*, 568 U.S. at 408.

### 1. Plaintiffs Have Not Met Their Burden of Showing an Injury in Fact that is Fairly Traceable to Any Action by Defendants.

Each of the Plaintiffs bear the burden of establishing that they have standing in their own right to pursue their claims.  *See Klayman v. Obama*, 142 F. Supp. 3d 172, 184 (D.D.C. 2015).  An examination of the facts of this case, however, shows that that none of the Plaintiffs have standing.

<u>Current Service Members With Diagnoses of Gender Dysphoria</u>.  Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and John Doe 1 are current service members who have been diagnosed with gender dysphoria.  *See* Second Am. Compl. ¶¶ 7–21, 27–30.  Under the new DoD policy, current service members who have been diagnosed with gender dysphoria by a military medical provider "since the previous administration's policy took effect and prior to the effective date of this new policy" will be permitted to "continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria."  Memorandum for the President regarding Military Service by Transgender Individuals 2 (Feb. 22, 2018), Dkt. 96-1 (hereinafter, "Mattis Memorandum").  Because these Plaintiffs may continue to serve in the military in their preferred gender and receive medically necessary treatment, *see id.*, they have not suffered an actual injury.

These five Plaintiffs attempt to meet their burden to establish standing on allegations of possible future harm.  Citing to the severability provision in DoD's Report and Recommendations on Military Service by Transgender Persons ("Report"), these five Plaintiffs claim that because the exemption allowing their continued military service is "conditional and limited," they are "forced to serve under a *cloud of uncertainty* about continued service, promotions and health care."  Second Am. Compl. ¶¶ 11, 18, 21 (emphasis added); *see also id.* ¶¶ 14, 30 (stating that they are "forced to serve under a cloud of uncertainty about continued service and health care"); *id.* ¶ 87 (alleging that the provisions

applying to current service members are "limited and conditional"). But Plaintiffs' admitted "uncertainty" of future harm is wholly insufficient to establish standing; as the Supreme Court has repeatedly held, "[a] threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 410 (quotation omitted); *DaimlerChrysler*, 547 U.S. at 345.

In *Clapper*, the Supreme Court rejected a similar theory of standing that rested on speculative future harm. *See* 568 U.S. at 410. The plaintiffs in that case challenged a provision in the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1881a, that allows the Attorney General and the Director of National Intelligence to, after seeking approval from the Foreign Intelligence Surveillance Court, jointly authorize the "surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States." *Id.* at 401 (quoting 50 U.S.C. § 1881a). The plaintiffs claimed that because their work "requires them to engage in sensitive international communications with individuals who they believe are likely targets of surveillance," there is "an objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future." *Id.* Thus, the plaintiffs argued, they had established that they would suffer a future injury sufficient to give them standing. *Id.*

The Supreme Court entirely rejected that argument, finding that the plaintiffs' "theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be certainly impending." *Id.* For the plaintiffs to suffer an actual injury, the Supreme Court reasoned, a "highly attenuated chain of possibilities" would have to occur, some of which would require members of the Executive and Judicial Branches to exercise their independent judgment in a certain manner. *See id.* at 410–14. After "declin[ing] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors," the Supreme Court concluded that the plaintiffs' "speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending or is fairly traceable to § 1881a." *Id.* at 414.

These five Plaintiffs appear to speculate that the severability provision in the Report means that their discharge is certainly impending. *See* Second Am. Compl. ¶ 87. But this reading is not consistent with the plain language of the provision, which simply provides: "While the Department believes that its commitment to these Service members, including the substantial investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy." Report 43. Thus, for these five Plaintiffs to be discharged from the military on the basis of their medical condition (gender dysphoria), the following would have to occur: First, a court would have to rule that (1) the entire DoD policy was unlawful due to the reliance exemption, (2) the entire DoD policy would be lawful but for that exemption, and (3) that exemption should therefore be severed from the rest of the policy. Second, that decision would have to be upheld upon any further judicial review. Third, with the reliance exemption gone, officials within DoD would then have to make the independent decision to discharge current service members who have been diagnosed with gender dysphoria. Finally, these five Plaintiffs would have to be processed for discharge on that basis. *See id.*

As in *Clapper*, this highly attenuated chain of events requires members of the Executive and Judicial Branches to exercise their independent judgment in a certain manner and is insufficient to establish an injury in fact. *See Clapper*, 568 U.S. at 413–14; *see also Attias v. CareFirst, Inc.*, 865 F.3d 620, 628 (D.C. Cir. 2017) (stating that in *Clapper*, "the harm also would not have arisen unless a series of independent actors, including intelligence officials and Article III judges, exercised their independent judgment in a specific way"). If Plaintiffs are involuntarily discharged in the future they will likely have standing to challenge that discharge, but at this point Plaintiffs' challenge to their assumed future discharge is entirely premature and based purely on speculation of what may occur months or even

years from now. *Lujan*, 504 U.S. at 564 n.2 ("Where there is no actual harm, however, its imminence (though not its precise extent) must be established.").

These five Plaintiffs' claims of standing as they relate to "uncertainty" over "health care" are also speculative. *See* Second Am. Compl. ¶¶ 11, 14, 18, 21, 30.   They allege that "the substance of [the medical care that] may be provided *may* fall short of servicemembers' actual medical needs" and that transgender service members "face the *likely* denial of surgical and other care for transgender health needs." *Id.* ¶ 88 (emphasis added).   These assertions are far too speculative to establish a "certainly impending" injury. *See Clapper*, 568 U.S. at 411.   The sole basis for Plaintiffs' allegation is that the Mattis Memorandum and the Report "reject[] the established medical consensus confirming the safety and efficacy of gender-transition related medical care and instead conclude[] that the available scientific evidence is 'unclear.'"   Second Am. Compl. ¶ 88.   But neither the Mattis Memorandum nor the Report purport to change the policies governing the medical treatment of gender dysphoria for current service members covered by the exemption. *See generally* Mattis Mem.; Report.   Thus, Plaintiffs' claim that they "may" be denied health care is not only speculative, it is baseless as well.

The claims of standing as they relate to "uncertainty" over "promotions" are even more speculative. *See* Second Am. Compl. ¶¶ 11, 18, 21.   On their face, the Mattis Memorandum and the Report do not apply to promotions, and there is nothing in either document discussing promotions.[2]

---

[2] Jane Doe 3 alleges that she is "interested in applying to become a warrant officer or making other career transitions that could be considered a new accession into the Army," but that "[u]nder the transgender military ban, it is unclear whether [she] will be able to make these career transitions." Second Am. Compl. ¶ 14.   Jane Doe 3 is an exempted service member and therefore is subject to the Carter policy. *See* Report 6.   Therefore, when she applies for a warrant or a commission (*i.e.*, enlisted soldier to officer), she must meet the Carter accessions standards and other requirements applicable to all service members. *See id.*; *see also* Report 43 ("The reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed.").

*See generally* Mattis Mem.; Report.  Thus, any denial of a promotion could not be said to be fairly traceable to the new DoD policy.  *See Lujan*, 504 U.S. 560–61.

<u>Current Service Member Without a Diagnosis of Gender Dysphoria</u>.  Plaintiff Jane Doe 6 is a current service member who has not been diagnosed with gender dysphoria by a military doctor.[3] *See* Second Am. Compl. ¶¶ 22, 23 (stating that she "never came out to her doctors or chain of command as transgender").  Jane Doe 6 claims that if she "notifies her command that she is transgender and seeks health care for the distress she experiences from having to serve in a manner inconsistent with her gender identity, she faces separation from the military." *Id.* ¶ 24.  Along with allegedly facing "separation from the military," Jane Doe 6 claims that she is harmed by "curtailing her access to health care" and being "forc[ed] . . . to live inconsistently with her gender identity."  *Id.*

Under the new DoD policy, "currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria."  Mattis Mem. 2.  The new DoD policy is not in effect and an effective date has yet to be set.  Therefore, if Jane Doe 6 is being harmed by "liv[ing] inconsistently with her gender identity" and needs, as she claims, "health care for the distress she experiences from having to serve in a manner inconsistent with her gender identity," Second Am. Compl. ¶ 24, she may see a military doctor and obtain a gender dysphoria diagnosis.  Once she does so, Jane Doe 6 will be covered under the exemption for currently serving service members, meaning that she will be able to "continue to serve in [her] preferred gender and receive medically necessary treatment for gender dysphoria." Mattis Mem. 2.

---

[3] It is unclear from the Second Amended Complaint whether Plaintiff Jane Doe 6 has been diagnosed with gender dysphoria by a private physician.  *See* Second Am. Compl. ¶¶ 22–24.

By failing to seek medical care to obtain a diagnosis and treatment for gender dysphoria, Jane Doe 6 is asserting an injury that is of her own making.  The Supreme Court and the D.C. Circuit have consistently held that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing."); *see also Lujan*, 504 U.S. at 564 n.2 (stating that the concept of "imminence" is "stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control").  Because Jane Doe 6 can seek a medical diagnosis and then, if she has gender dysphoria, continue to serve in the military and receive health care for that condition, she has failed to assert a cognizable injury.  *See Clapper*, 568 U.S. at 416.

<u>Midshipman at the U.S. Naval Academy</u>.  Plaintiff Regan Kibby is a midshipman at the U.S. Naval Academy and has notified the Academy that he is transgender.  Second Am. Compl. ¶ 33. Midshipman Kibby alleges that he has been granted medical leave from the Naval Academy and fears that he will not be permitted to return to the Academy or to be commissioned as an officer in the U.S. Navy upon graduation from the Academy.  *Id.* ¶ 34.  Defendants have submitted the Declaration of Navy Captain Robert B. Chadwick, Commandant of the United States Naval Academy, stating that Midshipman Kibby is on medical leave, and there is currently no impediment to his returning to the Academy when his leave ends in May 2018.  Chadwick Decl. ¶¶ 9, 12, Dkt. 45-2.  Because Midshipman Kibby is considered to be a current service member who has been diagnosed with gender dysphoria, the exemption for current service members applies to Midshipman Kibby and he will be allowed to return to the U.S. Naval Academy and commission as an officer, provided he meets the Academy's commissioning requirements.  Although Midshipman Kibby alleges that, if he is permitted to return

the Academy and join the U.S. Navy, "he will be forced to serve under a cloud of uncertainty about continued service and health care," Second Am. Compl. ¶ 34, his admitted "uncertainty" of future harm is wholly insufficient to establish a "*certainly impending*" injury. *Clapper*, 568 U.S. at 409.

Prospective Service Members Who Have Undergone Gender Transition. Plaintiffs Jane Doe 7 and John Doe 2 are individuals who have undergone gender transition and wish to join the military. *See* Second Am. Compl. ¶¶ 25, 31. Plaintiff Jane Doe 7 does not allege that she has actually applied to access in the military, let alone had an application denied because of the DoD policy. *See* Second Am. Compl. ¶¶ 25–26. Plaintiff John Doe 2 alleges that he began the enlistment process, but he does not allege that his enlistment application was denied. *See id.* ¶¶ 31–32. Because the DoD policy has not yet gone into effect, and because DoD is currently allowing individuals who have undergone gender transition to access into the military pursuant to the preliminary injunctions entered in this and the related cases, if Plaintiffs Jane Doe 7 and John Doe 2 attempted to access into the military, they would not be denied accession on the basis of their gender transition. If they accessed into the military, they would then be allowed to serve in their preferred gender and receive medically necessary treatment for gender dysphoria. Mattis Mem. 2. Thus, by not attempting to join the military at this time, Jane Doe 7 and John Doe 2 are "inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. As with Plaintiff Jane Doe 6, Plaintiffs Jane Doe 7 and John Doe 2 "cannot manufacture standing" by purposefully not seeking to join the military at this time. *Id.*[4] Nor can they show that this alleged injury would be

---

[4] Although under the new DoD Policy "[t]ransgender persons who require or have undergone gender transition are disqualified from military service," Mattis Mem. 2, applicants who are denied accession on the basis of gender transition may seek a "waiver or exception to [the] policy." Report 5. "[E]ach accession standard may be waived in the discretion of the accessing Service based on that Service's policies and practices, which are driven by the unique requirements of different Service missions, different Service occupations, different Service cultures, and at times, different Service recruiting missions." *Id.* at 10. Thus, even if Plaintiffs had been denied accession under the New DoD Policy

redressable by the requested relief, as there is no claim that either of them could obtain the requisite certificate establishing 18 months' stability post-treatment under the Carter policy. *See* Second Am. Compl. ¶¶ 25–26, 31–32; *see also* DTM 16-005 at Attachment ¶ 2.

First-Year College Student Taking ROTC Classes. Plaintiff Dylan Kohere is a first-year college student who is taking academic classes as part of his school's ROTC program. Second Am. Compl. ¶ 35. Mr. Kohere is transgender, but he does not allege that he has been diagnosed with gender dysphoria. *See id.*; *see also* Kohere Decl. ¶ 10, Dkt. 13-15 (discussing a "treatment plan," but failing to allege that he has been diagnosed with gender dysphoria). Because he does not allege whether he has gender dysphoria, it is unclear whether DoD's new policy would even apply to Mr. Kohere, as under the new policy "[t]ransgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members in their biological sex." Mattis Mem. 3. Mr. Kohere alleges that he has been injured because he is "not permitted to enroll in the ROTC program or to receive an ROTC scholarship." Second Am. Compl. ¶ 36. But Defendants have submitted the declaration of Robert O. Burns, Deputy Chief of Staff for Personnel, G1, for the U.S. Army Cadet Command, stating that Mr. Kohere is participating in the ROTC program and that he did not apply for an ROTC scholarship. Burns Decl. ¶¶ 8.b., 8.c, Dkt. 45-3. Because the DoD policy has not gone into effect and because transgender individuals are permitted to enroll in the ROTC program and access into the military pursuant to the preliminary injunctions entered in this and the related cases, if Mr. Kohere attempted to enroll in the ROTC program and apply for a scholarship, he would not be denied either on the basis of his transgender status. By not attempting to enroll in the ROTC program and apply for a scholarship, Mr. Kohere is "inflicting harm on [himself] based on [his] fear[] of hypothetical future harm that is not certainly impending." *Clapper*,

---

on the basis of gender transition, they still would lack standing because they have not sought a waiver and had their waiver applications denied.

568 U.S. at 416.  Mr. Kohere "cannot manufacture standing" by purposefully not seeking to enroll in the ROTC program or apply for a scholarship at this time.  *Id.*  Moreover, because he is a first-year college student and wants to get a college education before he starts his military service, Kohere Decl. ¶ 3, Mr. Kohere is unlikely to seek accession into the military until at least 2021, Burns Decl. ¶ 8.c. An injury that may occur three years in the future should not be considered imminent for standing purposes.  *See DaimlerChrysler*, 547 U.S. at 345; *see also McConnell v. FEC*, 540 U.S. 93, 226 (2003) (more than four-year gap between challenge and alleged injury "too remote temporally to satisfy Article III"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).

### 2.  Plaintiffs' Claims Against the President Are Not Redressable.

Although Plaintiffs allege claims and seek a declaratory judgment against the President, he is not a proper defendant in this case.  Plaintiffs may not obtain—and the Court may not grant— declaratory relief against the President for his official, non-ministerial conduct, particularly where, as here, relief granted against subordinate Executive officials would provide full relief to Plaintiffs. Because any injury caused by the President is not redressable, the Court should dismiss all of Plaintiffs' claims against the President.  *See DaimlerChrysler*, 547 U.S. at 352 (requiring that a plaintiff "demonstrate standing separately for each form of relief sought" (quotation omitted)).

It is well-established that courts lack authority to issue injunctive relief against the President for non-ministerial actions that he has taken in his official capacity.[5]  *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)).  With respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction," *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (citing *Sanchez-*

---

[5] Perhaps in recognition of this well-established principle, Plaintiffs no longer seek injunctive relief against the President.  *Compare* Am. Compl. at 18 (requesting injunctive relief against all Defendants, including the President), *with* Second Am. Compl. at 20 (requesting the Court enter "a preliminary and permanent injunction[] against all Defendants other than President Trump").

*Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985)), because "it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-Espinoza*, 770 F.2d at 208 n.8. Therefore, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996); *Lovitky v. Trump*, No. 17-cv-00450, 2018 WL 1730278 at *5 n.5 (D.D.C. Apr. 10, 2018) (Kollar-Kotelly, J.); *see also Sanchez-Espinoza*, 770 F.2d at 208 n.8 (The "equivalence of [the] effect" of injunctive and declaratory relief directed at Executive branch officials "dictates an equivalence of criteria for issuance."). As Justice Scalia explained in *Franklin*:

> I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he can be compelled personally to defend his executive actions before a court . . . . The President's immunity from such judicial relief is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."

505 U.S. at 827–28 (Scalia, J., concurring) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)). Following *Franklin*, the D.C. Circuit determined that "declaratory relief" against the President for his non-ministerial conduct "is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). This is because "a court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Id.* at 1012 (emphasis added) (citing *Mississippi*, 71 U.S. at 499); *see also Lovitsky*, 2018 WL 1730278 at *7 (recognizing same).

Although the court in the related case *Karnoski v. Trump* recently determined that it has "jurisdiction to issue declaratory relief against the President" and that "this case presents a 'most appropriate instance' for such relief," those findings were in error. No. 17-1297, 2018 WL 1784464, at *13 (W.D. Wash. Apr. 13, 2018) (quoting *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) ("*NTEU*")). The *Karnoski* Court relied upon a 1974 case from the D.C. Circuit, *NTEU*, but, as this Court has recognized, the D.C. Circuit has "questioned whether [*NTEU*] remains valid after *Franklin*." *Lovitsky*, 2018 WL 1730278 at *7 (citing *Swan*, 100 F.3d at 978). Even if *NTEU*

remains good law, it is readily distinguishable in two ways.  First, as the D.C. Circuit repeatedly acknowledged, *NTEU* involved a Presidential action that allegedly was "ministerial" and not discretionary.  492 F.2d at 591, 601, 602, 605, 606 n.42.  A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion."  *Mississippi*, 71 U.S. at 498; *see also Swan*, 100 F.3d at 977.  There can be no question here that any Presidential action involving the formation of military policy involves "judgment, planning, or policy decisions" and is not ministerial.  *See Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (defining discretionary duties).

Second, in *NTEU*, the D.C. Circuit found that there were no other defendants the plaintiffs could sue in lieu of the President.  492 F.2d at 614–15.  That is not the case here.  Plaintiffs may challenge the constitutionality of the policy governing military service by transgender individuals being carried out by the subordinate Executive officials who are defendants in this case and, if successful, the Court may redress Plaintiffs' injuries by issuing relief against those officials.  As the Supreme Court and the D.C. Circuit have repeatedly recognized, because the President often acts through subordinate Executive officials, courts ordinarily can rule on the legality of the President's actions and rectify a plaintiff's injuries by issuing injunctive or declaratory relief against those subordinate officials. *Franklin*, 505 U.S. at 803 (concluding that the "injury alleged is likely to be redressed by declaratory relief against the Secretary [of Commerce] alone"); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–89 (1952) (holding that the President's order was unconstitutional and affirming the district court's decision enjoining the Secretary of Commerce from carrying out the order, even though the President was not a defendant in the case).  Providing relief in this fashion would avoid the fundamental separation-of-powers intrusion that arises with the Judiciary entering declaratory relief against the head of the Executive Branch.  *See Swan*, 100 F.3d at 978–79.

Accordingly, if the Court does not dismiss the case in its entirety, the Court nevertheless should dismiss the President as a defendant because any injuries caused by the President are not

redressable by the Court.  *See Lovitsky*, 2018 WL 1730278 at *4 (where the plaintiff sought a declaratory judgment against the President, finding that "even if there were injury-in-fact, and it were fairly traceable to [the President's] conduct, it is clear that Plaintiff's injury would not be redressable").

## II.   Because Plaintiffs Have Failed to State a Plausible Claim for Relief, the Court Should Dismiss the Second Amended Complaint.

### A.  The Department's New Policy is Subject to Highly Deferential Review.

On its face, DoD's new policy triggers rational basis review.  That policy, like the Carter policy before it, draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not transgender status.  *Compare* Report 3–5, *with* DTM 16-005 at 1–2. Such classifications receive only rational basis review.  *See, e.g., Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365–68 (2001).  Indeed, Plaintiffs continue to seek an injunction requiring the military to maintain the Carter policy, including its presumptive disqualification of individuals with a history of gender dysphoria and/or gender transition.  Tel. Conf. Tr. 20, Dkt. 102; *see* Op. 10 (discussing this presumptive bar).  Given that courts should be "reluctant to establish new suspect classes"—a presumption that "has even more force when the intense judicial scrutiny would be applied to the 'specialized society' of the military"—there is no basis for departing from rational basis review here. *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) (en banc).  That reluctance is especially warranted in this challenge given the American Psychiatric Association's conclusion that gender dysphoria is a medical condition "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning," Report 13, which is surely a relevant consideration in determining who may serve, *see id.* at 9 ("[T]he military would be negligent in its responsibility if its military standards permitted admission of applicants with physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have.").

17

But even assuming *arguendo* that DoD's new policy would trigger intermediate scrutiny outside of the military context, that context, unquestionably present here, requires a far less searching form of review. While all agree that the government is not "free to disregard the Constitution" when acting "in the area of military affairs," it is equally true that "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). In short, "constitutional rights must be viewed in light of the special circumstances and needs of the armed forces," and "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." *Beller v. Middendorf*, 632 F.2d 788, 810–11 (9th Cir. 1980) (Kennedy, J.), *overruled on other grounds by Witt v. Dep't of Air Force*, 527 F.3d 806, 820–21 (9th Cir. 2008).

This different, and highly deferential, form of review is necessary not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but also because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see Rostker*, 453 U.S. at 65–66. That is particularly true with respect to the "complex, subtle, and professional decisions as to the composition … of a military force, which are essentially professional military judgments." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (quotation omitted).

Although the Supreme Court has expressly refused to attach a "label[]" to the standard of review applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, several features of its decisions in this area demonstrate that rational basis review most closely describes its approach in practice. First, even though the Court generally has declined "to hypothesize or invent governmental purposes for gender classifications post hoc in response to litigation," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1697 (2017), it has done so when military deference is required. In *Schlesinger v. Ballard*, 419 U.S. 498 (1975), the Court upheld a statutory scheme under which male naval officers were subject to mandatory discharge for failing twice to be promoted within roughly 10 years

of service, while female officers were afforded 13 years to obtain equivalent promotions. *Id.* at 499–505, 510. The Court explained that in creating this framework, "Congress may … quite rationally have believed" that female officers "had less opportunity for promotion than did their male counterparts," and that different standards would address that imbalance. *Id.* at 577.

Similarly, in *Rostker*, the Supreme Court rejected an equal protection challenge to a statute exempting women from the requirement to register for the draft. 453 U.S. at 83. Even though the challenge had been filed in 1971, the Court relied on Congress's analysis of the issue nine years later, when it declined to amend the statute to allow the conscription of women. *See id.* at 60–63. The Court expressly rejected the argument that it "must consider the constitutionality of the [relevant statute] solely on the basis of the views expressed by Congress in 1948, when the [law] was first enacted in its modern form." *Id.* at 74. Instead, because Congress in 1980 had "thoroughly reconsider[ed] the question of exempting women from [the draft], and its basis for doing so," its views from that time were "highly relevant in assessing the constitutional validity of the exemption." *Id.* at 75.

And the Court reached this conclusion despite the challengers' claim that the 1980 legislative record amounted to "litigation-inspired afterthoughts" that "are constitutionally inadmissible in defending laws classifying by gender." Br. for Appellees at 31–32, *Rostker*, 453 U.S. 57 (No. 80-251), 1980 WL 339849, at *31–32. As the record in *Rostker* demonstrated, a representative of the Justice Department had testified before the relevant Senate Subcommittee that "the constitutionality of an all male draft" was "currently in litigation"; that the "legislative history" of the 1948 Act "has been totally unhelpful to the government in defending its constitutionality" thus far because it was "replete[] only with the kind of sexual stereotypes … that the Court has subsequently held will not support the constitutionality" of a sex-based classification; and that if Congress chose to reject President Carter's proposal, it "should speak out clearly and formulate the kind of record" that "will be helpful rather

than hurtful in the litigation." *Rostker* J.A. at 218, 220–21, quoted in Kastenmeier Amicus Br. at 20 n.14, *Rostker*, 453 U.S. 57 (No. 80-251), 1981 WL 390368, at *20 n.14.

Second, while the Court has rejected certain evidentiary defenses of sex-based classifications in the civilian context, *see, e.g.*, *Craig v. Boren*, 429 U.S. 190, 199–204 (1976), it has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including evidence from former military officials. In *Goldman*, for example, the Court rejected a free-exercise challenge to the Air Force's prohibition of a Jewish officer from wearing a yarmulke while working as a psychologist in an Air Force base hospital, even though that claim would have triggered strict scrutiny at the time had it been raised in the civilian context. 475 U.S. at 510. Likewise, the Court in *Rostker* declined to overrule the judgment of the political branches in the military context, even in the face of disagreement within those branches. Specifically, President Carter had provided "testimony of members of the Executive Branch and the military in support of [his] decision" to urge Congress to allow the registration of women for the draft. 453 U.S. at 79. Relying on this testimony, the lower court held that Congress's refusal to do so was unconstitutional because "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'" *Id.* at 63 (citation omitted). But the Supreme Court reversed, noting that the lower court had "palpably exceeded its authority" in "relying on this testimony," as Congress had "rejected it in the permissible exercise of its constitutional responsibility." *Id.* at 81–82.

Third, whereas concerns about "administrative convenience" ordinarily cannot be used to survive intermediate scrutiny, *e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 205 (1977), they play a significant role in cases involving military judgments. In *Rostker*, Congress "did not consider it worth the added burdens of including women in draft and registration plans," as "training would be needlessly burdened by women recruits who could not be used in combat," and additional "administrative problems such as housing and different treatment with regard to dependency, hardship and physical

standards would also exist." 453 U.S. at 81 (quotation omitted).  The Court reasoned that it was not its place "to dismiss such problems as insignificant in the context of military preparedness." *Id.*

Fourth, the political branches enjoy significant latitude to choose "among alternatives" in furthering military interests. *Id.* at 71–72 (majority opinion); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 67 (2006).  Again, in *Rostker*, President Carter and military leadership urged a sex-neutral alternative to draft registration that they believed "would materially increase [military] flexibility, not hamper it"'—namely, requiring both sexes to register—but Congress rejected that proposal in favor of retaining its sex-based approach.  453 U.S. at 63, 70.  Invoking the "deference due" Congress in this area, the Court refused "to declare unconstitutional [that] studied choice of one alternative in preference to another." *Id.* at 71–72.  All of this indicates an application of a rational basis type review rather than intermediate scrutiny.  *See Nguyen v. INS*, 533 U.S. 53, 77–78 (2001) (O'Connor, J., dissenting) ("[T]hat other means are better suited to the achievement of governmental ends … is of no moment under rational basis review," whereas "under heightened scrutiny, the availability of sex-neutral alternatives to a sex-based classification is often highly probative").

Finally, arguable inconsistencies resulting from line-drawing have not been enough to render military decisions invalid.  In *Goldman*, the Court acknowledged that the Air Force had an "exception … for headgear worn during indoor religious ceremonies" and gave commanders "discretion" to allow "visible religious headgear … in designated living quarters." 475 U.S. at 509.  Service members could also "wear up to three rings and one identification bracelet," even if those items "associate[d] the wearer with a denominational school or a religious or secular fraternal organization" and thereby served as "emblems of religious, social, and ethnic identity." *Id.* at 518 (Brennan, J., dissenting).  Yet the Court deferred to the Air Force's judgment that creating an exception for a psychologist who wanted to wear religious headgear in a hospital on base "would detract from the uniformity sought by

21

[its] dress regulations." *Id.* at 510 (majority opinion). Had this case occurred in the civilian context and strict scrutiny been applied, it is doubtful that the challenged decision would have been sustained.

Given the Court's substantial departure from core aspects of intermediate and even strict scrutiny in cases involving military deference, the most appropriate description of the applicable standard is rational basis review. But at a minimum, even if the Court prefers to label the standard a peculiar form of "intermediate scrutiny," Op. at 64, its substantive analysis of the new policy should track the Supreme Court's highly deferential approach in this area. *See Rostker*, 453 U.S. at 69–70 (disavowing the utility of traditional scrutiny labels in cases involving military deference). Put differently, regardless of the standard of review the Court employs, the basic elements of traditional intermediate scrutiny should not apply.

### B. The Department's New Policy Survives Highly Deferential Scrutiny.

Although it is not entirely clear which aspects of the new policy Plaintiffs believe are unconstitutional, their principal objection appears to be that in general, it does not accommodate gender transition by individuals with gender dysphoria. *See* Second Am. Compl. at 17.[6] That denial of a general accommodation survives the highly deferential review applicable here. As DoD explained, accommodating gender transition would create unacceptable risks to military readiness, undermine good order and discipline as well as unit cohesion, and impose disproportionate costs. Mattis Mem. 2. There should be no dispute that avoiding those harms is at least an important interest. *See* Op. 65. Indeed, courts must "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest,'" *Winter*, 555 U.S. at 24, and here,

---

[6] Because Plaintiffs seek a return to the Carter policy, Second Am. Compl., at 20, they cannot challenge the new policy's requirement that transgender individuals without gender dysphoria must serve in their biological sex, as the same rule existed under the Carter policy, Report 4. To the extent Plaintiffs also challenge any limits on taxpayer-funded medical transitions, they lack standing to do so. And even if they had standing, Plaintiffs point to no authority that would support a constitutional right to taxpayer-funded sex-reassignment surgery or cross-sex hormone therapy.

DoD has concluded that minimizing these risks is "absolutely essential to military effectiveness," Mattis Mem. 2; *accord* Report 41.  Thus, the only issue is whether this Court should defer to the military's independent, professional judgment that the new policy is "necessary" to effectuate that critical interest.  *E.g.*, Report 32.  That should not be a close question.

### 1.   Military Readiness

In DoD's professional military judgment, allowing individuals who require or have undergone gender transition to serve poses at least two significant risks to military readiness.  First, in light of "evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment"—including sex-reassignment surgery—as compared to others, as well as the "considerable scientific uncertainty" over whether gender transition "treatments fully remedy … the mental health problems associated with gender dysphoria," DoD found that "[t]he persistence of these problems is a risk for readiness."  Report 32.  In the military's view, it was "imperative" that it "proceed cautiously" in adopting "accession and retention standards for persons with a diagnosis or history of gender dysphoria" in light of "the scientific uncertainty surrounding the efficacy of transition-related treatment."  *Id.* at 27.

This risk-based assessment—grounded in an extensive review of evidence, including materials unavailable at the time the Carter policy was adopted—is a classic military judgment entitled to deference.  *See id.* at 19–27.  For example, the Centers for Medicare and Medicaid Services issued a study in August 2016, over a month after the Carter policy was announced, concluding that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."  *Id.* at 24.  Although this study was primarily concerned with Medicare beneficiaries, it "conducted a comprehensive review" of "the universe of literature regarding sex reassignment surgery," which consisted of "over 500 articles, studies, and reports" addressing a more general population.  *Id.*  Of these materials, only "33 studies"

23

were "sufficiently rigorous to merit further review," and "[o]verall, the quality and strength of evidence" in even these studies "were low." *Id.* In fact, there were only "six studies" that provided "useful information" on the efficacy of sex reassignment surgery as a general matter, and "the four best designed and conducted studies … did not demonstrate clinically significant changes or differences in psychometric test results" following the procedure. *Id.* And "one of the most robust" of those six, a Swedish "nationwide population-based, long-term follow-up" of individuals who had undergone sex-reassignment surgery—which the study noted was "a unique intervention not only in psychiatry but in all of medicine"—"found increased mortality [due to suicide and cardiovascular disease] and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a health control group." *Id.* at 22, 25–26. According to that study, "post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up," and "[e]ven though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons." *Id.* at 26.

In DoD's judgment, the need to "proceed cautiously" in this area is particularly compelling given the uniquely stressful nature of a military environment. *Id.* at 27. Although none of the available studies "account for the added stress of military life, deployments, and combat," *id.* at 24, preliminary data show that service members with gender dysphoria are "eight times more likely to attempt suicide" and "nine times more likely to have mental health encounters" than service members as a whole, *id.* at 21–22. Thus, in Secretary Mattis's judgment, DoD should not risk "compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations." Mattis Mem. 2.

In short, DoD concluded that the military risks stemming from the uncertain efficacy of a particular medical treatment for a particular medical condition outweighed the possible benefits of allowing individuals with that condition to serve generally. That is the type of analysis DoD must

perform with respect to all medical accession or retention standards, and the cautious approach it took here is hardly out of the norm. *See* Report 3 ("Given the life-and-death consequences of warfare, [DoD] has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members."). Indeed, even the Carter policy implicitly acknowledged that gender dysphoria or gender transition could impede military readiness by requiring applicants with a history of that condition and/or treatment to demonstrate that they had been stable or had avoided complications for an 18-month period. *See* DTM 16-005 at Attachment ¶ 2. Given that even administrative convenience concerns cannot be dismissed in this context, *see Rostker*, 453 U.S. at 81, the military's assessment of the tolerable level of risk from a medical condition and its treatment should not be second-guessed.

Second, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by gender transition, "most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time." Report 35. In the military's view, that limitation on deployability constituted a separate "readiness risk." *Id.* at 33. After documenting the restrictions on deployability associated with cross-sex hormone therapy and sex-reassignment surgery—including reports by some commanders that transitioning service members under their authority would be non-deployable for two to two-and-half-years—DoD made a military assessment that these burdens on military readiness were unacceptable. *Id.* at 33–35.

These deployability limitations would also have harmful collateral effects on the service members' units as a whole. As DoD explained, any "increase in the number of non-deployable military personnel places undue risk and personal burden" on those who are "qualified and eligible to deploy." *Id.* at 35. On top of these personal costs, service members who are deployed "more often to backfill or compensate for non-deployable" ones may face risks to family resiliency. *Id.* And when those with limitations deploy, but then fail to "meet medical deployment fitness standards" in the field, they may

"be sent home" and leave "the deployed unit with less manpower." *Id.* at 34. Each of these situations poses a "significant challenge for unit readiness." *Id.* at 35.

These are not new concerns. Secretary Carter acknowledged that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs." DTM 16-005 at Attachment ¶ 3. So did RAND, which concluded that the relevant limitations on deployability would "have a negative impact on readiness." Report 34–35. Although RAND dismissed this harm as "minimal" due to its estimation of the "exceedingly small number of transgender Service members who would seek transition-related treatment," *id.*, in DoD's judgment, that was the wrong question: "The issue is not whether the military can absorb periods of non-deployability in a small population," but "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." *Id.* at 35. After all, "by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers." *Id.* Put differently, RAND "failed to analyze the impact" on "unit readiness" at "the micro level" by taking a "macro" view of the entire military. *Id.* at 14. Given that even Congress may reject the military's judgment based on legislative concerns about deployability, then military leadership between administrations should be able to differ over what limitations on deployability are acceptable. *See Rostker*, 453 U.S. at 82 (noting concern that absorbing female inductees into noncombat positions would impede deployability of combat-ready soldiers); *cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (even in the civilian context, the government must review "the wisdom of its policy on a continuing basis, for example, in response to … a change in administrations") (internal citation omitted).

26

In fact, this is what Secretary Carter contemplated when he issued the accessions standards described in DTM 16-005. In conjunction with the issuance of the new accessions standards for individuals with a history of gender dysphoria or medical treatment related to gender dysphoria Secretary Carter directed that those standards would be reviewed "no later than 24 months from the effective date of this memorandum [June 30, 2016] and may be maintained or changed, as appropriate, to reflect applicable medical standards and clinical practice guidelines, ensure consistency with military readiness, and promote effectiveness in the recruiting and retention policies and procedures of the Armed Forces." DTM 16-005 at Attachment, ¶ 2. DoD conducted a review of these standards, as originally directed by Secretary Carter, in the timeframe he originally anticipated, using medical data from service members diagnosed with gender dysphoria that was unavailable to RAND or Secretary Carter 2016. Based on a review of that data, DoD concluded that RAND underestimated the limitations on deployability associated with gender transition.[7] Report 31. Given that RAND's conclusions were predictive, based on available evidence from a small sample size from foreign militaries and the civilian population, *see* Dkt. 13-4, Exh. B, Chapter 6, it is certainly reasonable that the current panel would come to a different conclusion on accessions when it reviewed actual medical data of a much greater sample size from the U.S. military population.[8]

## 2. Order, Discipline, Leadership, and Unit Cohesion

The Department similarly disagreed with RAND's analysis of "the intangible ingredients of military effectiveness"—namely, "leadership, training, good order and discipline, and unit cohesion."

---

[7] For example, RAND estimated that "as an upper bound," a total of 140 service members would seek "transition-related hormone therapy." Dkt. 13-4, Exh. B, at xi. In reality, of the 424 approved treatment plans that the Panel had available for study, 388 of those—over 91%—include such treatment. Report 31.

[8] RAND itself acknowledged this limitation in its findings. RAND notes several times in its report that the lack of data on the transgender population serving in the military was a "critical limitation" and as a result states that its findings should be "interpreted with caution." *See, e.g.*, Dkt. 13-4, Exh. B., at 3–4, 39.

Report 3.   While the RAND Report agreed that "unit cohesion" was "a critical input for unit readiness" and a "key concern" in any analysis of transgender service, it concluded that accommodating gender transition would likely have "no significant effect" based on the experiences of four foreign militaries that had "fairly low numbers of openly serving transgender personnel." Dkt. 13-4, Ex. B., at 44–45.   By adopting this approach, however, RAND, in DoD's judgment, failed to "examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy"—"all of which are critical to unit cohesion"—"at the unit and sub-unit levels."   Report 14.   Aside from the potential harms to unit cohesion associated with limits on deployability, accommodating gender transition would undermine the objectives served by the military's sex-based standards—"good order and discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality"—in several respects.   *Id.* at 28.

First, DoD concluded that any accommodation policy that does not require full sex-reassignment surgery threatens to "erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline."   *Id.* at 37.   As DoD explained, "[g]iven the unique nature of military service," service members must frequently "live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom."   *Id.*   To protect its service members' reasonable expectations of privacy, the Department "has long maintained separate berthing, bathroom, and shower facilities for men and women while in garrison."   *Id.*   This is hardly a suspect practice.   The Supreme Court has acknowledged that it is "necessary to afford members of each sex privacy from the other sex in living arrangements," *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996), and "[i]n the context of recruit training, this separation is even mandated by Congress," Report 37; *see* 10 U.S.C. §§ 4319, 4320, 6931, 6932, 9319, 9320.

Accommodating gender transition, DoD reasoned, at least with respect to those individuals who have not undergone a complete sex reassignment, would "undermine" these efforts to honor

service members' "reasonable expectations of privacy."  Report 36.  Allowing transgender service members "who have developed, even if only partially, the anatomy of their identified gender" to use the facilities of either their identified gender or biological sex "would invade the expectations of privacy" of the non-transgender service members who share those quarters.  *Id.* at 37.

Absent the creation of separate facilities for transgender service members, which could be "logistically impracticable for the Department," not to mention unacceptable to transgender service members, the military would face irreconcilable privacy demands.  *Id.*  For example, the Panel of Experts received a report from one commander who faced dueling equal opportunity complaints under the Carter policy over allowing a transgender service member who identified as a female but had male genitalia to use the female shower facilities—one from the female service members in the unit and one from the transgender service member.  *Id.*  And even DoD's handbook for implementing the Carter policy described the "unique leadership challenges" created by that policy with respect to expectations of privacy.  *Id.* at 38.  These concerns are consistent with reports from commanding officers in the Canadian military that "they would be called on to balance competing requirements" by "meeting [a] trans individual's expectations … while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness."  *Id.* at 40.

In DoD's judgment, such collisions of privacy demands "are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions."  *Id.* at 37.  Accommodating gender transition would mean the "routine execution of daily activities" could be a recurring source of "discord in the unit" requiring commanders "to devote time and resources to resolve issues not present outside of military service."  *Id.* at 38.  And any delayed or flawed solution to these conflicts by commanders "can degrade an otherwise highly functioning team," as any "appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline."  *Id.*

In addition, accommodating gender transition, at least in the context of basic recruiting, would be in tension with other federal statutory law.  As DoD observed, Congress has "required by statute that the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits during basic training and that access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits' to ensure 'after-hours privacy for recruits during basic training.'" *Id.* at 29 (citing 10 U.S.C. §§ 4319, 4320 (Army); *id.* §§ 6931, 6932 (Navy); *id.* §§ 9319, 9320 (Air Force)).  Accommodating the gender transition of recruits, drill sergeants, or training personnel in the context of basic recruit training places DoD in jeopardy of contravening those statutory mandates.  The new policy advances the military's interest in avoiding that legal risk.

Second, DoD concluded that accommodating gender transition creates safety risks for, and perceptions of unfairness among, service members by applying "different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology."  Report 36.  For example, "pitting biological females against biological males who identify as female, and vice versa," in "physically violent training and competition" could pose "a serious safety risk."  *Id.*  Moreover, both male and female service members who are not transgender would likely be frustrated by a "biological male who identifies as female" but "remain[s] a biological male in every respect" and yet is "governed by female standards" in "training and athletic competition," which tend to be less exacting than male training and athletic standards.  *Id.*

Again, these are legitimate military concerns, as both Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for service members to address biological differences between the sexes.  *Virginia*, 518 U.S. at 550 n.19 (citing statute requiring standards for women admitted to the service academies to "be the same as those … for male individuals, except for those minimum essential adjustments in such standards required

30

because of physiological differences between male and female individuals"). Especially given that "physical competition[] is central to the military life and indispensable to the training and preparation of warriors," Report 36, DoD's concerns about the risks in this area should not be ignored.

Third, DoD was concerned that exempting transgender service members from uniform and grooming standards associated with their biological sex would create additional friction in the ranks. For example, "allowing a biological male to adhere to female uniform and grooming standards" would "create[] unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity." *Id.* at 31. This is likely to be particularly true when non-transgender service members are barred from expressing core aspects of their identity. And in the military's judgment, policies "creating unfairness, or perceptions thereof," threaten to "adversely affect unit cohesion and good order and discipline." *Id.* at 36.

Given these concerns, DoD concluded that accommodating gender transition "risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline." *Id.* at 40. And because of "the vital interests at stake— the survivability of Service members, including transgender persons, in combat and the military effectiveness and lethality of our forces"—DoD decided to take a cautious approach to accommodating gender transition. *Id.* at 40–41.

That careful military judgment merits significant deference. "Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507–08 (citation omitted); *see also Steffan v. Perry*, 41 F.3d 677, 686 (D.C. Cir. 1994) (en banc) ("[t]he military is entitled to deference with respect to its estimation of the effect" a policy or practice will have "on military discipline"). That is particularly true given that military assessments regarding leadership, training, good order and

discipline, and unit cohesion "cannot be easily quantified," but instead are based on "necessarily subjective" military judgments "acquired from hard-earned experience leading Service members in peace and war." Report 3.

Accordingly, the Supreme Court has repeatedly deferred to similar judgments. One of its bases for upholding the sex-based statute in *Rostker*, for instance, was that it could not dismiss concerns about "problems such as housing and different treatment with regard to … physical standards" in the "context of military preparedness." 453 U.S. at 81 (internal quotation omitted). Likewise, in *Goldman*, the Court deferred to the Air Force's view that "the wearing of religious apparel such as a yarmulke … would detract from the uniformity sought by the dress regulations." 475 U.S. at 509–10. And in the decision affirmed by the Supreme Court in *Goldman*, the D.C. Circuit respected the judgment of the Air Force that "it cannot make exceptions … for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly … , thereby undermining the goals of teamwork, motivation, discipline, and the like." *Goldman v. Sec'y of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984). These courts did so even though others, including current and former military officials, disagreed. *See id.* There is no basis for treating the military's judgments here any differently.

### 3. Disproportionate Costs

Finally, DoD explained that under its experience with the Carter policy, accommodating gender transition was "proving to be disproportionately costly on a per capita basis." Report 41. Specifically, since the Carter policy's implementation, the medical costs for service members with gender dysphoria have "increased nearly three times" compared to others. *Id.* And that is "despite the low number of costly sex reassignment surgeries that have been performed so far"—"only 34 non-genital sex reassignment surgeries and one genital surgery"—which is only likely to increase as more service members with gender dysphoria avail themselves of these procedures. *Id.* Notably, "77% of

32

the 424 Service member treatment plans available for review"—*i.e.*, approximately 327 plans— "include requests for transition-related surgery" of some kind. *Id.*

The Department's Report adds that several commanders also reported that providing transition-related treatment for service members in their units "had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care." *Id.* This is not surprising given that "gender transition requires frequent evaluations" by both a mental health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." *Id.* at 41 n.164. Service members therefore "may have significant commutes to reach their required specialty care," and those "stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations." *Id.*

In light of the military's general interest in maximizing efficiency through minimizing costs, DoD concluded that its disproportionate expenditures on accommodating gender transition could be better devoted elsewhere. *See id.* at 3, 41. Again, such a conclusion is owed deference. Even when the alleged constitutional rights of service members are involved, judgments by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" are entitled to significant respect. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976) (no due process right to counsel at summary courts-martial).

*     *     *

In sum, DoD had significant concerns that "accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs." Report 5. It therefore made a "military judgment" that no longer providing a general accommodation for gender transition was "a necessary departure from the Carter policy."

33

*Id.* at 32.   In doing so, it was "well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues." *Id.* at 44.   But DoD's latest review of the issue had revealed that "the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed." *Id.*   In fact, even RAND had "concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs," but dismissed "such harms [as] negligible in light of the small size of the transgender population." *Id.*[9]   But given "the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect," DoD was "not convinced that these risks could be responsibly dismissed or that even negligible harms" (at the macro level) "should be incurred given [its] grave responsibility." *Id.*   It therefore "weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring," and concluded that "the various balances struck" by the new policy "provide the best solution currently available." *Id.*   That careful cost-benefit analysis by DoD easily survives the highly deferential form of review applicable here.

In addition, to the extent Plaintiffs are now challenging DoD's new policy, their claims should be dismissed because they have not brought them under the Administrative Procedure Act, *see* Dkt. 108 at 10 ("Plaintiffs have asserted claims directly under the Fifth Amendment, not the APA."), which is generally the only avenue for judicial review of the actions of Executive Branch agencies, *see Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237 (D.N.M. 2014) (quoting *Webster v. Doe*, 486 U.S. 592, 607 n.1 (1988) (Scalia, J., dissenting)( (["A]t least with respect to all entities

---

[9] RAND has recently explained that it was "not ask[ed] … to recommend whether" the pre-Carter policy should abandoned, but simply to answer seven specific questions.  Agnes Gereben Schaefer, *On RAND's Research Findings Regarding Transgender Military Personnel Policy*, COMMENTARY (THE RAND BLOG) (Mar. 27, 2018), Exh. 2.  It has also stressed that when it conducted its review, "there was limited data available" and that it "highlighted and caveated those limitations throughout the report so that DoD could understand the limitations and factor them into its decision making process." *Id.*

that come within the Chapter's definition of 'agency,' *see* 5 U.S.C. § 701(b), if review is not available under the APA it is not available at all.").

### C. The New Policy Does Not Violate Due Process.

Plaintiffs' remaining due process claim, which takes three forms, fails for essentially the same reasons as their equal protection claim. Each theory also contains additional defects.

First, Plaintiffs claim the new policy is "arbitrary and capricious" and "lack[s] any rational basis." Second Am. Compl. ¶ 97. But that is not the case for the reasons explained above—viz., that the new policy is constitutional under the highly deferential form of review applied to military policies. *See George Washington Univ. v. Dist. of Columbia*, 391 F. Supp. 2d 109, 114 (D.D.C. 2005) (noting that the rational basis tests under equal protection and due process "are almost indistinguishable").

Second, Plaintiffs claim that their "reliance" on the "2016 policy permitting transgender people to serve openly in the military" "created a protected interest in Plaintiffs' ability to continue serving in the military" that Defendants are threatening to take away. Second Am. Compl. ¶ 98. But that fails for a number of reasons. To begin, any alleged reliance interest is already protected by the new policy's categorical reliance exception for service members who took advantage of the Carter policy. *See* Report 4. And in any event, Plaintiffs' reliance interest claim is simply a repackaged form of their estoppel claim, *see* Am. Compl. ¶¶ 101–108, which this Court already has dismissed, *see* Op. 4, 55–58.

Moreover, Plaintiffs' Second Amended Complaint fails to indicate that Plaintiffs have been deprived of a cognizable liberty or property interest. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (concluding that plaintiff's due process claim failed because he "has not alleged facts suggesting he has been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest."); *George Washington Univ. v. D.C.*, 318 F.3d 203, 206 (D.C. Cir. 2003), as amended (Feb. 11, 2003). It is well established that "there is no protected property interest in continued military service." *Spadone v. McHugh*, 842 F. Supp. 2d 295, 304 (D.D.C. 2012) (quoting *Wilhelm v. Caldera*, 90

F. Supp. 2d 3, 8 (D.D.C. 2000)).[10]   Thus, no Plaintiff can maintain a due process claim based on the alleged uncertainty as to his future employment status with the military.  *See, e.g.*, Second Am. Compl. ¶¶ 11, 14, 18, 21, 24, 26, 30, 32, 34, 36.

Third, Plaintiffs contend that Defendants have violated their "fundamental rights" to "autonomy" and "privacy."  *See id.* ¶ 100.  That is framed at too high a level of generality.  The Supreme Court has counseled that substantive due process claims require a "'careful description' of the asserted fundamental liberty interest," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997), and that "vague generalities . . . will not suffice," *Chavez v. Martinez*, 538 U.S. 760, 776 (2003).  Finally, even if a fundamental liberty interest were cognizable in the military context, Plaintiffs have failed to indicate how Defendants have intruded upon such interest.  *See Glucksberg*, 521 U.S. at 721.  As explained above, Plaintiffs have not been discharged from the military, denied the right to enlist or reenlist, or refused transition-related health care.  And as discussed, there is no fundamental right to serve in the military, much less receive taxpayer-funded sex-reassignment surgery or cross-sex hormone therapy. Finally, even if there were such a right triggering heightened scrutiny, the new policy would survive that form of review for the reasons given above.  Therefore, Plaintiffs' substantive due process claim should be dismissed.

### D.  The New Policy Addresses This Court's Prior Reasoning.

The Department's new policy also addresses all of the concerns that this Court held justified enjoining the enforcement of its understanding of two directives in the 2017 Memorandum.  None of the reasons the Court gave for either eschewing a deferential form of review or for deeming those directives to be likely unconstitutional should apply to this new policy.

---

[10] *See also Hanson v. Wyatt*, 552 F.3d 1148, 1158 (10th Cir. 2008); *Guerra v. Scruggs*, 942 F.2d 270 (4th Cir. 1991); *Christoffersen v. Wash. State Air Nat'l Guard*, 855 F.2d 1437, 1443 (9th Cir. 1988); *MacFarlane v. Grasso,* 696 F.2d 217, 222 (2d Cir. 1982); *Woodard v. Marsh*, 658 F.2d 989 (5th Cir. 1981); *Ampleman v. Schlesinger*, 534 F.2d 825 (8th Cir. 1976); *Pauls v. Sec'y of the Air Force*, 457 U.S. 294, 297 (1st Cir. 1972).

In reviewing the 2017 Memorandum, this Court declined to adopt a deferential standard of scrutiny due to its conclusion that the President's directives were based on neither (1) "study and evaluation," Op. 70 (citing *Rostker*, 453 U.S. at 72), nor (2) the "'considered professional judgment'" of military officials, Op. 67 n.11 (quoting *Goldman*, 475 U.S. at 508). Defendants respectfully disagree, but, in any event, neither charge can be leveled against the military's new policy. The Department "received extensive evidence on the issue," and, as it had done under former Secretary Carter, "chose one of two competing alternatives." Op. 70. And that choice rested on the "considered professional judgment" of multiple military experts, many with combat experience, including the Secretary of Defense himself. Op. 67 n.11; *see* Mattis Mem. 2–3; Report 18, 41, 44. Accordingly, there is no basis for declining to give DoD's decision appropriate deference.

Likewise, "the unusual factors" that caused this Court to rule that the 2017 Memorandum would likely fail intermediate scrutiny are absent here. Op. 65. In other words, even if an ordinary form of intermediate scrutiny applied, the new policy would survive it.

First, whereas this Court was troubled by "the sheer breadth" of the 2017 Memorandum— which it understood to "ban[] the accession, and permit[] the discharge, of an entire category of individuals from the military solely because they are transgender," Op. 65—the new policy is considerably narrower in scope. To start, it permits those transgender service members diagnosed with gender dysphoria by a military medical provider between the effective date of the Carter policy and the effective date of DoD's new policy to continue to serve in their preferred gender and receive any medically necessary procedure. Report 43. That significant exception alone makes this policy far more nuanced than this Court's understanding of the policy set forth in the 2017 Memorandum. As for applicants and service members going forward, the new policy does not turn "solely" on whether "they are transgender," Op. 65, but, like the Carter policy, on whether they have a history or diagnosis of gender dysphoria, a medical condition that is not coterminous with transgender status, *see* Report

37

4–6, 20.  And even then, individuals with a history or diagnosis of this medical condition are not barred

from military service across the board, but may instead qualify for a number of categorical exemptions

in addition to the possibility of individualized waivers.  *See id.* at 4–6.  In short, the new policy cannot

be fairly characterized as one "banning all transgender individuals from serving in the military."  Op.

72.

      Second, the reasons for this nuanced policy are neither "hypothetical" nor "extremely

overbroad."  Op. 65.  Instead, they are rooted in extensive studies, *see, e.g.*, Report 19–27; the military's

experience under the Carter policy, *see, e.g., id.* at 8, 34, 37, 41; and the considered professional judgment

of military officials, *see, e.g., id.* at 4, 18, 32, 41, 44.  And even where the new policy appears to sweep

broadly, DoD explained why it does so.  For example, DoD considered, but rejected, allowing

individuals who had undergone "a full sex reassignment surgery" to serve.  *Id.* at 31.  As it explained,

that measure would be "at odds with current medical practice, which allows for a wide range of

individualized treatment" for gender dysphoria.  *Id.*  It also would have little practical effect, as the

"rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender

women."  *Id.*  In fact, only 22 service members have requested a waiver for that procedure so far,

which has occurred only once (for a twenty-third individual).  *Id.*  And in any event, this measure

would not address concerns about "the inconclusive scientific evidence that transition-related

treatment restores persons with gender dysphoria to full mental health."  *Id.* at 41.  Such careful

reasoning, resting in part on a recognition of the significant diversity of treatments for gender

dysphoria, cannot be cast as "unsupported, 'overbroad generalizations about the different talents,

capacities, or preferences,' of transgender individuals.'"  Op. 66.

      Third, the "military concerns" underlying DoD's new policy obviously were not "studied and

rejected by the military itself."  Op. 67.  To be sure, the former officials responsible for the Carter

policy may object to DoD's current approach, but, as *Rostker* and *Goldman* illustrate, such disagreement

does not alter the deferential analysis required here. *See also Winter*, 555 U.S. at 17 (deferring to the military's judgment in the face of the plaintiffs' "scientific studies, declarations from experts, and other evidence"). Indeed, in issuing the preliminary injunction, this Court stressed that "additional studies" could "be undertaken" and that the Carter policy could "be reevaluated," Op. 71, and it crafted its order to permit the military to "conduct[] studies" and "gather[] advice or recommendations on transgender service," Op. 75. All of this presumes the ability to adopt a different policy. Now that the military has completed its latest review, its "previous study cannot forever bind future administrations" from changing course. Op. 71.

Finally, far from being "abruptly announced," the new policy was accompanied by "the formality [and] deliberative processes" that this Court expected. Op. 68. The Department's independent reexamination of the Carter policy—begun without any direction from the President and well before his July 25, 2017 statement on Twitter—was an extensive deliberative process lasting over seven months and involving many of DoD's high-ranking officials as well as experts in a variety of subjects. *See* Mattis Mem. 1–2; Report 17–18. The Department considered evidence that both supported and cut against its approach, including the materials underlying, and the military's experience with, the Carter policy itself, and thoroughly explained why it was departing from that policy to some extent. *See, e.g.*, Report 18, 44. In short, although some may deeply disagree with DoD's ultimate conclusions, they cannot fairly contest that those good-faith judgments were "driven by genuine concerns regarding military efficacy." Op. 68.

### E. The New Policy is Not the Final Version of a "Transgender Service Ban."

Rather than engage with the substance of the new policy, Plaintiffs simply dismiss it as the implementation of the "transgender service ban" announced by the President "in tweets," presumably in an attempt to argue that the military's judgment merits no deference. Second Am. Compl. at 1–2; *see id.* at 15–18. In doing so, they echo the *Karnoski* Court, which dismissed DoD's policy as simply a

more detailed version of "the 'Ban'" announced by the President last year.  2018 WL 1784465, at *1 n.1.  Whatever rhetorical appeal this strategy may have, it cannot be squared with the facts or the law.

     **a.**     On the facts, one cannot fairly maintain that DoD's new policy, with its various exceptions permitting some transgender individuals, including most Plaintiffs here, to serve, is the same as, or even implements, the President's statement on Twitter that "the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military."  Op. 1. Nor does the new policy implement the 2017 Memorandum, especially as that document was understood by this Court and Plaintiffs (at least before their latest complaint).  Both this Court and Plaintiffs understood that Memorandum to institute "a policy banning the accession, and authorizing the discharge, of an entire category of individuals from the military solely because they are transgender."  Op. 65; *see, e.g.*, Am. Compl. 3 ("[N]o servicemembers who are openly transgender may enlist or continue their military service.").  Likewise, this Court and Plaintiffs believed that those service members who relied on the Carter policy "will be involuntarily discharged" if the 2017 Memorandum were "to take effect."  Am. Compl. 5; *see, e.g.*, Op. 50 ("the head of the military stat[ed]" that they "will be" "discharged from the military").  By contrast, the new policy, like the Carter policy before it, limits the service of only some transgender individuals on the basis of gender dysphoria, and permits those with gender dysphoria who relied on the Carter policy to continue to serve.

     Of course, the 2017 Memorandum did require the military to maintain the pre-Carter accession policy while it conducted further study of the issue, but that policy differs significantly from the new one proposed by DoD.  While the pre-Carter policy generally disqualified individuals on the basis of transgender status, DoD's new policy, like the Carter policy, turns on gender dysphoria (and the accompanying treatment of gender transition), a medical condition affecting only a subset of transgender individuals.  Report 10, 12–13, 20–21.  In addition, the new policy categorically allows some transgender individuals, including many Plaintiffs here, to serve in their preferred gender, an

option that was generally unavailable in the pre-Carter era. Indeed, Secretary Mattis recommended that the President "revoke" his 2017 Memorandum in order to "allow[]" the military to implement its preferred framework. Mattis Mem. 3. If the new policy simply implemented the 2017 Memorandum, there would have been no need for him to have made that recommendation or for the President to have revoked that Memorandum. *Cf.* Op. 54 ("[F]uture policy by the military—*absent action from the President*—cannot change what the directives require.") (emphasis added).

Rather than address the differences between the pre-Carter policy and DoD's new policy, Plaintiffs, like the *Karnoski* Court, invoke two September 2017 memoranda from Secretary Mattis confirming that (1) DoD will "carry out the President's policy and directives"; (2) it will "comply with" the 2017 Memorandum; (3) it will "develop[] an Implementation Plan … to effect the policy and directives" in the 2017 Memorandum; and (4) the 2017 Memorandum "directs DoD to maintain the policy currently in effect, which generally prohibits accession of transgender individuals into military service." Mem. from Secretary Mattis, "Interim Guidance" (Sept. 14, 2017), Dkt. 45-1; Mem. from Secretary Mattis, "Terms of Reference" (Sept. 14, 2017), Exh. 3; *see Karnoski*, 2018 WL 1784464, at *2, 6; Seccond Am. Compl. 16–17. None of those statements, however, changes the fact that DoD's new policy differs significantly from the pre-Carter framework. Rather, they simply reflect the fact, as Defendants have consistently explained, that the 2017 Memorandum directed the military to conduct "further study" and maintain the pre-Carter accession policy while doing so. 2017 Memorandum §§ 1(a), 2(a). As Secretary Mattis explained in recommending the new policy to the President, the 2017 Memorandum had "made clear that we could advise you 'at any time, in writing, that a change to [the pre-Carter] policy is warranted,'" and that is exactly what he did. Mattis Mem. 1. In short, one could say that the military "implemented" the 2017 Memorandum by studying the issue and advising the President that a new and different policy was appropriate, but nothing about that renders the new

policy unlawful.  *See* Op. 71 ("The Court by no means suggests that it was not within the President's authority to order that additional studies be undertaken and that [the Carter] policy be reevaluated.").

Nor do the efforts by the *Karnoski* Court to cast DoD's new policy as a "'categorical' prohibition on service by openly transgender people" withstand scrutiny.  2018 WL 1784464, at *6. To start, that court never reconciled its claim that the new policy is "categorical" with the existence of the reliance "exception," other than to dismiss it as "narrow" and "severable."  *Id.* at *6 n.6.  But a policy with even a narrow "exception" is by definition not a "categorical" one, and in any event this exception is hardly insignificant.  As this Court's earlier opinion illustrates, one of the key features of the litigation over the 2017 Memorandum was the concern that those service members who had relied on the Carter policy would be discharged.  *See, e.g.,* Op. 19–26 (discussing Plaintiffs' fears of discharge); Op. 36–37 (concluding that the likely purpose of the implementation plan was to determine how to facilitate "the removal and replacement of [transgender] individuals" currently serving); Op. 50 (ruling that Plaintiffs face at least a "substantial risk of discharge"); Op. 66 (stating that there was no explanation for a "need to discharge … *all* transgender people"); Op. 75 (noting evidence that "the *discharge* … of [transgender] individuals" would have a "negative effect" on the military).  Indeed, Plaintiffs' dismissed estoppel claim rested on this precise fear.  *See* Op. 55–58.  Unless that concern was itself a trivial consideration, an exception addressing it cannot be characterized as a minor one.

The *Karnoski* Court's only explanation for why the new policy was a categorical ban was that it would disqualify "transgender people—including those who have neither transitioned nor been diagnosed with gender dysphoria—from serving, unless they are 'willing and able to adhere to all standards associated with their biological sex,'" and thereby "force [them] to suppress the very characteristic that defines them as transgender in the first place."  2018 WL 1784464, at *6.  But the same could be said about the Carter policy the *Karnoski* Court ordered the military to maintain, as that

policy likewise requires transgender individuals who have not "been diagnosed with gender dysphoria … to adhere to all standards associated with their biological sex." *Id.*; *see* Report 15.

      **b.**      On the law, even if this Court believes that no daylight exists between the policy set forth in the 2017 Memorandum and the one recommended by DoD, it should still defer to the military's judgment. Although Plaintiffs suggest that the process here was a *post hoc* effort with a preordained result, that is not the case. To the contrary, DoD's review of the issue of transgender service began at the initiative of Secretary Mattis nearly a month *before* the President made his statement on Twitter. After the 2017 Memorandum was issued, Secretary Mattis then ordered the creation of a Panel of Experts to engage in "an *independent* multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." Terms of Reference 1–2 (emphasis added). Secretary Mattis "charged the Panel to provide its best military advice … without regard to any external factors." Mattis Mem. 1. Following this review, "[t]he Panel made recommendations based on each Panel member's independent military judgment." Report 4. After considering "those recommendations and the information underlying them, as well as additional information," DoD conducted an analysis that did not "start with [a] presumption" in favor of an outcome, but "ma[de] no assumptions" at all. *Id.* at 18–19. The resulting policy, in Secretary Mattis's words, was the product of "the Panel's professional military judgment," "the Department's best military judgment," and his "own professional judgment." Mattis Mem. 2, 3; *see also* 2018 Memorandum (noting that these are "the policies on this issue that the Secretary of Defense, in the exercise of his independent judgment, has concluded should be adopted"). The Court should credit the unambiguous statements of senior military leadership, and categorically reject any argument that the new policy does not reflect the independent, professional judgment of the United States military. *Cf. Stimpson*, 39 U.S. (14 Pet.) at 458 (presumption of regularity applies *a fortiori* to Cabinet Secretaries and the President).

Nor does the fact that DoD's new policy postdates the 2017 Memorandum change the analysis. Again, because the new policy differs from the one set forth under any reading of the 2017 Memorandum, Defendants are not trying to support an existing policy with after-the-fact evidence. But even if they were, the consideration of such materials would be appropriate in this context. As discussed, the Supreme Court has repeatedly considered evidence and rationales produced after the adoption of a military policy, even if the same policy would trigger heightened scrutiny in the civilian sphere. In fact, it has even gone so far as rely on theories as to what "Congress may … quite rationally have believed" to sustain a sex-based classification concerning military affairs. *Ballard*, 419 U.S. at 508.

That willingness to rely on *post hoc* explanations in the military context makes sense. Even if a decision concerning military matters originally rested on constitutionally impermissible reasons, it would be imprudent to hold that courts should ignore (or even discount) a subsequent judgment by military experts that the decision itself was in fact good for national defense. Again, *Rostker* is instructive: Even though Congress's original exemption of women from the requirement to register was apparently based on impermissible stereotypes, the Supreme Court refused to ignore Congress's later justification of that rule on military grounds. Yet under Plaintiffs' approach, those legitimate concerns about national defense should have been disregarded simply because they were raised after the law's enactment.

Likewise, even the *Karnoski* court declined an invitation to reject DoD's new policy as an irrelevant post hoc justification, but instead "carefully considered" the military's documents. 2018 WL 1784464, at *12. Although that court wrongly went on to rule that discovery into DoD's "deliberative process" was necessary, it at least refused to dismiss the new policy out of hand.

In fact, the Carter policy itself was the product of *post hoc* decisionmaking. The deliberative process leading up to that policy began with then-Secretary Carter's statement that the current policy was "outdated, confusing, [and] inconsistent," 2015 Statement by Secretary Carter, Exh. 1, an effective

moratorium on gender-identity-based discharges, and an instruction to the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, except where objective practical impediments are identified," Report 13. Yet no one would contend that in a challenge to the Carter policy, courts should disregard the RAND Report.

At bottom, Plaintiffs' position is that, due to the President's actions last summer, the military must adhere to the Carter policy (or some variant of it) going forward. That view cannot be squared with this Court's opinion, which "fully agree[d]" that "the military's previous study of transgender service cannot forever bind future administrations from looking into the issue themselves." Op. 71. As the Court noted, "[i]f the President had" ordered "that additional studies be undertaken and that [the Carter] policy be reevaluated" before deciding that a different policy "was beneficial to the various military objectives cited, this would be a different case." Op. 71–72. That describes the situation now. It makes no difference that the military finished its study *after* the 2017 Memorandum was issued. Otherwise, this Court's promise that the military may "continu[e] to study issues surrounding the service of transgender individuals in the military" despite the preliminary injunction would be illusory. Op. 72; *see also Karnoski*, 2018 WL 1784464, at *12 ("The Court's entry of a preliminary injunction was not intended to prevent the military from continuing to review the implications of open service by transgender people, nor to preclude it from *ever* modifying the Carter policy.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Second Amended Complaint, or, in the alternative, grant summary judgment for Defendants.

April 20, 2018

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

BRINTON LUCAS
Counsel to the Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

 /s/ *Ryan Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 514-4336
Email: ryan.parker@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JANE DOE 2 *et al.*,

      Plaintiffs,

v.

DONALD J. TRUMP *et al.*,

      Defendants.

Civil Action No. 17-cv-1597 (CKK)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED
COMPLAINT, OR, IN THE ALTERANTIVE, DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

1. For decades, military standards presumptively barred the accession and retention of transgender individuals.  Department of Defense Report and Recommendations on Military Service by Transgender Persons at 7 (Feb. 2018), Dkt. 96-2 (hereinafter, "Report").

2. The third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association (APA), treated "transsexualism" as a disorder.  *See* Report at 10 (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, at 261–64 (3d ed. 1980)).

3. The military's retention standards at various points generally permitted the discharge of service members with "transsexualism" or "sexual gender and identity disorders."  Report at 11 (citing Department of Defense Instruction (DoDI) 1332.38, *Physical Disability Evaluation* (Nov. 14, 1996) *cancelled by* DoDI 1332.18, *Disability Evaluation System* (Aug. 4, 2014)).

4. In 2013, the APA published the fifth edition of the DSM, which replaced the term "gender identity disorder" (itself a replacement for "transsexualism" in the fourth edition) with "gender

1

dysphoria." Report at 12 (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, at 451–59 (5th ed. 2013)).

5. The APA concluded that, by itself, identification with a gender different from one's biological sex—*i.e.*, transgender status—was not a mental disorder because "not all transgender people suffer from gender dysphoria." Report at 20 (quoting APA, "Expert Q & A: Gender Dysphoria," *available at* https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018)) (citing DSM-5 at 452–53).

6. The fifth edition of the DSM defines the mental condition of "gender dysphoria" as a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration," that is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Report at 12–13 (quoting DSM-5 at 453.

7. In July 2015, then-Secretary of Defense Ashton Carter announced that the Department of Defense's longstanding policy concerning transgender service was "outdated, confusing, [and] inconsistent." Statement by Secretary of Defense Ash Carter on DOD Transgender Policy, Release No. NR-272-15 (July 13, 2015), *available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/ (last visited Apr. 18, 2018), Exh. 1.

8. In July 2015, Secretary Carter ordered the creation of a working group "to study over the next six months the policy and readiness implications of welcoming transgender persons to serve openly," and instructed it to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." Statement by Secretary of Defense Ash Carter on DOD Transgender Policy, Release No. NR-272-15 (July 13, 2015), *available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/ (last visited Apr. 18, 2018), Exh. 1; *see also* Report at 13.

9. During the pendency of the study directed by Secretary Carter, no service member could be discharged on the basis of gender identity or gender dysphoria without personal approval from the Under Secretary of Defense for Personnel and Readiness. Statement by Secretary of Defense Ash Carter on DOD Transgender Policy, Release No. NR-272-15 (July 13, 2015), *available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/ (last visited Apr. 18, 2018), Exh. 1; *see also* Report at 13.

10. The Department of Defense commissioned the RAND National Defense Research Institute (RAND) to conduct a study to "(1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly." RAND National Defense Research Institute, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, at 1 (RAND Corp. 2016), Dkt. 13-6 at Exh. A (hereinafter, "RAND report").

11. The resulting RAND report concluded that allowing transgender service members to serve in their preferred gender would limit deployability, impede readiness, and impose costs on the military, but dismissed these burdens as "negligible," "marginal," or "minimal." RAND report at xii, 39–42, 46–47, 69–70.

12. On June 30, 2016, Secretary Carter approved the publication of Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members." DTM 16-005, Dkt. 13-6, Exh. B.

13. In DTM 16-005, Secretary Carter directed the Department of Defense to revise its accession standards by July 1, 2017. DTM 16-005 at Attachment, ¶ 2. Under this revised accession

standards, a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" would remain disqualifying unless an applicant provided a certificate from a licensed medical provider that the applicant had been stable or free from associated complications for 18 months. *Id.*

14. In DTM 16-005, Secretary Carter further directed that the accessions standards described in DTM 16-005 would be reviewed "no later than 24 months from the effective date of this memorandum [June 30, 2016] and may be maintained or changed, as appropriate, to reflect applicable medical standards and clinical practice guidelines, ensure consistency with military readiness, and promote effectiveness in the recruiting and retention policies and procedures of the Armed Forces." DTM 16-005 at Attachment, ¶ 2.

15. DTM 16-005 stated that effective June 30, 2016, current service members could not be discharged "solely on the basis of their gender identity" or their "expressed intent to transition genders." DTM 16-005 at Attachment, ¶ 1.

16. On June 30, 2016, Secretary Carter approved the publication of DoDI 1300.28, entitled "In-service Transition for Service Members Identifying as Transgender." DoDI 1300.28, *available at* https://www.defense.gov/Portals/1/features/2016/0616_policy/DoD-Instruction-1300.28.pdf (last accessed Apr. 19, 2018).

17. Under DoDI 1300.28, if a service member was diagnosed with gender dysphoria, that individual could transition genders. DoDI 1300.28, para. 3.1.b.

18. Under DoDI 1300.28, transgender service members who did not meet the clinical criteria for gender dysphoria remained subject to the standards and requirements applicable to their biological sex. Report at 15.

19. Before the Carter accession standards took effect on July 1, 2017, the Deputy Secretary of Defense directed the Services to assess their readiness to begin accessing transgender

individuals into the military.  *See* Memorandum from James N. Mattis, Secretary of Defense, *Accession of Transgender Individuals into the Military Services* (June 30, 2017), Dkt. 96-4.

20. "Building upon that work and after consulting with the Service Chiefs and Secretaries," Secretary of Defense James Mattis "determined that it [was] necessary to defer the start of [these] accessions" so that the military could "evaluate more carefully the impact of such accessions on readiness and lethality."  Memorandum from James N. Mattis, Secretary of Defense, *Accession of Transgender Individuals into the Military Services* (June 30, 2017).

21. On June 30, 2017, based on the recommendation of the services and in the exercise of his independent discretion, Secretary Mattis delayed the implementation of the Carter accession standards until January 1, 2018.  Memorandum from James N. Mattis, Secretary of Defense, *Accession of Transgender Individuals into the Military Services* (June 30, 2017).

22. Secretary Mattis ordered the Under Secretary of Defense for Personnel and Readiness to lead a review, which would "include all relevant considerations" and last for five months, with an end date of December 1, 2017.  Memorandum from James N. Mattis, Secretary of Defense, *Accession of Transgender Individuals into the Military Services* (June 30, 2017).

23. Secretary Mattis explained that this review would give him "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department," and that he "in no way presupposes the outcome of the review."  Memorandum from James N. Mattis, Secretary of Defense, *Accession of Transgender Individuals into the Military Services* (June 30, 2017).

24. While that review was ongoing, the President stated on Twitter on July 26, 2017, that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  Op. 1, Dkt. 61.

25. On August 25, 2017, the President issued a memorandum ordering "further study" into the risks of maintaining the Carter policy and adherence to current accession standards while that review was ongoing.  Military Service by Transgender Individuals, 82 Fed. Reg. 41319 (Aug. 25, 2017) §§ 1(a), 2(a).

26. On September 14, 2017, Secretary Mattis established a Panel of Experts (Panel) to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  Memorandum from James N. Mattis, Secretary of Defense, "Terms of Reference—Implementation of Presidential Memorandum on Military Service by Transgender Individuals, at 1–2 (Sept. 14, 2017); *see also* Military Service by Transgender Individuals – Interim Guidance (Sept. 14, 2017), Dkt. 45-1; Report at 17.

27. The Panel consisted of the members of senior military leadership who had "the statutory responsibility to organize, train, and equip military forces" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." Report at 18.

28. The Panel was chaired by the Under Secretary of Defense for Personnel and Readiness and included the Under Secretaries of the Military Departments, the Armed Services' Vice Chiefs, and Senior Enlisted Advisors (or officials performing those duties).  Report at 18.

29. In 13 separate meetings over the span of 90 days, the Panel met with military and civilian medical professionals, commanders of transgender service members, and transgender service members themselves.  Report at 18.

30. The Panel reviewed information regarding gender dysphoria, its treatment, and its impact on military effectiveness, unit cohesion, and military resources.  Report at 18.

31. The Panel received briefing from three separate working groups or committees dedicated to issues involving personnel, medical treatment, and military lethality.  Report at 18.

32. The Panel drew on the military's experience with the Carter policy to date and considered evidence supporting and cutting against its recommendations.  Report at 18.

33. As part of its review, the Panel examined data related to current service members diagnosed with gender dysphoria that was not available to RAND in 2016 and thus not considered or incorporated in its report or the Carter policy.  Report at 31.

34. In contrast to the development of the Carter policy, the Panel did not "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness," but made "no assumptions" at all.  Report at 19; Statement by Secretary of Defense Ash Carter on DOD Transgender Policy, Release No. NR-272-15 (July 13, 2015), *available at* https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/ (last visited Apr. 18, 2018).

35. Exercising its professional military judgment, the Panel provided Secretary Mattis with a set of recommendations.  Report at 19.

36. After considering the Panel's recommendations, along with additional information, Secretary Mattis, with the agreement of the Secretary of Homeland Security, sent the President a memorandum in February 2018 proposing a new policy consistent with the Panel's conclusions.  Memorandum for the President regarding Military Service by Transgender Individuals (Feb. 22, 2018), Dkt. 96-1 (hereinafter, "Mattis Memorandum").

37. The Mattis Memorandum was accompanied by a 44-page report setting forth in detail the bases for the Department of Defense's recommended new policy.  Mattis Memorandum at 3; *see* Report.

38. The Mattis Memorandum stated, "Based on the work of the Panel and the Department's best military judgment," the Department of Defense had concluded "that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis

of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender." Mattis Memorandum at 2.

39. The Mattis Memorandum stated that the Department of Defense had found "that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all Service members, including transgender Service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Mattis Memorandum at 2.

40. The Mattis Memorandum stated that the RAND report "contained significant shortcomings" because, among other defects, it relied on "limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own." Mattis Memorandum at 2.

41. The Mattis Memorandum stated, "In short, this policy issue has proven more complex than the prior administration or RAND assumed." Mattis Memorandum at 2.

42. "[I]n light of the Panel's professional military judgment and [his] own professional judgment," Secretary Mattis proposed a policy that continued some aspects of the Carter policy and departed from others. Mattis Memorandum at 2–3; Report at 4–6, 33–43.

43. Like the Carter policy, the new policy set forth in the Mattis Memorandum and Report does not draw lines on the basis of transgender status, but presumptively disqualifies from service individuals with a certain medical condition, gender dysphoria. *Compare* Report at 4–6, 19, *with* DTM 16-005.

44. Under the new policy, as under the Carter policy, individuals who "identify as a gender other than their biological sex" but who do not suffer clinically significant "distress or impairment

of functioning in meeting the standards associated with their biological sex"—and therefore have no history or diagnosis of gender dysphoria—may serve if "they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex." Report at 4.

45. Under the new policy, individuals who both are "diagnosed with gender dysphoria, either before or after entry into service," and "require transition-related treatment, or have already transitioned to their preferred gender," are presumptively "ineligible for service." Report at 5.

46. This presumptive disqualification for individuals who both are "diagnosed with gender dysphoria, either before or after entry into service," and "require transition-related treatment, or have already transitioned to their preferred gender," is subject to both individualized "waivers or exceptions" that generally apply to all Department and Service-specific standards and policies as well as a categorical reliance exception for service members who took advantage of the Carter policy. Report at 5.

47. Service members "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy," including those who entered the military "after January 1, 2018," "may continue to receive all medically necessary care, to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences." Report at 5–6.

48. Under the new policy, individuals who "are diagnosed with, or have a history of, gender dysphoria" but who neither require nor have undergone gender transition are likewise "generally disqualified from accession or retention." Report at 5–6.

49. This presumptive disqualification for individuals who "are diagnosed with, or have a history of, gender dysphoria" but who neither require nor have undergone gender transition is subject to both individualized "waivers or exceptions" that generally apply to all Department and Service-specific standards and policies as well as a categorical reliance exception for service members who took advantage of the Carter policy.  Report at 5–6.

50. Under the new policy, with respect to accession, individuals with a history of gender dysphoria may enter the military if they (1) can demonstrate "36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application"; (2) "have not transitioned to the opposite gender"; and (3) "are willing and able to adhere to all standards associated with their biological sex."  Report at 5–6.

51. Under the new policy, with respect to retention, individuals diagnosed with gender dysphoria after entering the military may remain so long as they (1) can comply with Department and Service-specific "non-deployab[ility]" rules; (2) do "not require gender transition"; and (3) "are willing and able to adhere to all standards associated with their biological sex."  Report at 5.

52. On March 23, 2018, the President issued a new memorandum that revoked the 2017 Memorandum "and any other directive" the President "may have made with respect to military service by transgender individuals," thereby allowing the Secretaries of Defense and Homeland Security to "exercise their authority to implement any appropriate policies concerning military service by transgender persons."  2018 Memorandum, Dkt. 95-1.

53. Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and John Doe 1 are current service members who have been diagnosed with gender dysphoria.  *See* Second Am. Compl. ¶¶ 7–21, 27–30, Dkt. 106.

54. Plaintiff Jane Doe 6 is a current service member who has not been diagnosed with gender dysphoria by a military doctor.  *See* Second Am. Compl. ¶¶ 22, 23

55. Plaintiff Regan Kibby is a midshipman at the U.S. Naval Academy and has notified the Academy that he is transgender.  Second Am. Compl. ¶ 33.

56. Midshipman Kibby is on medical leave, and there is currently no impediment to his returning to the Academy when his leave ends in May 2018.  Chadwick Decl. ¶¶ 9, 12, Dkt. 45-2.

57. Plaintiffs Jane Doe 7 and John Doe 2 are individuals who have undergone gender transition and wish to join the military.  *See* Second Am. Compl. ¶¶ 25, 31.

58. Plaintiff Jane Doe 7 does not allege that she has actually applied to access in the military, let alone had an application denied because of the DoD policy.  *See* Second Am. Compl. ¶¶ 25–26.

59. Plaintiff John Doe 2 alleges that he began the enlistment process, but he does not allege that his enlistment application was denied.  *See* Second Am. Compl. ¶¶ 31–32.

60. Plaintiff Dylan Kohere is a first-year college student who is taking academic classes as part of his school's ROTC program.  Second Am. Compl. ¶ 35.

61. Mr. Kohere is transgender, but he does not allege that he has been diagnosed with gender dysphoria.  *See* Second Am. Compl. ¶ 35.

April 20, 2018                                     Respectfully Submitted,

                                                  CHAD A. READLER
                                                  Acting Assistant Attorney General
                                                  Civil Division

                                                  BRETT A. SHUMATE
                                                  Deputy Assistant Attorney General

                                                  BRINTON LUCAS
                                                  Counsel to the Assistant Attorney General

                                                  JOHN R. GRIFFITHS
                                                  Branch Director

                                                  ANTHONY J. COPPOLINO

11

Deputy Director

/s/ *Ryan Parker*

RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 514-4336
Email: ryan.parker@usdoj.gov

*Counsel for Defendants*