UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JANE DOE 2 *et al.*,<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>**DONALD J. TRUMP** *et al.*,<br><br>     **Defendants.** | **Civil Action No. 17-cv-1597 (CKK)** |

**DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................... 1

BACKGROUND ................................................................................................................................. 2

    A.  History of Policies Concerning Transgender Service Before 2017 ................................................. 2

    B.  Development of the Department's New Policy ............................................................................. 4

    C.  The Department's New Policy ..................................................................................................... 6

    D.  Litigation Concerning the New Policy ........................................................................................ 8

ARGUMENT ...................................................................................................................................... 9

    I.      Plaintiffs Cannot Demonstrate A Likelihood of Success On The Merits ............................... 9

        A.  The Current Challenge to the 2017 Presidential Memorandum Is Moot ............................ 9

        B.  The Department's New Policy Withstands Constitutional Scrutiny .................................. 13

            1.  The Department's new policy is subject to highly deferential review ............................ 13

            2.  The Department's new policy survives highly deferential scrutiny ................................ 20

                a.  Military Readiness ..................................................................................................... 20

                b.  Order, Discipline, Leadership, and Unit Cohesion ................................................. 25

                c.  Disproportionate Costs ............................................................................................ 30

            3.  The new policy addresses this Court's prior concerns ................................................... 33

            4.  The new policy is not the final version of a "transgender service ban" ........................ 36

    II.    Plaintiffs Have Not Satisfied The Equitable Factors For A Preliminary Injunction ............ 42

        A.  Plaintiffs Have Not Established Irreparable Injury .................................................................. 42

        B.  Plaintiffs Have Not Demonstrated the Balance of the Equities and Public Interest Favor a Preliminary Injunction Against the Department's New Policy ......................................... 44

    III.  At A Minimum, The Injunction Should Be Dissolved In Part ............................................. 45

CONCLUSION ................................................................................................................................. 45

**INTRODUCTION**

Last October, this Court entered a preliminary injunction forbidding the enforcement of two directives in a Presidential Memorandum concerning military service by transgender individuals (2017 Memorandum). Dkt. No. 60. The Court understood these directives to institute "a policy banning the accession, and authorizing the discharge, of an entire category of individuals from the military solely because they are transgender"; believed that this policy's justifications "were not merely unsupported, but were actually *contradicted* by the studies, conclusions, and judgment of the military itself"; and enjoined the policy's enforcement based on that understanding. Mem. Op. ("Op.") at 65, 67, Dkt. No. 61.

The bases for that preliminary injunction no longer exist. In February 2018, the Secretary of Defense, with the agreement of the Secretary of Homeland Security, sent the President a memorandum recommending that the President revoke his 2017 Memorandum so that the military can implement a new policy concerning transgender service. Mattis Memorandum, Dkt. No. 96-1. As Secretary Mattis explained, after an extensive review of the issue, the Department of Defense concluded that maintaining the policy on transgender service recently put in place by Secretary Carter would pose substantial risks to military readiness and therefore proposed a new policy. *Id.* at 1–2. Far from a categorical ban based on transgender status, this new policy, like the Carter policy before it, turns on the medical condition of gender dysphoria and contains a nuanced set of exceptions allowing some transgender individuals, including most Plaintiffs here, to serve. *Id.* at 2–3. Along with this memorandum, Secretary Mattis sent the President a 44-page report explaining why, in the professional, independent judgment of the Defense Department, this new policy is necessary to further military interests. DoD Report ("Report"), Dkt. No. 96-2. The President then issued a new memorandum in March 2018 revoking his 2017 Memorandum, thereby allowing the military to implement the policy it developed after studying the issue. Dkt. No. 96-3 ("2018 Memorandum").

1

In light of these changed circumstances, the preliminary injunction should be dissolved. Simply put, Plaintiffs can no longer meet any of the four criteria for this form of relief.  On the likelihood of success on the merits, their challenge to the revoked 2017 Memorandum is no longer a live controversy and the military's new policy is constitutional.  Nor have Plaintiffs—most of whom may continue serving in their preferred gender under the new policy—established that they would suffer any cognizable injury from the new policy, much less an irreparable one.  And given the Department's professional judgment that retaining the Carter policy would pose significant risks to military readiness, the balance of the equities and the public interest strongly cut against maintaining a preliminary injunction that would prolong this state of affairs.

To be clear, Defendants respectfully maintain that the Court's preliminary injunction, which addressed only certain provisions of the President's 2017 Memorandum, does not extend to the Department's new policy.  But in an abundance of caution, Defendants urge this Court to dissolve the preliminary injunction in order to permit the military to implement the policy it believes will best ensure our Nation's defense.  Plaintiffs' challenge to that new policy should not be litigated under the shadow of a preliminary injunction of a Presidential Memorandum that is no longer in effect.[1]

**BACKGROUND**

**A.      History of Policies Concerning Transgender Service Before 2017**

For decades, military standards generally barred the accession and retention of transgender individuals.  Report 7, 11.  That approach was consistent with the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association (APA), which treated "transsexualism" as a disorder. *Id.* at 10.  In 2013, the APA published the fifth edition of the DSM, which replaced the term "gender identity disorder" (itself a replacement for

---

[1] On April 20, 2018, counsel for Defendants discussed this motion with Plaintiffs' counsel, who stated that Plaintiffs oppose this motion.

"transsexualism" in the fourth edition) with "gender dysphoria." *Id.* at 10, 12. The change reflected the APA's conclusion that, by itself, identification with a gender different from one's biological sex—*i.e.*, transgender status—was not a mental disorder. *Id.* at 12. As the APA stressed, "not all transgender people suffer from gender dysphoria." *Id.* at 20. Instead, the fifth edition of the DSM defines the mental condition of "gender dysphoria" as a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration," that is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 12–13.

Two years later, then-Secretary of Defense Carter announced in July 2015 that the Department's longstanding policy concerning transgender service was "outdated, confusing, [and] inconsistent." Ex. 1 ("2015 Statement"). He then ordered the creation of a working group in July 2015 "to study the policy and readiness implications of welcoming transgender persons to serve openly," and instructed it to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." Report 13. He also directed that no service member could be discharged on the basis of gender identity or gender dysphoria without personal approval from the Under Secretary of Defense for Personnel and Readiness. *Id.*

The Department then commissioned the RAND National Defense Research Institute to study the issue. *Id.* The resulting RAND report concluded that allowing transgender service members to serve in their preferred gender would limit deployability, impede readiness, and impose costs on the military, but dismissed these burdens as "negligible," "marginal," or "minimal." Dkt. No. 13-4, Ex. B. at xii, 39–42, 46–47, 69–70.

After this review, Secretary Carter ordered the Defense Department on June 30, 2016, to adopt various changes to its policies. First, the Department had until July 1, 2017, to revise its accession standards. Report 14. Under this revision, a history of "gender dysphoria," "medical treatment

3

associated with gender transition," or "sex reassignment or genital reconstruction surgery" would remain disqualifying unless an applicant provided a certificate from a licensed medical provider that the applicant had been stable or free from associated complications for 18 months and, where relevant, had completed all transition-related medical treatment. *Id.* at 15. Second, and effective immediately, current service members could not be discharged "solely on the basis of their gender identity" or "expressed intent to transition genders," Dkt. No. 13-6, Ex. B at 4, but instead, if diagnosed with gender dysphoria, could transition genders, Report 14. Transgender service members who did not meet the clinical criteria for gender dysphoria, however, had to serve in their biological sex. *Id.* at 15.

**B.    Development of the Department's New Policy**

Before the Carter accession standards took effect on July 1, 2017, the Deputy Secretary of Defense directed the Services to assess their readiness to begin accessing transgender individuals into the military. *See* Dkt. No. 96-4 ("Deferral Memorandum"). "Building upon that work and after consulting with the Service Chiefs and Secretaries," Secretary Mattis "determined that it [was] necessary to defer the start of [these] accessions" so that the military could "evaluate more carefully the impact of such accessions on readiness and lethality." *Id.* Based on the recommendation of the services and in the exercise of his independent discretion, he therefore delayed the implementation of the new accession standards on June 30, 2017 until January 1, 2018. *Id.*; *see* Statement by Dana W. White (June 30, 2017), Dkt. No. 13-2, Ex. C; Report 4. He also ordered the Under Secretary of Defense for Personnel and Readiness to lead a review, which would "include all relevant considerations" and last for five months, with an end date of December 1, 2017. Deferral Memorandum. Secretary Mattis explained that this study would give him "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department," and that he "in no way presupposes the outcome of the review." *Id.*; *see* Mattis Memorandum 1; Report 17.

While that review was ongoing, the President stated on Twitter on July 26, 2017, that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military." Op. 1; *see* Report 17 (quoting Mattis Memorandum 2). The President then issued a memorandum on August 25, 2017, ordering "further study" into the risks of maintaining the Carter policy and adherence to current accession standards while that review was ongoing. 2017 Memorandum §§ 1(a), 2(a).[2]

On September 14, 2017, Secretary Mattis established a Panel of Experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." Report 17. The Panel consisted of the members of senior military leadership who had "the statutory responsibility to organize, train, and equip military forces" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." *Id.* at 18. Specifically, the Panel was chaired by the Under Secretary of Defense for Personnel and Readiness and included the Under Secretaries of the Military Departments, the Armed Services' Vice Chiefs, and Senior Enlisted Advisors (or officials performing those duties). *Id.*

In 13 separate meetings over the span of 90 days, the Panel met with military and civilian medical professionals, commanders of transgender service members, and transgender service members themselves. *Id.* It reviewed information regarding gender dysphoria, its treatment, and its impact on military effectiveness, unit cohesion, and military resources. *Id.* It received briefing from three separate working groups or committees dedicated to issues involving personnel, medical treatment, and military lethality. *Id.* It drew on the military's experience with the Carter policy to date and considered evidence supporting and cutting against its recommendations. *Id.* And, in contrast to the development of the Carter policy, it did not "start with the presumption that transgender persons

---

[2] This filing does not describe the Memorandum and ensuing litigation given this Court's familiarity.

can serve openly without adverse impact on military effectiveness and readiness." *Id.* at 19.  Exercising

its professional military judgment, the Panel provided Secretary Mattis with its recommendations.  *Id.*

After considering the Panel's recommendations, along with additional information, Secretary

Mattis, with the agreement of the Secretary of Homeland Security, sent the President a memorandum

in February 2018 proposing a new policy consistent with the Panel's conclusions.  *Id.*; *see* Mattis

Memorandum.  The memorandum was accompanied by a 44-page report setting forth in detail the

bases for the Department of Defense's recommended new policy.  Mattis Memorandum 3.

## C.    The Department's New Policy

In his memorandum, Secretary Mattis explained why departing from certain aspects of the

Carter policy was necessary.  "Based on the work of the Panel and the Department's best military

judgment," the Department had concluded "that there are substantial risks associated with allowing

the accession and retention of individuals with a history or diagnosis of gender dysphoria and require,

or have already undertaken, a course of treatment to change their gender."  *Id.* at 2.  In addition, the

Department had found "that exempting such persons from well-established mental health, physical

health, and sex-based standards, which apply to all Service members, including transgender Service

members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an

unreasonable burden on the military that is not conducive to military effectiveness and lethality."  *Id.*

Although the prior administration had concluded otherwise, it did so largely on the basis of

the RAND report, which "contained significant shortcomings."  *Id.*  Among other defects, it relied on

"limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare

costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign

militaries with different operational requirements than our own."  *Id.*  "In short, this policy issue has

proven more complex than the prior administration or RAND assumed."  *Id.*

"[I]n light of the Panel's professional military judgment and [his] own professional judgment," Secretary Mattis thus proposed a policy that continued some aspects of the Carter policy and departed from others. *Id.*; *see id.* at 2–3; Report 4–6, 33–43. Like the Carter policy, the new policy does not draw lines on the basis of transgender status, but presumptively disqualifies from service individuals with a certain medical condition, gender dysphoria. *Compare* Report 4–6, 19, *with* Dkt. No. 13-6. The key difference between the two policies is the scope of the exceptions to that presumptive disqualification.

To start, under the new policy, as under the Carter policy, individuals who "identify as a gender other than their biological sex" but who do not suffer clinically significant "distress or impairment of functioning in meeting the standards associated with their biological sex"—and therefore have no history or diagnosis of gender dysphoria—may serve if "they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex." Report 4.

By contrast, individuals who both are "diagnosed with gender dysphoria, either before or after entry into service," and "require transition-related treatment, or have already transitioned to their preferred gender," are presumptively "ineligible for service." Report 5. This presumptive bar is subject to both individualized "waivers or exceptions" that generally apply to all Department and Service-specific standards and policies as well as a categorical reliance exception for service members who took advantage of the Carter policy. *Id.* Specifically, service members "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy," including those who entered the military "after January 1, 2018," "may continue to receive all medically necessary care, to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences." *Id.* at 5–6.

In addition, individuals who "are diagnosed with, or have a history of, gender dysphoria" but

7

who neither require nor have undergone gender transition are likewise "generally disqualified from accession or retention." *Id.* at 5. This presumptive disqualification is subject to the same exceptions discussed above as well as two new categorical ones. *Id.* With respect to accession, individuals with a history of gender dysphoria may enter the military if they (1) can demonstrate "36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application"; (2) "have not transitioned to the opposite gender"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.* With respect to retention, those diagnosed with gender dysphoria after entering the military may remain so long as they (1) can comply with Department and Service-specific "non-deployab[ility]" rules; (2) do "not require gender transition"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.*

On March 23, 2018, the President issued a new memorandum that revoked the 2017 Memorandum "and any other directive" the President "may have made with respect to military service by transgender individuals," thereby allowing the Secretaries of Defense and Homeland Security to "exercise their authority to implement any appropriate policies concerning military service by transgender individuals." 2018 Memorandum.

**D.     Litigation Concerning the New Policy**

The same day the President issued his new memorandum, Defendants moved to dissolve the preliminary injunctions entered against the 2017 Memorandum by this Court and three others. At this Court's invitation, Plaintiffs then filed a second amended complaint challenging the new policy.

Last Friday, the Western District of Washington denied Defendants' motion to dissolve the nationwide preliminary injunction it had issued forbidding enforcement of the 2017 Memorandum, except with respect to the President. *Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464, at *1, 14 (W.D. Wash. Apr. 13, 2018). Instead, that court expanded that injunction to preclude Defendants other than the President from implementing the military's new policy. *Id.* at *14.

8

## ARGUMENT

"Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.). Accordingly, courts regularly dissolve preliminary injunctions when changed circumstances undermine the basis for the interlocutory relief. *See, e.g.*, *CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1111 (9th Cir. 2017) (discussing dissolution of injunction in response to amendment of challenged law). Ordinarily, "dissolution should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place"—*i.e.*, "[t]he familiar quartet" of "likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994). The changed circumstances here preclude Plaintiffs from satisfying any of these criteria.

## I.   Plaintiffs Cannot Demonstrate A Likelihood of Success On The Merits

### A.   Plaintiffs' Challenge to the 2017 Presidential Memorandum Is Moot

To start, Plaintiffs are unlikely to succeed in their challenge to the 2017 Memorandum—the only directive covered by the preliminary injunction—because that controversy is moot. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question as to jurisdiction … mak[es] such success more *unlikely* due to potential impediments to even reaching the merits."). A case is moot "'when it is impossible for a court to grant any effectual relief to the prevailing party,'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted), and that is true here. Because the President has revoked the 2017 Memorandum, Plaintiffs are no longer suffering any alleged injury from that Memorandum. Granting their requested relief—a declaration that the 2017 Memorandum is unconstitutional and an injunction against its enforcement—would therefore amount to an impermissible advisory opinion.

That is true even though Plaintiffs have now challenged the Department's new policy. Any of their asserted future injuries from that policy would stem from the independent actions of the Secretaries of Defense and Homeland Security in implementing that policy, not the 2017 or 2018 Memoranda. And even if some Plaintiffs have standing to challenge the new policy, *but see infra* Part II.A, continuing to enjoin the enforcement of the 2017 Memorandum would not redress any of their alleged harms. If the new policy would disqualify them from service, preserving an injunction against the enforcement of the (non-existent) 2017 Memorandum would do nothing to cure their injuries.

In an attempt to escape this problem, Plaintiffs suggest that the new policy is insufficiently different from the 2017 Memorandum to moot the case. *See* Second Am. Compl., Dkt. No. 106 at 1–2, 15–18; *see also Karnoski*, 2018 WL 1784464, at *5–7 (advancing the same theory). In doing so, they seek refuge in the doctrine that "a defendant's voluntary cessation of a challenged practice" does not always moot the case, an exception designed to prevent manipulation of the judicial process. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

At the outset, precedent forecloses this Court from applying the voluntary cessation doctrine against the President. As the *en banc* D.C. Circuit has observed, "[a]lthough the doctrine has more recently been applied to legislative bodies," there appears to be "no case applying the doctrine to Congress," and "[w]e have serious doubts whether it could be." *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990). That is because "[a]t least in the absence of overwhelming evidence (and perhaps not then), it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose." *Id.* That reasoning should apply with equal force to the President's decision to revoke a Memorandum. *See Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 353 (D.C. Cir. 1997) ("[T]he courts accord the executive branch the same presumption of legitimate motive as is given the legislative branch."). After all, the presumption of regularity—*i.e.*,

the rule that "[e]very public officer is presumed to act in obedience to his duty, until the contrary is shown"—applies "*a fortiori*" to the President. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 33 (1827) (Story, J.); *accord Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727–28 (D.C. Cir. 1989). It would be inconsistent with that heightened presumption, and inappropriate under the separation of powers, for courts to imply that the Head of the Executive Branch revoked an order simply to avoid judicial review, especially where, as here, there is no evidence to support such a charge. That is particularly true here given that the 2017 Memorandum itself presumed that the military would study the issue and develop its own policy.

In all events, this doctrine would provide no help to Plaintiffs. When a law is repealed and replaced, the relevant question is "whether the new [policy] is sufficiently similar to the repealed [one] that it is permissible to say that the challenged conduct continues," or, put differently, whether the policy "has been 'sufficiently altered so as to present a substantially different controversy from the one … originally decided.'" *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993). When a new policy has "changed substantially," the original controversy is moot, as there is "no basis for concluding that the challenged conduct [is] being repeated." *Id.*

Plaintiffs' objection to the Department's new policy "'present[s] a substantially different controversy'" than their challenge to the President's 2017 Memorandum. *Id.*; *see infra* Part I.B.4. In the litigation over the 2017 Memorandum, Plaintiffs' target was "[t]he President's categorical exclusion of transgender people from [military service]" in the face of contrary conclusions by former military leadership following what Plaintiffs described as "an exhaustive review process." Am. Compl. 2, 3, Dkt. No. 9. Likewise, this Court's preliminary injunction rested on "the sheer breadth of the exclusion" it believed the President had ordered—*i.e.*, a policy "categorically excluding transgender individuals"—and "the recent rejection of [his] reasons by the military itself." Op. 3, 70. The new policy, by contrast, is the product of independent military judgment following an extensive study of

the issue. And far from a categorical exclusion of transgender individuals, this policy contains several exceptions allowing some transgender individuals, including almost every Plaintiff here, to serve. *See infra* Parts I.B.3–4, II.A.

Those differences are sufficient to moot the original challenge. At a minimum, the replacement of the alleged categorical exclusion with a more nuanced regime presents a substantially different controversy. In *Department of Treasury v. Galioto*, 477 U.S. 556 (1986) (per curiam), a lower court held that a federal statute barring all former mental patients who were involuntarily committed from purchasing firearms was unconstitutional on the ground that it created an "'irrebuttable presumption'" that anyone involuntarily committed was permanently a threat "no matter the circumstances." *Id.* at 559 (citation omitted). During the appeal, Congress amended the law to allow anyone prohibited from purchasing firearms to seek individualized relief from the Treasury Department. *Id.* Concluding that "no 'irrebuttable presumption' now exists since a hearing is afforded to anyone subject to firearms disabilities," the Supreme Court held that the issue was moot without ever mentioning voluntary cessation. *Id.*; *see also Clarke*, 915 F.2d at 705 (discussing *Galioto*). This case is no different. Because Plaintiffs sought an injunction against the enforcement of the 2017 Memorandum—and thereby to effectively maintain the Carter policy, which, like the new policy, treats gender dysphoria as presumptively disqualifying, Op. 10—the heart of their challenge was necessarily limited to the allegedly categorical nature of that Memorandum. With that issue gone, the appropriate course is to dissolve the preliminary injunction and address Plaintiffs' new challenge separately. *Cf. Washington v. Trump*, No. C17-0141JLR, 2017 WL 1045950, at *3–4 (W.D. Wash. Mar. 16, 2017) (injunction against President's first travel order did not extend to his second due to a new exception for lawful permanent residents and certain foreign nationals and a clarification that individuals could seek asylum).

12

**B.      The Department's New Policy Withstands Constitutional Scrutiny**

In all events, Plaintiffs are not entitled to a preliminary injunction barring implementation of the new policy.  To justify such relief, they would have to prove that the new policy likely violates equal protection principles.[3]  They cannot do so.  Although this Court found it likely that the 2017 Memorandum was subject to and could not survive intermediate scrutiny, neither of those conclusions are justified with respect to the new policy.

**1.      The Department's new policy is subject to highly deferential review**

On its face, the Department's new policy triggers rational basis review.  That policy, like the Carter policy before it, draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not transgender status.  *Compare* Report 3–5 *with* Dkt. No. 13-6 Ex. B, at 1–2.  Such classifications receive only rational basis review, which is why no one ever challenged the Carter policy on grounds that it was subject to heightened scrutiny.  *See, e.g.*, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365–68 (2001); *Geduldig v. Aiello*, 417 U.S. 484, 494– 97 & n.20 (1974).  Indeed, Plaintiffs continue to seek an injunction requiring the military to maintain the Carter policy, including its presumptive disqualification of individuals with a history of gender dysphoria and/or gender transition.  Tel. Conf. Tr. 20, Dkt. No. 102; *see* Op. 10 (discussing this presumptive bar).  Given that courts should be "reluctant to establish new suspect classes"—a presumption that "has even more force when the intense judicial scrutiny would be applied to the 'specialized society' of the military"—there is no basis for departing from rational basis review here.  *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) (en banc).  That reluctance is especially warranted

---

[3] This Court enjoined the 2017 Memorandum's directives solely on the basis of the "equal protection component" of the Due Process Clause and did not address Plaintiffs' other "analytical frameworks" for applying that provision.  Op. 58.  If Plaintiffs wish to expand that injunction to cover the new policy on the basis of their other due process theories, they should, at a minimum, move for a new preliminary injunction.  In any event, those other challenges are just as unlikely to succeed as their equal protection one for the reasons given in Defendants' accompanying motion to dismiss.

in this challenge given the APA's conclusion that gender dysphoria is a medical condition "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning," Report 13, which is surely a relevant consideration in determining who may serve, *see id.* at 9 ("[T]he military would be negligent in its responsibility if its military standards permitted admission of applicants with physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have.").[4]

But even assuming *arguendo* that the Department's new policy would trigger intermediate scrutiny outside of the military context, that context, unquestionably present here, requires a far less searching form of review. While all agree that the government is not "free to disregard the Constitution" when acting "in the area of military affairs," it is equally true that "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations destined for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). The same is true with respect to the constitutional "rights of servicemembers" more generally, including those within the Due Process Clause. *Weiss v. United States*, 510 U.S. 163, 177 (1994); *see also Solorio v. United States*, 483 U.S. 435, 448 (1987) (listing "variety of contexts" where deferential review applied). In short, "constitutional rights must be viewed in light of the special circumstances and needs of the armed forces," and "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military

---

[4] Even if the new policy could be characterized as turning on transgender status, such classifications warrant rational basis review, not intermediate scrutiny. *See, e.g.*, *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227–28 (10th Cir. 2007) (rational basis review applies to classifications on the basis of transgender status, even in civilian context). Although this Court disagrees, Defendants respectfully reiterate this position to preserve the issue for further review. Defendants agree with the Court, however, that strict scrutiny is inappropriate. *See* Op. 59–63.

14

necessities." *Beller v. Middendorf*, 632 F.2d 788, 810–11 (9th Cir. 1980) (Kennedy, J.), *overruled on other grounds by Witt v. Dep't of Air Force*, 527 F.3d 806, 820–21 (9th Cir. 2008).

This different, and highly deferential, form of review is necessary not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but also because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see Rostker*, 453 U.S. at 65–66. That is particularly true with respect to the "complex, subtle, and professional decisions as to the composition … of a military force, which are essentially professional military judgments." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted).

Although the Supreme Court has expressly refused to attach a "label[]" to the standard of review applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, several features of its decisions in this area demonstrate that rational basis review most closely describes its approach in practice. First, even though the Court has generally declined "to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1697 (2017) (citation omitted), it has done so when military deference is required. In *Schlesinger v. Ballard*, 419 U.S. 498 (1975), the Court upheld a statutory scheme under which male naval officers were subject to mandatory discharge for failing twice to be promoted within roughly 10 years of service, while female officers were afforded 13 years to obtain equivalent promotions. *Id.* at 499–505, 510. The Court explained that in creating this framework, "Congress may … quite rationally have believed" that female officers "had less opportunity for promotion than did their male counterparts," and that different standards would address that imbalance. *Id.* at 577. In response, the principal dissent criticized the Court for "conjur[ing] up a legislative purpose which may have underlain the gender-based distinction." *Id.* at 511 (Brennan, J.).

15

Similarly, in *Rostker*, the Supreme Court rejected an equal protection challenge to a statute exempting women from the requirement to register for the draft. 453 U.S. at 83. Even though the challenge had been filed in 1971, the Court relied on Congress's analysis of the issue nine years later, when it declined to amend the statute to allow the conscription of women at President Carter's urging. *See id.* at 60–63. In doing so, the Court expressly rejected the argument that it "must consider the constitutionality of the [relevant statute] solely on the basis of the views expressed by Congress in 1948, when the [law] was first enacted in its modern form." *Id.* at 74. Instead, because Congress in 1980 had "thoroughly reconsider[ed] the question of exempting women from [the draft], and its basis for doing so," its views from that time were "highly relevant in assessing the constitutional validity of the exemption." *Id.* at 75. And the Court reached this conclusion despite the challengers' claim that the 1980 legislative record amounted to "litigation-inspired afterthoughts" that "are constitutionally inadmissible in defending laws classifying by gender." Brief for Appellees at 31–32, *Rostker*, 453 U.S. 57 (No. 80-251), 1980 WL 339849, at *31–32. As the record in *Rostker* demonstrated, a representative of the Justice Department had testified before the relevant Senate Subcommittee that "the constitutionality of an all male draft" was "currently in litigation"; that the "legislative history" of the 1948 Act "has been totally unhelpful to the government in defending its constitutionality" thus far because it was "replete[] only with the kind of sexual stereotypes … that the Court has subsequently held will not support the constitutionality" of a sex-based classification; and that if Congress chose to reject President Carter's proposal, it "should speak out clearly and formulate the kind of record" that "will be helpful rather than hurtful in the litigation." *Rostker* J.A. at 218, 220–21, *quoted in* Kastenmeier Amicus Brief at 20 n.14, *Rostker*, 453 U.S. 57 (No. 80-251), 1981 WL 390368, at *20 n.14.

Second, while the Court has rejected certain evidentiary defenses of sex-based classifications in the civilian context, *see, e.g.*, *Craig v. Boren*, 429 U.S. 190, 199–204 (1976), it has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including

16

evidence from former military officials.  In *Goldman*, the Court rejected a free-exercise challenge to the Air Force's prohibition of a Jewish officer from wearing a yarmulke while working as a psychologist in an Air Force base hospital, even though that claim would have triggered strict scrutiny at the time had it been raised in the civilian context.  475 U.S. at 510; *see id.* at 506.  The Court did so even though the plaintiff had provided "expert testimony" from a former Chief Clinical Psychologist to the Air Force that religious exceptions to a military dress code would "increase morale," and even though the "Air Force's assertion to the contrary [was] mere *ipse dixit*, with no support from actual experience or a scientific study in the record."  *Goldman*, 475 U.S. at 509; *see* Brief for the Petitioner at 12, *Goldman*, 475 U.S. 503 (No. 84-1097); 1985 WL 669072, at *21.  In the Court's view, the beliefs of "expert witnesses"—even former military officials—were "quite beside the point," as current "military officials … are under no constitutional mandate to abandon their considered professional judgment."  475 U.S. at 509.  The principal dissent criticized this approach as a "subrational-basis standard" requiring deference to the military "no matter how … unsupported" its decision may be.  *Id.* at 515 (Brennan, J.).

Likewise, the Court in *Rostker* declined to overrule the judgment of the political branches in the military context, even in the face of disagreement within those branches.  Specifically, President Carter had provided "testimony of members of the Executive Branch and the military in support of [his] decision" to urge Congress to allow the registration of women for the draft.  435 U.S. at 79. Relying on this testimony, the lower court held that Congress's refusal to do so was unconstitutional because "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'"  *Id.* at 63 (citation omitted).  But the Supreme Court reversed, noting that the lower court had "palpably exceeded its authority" in "relying on this testimony," as Congress had "rejected it in the permissible exercise of its constitutional responsibility." *Id.* at 81–82.

Third, whereas concerns about "administrative convenience" ordinarily cannot be used to survive intermediate scrutiny, *e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 205 (1977), they can play a significant role in cases involving military judgments. In *Rostker*, Congress "did not consider it worth the added burdens of including women in draft and registration plans," as "training would be needlessly burdened by women recruits who could not be used in combat," and additional "administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards would also exist." 453 U.S. at 81 (quoting S. Rep. No. 96–826, p. 159, U.S.C.C.A.N. 1980, 2649 (1980)). The Court reasoned that it was not its place "to dismiss such problems as insignificant in the context of military preparedness." *Id.* Again, the dissents criticized the Court for jettisoning the requirements of intermediate scrutiny. *See id.* at 94 (Brennan, J.) ("[T]he administrative convenience of employing a gender classification is not an adequate constitutional justification under the *Craig v. Boren* test."); 435 U.S. at 85 (White, J.) (same).

Fourth, the political branches enjoy significant latitude to choose "among alternatives" in furthering military interests. *Id.* at 71–72 (majority opinion); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 67 (2006) ("The issue is not whether other means of raising an army and providing for a navy might be adequate. That is a judgment for Congress, not the courts." (internal citations omitted)). Again, in *Rostker*, President Carter and military leadership urged a sex-neutral alternative to draft registration that they believed "would materially increase [military] flexibility, not hamper it'"—namely, requiring both sexes to register—but Congress rejected that proposal in favor of retaining its sex-based approach. 453 U.S. at 63 (citation omitted); *see* 435 U.S. at 70. Invoking the "deference due" Congress in this area, the Court refused "to declare unconstitutional [that] studied choice of one alternative in preference to another." *Id.* at 71–72. And again, the principal dissent attacked the Court's approach as "significantly different from" its analysis in ordinary sex-discrimination cases, as the government had not shown that "a gender-neutral statute would be a less

effective means" of accomplishing military objectives. *Id.* at 94 (Brennan, J.) (citation omitted). All of this indicates an application of rational basis review rather than intermediate scrutiny. *See Nguyen v. INS*, 533 U.S. 53, 77–78 (2001) (O'Connor, J., dissenting) ("[T]hat other means are better suited to the achievement of governmental ends … is of no moment under rational basis review," whereas "under heightened scrutiny, the availability of sex-neutral alternatives to a sex-based classification is often highly probative.") (collecting cases).

Finally, arguable inconsistencies resulting from line-drawing have not been enough to render military decisions invalid. In *Goldman*, the Court acknowledged that the Air Force had an "exception … for headgear worn during indoor religious ceremonies" and gave commanders "discretion" to allow "visible religious headgear … in designated living quarters." 475 U.S. at 509. Service members could also "wear up to three rings and one identification bracelet," even if those items "associate[d] the wearer with a denominational school or a religious or secular fraternal organization" and thereby served as "emblems of religious, social, and ethnic identity." *Id.* at 518 (Brennan, J., dissenting). Yet the Court deferred to the Air Force's judgment that creating an exception for a psychologist who wanted to wear religious headgear in a hospital on base "would detract from the uniformity sought by [its] dress regulations." *Id.* at 510 (majority opinion). Had this case occurred in the civilian context and strict scrutiny been applied, it is doubtful that the challenged decision would have been sustained.

Given the Court's substantial departure from core aspects of intermediate and even strict scrutiny in cases involving military deference, the most appropriate description of the applicable standard is rational basis review. But at a minimum, even if the Court prefers to label the standard a peculiar form of "intermediate scrutiny," Op. at 64, its substantive analysis of the new policy should track the Supreme Court's highly deferential approach in this area. *See Rostker*, 453 U.S. at 69–70 (disavowing the utility of traditional scrutiny labels in cases involving military deference). Put

19

differently, regardless of the standard of review the Court employs, the basic elements of traditional intermediate scrutiny should not apply.

**2.      The Department's new policy survives highly deferential scrutiny**

Although it is not entirely clear which aspects of the new policy Plaintiffs believe are unconstitutional, their principal objection appears to be that in general, it does not accommodate gender transition by individuals with gender dysphoria.  *See* Second Am. Compl. 17.[5]  That denial of a general accommodation survives the highly deferential review applicable here.  As the Department explained, accommodating gender transition would create unacceptable risks to military readiness, undermine good order and discipline as well as unit cohesion, and impose disproportionate costs.  Mattis Memorandum 2.  There should be no dispute that avoiding those harms is at least an important interest.  *See* Op. 65.  Indeed, courts must "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest,'" *Winter*, 555 U.S. at 24, and here, the Department has concluded that minimizing these risks is "absolutely essential to military effectiveness," Mattis Memorandum 2; *accord* Report 41.  Thus, the only issue is whether this Court should defer to the military's independent, professional judgment that the new policy is "necessary" to effectuate that critical interest.  *E.g.*, Report 32.  That should not be a close question.

**a.      Military Readiness**

In the Department's professional military judgment, allowing individuals who require or have undergone gender transition to serve poses at least two significant risks to military readiness.  First, in

---

[5] Because Plaintiffs seek a return to the Carter policy, Dkt, 106, at 20, they cannot challenge the new policy's requirement that transgender individuals without gender dysphoria must serve in their biological sex, as the same rule existed under the Carter policy, Report 4.  To the extent Plaintiffs also challenge any limits on taxpayer-funded medical transitions, they must request a new preliminary injunction, as this Court expressly declined to address that subject in enjoining the 2017 Memorandum, *see* Op. 51–52, 75–76.  In any event, they would be unlikely to prevail on any such challenge for the reasons given in Defendants' accompanying motion to dismiss.

20

light of "evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment"—including sex-reassignment surgery—as compared to others, as well as the "considerable scientific uncertainty" over whether gender transition "treatments fully remedy … the mental health problems associated with gender dysphoria," the Department found that "[t]he persistence of these problems is a risk for readiness." Report 32. In the military's view, it was "imperative" that it "proceed cautiously" in adopting "accession and retention standards for persons with a diagnosis or history of gender dysphoria" in light of "the scientific uncertainty surrounding the efficacy of transition-related treatment[]." *Id.* at 27.

This risk-based assessment—grounded in an extensive review of evidence, including materials unavailable at the time the Carter policy was adopted—is a classic military judgment entitled to deference. *See id.* at 19–27. For example, the Centers for Medicare and Medicaid Services issued a study in August 2016, over a month after the Carter policy was announced, concluding that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria." *Id.* at 24. Although this study was primarily concerned with Medicare beneficiaries, it "conducted a comprehensive review" of "the universe of literature regarding sex reassignment surgery," which consisted of "over 500 articles, studies, and reports" addressing a more general population. *Id.* Of these materials, only "33 studies" were "sufficiently rigorous to merit further review," and "[o]verall, . . . the quality and strength of evidence" in even these studies "were low." *Id.*[6] In fact, there were only "six studies" that provided "useful information" on the efficacy of sex reassignment surgery as a general matter, and "the four best designed and conducted studies … did not demonstrate clinically significant changes or

---

[6] Two other meta-studies, a 2010 one by the Mayo Clinic (reviewing 28 studies on cross-sex hormone therapy) and a 2014 one by the Hayes Directory (reviewing 10 peer-reviewed studies relating to cross-sex hormone therapy), similarly rated the quality of available evidence as "very low." Report 26.

differences in psychometric test results" following the procedure. *Id.* And "one of the most robust" of those six, a Swedish "nationwide population-based, long-term follow-up" of individuals who had undergone sex-reassignment surgery—which the study noted was "a unique intervention not only in psychiatry but in all of medicine"—"found increased mortality [due to suicide and cardiovascular disease] and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a health control group." *Id.* at 22, 25–26. According to that study, "post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up," and "[e]ven though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons." *Id.* at 26.

In the Department's judgment, the need to "proceed cautiously" in this area is particularly compelling given the uniquely stressful nature of a military environment. *Id.* at 27. Although none of the available studies "account for the added stress of military life, deployments, and combat," *id.* at 24, preliminary data show that service members with gender dysphoria are "eight times more likely to attempt suicide" and "nine times more likely to have mental health encounters" than service members as a whole, *id.* at 21–22. Thus, in Secretary Mattis's judgment, the Department should not risk "compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations." Mattis Memorandum 2.

In short, the Department concluded that the military risks stemming from the uncertain efficacy of a particular medical treatment for a particular medical condition outweighed the possible benefits of allowing individuals with that condition to serve generally. That is the type of analysis the Department must perform with respect to any medical accession or retention standard, and the cautious approach it took here is hardly out of the norm. *See* Report 3 ("Given the life-and-death consequences of warfare, the Department has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members.").

Indeed, even the Carter policy implicitly acknowledged that gender dysphoria or gender transition could impede military readiness by requiring applicants with a history of that condition and/or treatment to demonstrate that they had been stable or had avoided complications for an 18-month period. *See* Dkt. No. 13-6, Ex. B at 4-5. Given that even administrative convenience concerns cannot be dismissed in this context, *see Rostker*, 453 U.S. at 81, then the military's assessment of the tolerable level of risk from a medical condition and its treatment should not be second-guessed.

Second, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by gender transition, "most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time." Report 35. In the military's view, that limitation on deployability constituted a separate "readiness risk." *Id.* at 33. After documenting the restrictions on deployability associated with cross-sex hormone therapy and sex-reassignment surgery—including reports by some commanders that transitioning service members under their authority would be non-deployable for two to two-and-half-years—the Department made a military assessment that these burdens on military readiness were unacceptable. *Id.* at 33–35.

In addition to being inherently problematic, these deployability limitations would also have harmful collateral effects on the service members' units as whole. As the Department explained, any "increase in the number of non-deployable military personnel places undue risk and personal burden" on those who are "qualified and eligible to deploy." *Id.* at 35. On top of these personal costs, service members who are deployed "more often to backfill or compensate for non-deployable" ones may face risks to family resiliency. *Id.* And when those with limitations deploy but then fail to "meet medical deployment fitness standards" in the field, they may "be sent home" and leave "the deployed unit with less manpower." *Id.* at 34. All of this poses a "significant challenge for unit readiness." *Id.* at 35.

These are not new concerns. Secretary Carter acknowledged that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service

23

member in a manner consistent with military mission and readiness needs." Dkt. No. 13-6, Ex. B at 5. So did RAND, which concluded that the relevant limitations on deployability would "have a negative impact on readiness." Report 34–35. Although RAND dismissed this harm as "minimal" due to its estimation of the "exceedingly small number of transgender Service members who would seek transition-related treatment," *id.*, in the Department's judgment, that was the wrong question: "The issue is not whether the military can absorb periods of non-deployability in a small population," but "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." *Id.* at 35. After all, "by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers." *Id.* Put differently, RAND "failed to analyze the impact" on "unit readiness" at "the micro level" by taking a "macro" view of the entire military. *Id.* at 14. Given that even Congress may reject the military's judgment based on legislative concerns about deployability, then military leadership between administrations should be able to differ over what limitations on deployability are acceptable. *See Rostker*, 453 U.S. at 82 (noting concern that absorbing female inductees into noncombat positions would impede deployability of combat-ready soldiers); *cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (even in the civilian context, the government must review "the wisdom of its policy on a continuing basis, for example, in response to … a change in administrations") (citation omitted).

In fact, this is what Secretary Carter contemplated when he issued the revised accession standards in 2016. In conjunction with the issuance of the new standards for individuals with a history of gender dysphoria or medical treatment related to gender dysphoria, Secretary Carter directed that those standards would be reviewed "no later than 24 months from the effective date of this

24

memorandum [June 30, 2016] and may be maintained or changed, as appropriate, to reflect applicable medical standards and clinical practice guidelines, ensure consistency with military readiness, and promote effectiveness in the recruiting and retention policies and procedures of the Armed Forces." Dkt. No. 13-6, Ex. B at 2. DoD conducted a review of these standards, as originally directed by then-Secretary Carter, in the timeframe he originally anticipated, using medical data from service members diagnosed with gender dysphoria that was unavailable to RAND or DoD in June 2016. Based on a review of that data, DoD concluded that RAND underestimated the limitations on deployability associated with gender transition.[7] Report 31. Given that RAND's conclusions were predictive, based on available evidence from a small sample size from foreign militaries and the civilian population, *see* Dkt. 13-4, Ex. B, Chapter 6, it is certainly reasonable that the current panel would come to a different conclusion on accessions when it reviewed actual medical data of a much greater sample size from the U.S. military population.[8]

### b.      Order, Discipline, Leadership, and Unit Cohesion

The Department similarly disagreed with RAND's analysis of "the intangible ingredients of military effectiveness"—namely, "leadership, training, good order and discipline, and unit cohesion." Report 3. While the RAND Report agreed that "unit cohesion" was "a critical input for unit readiness" and a "key concern" in any analysis of transgender service, it concluded that accommodating gender transition would likely have "no significant effect" based on the experiences

---

[7] For example, RAND estimated that "as an upper bound," a total of 140 service members would seek "transition-related hormone therapy." Dkt. No. 13-4, Ex. B, at xi. In reality, of the 424 approved treatment plans that the Panel had available for study, 388 of those—over 91%—include such treatment. Report 31.

[8] RAND itself acknowledged this limitation in its findings. RAND notes several times in its report that the lack of data on the transgender population serving in the military was a "critical limitation" and as a result states that its findings should be "interpreted with caution." *See, e.g.,* Dkt. 13-4, Ex. B., at 3-4, 39.

of four foreign militaries that had "fairly low numbers of openly serving transgender personnel." Dkt. No. 13-4, Ex. B., at 44–45. By adopting this approach, however, RAND, in the Department's judgment, failed to "examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy"—"all of which are critical to unit cohesion"—"at the unit and sub-unit levels." Report 14. Aside from the potential harms to unit cohesion associated with limits on deployability, *see supra* Part I.B.2.a, accommodating gender transition would undermine the objectives served by the military's sex-based standards—"good order and discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality"— in several respects. *Id.* at 35–36.

First, the Department concluded that any accommodation policy that does not require full sex-reassignment surgery threatens to "erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline." *Id.* at 37. As the Department explained, "[g]iven the unique nature of military service," service members must frequently "live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." *Id.* To protect its service members' reasonable expectations of privacy, the Department "has long maintained separate berthing, bathroom, and shower facilities for men and women while in garrison." *Id.* This is hardly a suspect practice. The Supreme Court has acknowledged that it is "necessary to afford members of each sex privacy from the other sex in living arrangements," *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996), and "[i]n the context of recruit training, this separation is even mandated by Congress," Report 37; *see* 10 U.S.C. §§ 4319, 4320, 6931, 6932, 9319, 9320.

Accommodating gender transition, the Department reasoned, at least with respect to those individuals who have not undergone a complete sex reassignment, would "undermine" these efforts to honor service members' "reasonable expectations of privacy." Report 36. Allowing transgender service members "who have developed, even if only partially, the anatomy of their identified gender"

26

to use the facilities of either their identified gender or biological sex "would invade the expectations of privacy" of the non-transgender service members who share those quarters. *Id.* at 37.

Absent the creation of separate facilities for transgender service members, which could be "logistically impracticable for the Department," not to mention unacceptable to transgender service members, the military would face irreconcilable privacy demands. *Id.* For example, the Panel of Experts received a report from one commander who faced dueling equal opportunity complaints under the Carter policy over allowing a transgender service member who identified as a female but had male genitalia to use the female shower facilities—one from the female service members in the unit and one from the transgender service member. *Id.* And even the Department's handbook for implementing the Carter policy described the "unique leadership challenges" created by that policy with respect to expectations of privacy. *Id.* at 38. These concerns are consistent with reports from commanding officers in the Canadian military that "they would be called on to balance competing requirements" by "meeting [a] trans individual's expectations … while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness." *Id.* at 40.

In the Department's judgment, such collisions of privacy demands "are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions." *Id.* at 37. Accommodating gender transition would mean the "routine execution of daily activities" could be a recurring source of "discord in the unit" requiring commanders "to devote time and resources to resolve issues not present outside of military service." *Id.* at 38. And any delayed or flawed solution to these conflicts by commanders "can degrade an otherwise highly functioning team," as any "appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline." *Id.*

In addition, accommodating gender transition, at least in the context of basic recruiting, could be in tension with federal statutory law. As the Department observed, Congress has "required by

27

statute that the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits during basic training and that access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits' to ensure 'after-hours privacy for recruits during basic training.'" *Id.* at 29 (citing 10 U.S.C. §§ 4319, 4320 (Army); *id.* §§ 6931, 6932 (Navy); *id.* §§ 9319, 9320 (Air Force)). Accommodating the gender transition of recruits, drill sergeants, or training personnel in the context of basic recruit training places the Department in jeopardy of contravening those statutory mandates. The new policy advances the military's interest in avoiding that legal risk.[9]

Second, the Department concluded that accommodating gender transition creates safety risks for, and perceptions of unfairness among, service members by applying "different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology." Report 36. For example, "pitting biological females against biological males who identify as female, and vice versa," in "physically violent training and competition," could pose "a serious safety risk." *Id.* Moreover, both male and female service members who are not transgender would likely be frustrated by a "biological male who identifies as female" but "remain[s] a biological male in every respect" and yet is "governed by female standards" in "training and athletic competition," which tend to be less exacting than male training and athletic standards. *Id.*

---

[9] Because these laws do not provide any specialized definition for "sex," "male," or "female," courts may conclude that their terms retain their ordinary meaning, *e.g.*, *Johnson v. United States*, 559 U.S. 133, 138 (2010), which turns on biology rather than gender identity, *see, e.g.*, *Oxford American English Dictionary* 622 (1980) (defining "sex" as "either of the two main groups (*male* and *female*) into which living things are placed according to their reproductive functions, the fact of belonging to these"); *id.* at 401 (defining "male" as "of the sex that can beget offspring by fertilizing egg cells produced by the female"); *id.* at 237 (defining "female" as "of the sex that can bear offspring or produce eggs"); *Webster's Third New International Dictionary* 836, 1366, 2081 (1993) (similar). That risk is increased by the fact that Congress has confirmed this ordinary understanding by expressly prohibiting discrimination on the basis of "gender identity" in addition to, rather than within, discrimination on the basis of "sex" or "gender." *E.g.*, 18 U.S.C. § 249(a)(2); 34 U.S.C. §12291(b)(13)(A).

Again, these are legitimate military concerns, as both Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for service members to address biological differences between the sexes. *Virginia*, 518 U.S. at 550 n.19 (citing statute requiring standards for women admitted to the service academies to "be the same as those … for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals"). Especially given that "physical competition[] is central to the military life and indispensable to the training and preparation of warriors," Report 36, the Department's concerns about the risks in this area should not be ignored.

Third, the Department was concerned that exempting transgender service members from uniform and grooming standards associated with their biological sex would create additional friction in the ranks. For example, "allowing a biological male to adhere to female uniform and grooming standards" would "create[] unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity." *Id.* at 31. This is likely to be particularly true when non-transgender service members are barred from expressing core aspects of their identity. And in the military's judgment, policies "creating unfairness, or perceptions thereof," threaten to "adversely affect unit cohesion and good order and discipline." *Id.* at 36.

Given these concerns, the Department concluded that accommodating gender transition "risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline." *Id.* at 40. And because of "the vital interests at stake—the survivability of Service members, including transgender persons, in combat and the military effectiveness and lethality of our forces"—the Department decided to take a cautious approach to accommodating gender transition. *Id.* at 40–41.

That careful military judgment merits significant deference. "Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might

have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507–08 (citation omitted); *see also Steffan v. Perry*, 41 F.3d 677, 686 (D.C. Cir. 1994) (en banc) ("[t]he military is entitled to deference with respect to its estimation of the effect" a policy or practice will have "on military discipline"). That is particularly true given that military assessments regarding leadership, training, good order and discipline, and unit cohesion "cannot be easily quantified," but instead are based on "necessarily subjective" military judgments "acquired from hard-earned experience leading Service members in peace and war." Report 3.

Accordingly, the Supreme Court has repeatedly deferred to similar judgments. One of its bases for upholding the sex-based statute in *Rostker*, for instance, was that it could not dismiss concerns about "problems such as housing and different treatment with regard to … physical standards" in the "context of military preparedness." 453 U.S. at 81 (citation omitted). Likewise, in *Goldman*, the Court deferred to the Air Force's view that "the wearing of religious apparel such as a yarmulke … would detract from the uniformity sought by the dress regulations." 475 U.S. at 509–10. And in the decision affirmed by the Supreme Court in *Goldman*, the D.C. Circuit respected the judgment of the Air Force that "it cannot make exceptions … for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly … , thereby undermining the goals of teamwork, motivation, discipline, and the like." *Goldman v. Sec'y of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984). These courts did so even though others, including current and former military officials, disagreed. There is no basis for treating the military's judgments here any differently.

### c.      Disproportionate Costs

Finally, the Department explained that under its experience with the Carter policy, accommodating gender transition was "proving to be disproportionately costly on a per capita basis." Report 41. Specifically, since the Carter policy's implementation, the medical costs for service

members with gender dysphoria have "increased nearly three times" compared to others. *Id.* And that is "despite the low number of costly sex reassignment surgeries that have been performed so far"—"only 34 non-genital sex reassignment surgeries and one genital surgery"—which is only likely to increase as more service members with gender dysphoria avail themselves of these procedures. *Id.* Notably, "77% of the 424 Service member treatment plans available for review"—*i.e.*, approximately 327 plans—"include requests for transition-related surgery" of some kind. *Id.*

In addition, the Department noted, several commanders also reported that providing transition-related treatment for service members in their units "had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care." *Id.* This is not surprising given that "gender transition requires frequent evaluations" by both a mental health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." *Id.* at 41 n.164. Service members therefore "may have significant commutes to reach their required specialty care," and those "stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations." *Id.*

In light of the military's general interest in maximizing efficiency through minimizing costs, the Department concluded that its disproportionate expenditures on accommodating gender transition could be better devoted elsewhere. *See id.* at 3, 41. Again, such a conclusion is owed deference. Even when the alleged constitutional rights of service members are involved, judgments by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" are entitled to significant respect. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976) (no due process right to counsel at summary courts-martial).

*    *    *

31

In sum, the Department had significant concerns that "accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs." Report 5. It therefore made a "military judgment" that no longer providing a general accommodation for gender transition was "a necessary departure from the Carter policy." *Id.* at 32. In doing so, it was "well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues." *Id.* at 44. But the Department's latest review of the issue had revealed that "the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed." *Id.* In fact, even RAND had "concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs," but dismissed "such harms [as] negligible in light of the small size of the transgender population." *Id.*[10] But given "the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect," the Department was "not convinced that these risks could be responsibly dismissed or that even negligible harms" (at the macro level) "should be incurred given [its] grave responsibility." *Id.* It therefore "weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring," and concluded that "the various balances struck" by the new policy "provide the best solution currently available." *Id.* That careful cost-benefit analysis by the Defense Department easily survives the highly deferential form of review applicable here.

---

[10] RAND has recently explained that it was "not ask[ed] … to recommend whether" the pre-Carter policy should abandoned, but simply to answer seven specific questions. Ex. 2, Agnes Gereben Schaefer, *On RAND's Research Findings Regarding Transgender Military Personnel Policy*, COMMENTARY (THE RAND BLOG) (Mar. 27, 2018). It has also stressed that when it conducted its review, "there was limited data available" and that it "highlighted and caveated those limitations throughout the report so that DoD could understand the limitations and factor them into its decision making process." *Id.*

### 3.    The new policy addresses this Court's prior concerns

The Department's new policy also addresses all of the concerns that this Court held justified

enjoining the enforcement of its understanding of two directives in the 2017 Memorandum.  None of

the reasons the Court gave for either eschewing a deferential form of review or for deeming those

directives to be likely unconstitutional should apply to this new policy.

In reviewing the 2017 Memorandum, this Court declined to adopt a deferential standard of

scrutiny due to its conclusion that the President's directives were based on neither (1) "study and

evaluation," Op. 70 (citing *Rostker*, 453 U.S. at 72), nor (2) the "'considered professional judgment'"

of military officials, Op. 67 n.11 (quoting *Goldman*, 475 U.S. at 508).  Defendants respectfully disagree,

but, in any event, neither charge can be leveled against the military's new policy.  The Department

"received extensive evidence on the issue," and, as it had done under former Secretary Carter, "chose

one of two competing alternatives."  Op. 70.  And that choice rested on the "considered professional

judgment" of multiple military experts, many with combat experience, including the Secretary of

Defense himself.  Op. 67 n.11; *see* Mattis Memorandum 2–3; Report 18, 41, 44.  Accordingly, there is

no basis for declining to give the Department's decision appropriate deference.

Likewise, "the unusual factors" that caused this Court to rule that the 2017 Memorandum

would likely fail intermediate scrutiny are absent here.  Op. 65.  In other words, even if an ordinary

form of intermediate scrutiny applied, the new policy would survive it.

First, whereas this Court was troubled by "the sheer breadth" of the 2017 Memorandum—

which it understood to "ban[] the accession, and permit[] the discharge, of an entire category of

individuals from the military solely because they are transgender," Op. 65—the new policy is

considerably narrower in scope.  To start, it permits those transgender service members diagnosed

with gender dysphoria by a military medical provider between the effective date of the Carter policy

and the effective date of the Department's new policy to continue to serve in their preferred gender

and receive any medically necessary procedure. Report 43. That significant exception alone makes this policy far more nuanced than this Court's understanding of the policy set forth in the 2017 Memorandum. As for applicants and service members going forward, the new policy does not turn "solely" on whether "they are transgender," Op. 65, but, like the Carter policy, on whether they have a history or diagnosis of gender dysphoria, a medical condition that is not coterminous with transgender status, *see* Report 4–6, 20. And even then, individuals with a history or diagnosis of this medical condition are not barred from military service across the board, but may instead qualify for a number of categorical exemptions in addition to the possibility of individualized waivers. *See id.* at 4–6. In short, the new policy cannot be fairly characterized as one "banning all transgender individuals from serving in the military." Op. 72.

Second, the reasons for this nuanced policy are neither "hypothetical" nor "extremely overbroad." Op. 65. Instead, they are rooted in extensive studies, *see, e.g.*, Report 19–27; the military's experience under the Carter policy, *see, e.g.*, *id.* at 8, 34, 37, 41; and the considered professional judgment of military officials, *see, e.g.*, *id.* at 4, 18, 32, 41, 44. And even where the new policy appears to sweep broadly, the Department explained why it does so. For example, the Department considered, but rejected, allowing individuals who had undergone "a full sex reassignment surgery" to serve. *Id.* at 31. As it explained, that measure would be "at odds with current medical practice, which allows for a wide range of individualized treatment" for gender dysphoria. *Id.* It also would have little practical effect, as the "rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender women." *Id.* In fact, only 22 service members have requested a waiver for that procedure so far, which has occurred only once (for a twenty-third individual). *Id.* And in any event, this measure would not address concerns about "the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health." *Id.* at 41. Such careful reasoning, resting in part on a recognition of the significant diversity of treatments for gender

dysphoria, cannot be cast as "unsupported, 'overbroad generalizations about the different talents, capacities, or preferences,' of transgender individuals.'" Op. 66.

Third, the "military concerns" underlying the Department's new policy obviously were not "studied and rejected by the military itself." Op. 67. To be sure, the former officials responsible for the Carter policy may object to the Department's current approach, but, as *Rostker* and *Goldman* illustrate, such disagreement does not alter the deferential analysis required here. *See supra* pp. 16–17; *see also Winter*, 555 U.S. at 17 (deferring to the military's judgment in the face of the plaintiffs' "scientific studies, declarations from experts, and other evidence"). Indeed, in issuing the preliminary injunction, this Court stressed that "additional studies" could "be undertaken" and that the Carter policy could "be reevaluated," Op. 71, and it crafted its order to permit the military to "conduct[] studies" and "gather[] advice or recommendations on transgender service," Op. 75. All of this presumes the ability to adopt a different policy. Now that the military has completed its latest review, its "previous study cannot forever bind future administrations" from changing course. Op. 71.

Finally, far from being "abruptly announced," the new policy was accompanied by "the formality [and] deliberative processes" that this Court expected. Op. 68. The Department's independent reexamination of the Carter policy—begun without any direction from the President and well before his July 25, 2017 statement on Twitter—was an extensive deliberative process lasting over seven months and involving many of the Department's high-ranking officials as well as experts in a variety of subjects. *See* Mattis Memorandum 1–2; Report 17–18. The Department considered evidence that both supported and cut against its approach, including the materials underlying, and the military's experience with, the Carter policy itself, and thoroughly explained why it was departing from that policy to some extent. *See, e.g.*, Report 18, 44. In short, although some may deeply disagree with the Department's ultimate conclusions, they cannot fairly contest that those good-faith judgments were "driven by genuine concerns regarding military efficacy." Op. 68.

35

### 4.    The new policy is not the final version of a "transgender service ban"

Rather than engage with the substance of the new policy, Plaintiffs simply dismiss it as the implementation of the "transgender service ban" announced by the President "in tweets," presumably in an attempt to argue that the military's judgment merits no deference.  Second Am. Compl. 1-2; *see id.* at 15–18.  In doing so, they echo the *Karnoski* court, which dismissed the Department's new policy as simply a more detailed version of "the 'Ban'" announced by the President last year.  2018 WL 1784465, at *1 n.1.  Whatever rhetorical appeal this strategy may have, it cannot be squared with the facts or the law.

a.    On the facts, one cannot fairly maintain that the Department's new policy, with its various exceptions permitting some transgender individuals, including most Plaintiffs here, to serve, is the same as, or even implements, the President's statement on Twitter that "the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military."  Op. 1.  Nor does the new policy implement the 2017 Memorandum, especially as that document was understood by this Court and Plaintiffs (at least before their latest complaint).  Both this Court and Plaintiffs understood that Memorandum to institute "a policy banning the accession, and authorizing the discharge, of an entire category of individuals from the military solely because they are transgender."  Op. 65; *see, e.g.*, Am. Compl. 3, Dkt. No. 9 ("[N]o servicemembers who are openly transgender may enlist or continue their military service.").  Likewise, this Court and Plaintiffs believed that those service members who relied on the Carter policy "will be involuntarily discharged" if the 2017 Memorandum were "to take effect."  Am. Compl. 5, Dkt. No. 9; *see, e.g.*, Op. 50 ("the head of the military stat[ed]" that they "will be" "discharged from the military").  By contrast, the new policy, like the Carter policy before it, limits the service of only some transgender individuals on the basis of gender dysphoria, and permits those with gender dysphoria who relied on the Carter policy to continue to serve.

Of course, the 2017 Memorandum did require the military to maintain the pre-Carter accession policy while it conducted further study of the issue, but that policy differs significantly from the new one proposed by the Department. While the pre-Carter policy generally disqualified individuals on the basis of transgender status, the Department's new policy, like the Carter policy, turns on gender dysphoria (and the accompanying treatment of gender transition), a medical condition affecting only a subset of transgender individuals. Report 10, 12–13, 20–21. In addition, the new policy categorically allows some transgender individuals, including many Plaintiffs here, to serve in their preferred gender, an option that was generally unavailable in the pre-Carter era. This explains why Secretary Mattis had to recommend that the President "revoke" his 2017 Memorandum in order to "allow[]" the military to implement its preferred framework. Mattis Memorandum 3. If the new policy simply implemented the 2017 Memorandum, there would have been no need for him to have made that recommendation or for the President to have revoked that Memorandum. *Cf.* Op. 54 ("[F]uture policy by the military— *absent action from the President*—cannot change what the directives require.") (emphasis added).

Rather than address the differences between the pre-Carter policy and the Department's new policy, Plaintiffs, like the *Karnoski* court, invoke two September 2017 memoranda from Secretary Mattis confirming that (1) the Department will "carry out the President's policy and directives"; (2) it will "comply with" the 2017 Memorandum; (3) it will "develop[] an Implementation Plan … to effect the policy and directives" in the 2017 Memorandum; and (4) the 2017 Memorandum "directs DoD to maintain the policy currently in effect, which generally prohibits accession of transgender individuals into military service." Dkt. No. 45-1; Ex. 3 ("Terms of Reference"); *see Karnoski*, 2018 WL 1784464, at *2, 6; Dkt. No. 106, at 16–17. None of those statements, however, changes the fact that the Department's new policy differs significantly from the pre-Carter framework. Rather, they simply reflect the fact, as Defendants have consistently explained, that the 2017 Memorandum directed the military to conduct "further study" and maintain the pre-Carter accession policy while doing so. 2017

Memorandum §§ 1(a), 2(a).  As Secretary Mattis explained in recommending the new policy to the President, the 2017 Memorandum had "made clear that we could advise you 'at any time, in writing, that a change to [the pre-Carter] policy is warranted,'" and that is exactly what he did.  Mattis Memorandum 1.  In short, one could say that the military "implemented" the 2017 Memorandum by studying the issue and advising the President that a new and different policy was appropriate, but nothing about that renders the new policy unlawful.  *See* Op. 71 ("The Court by no means suggests that it was not within the President's authority to order that additional studies be undertaken and that [the Carter] policy be reevaluated.").

Nor do the efforts by the *Karnoski* court to cast the Department's new policy as a "'categorical' prohibition on service by openly transgender people" withstand scrutiny.  2018 WL 1784464, at *6.  To start, that court never reconciled its claim that the new policy is "categorical" with the existence of the reliance "exception," other than to dismiss it as "narrow" and "severable."  *Id.* at *6 n.6.  But a policy with even a narrow "exception" is by definition not a "categorical" one, and in any event this exception is hardly insignificant.  As this Court's earlier opinion illustrates, one of the key features of the litigation over the 2017 Memorandum was the concern that those service members who had relied on the Carter policy would be discharged.  *See, e.g.*, Op. 19–26 (discussing Plaintiffs' fears of discharge); Op. 36–37 (concluding that the likely purpose of the implementation plan was to determine how to facilitate "the removal and replacement of [transgender] individuals" currently serving); Op. 50 (ruling that Plaintiffs face at least a "substantial risk of discharge"); Op. 66 (stating that there was no explanation for a "need to discharge … *all* transgender people"); Op. 75 (noting evidence that "the *discharge* … of [transgender] individuals" would have a "negative effect" on the military).  Indeed, Plaintiffs' dismissed estoppel claim rested on this precise fear.  *See* Op. 55–58.  Unless that concern was itself a trivial consideration, an exception addressing it cannot be characterized as a minor one.

The *Karnoski* court's only explanation for why the new policy was a categorical ban was that it would disqualify "transgender people—including those who have neither transitioned nor been diagnosed with gender dysphoria—from serving, unless they are 'willing and able to adhere to all standards associated with their biological sex,'" and thereby "force [them] to suppress the very characteristic that defines them as transgender in the first place." 2018 WL 1784464, at *6.  But the same could be said about the Carter policy the *Karnoski* court ordered the military to maintain, as that policy likewise requires transgender individuals who have not "been diagnosed with gender dysphoria … to adhere to all standards associated with their biological sex."  *Id.*; *see* Report 15.  Moreover, not all transgender service members who choose to meet the standards associated with their biological sex are being "force[d] to suppress the very characteristic that defines them as transgender in the first place." 2018 WL 1784464, at *6.  To the contrary, as RAND explained, only "a subset" of transgender individuals "choose to *transition*, the term used to refer to the act of living and working in a gender different from one's sex assigned at birth."  Dkt. No. 13-3, Ex. B., at 6.  In other words, the defining feature of transgender individuals is that they "identify with a gender different from the sex they were assigned at birth," not that they choose to live and work in accordance with that identity.  Dkt. No. 13-4, Ex. B., at 6.  The *Karnoski* court reached its conclusion only by conflating transgender with transition.

b.        On the law, even if this Court believes that no daylight exists between the policy set forth in the 2017 Memorandum and the one recommended by the Department, it should still defer to the military's judgment.  Although Plaintiffs suggest that the process here was a *post hoc* effort with a preordained result, that is not the case.  To the contrary, the Department's review of the issue of transgender service began at the initiative of Secretary Mattis nearly a month *before* the President made his statement on Twitter.  *See supra* p. 4.  After the 2017 Memorandum was issued, Secretary Mattis then ordered the creation of a Panel of Experts to engage in "an *independent* multi-disciplinary review

39

and study of relevant data and information pertaining to transgender Service members." Terms of Reference 2 (emphasis added); *accord* Report 17. As he later explained, "I charged the Panel to provide its best military advice … without regard to any external factors." Mattis Memorandum 1. Following this review, "[t]he Panel made recommendations based on each Panel member's independent military judgment." Report 4. After considering "those recommendations and the information underlying them, as well as additional information," the Department conducted an analysis that did not "start with [a] presumption" in favor of an outcome, but "ma[de] no assumptions" at all. *Id.* at 18–19. The resulting policy, in Secretary Mattis's words, was the product of "the Panel's professional military judgment," "the Department's best military judgment," and his "own professional judgment." Mattis Memorandum 2, 3. Unless Plaintiffs are prepared to accuse senior military leadership, including the Secretary of Defense himself, of making deliberate misrepresentations, they should abandon any suggestion that the new policy does not reflect the independent, professional judgment of the United States military. *Cf. Phila. & Trenton R. Co. v. Stimpson*, 39 U.S. (14 Pet.) 448, 458 (1840) (presumption of regularity applies *a fortiori* to Cabinet Secretaries and the President).

Nor does the fact that the Department's new policy postdates the 2017 Memorandum change the analysis. Again, because the new policy differs from the one set forth under any reading of the 2017 Memorandum, Defendants are not trying to support an existing policy with after-the-fact evidence. But even if they were, the consideration of such materials would be appropriate in this context. As discussed, the Supreme Court has repeatedly considered evidence and rationales produced after the adoption of a military policy, even if the same policy would trigger heightened scrutiny in the civilian sphere. In fact, it has even gone so far as to rely on theories as to what "Congress may … quite rationally have believed" to sustain a sex-based classification concerning military affairs. *Ballard*, 419 U.S. at 508.

40

That willingness to rely on *post hoc* explanations in the military context makes sense. Even if a decision concerning military matters originally rested on constitutionally impermissible reasons, it would be imprudent to hold that courts should ignore (or even discount) a subsequent judgment by military experts that the decision itself was in fact good for national defense. Again, *Rostker* is instructive: Even though Congress's original exemption of women from the requirement to register was apparently based on impermissible stereotypes, the Supreme Court refused to ignore Congress's later justification of that rule on military grounds. Yet under Plaintiffs' approach, those legitimate concerns about national defense should have been disregarded simply because they were raised after the law's enactment.

Likewise, even the *Karnoski* court declined to ignore the Department's new policy as an irrelevant *post hoc* justification, but instead "carefully considered" the military's documents. 2018 WL 1784464, at *12. Although that court wrongly went on to rule that discovery into the Department's deliberative process was necessary, it at least refused to dismiss the new policy out of hand.

In fact, the Carter policy itself was the product of post hoc decisionmaking. The deliberative process leading up to that policy began with then-Secretary Carter's statement that the current policy was "outdated, confusing, [and] inconsistent," 2015 Statement, an effective moratorium on gender-identity-based discharges, Report 13, and an instruction to the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified," *id.* Yet no one would contend that in a challenge to the Carter policy, courts should disregard the RAND Report.

At bottom, Plaintiffs' position is that, due to the President's actions last summer, the military must adhere to the Carter policy (or some variant of it) going forward. That view cannot be squared with this Court's opinion, which "fully agree[d]" that "the military's previous study of transgender

41

service cannot forever bind future administrations from looking into the issue themselves." Op. 71. As the Court noted, "[i]f the President had" ordered "that additional studies be undertaken and that [the Carter] policy be reevaluated" before deciding that a different policy "was beneficial to the various military objectives cited, this would be a different case." Op. 71–72. That describes the situation now. It makes no difference that the military finished its study *after* the 2017 Memorandum was issued. Otherwise, this Court's promise that the military may "continu[e] to study issues surrounding the service of transgender individuals in the military" despite the preliminary injunction would be illusory. Op. 72; *see also Karnoski*, 2018 WL 1784464, at *12 ("The Court's entry of a preliminary injunction was not intended to prevent the military to continue to review the implications of open service by transgender people, nor to preclude it from *ever* modifying the Carter policy.").

## II.  Plaintiffs Have Not Satisfied The Equitable Factors For A Preliminary Injunction

Even if Plaintiffs could establish a live controversy in which they were likely to succeed, the preliminary injunction would still have to be dissolved. Plaintiffs have not demonstrated that they meet any of the equitable factors necessary for maintaining this relief in light of the revocation of the 2017 Memorandum and the military's proposal of a new policy.

### A.  Plaintiffs Cannot Establish Irreparable Injury

To start, as explained in the accompanying motion to dismiss, Plaintiffs will not sustain any injury cognizable under the new policy, much less an irreparable one. But even if they had standing to challenge the new policy, they still would be unable to meet the "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Because a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," those seeking such relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22; *see also Chaplaincy*, 454 F.3d at 297.

In light of the decision by the *Karnoski* court to extend its nationwide injunction to cover implementation of the Department's new policy, Plaintiffs cannot make that showing. In issuing that order, the *Karnoski* court provided Plaintiffs here with all the injunctive relief they seek and more. *Compare* 2018 WL 1784464, at \*14 ("Defendants are enjoined from taking any action relative to transgender people that is inconsistent with the status quo that existed prior to President Trump's July 26, 2017 announcement."), *with* Dkt. No. 106, at 20 (requesting injunction that "Defendants shall revert to the status quo with regard to accession and retention that existed before the August 25, 2017 issuance of the Presidential Memorandum"). Under these circumstances, Plaintiffs cannot prove that unless this Court maintains and extends its preliminary injunction, they will likely face an imminent irreparable injury. Any alleged risks they face will not materialize unless and until the *Karnoski* court's nationwide injunction is dissolved, a prospect that is far from imminent. This Court should dissolve the preliminary injunction for this reason alone.

In fact, this Court (and others) took a similar approach when faced with overlapping nationwide injunctions concerning the President's travel orders. In *Pars Equality Center v. Trump*, No. 17-cv-0255 (TSC) (D.D.C. May 11, 2017), Dkt. No. 84, this Court stayed the resolution of a motion for a preliminary injunction on the ground that "[t]he existence of two other nationwide injunctions" covering the challenged action "casts uncertainty on the issue of whether the harms Plaintiffs allege are actually imminent or certain." *Id.* at 2; *see also, e.g., Roe v. Trump*, No. 3:17-cv-00557-WHO (N.D. Cal. Jan. 8, 2018) (staying preliminary injunction motion because "plaintiffs here concede that they 'do not currently face irreparable injury'" as another court had "enjoined on a nationwide basis" the President's order); *Washington v. Trump*, No. C17-0141JLR, 2017 WL 1050354, at \*4 (W.D. Wash. Mar. 17, 2017) (staying motion for preliminary relief as another "nationwide injunction already provides Plaintiffs the relief they seek"); *Ali v. Trump*, 241 F. Supp. 3d 1147, 1152 (W.D. Wash. 2017) (same).

This case should be treated no differently. Even if the Court believes Plaintiffs are likely to succeed in challenging the new policy, it should dissolve the preliminary injunction (and not enter a new one) until they can show an irreparable injury. If the *Karnoski* injunction is dissolved, this Court can always consider whether to issue a preliminary injunction against implementation of the new policy then. In the interim, there is no basis for subjecting the military to overlapping nationwide injunctions.

**B.      Plaintiffs Have Not Demonstrated the Balance of the Equities and Public Interest Favor a Preliminary Injunction Against the Department's New Policy**

In contrast to the absence of any irreparable harm associated with dissolving the preliminary injunction, maintaining this order will force the Defense Department to adhere to a policy that it has concluded poses "substantial risks" and threatens to "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Mattis Memorandum 2; *see also, e.g.*, Report 32–35, 41, 44. These "specific, predictive judgments" from "senior" military officials, including the Secretary of Defense himself, "about how the preliminary injunction would reduce the effectiveness" of the military merit significant deference. *Winter*, 555 U.S. at 27. After all, the military is not "required to wait until the injunction actually results in an inability" to effectively prepare "for the national defense before seeking its dissolution." *Id.* at 31 (citation omitted).

Although this Court concluded that the equities favored granting a preliminary injunction with respect to the 2017 Memorandum, that was due to its belief that, "[o]n the record before [it]," there was "no support for the claim that the ongoing service of transgender people would have *any* negative effect[] on the military at all." Op. 75. The current record is quite different. The Defense Department has documented the risks associated with the Carter policy and explained why, in its professional military judgment, it was "necessary" to depart from that framework. Report 32. Plaintiffs, by contrast, have not even established a constitutionally cognizable injury, let alone an irreparable one. Although "military interests do not always trump other considerations," in this case, "the proper

44

determination of where the public interest lies" should not be difficult. *Winter*, 555 U.S. at 26. It is Secretary Mattis's "professional judgment" that "these policies will place the Department of Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the survival and success of our Service members around the world," Mattis Memorandum 3, and Plaintiffs have offered no basis for why the military should be precluded from adopting them.

## III.   At A Minimum, The Injunction Should Be Dissolved In Part

Even if this Court does not dissolve the injunction entirely, it should narrow it in two respects. First, for the reasons set forth in our partial motion for judgment on the pleadings and motion to partially dissolve the preliminary injunction, the Court should at the very least dissolve the preliminary injunction to the extent that it applies to the President. *See* Dkt. 90; Dkt. 94. Even the *Karnoski* court dissolved this aspect of its injunction, 2018 WL 1784464, at *13, and Plaintiffs themselves no longer request this particular relief, Dkt. 106, at 20. Second, Defendants respectfully maintain that this Court should dissolve the injunction insofar as it applies to anyone other than the Plaintiffs this Court believes have standing. *See* Dkt. 45, at 42–43.

## CONCLUSION

This Court should dissolve the preliminary injunction issued on October 30, 2017. In light of the Department of Defense's judgment that maintaining the Carter policy poses substantial risks to military readiness, Defendants respectfully request a ruling on this motion as soon as possible and no later than May 23, 2018.

April 20, 2018                              Respectfully Submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General
                                            Civil Division

                                            BRETT A. SHUMATE
                                            Deputy Assistant Attorney General

                                            BRINTON LUCAS
                                            Counsel to the Assistant Attorney General

                                            JOHN R. GRIFFITHS
                                            Branch Director

                                            ANTHONY J. COPPOLINO
                                            Deputy Director

                                             /s/ *Ryan Parker*
                                            RYAN B. PARKER
                                            Senior Trial Counsel
                                            ANDREW E. CARMICHAEL
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            Tel: (202) 514-4336
                                            Email: ryan.parker@usdoj.gov

                                            *Counsel for Defendants*

46