**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBUA**

| | |
|---|---|
| DOE, et al., )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>DONALD J. TRUMP, et al, )<br>Defendants. )<br> )<br>     and )<br> )<br>Family Research Council )<br>801 G Street, NW )<br>Washington, DC 20001 )<br> )<br>Heritage Foundation )<br>214 Massachusetts Ave, NE )<br>Washington, DC 20002 )<br> )<br>     Non-Parties ) | Civil Action No. 17-CV-1597 (CKK) |

**JOINT RESPONSE OF NON-PARTIES HERITAGE FOUNDATION
AND FAMILY RESEARCH COUNCIL IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS FOR THE
PRODUCTION OF DOCUMENTS**

**INTRODUCTION**

Plaintiffs have sued the Government, alleging, among other things, that the Administration's policy regarding transgender individuals' service in the military violates their rights to equal protection of the law. Plaintiffs have alleged that the Administration's policy was motivated by an improper animus or purpose, not driven by genuine concerns, and that "all of the reasons proffered by *the President* for excluding transgender individuals from the military in this case were not merely unsupported, but were actually contradicted by the studies, conclusions and judgment of the military itself." ECF No. 61 at 67 (italics added).

Plaintiffs then served Defendants with requests for the production of documents, seeking, among other things, communications between Defendants and third parties related to the policy.

Defendants have objected to production and moved for a protective order, all of which is before this Court. (Pls.' Memo. at 3). Plaintiffs also served subpoenas on non-parties for some of the information requested of Defendants. Recently, Plaintiffs told this Court that it had become aware "that certain third parties may have provided advice and assistance to the Department of Defense" and that "one or more 'Technical Advisory Groups' or 'Commander Advisory Groups' may have been involved in making specific recommendations." (ECF No. 108 at 15). Concerned with the "opacity of these groups' memberships, duties and role," Plaintiffs told the Court that by April 13, it would serve further written discovery requests upon Defendants to obtain information about the role of those third parties and advisory groups. *Id*. Although it had not even received a response to such requests from Defendants, Plaintiffs had already served subpoenas upon non-parties. Plaintiffs informed this Court that it had served three third-party document production subpoenas on organizations "that are believed to have communicated with Defendants to persuade the Administration to ban military service by transgender people." *Id*. at 16. Plaintiffs now seek "[e]vidence of Defendants' consultation with outside groups well known to oppose civil rights for transgender people." (Pls. Memo at 5).

## ARGUMENT

Plaintiffs may not impose undue burden or expense on a non-party or seek disclosure of privileged or other protected matter or subjects. In assessing whether a burden is undue, a court will look at the factors articulated in Rule 26(b). *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007). Rule 26 generally limits discovery to any nonprivileged matter that is relevant to any party's claim or defense and is proportional to the needs of the case. Rule 26(b)(2) requires a court to limit discovery if the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expense, or if the

discovery is not relevant to any party's claim or defense and proportional to the needs to the case. Non-party status is another factor that weighs against compelling disclosure. *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 52 (D.D.C. 2005) (noting non-party status is relevant in considering the burden); *Katz v. Batavia Marine & Sporting Supplies*, 984 F.2d 422, 424 (Fed. Cir. 1993) (the status of a person as a non-party is a factor that weights against disclosure).

Even though a subpoena may not impose an undue financial burden, this Court must still determine whether the subpoena violates the First Amendment rights of Heritage Foundation ("Heritage") and Family Research Council ("FRC") by prying into its efforts, if any, to petition the Government. In weighing a claim of First Amendment privilege in the discovery context, the D.C. Circuit has instructed courts that a balancing inquiry should be conducted. *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981).[1] "Before granting a motion to compel discovery," the First Amendment claim should be measured against the party's need for the information sought so that the interests of both parties can be protected. *Id*. at 1266. Courts must determine whether litigants seeking disclosure have exhausted every reasonable alternative source of information, and whether the information sought goes to "the heart of the matter." *Id*. at 1268. "Infringement of First Amendment interests must be kept to a minimum." *Id*.

I. **The Plaintiffs Have Not Met Their Burden of Showing Exhaustion**

Plaintiffs are required to show, first, that they have exhausted every reasonable alternative avenue for discovery before seeking privileged documents from FRC and Heritage. *See Black*

---

[1] *Vacated as moot Smith v. Black Panther Party*, 458 U.S. 1118 (1982). *See Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 n.6 (D.D.C. 2002) (nothing that "[t]here is no suggestion in later case law in this Circuit that [*Black Panther's*] reasoning or analysis has been rejected or abandoned by our Court of Appeals.").

*Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981); *International Union, UAW v. National Right to Work Legal Defense & Education Foundation, Inc.*, 590 F.2d 1139, 1152-1153 (D.C. Cir. 1979) (although membership list was of central relevance, discovery was denied because plaintiff unions failed to show they had been unable to obtain information from alternative sources). This showing "must be reasonably explicit." *Id*. Otherwise, protected petitioning activity may become public at the drop of a lawsuit. Plaintiffs have failed to make this explicit showing.

Plaintiffs have stated that while they've requested documents from Defendants, they have been "stymied" or hindered in their attempts, but acknowledge that the issue is before this Court. (Pls. Memo at 3, 12). Not content to wait, Plaintiffs have also requested this information from non-parties. (ECF No. 108 at 16 ("Plaintiffs have served three third-party document production subpoenas on organizations that *are believed to have* communicated with Defendants to persuade the Administration to ban military service by transgender people.") (italics added)). However, as Plaintiffs themselves admit, they have not even requested all of this information of Defendants, even though they had planned to do so by April 13. (ECF No. 108 at 15).

As to those documents which Plaintiffs have already requested, Plaintiffs claim that because of Defendants' position regarding the discovery of documents, which they are likely to pursue on appeal, they have "no alternative but to seek the records from these third parties." (Pls.'s Memo at 7). But Plaintiffs cannot escape their obligation to exhaust alternative sources simply because pursuing these documents from the Defendants is likely to be time-consuming, unproductive, or require further litigation. *See Zerilli v. Smith*, 656 F.2d 705, 715 (D.C. Cir. 1981) (court stating that party could not escape their obligation to exhaust alternative sources simply because they "feared that deposing Justice Department employees would be time-consuming,

costly, and unproductive.").

Plaintiffs clearly have not exhausted other reasonable avenues. Some of the information has not been, or was only recently, requested. Moreover, there has been no ruling from this Court on production of documents from Defendants. Plaintiffs have taken only three depositions, but have plans for eight more. (ECF. No. 108 at 17). Plaintiffs have not claimed to have deposed the "Generals and military experts" upon whose judgment Defendants claim the President relied. (ECF No. 108 at 4). This is a far cry from the exhaustion required in journalistic and First Amendment privilege cases.[2] Plaintiffs have not exhausted reasonable avenues for discovery about alleged "Technical Advisory Groups" or "Commander Advisory Groups" and told the Court that it planned to serve discovery requests by April 13, 2018. (ECF No. 108 at 15). Plaintiffs sought information from non-parties before it had received any response from Defendants regarding this information.

The Court must therefore consider the possibility that alternative sources, namely the Defendants, may be able to provide the information sought. *Black Panther*, 661 F.2d at 1269. Information provided by the Defendants might demonstrate that communications by Heritage and FRC are not relevant to the case. *See Zerilli*, 656 F.2d at 715 (noting that it was "quite possible that interviewing these four individuals could have shed further light on the question whether the

---

[2] *See Zerilli v. Smith*, 656 F.2d 705, 714 (D.C. Cir. 1981) (court noting that in the past, it had required the taking of as many as 60 depositions to be a reasonable prerequisite to piercing the journalistic privilege); *Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9, (D.D.C. 2015) (number of depositions in a journalistic privilege case is determined on a case-by-case basis, "[b]ut where there is a reasonably well-defined number of possible alternative sources for the same information sought," the party seeking to compel must demonstrate reasonable efforts to exhaust those possible sources); *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004) (court quashing subpoena for non-party's communications with current and former elected officials finding insufficient attempts to obtain the information through other reasonable sources, including deposing the public officials).

5

Justice Department was responsible for the leaks."). Alternatively, Plaintiffs may be able to obtain information regarding the advisory groups from Defendants themselves—an alternative source of information. Indeed, district courts have recognized that, if documents are available from a party, it is better to obtain them from the party. *See In re Motion to Compel Compliance with Subpoena Directed to Dep't of Veteran Affairs*, 257 F.R.D. 12, 19 (D.D.C. 2009) (rejecting motion to compel third party in a patent infringement case where party serving subpoena failed to show the information was not available from a party).

Plaintiffs' subpoena thus imposes an undue burden on non-parties FRC and Heritage because the documents they seek are likely available from the Defendants themselves. *See Burlodge Ltd. v. Standex Int'l Corp.*, 257 F.R.D. 12, 19 (D.D.C. 2009) ("[E]ven modifying the subpoena to seek this limited information is unduly burdensome because of the absence of any showing that the information sought is not available from other sources."); *see also Watts*, 482 F.3d at 509 (courts may consider "whether the discovery sought is 'obtainable from some other source that is more convenient, less burdensome, or less expensive'" (quoting Fed. R. Civ. P. 26(b))); *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 577 (D.D.C. 2007) ("There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant"); *Wyoming v. U.S. Dept. of Agriculture*, 208 F.R.D. 449, 454 (D.D.C. 2002) (communications sought from third party "would be in the hands of the . . . defendants, and thus intrusion into the activities of the non-party witnesses is unwarranted and unnecessarily burdensome"). The Court should sustain the First Amendment privilege, at least until the Plaintiffs first exhaust discovery from the Defendants. *See Shoen v. Shoen*, 5 F.3d 1289, 1297 (9th Cir. 1993) (stating exhaustion of alternate sources is nearly implausible early in the discovery process).

**II.     The Documents Sought by Plaintiffs Do Not Go to the Heart of the Lawsuit**

Where, as in this case, Plaintiffs have failed to exhaust alternative sources, there is no need to consider the remaining portion of the balancing test. *See Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 120 n.4 (D.D.C. 2002) (failure to exhaust alternative sources weighed "so heavily in favor of quashing the subpoena" that court declined to consider the remaining analysis). Even proceeding to the second part of the balancing test, Plaintiffs' motion to compel must be denied.

It is settled that "[b]alancing one party's First Amendment interests against another party's need for disclosure to determine whether a claim of privilege should be upheld or whether discovery should be ordered requires a detailed and painstaking analysis. *Black Panther*, 661 F.2d at 1267. Before compelling discovery of material implicating the First Amendment in the discovery context, a court must assess whether the information goes to the "heart of the lawsuit." *National Right to Work*, 590 F.2d at 1152.

One instructive decision is *Wyoming v. United States Dep't of Agric.*, in which the plaintiff filed a motion to compel against non-parties in a challenge to federal agency actions. 208 F.R.D. 449 (D.D.C. 2002). The court denied production, finding that the non-parties' documents were irrelevant to the plaintiffs' claim that the *government* violated the law because all relevant documents would be in the hands of the federal defendants, and "intrusion into the activities of the non-party witnesses is unwarranted and unnecessarily burdensome." *Id*. The court also noted that the plaintiff could obtain the information needed to proceed on its claim from the federal defendants. *Id*. at 455. That is the case here.

In an end run around the exhaustion requirement, Plaintiffs contend, without support, that FRC and Heritage are the best sources of the information sought. For two reasons, this argument

7

is flawed.

First, Plaintiffs seek privileged documents only on a *belief* that non-parties may have communicated with Defendants, but provide no basis for this belief. Without more, how can FRC and Heritage be the best sources of the information sought? To permit the Plaintiffs to use non-parties as a source of first resort eliminates the First Amendment privilege and allows discovery to be used as a fishing expedition or tool of harassment. "Because of the preferred position of First Amendment rights, 'compelled disclosure . . . (is) normally the end, and not the beginning, of the inquiry.'" *Black Panther*, 661 F.2d at 1268 (*quoting Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) (citation omitted)).

Second, Plaintiffs allege that the communications sought from FRC and Heritage go to the heart of this lawsuit merely because the requested communications are about transgender military service – the subject of the lawsuit. Plaintiffs deem a communication *to* Defendants as probative of the process and the President's decision, as well as whether the Executive Branch acted with an unconstitutional purpose. (Pls. Memo at 12). Under this rationale, Plaintiffs could seek discovery from any individual or group which communicates with Defendants, without regard to whether the communication was relevant, or even considered by Defendants.

In any event, the best sources of information about the process, the specific sequence of events leading to the challenged decision, and the President's decision are the Defendants themselves – not non-parties. *See Heartland Surreal Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 19475 (court refusing to allow discovery of non-party advocacy communications because plaintiff had not made an attempt to obtain the information from the defendants who were members of the task force). Merely communicating with a government official about what should or should not be in a policy does not automatically make that

is flawed.

First, Plaintiffs seek privileged documents only on a *belief* that non-parties may have communicated with Defendants, but provide no basis for this belief. Without more, how can FRC and Heritage be the best sources of the information sought? To permit the Plaintiffs to use non-parties as a source of first resort eliminates the First Amendment privilege and allows discovery to be used as a fishing expedition or tool of harassment. "Because of the preferred position of First Amendment rights, 'compelled disclosure . . . (is) normally the end, and not the beginning, of the inquiry.'" *Black Panther*, 661 F.2d at 1268 (*quoting Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) (citation omitted)).

Second, Plaintiffs allege that the communications sought from FRC and Heritage go to the heart of this lawsuit merely because the requested communications are about transgender military service – the subject of the lawsuit. Plaintiffs deem a communication *to* Defendants as probative of the process and the President's decision, as well as whether the Executive Branch acted with an unconstitutional purpose. (Pls. Memo at 12). Under this rationale, Plaintiffs could seek discovery from any individual or group which communicates with Defendants, without regard to whether the communication was relevant, or even considered by Defendants.

In any event, the best sources of information about the process, the specific sequence of events leading to the challenged decision, and the President's decision are the Defendants themselves – not non-parties. *See Heartland Surreal Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 19475 (court refusing to allow discovery of non-party advocacy communications because plaintiff had not made an attempt to obtain the information from the defendants who were members of the task force). Merely communicating with a government official about what should or should not be in a policy does not automatically make that

communication probative or the communicator the best source of information. How can plaintiffs credibly divine what information actually influenced the Defendants simply by looking to the communications of third parties? It strains credulity to argue that a non-party's communications to Defendants is the best source of evidence of the "professional military advice and judgment" relied upon by Defendants. (Pls. Memo at 12).

Plaintiffs nevertheless claim that alleged communications from non-parties FRC and Heritage may be evidence that the President's decision was not the product of professional military advice and judgment, but instead driven by animus. (Pls. Memo at 12). Plaintiffs have sought to compel discovery from groups which they believe petitioned the Government and with which they disagree in order to use that disagreement as evidence of animus. Again, the position or non-position of non-parties FRC and Heritage on transgender service in the military is not probative of Defendants' animus. Defendants are the best sources of the purpose of the military justification. How can Plaintiffs extrapolate Defendants' animus from communications from cherry-picked third parties?

Instead of conceding that Defendants are the best sources of the processes and underlying professional military advice and judgment, Plaintiffs try to minimize the First Amendment interests of FRC and Heritage. But petitioning activity does not lose its First Amendment protection once communicated to a government official. *See, e.g., Heartland Surreal Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 19475 (D. Kan. 2007) (court refusing to allow discovery of non-party advocacy documents argued to reveal defendants' views and opinions.). In at least two of the cases cited by Plaintiffs, the courts either failed to conduct an analysis of whether the documents requested were available from the parties or found that the documents were not available. *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 2016 U.S.

Dist. LEXIS 140450 (W.D. Tex. Oct. 11, 2016); *Pulte Home Corp. v. Montgomery Cty., Md.*, 2017 U.S. Dist. LEXIS 43153 (D. Md. March 24, 2017) (court noting that not all of the material which the plaintiffs sought would be available from the defendants). Unlike the cases cited by Plaintiffs, the information relevant to Plaintiffs' claims are in the possession of the Defendants. Therefore, the tangential (at best) information Plaintiffs seek is outweighed by the harm to FRC's and Heritage's First Amendment associational and petition rights.

**III.     The First Amendment Requires That the Motion Be Denied**

Even setting aside that third-party discovery is not warranted at this time, the First Amendment protects the non-parties from being required to disclose any responsive documents they may have. Such a requirement would not only violate Heritage's and FRC's right to petition the government, but also their freedoms of association and speech.

**A.     The subpoena impermissibly burdens the third parties' right to petition**

As noted previously, the First Amendment right to petition entitles citizens to communicate with their government officials to express ideas and concerns. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388-89 (2011). "[P]etitioning the government is [] central to First Amendment values." *State of Wyoming v. United States Dep't of Agric.*, 208 F.R.D. 449,454 (D.D.C. 2002); *see also*, *Austl./E. USA Shipping Conference v. United States*, 537 F. Supp. 807, 809-810) (D.C. Cir. 1982) (court stating that "petitioning the government is equally central to first amendment values").

The third parties' right of petition is burdened by the subpoena because it is asking them to reveal both if they petitioned governmental officials on this issue and, assuming they did, the contents of the petitions. This creates a "reasonable probability"—that the third parties will then be "subject … to threats, harassment, or reprisals from either

10

Government officials or private parties," which is impermissible. *See Citizens United v. FEC*, 558 U.S. 310, 367 (2010) (Free Speech Clause) (internal quotation marks and citation omitted).

Indeed, for FRC, the threat of harassment is far from hypothetical. Websites already collect cherry-picked quotes regarding FRC's position on issues like those in this suit.[3] Not only does FRC receive hate mail and criticisms on social media because of these quotes, but an FRC employee has been shot by a man enraged by these websites.[4]

The same is true of Heritage. Heritage receives threatening mail on issues like those in this suit, and even its position on something as anodyne as the annual budget for the federal government drew some 100-200 protesters to storm its lobby as recently as last year.[5] Given these risks of disclosure, FRC and Heritage are each obviously burdened by the forced disclosure of the communications sought by the subpoena.

---

[3] See, *e.g.*, Southern Policy Law Center, Family Research Council, https://www.splcenter.org/fighting-hate/extremist-files/group/family-research-council.

[4] Carol Cratty, *25-year sentence in Family Research Council shooting*, CNN (Sep. 9, 2013) https://www.cnn.com/2013/09/19/justice/dc-family-research-council-shooting/index.html. While noting this threat, FRC acknowledges that almost all individuals who disagree with FRC's political positions will never attempt to harm FRC through acts of violence.

[5] See, e.g., Joshua Eaton, *Protesters storm Heritage Foundation Building to Call for 'Budget for the People,'* THINKPROGRESS (Apr. 25, 2017), https://thinkprogress.org/protests-at-white-house-heritage-foundation-call-for-budget-for-the-people-9bd41cda761c; Melissa Quinn, *Demonstrators Descend on Heritage Foundation to Protest Trump Budget*, THE DAILY SIGNAL (Apr. 25, 2017), https://www.dailysignal.com/2017/04/25/demonstrators-descend-on-heritage-foundation-to-protest-trump-budget; Penny Starr, *Protesters from Chicago Storm Heritage Foundation to Protest Budget Blueprint Shared with President Trump*, BREITBART NEWS (Apr. 25, 2017), http://www.breitbart.com/big-government/2017/04/25/protestors-from-chicago-storm-heritage-foundation-to-protest-budget-blueprint-shared-with-president-trump.

As Plaintiffs cannot show a compelling interest in disclosure or that they have pursued alternative methods of obtaining the requested materials, the third parties cannot be compelled to comply with the subpoena.

Attempting to avoid all this, the plaintiffs cite (at 9) a line of cases, which, they claim, limit the third parties' First Amendment rights to *internal* communications. They are mistaken.  None of these cases deals with the rights of non-parties, and none deals with the right to petition the government.  For example, plaintiffs cite (at 10) a Ninth Circuit case, *Perry v. Schwarzenegger*, where discovery of an intervenor's documents that were "conveyed to the electorate" was allowed despite an objection under freedom of association. 591 F.3d 1147, 1165 n.12 (2010).  This non-binding precedent doesn't address the right to petition, nor the enhanced protection that free speech and freedom of association claims should receive when the action burdens another First Amendment right. *Cf. Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001). Thus, strict scrutiny must apply to these external communications. And as shown below, enforcing the subpoena cannot satisfy strict scrutiny.

**B.     The subpoena impermissibly burdens the third parties' freedom of association**

In addition to burdening the third parties' right to petition, the subpoena burdens their freedom to associate with other individuals and groups. The third parties have a right under the First Amendment to associate with others in a joint effort to convince the government to act. *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 525 (2002). When a claim of associational privilege is asserted, the relevance standard is more exacting than the minimal showing of relevance under Rule 26(b)(1), and the information must go to the heart of the matter.

*State of Wyoming v. United States of Dep't of Agric.*, 239 F. Supp. 2d 1219, (D. Wyo. 2002), *vacated as moot*, 414 F.3d 1207, 1241 (10th Cir. 2005).

In this case, forced disclosure of the subpoenaed documents might inhibit other groups and individuals from associating with the third parties. The price of joining forces with FRC or Heritage would be a fear that, the next time their petitions and other advocacy convinces a governmental body to change position, they will be subpoenaed and information about their allies will be revealed. Likewise, donors may fear donating to FRC or Heritage, for fear that information they give to either organization will be exposed.[6] The First Amendment protects the third parties for this reason as well. *See Citizens United*, 558 U.S. at 367.

In short, as Plaintiffs cannot show a compelling governmental interest in disclosure (see 14–15, *infra*), the third parties cannot be compelled to comply with the subpoena.

### C.     The subpoena impermissibly burdens the third parties' freedom of speech

Compliance with the subpoena would also burden the third parties' free speech rights. As already explained, a limitation on free speech rights may not be imposed when there is a "reasonable probability"—that a group will be "subject … to threats, harassment, or reprisals from either Government officials or private parties," which is impermissible. *Citizens United*, 558 U.S. at 367 (2010) (internal quotation marks and citation omitted).

---

[6] See Heritage Foundation, *Heritage Leaders Help to Reverse Guidestar's 'Hate Group' Annotations for Conservative Groups*, (July 14, 2017), https://www.heritage.org/impact/heritage-leaders-help-reverse-guidestars-hate-group-annotations-conservative-groups.

Further, the speech sought in this case is political speech, which lies at the core of the First Amendment's speech protections. *E.g. Boos v. Barry,* 485 U.S. 312 (1988).

Forcing the third parties to disclose speech to the government would have immediate harmful benefits. The third parties face a perpetual threat that private parties will cut off essential services because of their political views. For example, some groups have already experienced boycotts when they resist "modern" views on sexuality-related issues.[7] While the third parties respect the rights of businesses to disassociate from "conservative" causes, they also seek to protect themselves from misquotation or other harm by compelled disclosure of their communications.[8] For this reason as well, the third parties cannot be compelled to comply with the subpoena.

### D. Plaintiffs cannot show the subpoena is narrowly tailored to meet a compelling government interest.

To survive strict scrutiny, moreover, a law or order (here the subpoena) must be narrowly tailored to meet a compelling governmental interest. *E.g. Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). Given the third parties' tangential (at best) relationship to this suit, Plaintiffs simply cannot show a compelling governmental interest in enforcing the subpoena.

To be sure, Plaintiffs assert (at 18 – 19) a compelling interest in ensuring the "courts have access to all the facts necessary to ensure fair and accurate adjudication of the cases

---

[7] *See, e.g.*, Ruth Institute, *The Cost of Being Labeled a Hate Group*, (August 31, 2017) http://www.ruthinstitute.org/press/ruth-institute-s-on-line-donation-processor-cuts-them-off-for-promoting-hate-violence-harassment-or-.

[8] See SPLC, supra note 2 (cherry-picking FRC quotes)

before them." But no case has upheld such a general rule in the civil context. All three cases cited by Plaintiffs for this proposition were for *criminal* charges.[9]

Plaintiffs here are trying to protect, not their right to be free from serious crimes, but to protect what they claim to be their civil rights. In doing so, however, they are attacking the third parties' civil rights—of petition, association and speech. While Plaintiffs have every right to pursue their equal protection and due process claims, their legal theory does not give them the right to enlist the third parties to assist cause. Burdening one (or several) constitutional rights is not necessary to adjudicate this case.

Plaintiffs' claim boils down to a compelling interest, not in the documents themselves, but in ultimate victory against the government through a fair adjudication. Even assuming a compelling governmental interest in ruling for Plaintiffs, there is an obvious less restrictive means: bifurcate the claims that really require the documents Plaintiffs seek here, and compel production of those documents *only* if Plaintiffs cannot achieve the relief they seek without them. Anything less than this impermissibly burdens the third parties' constitutional rights.

## IV. RFRA Also Requires The Denial Of The Motion To Compel As To FRC

In addition to violating FRC's constitutional rights, the subpoena violates FRC's rights under the Religious Freedom Restoration Act (RFRA). Plaintiffs have not disputed that FRC is in fact a religious organization generally protected by RFRA. As with other religious groups, burdens placed on FRC by any entity of the federal government—

---

[9] *In re Grand Jury Empaneling of Special Grand Jury*, 171 F.3d 826, 832 (3d Cir. 1999); *In re Grand Jury Proceedings of John Doe*, 842 F.2d 244, 248 (10th Cir. 1988); *Port v. Heard*, 764 F.2d 423, 432 (5th Cir. 1985) (murder investigation).

including this Court—are subject to RFRA. *See, e.g.* 42 USCS § 2000bb-1; *Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014). A burden is substantial if it—in plaintiffs' words—pressures FRC "to modify its religious practices or violate its beliefs."

1. As Plaintiffs explain (at 17), "[a] substantial burden exists when government action puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (internal quotation marks omitted). But Plaintiffs are wrong in contending that FRC would not be substantially burdened by disclosure. To the contrary, FRC's religiously-based advocacy would be chilled if it were compelled to comply with the subpoena.

To explain by analogy: Imagine a church being asked to disclose its communications with potential converts. Obviously, that would burden future church members: Even without disclosing internal communications or violating its practices, such a subpoena would chill missionary efforts, affecting the actions of both the proselytizer and potential converts. Some donors might even donate to other churches' efforts as a result.

So too here: The subpoena, if enforced by this Court, would burden FRC's religious exercise by (1) chilling its religiously-motivated advocacy, (2) jeopardizing its relationships with donors and other advocacy groups, and (3) hindering its right to petition the government. *See generally* U.S. Const. Amend. I. Under the perpetual threat of future subpoena, FRC would face immense pressure to make its advocacy more politically correct. FRC also has a solemn religious obligation to tell the truth about God's view on matters affecting government policy. Enforcing the subpoena would thus put "substantial pressure" on FRC to modify its behavior and to violate its beliefs.

Thus, before Plaintiffs can enforce a subpoena against FRC, they must demonstrate that the subpoena is the least restrictive means of achieving a compelling government interest. The compelling interest must be an interest with respect to a specific religious individual or group. *See*, *e.g.*, *Hobby Lobby*, 134 S. Ct at 2767.  Furthermore, generally stated interests do not meet RFRA's requirement that there be a compelling interest as applied to the religious objector. Any compelling interest in advancing Plaintiffs' policy preferences, legal theories, or relief does not imply a compelling interest in *enlisting FRC* to help Plaintiffs advance their cause.

Moreover, as shown earlier, Plaintiffs have numerous other means of seeking the information sought here—by discovery on the Defendants or even through requests under the Freedom of Information Act.   Plaintiffs thus cannot show that burdening FRC is the least restrictive means of obtaining the documents it seeks—at least until all other attempts to get the documents have been resolved against Plaintiffs.

In short, Plaintiffs cannot show that they must drag FRC to the courthouse to get relief against the Defendants; they have other means of proving their case, which must be pursued first. *See* Section I, *supra*.[10]

2. According to Plaintiffs, this Court's actions are not even covered by RFRA because RFRA, they say, is inapplicable in suits between private parties.  To prevent

---

[10] For similar reasons, the Free Exercise Clause would give FRC relief even in the absence of RFRA. *Cf.*, *e.g. Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) (targeting of religious groups violates Free Exercise Clause); *Employment Division v. Smith*, 494 U.S. 872, 881 (1990) (dicta suggesting enhanced scrutiny of free exercise claims when other constitutional rights implicated).

RFRA's application, Plaintiffs would need to be right on both counts. But Plaintiffs are wrong on both counts.

First, Plaintiffs' theory that RFRA doesn't cover this court is wrong: RFRA applies to any "branch, … of the United States." 42 U.S.C. § 2000bb-2; *see also City of Boerne v. Flores,* 521 U.S. 507, 516 (1997) ("RFRA's mandate applies to *any* 'branch … of the United States.'") (emphasis added). Plaintiffs attempt to wish away this language by noting a court system does not typically have a "burden of going forward" with evidence. But this plea to ignore Congress' instruction fails: RFRA applies to the judicial branch, and this court is a member of that branch. Where a proposed action burdens religious exercise, the Court must determine that the action is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphasis added). Plaintiffs' argument otherwise is patently wrong.

Second, as multiple circuits have held—and the D.C. Circuit has implied—RFRA indeed applies to suits between private parties. As plaintiffs grudgingly acknowledge (at 14 n.5), the Second Circuit squarely reached this conclusion in *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006). The Eighth Circuit has done so as well. *In re Young II*, 141 F.3d 854 (8th Cir. 1998). And when a private University claimed it was entitled to a RFRA defense in this Circuit, the D.C. Circuit applied RFRA equally against a public plaintiff and a private plaintiff. *EEOC v. Catholic Univ.*, 83 F.3d 455, 467-70 (D.C. Cir. 1996), *accord* Sara Lunsford Kohen, *Religious Freedom in Private Lawsuits: Untangling when RFRA Applies to suits Involving Only Private Parties*, 10 Card. Pub. L. Pol'y & Ethics J. 43, 52 (2011).

So too here: a private plaintiff is asking the government to apply federal law in a way that Congress could not affirmatively require under RFRA. This Court cannot compel compliance with the subpoena without showing that strict scrutiny is satisfied. For all the reasons stated above, it is not, especially at this stage of litigation.

## CONCLUSION

Compelling compliance with the subpoena at this stage would unduly burden the third parties' constitutional (and FRC's statutory) rights, and not serve any compelling interest. For this reason, the motion to compel should be denied. In the alternative, the motion should be held unless and until Plaintiffs demonstrate that they cannot get the relief they seek without the requested documents.

April 23, 2018

Respectfully submitted,

/s/ Gene C. Schaerr
Gene C. Schaerr (DC Bar No. 416638)
*Counsel of Record*
Michael T. Worley (DC Bar No. 1034367)*
Schaerr | Duncan LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-duncan.com
* *Admission to this Court pending*

Attorneys for Family Research Council

/s/ Heidi K. Abegg
Heidi K. Abegg (DC Bar No. 463935)
Webster, Chamberlain & Bean, LLP
1747 Pennsylvania Ave, NW, Suite 1000
Washington, DC 20006
(202) 785-9500
habegg@wc-b.com

Attorney for Heritage Foundation

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2018, I caused a copy of Joint Response and Proposed Order to be filed electronically and that these documents are available for viewing and downloading from the ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Gene C. Schaerr
Gene C. Schaerr