**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JANE DOE 2 *et al.*, <br><br>                  Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as <br> President of the United States, *et al.*, <br><br>                  Defendants. | Civil Action No. 17-cv-1597 (CKK) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS AND MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... iii

TABLE OF FREQUENTLY CITED DOCUMENTS ............................................................... vii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

ARGUMENT ................................................................................................................................. 5

I.    THE GOVERNMENT'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE
      THE MATTIS PLAN DOES NOT DIVEST THIS COURT OF JURISDICTION TO
      HEAR PLAINTIFFS' CHALLENGE ......................................................................................... 5

    A.    Plaintiffs' Claims Are Not Moot ........................................................................... 5

        1.    Plaintiffs' second amended complaint challenges the Mattis Plan. ........................ 6

        2.    The Mattis Plan does not establish a new policy. ................................................... 7

        3.    The government's "voluntary cessation" does not moot this
              challenge. ............................................................................................................... 11

    B.    Plaintiffs Have Standing To Challenge The Mattis Plan ..................................... 13

        1.    Current servicemembers are harmed by the inherent inequality,
              stigma, and hamstrung military careers imposed by the Mattis
              Plan. ....................................................................................................................... 14

        2.    Jane Doe 6, a current, transgender servicemember without a
              military diagnosis of gender dysphoria, will be barred from service
              under the Mattis Plan. ........................................................................................... 17

        3.    Jane Doe 7 and John Doe 2, aspiring servicemembers who
              transitioned years ago, are barred from service under the Mattis
              Plan. ....................................................................................................................... 18

        4.    Dylan Kohere, an aspiring servicemember and college student
              currently taking ROTC classes, will be barred from service under
              the Mattis Plan. ..................................................................................................... 20

        5.    Plaintiffs' claims against the President are redressable. ....................................... 21

II.   DEFENDANTS HAVE NOT JUSTIFIED DISSOLUTION OF THE PRELIMINARY
      INJUNCTION ...................................................................................................................... 22

i

A.  Plaintiffs Remain Likely To Succeed On The Merits........................................................ 23

    1.  The government's policy barring transgender people from serving
       in the military requires heightened scrutiny............................................................ 23

        a)  Heightened scrutiny applies because the Mattis Plan
           facially discriminates based on transgender status and sex. .................... 23

        b)  Deference, even if it applies, does not require or permit
           application of a lower standard of scrutiny in military cases.................... 24

        c)  No deference is warranted here................................................................. 28

    2.  The government's justifications for its policy are not rationally,
       much less substantially, furthered by barring transgender people
       from military service........................................................................................ 29

        a)  The Ban does not promote military readiness........................................... 30

        b)  Defendants' arguments about unit cohesion are circular and
           rest on impermissible gender stereotypes. ................................................ 34

        c)  Banning transgender people from military service cannot
           be justified based on cost. ......................................................................... 38

        d)  The "grandfather clause" highlights the incoherence of the
           Mattis Plan. .............................................................................................. 40

B.  Plaintiffs Continue To Satisfy The Equitable Factors For A Preliminary
    Injunction .................................................................................................................. 40

    1.  Plaintiffs will suffer irreparable injury if the preliminary injunction
       is dissolved..................................................................................................... 40

    2.  The balance of the equities and the public interest favor the
       preliminary injunction..................................................................................... 42

CONCLUSION............................................................................................................................ 44

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adair v. England*, 183 F. Supp. 2d 31 (D.D.C. 2002)...................................................28

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)..........................................15

*Ali v. Trump*, 241 F. Supp. 3d 1147 (W.D. Wash. 2017).............................................42

*American Council of the Blind v. Mnuchin*, 878 F.3d 360 (D.C. Cir. 2017) ................22

*American Freedom Law Center v. Obama*, 821 F.3d 44 (D.C. Cir. 2016).....................13

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016)..............................................................11

*Berkley v. United States*, 287 F.3d 1076 (Fed. Cir. 2002) ............................................27

*Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001) ..............31

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)..........................................................34

*Burlington N.R. Co. v. Surface Transportation Board*, 75 F.3d 685 (D.C. Cir. 1996) ...................................................................................................................6

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ...............................29

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982)...........................11, 12

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).......................................16

*Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) (en banc)..............................12

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................21

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979)...................................................5

*Craig v. Boren*, 429 U.S. 190 (1976).............................................................................25

*Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1976) ..................................................34

*Cruzan v. Special School District*, 294 F.3d 981 (8th Cir. 2002)..................................36

*Department of Treasury v. Galioto*, 477 U.S. 556 (1986) (per curiam) .......................10

*Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011) ............................................................39

*Doe v. Boyertown Area School District*, 276 F. Supp. 3d 324 (E.D. Pa. 2017) ...........36

iii

*Doe v. Trump*, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) ..........................................20, 42, 44

*Evancho v. Pine-Richland School District*, 237 F. Supp. 3d 267 (W.D. Pa. 2017)......................17

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528
        U.S. 167 (2000)..................................................................................................................6, 18

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ...............................................................................26

*Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ................................................................7

*Goldman v. Weinberger*, 475 U.S. 503 (1986) .......................................................................27, 28

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .......................................................................43

*Graham v. Richardson*, 403 U.S. 365 (1971) ................................................................................39

*Gratz v. Bollinger*, 539 U.S. 244 (2003).......................................................................................19

*Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015) ............................................................17

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir.), *vacated as moot*, 874 F.3d 1112 (9th
        Cir. 2017) .........................................................................................................................21

*Heckler v. Mathews*, 465 U.S. 728 (1984).....................................................................................17

*Honig v. Doe*, 484 U.S. 305 (1988) .................................................................................................6

*Horne v. Flores*, 557 U.S. 433 (2009) ...........................................................................................22

*In re Levenson*, 587 F.3d 925 (9th Cir. 2009).................................................................................40

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012)...............................................................16

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013).................................................................27

*Karnoski v. Trump*, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ..........................................23

*Karnoski v. Trump*, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018), *appeal
        docketed*, No. 18-35347 (9th Cir. Apr. 30, 2018) ....................................................... *passim*

*Karnoski v. Trump*, No. 17-cv-1297, Dkt. 236 (W.D. Wash Apr. 30, 2018) ...............................41

*Karnoski v. Trump*, No. 17-cv-1297, Dkt. 238 (W.D. Wash. Apr. 30, 2018) ..............................41

*Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014)..................................................................................34

*Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884 (C.D. Cal. 2010),
        *vacated on other grounds*, 658 F.3d 1162 (9th Cir. 2011) ................................................25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................................13

*M.A.B. v. Board of Education of Talbot County*, 286 F. Supp. 3d 704 (D. Md. 2018) ....................................................................................................................................36

*Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974) ...................................................38

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)....................................................18

*Motor & Equipment Manufacturers Ass'n v. Nichols*, 142 F.3d 449 (D.C. Cir. 1998) ...........................................................................................................................................5

*National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974)...........................21

*Northeastern Florida Chapter of Associate General Contractors v. City of Jacksonville*, 508 U.S. 656 (1993) ...........................................................................6, 11, 12

*Oklahoma Department of Enivronmental Quality v. EPA*, 740 F.3d 185 (D.C. Cir. 2014) ............................................................................................................................................18

*Owens v. Brown*, 455 F. Supp. 291 (D.D.C. 1978)................................................................37, 38

*Palmore v. Sidoti*, 466 U.S. 429 (1984).....................................................................................37

*Pars Equality Center v. Trump*, No. 17-cv-0255, Dkt. 143 (D.D.C. Mar. 2, 2018) ....................41

*Plyler v. Doe*, 457 U.S. 202 (1982)............................................................................................39

*Rockwell International Corp. v. United States*, 549 U.S. 457 (2007)............................................7

*Roe v. Trump*, No. 3:17-cv-00557, Dkt. 91 (N.D. Cal. Jan. 8, 2018) ...........................................42

*Rostker v. Goldberg*, 453 U.S. 57 (1981) .......................................................................25, 26, 27

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006).....................13

*Schlesinger v. Ballard*, 419 U.S. 498 (1975) ..........................................................................25, 26

*SEC v. Vision Communications, Inc.*, 1995 WL 109037 (D.D.C. Mar. 6, 1995) .........................22

*Seeger v. U.S. Department of Defense*, __ F. Supp. 3d __, 2018 WL 1568883 (D.D.C. Mar. 30, 2018)..............................................................................................................5

*Stockman v. Trump*, No. 5:17-cv-01799, Dkt. 105 (C.D. Cal. May 7, 2018) ...............................10

*Stockman v. Trump*, No. 5:17-cv-01799, Dkt. 79 (C.D. Cal. Dec. 22, 2017)...............................23

*Stone v. Trump*, 280 F. Supp. 3d 747 (D. Md. 2017)..................................................................23

v

*Students & Parents for Privacy v. U.S. Department of Education*, 2016 WL
    6134121 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted by*
    2017 WL 6629520 (N.D. Ill. Dec. 29, 2017) .......................................................36

*United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ....................................5

*United States v. Swift & Co.*, 286 U.S. 106 (1932)........................................................22

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 (1968) ..........................................22

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................25, 29, 37

*United States v. Windsor*, 570 U.S. 744 (2013) ...........................................................28

*Washington v. Davis*, 426 U.S. 229 (1976).................................................................27

*Washington v. Trump*, 2017 WL 1050354 (W.D. Wash. Mar. 17, 2017)......................................42

*Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d
    1034 (7th Cir. 2017).................................................................................36

*Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008) .......................................25

## STATUTES, RULES, AND REGULATIONS

Federal Rule of Civil Procedure 15(d)...........................................................................7

U.S. Constitution article I, § 7 ...............................................................................12

vi

**TABLE OF FREQUENTLY CITED DOCUMENTS**

| Short Citation | Document and Location |
|---|---|
| 2017 Presidential Memorandum | Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security, dated August 25, 2017 (Milgroom Decl., Ex. T) (previously filed at Dkt. No. 13-2, Ex. A)[1] |
| 2018 Presidential Memorandum | Memorandum for the Secretary of Defense and the Secretary of Homeland Security re: Military Service by Transgender Individuals, dated March 23, 2018 (Milgroom Decl., Ex. FF) (previously filed at Dkt. 96-3) |
| DTM 16-005 | Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," dated June 30, 2016 (previously filed at Dkt. No. 13-10, Ex. C) |
| Interim Guidance | Military Service by Transgender Individuals – Interim Guidance, dated September 14, 2017 (Milgroom Decl., Ex. W) (previously filed at Dkt. No. 45-1) |
| Mattis Plan | Memorandum for the President re: Military Service by Transgender Individuals, dated February 22, 2018 (Milgroom Decl., Ex. DD) (previously filed at Dkt. No. 96-1) |
| Panel Report | Department of Defense Report and Recommendations on Military Service by Transgender Persons, dated February 2018 (Milgroom Decl., Ex. EE) (previously filed at Dkt. No. 96-2) |
| PI Order | Memorandum Opinion Granting in Part and Denying in Part Defendants' Motion to Dismiss and Plaintiffs' Motion for Preliminary Injunction (Dkt. 61) |
| Terms of Reference | Terms of Reference – Implementation of Presidential Memorandum on Military Service by Transgender Individuals, dated |

---

[1]     For the Court's convenience, certain frequently cited documents are being filed together as exhibits to the Declaration of Lauren Godles Milgroom ("Milgroom Decl."), filed today.  For those documents, the table notes both their location in the Milgroom Declaration and where they were previously filed in this case.

|  |  |
|---|---|
|  | September 14, 2017 (Milgroom Decl., Ex. X) (previously filed at Dkt. No. 108-6) |
| US PI Br. | Defendants' Motion to Dissolve the Preliminary Injunction (Dkt. No. 116) |
| US SJ Br. | Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, or, in the Alternative, Defendants' Motion for Summary Judgment (Dkt. No. 115) |

**INTRODUCTION**

Defendants move to dismiss Plaintiffs' challenge to the government's ban on transgender persons serving in the U.S. military for mootness and lack of standing, and relatedly contend that the Court should dissolve its preliminary injunction.  Both motions start from the false premise that the implementation plan announced by Secretary of Defense Mattis in March 2018 is somehow meaningfully distinct from the ban the President tweeted, and this Court enjoined, in late 2017, and therefore constitutional.  That is wrong:  The Mattis Plan, like the President's directive it effectuates, bars transgender individual from joining or serving in our nation's military.

This Court has jurisdiction to hear Plaintiffs' challenge to the Mattis Plan.  The case presents a live controversy—a constitutional challenge to a current government policy that, but for this Court's preliminary injunction, would be operative.  And Plaintiffs—current and aspiring transgender servicemembers—have standing to sue for the same reasons this Court recognized in its preliminary injunction order:  The government's ban subjects them to "inherent inequality," brands them as inferior in the eyes of their fellow servicemembers, and either hampers or outright precludes their career prospects.  PI Order 2.

Defendants similarly come nowhere close to meeting the heavy burden of demonstrating that changed circumstances warrant dissolution of the Court's preliminary injunction.  By its own terms, the Mattis Plan implements the President's directive to prohibit transgender persons from serving in the U.S. military.  The Plan thus uniquely targets transgender people and singularly prevents them as a class from serving their country.  That disparate treatment violates Plaintiffs' rights to equal protection and due process under the Fifth Amendment.  The equities remain decisively in Plaintiffs' favor, as the public interest is served by allowing qualified and willing transgender servicemembers to defend the country.  Because the Mattis Plan and the

accompanying Panel Report are bereft of any justification that supports the government's ban, Defendants have no argument that they (or the public) will be harmed by keeping the injunction in place.  Both motions should be denied.

## BACKGROUND

In July 2017, President Trump announced via Twitter that "the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military." On August 25, 2017, the President issued a memorandum memorializing that policy.  *See* 2017 Presidential Memorandum.  The 2017 Presidential Memorandum required the Department of Defense to return to the "policy and practice on military service by transgender individuals that was in place prior to June 2016 until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice" was warranted.  *Id.*  The memorandum also directed the Department to continue to prohibit "accession of transgender individuals into military service … until such time as the Secretary of Defense … provides a recommendation to the contrary that [the President] find[s] convincing."  *Id.*

The 2017 Presidential Memorandum ordered the Secretary of Defense to submit to the President, by February 21, 2018, "a plan for implementing" the policies and directives set out in the memorandum.  2017 Presidential Memorandum.  As "part of the implementation plan," the memorandum also directed the Secretary of Defense to "determine how to address transgender individuals currently serving in the United States military."  *Id.*

The Department began developing an implementation plan immediately after the President announced the ban on transgender service and accessions.  On August 29, 2017, Secretary Mattis issued a statement saying that the Department had "received the [August 2017] Presidential Memorandum" and that it would "carry out the president's policy direction." Milgroom Decl. Ex. U.  In particular, Secretary Mattis confirmed that the Department would

2

"develop a study and implementation plan." *Id.* To develop that plan, the Department would "establish a panel of experts … to provide advice and recommendations on the implementation of the president's direction," and that after that panel issued its recommendations, Secretary Mattis would "provide [his] advice to the president concerning implementation of [the president's] policy directive." *Id.*

On September 14, 2017, Secretary Mattis issued two memoranda concerning military service by transgender individuals, one appending interim guidance and the other directing the implementation process. *See* Interim Guidance; Terms of Reference. In the Interim Guidance, Secretary Mattis again affirmed that the Department "will carry out the President's policy and directives" and will "comply with the Presidential Memorandum." Interim Guidance. Secretary Mattis also indicated that he would "present the President" with that implementation plan "[n]ot later than February 21, 2018," as required by the 2017 Presidential Memorandum. Interim Guidance.

In the document directing the implementation process, known as the "Terms of Reference," Secretary Mattis convened a panel to "develop[] an Implementation Plan on military service by transgender individuals, to effect the policy and directives in the Presidential Memorandum." Terms of Reference; *see also id.* (ordering an "independent multidisciplinary review and study of relevant data and information … *to inform the Implementation Plan*" (emphasis added)). The Terms of Reference stated that the Department of Defense was required to "return to the longstanding policy and practice … that was in place prior to June 2016," and asked the panel to update the "guidelines" in order "to reflect currently accepted medical terminology." *Id.*

3

Secretary Mattis directed that the "Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff, supported by a panel of experts … shall propose for [his] consideration recommendations supported by appropriate evidence and information" by January 2018.  Terms of Reference.  Around the time that Secretary Mattis issued his September 14 memoranda, the Acting Under Secretary of Defense for Personnel and Readiness, Anthony M. Kurta, issued a memorandum entitled "Military Service by Transgender Individuals—Panel of Experts."  That memorandum announced that Acting Under Secretary Kurta would "chair a Panel of Experts ('Panel') … to support the … development of an Implementation Plan on military service by transgender individuals."  Milgroom Decl. Ex. Y.

In February 2018, that panel produced its proposed implementation plan in a report "on military service by transgender individuals."  Panel Report.  Consistent with the President's directives, that Panel Report recommended barring military service by transgender persons who have undergone or require gender transition.  The Panel Report also recommended an exception for currently serving servicemembers "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy."  *See id.* at 5.

On February 22, 2018, Secretary Mattis submitted a memorandum to the President presenting the proposals contained in the panel's report.  *See* Mattis Plan.  On March 23, 2018, the date named in the 2017 Presidential Memorandum for the reinstatement of a ban on military service by transgender people, the President issued a memorandum summarizing the recommendations that were developed by the panel of experts and endorsed by Secretary Mattis.  *See* 2018 Presidential Memorandum.  The 2018 Presidential Memorandum stated that it revokes the 2017 Presidential Memorandum and "any other directive [he] may have made with respect to military service by transgender individuals."  *Id.*  It also directed the Secretary of Defense to

4

"exercise [his] authority to implement any appropriate policies" regarding service by transgender individuals.  *Id.*

**ARGUMENT**

I.      **THE GOVERNMENT'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE MATTIS PLAN DOES NOT DIVEST THIS COURT OF JURISDICTION TO HEAR PLAINTIFFS' CHALLENGE**

The government moves to dismiss Plaintiffs' second amended complaint, principally on the ground that the Mattis Plan divests this Court of jurisdiction because it renders Plaintiffs' claims moot and deprives them of standing.[2]  The government also moves to dissolve this Court's preliminary injunction on the same grounds.  The government's mootness and standing arguments have no merit and require neither dismissal nor dissolution of the injunction.

     **A.**      **Plaintiffs' Claims Are Not Moot**

"The burden of demonstrating mootness 'is a heavy one.'"  *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998) ("The burden of establishing mootness rests on the party that raises the issue.  It is a 'heavy' burden." (citation omitted)).  The party urging mootness must demonstrate that "the challenged conduct [has ceased] such that there is no reasonable expectation that the wrong will be repeated," and it is accordingly "impossible for the court to grant any effectual relief whatever to the prevailing party."  *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009); *see also Seeger v. U.S. Dep't of Def.*, __ F. Supp. 3d __, 2018 WL 1568883, at *10 (D.D.C. Mar. 30, 2018) (party urging mootness "must show that events have occurred which

---

[2]     The government also moves to dismiss Plaintiffs' substantive causes of action for failure to state a claim or, in the alternative, for summary judgment.  Plaintiffs address those arguments in their separate summary judgment brief, filed today.

5

prevent the court from granting the relief sought" (citing *Burlington N.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996))).

Defendants' mootness argument fails at the outset because it is based on the faulty premise that Plaintiffs are challenging only the 2017 Presidential Memorandum.  But Plaintiffs' Second Amended Complaint also challenges and seeks to enjoin the policy in the Mattis Plan. There remains an "actual, ongoing controvers[y]" regarding whether the Mattis Plan is constitutional and should be enjoined.  *Honig v. Doe*, 484 U.S. 305, 317 (1988).

Defendants fail to meet their burden for two additional reasons.  First, the underlying violation—subjecting Plaintiffs to a facially discriminatory policy based on their transgender status—has not been cured by the Mattis Plan.  Instead, the Mattis Plan carries out substantially the same policy already enjoined by the Court and inflicts substantially the same injuries on Plaintiffs.  Second, even if the Mattis Plan were independent of the President's 2017 directives that this Court has enjoined, Defendants do not satisfy "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).  When a governmental policy is under challenge, the government cannot evade judicial review by issuing a new policy that still disadvantages the plaintiffs.  *See Northeastern Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 661-662 (1993).  The government cannot possibly meet that burden here:  Defendants have stated their intention to enforce the Mattis Plan, US PI Br. 2, thus ensuring that the wrongful behavior will recur.

### 1.    Plaintiffs' second amended complaint challenges the Mattis Plan.

Defendants' motion to dismiss starts from the mistaken premise that Plaintiffs are challenging *only* the 2017 Presidential Memorandum, and not the implementation of that policy in the Mattis Plan.  That is incorrect.  Plaintiffs' Second Amended Complaint, filed on April 6,

2018, also challenges the policies in the Mattis Plan.  Paragraph 85 explains that "[t]he policy set forth in the February 22 Memorandum and its attachment expressly targets transgender individuals," Second Am. Compl. ¶ 85 (Dkt. 106), and Paragraph 86 explains that the same policy "prevents any transgender individual from serving consistent with their gender identity," *id.* ¶ 86, subject to limited carve-outs for some currently serving members, *id.* ¶ 87.  The operative complaint's causes of action clearly allege that "[t]he *policies*"—*i.e.*, the ban on transgender service as reflected in *both* the 2017 Presidential Memorandum and the Mattis Plan—violate the Fifth Amendment.  *See id.* ¶¶ 92, 97 (emphasis added).

The centerpiece of the government's mootness argument—that the 2017 Presidential Memorandum has been superseded by the Mattis Plan—is therefore beside the point.  Although the Mattis Plan is properly understood as an implementation of the 2017 Presidential Memorandum, not new and independent policymaking by the Department of Defense, Plaintiffs have challenged "the policies" reflected in *both* memoranda.  Where Plaintiffs have filed an amended complaint, any jurisdictional motion to dismiss must meet all the allegations in the amended complaint, not merely those in a previous version.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-474 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."); *see also* Fed. R. Civ. P. 15(d).

### 2.    The Mattis Plan does not establish a new policy.

Having trained its motion to dismiss on Plaintiffs' initial challenge to the 2017 Presidential Memorandum, the government contends that the Mattis Plan presents a "substantially different controversy" from the policy this Court enjoined, and so Plaintiffs' challenge is moot.  That argument has no merit.  *See Global Tel*Link v. FCC*, 866 F.3d 397, 414 (D.C. Cir. 2017) (stating that "replacing the challenged law 'with one that differs only in some

insignificant respect' and 'disadvantages [petitioners] in the same fundamental way' does not moot the underlying challenge").

This Court has already recognized that the 2017 Presidential Memorandum gave the Department no authority to develop a policy that diverged from the policy directives in that memorandum. PI Order 37 (observing that the Secretary's authority is limited to deciding "how to best implement a policy under which transgender accession is *prohibited*, and discharge of transgender service members is *authorized*"). Instead, the 2017 Presidential Memorandum required the Department to return to the "policy and practice on military service by transgender individuals that was in place prior to June 2016"—*i.e.*, to ban open service by transgender individuals—and to prohibit accessions by transgender individuals indefinitely. 2017 Presidential Memorandum. To effectuate those policies, the 2017 Presidential Memorandum mandated that the Secretary "*shall* submit to [the President] a plan for implementing" the President's policies by February 21. *Id.* (emphasis added); *see Karnoski v. Trump*, 2018 WL 1784464, at *6 (W.D. Wash. Apr. 13, 2018) ("The 2017 Memorandum did not direct Secretary Mattis to determine *whether* or not the directives should be implemented, but instead ordered the directives to be implemented by specific dates and requested a plan for *how* to do so."), *appeal docketed*, No. 18-35347 (9th Cir. Apr. 30, 2018).

Secretary Mattis made clear that his authority was limited by the President's orders. Shortly after issuance of the 2017 Presidential Memorandum, Secretary Mattis affirmed that the Department "will carry out the President's policy and directives" and will "comply with the Presidential Memorandum." Interim Guidance. Secretary Mattis directed his staff to "develop[] an Implementation Plan on military service by transgender individuals, to effect the *policy and directives in [the] Presidential Memorandum*." Terms of Reference (emphasis added).

8

Secretary Mattis described the process that DOD would undertake to develop the plan in a September 14, 2017 memorandum setting forth "Terms of Reference" for "Implementation of [the] Presidential Memorandum on Military Service by Transgender Individuals." *Id.* The Terms of Reference directed the Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff to assemble a panel drawn from the DOD and the Department of Homeland Security in order to conduct an "independent multidisciplinary review and study of relevant data and information … to inform the Implementation *Plan*." *Id.* (emphasis added).

The Terms of Reference instructed the panel to comply with the directives in the 2017 Presidential Memorandum. In defining the panel's assignment with respect to enlistment, Secretary Mattis did not ask for a recommendation as to whether accession of transgender individuals should be allowed, but rather informed his subordinates that the Department had been "direct[ed]" to prohibit accessions. Terms of Reference. The panel was asked to consider only how the "guidelines" for such a policy should be updated "to reflect currently accepted medical terminology." *Id.* Similarly, with respect to service by transgender individuals, the panel was told that DOD was required to "return to the longstanding policy and practice … that was in place prior to June 2016," *i.e.*, a ban. *Id.* In February 2018, the Department completed that process—on precisely the timeline directed by the President's memorandum—and submitted a plan to the President that would "implement" his directive.

Contrary to Defendants' arguments, the contents of the Mattis Plan operationalize the policy the President ordered—a ban on transgender people serving their country. Defendants' policy does not exclude individuals with gender dysphoria from military service. The accession and retention standards exclude "transgender persons who require or have undergone gender transition" (Mattis Plan 2), and require any transgender person who enlists or serves in the

9

military to "adhere to all standards associated with their biological sex" (Panel Report 42).  By definition, transgender people do not identify or live in accord with their assigned sex at birth. By preventing all such persons from serving, the policy targets transgender people as a class. *See* Pls.' SJ Br. 6-10 (discussing merits).[3]

Defendants' claim that the Mattis Plan presents "a substantially different controversy" than the President's directive because it permits transgender people to serve in their birth sex has no merit.  Just as a policy allowing Muslims to serve in the military if they renounce their Muslim faith would be a ban on military service by Muslims, a policy requiring transgender individuals to serve in their birth sex *is* a ban on transgender service.  The Mattis Plan thus effectuates what the President, on July 26, 2017, announced that he intended to do:  It bars transgender individuals from joining or serving in our nation's military.[4]

Defendants' attempted reliance on *Department of Treasury v. Galioto*, 477 U.S. 556 (1986) (per curiam) is unavailing.  In *Galioto*, the district court enjoined a federal law barring certain formerly involuntarily committed persons from buying firearms, with no avenue for seeking individualized relief, while providing an avenue for such relief for convicted felons.  *Id.*

---

[3]     The government erroneously contends that the Mattis Plan is like the Carter policy—*i.e.*, the open service policy adopted in 2016—in that both purportedly require transgender people to serve in their biological sex.  *See, e.g.*, Defs.' Reply Supp. Mot. Dissolve Prelim. Inj., *Stockman v. Trump*, No. 5:17-cv-01799, Dkt. 105 (C.D. Cal. May 7, 2018).  In fact, the two policies are entirely distinct.  The Carter policy permits transgender individuals to transition and to serve in accord with their gender identity.  The Mattis Plan prohibits transgender individuals from transitioning and requires them to serve in their birth sex.

[4]     Nor does the Mattis Plan's limited grandfathering of service by current transgender servicemembers mean that it is a new or different policy.  The 2017 Presidential Memorandum specifically anticipated that the implementation plan might treat currently serving transgender service members differently, stating that, "[a]s part of the implementation plan," the Secretary "shall determine how to address transgender individuals currently serving in the United States military."  2017 Presidential Memorandum.  In addition, that provision does not insulate currently serving Plaintiffs from the serious constitutional and other harms caused by the Mattis Plan, as set forth in Section I.B.1 *infra*.

10

at 558.  While the government's appeal was pending, Congress amended the law to permit anyone barred from buying firearms, for any reason, to seek individualized relief.  *Id*.  The Supreme Court held that the plaintiff's challenge was moot, since the disparate treatment of about which he complained had been entirely eliminated by the new law.  *Id*. at 558-559.  In contrast, the Mattis Plan presents substantially the same equal protection issue and inflicts substantially the same constitutional injury as the policy originally challenged by Plaintiffs and enjoined by this Court.

### 3.    The government's "voluntary cessation" does not moot this challenge.

Even if the Mattis Plan were a new policy separate from the 2017 Presidential Memorandum that it implements—and it is not—this case is still not moot.  A defendant's voluntary cessation of allegedly unlawful activity—including a governmental defendant's repeal or amendment of a policy under challenge—generally does not render a case moot.  *See Northeastern Fla. Contractors*, 508 U.S. at 661-662; *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  In circumstances such as these, Defendants "bear[] the heavy burden of showing it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to occur" and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016).

Defendants cannot meet that burden.  The Mattis Plan has not "completely and irrevocably eradicated the effects" of the President's policy directives; like the directives already enjoined by this Court, it targets transgender people and bars them from military service.  It harms Plaintiffs in substantially the same way as the ban announced in the President's tweets and formalized in the 2017 Presidential Memorandum.  Defendants' claim (US SJ Br. 2-3) that they have not yet implemented the Mattis Plan is irrelevant.  As Defendants acknowledge, they seek

11

to dissolve this Court's preliminary injunction "in order to permit the military to implement" the Mattis Plan. US PI Br. 2.

The government contends that the voluntary cessation doctrine does not apply here because it would be improper to impute an intention to evade judicial review to the President. That is not the point. Whether this case is moot does not turn on whether Defendants *intended* to evade judicial review by issuing the Mattis Plan. Rather, the issue is whether this Court's jurisdiction, once established, is ousted by a modification of the policy under challenge that continues to inflict substantially the same harm. *Northeastern Florida Contractors* and *City of Mesquite* make clear that the Court does not lose jurisdiction in such circumstances.

Nor does *Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) (en banc), support Defendants' argument that the voluntary cessation doctrine does not apply to them. That case recognizes that Congress is different from other actors for voluntary cessation purposes because enactment of federal legislation is extraordinarily difficult, given the bicameralism and presentment requirements of the Constitution. *See* U.S. Const. art. I, § 7. When Congress repeals an offending federal statute or allows such a statute to lapse by its own terms, thus terminating the immediate controversy, it may be appropriate to presume that Congress cannot readily re-enact the same statute into force. But no such difficulties attend the issuance of policies governing the military by the President and the Secretary of Defense. Both the President and the Secretary of Defense can easily alter military policies at any time, which gives rise to the precise concern that animates the voluntary cessation doctrine—that a defendant will simply return to the challenged practice as soon as the shadow of litigation has lifted. Here, Defendants have expressly stated their intention to do so.

### B.    Plaintiffs Have Standing To Challenge The Mattis Plan

When this Court denied Defendants' first motion to dismiss in part and concluded

Plaintiffs had standing to sue, it recognized that the ban on military service by transgender

individuals injures both current and aspiring servicemembers.  As the Court explained in its

preliminary injunction order, "Plaintiffs have established that they will be injured by these

directives, due both to the inherent inequality they impose, and the risk of discharge and denial

of accession that they engender."  PI Order 2.  The Court found that "the Accession and

Retention Directives of the Presidential Memorandum impose a competitive barrier that the

Named and Pseudonym Plaintiffs are substantially likely to encounter" and "that this barrier

constitutes an injury in fact."  *Id*. at 43.  "'The injury in fact element of standing in an equal

protection case is the denial of equal treatment resulting from the imposition of the barrier.'"  *Id*.

at 39 (quoting *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 51 (D.C. Cir. 2016)).

Plaintiffs continue to suffer those injuries under the Mattis Plan.[5]  Under the Mattis Plan,

current servicemembers will continue to be subjected to the "inherent inequality" imposed by the

ban.  At best, they will be permitted to serve only on sufferance, under conditions of fundamental

inequality and caste-like inferiority, and subject to the debilitating stigma and indignity of being

officially labeled as members of a group that is mentally unstable, burdensome, and dangerous to

---

[5]    Plaintiffs have standing because (1) they are suffering an injury-in-fact, (2) there is a causal connection between that injury and the conduct complained of, and (3) a decision by the court in their favor would be likely to redress their injury.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  While "the presence of one party with standing is sufficient," *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 53 n.2 (2006), each of the Plaintiffs satisfies these requirements.  Defendants focus their arguments on the standing requirement of injury-in-fact, and so this brief principally discusses that point as well. In any event, there can be no dispute that the other two requirements of standing are satisfied; Plaintiffs' injuries flow directly from the ban on transgender military service that Defendants have announced, and an injunction by this Court will redress those injuries.

the privacy and safety of others.  Plaintiffs who are aspiring transgender servicemembers are barred from accession, and the Plaintiff who is a current transgender servicemember who has not yet sought to transition will be subject to discharge if she does so.  Defendants' argument that these Plaintiffs lack standing because the Mattis Plan is not yet in effect is specious.  The only reason those individuals could currently serve in the military is that this Court enjoined the unconstitutionally discriminatory exclusion set forth in the 2017 Presidential Memorandum.  If this Court were to dissolve the injunction as Defendants request, Defendants would implement the Mattis Plan, and those Plaintiffs would be barred from serving.  In effect, Defendants are arguing that Plaintiffs lack standing because they obtained a preliminary injunction.  Unsurprisingly, there is no support for that proposition.

### 1.    Current servicemembers are harmed by the inherent inequality, stigma, and hamstrung military careers imposed by the Mattis Plan.

Defendants claim that Jane Does 2 through 5 and John Doe 1—current servicemembers diagnosed with gender dysphoria—lack standing because under the Mattis Plan, they "may continue to serve in the military in their preferred gender and receive medically necessary treatment" and that they face only "possible future harm."  US SJ Br. 6.[6]  But Defendants ignore the serious harms that these Plaintiffs face under the Mattis Plan, and overstate how much protection the grandfather provision provides.

---

[6]    Kibby's standing should be analyzed in the same way.  Defendants have represented that "[b]ecause Midshipman Kibby is considered to be a current service member who has been diagnosed with gender dysphoria, the exemption for current service members applies to Midshipman Kibby and he will be allowed to return to the U.S. Naval Academy and commission as an officer, provided he meets the Academy's commissioning requirements."  US SJ Br. 11. Kibby is thus similarly situated to the five currently serving Plaintiffs that Defendants claim are subject to the grandfather provision.

14

The Mattis Plan subjects Plaintiffs to inherent inequality.  Plaintiffs suffer the disparate adverse treatment of being marked as members of a small group permitted to serve only as an exception to a policy that otherwise subjects them to discharge.  As a result of the Mattis Plan, they are being deemed mentally unstable, unfit to serve, burdensome, and disruptive of unit cohesion.  Although these five Plaintiffs may be exempted from automatic discharge and permitted to serve for some period of time—so long as their presence does not compromise the government's litigation position—the Mattis Plan places them in an inferior class and sends a clear message that they should not be part of the military.  Having been branded as part of a class that is unfit to serve, these Plaintiffs will be treated differently than their peers, face a substantial risk they will have reduced opportunities for assignments, promotion, training, and deployment, and be placed in harm's way by the eroded bonds of trust with their fellow servicemembers and leadership.  *See, e.g.*, Dkt. 40-2 (Jane Doe 2 Decl.) ¶ 15 (detail assignment requires her to drive far from base and keeps her from supervising soldiers she is assigned to mentor and train).[7]  This is precisely the type of unequal treatment that constitutes injury-in-fact in similar equal protection cases.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("The injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'").

---

[7]    *See also, e.g.*, Dkt. No. 51-4 (Eitelberg Decl.) ¶ 11 (transgender ban "erodes the value that members serving with them place on their contributions or performance" and "legitimizes any bias or prejudice that may have existed among non-transgender members prior to training"); *id.* ¶ 8 (transgender ban causes serving individuals to be "stashed," maintained in dead-end assignments, given "make-work," or held in "holding pattern" positions); Dkt. No. 51-3 (Fanning Supp. Decl.) ¶ 6 (transgender ban "serves to substantially limit[] [transgender service members'] advancement and promotion opportunities in the military; and undermines their standing with superiors and peers"); Dkt. No. 51-1 (Mabus Supp. Decl.) ¶¶ 4-7 (transgender ban affects command decisions about deployments and permanent change of station (PCS) moves, resulting in lost opportunities relating to assignent, advancements, and promotions).

Defendants compare this case to *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), in which a group of organizations challenged a provision in the Foreign Intelligence Surveillance Act out of concern that their communications with certain foreign individuals would be intercepted.  The Supreme Court ruled that those groups did not have standing, because it was "speculative" whether the government would target their communications, and their theory of harm relied on a "highly attenuated chain of possibilities."  *Id*. at 410.  But here, it is not speculative that the Mattis Plan directly harms these Plaintiffs.  It relegates them to an inferior class, allowed to serve only as a one-time, disfavored exception, under demeaning conditions of fundamental inequality.  That some Plaintiffs will only meet concrete obstacles to career advancement in the future is immaterial; it is not speculation that a policy that "facilitate[s] or exacerbate[s] discrimination" will have profoundly negative consequences for Plaintiffs' continued service and career opportunities.  *In re Navy Chaplaincy*, 697 F.3d 1171, 1177 (D.C. Cir. 2012) (plaintiff clergy had standing to challenge the constitutionality of alleged religious bias in promotion proceedings, even though they had not yet participated in such proceedings).

Indeed, as this Court previously held, the fact that these Plaintiffs have been subjected to a discriminatory and stigmatizing classification—being placed into a unique class of persons permitted to serve only as an exception to a policy requiring discharge of the class—is sufficient to establish standing.  PI Order 2 ("Plaintiffs have established that they will be injured by these directives, due both to the inherent inequality they impose, and the risk of discharge and denial of accession that they engender.").  When a government policy facially singles out and demeans a disfavored class, that discrimination in and of itself constitutes an injury sufficient to confer standing to challenge that policy.  As the Supreme Court has explained:

> [D]iscrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the disfavored group as "innately inferior" and therefore

> as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

*Heckler v. Mathews*, 465 U.S. 728, 739-740 (1984); *see also, e.g.*, *Hassan v. City of New York*, 804 F.3d 277, 289-290 (3d Cir. 2015) (stating that "'discriminatory classification is itself a penalty' … and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake"); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 293, 294 n.44 (W.D. Pa. 2017) ("[S]ettled precedent provides that impermissible distinctions by official edict cause tangible Constitutional harm" and "a bare equal protection violation is sufficient to constitute an injury in fact for the purposes of establishing Article III standing because unequal treatment under the law is harm unto itself."). Moreover, the severability of the grandfather provision underscores the discriminatory nature of the classification: Defendants are ready to abandon their "commitment" to "honor [Plaintiffs'] service," if necessary to ensure that other transgender individuals cannot access into the military. Panel Report 43.

### 2. Jane Doe 6, a current, transgender servicemember without a military diagnosis of gender dysphoria, will be barred from service under the Mattis Plan.

Jane Doe 6 is transgender and currently serves in the Army. She had made a behavioral health appointment to obtain a transition plan and begin her gender transition when President Trump tweeted his announcement that transgender people were no longer permitted to serve. As a result, she never disclosed her transgender identity to military doctors and never received a military diagnosis of gender dysphoria. Second Am. Compl. ¶¶ 22-23. Under the Mattis Plan, because Jane Doe 6 never received a diagnosis of gender dysphoria from a military physician, Jane Doe 6 faces discharge if she seeks gender transition.

Defendants argue that is an injury of her own making. They contend than Jane Doe 6 is free to seek a diagnosis of gender dysphoria from a military doctor, which would enable her to

serve under the Mattis Plan, which states that transgender servicemembers who obtained such a diagnosis between the effective date of the Carter policy and the effective date of "any new policy"—including the Mattis Plan itself—will be included within the "grandfathered" class. But Jane Doe 6 has good reason not to seek such a military diagnosis.  The Mattis Plan prohibits her from continued service if she undergoes transition.  She faces a Hobson's choice—remain in service and disavow who she is, or come out and face discharge.  Either way, she faces injury and has standing to challenge the Mattis Plan.

Only by not disclosing her transgender identity or seeking to transition can Jane Doe 6 protect herself from the overt bias and disruption that would result from serving in the military as a member of an officially inferior class.  Her decision not to assume those serious risks cannot be considered self-inflicted injury.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (plaintiffs demonstrated injury-in-fact where they would have to take mitigation steps to avoid the risk of "gene flow"); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 182 (2000) (plaintiff suffered injury-in-fact where she no longer engaged in recreational activities near river due to concerns about harmful effects from discharged pollutants); *Oklahoma Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 190 (D.C. Cir. 2014) (where pursuing relief under a statute is not "certain or complete" and could be subject to a condition "inconsistent with [a state's] current … authority," state's decision to pursue litigation instead of seeking relief under that statute does not "render [its] injury self-inflicted").

### 3.    Jane Doe 7 and John Doe 2, aspiring servicemembers who transitioned years ago, are barred from service under the Mattis Plan.

With respect to the prospective servicemembers who have already undergone gender transition and taken steps toward enlistment process, Jane Doe 7 and John Doe 2, Defendants assert that they are "purposefully not seeking to join the military at this time" and if they did

attempt to join, "they would not be denied accession on the basis of their gender transition." US

SJ Br. 12. Neither is true. Both Plaintiffs are seeking enlistment, Jane Doe 7 Decl. ¶ 7, 9-10,

John Doe 2 Decl. ¶ 11, and may continue to do so only as long as this Court's order remains in

place. Jane Doe 7 and John Doe 2 both underwent gender transition years ago. Second Am.

Compl. ¶¶ 25, 31. Under the plain terms of the Mattis Plan, they are barred from enlistment

because they "have undergone gender transition." Mattis Plan 2.

Defendants try to avoid that clear result by again invoking the preliminary injunction that

this Court (and others) have put in place, explaining that "DoD is currently allowing individuals

who have undergone gender transition to access into the military pursuant to the preliminary

injunctions entered in this and the related cases." US SJ Br. 12. But as explained above,

Plaintiffs do not lack standing simply because a preliminary injunction is in place that mitigates

their injuries pending the ultimate outcome of the litigation. Indeed, Defendants do not cite a

single case that stands for that proposition. The question is not whether Plaintiffs are being

injured by the *enjoined* ban; the question is whether Plaintiffs would be injured if Defendants

were to *implement* such a ban, as they seek to do. Because Jane Doe 7 and John Doe 2 would be

disqualified from military service if Defendants are allowed to carry out the ban, they have

standing to challenge it.[8]

---

[8]    Defendants also argue that Jane Doe 7 and John Doe 2 have not suffered injury-in-fact because they could apply for a waiver. The Court has already rejected that argument. PI Order 46-47. The fact that Jane Doe 7 and John Doe 2 would have to seek a waiver to accede is itself harm sufficient to grant standing, as that requirement constitutes a discriminatory barrier disadvantaging transgender individuals. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). Moreover, there is no evidence that waivers were ever granted for accession by transgender individuals. PI Order 46.

19

**4.    Dylan Kohere, an aspiring servicemember and college student currently taking ROTC classes, will be barred from service under the Mattis Plan.**

Dylan Kohere, a college student, is barred from joining his university's ROTC program because he is transgender. Defendants contend that because this Court's preliminary injunction allows transgender individuals to enroll in the ROTC program and then join the military, "if Mr. Kohere attempted to enroll in the ROTC program and apply for a scholarship, he would not be denied either on the basis of his transgender status." US SJ Br. 13. That argument suffers from the same flaws as those discussed above; the fact that Kohere has obtained a preliminary injunction does not mean that he lacks standing. To the contrary, if Defendants are allowed to put the implementation plan into effect, Kohere will be prohibited from contracting into ROTC and ultimately from entering into military service.

Defendants have already acknowledged that the accession ban prevents Kohere from enrolling as a cadet in his university ROTC program. Dkt. 45-3 (Burns Decl.) ¶ 6. And Defendants do not claim that Kohere will be able to join the military under the implementation plan; they simply offer that Kohere, provided he has not been diagnosed with gender dysphoria, may serve "in [his] biological sex." US SJ Br. 13. That is tantamount to saying that Kohere may serve if he is not transgender. But Kohere *is* transgender. The Mattis Plan bars him from serving as such.

Defendants also argue that because Kohere is unlikely to seek accession into the military until 2021, his injury is too remote to be considered imminent for standing purposes. But as the D.C. Circuit explained in this case, Kohere's "inability to accede in the future … disqualifies [him] from educational opportunities *now*." *Doe v. Trump*, 2017 WL 6553389, at \*3 (D.C. Cir. Dec. 22, 2017) (emphasis added).

20

**5.      Plaintiffs' claims against the President are redressable.**

Importing arguments from their partial motion for judgment on the pleadings and to partially vacate the preliminary injunction, Defendants argue that the President should be dismissed from the case because any injuries caused by the President are not redressable by the Court. US SJ Br. 14-17. That issue is already fully briefed, and ready for the Court's decision. For the reasons set forth in Plaintiffs' opposition (Dkt. 92) and notice of supplemental authority (Dkt. 111), Defendants' extreme claim that the President is absolutely immune from suit should be rejected.

As a general matter, the President is not immune from declaratory relief. *See Clinton v. City of New York*, 524 U.S. 417, 425 n.9 (1998) (affirming entry of declaratory judgment against President Clinton stating that Line Item Veto Act was unconstitutional); *National Treasury Emps. Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) ("[N]o immunity established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief."); *see also Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (vacating injunctive relief against President Trump, but not dismissing him in suit for declaratory relief), *vacated as moot*, 874 F.3d 1112 (9th Cir. 2017). And here, it is particularly appropriate for the Court to issue a declaratory judgment running against the President, because it the President who initially directed the ban on military service by transgender people, and because the steps taken by Defendants since have been intended to formulate and support a policy consistent with the President's ban. *See Karnoski*, 2018 WL 1784464, at *13 ("The Court concludes that, not only does it have jurisdiction to issue declaratory relief against the President, but that this case presents a 'most appropriate instance' for such relief. The Ban was announced by President Trump (@realDonaldTrump) on Twitter, and was memorialized in the 2017 and 2018

21

Presidential Memorandums, which were each signed by President Trump." (internal citation omitted)).

*    *    *

The government has failed to carry both its heavy burden of demonstrating mootness and its burden of demonstrating that Plaintiffs have failed to plausibly allege a constitutional injury from Defendants' maintenance of a ban on military service by transgender individuals. The motion to dismiss on jurisdictional grounds should be denied.

## II.   DEFENDANTS HAVE NOT JUSTIFIED DISSOLUTION OF THE PRELIMINARY INJUNCTION

The party seeking modification or dissolution of a preliminary injunction bears the burden of establishing that "a significant change either in factual conditions or in law renders" continued enforcement of the injunction "detrimental to the public interest." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (internal quotation marks omitted); *see also Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (the "party seeking relief bears the burden of establishing that changed circumstances warrant relief"); *SEC v. Vision Commc'ns, Inc.*, 1995 WL 109037, at *2 (D.D.C. Mar. 6, 1995) ("An injunction may be dissolved where, for instance, changed circumstances eviscerate the justification therefor."). The change in circumstances must be not only significant, but also "unforeseen" at the time the injunction issued. *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932). Moreover, the injunction "may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree … have not been fully achieved." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248 (1968).

Defendants fall short of meeting their demanding burden for dissolution of the preliminary injunction. Nothing of substance has changed in this case; although Defendants invoke the issuance of the Mattis Plan as a fundamental alteration in their policy towards military service by transgender individuals, the plain terms of the Plan establish otherwise. The Mattis

22

Plan, no less than the presidential directive that it implements, reflects impermissible discrimination in violation of the Fifth Amendment and causes irreparable harm to Plaintiffs. This Court's preliminary injunction should therefore remain in place pending the Court's final judgment in this case.

      **A.**      **Plaintiffs Remain Likely To Succeed On The Merits**

            **1.**      **The government's policy barring transgender people from serving in the military requires heightened scrutiny.**

                    **a)**      **Heightened scrutiny applies because the Mattis Plan facially discriminates based on transgender status and sex.**

This Court has already held that "discrimination on the basis of someone's transgender identity is a quasi-suspect form of classification that triggers heightened scrutiny" and that the President's directive is "a form of discrimination on the basis of gender, which is itself subject to intermediate scrutiny." PI Order 61, 62; *see also* DTM 16-005, Attachment, at 5.a ("[D]iscrimination based on gender identity is a form of sex discrimination."); *accord Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017) (applying intermediate scrutiny); Order, *Stockman v. Trump*, No. 5:17-cv-01799, Dkt. 79 (C.D. Cal. Dec. 22, 2017) (same); *Karnoski v. Trump*, 2017 WL 6311305, at *7 (W.D. Wash. Dec. 11, 2017) (same); *see also Karnoski v. Trump*, 2018 WL 1784464, at *11 (W.D. Wash. Apr. 13, 2018) (concluding upon further examination that such discrimination warrants strict scrutiny). Like other types of discrimination based on suspect and quasi-suspect classifications, careful scrutiny of governmental policies based on a person's transgender status is required because such policies are highly likely to reflect improper bias or prejudice rather than legitimate concerns.

Defendants argue that the Mattis Plan triggers only rational-basis review, because it "draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not transgender status." US SJ Br. 17; US PI Br. 13. That argument is

meritless.  The policy articulated in the Mattis Plan is, on its face, by design, and in effect, a ban on open service by transgender individuals, not (as Defendants contend) a policy contingent on whether a person has gender dysphoria.

As the title of the Panel Report indicates, it is a policy about "transgender persons."  The accession and retention standards exclude transgender people who "require or have undergone gender transition" and require any transgender person who enlists or serves in the military to "adhere to all standards associated with their biological sex."  Panel Report 32, 42.  By definition, transgender people do not identify or live in accord with their assigned sex at birth.  By preventing all such persons from serving, the policy targets transgender people as a class.  Such a policy "force[s] transgender service members to suppress the very characteristic that defines them as transgender in the first place," *Karnoski*, 2018 WL 1784464, at *6, such that it remains a ban on transgender service that triggers heightened scrutiny.

In addition, Defendants do not even address the second, independent reason the Court identified for applying intermediate scrutiny:  The Mattis Plan is "inextricably intertwined with gender classifications."  PI Order 63.  As was true under the 2017 Presidential Memorandum, under the Mattis Plan, "[a] service member who was born a male is punished … if he identifies as a woman, whereas that same service member would be free to join and remain in the military if he was born a female, or if he agreed to act in the way society expects males to act."  *Id.*  Accordingly, intermediate scrutiny applies.

### b) Deference, even if it applies, does not require or permit application of a lower standard of scrutiny in military cases.

Defendants alternatively argue that the Court should apply "rational basis type review"— or at most an extremely watered-down version of heightened scrutiny—because the challenged

policy involves military decision-making.  US SJ Br. 21-22; US PI Br. 19.  That argument fails for numerous reasons.

Under *Rostker*, "meaningful scrutiny of the constitutionality of the [challenged policies] is appropriate despite the fact that they pertain to decisions about military personnel."  PI Order 63; *see also Rostker v. Goldberg*, 453 U.S. 57, 70 (1981) (stating that "deference does not mean abdication").  Indeed, under controlling precedent, military policies that discriminate based on sex are subject to the same heightened scrutiny applied in other settings.  *See Rostker*, 453 U.S. at 71 (declining "to apply a different equal protection test because of the military context"); *see also United States v. Virginia*, 518 U.S. 515, 550 (1996) (carefully scrutinizing the extensive statistical and expert evidence about gender-based differences proffered by the Commonwealth of Virginia to justify its exclusion of women from the Virginia Military Institute).

When a military regulation infringes fundamental constitutional rights, careful scrutiny of the government's evidence and arguments is required.  *See* Pls.' SJ Br. 11-17; *see also Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (holding that Don't Ask, Don't Tell statute was subject to heightened scrutiny); *Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 911-23 (C.D. Cal. 2010) (same), *vacated on other grounds*, 658 F.3d 1162 (9th Cir. 2011).

Defendants overread the applicable precedent in characterizing the scrutiny that applies to military decision-making.  Defendants claim that *Schlesinger v. Ballard*, 419 U.S. 498 (1975) shows that *post hoc* justifications for sex-based discrimination are sufficient in military cases.  US SJ Br. 18-19; US PI Br. 15.  That argument is incorrect.  *Ballard* predated the Supreme Court's definitive adoption of heightened scrutiny for sex-based classifications in *Craig v. Boren*, 429 U.S. 190 (1976), and so does not provide useful guidance about the appropriate standard for sex-based classifications in any context.  In addition, *Ballard* did not endorse

25

reliance on *post* hoc justifications.  To the contrary, the Court's decision noted that, *at the time Congress considered the challenged statute*, which provided differential limits for the times that male and female officers could serve before being discharged, Congress sought to compensate for the fact "that women line officers had less opportunity for promotion than did their male counterparts."  419 U.S. at 508; *see also id*. at 508 & n.12 (quoting legislative history showing that Congress recognized at the time that women had less opportunity for promotion and that male officers would be discharged earlier than female officers).

Defendants also point to *Rostker*, but the Court upheld the sex-based classification there only after determining that it was substantially related to an important governmental interest. Only after determining that the law met that threshold requirement did the Court defer to Congress' selection of one policy alternative over another.  In addition, Congress's decision about whether to change the law to require selective service for women can hardly be considered a *post hoc* justification.  Unlike in this case, where Defendants' study was circumscribed by the President's directive to ban service by transgender individuals, *see* Terms of Reference, Congress was completely free to adopt any policy it wished.

Defendants argue that *Rostker* upheld a discriminatory law based on mere "administrative convenience."  US SJ Br. 22-23; US PI Br. 18-19.  "Administrative convenience," however, was hardly the sole or even the primary basis for excluding women from the draft.  Instead, the Court upheld the exclusion of women from the draft because it was "closely related to Congress' purpose" of "develop[ing] a pool of potential combat troops."  453 U.S. at 79; *see also Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (plurality op.) (explicitly rejecting "administrative convenience" as a legitimate rationale for military spousal benefits statute treating servicemembers differently on the basis of sex).  And in discussing the administrative issues that

26

would result from drafting women, the Court focused on Congress's careful judgments about how doing so would affect military preparedness, flexibility, and efficiency—not the military's "convenience." *Rostker*, 453 U.S. at 81-82 ("Most significantly, Congress determined that staffing noncombat positions with women during a mobilization would be positively detrimental to the important goal of military flexibility."). Nothing in *Rostker* suggests that administrative convenience alone would have sufficed.

Defendants also contend that "the political branches have significant latitude to choose among alternatives in furthering military interests." US SJ Br. 21; US PI Br. 18-19. But in *Rostker*, the Court upheld the challenged statute only because it withstood the same careful scrutiny required in non-military cases. *See Rostker*, 453 U.S. at 67, 74-80 (explaining that gender-based classifications are unconstitutional where they are based on "overbroad generalizations" of sex-based distinctions, and finding that the male-only registration was based not on such a generalization, but on exclusion of women from combat positions).

Finally, Defendants note that the Supreme Court tolerated "inconsistencies resulting from line-drawing" in *Goldman v. Weinberger*, 475 U.S. 503 (1986). US SJ Br. 21-22; US PI Br. 19. But in *Goldman*, the Court deferred to the Air Force's judgment about whether to create an *exception* to a facially neutral rule. Facially neutral rules are ordinarily subject to a lower-level, rational basis scrutiny unless they are motivated by discriminatory purpose. *See Washington v. Davis*, 426 U.S. 229, 247-248 (1976); *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013). Conversely, where a military policy discriminates against a protected class on its face, heightened or strict scrutiny applies, regardless of the military context. *See Berkley v. United States*, 287 F.3d 1076, 1084-1085, 1090-1091 (Fed. Cir. 2002) (reversing district court's application of rational basis review and ordering it to apply strict scrutiny to reduction-in-force

order that explicitly treated minority and female officers differently, and noting that military deference does not preclude review of the policy for constitutional violations).[9] The policy here is facially discriminatory; it applies only to transgender people. As this Court has already determined, such a policy requires, and likely fails, heightened scrutiny.

### c)      No deference is warranted here.

Under heightened scrutiny, the Mattis Plan would fail constitutional scrutiny even if it were an independent military policy; nonetheless, that is plainly not the case here, where the undisputed evidence shows that the military was acting on the President's orders, not writing policy on a blank slate. The same "unusual factors" that bolstered this Court's prior determination that no deference to the President's directive is warranted continue to exist and still weigh against deference here. PI Order 65.

Like the President's directive, the Mattis Plan is "a *revocation* from transgender people of rights previously given." PI Order 71 (emphasis in original). In addition, as this Court has already found, the announcement of Defendants' policy through the President's initial tweets was "abrupt[]" and "without any of the formality or deliberative processes that generally accompany the development and announcement of major policy changes," *id.* at 68; *see also United States v. Windsor*, 570 U.S. 744, 770 (2013) ("In determining whether a law is motivated by an improper animus or purpose, '[d]iscriminations of an unusual character' especially require careful consideration."), and, as described above and in Plaintiffs' cross-motion for summary

---

[9]      Moreover, this Court has explicitly rejected extending *Goldman* beyond the context of Free Exercise challenges regarding military conduct regulations, explaining that "[a]lthough this Court is mindful of the Supreme Court's admonishment that the judiciary should give substantial deference to matters related to management of the military, such protection does not extend to practices that may subvert one's inalienable constitutional rights." *Adair v. England*, 183 F. Supp. 2d 31, 52 (D.D.C. 2002) (rejecting the "slippery slope" of extending *Goldman* to Equal Protection and Establishment Clause claims).

28

judgment, *see* Pls.' SJ Br. 17-22, the process that led to that policy's formalization and implementation in the Mattis Plan was constrained by—and, indeed, dictated by—the President's initial order. Those factors distinguish this case from the military deference cases on which Defendants rely.

### 2. The government's justifications for its policy are not rationally, much less substantially, furthered by barring transgender people from military service.

Under the heightened review this Court has said applies, the burden falls on the government to prove that the ban is substantially related to an exceedingly persuasive justification. *Virginia*, 518 U.S. at 533. "The justification must be genuine, not hypothesized or invented post hoc in response to litigation," and "it must not rely on overbroad generalizations about the different talents, capacities, or preferences" about transgender people. *Id.* But even if heightened scrutiny did not apply, the transgender ban fails the most elemental requirement of equal protection—that there be a rational relationship between the classification and the object to be served. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985). The asserted justifications for the ban in the Panel Report are so discontinuous with its broad sweep that it fails even that relatively forgiving test.

Defendants claim barring military service by transgender people advances three justifications: (1) promoting military readiness, based on purported concerns about the deployability of transgender troops; (2) promoting unit cohesion, based on concerns about maintaining sex-based standards; and (3) lowering costs. None of these asserted justifications justifies singling out and categorically disqualifying transgender people from service as Defendants have done.

### a)    The Ban does not promote military readiness.

Banning individuals from military service because they are transgender undermines military readiness.  The military already has universal policies for enlistment, deployment, and retention.  Apart from transgender people, the military relies on these universal standards to determine fitness to serve; no other class of people is excluded from individualized evaluation under those standards or presumed to be unfit simply by virtue of their membership in a particular class.  Because transgender service members must already comply with military-wide policies, having a separate policy that excludes them from service simply for being transgender serves only to bar transgender individuals who are fit to serve and to deploy.

*First*, under generally applicable enlistment criteria, all prospective military service members must undergo a rigorous examination to identify any preexisting physical or mental health diagnoses that would preclude enlistment.  *See* Milgroom Decl. Ex. II (DoD Instruction 6130.03) at 1.2(c).  Ignoring that this screening process already applies to transgender persons as well, the Panel Report seeks to justify banning transgender people from accession by claiming that they "suffer from high rates of mental health conditions such as anxiety, depression, and substance use disorders" and "[h]igh rates of suicide ideation, attempts and completion."  Panel Report 21.  But even if these sweeping assertions were true—and they are not—they do not explain the need to single out a particular group (transgender people) for exception from that screening and presumption of its outcome when the military already directly screens for those conditions.  Anyone with a history of suicidal behavior—whether transgender or not—is barred from enlisting.  *See id.*; Milgroom Decl. Ex. PP (USMEPCOM Regulation No. 40-1, Medical Qualification Program) ¶ 1-1.  Anyone with a history of anxiety or depression—whether transgender or not—is barred from enlisting unless they meet generally applicable criteria to demonstrate those conditions will not limit their ability to serve.  *See* DOD Instruction 6130.03

at 5.29(f), (q).  Under these universal standards, any enlistee, whether transgender or not, is screened to ensure that their past or current medical or mental health history is consistent with service requirements.

Defendants do not claim, nor is it true, that every transgender person shares the characteristics that raise these purported fitness and deployment concerns.  As a result, the only effect of the transgender ban is to exclude transgender applicants who are otherwise qualified and fit to serve.  The only impact of the policy is to impede, not advance, military readiness.

The irrationality of that result—excluding fit applicants—is why the military does not adopt a similar categorical approach to other demographic groups who have or may have disproportionate rates of depression, suicidality, anxiety, or other mental health conditions.  For example, children of service members have a significantly elevated incidence of suicide attempts.  Milgroom Decl. Ex. QQ (Decl. of Dr. George Brown ISO Opp. to Mot. to Dissolve ("Brown Decl.") ¶ 22.  But the military does not exclude them from military service.  Women are twice as likely as men to have anxiety disorders, but the military does not bar women from military service.  *Id.*  Depression, anxiety, and suicide are more common among white people than black people, but the military does not bar white people from military service.  *Id.* Defendants' reliance on this rationale to support a categorical exclusion of transgender people is completely anomalous—strongly suggesting that the policy is based on animus rather than legitimate concerns.  *Cf. Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) (noting that a policy should be struck down where its "justifications … made no sense in light of how the [government] treated others groups similarly situated in relevant respects").

The Mattis Plan also irrationally invokes concerns about deployability to justify barring from enlistment even transgender individuals who have completed gender transition and need no

31

further medical care beyond the same routine hormone therapy required by many other service members. *See* Mattis Plan 2. Because the individuals excluded by that prohibition need no surgeries, there is no connection (much less a substantial one) between the policy and any purported concerns about transgender service members' potential non-deployability due to transition-related surgical care. Instead, the policy excludes individuals who are medically stable and fit and who—but for Defendants' singular treatment of transgender people—would be able to meet the same accession criteria applied to other similarly situated applicants.

*Second*, the policy also irrationally excludes transgender people from universal deployment standards that already mandate the discharge of service members who are nondeployable "for more than 12 consecutive months, for any reason." Milgroom Decl. Ex. MM at 1. Defendants do not claim (nor could they) that every transgender service member is incapable of meeting that standard. By their own admission, not all transgender persons undergo any surgical treatments, and even for those who do, the typical recovery times fall well short of 12 months. Panel Report 23; *see also* Milgroom Decl. Ex. SS (Decl. of Dr. Joshua D. Safer) ¶¶ 17-22 (describing related testimony before the panel of experts). The only effect of having a special rule for transgender people—again—is to require the discharge of individuals who can meet the universal deployment standards and thus to undermine military readiness.

*Finally*, the ban also irrationally creates a special rule requiring discharge of any service member who "require[s] transition" as part of their medical care rather than relying on medical retention standards that already apply to all service members. *Compare* Panel Report 32, *with* Milgroom Decl. Ex. B (DOD Instruction 1332.18, Disability Evaluation System (DES)). Under those existing standards, any service member who develops a health condition that could result in unfitness must undergo a medical evaluation process, including review by a medical

evaluation board.  *See* DOD Instruction 1332.18 at Encl. 3.2.a (purpose of medical evaluation board); Encl. 3.3.a (purpose of physical evaluation board); Encl. 3, App'x 1.2 (criteria for referral).  That review determines whether there are restrictions on the person's ability to serve and may, where appropriate, result in discharge.  *See id.*[10]  Defendants' policy diverts transgender service member from that individualized review process and subjects them to automatic discharge.  There is nothing unique to gender dysphoria or its treatment that justifies bypassing the ordinary medical evaluation process that is already in place.  The government does not claim (nor is it true) that all transgender people who require gender transition would fail that individualized review.[11]  Once again, the only effect of Defendants' policy is to require the discharge of individuals who are otherwise fit to serve—thereby undermining, rather than advancing, military readiness.[12]

---

[10]     Each service issues implementing instructions to DODI 1332.18 that detail the medical concerns that trigger review by a medical evaluation board.  *See, e.g.*, Milgroom Decl. Ex. OO (Army Regulation 40-501, Standards of Medical Fitness).  Under those force-wide Army retention standards, mental health counseling, hormone therapy, or surgical treatment do not generally trigger a requirement for a medical evaluation board.

[11]     As explained by Plaintiffs' expert Dr. George Brown:  "If a transgender service member's limited period of non-deployability complies with those generally applicable standards, there is no reason why the service member should be automatically discharged simply because" they are receiving transgender-related care.  Milgroom Decl. Ex. QQ (Decl. of Dr. George Brown ISO Opp. to Mot. to Dissolve ("Brown Decl.")) ¶ 40.

[12]     Consistent with this pattern of subjecting transgender people to standards not applied to others, the Report states that there is "scientific uncertainty surrounding the efficacy of transition-related treatments for gender dysphoria," citing the absence of "randomized controlled trials."  Panel Report 26-27.  However, because the military does not apply such a high standard of efficacy to other medical conditions, this asserted rationale holds "treatment for gender dysphoria to … a standard that few if any medical conditions are required to meet."  Brown Decl. ¶ 16.  As Dr. Brown states, "[i]f the military limited all medical care to surgical procedures supported by prospective, controlled, double-blind studies," very few medical conditions would be treated, and many common procedures such as tonsillectomies and appendectomies would not be provided.  *Id.* ¶¶ 13-15.

33

In sum, singling out transgender people for a special exclusionary rule based on speculation that some transgender people may fail to meet the same military standards applied to all others is both dramatically overinclusive in excluding many transgender people who are fit to serve, and dramatically underinclusive in failing to recognize that many non-transgender people have medical needs that may result in periods of nondeployment or may be at increased risk of the same conditions that Defendants claim justify excluding transgender people. Laws that are "grossly over- and under-inclusive" are thus "so poorly tailored" to any legitimate interest that they "cannot survive heightened scrutiny." *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014); *see also Bostic v. Schaefer*, 760 F.3d 352, 382 (4th Cir. 2014) (rejecting justification that is "so underinclusive" that the policy's real justification "must have rested on irrational prejudice" (internal quotation marks omitted)). As the Second Circuit held in *Crawford v. Cushman*, 531 F.2d 1114, 1123 (2d Cir. 1976), a military policy that singles out a condition associated with a particular group—in that case, pregnant women—in such an anomalous fashion fails even rational basis review: "Why the Marine Corps should choose, by means of the mandatory discharge of pregnant Marines, to insure its goals of mobility and readiness, but not to do so regarding other disabilities equally destructive of its goals, is subject to no rational explanation."

> **b)  Defendants' arguments about unit cohesion are circular and rest on impermissible gender stereotypes.**

Defendants' attempt to justify the ban on transgender service members because their mere presence is "[i]ncompatible with [s]ex-[b]ased [s]tandards" is also meritless. Panel Report 35. Defendants' Report simply points to a number of instances where the military has different standards for men and women—none of which Plaintiffs challenge here—and then asserts that the presence of transgender servicemembers would be incompatible with "biologically-based" standards. *Id.* at 36. That is not an argument; rather, it is a tautology that merely restates the

34

policy's discriminatory exclusion (only persons living in their birth sex may serve) as an asserted justification.

Plaintiffs do not challenge the ability of the military to maintain any of the sex-based standards that currently exist in the Armed Forces. They simply seek to be held to the same standards as everyone else. Using the phrase "biologically-based" to describe these standards does nothing to justify discrimination; nor does it give Defendants *carte blanche* to exclude transgender servicemembers. *See* Panel Report 36.

Permitting transgender men to serve as men and transgender women to serve as women does not disrupt the military's maintenance of sex-based standards in the few areas where they exist. Under the open service policy that went into effect in July 2016, a service member's sex for all purposes while in the military is determined by the DEERS marker. Dkt. No. 13-10, Ex. F (Transgender Service Implementation Handbook) at 11. Changing the DEERS marker requires demonstration of completion of gender transition and requires a commander's approval, consistent with that commander's evaluation of "expected impacts on mission and readiness." *See* Milgroom Decl. Ex. G (DODI 1300.28) at 1.2(f); Milgroom Decl. Ex. RR (Declaration of Brad R. Carson ISO Opp. to. Mot. to Dissolve ("Carson Decl.")) ¶¶ 12-19, 26. That process creates a bright line rule that ensures the military can maintain sex-based standards, when appropriate, including with regard to the transgender men and women to whom the same standards also apply.

Defendants' contention that a transgender person who retains some physical characteristics of his or her birth sex inherently violates the privacy rights of others has no merit. Panel Report 37. As this Court has already held, "[t]he defining characteristic of a transgender individual is that their inward identity, behavior, and possibly physical characteristics, do not

35

conform to stereotypes of how an individual of their assigned sex should feel, act, and look." PI

Order 62. To argue that the mere presence of such a person violates the privacy rights of others

is to rely on the same impermissible gender stereotypes that explain why discrimination against

transgender people is "a form of discrimination on the basis of gender." *Id.*[13] Defendants'

reliance on such stereotypes cannot justify their discrimination against transgender people;

rather, it shows why their discriminatory policy fails heightened scrutiny.

Defendants' argument boils down to a claim that, simply by existing as such, transgender

people undermine sex-based standards. But if that claim were sufficient to justify barring all

transgender people from military service, it would also justify their exclusion from any, and all,

institutions that maintain sex-based criteria for facilities, including schools, workplaces, public

accommodations, and beyond. In effect, and consistent with their policy requiring transgender

people to live in their birth sex in order to serve in the military, Defendants' claim would banish

transgender people from any ability to live or participate in virtually any aspect of public life.

Courts have rejected the use of Defendants' rationale to justify discrimination against

transgender individuals in other settings. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd.

of Educ.*, 858 F.3d 1034, 1046-1047 (7th Cir. 2017); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F.

Supp. 3d 704, 723-726 (D. Md. 2018); *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324,

383-390 (E.D. Pa. 2017); *Students & Parents for Privacy v. U.S. Dep't of Educ.*, 2016 WL

6134121, at *28-29 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted by* 2017 WL

6629520 (N.D. Ill. Dec. 29, 2017). As these courts have recognized, permitting transgender

---

[13]     Defendants point to no law in support of their professed concern about liability for violating federal statutes by authorizing transgender people to comply with gender-based standards based on their identity, nor could they. *See Cruzan v. Special School District*, 294 F.3d 981 (8th Cir. 2002) (rejecting discrimination claim brought by non-transgender woman against school that authorized transgender woman's use of shared women's restroom).

36

individuals to live in accord with their gender identity does not undermine the existence of sex-based activities or facilities, nor does it threaten the privacy or safety interests of others. The same analysis applies here.

To the extent Defendants claim there is anything unique about the military justifying a departure from this established precedent, that argument is belied by the military's successful implementation of extensive guidance and training since the adoption of the open service policy. *See* Milgroom Decl. Ex. RR (Carson Decl.) ¶¶ 12-19, 26, 29. With nearly two years of experience integrating openly transgender people into the service, it is notable that Defendants present no evidence in support of their claims and rely instead on hypothetical rather than actual concerns. Panel Report 36-37.[14] Under the heightened scrutiny that applies to this case, such hypothetical justifications are insufficient to justify Defendants' policy. *See Virginia*, 518 U.S. at 533. And "[t]o the extent this is a thinly-veiled reference to an assumption that other service members are biased against transgender people, this would not be a legitimate rationale for the challenged policy." PI Order 66 n.10 (citing *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")).

Defendants' arguments are similar to those rejected by the court in *Owens*. In that case, the government sought to justify a law that barred Navy commanders from assigning female personnel to ships. *Owens v. Brown*, 455 F. Supp. 291, 294-295 (D.D.C. 1978). The

---

[14]    Tellingly, the "best illustration" Defendants can muster is a single commander who "was confronted with dueling equal opportunity complaints" arising from a conflict between a transgender woman and a non-transgender woman. Panel Report 37. However, if the mere existence of a single conflict or complaint were sufficient to justify the exclusion of an entire group of people, then many other groups—including women, gay people, religious minorities, and many racial and ethnic groups—would likely be unable to serve.

government argued that permitting such assignments would undermine morale and discipline, citing "the unknown effects that full sexual integration might have on group dynamics." *Id.* at 306. The court rejected that justification as legally insufficient and granted summary judgment to the Plaintiffs: "Commanding Officers have sufficient authority to deal with persons having difficulty adjusting to mixed crews. … Adjustments and thawing of previously held barriers to the presence of women and acceptance by the male ship's company are social facts of life which must be recognized and dealt with." *Id.* at 309 (internal citation and marks omitted). The court therefore concluded that "none of the practical concerns regarding the integration of male and female personnel afford a warrant for upholding the total exclusion reflected in [the challenged law]. Whatever problems might arise from integrating shipboard crews are matters that can be dealt with through appropriate training and planning." *Id.* The same analysis applies here. Commanding officers have ample authority to deal with any persons having difficulty adjusting to transgender service members, just as they have dealt with any such issues relating to the military's inclusion of women, racial and religious groups, and gay people. The military has already engaged in significant planning and training on this issue, and transgender troops have been serving openly for more than two years. In light of those realities, Defendants' hypothetical concerns that transgender people undermine cohesion, order, or discipline have no bases in fact; like those rejected in *Owens*, they are legally insufficient to justify a policy that facially discriminates based on sex.

> c)   **Banning transgender people from military service cannot be justified based on cost.**

Defendants argue that the ban is justified by "the military's general interest in maximizing efficiency through minimizing costs." US SJ Br. 33. Under heightened review, however, Defendants "must do more than show that denying … medical care … saves money."

*Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974). "The conservation of the taxpayers' purse is simply not a sufficient state interest" to justify an equal protection violation under heightened scrutiny. *Id.*; *see also Graham v. Richardson*, 403 U.S. 365, 375 (1971) ("The saving of welfare costs cannot justify an otherwise invidious classification.").

Even under rational basis review, "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Plyler v. Doe*, 457 U.S. 202, 227 (1982). The government must articulate more than a desire to save resources; it must justify why it chose a particular group, as opposed to others similarly situated, to bear the burden of cost savings. *Id.* at 229 (cost-cutting could not justify denying free public education to children of undocumented immigrants); *see also Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011) ("[W]hen a state chooses to provide [health care] benefits, it may not do so in an arbitrary or discriminatory manner that adversely affects particular groups that may be unpopular.").

Defendants have not explained why the cost savings they seek should be borne by transgender service members. As Margaret Wilmoth, former Deputy Surgeon General for Mobilization, Readiness and Army Reserve Affairs in the Office of the Surgeon General of the United States Army, explained, for the "large majority" of transgender service members' medical care needs, the Military Health System (MHS) "already provid[es] the same or substantially similar services to other service members." Dkt No. 13-13 (Wilmoth PI Decl.) ¶¶ 14-21. Because the military already provides substantially the same medically necessary surgical and other care for other conditions, Defendants have no sufficient cost-related justification for a policy banning transgender persons from military service. Indeed, their cost-savings argument does nothing more than attempt to "justify [their] classification with a concise expression of an intention to discriminate." *Plyler*, 457 U.S. at 227.

39

### d)    The "grandfather clause" highlights the incoherence of the Mattis Plan.

Defendants' decision to permit some transgender service members to remain on active duty during or after the process of gender transition while forbidding others from doing the same only highlights the absence of any legitimate basis for banning transgender troops. Mattis Plan, 2. Defendants claim that allowing transgender people to serve will compromise military readiness, yet they propose to allow currently serving transgender individuals who have already transitioned or begun the process of doing so to do exactly that. It is only transgender service members who have not yet sought to transition or those who seek to join the military after transitioning in the future who are subjected to this discriminatory refusal. *Id*. at 2-3. If transgender service members who are already serving openly can complete their transition and serve honorably and effectively, then transgender service members who have not yet publicly identified themselves and sought to transition or who join the military going forward can do the same. Defendants' creation of this exception fatally undermines any argument that the ban serves even a legitimate purpose, much less that it is supported by an "exceedingly persuasive justification." *Cf. In re Levenson*, 587 F.3d 925, 933 (9th Cir. 2009).

### B.    Plaintiffs Continue To Satisfy The Equitable Factors For A Preliminary Injunction

#### 1.    Plaintiffs will suffer irreparable injury if the preliminary injunction is dissolved.

Defendants make the conclusory assertion that even if Plaintiffs "had standing to challenge the new policy, they still would be unable to meet the 'high standard for irreparable injury.'" US PI Br. 42. But this Court has already recognized, Plaintiffs' injuries that support standing—identified in Section I.B—are irreparable. The Mattis Plan subjects transgender individuals to inherently unequal treatment and places them into a legally inferior class of people

who, because of their transgender status, are deemed ineligible for service. That violates Plaintiffs' rights to due process and equal protection, and this "loss of constitutional freedoms … "'unquestionably constitutes irreparable injury.'" PI Order 73. The Mattis Plan also "brands and stigmatizes Plaintiffs as less capable of serving in the military, reduces their stature among their peers and officers, stunts the growth of their careers, and threatens to derail their chosen calling or access to unique educational opportunities." *Id.*

Defendants do not engage with the Court's prior findings on irreparable injury, but instead argue that because the *Karnoski* court has entered a nationwide injunction that prevents enforcement of the Mattis Plan, Plaintiffs will not suffer any injuries, irreparable or otherwise. That is not a legitimate basis to deny, much less *dissolve*, a preliminary injunction. Defendants have appealed the *Karnoski* court's refusal to dissolve the preliminary injunction, *Karnoski v. Trump*, No. 17-cv-1297, Dkt. 236 (W.D. Wash Apr. 30, 2018), and sought a stay of the preliminary injunction pending appeal, *Karnoski v. Trump*, No. 17-cv-1297, Dkt. 238 (W.D. Wash. Apr. 30, 2018). It would not be a sound use of judicial resources for this Court to dissolve its preliminary injunction, only to have Plaintiffs return to the Court in the event Defendants succeed in dissolving or narrowing the *Karnoski* injunction on appeal. This injunction is already in place—indeed, it was issued *before* the *Karnoski* injunction—and Plaintiffs are entitled to the relief sought. That is enough to reject Defendants' argument.

Defendants cite cases in which courts *stayed resolution* of motions for preliminary injunctions while other nationwide injunctions remained in place. But whether a court may exercise its "'broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere,'" *Pars Equality Center v. Trump*, No. 17-cv-0255, Dkt. 143 (D.D.C. Mar. 2, 2018), is an entirely separate issue from whether a court should dissolve a

41

preexisting injunction because of the actions of another court.[15]  Defendants have not sought a stay to preserve judicial resources in that manner; instead, they have proposed complicating the judicial process by conditioning the relief this Court can grant on the proceedings and decisions in potential multiple other cases, with no apparent benefit to the Court or the parties.  The Court should decline this invitation to deprive Plaintiffs of relief to which they are entitled.

### 2.    The balance of the equities and the public interest favor the preliminary injunction.

This Court and the D.C. Circuit have already concluded that the public interest and the balance of hardships weigh in favor of injunctive relief.  This Court held that there is "absolutely no support for the claim that the ongoing service of transgender people would have *any* negative effective on the military at all" and "there is considerable evidence that it is the *discharge* and *banning* of such individuals that would have such effects."  PI Order 75.  In addition, the Court held that the residents of numerous States would be harmed if the ban were not enjoined.  *Id.*  Likewise, the D.C. Circuit recognized that the ban "would directly impair and injure the ongoing educational and professional plans of transgender individuals and would deprive the military of skilled and talented troops," contrary to the public interest.  *Doe v. Trump*, 2017 WL 6553389, at *3 (D.C. Cir. Dec. 22, 2017).  The D.C. Circuit also emphasized that "all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to

---

[15]    *See also Roe v. Trump*, No. 3:17-cv-00557, Dkt. 91 (N.D. Cal. Jan. 8, 2018); *Washington v. Trump*, 2017 WL 1050354, at *5 (W.D. Wash. Mar. 17, 2017); *Ali v. Trump*, 241 F. Supp. 3d 1147, 1154 (W.D. Wash. 2017).  Notably, all three of these cases were in the same circuit as the case in which the nationwide injunction was issued, so it was particularly appropriate to defer resolution until the Ninth Circuit issued a ruling.

willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them." *Id.*

Defendants argue that the record has changed, and that there is now evidence that military service by transgender individuals "threatens to 'undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.'" US PI Br. 44. But the study conducted by Defendants was designed to support the President's predetermined conclusion. Its conclusions are not logically supported by the studies or evidence it cites, and the concerns it raises about the fitness of transgender troops are already addressed by military-wide accession, deployability, and retention standards with which all servicemembers, including those who are transgender, must comply. *See* Section II.A.2; Pls.' SJ Br. 22-36. Dissolution of the preliminary injunction would allow Defendants to violate Plaintiffs' constitutional rights, which "is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

Defendants fail to establish that keeping the preliminary injunction in place pending the outcome of this litigation would impair military readiness or otherwise burden Defendants. Even under the Mattis Plan, hundreds of transgender individuals—those who recently received a diagnosis of gender dysphoria and are currently serving—will be permitted to serve. Defendants do not explain why if these transgender individuals are able to serve without undermining military readiness, others cannot do so as well. As the D.C. Circuit previously concluded, enforcement of the ban would "deprive the military of skilled and talented troops." *Doe*, 2017

WL 6553389, at *3.  Defendants' "bare invocation of 'national defense'" is not enough to show

that the public interest and the balance of the equities are in their favor.  PI Order 75.[16]

## CONCLUSION

The government's motion to dismiss and the motion to dissolve the preliminary

injunction should be denied.

---

[16]    Defendants also ask that the preliminary injunction be dissolved in part.  First, Defendants ask that the Court dissolve the preliminary injunction to the extent that it applies to the President; Plaintiffs do not object to this request, provided the other Defendants remain enjoined.  Second, Defendants request, without argument, that the Court should dissolve the injunction insofar as it applies to anyone other than named Plaintiffs who have standing.  The Court has already rejected this position, holding that "there was nothing improper about the scope of the preliminary injunction."  Dkt. 75 at 7.

44

May 11, 2018

Respectfully submitted,

/s/  Alan E. Schoenfeld

Alan E. Schoenfeld (pro hac vice)
WILMER CUTLER PICKERING
    HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Claire Laporte (*pro hac vice*)
Matthew E. Miller (*pro hac vice*)
Daniel McFadden (*pro hac vice*)
Kathleen M. Brill (*pro hac vice*)
Michael Licker (*pro hac vice*)
Rachel C. Hutchinson (*pro hac vice*)
Lauren Godles Milgroom (*pro hac vice*)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Paul R.Q. Wolfson (D.C. Bar No. 414759)
Kevin M. Lamb (D.C. Bar No. 1030783)
WILMER CUTLER PICKERING
    HALE & DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Theresa M. Roosevelt (D.C. Bar No. 1021853)
FOLEY HOAG LLP
1717 K Street NW
Washington, DC 20006
Telephone: 202-223-1200
Fax: 202-785-6687

Christopher R. Looney (pro hac vice)
Harriet Hoder (pro hac vice)
Adam M. Cambier (pro hac vice)
WILMER CUTLER PICKERING
    HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

Jennifer Levi (*pro hac vice*)
Mary L. Bonauto (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont St., Ste. 950
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Nancy Lynn Schroeder (pro hac vice)
WILMER CUTLER PICKERING
    HALE & DORR LLP
350 S. Grand Ave., Ste. 2100
Los Angeles, California 90071
Telephone: 213-443-5300
Fax: 213-443-5400
*Attorneys for Plaintiffs*

Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
Chris Stoll (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

45