# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE 2, *et al.*,<br>　　　Plaintiffs<br>　　　v.<br>DONALD J. TRUMP, *et al.*,<br>　　　Defendants | Civil Action No. 17-1597 (CKK) |

## MEMORANDUM OPINION
(August 6, 2018)

On July 26, 2017, President Donald J. Trump issued a statement via Twitter announcing that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military." A formal Presidential Memorandum followed on August 25, 2017. Before the 2017 Presidential Memorandum, the Department of Defense had announced that openly transgender individuals would be allowed to enlist in the military, effective January 1, 2018, and had prohibited the discharge of service members based solely on their gender identities. The 2017 Presidential Memorandum reversed these policies. It indefinitely extended the prohibition against transgender individuals entering the military (a process formally referred to as "accession"), and required the military to authorize the discharge of transgender service members. The President ordered Secretary of Defense James N. Mattis to submit a plan for implementing the policy directives of the 2017 Presidential Memorandum by February 2018. Plaintiffs filed suit and sought preliminary injunctive relief, which the Court granted.

Currently pending before the Court are Defendants' [115] Motion to Dismiss Plaintiffs' Second Amended Complaint, or, in the Alternative, Defendants' Motion for Summary Judgment, and Defendants' [116] Motion to Dissolve the Preliminary Injunction. Upon consideration of the

pleadings,[1] the relevant legal authorities, and the record as a whole, the Court DENIES

Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, and DENIES

Defendants' Motion to Dissolve the Preliminary Injunction.[2]   Both of these motions are based

on the same fundamental premise: that Defendants have recently proposed a "new policy" that

will now allow transgender individuals to serve in the military.   Based on this premise,

Defendants argue in these motions that Plaintiffs no longer have standing, that their claims are

moot, and that there is no longer any need for this Court's preliminary injunction.   For reasons

discussed in more detail below, the Court is not persuaded by these arguments.   This case shall

proceed, and the Court's preliminary injunction shall continue to maintain the *status quo ante*.

---

[1] The Court's consideration has focused on the following documents:

- Defs.' Mem. in Supp. of Mot. to Dismiss Pls.' 2d Am. Compl., or, in the Alternative, Defs.' Mot. for Summ. J., ECF No. 115 ("Defs.' Mem.");
- Defs.' Mot. to Dissolve the Prelim. Inj., ECF No. 116;
- Pls.' Opp'n to Defs.' Mot. to Dismiss and to Dissolve the Prelim. Inj., ECF No. 130 ("Pls.' Opp'n");
- Defs.' Reply in Supp. of their Mot. to Dismiss Pls.' 2d Am. Compl., or, in the Alternative, for Summ. J., and Opp'n to Pls.' Cross-Mot. for Summ. J., ECF No. 138 ("Defs.' Reply"); and
- Defs.' Reply in Support of their Mot. to Dissolve the Prelim. Inj., ECF No. 140.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[2] Although the parties' briefing mixes arguments about dismissal for lack of jurisdiction and summary judgment, the Court has exercised its discretion to first consider their arguments in the context of Defendants' motion to dismiss for lack of jurisdiction.  Because those arguments largely resolve the issues raised in Defendants' Motion to Dissolve the Preliminary Injunction, the Court also addresses that motion in this Memorandum Opinion.  However, this Opinion does *not* address the summary judgment aspects of Defendants' [115] Motion, nor does it address Plaintiffs' [131] Cross-Motion for Summary Judgment.  Those motions will be dealt with separately.  In addition, this Opinion does not address Defendants' argument that Plaintiffs do not have standing to press their claims against the President.  This argument is moot because the Court has issued a separate Memorandum Opinion and Order today which dismisses the President as a party from this case.

# I. BACKGROUND

Plaintiffs are current and aspiring transgender service members. Many have years of experience in the military. Some have decades. They have been deployed on active duty in Iraq and Afghanistan. They have and continue to serve with distinction. All fear that the directives of the 2017 Presidential Memorandum will have devastating impacts on their careers and their families. Accordingly, they filed this lawsuit challenging those directives and moved this Court to enjoin the implementation of the 2017 Presidential Memorandum. They claimed that the President's directives violate the fundamental guarantees of due process afforded by the Fifth Amendment to the United States Constitution.

On October 30, 2017, the Court issued a preliminary injunction in this case. As particularly relevant here, the Court found that Plaintiffs had standing and were likely to succeed on their Fifth Amendment claim. The Court concluded that, as a form of government action that classifies people based on their gender identity, and disfavors a class of historically persecuted and politically powerless individuals, the President's directives were subject to heightened scrutiny. Plaintiffs claimed that the President's directives could not survive such scrutiny because they were not genuinely based on legitimate concerns regarding military effectiveness or budget constraints, but were instead driven by a desire to express disapproval of transgender people generally. The Court found that a number of factors—including the breadth of the exclusion ordered by the directives, the unusual circumstances surrounding the President's announcement of them, the fact that the reasons given for them did not appear to be supported by any facts, and the recent rejection of those reasons by the military itself—strongly suggested that Plaintiffs' Fifth Amendment claim was meritorious. Accordingly, the Court enjoined Defendants from enforcing the President's directives. The effect of the Court's preliminary

injunction was to revert to the *status quo ante* with regard to accession and retention that existed before the issuance of the 2017 Presidential Memorandum.

Defendants appealed, *see* Defs.' Notice of Appeal, ECF No. 66, and moved this Court to stay the portion of its preliminary injunction that required Defendants to begin accepting transgender individuals into the military on January 1, 2018, *see* Defs.' Mot. for Partial Stay of Prelim. Inj. Pending Appeal, ECF No. 73. On December 11, 2017, the Court denied Defendants' motion to stay. *See* Dec. 11, 2017 Order, ECF No. 75.

Defendants then sought the same relief from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"). On December 22, 2017, the D.C. Circuit denied Defendants' motion to stay this Court's preliminary injunction. *See Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017). The D.C. Circuit concluded that Defendants had not demonstrated that they had a strong likelihood of success on appeal, that they would be irreparably harmed absent a stay, or that the stay would not harm the other parties to the proceeding. *Id.* It held that "given that the enjoined accession ban would directly impair and injure the ongoing educational and professional plans of transgender individuals and would deprive the military of skilled and talented troops, allowing it to take effect would be counter to the public interest." *Id.* at *3. The D.C. Circuit also explained that "in the balancing of equities, it must be remembered that all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them." *Id.* After the D.C. Circuit's opinion was issued, Defendants

voluntarily dismissed their appeal of this Court's preliminary injunction. The military began permitting openly transgender individuals to accede on January 1, 2018.

This case then moved forward into the discovery stage. Defendants strenuously resisted engaging in discovery. As noted above, the 2017 Presidential Memorandum had called for the Secretary of Defense to submit a plan to implement the President's policy directives by February 2018. Defendants repeatedly argued that discovery should be halted until that plan was submitted. Defendants even argued at one point that Plaintiffs were not entitled to discovery in this case at all. The Court repeatedly rejected Defendants' arguments and ordered Defendants to cooperate with discovery so that this case could move forward efficiently toward an ultimate resolution on the merits. Despite the Court's orders, discovery remains unfinished because Defendants have asserted that a substantial portion of the documents and information sought by Plaintiffs are privileged (pursuant to the deliberative process privilege and the presidential communications privilege), and the parties' disputes about these assertions of privilege remain outstanding.[3]

In February 2018, as ordered by the 2017 Presidential Memorandum, Secretary of Defense Mattis presented a memorandum to the President that proposed a policy to effectively prevent transgender military service. *See* Defs.' Mot. to Dissolve the Preliminary Injunction, Ex. 1, ECF No. 96-1 (hereinafter, the "Mattis Implementation Plan"). The Mattis Implementation Plan, unlike the President's 2017 tweet and memorandum, purports not to be a blanket ban on all "transgender individuals." However, the plan effectively implements such a ban by targeting proxies of transgender status, such as "gender dysphoria" and "gender transition," and by

---

[3] The Court is aware that the court in *Karnoski v. Trump*, No. C17-1297-MJP (W.D. Wash.), has recently ordered Defendants to produce materials that they have withheld on the basis of privilege and that Defendants have sought appellate review of that order.

requiring all service members to serve "in their biological sex." Based on the conclusion "that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender," Mattis Implementation Plan at 2, the Mattis Implementation Plan proposes the following policies:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

*Id.* at 2-3.

To summarize: under the Mattis Implementation Plan, individuals who require or have undergone gender transition are absolutely disqualified from military service; individuals with a history or diagnosis of gender dysphoria are largely disqualified from military service; and, to the extent that there are any individuals who identify as "transgender" but do not fall under the first two categories, they may serve, but only "in their biological sex." By definition, transgender persons do not identify or live in accord with their biological sex, which means that the result of the Mattis Implementation Plan is that transgender individuals are generally not

allowed to serve openly in the military. There is only one narrow class of transgender individuals who are allowed to serve as openly transgender under the Mattis Implementation Plan. Pursuant to a "grandfather provision," those "currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of" the policy set forth in the Mattis Implementation Plan, may continue to serve in their preferred gender.

The reasoning underlying the Mattis Implementation Plan is spelled out in a second memorandum that was sent from the Department of Defense to the President in February 2018. *See* Defs.' Mot. to Dissolve the Preliminary Injunction, Ex. 2, ECF No. 96-2 (hereinafter, the "Panel Report"). Like the Mattis Implementation Plan, the Panel Report carefully avoids categorical language banning all transgender individuals. Instead, the document speaks in terms of individuals with "gender dysphoria" and those who have undergone or will require "gender transition" (both of which, again, are proxies for transgender status). Generally speaking, the Panel Report concludes that individuals with gender dysphoria or who have undergone or will require gender transition undermine the military. According to the report, these service members are fundamentally incompatible with the military's mental health standards, physical health standards, and sex-based standards. The report suggests that they are a detriment to military readiness and unit cohesion. It likens gender dysphoria to conditions such as "bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder." Panel Report at 20. It concludes that individuals with gender dysphoria or who have undergone or will require gender transition are more likely to have other mental health conditions and substance abuse problems, and to commit suicide. *Id.* at 21. The Panel Report also states that these individuals impose "disproportionate costs" on the military. *Id.* at

41.  For the most part, in lieu of affirmative evidence, the Panel Report repeatedly cites

"uncertainty" in the medical field about these individuals as a reason to urge that the military

"proceed with caution."  *Id.* at 6.  Although not necessary to the outcome of this particular

Memorandum Opinion, it is worth noting that these conclusions were immediately denounced by

the American Psychological Association and the American Medical Association.  *See* Decl. of

Lauren Godles Milgroom, ECF No. 128 ("Milgroom Decl."), Exs. GG, HH.

On March 23, 2018, Defendants filed a Notice informing the Court that President Trump

had issued a second memorandum on military service by transgender individuals.  *See* Defs.'

Notice, ECF No. 95.  In the 2018 Presidential Memorandum, the President stated that he

"revokes" his 2017 Presidential Memorandum, "and any other directive [he] may have made

with respect to military service by transgender individuals."  *Id.* at 1.  The President ordered that

"[t]he Secretary of Defense, and the Secretary of Homeland Security, with respect to the U.S.

Coast Guard, may exercise their authority to implement any appropriate policies concerning

military service by transgender individuals."  *Id.*  To be clear, as has just been laid out, the

"appropriate policies" that the Secretaries intended to implement had already been developed and

proposed to the President at the time he issued this memorandum.

The events described above have sparked a great debate between the parties as to the

future of this case, and prompted the filing of numerous motions.  As relevant to this

Memorandum Opinion, pending before the Court are Defendants' Motion to Dismiss Plaintiffs'

Second Amended Complaint, or, in the Alternative, Defendants' Motion for Summary Judgment,

and Defendants' Motion to Dissolve the Preliminary Injunction.  Defendants argue that the

Mattis Implementation Plan represents a "new policy" divorced and distinct from the President's

2017 policy directives that were previously enjoined by this Court.  They also contend that the

Mattis Implementation Plan does not harm the Plaintiffs in this case. Accordingly, Defendants seek the dismissal of Plaintiffs' recently filed Second Amended Complaint for lack of jurisdiction because Plaintiffs lack standing and because their claims are now moot. For largely the same reasons, Defendants also argue that the Court's preliminary injunction should be dissolved. In sum, it is Defendants' view that they have preempted this lawsuit by drafting and issuing the Panel Report, the Mattis Implementation Plan, and the 2018 Presidential Memorandum. The Court disagrees.

**Summary:** This Memorandum Opinion sets forth the Court's reasoning for denying Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint and Defendants' Motion to Dissolve the Preliminary Injunction. The Court first concludes that Plaintiffs have standing because they would all be harmed if the Mattis Implementation Plan were allowed to take effect. The Court next concludes that the Mattis Implementation Plan has not mooted Plaintiffs' claims because that plan is not a "new policy" that is meaningfully distinct from the President's 2017 directives that were originally challenged in this case. Instead, at a fundamental level, the Mattis Implementation Plan is just that—a plan that *implements* the President's directive that transgender people be excluded from the military. For largely the same reasons, the rationale for the Court's preliminary injunction maintaining the *status quo ante* until the final resolution of this case remains intact. Nothing in this Memorandum Opinion represents a final adjudication of whether Defendants' actions were constitutional. The Court merely holds that whatever legal relevance the Mattis Implementation Plan might have, it has not fundamentally changed the circumstances of this lawsuit such that Plaintiffs' claims should be dismissed for lack of jurisdiction, or that the need for the Court's preliminary injunction has dissipated.

## II. LEGAL STANDARD

When a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) is filed, a federal court is required to ensure that it has "the 'statutory or constitutional power to adjudicate [the] case[.]'" *Morrow v. United States*, 723 F. Supp. 2d 71, 77 (D.D.C. 2010) (emphasis omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). "Federal courts are courts of limited jurisdiction" and can adjudicate only those cases or controversies entrusted to them by the Constitution or an Act of Congress. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In determining whether there is jurisdiction on a motion to dismiss, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations omitted).

## III. DISCUSSION

The Court begins this Memorandum Opinion with an assessment of its jurisdiction. Article III of the Constitution limits the jurisdiction of this Court to the adjudication of "Cases" and "Controversies." U.S. Const., Art. III, § 2. "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing [and] mootness." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen v. Wright*, 468 U.S.

737, 750 (1984)).  Defendants argue that the issuance of the 2018 Presidential Memorandum, the Mattis Implementation Plan, and the Panel Report have rendered this case moot and have deprived all Plaintiffs of standing.  They contend that the Court must therefore dismiss the case for lack of jurisdiction.  Defendants are wrong.  In addition, for largely the same reasons that the Court continues to have jurisdiction over Plaintiffs' claims, Defendants have not satisfied their burden of demonstrating that the Court's preliminary injunction should be dissolved.

### 1.  Standing

Standing is an element of the Court's subject-matter jurisdiction, and requires, in essence, that a plaintiff have "a personal stake in the outcome of the controversy."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  A plaintiff cannot be a mere bystander or interested third-party, or a self-appointed representative of the public interest; he or she must show that the defendant's conduct has affected them in a "personal and individual way."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).  Consequently, the standing analysis is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "[A] plaintiff must demonstrate standing for each claim he seeks to press" and for each form of relief sought, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), but "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 (2006).

The familiar requirements of Article III standing are:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan*, 504 U.S. at 560–61); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). With respect to the "injury in fact" requirement, which is predominantly at issue in this case, "future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Clapper*, 568 U.S. at 409, 414 n.5).

The Court rejects Defendants' argument that Plaintiffs no longer have standing because they are not harmed by the Mattis Implementation Plan. In its October 30, 2017 Memorandum Opinion, the Court explained in detail why the Plaintiffs in this case had standing. *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 192-203 (D.D.C. 2017). The Court will assume familiarity with that discussion and will not repeat it here (although it does expressly incorporate that discussion into this Memorandum Opinion as though stated in full). With the principles set forth in that earlier Opinion as a baseline, in this Opinion the Court focuses more narrowly on Defendants' arguments about why the Mattis Implementation Plan has nullified Plaintiffs' standing. As explained above, the effect of that plan would be that individuals who require or have undergone gender transition would be absolutely disqualified from military service, individuals with a history or diagnosis of gender dysphoria would be largely disqualified from military service, and, to the extent that there are any individuals who identify as "transgender" but do not fall under the first two categories, they would be allowed serve, but only "in their biological sex" (which

means that openly transgender persons would generally not be allowed to serve in conformance with their identity).

   i.  Current Service Members With Diagnoses of Gender Dysphoria Who Either Have Transitioned or Have Begun to Transition

   Plaintiffs Regan Kibby, Jane Does 2 through 5, and John Doe 1 are current service members who have been diagnosed with gender dysphoria.[4]  The Mattis Implementation Plan generally bans individuals who have been diagnosed with gender dysphoria from military service on the grounds that they are mentally unstable and that their presence in the military disrupts unit cohesion, prevents good order and discipline, and is generally incompatible with military readiness and lethality.  However, the Mattis Implementation Plan contains a limited exception from this ban for current service members who, like Plaintiffs Regan Kibby, Jane Does 2 through 5, and John Doe 1, were "diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy."  Mattis Implementation Plan at 2.  This "grandfather provision" purports to be based on the military's prior "commitment to these Service members" and "the substantial investment it has made in them."  Panel Report at 43.  Defendants argue that the existence of this grandfather provision means that the Mattis Implementation Plan does not harm these Plaintiffs.

   Defendants are wrong.  The Mattis Implementation Plan clearly harms all current service members with gender dysphoria—even those who are allowed to remain in the military as a result of a narrow grandfather provision.  It singles them out from all other service members and marks them as categorically unfit for military service.  *See generally* Panel Report.  It sends the message to their fellow service members and superiors that they cannot function in their

_____

[4] Plaintiff Regan Kibby is a midshipman at the U.S. Naval Academy.  The parties agree that for the purposes of the Court's standing analysis, he should be treated as a current service member.

respective positions. That they are mentally unstable. That their presence in the military is incompatible with military readiness, unit cohesion, good order, and discipline. In sum, it is an express statement that these individuals' very presence makes the military weaker and less combat-ready.

By singling these Plaintiffs out and stigmatizing them as members of an inherently inferior class of service members, the Mattis Implementation Plan causes Plaintiffs grave non-economic injuries that are alone sufficient to confer standing. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.") (internal citation omitted).

Defendants disagree that this "stigmatic" injury alone is sufficient to confer standing. They claim that "an alleged injury arising from discrimination 'accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.'" Defs.' Reply at 11 (quoting *Allen*, 468 U.S. at 755). But the principal case Defendants cite in support of this argument, *Allen v. Wright*, is readily distinguishable. The plaintiffs in *Allen* were the parents of African American public school children. *Allen*, 468 U.S. at 739. They challenged the Internal Revenue Service's grant of tax-exempt status to racially segregated private schools. *Id.* at 744-45. The *Allen* Court rejected the plaintiffs' claim of standing based on the "stigmatic injury, or denigration" that is "suffered by all members of a racial group when the Government discriminates on the basis of race." *Id.* at 754. The Supreme Court held that "[t]here can be no doubt that this sort of noneconomic injury is one of the most

serious consequences of discriminatory government action and is sufficient in some circumstances to support standing." *Id.* at 755. However, it concluded that such stigmatic injury did not support standing for the particular plaintiffs in *Allen* because their children had never applied to any of the private schools at issue, and therefore they had not been "personally denied equal treatment." *Id.* Instead, they had merely alleged an "abstract stigmatic injury" that would be equally applicable to "all members" of an entire racial group, nationwide. *Id.* at 756.

The situation here is fundamentally different. Plaintiffs are not merely concerned members of the public or bystanders presenting a generalized grievance. They are members of the precisely defined group that the Mattis Implementation Plan discriminates against by labelling as unsuited for military service. The Mattis Implementation Plan sends a blatantly stigmatizing message to all members of the military hierarchy that has a unique and damaging effect on a narrow and identifiable set of individuals, of which Plaintiffs are members. Moreover, unlike the alleged injury in *Allen*, the stigmatic injury alleged by Plaintiffs is caused by their receiving unequal treatment under the Mattis Implementation Plan. Under that plan, Plaintiffs would be allowed to remain in the military but, unlike any other service members, only pursuant to an exception to a policy that explicitly marks them as unfit for service. No other service members are so afflicted. These Plaintiffs are denied equal treatment because they will be the only service members who are allowed to serve only based on a technicality; as an exception to a policy that generally paints them as unfit. In their words, "[w]hile other service members will enjoy the security and status of serving as honored, respected, and equal members of the Armed Forces," Plaintiffs "will serve only on conditional sufferance and therefore on objectively unequal terms." Pls.' Reply in Support of their Cross-Mot. for Summary Judgment,

ECF No. 149, at 23.[5]  Because their stigmatic injury derives from this unequal treatment, it is sufficient to confer standing.

Regardless, even assuming that the "stigmatic" aspects of Plaintiffs' injuries were not alone sufficient to confer standing, the Mattis Implementation Plan does more than just stigmatize Plaintiffs.  It creates a substantial risk that Plaintiffs will suffer concrete harms to their careers in the near future.  There is a substantial risk that the plan will harm Plaintiffs' career development in the form of reduced opportunities for assignments, promotion, training, and deployment.  These harms are an additional basis for Plaintiffs' standing.

Defendants argue that these alleged harms are too "speculative," but the Court disagrees. The Secretary of Defense has personally issued a policy, with a lengthy supporting memorandum, that, in effect, instructs the entire armed forces that Plaintiffs' service is harmful to the military.  There is nothing speculative about the proposition that, having been so instructed by the very top of the military hierarchy, Plaintiffs' supervisors will place less trust in Plaintiffs and be less likely to give Plaintiffs quality assignments and opportunities.  The very nature of such a pronouncement from the Secretary of Defense creates a non-speculative and substantial risk that Plaintiffs' experience, career development, and growth in the military will be hampered. To pretend otherwise is fanciful.  This fairly obvious conclusion is buttressed by evidence of the effects of prior negative proclamations about transgender service.   For instance, Jane Doe 2 declares that she received an unfavorable work detail to keep her "separated from the rest of [her] unit because [she is] transgender and because of the President's ban, as [she] never had any

---

[5] *In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008) is also distinguishable.  Unlike in that case, Plaintiffs here do not merely take offense to a message that can be *interpreted* from government action.  Plaintiffs assert that they are directly injured by an *explicit government message* about their suitability as service members.

problems with this kind of treatment in [her] old unit and [does] not know of any other reason [why] she would be treated this way." Decl. of Jane Doe 2, ECF No. 40-2, at ¶ 15. The detail requires Jane Doe 2 to "driv[e] far away from my base all day every day" and despite the fact that she is "supposed to be in charge of four or five other soldiers, [she has] yet to meet them." *Id.* The conclusion is also supported by the declarations of the former United States Secretaries of the Army and Navy, and a Professor Emeritus at the Naval Postgraduate School in Monterey, California. *See, e.g.*, Supp. Decl. of Raymond E. Mabus, Jr., ECF No. 51-1, at ¶ 7 ("transgender service members are losing opportunities for assignments that they are capable of doing"); Supp. Decl. of Eric K. Fanning, ECF No. 51-3, at ¶ 6 (transgender service members' "advancement and promotion opportunities in the military" are being substantially limited); Decl. of Mark J. Eitelberg, ECF No. 51-4, at ¶ 11 (directives "instruct[ing] commanders and other service members that transgender individuals are detrimental to the military . . . erode[ ] the value that members serving with them place on their contributions or performance" which "harm[s] and restrict[s] artificially" their ability to serve).[6]

The grandfather provision of the Mattis Implementation Plan does not alleviate these harms. That provision does not state, nor does it appear to be based on, a conclusion that those who will be allowed to remain in the military like Regan Kibby, Jane Does 2 through 5, and John Doe 1 are somehow more fit to serve than those who will be banned. Instead, the provision is based—purportedly—on a conclusion that discharging these particular individuals would be

---

[6] Defendants argue that the statements of these individuals are all irrelevant because they predate the Mattis Implementation Plan, Defs.' Reply at 13-14, but that argument assumes what the Court rejects in the latter portions of this Opinion: that the Mattis Implementation Plan is a "new policy" separate and distinct from the President's 2017 directives. The Mattis Implementation Plan merely implements the basic policy directives in the President's 2017 tweet and memorandum. Evidence about the effects of the 2017 directives is therefore relevant to assessing the impact of the Mattis Implementation Plan.

unfair because they relied on the military's prior policy pronouncements, and also inefficient because the military has already invested time and money into their training. Accordingly, the message of the policy—that, under general circumstances, these Plaintiffs should not be in the military—remains intact. That message is substantially likely to harm Plaintiffs' careers in very real ways. Accordingly, the Court finds that Plaintiffs Regan Kibby, Jane Does 2 through 5, and John Doe 1 have standing.

    ii. <u>Prospective Service Members Who Have Undergone Gender Transition</u>

    Jane Doe 7 and John Doe 2 are prospective service members who have already undergone, or are currently undergoing, gender transition, and are also actively taking steps toward enlistment. *See* Decl. of Jane Doe 7, at ¶ 1 (attesting that she "went through the process of gender transition seven years ago" and has "been trying to enlist in the Coast Guard"); Decl. of John Doe 2, at ¶¶ 8-13 (attesting that he has "completed transition" and been "actively working with [his] recruiter to enlist in the Army"). If the Mattis Implementation Plan takes effect, these individuals will be barred from military service because they have undergone gender transition. Being barred from service is clearly an "injury in fact" sufficient to give these Plaintiffs standing. *See Doe 1*, 275 F. Supp. 3d at 203 (explaining in Court's prior Opinion that Plaintiffs have standing due to the "substantial risk that they will be denied accession or discharged from the military due to their transgender status").

    Defendants argue that the Mattis Implementation Plan deprives these Plaintiffs of standing because (if they rush to enlist) they can still join the military while this Court's preliminary injunction is in effect and the Mattis Implementation Plan is not allowed to be implemented. *See* Defs.' Mem. at 12-13. Distilled to its essence, Defendants' argument is that because transgender service members who enlist before the Mattis Implementation Plan goes into effect will be allowed to remain in the military under the plan's grandfather provision, Plaintiffs can and

should enlist now to avoid any harm. *Id.* If Plaintiffs do not enlist right now while the preliminary injunction is in effect and take advantage of the grandfather provision, their harm is self-inflicted. *Id.* Defendants argue that Plaintiffs cannot manufacture standing based on "self-inflicted" harm. *Id.*

This argument is based on a misunderstanding of the Court's standing analysis. Plaintiffs challenge the constitutionality of the policies realized in the Mattis Implementation Plan, which Defendants are prepared to implement. Those policies, and that plan in particular, are not yet in effect, *but only because the Court granted Plaintiffs' Motion for a Preliminary Injunction in this case*, not because Defendants have decided to allow Plaintiffs to enlist as transgender military personnel during this period. All indications suggest that the Defendants have every intention of enforcing the plan as soon as they are no longer enjoined from doing so and, in fact, Defendants have moved this Court and other courts to dissolve injunctions so that they can accomplish that goal. That the plan does not harm Plaintiffs so long as the preliminary injunction is in force, of course, does not mean that Plaintiffs lack standing. To assess whether Plaintiffs have standing, the Court must determine whether that plan would harm them if the Court *lifted* its injunction and allowed the plan to go into effect. There is no dispute that if the Court did so, Jane Doe 7 and John Doe 2 would be barred from military service by the Mattis Implementation Plan. Accordingly, they have standing.[7]

Moreover, even if these Plaintiffs did rush to enlist in the military while this Court's injunction was in place and therefore fell into the Mattis Implementation Plan's grandfather

_____

[7] Moreover, the very fact that these Plaintiffs are required to enlist in the military immediately, while the Court's preliminary injunction remains in effect, or be forever banned, is a sufficient injury to confer standing. These Plaintiffs are harmed by such a "now-or-never" requirement because it subjects them to a barrier on their entry into the military that their competitors are not subject to.

provision, they would still be subject to the same stigmatic and career-damaging injuries that afflict those Plaintiffs who are current service members who have been diagnosed with gender dysphoria.

Finally, Defendants argue that, even assuming that the Mattis Implementation Plan has taken effect, and thus Jane Doe 7 and John Doe 2 are barred from military service, there would still be no injury because these Plaintiffs "would not be personally denied equal treatment." Defs.' Reply at 15.  This is so, Defendants argue, because Plaintiffs "have not shown that they would be treated differently than any other individual who seeks to join the military with a preexisting medical condition."  *Id.*  This argument "concerns the merits rather than the justiciability of plaintiffs' claims."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018).  It has no relevance to the Court's assessment of standing.  When assessing standing, the Court assumes that the challenged policies in fact violate equal protection.  *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) ("[T]he Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim." (internal quotation marks omitted)).[8]

### iii.  Current Service Member Without a Diagnosis of Gender Dysphoria

Jane Doe 6 is a current service member who does not yet have a diagnosis of gender dysphoria.  Jane Doe 6 had made a behavioral health appointment to obtain a transition plan and begin her gender transition, but—for obvious reasons—aborted that effort when President Trump tweeted that transgender individuals would not be permitted to serve.  After that, Jane Doe 6 has

---

[8] Defendants also argue that Plaintiffs who are prospective service members lack standing because, even though they are generally prohibited from acceding under the Mattis Implementation Plan, they may seek waivers from the policy.  *See* Defs.' Mem. at 12 n.4.  The Court already explained in its October 30, 2017 Memorandum Opinion why the hypothetical potential for waivers does not divest Plaintiffs of standing.  *See Doe 1*, 275 F. Supp. 3d at 201.

not disclosed her transgender identity and has not received a military diagnosis of gender dysphoria because she is afraid that she will be discharged. Because she has not yet received a diagnosis of gender dysphoria, Jane Doe 6 would face discharge under the Mattis Implementation Plan if she sought such a diagnosis after the plan took effect.

As with Jane Doe 7 and John Doe 2, Defendants argue that the Mattis Implementation Plan has alleviated any harm Jane Doe 6 might have suffered under the President's 2017 directives. Defendants claim that if Jane Doe 6 seeks a diagnosis of gender dysphoria from a military doctor while this Court's preliminary injunction is still in place and the Mattis Implementation Plan has not yet gone into effect, she will be able to continue to serve under the plan's grandfather provision. Defs.' Reply at 14-15. Again, the Court rejects the logic of this argument. The Court asks whether the Mattis Implementation Plan, if allowed to go into effect, would harm Jane Doe 6. The answer is clear: it would. It would subject her to discharge if she sought a diagnosis of gender dysphoria and gender transition therapy.

Moreover, even if Jane Doe 6 were to obtain a diagnosis prior to the implementation of the plan and therefore fall within the grandfather provision, she would still be subject to the same stigmatic and career-damaging injuries that afflict those Plaintiffs who are current service members who have been diagnosed with gender dysphoria. Jane Doe 6 does not lack standing simply because she has the option of either remaining in the military and disavowing her identity as a transgender person, or coming out and serving as a member of an officially branded inferior class of service members. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (holding that where a plaintiff "eliminated the imminent threat of harm by simply not doing what he claimed the right to do," the court still had "subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced").

iv.  Dylan Kohere

Finally, Plaintiff Dylan Kohere—who is transgender and has begun working with medical professionals on a treatment plan for transition—has standing.  Kohere is barred from joining his university's ROTC program and ultimately will not be allowed to accede into the military.  As the D.C. Circuit has already acknowledged, Kohere is injured by a policy that prevents him from acceding if for no other reason than because "inability to accede in the future . . . disqualifies [him] from educational opportunities now."  *Doe 1*, 2017 WL 6553389, at *3.

Defendants argue that Kohere now lacks standing because "since DoD's policy was announced in March 2018, Mr. Kohere has failed to respond to any of the cadre's multiple requests to discuss his enrollment in ROTC and did not register for any ROTC classes in the upcoming fall semester," nor did he apply for a scholarship.  Defs.' Reply at 17.  In other words, Defendants appear to be implying that Kohere lacks standing because he is no longer interested in pursuing a military career.  The Court is not convinced.  Kohere has attested that his goal is "to spend [his] entire career in the military."  Decl. of Dylan Kohere, ECF No. 13-15, ¶ 2.  The Mattis Implementation Plan would prevent him from doing so and deprive him of educational opportunities.  This is enough to establish his standing.[9]

Finally, Defendants also argue that "[f]ar from being 'categorically barred because he is transgender' . . . under the new policy, Mr. Kohere would be allowed to serve in his biological sex."  Defs.' Reply at 16.  This argument misses the point.  Mr. Kohere is *transgender*.  That means that he *does not identify with his biological sex*.  To serve in his biological sex would be to suppress his identity.  To do so would be a harm in and of itself, sufficient to confer standing.

_____

[9] As with the Plaintiffs discussed above, the fact that Kohere could fall within the Mattis Implementation Plan's grandfather provision does not change this analysis.

The fact that a plaintiff can avoid the effect of a discriminatory policy by renouncing the characteristic that leads to the discrimination in the first place does not mean that the plaintiff lacks standing.

*     *     *

In sum, each Plaintiff that remains in this case continues to have standing, despite the issuance of the 2018 Presidential Memorandum, the Mattis Implementation Plan, and the Panel Report. Defendants' motion to dismiss for lack of standing will be denied.

### 2. Mootness

Defendants also argue that Plaintiffs' claims should be dismissed as moot. Defendants' mootness argument reduces to the following points: Plaintiffs' lawsuit challenges President Trump's 2017 policy of banning transgender military service. The Mattis Implementation Plan does not completely ban transgender military service. It is instead a "new policy" that is distinct from the policy directives announced by President Trump in 2017. Because Defendants are no longer attempting to implement the challenged policy, Plaintiffs' suit is now moot.

The Supreme Court has commanded that a party asserting mootness through cessation of challenged conduct carries a "heavy burden." *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 980 (D.C. Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Defendants have not satisfied their burden here.

The Court begins by noting that even if it were to accept Defendants' argument that Plaintiffs' challenge to the President's 2017 directives is moot, Plaintiffs' lawsuit would not be dismissed in its entirety. Plaintiffs have recently amended their complaint to challenge the Mattis Implementation Plan, and that challenge is clearly still live. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the

amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007). Plaintiffs' Second Amended Complaint alleges that the Mattis Implementation Plan "expressly targets transgender individuals," "prevents transgender individuals from serving consistent with their gender identity," and violates the Fifth Amendment. Pls.' 2d Am. Compl., ECF No. 106, at ¶¶ 86, 87, 92, 97. Accordingly, even if the Court were to accept Defendants' arguments regarding claims focused on the President's 2017 directives, Plaintiffs' lawsuit would not be moot to the extent that it challenges the Mattis Implementation Plan.

Regardless, the Court *does not* accept Defendants' argument that Plaintiffs' challenge to the President's 2017 directives is moot. This argument attempts to draw artificial and unwarranted boundaries between the various policy pronouncements in this case. As explained above, Defendants' mootness argument is based upon the premise that the Mattis Implementation Plan is a new and different policy than the one announced by President Trump in 2017. But Defendants have not demonstrated that this is the case in any meaningful way. To the contrary, the Mattis Implementation Plan appears to be just that—an implementation plan. The plan *implements* the President's 2017 directives that the military not allow transgender individuals to serve in the military.

The Court reaches this conclusion for three basic reasons. First, a plan to implement a policy prohibiting transgender military service is precisely what the President ordered be submitted to him by February 2018 in his 2017 Presidential Memorandum. Second, over the months following the issuance of the 2017 Presidential Memorandum, Department of Defense officials repeatedly stated that they were preparing such an implementation plan. And third, the

Mattis Implementation Plan was provided to the President in February 2018, and it in fact prohibits transgender military service.

First, the 2017 Presidential Memorandum directed the Department of Defense to submit, by February 2018, a plan to *implement* the President's directives that transgender service be prohibited. It did not ask for the submission of a "new policy" on transgender service. In the 2017 Presidential Memorandum, the President directed the military to return to a policy under which: (i) transgender individuals are generally prohibited from accession and (ii) the military is authorized to discharge individuals who are transgender. The 2017 Presidential Memorandum ordered the Secretary of Defense to prepare an "implementation plan" that was circumscribed to suggestions about how to "implement a policy under which transgender accession is *prohibited*, and discharge of transgender service members is *authorized*." *Doe 1*, 275 F. Supp. 3d at 195. It is clear from the 2017 Presidential Memorandum that the "implementation plan" requested by the President was required to "prohibit transgender accession and authorize the discharge of transgender service members." *Id.* The plan was not intended to be a proposal for a "new policy" that *allowed* transgender service. *See Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464, at *6 (W.D. Wash. Apr. 13, 2018) ("The 2017 Memorandum did not direct Secretary Mattis to determine *whether* or not the directives should be implemented, but instead ordered the directives to be implemented by specific dates and requested a plan for *how* to do so.") (emphasis in original).

Second, the actions and statements of Secretary Mattis, and the Department of Defense generally, during the time between the issuance of the 2017 Presidential Memorandum and the Mattis Implementation Plan indicate that the plan being developed was not a "new one" to propose to President Trump, but instead simply one to *implement* President Trump's 2017 policy

directives. In an August 29, 2017 Statement, Secretary Mattis stated that the Department of Defense had "received the [2017] Presidential Memorandum" and would "carry out the president's policy direction." Milgroom Decl., Ex. U. He further stated that he would establish a panel of experts not to consider "new policies," but instead simply "to provide advice and recommendations on the *implementation of the president's direction*." *Id.* (emphasis added). After the "panel reports its recommendations and following . . . consultation with the secretary of Homeland Security," Secretary Mattis stated that he would "provide [his] advice to the president concerning *implementation of his policy direction*." *Id.* (emphasis added); *see also Doe 1*, 2017 WL 6553389, at *2 (noting that "the Secretary's August 29, 2017 statement makes clear that his actions are being undertaken to 'carry out the president's policy direction'").

In a September 14, 2017 document entitled "Military Service by Transgender Individuals – Interim Guidance," Secretary Mattis again stated that he would present the President with a "plan *to implement the policy and directives* in the [2017] Presidential Memorandum." Milgroom Decl., Ex. W, at 1 (emphasis added). The Interim Guidance further stated that the Department of Defense would "*carry out the President's policy and directives*" and would "*comply with the [2017] Presidential Memorandum*." *Id.* (emphasis added). A separate document issued to direct the implementation process stated that Secretary Mattis had convened a panel to "develop[ ] an Implementation Plan on military service by transgender individuals, *to effect the policy and directives of the Presidential Memorandum*." Milgroom Decl., Ex. X, at 1 (emphasis added). That document further acknowledges that the Department was required to "return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016," that is, the general prohibition on transgender service. *Id.* at 2. It stated that the Department had been "direct[ed]" to prohibit accession by transgender

individuals and asked the panel of experts merely how the "guidelines" for such a policy should be updated "to reflect currently accepted medical terminology." *Id.* Acting Under Secretary of Defense for Personnel and Readiness, Anthony M. Kurta, also issued a memorandum in September 2017 that stated that the Department had convened a panel of experts "to support the . . . development of an Implementation Plan on military service by transgender individuals." Milgroom Decl., Ex. Y.[10]

Third, and most importantly, the Mattis Implementation Plan *in fact prohibits transgender military service*—just as President Trump's 2017 directives ordered. It is true that the plan takes a slightly less direct approach to accomplishing this goal than the President's 2017 tweet and memorandum. Instead of expressly banning all "transgender individuals" from military service, the Mattis Implementation Plan works by absolutely disqualifying individuals who require or have undergone gender transition, generally disqualifying individuals with a history or diagnosis of gender dysphoria, and, to the extent that there are any individuals who identify as "transgender" but do not fall under the first two categories, only allowing them to serve "in their biological sex" (which means that openly transgender persons are generally not allowed to serve in conformance with their identity).

But it is not at all surprising that an implementation plan, crafted over the course of months (clearly with assistance from lawyers and an eye to pending litigation) is a longer, more nuanced expression of the President's policy direction than the brief, blanket assertions made by the President himself in 2017. To determine whether Plaintiffs' claims are moot, the Court must

---

[10] Defendants cite statements from Secretary Mattis about the "independence" of the process that led to the creation of the Mattis Implementation Plan, but the context suggests that such "independence" related to *how*, not *whether*, to implement the President's policy directives.

look past these surface-level differences and ask whether, in effect, the Mattis Implementation Plan accomplishes the President's policy that is challenged in this case.

The Court concludes that the Mattis Implementation Plan does just that: it prevents service by transgender individuals. The plan succeeds at doing so in part by prohibiting individuals with traits associated with being transgender: those with "gender dysphoria" and who have undergone or require "gender transition." In addition, although the plan purports to allow some transgender individuals (those without a diagnosis of gender dysphoria or who have not undergone or require gender transition) to serve in the military under certain narrow circumstances, even this purported allowance is illusory. Under the Mattis Implementation Plan, those transgender persons who are not summarily banned are only allowed in the military if they serve *in their biological sex*. But by definition—at least the definition relevant to Plaintiffs' claims in this lawsuit—transgender persons *do not identify or live in accord with their biological sex*. Accordingly, the Mattis Implementation Plan effectively translates into a ban on transgender persons in the military. Tolerating a person with a certain characteristic only on the condition that they renounce that characteristic is the same as not tolerating them at all.[11] As Plaintiffs correctly argue, "[j]ust as a policy allowing Muslims to serve in the military if they

---

[11] Defendants argue that forcing all transgender service members to live in accordance with their biological sex is not the same as a ban on transgender service members because not all transgender individuals choose to come out as such and "live and work in accordance with [their] identity." Defs.' Reply at 21. That this would be the case is not at all surprising, and certainly does not demonstrate that Defendants' policy is not a ban on transgender service members. Decisions about whether and when to admit one's transgender identity and initiate the process of gender transition are presumably affected by many factors, including career considerations, medical considerations, and fear of discrimination. Service members in particular might reasonably choose to delay due to upcoming deployments or other opportunities. That not all transgender service members have openly admitted to their status as such and sought to live in accordance with their gender identities by personal choice does not mean that an official policy forbidding them from doing so is not discriminatory.

renounce their Muslim faith would be a ban of military service by Muslims, a policy requiring transgender individuals to serve in their birth sex *is* a ban on transgender service." Pls.' Opp'n at 10 (emphasis in original); *see also Karnoski*, 2018 WL 1784464, at *6 ("Requiring transgender people to serve in their 'biological sex' does not constitute 'open' service in any meaningful way, and cannot reasonably be considered an 'exception' to the Ban. Rather, it would force transgender service members to suppress the very characteristic that defines them as transgender in the first place."). Accordingly, despite superficial differences between it and the President's 2017 directives, the Mattis Implementation Plan essentially effectuates the policy announced by President Trump in 2017: the banning of military service by transgender individuals. It accordingly does not moot Plaintiffs' claims. *See Glob. Tel\*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 413-14 (D.C. Cir. 2017) ("replacing the challenged law 'with one that differs only in some insignificant respect' and 'disadvantages [petitioners] in the same fundamental way' does not moot the underlying challenge") (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 662 (1993)).[12]

Finally, Defendants repeatedly argue that the 2017 Presidential Memorandum has been "revoked." Even if the Court were to favor form over substance and accept this as an accurate description of what has genuinely occurred, it would not alone be enough to warrant a finding of mootness. As Defendants argue, "[w]hen a law is repealed and replaced, the relevant question is 'whether the new [policy] is sufficiently similar to the repealed [one] that it is permissible to say

_____

[12] Defendants argue that the Mattis Implementation Plan is similar to the currently operative policy on transgender service. *See, e.g.*, Defs.' Reply at 1. The Court disagrees. Any similarities Defendants are able to find between the policies are red herrings. The policies are *fundamentally* different because one allows transgender individuals to serve in accordance with their gender identity, and the other does not (with the exception of a small group of individuals who will be allowed to remain in the armed forces under a grandfather provision).

that the challenged conduct continues,' or, put differently, whether the policy 'has been sufficiently altered so as to present a substantially different controversy from the one . . . originally decided.'"  Defs.' Mot. at 4 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am.,* 508 U.S. at 662 n.3).  Even assuming that the 2017 Presidential Memorandum has been "revoked," and the Mattis Implementation Plan could be viewed as a "new policy," at the very least, the new plan is sufficiently "similar" to the President's 2017 directives that Plaintiffs' claims are not moot.  As already discussed, like the 2017 Presidential Memorandum, the Mattis Implementation Plan generally bars service by transgender individuals.[13]

\*       \*       \*

In sum, whatever legal relevance the Mattis Implementation Plan and associated documents might have, they are not sufficiently divorced from, or different than, the President's 2017 directives such that Plaintiffs' claims are now moot.[14]

--------------------------------------

[13] Defendants argue that the voluntary cessation doctrine does not apply to them.  Defs.' Mem. at 3.  This argument does not survive scrutiny for two reasons.  First, because the Court finds that the Mattis Implementation Plan is simply a plan that implements the Presidential directives that were already at issue in this case, the challenged conduct simply has not ceased, and the Court need not rely on the voluntary cessation doctrine.  Second, the Court is not persuaded that the Defendants in this case—various Executive Branch departments and officials—are all immune from the doctrine.  In a separate Memorandum Opinion and Order issued today, the Court has dismissed the President as a party from this case.  Accordingly, at most, the Court would be applying the voluntarily cessation doctrine to lower Executive Branch officials.  Defendants have not brought to the Court's attention any cases that hold that the voluntary cessation doctrine does not apply to such defendants.  *See* Defs.' Mem. at 3 (citing only *Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990), which relates to Congress, not Executive Branch departments or officials).  As indicated by the facts of this very case, the Executive Branch is able to change military policies back and forth with relative ease and speed, giving rise to the concerns that animate the voluntary cessation doctrine.

[14] To the extent Defendants revive their motion to dismiss for failure to state a claim in this case, that motion is DENIED.  The Court already explained in detail why Plaintiffs' claims were likely meritorious in its October 30, 2017 Memorandum Opinion, and thus not subject to dismissal on the pleadings.  *See Doe 1*, 275 F. Supp. 3d at 205, 207-215.  For the same reasons that the Mattis

### 3. Motion to Dissolve the Preliminary Injunction

Finally, as the discussion above has likely already made clear, the Court will not dissolve its preliminary injunction. It is true that a preliminary injunction "may be dissolved where, for instance, changed circumstances eviscerate the justification therefor." *S.E.C. v. Vision Commc'ns, Inc.*, No. CIV. A. 94-0615 CRR, 1995 WL 109037, at *2 (D.D.C. Mar. 6, 1995). However, the party seeking relief from an injunction bears the burden of establishing that changed circumstances warrant relief. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017). The Court is not persuaded that the circumstances of this case have in fact genuinely changed in such a way that the Court's preliminary injunction is no longer warranted.[15]

Like Defendants' mootness argument, the basic premise of Defendants' argument in support of dissolving the preliminary injunction is that the Mattis Implementation Plan is a "new policy" that does not implement the 2017 directives that were preliminarily enjoined by this Court. For the reasons already set forth above, Defendants have not persuaded the Court that this is the case. Instead, the Court finds that the Mattis Implementation Plan effectively implements the policy directives that were already at issue when the Court's preliminary injunction was ordered. Accordingly, Plaintiffs' challenge to those directives is not moot, and the need remains intact for the Court's preliminary injunction maintaining the *status quo ante* until the final resolution of this case on the merits.

---

Implementation Plan does not moot Plaintiffs' claims, it also does not mean that their allegations now fail to state a claim.

[15] Defendants argue, yet again, that the Court's injunction should be dissolved insofar as it applies to anyone other than the Plaintiffs in this case. The Court has already rejected this argument, *see* Dec. 11, 2017 Order, ECF No. 75, at 7, and rejects it now for the same reasons.

The only material development that has occurred since the Court's preliminary injunction was issued is that the Defendants have prepared a plan to implement the enjoined directives, and a report that purportedly provides support for that plan. These developments do not change the Court's conclusion on any of the preliminary injunction factors.

On the merits, the Mattis Implementation Plan still accomplishes an extremely broad prohibition on military service by transgender individuals that appears to be divorced from any transgender individual's actual ability to serve. In the absence of the challenged policy, transgender individuals are subject to all of the same standards and requirements for accession and retention as any other service member. The Mattis Implementation Plan establishes a special *additional* exclusionary rule that precludes individuals who would otherwise satisfy the demanding standards applicable to all service members simply because they have certain traits that are associated with being transgender. Moreover, because the plan fundamentally implements the policy directives set forth by the President in 2017, the unusual factors associated with the issuance of the 2017 directives are still relevant. For example, the Court is still concerned that, immediately prior to the announcement of the 2017 Presidential directives, the military had studied the issue and found no reason to exclude transgender service members. The Court is likewise still concerned that the President's 2017 directives constituted an abrupt reversal in policy, and a *revocation* of rights, announced without any of the formality, deliberative process, or factual support usually associated with such a significant action. Although it makes no final ruling on the merits in this Memorandum Opinion, the Court is not convinced at this stage that the processes implemented by Defendants *after* President Trump's 2017 Presidential Memorandum, and the memoranda that they have issued since that time, resolve the constitutional issues that persuaded the Court that a preliminary injunction was

warranted in the first place. Based on the record before the Court, these *post hoc* processes and rationales appear to have been constrained by, and not truly independent from, the President's initial policy decisions.

With regard to irreparable injury, Defendants argue again that the Mattis Implementation Plan protects Plaintiffs from any injury. The Court has already rejected those arguments. If the Court were to dissolve its injunction and allow the Mattis Implementation Plan to go into effect, Plaintiffs would suffer very real harms. Defendants also argue that Plaintiffs will not be irreparably injured if the Court dissolves its preliminary injunction because other courts have since issued injunctions that are still in place. The Court rejects this argument as well. The fact that other courts[16] have similarly concluded that Defendants' policy is likely unconstitutional and warrants being preliminarily enjoined is no reason for this Court to lift its own injunction. This is especially so given that Defendants have moved to dissolve those preliminary injunctions, and have appealed the decision of the first court to deny such a motion. Finally, the Court's assessment of the balance of equities and public interest in its preliminary injunction Opinion still stands. It should not be forgotten that the United States military remains engaged in numerous armed conflicts throughout the world, and service members are still being injured and killed in those conflicts. The public interest and equities lie with allowing young men and women who are qualified and willing to serve our Nation to do so.

In short, because the Mattis Implementation Plan would effectively implement the very policies preliminarily enjoined by the Court, the development of that plan is not a reason to dissolve that injunction. To avoid any possible need for clarification, the Court states expressly:

---

[16] *See Karnoski v. Trump*, No. 17-cv-1297-MJP (W.D. Wash.); *Stone v. Trump*, No. 17-cv-2459-GLR (D. Md.); *Stockman v. Trump*, 17-cv-1799-JGB (C.D. Cal).

enforcing the Mattis Implementation Plan would violate the Court's October 30, 2017 preliminary injunction. All of the directives of that injunction remain in effect until further order of the Court.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss for lack of jurisdiction on standing and mootness grounds is DENIED. Defendants' Motion to Dissolve the Preliminary Injunction is also DENIED. The Court has made no final ruling on the merits of Plaintiffs' claims. It has simply held that all Plaintiffs still have standing to pursue their claims, this case is not moot, and there are no changed circumstances that justify dissolving the preliminary injunction. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
