## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| JANE DOE 2, et al., |
| |
| *Plaintiffs*, |
| |
| v. |
| |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al. |
| |
| *Defendants*. |

Case No. 17-cv-1597 (CKK)
Date:  May 21, 2018

### BRIEF OF RETIRED MILITARY OFFICERS AND
### FORMER NATIONAL SECURITY OFFICIALS AS AMICI CURIAE
### IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
### DISMISS AND MOTION FOR PRELIMINARY INJUNCTION,
### AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Harold Hongju Koh
Matthew S. Blumenthal
RULE OF LAW CLINIC
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
203-432-4932

Phillip Spector (D.C. Bar No. 479121)
MESSING & SPECTOR LLP
1200 Steuart Street #2112
Baltimore, MD  21230
202-277-8173

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................3

INTEREST OF *AMICI CURIAE* ...............................................................................................6

ARGUMENT ...............................................................................................................................6

    I.    The President's actions departed sharply from decades of practice involving similar military policy changes. ................................................................................................8

    II.    The President's actions will harm the national security and foreign policy interests of the United States. ...............................................................................................20

CONCLUSION ...........................................................................................................................23

APPENDIX:  LIST OF AMICI .....................................................................................................A

# TABLE OF AUTHORITIES

## CASES

*Goldman v. Weinberger*, 475 U.S. 503 (1986) ................................................................ 7, 17, 19

*Int'l Refugee Assistance Project v. Trump*,  883 F.3d 233 (4th Cir. 2018) (en banc) ............ 18, 19

*Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017),
  *vacated as moot sub nom.*, *Trump v. Int'l Refugee Assistance Project*,
  __ S.Ct. __, 2017 WL 4518553 ............................................................................... 19

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005) .................................................. 20

*Owens v. Brown*, 455 F. Supp. 291 (D.D.C. 1978) ................................................................. 17, 19

*Rostker v. Goldman*, 453 U.S. 57 (1981) ............................................................................... 17, 19

*Stone v. Trump*, 280 F.Supp.3d 747 (D.Md. 2017) ................................................................... 19

*Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996) ................................................................ 18, 19

*United States v. Fordice*, 505 U.S. 717 (1992) .......................................................................... 20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .............................. 20

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ............................................................... 7, 17

## REGULATIONS

Exec. Order No. 9,808, 11 Fed. Reg. 14,153 (Dec. 5, 1946). ...................................................... 9

Mem. from the President of the United States to Sec'y of Def. and Sec'y of Homeland
  Sec., 82 Fed. Reg. 41,319 (Aug. 25, 2017) ...................................................................... 6, 15

## OTHER AUTHORITIES

Barbara Starr et al., *US Joint Chiefs blindsided by Trump's transgender ban*,
  CNN.com, July 27, 2017 ..................................................................................................... 14

Declaration of Brad R. Carson in Support of Plaintiffs' Motion for Preliminary Injunction,
  *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. Aug. 28, 2017) ..................................... 12

Declaration of Raymond Edwin Mabus, Jr. in Support of Plaintiffs' Motion for Preliminary
  Injunction, *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. Aug. 28 2017) ..................... 12

Mem. of Points and Authorities in Supp. of Defs.' Mot. to Dissolve the Prelim. Inj. ............. 7, 16

Dep't of Def., Report and Recommendations on Military Service by Transgender
   Persons (Feb. 2018)............................................................................................... 7, 13, 22

Fact Sheet:  Women in Service Review (WISR) Implementation. ...................................... 11, 12

Harry S. Truman Library and Museum, *Records of the President's Committee
   on Civil Rights* (2000).........................................................................................9

Harry S. Truman Library and Museum, *Records of the President's Committee
   on Equality of Treatment and Opportunity in the Armed Services*.........................................10

Jody Feder, *"Don't Ask, Don't Tell": A Legal Analysis,* Cong. Res. Serv. R40795,
   Aug. 6, 2013.. ...............................................................................................11

Julie Hirschfeld Davis & Helene Cooper, *Trump Says Transgender People Will Not Be
   Allowed in the Military*, N.Y.Times, July 26, 2017...............................................14

K.K. Rebecca Lai et al., *Is America's Military Big Enough?*, N.Y. Times, Mar. 22, 2017 .........21

Kristy Kamarck, *Women in Combat:  Issues for Congress*, Cong. Res. Serv. R42075,
   Dec. 13, 2016..................................................................................................12

Martin Binkin & Mark J. Eitelberg, *Blacks and the Military* (1982) ............................................9

Mem. for Sec'y of Def. & the Sec'y of Homeland Sec., *Military Service by Transgender
   Individuals*, March 23, 2018...........................................................................16, 21

Mem. from Assistant Sec'y of Defense for Health Affairs, to Assistant Sec'y of the
   Army et al., *Guidance for Treatment of Gender Dysphoria for Active and Reserve
   Component Service Members*, July 29, 2016. ........................................................13

Mem. from Sec'y of Def., Mem. for the President, *Military Service by Transgender
   Individuals*, Feb. 22, 2018 ...................................................................................16

Mem. from Sec'y of Def., *Military Service by Transgender Individuals  – Interim Guidance,*
   Sept. 14, 2017 ...................................................................................................15

Mem. from Sec'y of Def., *Terms of Reference – Implementation of Presidential
   Memorandum   on Military Service by Transgender Individuals*, Sept. 14, 2017....................16

Michael Lee Lanning, *African Americans in the Revolutionary War* (2000). ...............................9

Palm Center, Fifty-Six Retired Generals and Admirals Warn That President
Trump's Anti-Transgender Tweets, If Implemented, Would Degrade Military
Readiness, Aug. 1, 2017......................................................................................22

President's Committee on Civil Rights, *To Secure These Rights: The Report of the President's Committee on Civil Rights* (1947) ........................................................................9

RAND Corp., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (2016). ............................................................................................................13

Richard Sisk, *Top Military Brass at Odds with Mattis on Transgender Issues*, Military Times (Apr. 20, 2018) ................................................................................................22

U.S. Dep't of Def., *Instr. 1300.28, In-Service Transition for Transgender Service Members*, Oct. 1, 2016 ...................................................................................................................13

U.S. Dep't of Def., *Report of the Comprehensive Review of the Issues Associated with a Repeal of "Don't Ask, Don't Tell,"* Nov. 30, 2010 ...............................................10

U.S. Dep't of Def., *Report to Congress on the Review of Laws, Policies, and Regulations Restricting the Service of Female Members in the U.S. Armed Forces*, Feb. 2012 ................11

U.S. Dep't of Def., *Statement from Pentagon Press Secretary Peter Cook on Secretary Carter's Approval of Women in Service Review Implementation Plans*, Mar. 10, 2016 .........12

U.S. Dep't of Def., *Statement by Secretary of Defense Ash Carter on DOD Transgender Policy*, Release No: NR-272-15, July 13, 2015 ...................................................12

U.S. Dep't of Def., *Transgender Service in the U.S. Military: An Implementation Handbook* (2016). ....................................................................................................................13

U.S. Sec'y of Def., *Remarks on the Women-in-Service Review*, Dec. 3, 2015 ...........................12

**INTEREST OF AMICI CURIAE**

Amici are retired military officers and former national security officials who have collectively devoted countless decades to safeguarding the security of the United States.  They have been responsible for the readiness of the service members under their command in times of hostilities and peace, and they have led and participated in policy-making processes regarding military personnel at the senior-most levels of the U.S. government.  They greatly appreciate and value military expertise, and the importance of the judiciary deferring to that expertise in appropriate cases.  They submit this brief to explain why this is not such a case.  The President's actions here continue to reflect a sharp departure from decades of military practice across multiple administrations regarding considered policy-making on major questions of military readiness.  Excluding transgender individuals from patriotic service that they are trained and qualified to give based on group characteristics, rather than individual fitness to serve, undermines rather than promotes the national security interests of the United States.

**ARGUMENT**

On the morning of July 26, 2017, President Donald Trump issued three tweets that announced a ban on transgender service members serving in the military.  The tweets did not emerge from a policy review of any kind, and his Joint Chiefs of Staff were unaware that he planned to make this decision at all.  Less than a month later, on August 25, 2017, President Trump issued a Presidential Memorandum that formalized the tweets.  But that document again did not identify any policy-making process or consultations with senior military officials.[1]  Nor

---

[1] Mem. from the President of the United States to Sec'y of Def. & Sec'y of Homeland Sec., 82 Fed. Reg. 41,319 (Aug. 25, 2017) [hereinafter Presidential Mem.].

did it point to a single piece of evidence demonstrating that the ban was necessary for reasons of military necessity, national security, or any other legitimate national interest.

Last month, the Secretary of Defense sent a memorandum to the President implementing the August 2017 Presidential Memorandum.[2]  The DOD memorandum was unambiguously meant to be an *implementation memorandum*, executing the previously made presidential decision; the Presidential memorandum called for such an implementation of its directives, and multiple internal documents make clear that that this is precisely what this memorandum and the study it adopted were intended to be.  Even so, Defendants try to shield this execution of the President's directives from judicial review, asserting throughout their motion that the President is owed the "great deference" that is due "the professional judgment of military authorities."[3] But these actions are as far removed as one can imagine from those cases where courts have deferred to the genuine "considered" or "professional judgment" of military officials.[4]  In fact, the President's tweets and Memorandum did not involve the professional judgment of military authorities at all.  He did not seek their judgment then, and cannot hide behind it now.  And convening a military group to implement his order after the fact cannot erase the original sin.  A predetermined, constitutionally defective order that is based on no evidence or consultations cannot be saved by process that is designed only to implement that order.

---

[2] Dep't of Def., Report and Recommendations on Military Service by Transgender Persons (Feb. 2018) [hereinafter Report and Recommendations].

[3] Mem. of Points and Authorities in Supp. of Defs.' Mot. to Dismiss Pls.' Second Amended Complaint, Or, in the Alternative, Defendants' Motion for Summary Judgment[hereinafter Defs.' Mem.] at 22 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)) (citations omitted) & 36 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 508-09 (1986)); *see also, e.g.*, *id.* at 17-22, 31-32.

[4] *Winter*, 555 U.S. at 24 (quotations and citations omitted); *Goldman*, 475 U.S. at 508-09.

Defendants cannot point to a single case where a court has afforded deference to a President regarding military affairs when that President ordered the abrogation of an existing policy based on no considered review, no consultations with military officials, and no evidence to support his decision.  The President's actions here reflect a remarkable departure from decades of practice across multiple administrations regarding the proper approach to major policy changes regarding personnel issues within the U.S. military.  Consequently, the policies that emerged from such a process will do serious harm to our military's readiness and unit cohesion.

Although the President's policies in this case *affect* national security, they did not emerge from the sort of national security *judgment* that deserves—much less compels—judicial deference.  Amici well understand the critical importance of considered military expertise to the security of our nation, and the need for the judiciary to defer to that expertise in the appropriate circumstances.  But the President should not be allowed to hide behind a cloak of deference a capricious and discriminatory order that will grievously harm not only the service members immediately affected, but also the national security and foreign policy of the United States.

I.    **The President's actions departed sharply from decades of practice involving similar military policy changes.**

Throughout its history, the U.S. military has exercised great care in the selection, training, and retention of qualified personnel as an integral aspect of military readiness.  Significant changes to its personnel policies—particularly those involving the exclusion of entire groups of individuals from military service—have been subjected time and again to a process that includes: 1) a searching policy review, 2) involving senior military officials, 3) that thoroughly examines the best available evidence regarding the impact and consequences of the change.  This practice reflects an appreciation for the gravity of such decisions and the ways in

which even incremental changes in military policy can dramatically affect our Armed Forces'
overall readiness to protect our country.

The paradigmatic case of a major personnel change in the U.S. military is President
Truman's decision seven decades ago to integrate African Americans into the Armed Forces.
Although African Americans had served in the United States military since the Revolutionary
War,[5] many had served in segregated units due to perceived concerns about unit cohesion and
morale.[6]  Prompted by growing concern about racial inequality and unrest in the United States,
on December 5, 1946 President Truman issued an Executive Order appointing the President's
Committee on Civil Rights, a presidential commission comprised of senior defense officials,
religious leaders, and civil rights activists to study, *inter alia*, the question of whether to
desegregate the military.[7]  Over nearly a year, the Committee deliberated across ten meetings,
undertook multiple studies, heard from numerous witnesses in public and private hearings,
received hundreds of communications from private organizations and individuals, and was
assisted in its work by twenty-five agencies across the federal government.[8]

In December 1947, the Committee issued its final report.  The report found that the
practices of the military services in excluding African-Americans was "indefensible," concluding
that that practice had "cost[] lives and money in the inefficient use of human resources,"
"weaken[ed] our defense" by "preventing entire groups from making their maximum
contribution to the national defense," and "impose[d] heavier burdens on the remainder of the

---

[5] *See* Michael Lee Lanning, *African Americans in the Revolutionary War* 73 (2000).
[6] *See* Martin Binkin & Mark J. Eitelberg, *Blacks and the Military* 25-26 (1982).
[7] Exec. Order No. 9,808, 11 Fed. Reg. 14,153 (Dec. 5, 1946); Harry S. Truman Library and
Museum, *Records of the President's Committee on Civil Rights* (2000).
[8] President's Comm. on Civil Rights, *To Secure These Rights: The Report of the President's
Committee on Civil Rights* XI (1947) [hereinafter *To Secure These Rights*]; Harry S. Truman
Library and Museum, *Records of the President's Committee on Civil Rights*, *supra* note 7.

population."[9]  As a result, the Committee called for an immediate end to discrimination and segregation based on "race, color, creed, or national origin, in the organization and activities of all branches of the Armed Services."[10]  Several months later, President Truman issued an executive order declaring that it would be the policy of the United States to require equality of treatment and opportunity for all persons in the U.S. Armed Services without regard to race.[11]

The Obama Administration's repeal of the Don't Ask, Don't Tell directive, which allowed gay, lesbian or bisexual people to serve openly in the military, followed a similarly searching process.  In March 2010, Secretary of Defense Robert Gates convened a working group co-chaired by General Counsel Jeh Johnson of the Department of Defense and General Carter F. Ham of the U.S. Army, and comprised of senior civilian and military leaders from across the Armed Services, to undertake a comprehensive review of the impacts of any repeal.[12] For nine months, members of the working group conducted 95 "information exchange forums" at 51 bases and installations around the world, conducted 140 focus groups, solicited input from nearly 400,000 active duty and reserve service members, engaged the RAND Corporation to update an earlier 1993 study on the topic, studied foreign militaries' integration of gays and lesbians, and conducted a thorough legal review.[13]

On November 30, 2010, the working group issued a 256-page report rejecting the contention that allowing gays to serve openly in the military would result in long-lasting and

---

[9] *To Secure These Rights*, *supra* note 8, at 46-47, 162-63.
[10] *Id.* at 163.
[11] Harry S. Truman Library and Museum, *Records of the President's Committee on Equality of Treatment and Opportunity in the Armed Services*; Exec. Order No. 9981, 13 Fed. Reg. 4313 (July 28, 1948).
[12] U.S. Dep't of Def., *Report of the Comprehensive Review of the Issues Associated with a Repeal of "Don't Ask, Don't Tell,"* Nov. 30, 2010.
[13] *Id.* at 33-39.

detrimental effects on unit cohesion or the ability of units to conduct military missions.[14]  Shortly thereafter, Secretary Gates and Chairman of the Joint Chiefs Admiral Michael Mullen called on Congress to immediately repeal the Don't Ask, Don't Tell law.  Congress passed just such a bill, which President Obama signed into law.  Seven months later, President Obama, newly confirmed Secretary of Defense Leon Panetta, and Admiral Mullen formally certified under the new statute that the American military was ready to repeal the old policy.[15]

The decision to include female service members in combat roles likewise emerged from a careful, evidence-based process—this time, a congressionally mandated policy and legal review undertaken by the Secretary of Defense, in consultation with the Military Department Secretaries, of the policies and regulations that had officially barred women from serving in combat positions.  The process involved an extensive review of the policies and laws governing the assignment of women in the Armed Forces, and the feasibility of opening to women military occupational specialties that were then closed to them.  Following that review, the Department of Defense wrote a February 2012 report concluding that, given the "dynamics of the modern-day battlefield . . . there is no compelling reason" to preclude female service members from being assigned to . . . direct ground combat units," and declaring its intent to rescind the "co-location rule" that had prevented female Service members from being assigned to units that were doctrinally required to physically co-locate with direct ground combat units.[16]

Following nine months of additional study, the Joint Chiefs of Staff unanimously recommended to Secretary Panetta that he also do away with the remaining barriers to service for

---

[14] *Id.* at 119.

[15] Jody Feder, *"Don't Ask, Don't Tell": A Legal Analysis,* CRS Rep. R40795, Aug. 6, 2013.

[16] U.S. Dep't of Def., *Report to Congress on the Review of Laws, Policies, and Regulations Restricting the Service of Female Members in the U.S. Armed Forces*, Feb. 2012; Fact Sheet: Women in Service Review (WISR) Implementation [hereinafter "Fact Sheet"].

women.  On January 24, 2013, Secretary Panetta announced that the Department would rescind

the Direct Combat Exclusion Rule on women serving in previously restricted occupations.[17]  He

also called on each of the services to undertake their own separate "women in the service"

reviews of how to move forward with the integration of women into previously closed positions,

and identify any recommended exemptions for particular positions.[18]  This process led to more

than thirty additional studies over the next three years.[19]  After the Secretaries of each of the

services completed their reviews and submitted their final recommendations, Secretary of

Defense Ashton Carter ordered the military to open all combat jobs to women who meet the

validated occupational standards.[20]

Finally, the very opening of military service to transgender personnel that President

Trump now is seeking summarily to reverse emerged from a rigorous, now-truncated

policymaking process.  In July 2015, Secretary Carter created a formal working group to explore

the "policy and readiness implications of welcoming transgender persons to serve openly" in the

military.[21]  Over the following year, the working group engaged in what one senior member

would describe as a "detailed, deliberative, [and] carefully run process."[22]  Each military service

was represented in the working group by a senior uniformed officer, a senior civilian official,

---

[17] Kristy N. Kamarck, *Women in Combat: Issues for Congress*, Cong. Res. Serv. R42075, Dec. 13, 2016.

[18] U.S. Dep't of Def., *Statement from Pentagon Press Secretary Peter Cook on Secretary Carter's Approval of Women in Service Review Implementation Plans*, March 10, 2016.

[19] Fact Sheet, *supra* note 16.

[20] U.S. Sec'y of Def., *Remarks on the Women-in-Service Review*, Dec. 3, 2015; Kamarck, *supra* note 17.

[21] U.S. Dep't of Def., *Statement by Secretary of Defense Ash Carter on DOD Transgender Policy,* Release No: NR-272-15, July 13, 2015.

[22] Decl. of Raymond Edwin Mabus, Jr. in Support of Plaintiffs' Motion for Preliminary Injunction at 3, *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. 28 Aug. 2017).

and various staff members.[23]  The working group created sub-groups to investigate specific

issues, consulted with medical, personnel, and readiness experts, and spoke with health insurance

companies and commanders of transgender service members.  At the end of this process, the

working group unanimously concluded that transgender individuals should be permitted to serve

openly.[24]

Meanwhile, the Department had commissioned a parallel, independent study from the

RAND Corporation.  This study focused on seven broad research questions, among them the cost

of providing medical coverage to transgender individuals, the readiness implications of the

proposed policy, and any applicable lessons from the eighteen foreign militaries that already

allowed open transgender service.[25]  RAND laid out its findings in a 71-page report, which found

that allowing transgender people to serve openly would place an "exceedingly small" burden on

health care expenditures and have a "minimal impact" on readiness.[26]  Based on the review

carried out by these two independent and thorough processes, Secretary Carter announced the

policy change in June 2016.

For more than a year after that change, transgender individuals currently in the military

were able to serve openly alongside their fellow service members.  The Department released a

71-page handbook specifying implementation strategies,[27] and issued guidelines for both in-

---

[23] Decl. of Brad R. Carson in Support of Plaintiffs' Motion for Preliminary Injunction at 3, *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. 28 Aug. 2017).

[24] *Id*. at 3, 7.

[25] RAND Corp., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ix (2016).

[26] *Id*. at xi and 47.

[27] U.S. Dep't of Def., *Transgender Service in the U.S. Military: An Implementation Handbook* (2016).

service medical transition procedures and treatment of gender dysphoria.[28]  But for President Trump's abrupt about-face, this studied, measured, and incremental process would have concluded on January 1, 2018 with the accession of openly transgender individuals into the U.S. military.

Each of the above personnel decisions was the product of a rigorous policy review involving senior military officials and an evidence-based examination of the likely impact of the proposed change.  The results were neither pre-cooked nor based on presumptions about the capabilities of the groups under study.  In sharp contrast, on the morning of July 26, 2017, President Trump suddenly announced a ban on transgender persons serving in the military.  In a series of three tweets, the President (speaking as @realDonaldTrump) declared,

> "The United States Government will not accept or allow . . . [t]ransgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming . . . victory and cannot be burdened with the tremendous medical costs and disruption that transgender [sic] in the military would entail. Thank you[.]"

No effort was made—nor evidence presented—to show that this pronouncement resulted from any analysis of the cost or disruption allegedly caused by allowing transgender individuals to serve openly in the military.  According to reports, the Joint Chiefs of Staff were not consulted at all on the decision before the President issued the tweet.[29]  Secretary of Defense James N. Mattis, who was on vacation at the time, was given only a single day's notice that the decision

---

[28] U.S. Dep't of Def., *Instr. 1300.28, In-Service Transition for Transgender Service Members* (Oct. 1, 2016); Mem. from Assistant Sec'y of Def. for Health Affairs to Assistant Sec'y of the Army et al., *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members*, July 29, 2016.
[29] Barbara Starr et al., *US Joint Chiefs blindsided by Trump's transgender ban*, CNN (July 27, 2017).

was coming.[30]   The announcement came so abruptly that White House and Pentagon officials were unable to explain even the most basic details about how it would be carried out.[31]

About four weeks later, on August 25, 2017, President Trump followed the tweets with a Presidential Memorandum entitled "Military Service by Transgender Individuals," directed to the Secretary of Defense and the Secretary of Homeland Security.[32]   This Memorandum instructed the Secretaries to return to the earlier policy of discrimination against transgender service members (in section 1(b)), and to maintain the bar on accession of transgender individuals into the military and halt the use of all resources to fund new sex reassignment surgical procedures (in section 2).   Again, this Memorandum pointed to no policy process that led to the decision, did not cite any consultations with any military officers, and did not identify a single piece of evidence to support its change in policy.

The Presidential Memorandum also instructed the Secretary of Defense, in consultation with the Secretary of Homeland Security, to "submit to me a plan for *implementing* both the general policy set forth in section 1(b) of this memorandum and the specific directives set forth in section 2 of this memorandum" by February 21, 2018.[33]   On September 14, 2017, the Secretary of Defense wrote a memorandum to senior Pentagon officials explaining that he had received the Presidential Memorandum and would "present the President with a plan to *implement* the policy and directives in the Presidential Memorandum."[34]   The Secretary nowhere

---

[30] Julie Hirschfeld Davis & Helene Cooper, *Trump Says Transgender People Will Not Be Allowed in the Military*, N.Y. Times (July 26, 2017).
[31] *Id.*
[32] Presidential Mem., *supra* note 1.
[33] *Id.* § 3 (emphasis added). The Presidential Memorandum twice more referred to this undertaking as an "implementation plan."  *Id.*
[34] Mem. from Sec'y of Def., *Military Service by Transgender Individuals – Interim Guidance*, Sept. 14, 2017.

suggested that he had any discretion or intention to promote reconsideration of the original policy decision made by presidential tweet.

In a separate memorandum issued the same day, the Secretary of Defense "direct[ed] the Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff to lead the Department of Defense (DOD) in developing an Implementation Plan on military service by transgender individuals, to effect the policy and directives in Presidential Memorandum, Military Service by Transgender Individuals, dated August 25, 2017."[35]  The memorandum ordered the creation of a panel of civilian and uniformed military leaders and combat veterans, and instructed that their work would be "planned and executed to inform the Implementation Plan."[36]  The memorandum went on to observe, with regard to accessions, that the "Presidential Memorandum directs DoD to maintain the policy currently in effect, which prohibits accession of transgender individuals into military service," and instruct that the role of the Panel would be not to consider the merits of this policy, but instead to recommend updates to the "guidelines to reflect currently accepted medical terminology."[37]  In February 2018, the Secretary of Defense, with the agreement of the Secretary of Homeland Security, sent the President a memorandum adopting the results of the panel, and a 44-page report reflecting the panel's work.[38]  The President adopted this implementation plan in a March 23, 2018 Presidential Memorandum.[39]

---

[35] Mem. from Sec'y of Def., *Terms of Reference – Implementation of Presidential Memorandum on Military Service by Transgender Individuals*, Sept. 14, 2017.
[36] *Id.*
[37] *Id.*
[38] Mem. from Sec'y of Def., Mem. for the President, *Military Service by Transgender Individuals*, Feb. 22, 2018.
[39] Mem. for Sec'y of Def. & Sec'y of Homeland Sec., *Military Service by Transgender Individuals*, March 23, 2018.

The President now seeks to shield this sequence of events from judicial scrutiny by invoking "the highly deferential review" that the Constitution has historically afforded national security and military judgments.[40]   He claims that such deference is appropriate here because the lawsuit is challenging "independent military judgment."[41]   In fact, the Supreme Court has only given "great deference to the *professional judgment of military authorities* concerning the relative importance of a particular military interest," *Winter*, 555 U.S. at 7 (emphasis added) (citations omitted), and the "*considered professional judgment*" of "appropriate military officials," *Weinberger*, 475 U.S. at 508-09 (emphasis added).   Here, the President issued the order to ban transgender individuals from the military entirely on his own, without even seeking the judgment of his senior military officials, then looked to those officials only to "implement" his decision.   The President cannot bypass the judgment of his military advisers, and then invoke deference expressly based on that judgment.

A review of earlier cases illustrates the sort of judgment that courts look for before affording special deference to the coordinate branches on issues of military personnel policy-making.   For example, in *Rostker v. Goldman*, 453 U.S. 57 (1981), the Supreme Court upheld the constitutionality of provisions that authorized the President to require men, but not women, to register for the draft.   The Court deferred to "Congress' evaluation of th[e] evidence," noting that "[t]his case is quite different from several of the gender-based discrimination cases we have considered in that . . . Congress did not act 'unthinkingly' or 'reflexively and not for any considered reason.'"   *Id.* at 72, 83 (quoting Br. for Appellees) (emphasis omitted).   The Court pointed to the fact that the issue was "extensively considered by Congress in hearings, floor

---

[40] Defs.' Mem. at 17.

[41] *Id.*

debate, and in committee" before a decision was reached on which of the available policy

options it would select.  *Id.* at 72; *see also, e.g.*, *id.* at 63, 79.

By contrast, this Court found unconstitutional a statutory provision barring the

assignment of female personnel to duty on Navy vessels other than hospital ships and transports.

*Owens v. Brown*, 455 F. Supp. 291 (D.D.C. 1978).  The court acknowledged that "a high degree

of deference is owed to the political branches of government in the area of military affairs," in

part because "oversight of military operations typically involves complex, subtle, and

professional judgments that are best left to those steeped in the pertinent learning."  *Id.* at 299

(quotations and citations omitted).  But the court noted that the language in that case had been

"added casually, over the military's objections and without significant deliberation," and the

court found compelling "the results of the experiment conducted by the Navy on the USS

Sanctuary . . . that assigning women to noncombat duty on vessels will pose no insurmountable

obstacles."  *Id.* at 305, 309.

The courts' treatment of claims of national security deference in this regard is

underscored by a comparison of a pair of cases from the Fourth Circuit.  In *Thomasson v. Perry*,

the court premised its decision upholding the constitutionality of the Don't Ask, Don't Tell

policy on a lengthy discussion of the policy deliberations that took place before the enactment of

the directive.  80 F.3d 915, 921-23 (4th Cir. 1996).  Emphasizing that the directive emerged from

an "exhaustive review" and "extensive deliberation" by the executive branch and Congress, the

court only then went on to defer to what it described as the "considered judgment" of those

coordinate branches of government.  *Id.* at 922-27.

In *Int'l Refugee Assistance Project ("IRAP") v. Trump*, by contrast, the Fourth Circuit

sitting en banc held that a challenge to President Trump's Proclamation restricting the entry of

individuals from predominantly Muslim-majority countries was likely succeed on its merits, over

the President's attempt to invoke deference on national security grounds.  883 F.3d 233 (4th Cir.

2018) (en banc).  The court underscored at the outset of its opinion that the "President's national

security officials were taken by surprise" by the initial executive order in the case, and that the

executive order "did not undergo the usual deliberative process."  *Id.* at 250 (citations omitted).[42]

President Trump's tweets and August 2017 Memorandum ordering a ban on transgender

individuals in the military show no signs of the considered judgment that traditionally has given

rise to deference in the military sphere.  These initial orders were not driven by the "professional

judgment" of "appropriate military officials," as there is no indication that military officials were

involved in the tweets and Memorandum at all.  *Weinberger*, 475 U.S. at 508-09.  Nor did these

actions result from an "exhaustive review", as in fact there was no review to speak of.

*Thomasson*, 80 F.3d at 927.  The President's actions here far more closely resemble those cases

where the decision was made "casually," *Owens,* 455 F. Supp. at 305, or "reflexively and not for

any considered reason," *Rostker*, 453 U.S. at 72, or where it "did not undergo the usual

deliberative process."  *IRAP*, 857 F.3d at 596.

It is no answer for Defendants to suggest that the recent Pentagon review belatedly

introduced military judgment into the process.  As the President plainly directed – and as the

Secretary of Defense acknowledged—this review was meant only to "implement[]" the

---

[42] *See also Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 592 (4th Cir. 2017), *vacated as moot sub nom.*, *Trump v. Int'l Refugee Assistance Project*, __ S.Ct. __, 2017 WL 4518553 (relying, in an earlier iteration of the same case, on "the exclusion of national security agencies from the decision-making process" to conclude that the Order's "stated national security interest was provided in bad faith, as a pretext for its religious purpose.").

President's order in his August 2017 Memorandum.[43]  The military's role here was only to

follow orders, not to "reconsider[] the question" of including transgender individuals or

otherwise revisit the initial presidential judgment. [44]  Predictably, the policy that resulted—a

sequence of rules that collectively bar transgender individuals from serving consistent with their

gender identity—achieves precisely what the President's tweets and August 2017 Memorandum

commanded.

        Even if the Department of Defense and Homeland Security review did not merely

implement existing orders, process after-the-fact process still would not cure the illegality of the

President's tweets and Memorandum.  The law is clear that an initial order that is tainted by an

unconstitutional purpose cannot be cured by a later review that preserves the essence of the

original.  *See McCreary County* v. *ACLU of Kentucky,* 545 U.S. 844, 866 (2005) (holding that

sectarian purpose had persisted in later iterations of a public display; the suggestion that

"purpose in a case like this one should be inferred . . . only from the latest news about the last in

a series of governmental actions . . . just bucks common sense"); *United States* v. *Fordice*, 505

U.S. 717, 730 (1992) (invalidating Mississippi's re-classification of its state colleges and

universities because "[i]f policies traceable to the *de jure* system are still in force and have

discriminatory effects, those policies too must be reformed to the extent practicable"); *IRAP*, 883

F.3d at 268 (rejecting argument that a later-in-time "months-long multi-agency review" cured the

impermissible purpose reflected in an initial executive order) (quotations omitted).

---

[43] *See supra* at pages 14-16; *see also Stone v. Trump*, 280 F.Supp.3d 747, 763 (D.Md. 2017)
(holding that the President's instruction in the Memorandum to complete an implementation plan
was "not a request for a study but an order to implement the Directives contained therein").
[44] Defs.' Mem. at 19 (quoting *Rostker*, 453 U.S. at 19).

Here, the process that led to the decision was not just deficient, but sharply departed from precedent.  The Supreme Court has emphasized that "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government action.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).  The President's failure to consult military experts in his initial tweet and August 2017 Presidential Memorandum, his failure to ground his decision in any evidence or facts, and his failure to undertake any considered review apart from implementing a major personnel decision he had already made, represents such a dramatic break from precedent that it can only call the true basis for that decision into question.

## II.   The President's actions will harm the national security and foreign policy interests of the United States.

The implementation plan imposes three principal restrictions on transgender individuals.  First, transgender individuals who "require or have undergone gender transition" are disqualified from military service.  Second, transgender individuals with a "history or diagnosis of gender dysphoria are disqualified from military service" except "under limited circumstances."  Third, all other transgender individuals are permitted to serve only "in their biological sex."[45]  Together, these rules effectively bar transgender individuals from serving consistent with their gender identity.  This exclusion of transgender individuals based on group characteristics rather than individual fitness will gravely harm the effectiveness of our military and the national security and foreign policy interests of the United States.

On its face, this policy harms military readiness by categorically excluding individuals on the basis of their gender identity, rather than their fitness to serve.  The U.S. military has in place

---

[45] Mem. from Sec'y of Def., *supra* note 38.

objective physical and psychological standards tied to individual performance and competency that all members must meet.  There is every indication that these standards can effectively screen transgender individuals who are unable to serve without the need for a categorical ban.  By the Department of Defense review's own admission, under the Open Policy, particular transgender individuals were disqualified on the basis of these standards, for reasons such as depression, just as other service members were.[46]  President Trump has proposed expanding the number of active duty Army and Marine Corps service members by almost 70,000 personnel—but to accomplish such an ambitious goal without degrading the effectiveness of our troops, the U.S. military will need to recruit all qualified individuals, not exclude entire groups from military service based on sweeping generalizations and prejudice, without regard for individuals' capacity to serve.[47]

Next, these prohibitions will negatively affect unit cohesion.  The policy forces transgender service members to live a lie, authorizes discriminatory behavior among fellow service members, and places troops in the unconscionable position of having "to choose between reporting their comrades or disobeying policy."[48]  The policy turns in part on the presence of a history or diagnosis of gender dysphoria – that is, "distress or impairment of functioning in meeting the standards associated with their biological sex."[49]  In the same way as the Don't Ask, Don't Tell policy encouraged service members to hide their LGBT status, the new policy encourages transgender troops to hide any distress they may experience from their gender identity and discourages them from seeking access to counseling and other mental health services.  Transgender service members have long been allowed to serve openly in the militaries

---

[46] Report and Recommendations, *supra* note 3, at 7.
[47] K.K. Rebecca Lai et al., *Is America's Military Big Enough?*, N.Y. Times, Mar. 22, 2017.
[48] Palm Center, *Fifty-Six Retired Generals and Admirals Warn That President Trump's Anti-Transgender Tweets, If Implemented, Would Degrade Military Readiness* 1 (Aug. 1, 2017).
[49] Report and Recommendations, *supra* note 3, at 32.

of such close United States allies as Israel and the United Kingdom without any evidence of harm to unit cohesion, and these transgender service members have already served alongside U.S. troops in NATO units without any demonstrated adverse effect on unit cohesion.  Notably, a number of current, high-ranking military leaders have confirmed publicly in congressional testimony in the last two weeks that they see no evidence that transgender troops serving openly have presented a problem for unit cohesion or military readiness.[50]

Finally, such a transparently discriminatory set of restrictions will send a troubling signal to those abroad, showing both allies and adversaries that the United States military is willing to distort its justly admired personnel polices to serve prejudice and political expediency.  The President's tweets and Memorandum convey to the world that able and patriotic Americans, eager and qualified to serve their country's military, can nevertheless be denied equal rights and opportunity based on illusory arguments.  That message undermines our government's efforts to advance human rights and principles of non-discrimination and equality throughout the world, as a longstanding central tenet of our foreign policy, and a critical means of promoting peace and security and avoiding humanitarian crises around the globe.

As public servants, amici took as an article of faith that our government will only judge individuals based on the content of their character, not on group characteristics unrelated to their ability to do their jobs.  To abandon that principle based on a transparently discriminatory façade is unworthy of the deference that the Constitution and the courts have historically afforded to genuine national security and military judgment.

**CONCLUSION**

---

[50] *See* Richard Sisk, *Top Military Brass at Odds with Mattis on Transgender Issues*, Military Times (Apr. 20, 2018).

For the foregoing reasons, Defendants' motions should be denied and Plaintiffs' cross-motion should be granted.

Dated May 21, 2018                                    Respectfully submitted,

                                                      _____/s/_____
         Harold Hongju Koh                            Phillip Spector
         Matthew S. Blumenthal                        MESSING & SPECTOR LLP
         RULE OF LAW CLINIC                           1200 Steuart Street
         Yale Law School                              #2112
         127 Wall Street, P.O. Box 208215             Baltimore, MD  21230
         New Haven, CT 06520-8215                     202-277-8173
         203-432-4932

                        *Counsel for Amici Curiae*

## APPENDIX

## LIST OF AMICI

1.   Brigadier General Ricardo Aponte, USAF (Ret.)

2.   Vice Admiral Donald Arthur, USN (Ret.)

3.   Michael R. Carpenter served as Deputy Assistant Secretary of Defense for Russia, Ukraine, Eurasia from 2015 to 2017.

4.   Brigadier General Stephen A. Cheney, USMC (Ret.)

5.   Derek Chollet served as Assistant Secretary of Defense for International Security Affairs from 2012 to 2015.

6.   Rudy DeLeon served as Deputy Secretary of Defense from 2000 to 2001.  Previously, he served as Under Secretary of Defense for Personnel and Readiness from 1997 to 2000.

7.   Rear Admiral Jay A. DeLoach, USN (Ret.)

8.   Major General (Ret.) Paul D. Eaton, USA

9.   Brigadier General (Ret.) Evelyn "Pat" Foote, USA

10.   Vice Admiral Kevin P. Green, USN (Ret.)

11.   General Michael Hayden, USAF (Ret.), served as Director of the Central Intelligence Agency from 2006 to 2009, and Director of the National Security Agency from 1995 to 2005.

12.   Chuck Hagel served as Secretary of Defense from 2013 to 2015.  From 1997 to 2009, he served as U.S. Senator for Nebraska.

13.   Kathleen Hicks served as Principal Deputy Under Secretary of Policy from 2012 to 2013.

14.   Brigadier General (Ret.) David R. Irvine, USA

15.   Lieutenant General Arlen D. Jameson (USAF) (Ret.), served as the Deputy Commander of U.S. Strategic Command.

16.   Brigadier General (Ret.) John H. Johns, USA

17.   Colin H. Kahl served as Deputy Assistant to the President and National Security Advisor to the Vice President.  Previously, he served as Deputy Assistant Secretary of Defense for the Middle East from 2009 to 2011.

A

18.     Lieutenant General (Ret.) Claudia Kennedy, USA

19.     Major General (Ret.) Dennis Laich, USA

20.     Major General (Ret.) Randy Manner, USA

21.     Brigadier General (Ret.) Carlos E. Martinez, USAF (Ret.)

22.     General (Ret.) Stanley A. McChrystal, USA, served as Commander of Joint Special
        Operations Command from 2003 to 2008, and Commander of the International Security
        Assistance Force and Commander, U.S. Forces Afghanistan from 2009 to 2010.

23.     Kelly E. Magsamen served as Principal Deputy Assistant Secretary of Defense for Asian
        and Pacific Security Affairs from 2014 to 2017.

24.     Leon E. Panetta served as Secretary of Defense from 2011 to 2013.  From 2009 to 2011,
        he served as Director of the Central Intelligence Agency.

25.     Major General (Ret.) Gale S. Pollock, CRNA, FACHE, FAAN.

26.     Rear Admiral Harold Robinson, USN (Ret.)

27.     Brigadier General (Ret.) John M. Schuster, USA

28.     Rear Admiral Michael E. Smith, USN (Ret.)

29.     Brigadier General (Ret.) Paul Gregory Smith, USA

30.     Julianne Smith served as Deputy National Security Advisor to the Vice President of the
        United States from 2012 to 2013.  Previously, she served as the Principal Director for
        European and NATO Policy in the Office of the Secretary of Defense in the Pentagon.

31.     Admiral James Stavridis, USN (Ret.), served as the 16th Supreme Allied Commander at
        NATO.

32.     Brigadier General (Ret.) Marianne Watson, USA

33.     William Wechsler served as Deputy Assistant Secretary for Special Operations and
        Combating Terrorism at the U.S. Department of Defense from 2012 to 2015.

34.     Christine E. Wormuth served as Under Secretary of Defense for Policy from 2014 to
        2016.

B

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Amicus Brief complies with the type-volume limitation of Local Civil Rule 7(o)(4) because it does not exceed 25 pages. This Amicus Brief complies with the typeface and the type style requirements of Local Civil Rule 5.1 because it has been prepared using double spacing and Word 12-point Times typeface.

_____/s/_____
Phillip Spector (D.C. Bar No. 479121)
MESSING & SPECTOR LLP
1200 Steuart Street
#2112
Baltimore, MD  21230
*Counsel for Amici Curiae*

C

## CERTIFICATE OF SERVICE

I, Phillip Spector, hereby certify that on May 21, 2018, the foregoing document was filed and served through the CM/ECF system.

Respectfully Submitted,

_____/s/_____
Phillip Spector (D.C. Bar No. 479121)
MESSING & SPECTOR LLP
1200 Steuart Street
#2112
Baltimore, MD  21230
*Counsel for Amici Curiae*