**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JANE DOE 2 *et al.*,  )<br>  )<br>　　　　　　　　Plaintiffs,  )<br>  )<br>v.  )<br>  )<br>JAMES MATTIS, in his official capacity as  )<br>Secretary of Defense, *et al.*,  )<br>  )<br>　　　　　　　　Defendants.  )<br>  ) | Civil Action No. 17-cv-1597 (CKK) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY**

## INTRODUCTION

The government's belated and meritless motion encapsulates its overarching strategy in this case—delay at any cost the timely and orderly resolution of the dispute before this Court.

In October 2017, this Court issued a preliminary injunction directing Defendants "to revert to the *status quo* with regard to accession and retention that existed before the issuance of the Presidential Memorandum." Dkt. 60 at 2. The Court found that (1) Plaintiffs are likely to succeed on their Fifth Amendment claim, (2) Plaintiffs would suffer irreparable injury in the absence of an injunction, and (3) the balance of equities and the public interest favor granting injunctive relief. Dkt. 61 at 58. No subsequent development in this case has diminished the strength of those findings. Nevertheless, the government persists in its belief that a faulty argument stated and restated will ultimately persuade, filing the instant motion more than one year after the injunction was originally issued, and three months after the government's motion to dissolve the injunction was denied.

The decision to grant a stay is entrusted to the equitable discretion of the Court. *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006). Granting a stay pending appeal is "always an extraordinary remedy," and the moving party "carries a heavy burden to demonstrate that the stay is warranted." *Id.* Here, as before, the government fails to shoulder its heavy burden of justifying a stay of the Court's preliminary injunction against the bar on military service by transgender people. The government's motion comes too late and belabors the same unpersuasive arguments it has made in its prior failed attempts to undo the injunction. It should likewise be rejected.

# ARGUMENT

## I. THE GOVERNMENT'S MOTION IS UNTIMELY

The untimeliness of the government's motion is reason enough for it to be denied. The government has had two prior opportunities to seek a stay of the preliminary injunction, including a request for narrowing the injunction: when the injunction issued in October 2017 and the government first moved to appeal, and again in August 2018, when this Court denied the government's motion to dissolve the injunction and the government again appealed. The government abandoned its first appeal in December 2017 and declined to seek a stay in August 2018.

The government fails to explain why its need for a stay is so pressing *now*, after the injunction has been in place for more than a year. Nor does the government attempt to explain why its past failures to seek this emergency relief should be overlooked. To justify the stay of an injunction, a party must convincingly show that its need for relief is urgent. *See Philip Morris USA*, 449 F. Supp. 2d at 990; *Shays v. FEC*, 340 F. Supp. 2d 39, 44 (D.D.C. 2004); *see also Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). Courts regularly deny belated stay applications like this one. *See, e.g.*, *Lightfoot v. District of Columbia*, No. CIV. 01-1484 (CKK), 2006 WL 175222, at *4 (D.D.C. Jan. 24, 2006) (Kollar-Kotelly, J.) (denying government defendants' motion for a stay pending appeal and advising defendants to follow Shakespeare's maxim: "Let's lack no discipline, make no delay: For lords, tomorrow is a busy day"); s*ee also AARP v. EEOC*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." (citing *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005))).

Here, the government's only justification for its belated application is that it has filed a petition for writ of certiorari in the Supreme Court before the D.C. Circuit even hears argument on the appeal in this case. But that petition has no bearing on the merits of the untimely stay the government now requests. When the government filed its notice of appeal in this case in October 2018, it evidently did not see any urgency necessitating a stay, because it did not ask for one, either from this Court or from the Court of Appeals. Instead, it requested only that the Court of Appeals expedite briefing on the appeal; the Court of Appeals granted that request, briefing is complete, and oral argument will be held on December 10. While the government is now unsatisfied with the expedited schedule that it requested and obtained, that change of heart does not justify a stay of the preliminary injunction in this Court.

A stay pending appeal is fundamentally a matter of equity. *Shays*, 340 F. Supp. 2d at 44; *see also Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). No equities justify giving the government a third bite at the apple.[1] Many of the substantive arguments raised in the government's stay motion are now before the D.C. Circuit, which will hear argument in less than two weeks. The government has received what it originally deemed sufficient to address any exigency—an expedited hearing on its appeal.

---

[1] As the docket in this case attests, the government has repeatedly sought to prevent the preliminary injunction from taking effect (as well as to stymie the proceedings, including discovery, necessary to litigate this case to final judgment). In November and December 2017, the government appealed the Court's preliminary injunction, *see* Dkt. 66; sought unnecessary "clarification" of the injunction on a wholly baseless theory that the Secretary of Defense is independent of the President, *see* Dkt. 67; and sought an emergency motion for an administrative stay and partial stay pending appeal, *see* Dkt. 73. Both this Court and the Court of Appeals denied the requested stay. *See* Dkt. 75; *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) (per curiam). Following issuance of the Mattis Implementation Plan, the government sought to dissolve the preliminary injunction on a theory that the implementation of the original policy was itself a new policy. *See* Dkts. 95, 96, 116. When that motion was denied in August 2018, the government again appealed to the Court of Appeals, but failed to request a stay at that time. *See* Dkt. 162.

Having forgone seeking a stay when it filed its appeal in October, and having produced nothing to suggest that circumstances have substantially changed since October, the government has forfeited any claim on this Court's equitable discretion.

## II.   NONE OF THE STAY FACTORS FAVORS THE GOVERNMENT

A party that moves for a stay pending appeal must show that the balance of four factors weighs in favor of the stay: (1) the likelihood that the party will prevail on the merits of the appeal; (2) the likelihood that the party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting a stay. *McCammon v. United States*, 584 F. Supp. 2d 193, 197 (D.D.C. 2008). In exercising its discretion whether to grant the stay, the Court must ultimately balance all equities. *Id.*; *see Holiday Tours*, 559 F.2d at 843.

The traditional stay factors offer no justification for the government's motion. First, the government presents no new rationale and cites no new case law that would suggest a likelihood of prevailing on the merits of the appeal. Rather, the government repeats its argument (at 5) that the Mattis Implementation Plan requires only rational-basis review because it merely discriminates on the basis of a medical condition and treatment and not on the basis of sex. *See also* Dkt. 116 at 9-42. As the Court recognized in declining to dissolve the injunction, the transgender ban implicates all the concerns that prompt heightened constitutional scrutiny and rests on impermissible stereotypes and overbroad generalizations rather than an evenhanded approach towards qualifications to serve in the military. *United States v. Windsor*, 570 U.S. 744, 770 (2013) (noting that "[d]iscriminations of an unusual character" suggest improper animus and require especially careful judicial consideration (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996))); *see also Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252,

4

267 (1977); Dkt. 157 at 32; Dkt. 61 at 65-72.  Plaintiffs, not Defendants, are likely to succeed on the merits.

Second, as the Court has already recognized, allowing the ban to take effect would inflict grave injury on Plaintiffs, who seek only to defend their country.  *See* Dkt. 157 at 33.  By contrast, Defendants have not made the case that maintaining the injunction would harm the government.  Indeed, despite the injunction being in effect for over a year, the government offers not one iota of evidence suggesting that allowing Plaintiffs to serve in the military has harmed military lethality, effectiveness, or good order and discipline.  Finally, because Plaintiffs are likely to succeed in establishing that the ban is unconstitutional, the public interest favors maintaining the injunction and preventing harm to others.  *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (noting that "enforcement of an unconstitutional law is always contrary to the public interest").  As this Court has stated, "[t]he public interest and equities lie with allowing young men and women who are qualified and willing to serve our Nation to do so." Dkt. 157 at 33; *see also Doe 1*, 2017 WL 6553389, at *3 ("[I]n the balancing of equities, it must be remembered that all Plaintiffs seek during this litigation is to serve their Nation[.]").

For all of the reasons this Court offered in issuing the injunction and declining to dissolve it, the likelihood of success on the merits has not changed, and the balance of equities still strongly favors Plaintiffs.

## III. THERE IS NO BASIS TO RELITIGATE THE SCOPE OF THE PRELIMINARY INJUNCTION

The government's challenge to the scope of the injunction is also untimely and inapt. The government had the opportunity to raise that issue a year ago, when the Court issued the preliminary injunction.  Indeed, the government unsuccessfully sought to stay the nationwide scope of the injunction, pending its first appeal raising that very issue (among others).  *See* Emergency Stay Mot. 10-11, *Doe 1 v. Trump*, No. 17-5267 (D.C. Cir. Dec. 11, 2017).  The

government could have pressed its appeal on that issue at that time, even if it did not appeal from the injunction as to the individual Plaintiffs. It decided not to do so and abandoned its appeal entirely. The government identifies no changed circumstances that would warrant revisiting the issue now. *See American Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (party seeking relief from an injunction bears the burden of establishing that changed circumstances warrant relief).

In any event, the government's argument relies on a fundamental misapprehension of the injury suffered by Plaintiffs—a misapprehension that this Court has taken pains to correct. Where a policy discriminates on the basis of an invidious classification, as the transgender ban does, it inflicts a profound class-based injury. As the Court recognized, the ban injures Plaintiffs "[b]y singling [them] out and stigmatizing them as members of an inherently inferior class of service members." Dkt. 157 at 14. That injury will persist if the transgender ban is allowed to go into effect as to any transgender individuals seeking to join or remain in the military, because the ban sends a powerful message that transgender people, including Plaintiffs, are unworthy of service in the military. Accordingly, an injunction limited to Plaintiffs alone will fail to address the core constitutional injury that the ban inflicts or to furnish complete relief. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (equitable principles support an injunction that is "necessary to provide complete relief to the plaintiff" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))).

The Mattis Implementation Plan's grandfather clause does not mitigate that core constitutional harm and offers no shelter to these Plaintiffs, who are left to serve under a policy that brands them as inferior and a detriment to a military to which they have dedicated their lives. "The Mattis Implementation Plan sends a blatantly stigmatizing message to all members of the

military hierarchy that has a unique and damaging effect on a narrow and identifiable set of individuals, of which Plaintiffs are members." Dkt. 157 at 15. Sufferance to serve in a military that holds, as a matter of policy, that transgender service members "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality," Mattis Memorandum 2 (Dkt. 96-1), cannot be deemed adequate redress of Plaintiffs' injuries.[2]

The government's arguments regarding principles of equity and orderly development of the law are unpersuasive. First, the government wrongly argues (at 9) that nationwide injunctions are categorically improper in light of "traditional principles of equity jurisdiction." The government's reliance here on *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), is misplaced. *Grupo Mexicano* and the cases on which it drew involved lawsuits between private parties, not lawsuits against the federal government, and certainly did not involve the vindication of constitutional rights. *E.g.*, *Atlas Life Ins. Co. v. W.I. Southern*, *Inc.*, 306 U.S. 563, 568 (1939). The government also incorrectly points to the limited scope of injunctions issued by the English Court of Chancery. But the English Court of Chancery issued injunctions only in private suits; it did not issue injunctions against the Crown *at all*—nationwide or otherwise. Bray, *Multiple Chancellors: Reforming the National Injunction*,

---

[2] The government's argument (at 11) that the mere presence of transgender individuals in the military causes "severe harm to the federal government" belies its attempts to minimize the constitutional, stigmatic, and practical injuries threatened by the ban. The government argues that a stay of the injunction is warranted because the mere presence of transgender servicemembers—who meet the same fitness requirements as others—compromises the military's mission. Transgender persons serving under the Mattis Implementation Plan, as the government's brief makes plain, would be harmed by an official policy branding them as unfit, unworthy, and a burden to the Nation they serve. Thus, the government cannot be heard to argue (at 11) that currently serving transgender servicemembers' claims of injury are merely "speculative."

7

131 Harv. L. Rev. 417, 425 (2017).  By contrast, federal courts unquestionably can enjoin the federal government.

Second, the government's argument (at 10) that this Court's injunction somehow inhibits judicial review in other fora misses the mark.  The Supreme Court's decision in *United States v. Mendoza*, 464 U.S. 154 (1984), did not suggest that injunctions facially invalidating an unconstitutional policy are categorically improper.  The Court in *Mendoza* was concerned that nonmutual offensive collateral estoppel against the government "would substantially thwart the development of important questions of law" by preventing percolation of legal issues through multiple courts of appeals.  *Id.* at 160.  Unlike collateral estoppel, where a decision in one case is "conclusive in a subsequent suit," *Mendoza*, 464 U.S. at 158, injunctions impose no limits on the arguments the federal government is entitled to make in other cases.[3]  Moreover, the government's argument overlooks the far more realistic prospect of duplicative litigation if every transgender person excluded from the military were required to bring a separate lawsuit to obtain relief.  In this case, limiting federal courts' equitable authority to patchwork injunctive relief would fundamentally erode "the rule of law."  *Wirtz v. Baldor Elec. Co.*, 337 F.2d 518, 534 (D.C. Cir. 1963).

Finally, *Department of Defense v. Meinhold*, 510 U.S. 939 (1993), does not support the government's contention (at 11) that the balance of equities weighs against facial relief.  Unlike Plaintiffs here, Meinhold—a gay man serving in the military at the time of the "Don't Ask Don't

---

[3]     The government's suggestion that nationwide injunctions inhibit the percolation of legal issues through multiple courts is particularly confusing in this case. As this Court is well aware, multiple challenges to the government's ban have continued forward through multiple courts in multiple circuits despite the entry of nationwide injunctions prohibiting the ban's implementation.  *See Karnoski v. Trump*, No. 17-1297 (W.D. Wash.); *Stockman v. Trump*, No. 17-1799 (C.D. Cal.); *Stone v. Trump*, No. 17-2459 (D. Md.).

8

Tell" policy—raised an as-applied challenge to his discharge that turned on the particular facts of his case.[4] Because the challenged policy was held unlawful only as applied to him, a broader injunction against the policy could not be maintained. Here, Plaintiffs' constitutional challenge to the Mattis Implementation Plan does not turn on their particular circumstances, but on the nature of the discrimination against transgender people as a group.

The government offers no basis for upsetting the Court's well-founded conclusions. This Court has previously rejected the government's repeated efforts to impede these proceedings and prevent Plaintiffs from obtaining relief. It should do so again.

## CONCLUSION

Defendants' motion to stay should be denied.

---

[4] Meinhold was discharged after he stated during a television interview that he was gay. He was dismissed based on that statement alone and challenged his dismissal on the ground that it was unlawful to dismiss him without any evidence that he had actually engaged in any homosexual conduct. Meinhold's challenge thus clearly implicated only the particular application of the military's policy to the facts of his case. *See Meinhold v. DOD*, 34 F.3d 1469, 1479 (9th Cir. 1994) (discussing "effect of the regulation as applied in Meinhold's case"); *id.* (holding that Meinhold's discharge was unlawful because his statement "in the circumstances under which he made it manifests no concrete, expressed desire to commit homosexual acts").

9

November 28, 2018

Matthew E. Miller (*pro hac vice*)
Kathleen M. Brill (*pro hac vice*)
Michael Licker (*pro hac vice*)
Rachel C. Hutchinson (*pro hac vice*)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: 617-832-1000
Fax: 617-832-7000

Theresa M. Roosevelt (D.C. Bar No. 1021853)
FOLEY HOAG LLP
1717 K Street NW
Washington, DC 20006
Telephone: 202-223-1200
Fax: 202-785-6687

Jennifer Levi (*pro hac vice*)
Mary L. Bonauto (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont St., Ste. 950
Boston, Massachusetts 02108
Telephone: 617-426-1350
Fax: 617-426-3594

Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
Chris Stoll (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market St., Ste. 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

Respectfully submitted,

/s/  Paul R.Q. Wolfson
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Kevin M. Lamb (D.C. Bar No. 1030783)
WILMER CUTLER PICKERING
    HALE & DORR LLP
1875 Pennsylvania Ave. N.W.
Washington, D.C. 20006
Telephone: 202-663-6000
Fax: 202-663-6363

Alan E. Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Telephone: 212-230-8800
Fax: 212-230-8888

Adam M. Cambier (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000

*Attorneys for Plaintiffs*