**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE 2, *et al.*,<br>        Plaintiffs<br>        v.<br>JAMES MATTIS, *et al.*,<br>        Defendants | Civil Action No. 17-1597 (CKK) |

**ORDER**
(November 30, 2018)

Before the Court is Defendants' Motion to Stay the Preliminary Injunction Pending

Appeal.  Defendants request a stay of the Court's October 30, 2017, preliminary injunction,

which prevents Defendants from enforcing a ban on transgender individuals serving in the

military. Defendants ask that the stay be granted pending any potential, future proceedings in the

United States Supreme Court. Alternatively, at a minimum, Defendants request a stay of the

nationwide scope of the injunction pending the outcome of their appeal to the United States

Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), in which oral argument

will be heard on December 10, 2018.  Plaintiffs oppose Defendants' motion on various grounds.

Upon consideration of the pleadings, [1] the relevant legal authorities, and the record as it

currently stands, the Court concludes that a stay is not warranted. Defendants have not proven

that they are likely to succeed on the merits of their appeal, that they face irreparable harm, that

---

[1] The Court's consideration has focused on the following documents: Defs.' Mot. to Stay the
Preliminary Injunction Pending Appeal [Defs.' Mot.], ECF No. 183; and Pls.' Opp'n to Defs.'
Mot. to Stay [Pls.'Opp'n], ECF No. 186. In light of their request for an expedited ruling,
Defendants decided to forgo filing a reply brief. Defs.' Mot., ECF No. 183, 12 n.5.

In an exercise of its discretion, the Court finds that holding oral argument in this action would
not be of assistance in rendering a decision. *See* LCvR 7(f).

Plaintiffs would not be harmed by a stay, or that public interest favors a stay. Accordingly, Defendants' [183] Motion is DENIED.

## I.    Background

This is not the first, or even the second, attempt by Defendants to either stay or dissolve the Court's preliminary injunction. On October 30, 2017, the Court granted Plaintiffs a preliminary injunction against the enforcement of a 2017 Presidential Memorandum prohibiting transgender individuals from serving in the military. As is relevant here, the effect of the Court's preliminary injunction was "to revert to the *status quo* with regard to accession and retention that existed before the issuance of the Presidential Memorandum—that is, the retention and accession policies established in a June 30, 2016 Directive-type Memorandum and later modified by Secretary of Defense James Mattis on June 30, 2017." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177 (D.D.C. 2017). The policies that Defendants were required to follow allowed for the accession and retention of transgender individuals in the military beginning on January 1, 2018.

Following the Court's issuance of the preliminary injunction, Defendants moved for a partial stay of the preliminary injunction pending appeal. *See* Defs.' Mot. for Partial Stay of Preliminary Injunction Pending Appeal, ECF No. 73. Specifically, Defendants asked the Court to stay the portion of the preliminary injunction which prevented Defendants from indefinitely extending a prohibition against transgender individuals entering the military. The Court refused to grant a stay, finding that the factual record had not changed in any material way since the Court issued the preliminary injunction and that a stay was not otherwise justified. *See generally Doe 1 v. Trump*, No. 17-1597, 2017 WL 6816476 (D.D.C. Dec. 11, 2017).

Defendants next made an emergency motion to the D.C. Circuit for an administrative stay and a partial stay of the preliminary injunction pending appeal. But, Defendants' motion was

denied as the Circuit Court concluded that Defendants had not demonstrated that they had a strong likelihood of success on appeal, that they would face irreparable harm, that the stay would not harm other parties to the proceeding, or that public interest warranted a stay. *See generally Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389 (D.C. Cir. Dec. 22, 2017). The Circuit Court reminded Defendants "that all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them." *Id.* at *3. Following the decision by the D.C. Circuit, Defendants voluntarily dismissed their appeal of this Court's preliminary injunction issued on October 30, 2017. *See* USCA Order, ECF No. 79-1.

With the preliminary injunction still in place, the case moved forward with discovery. But, despite Court orders mandating discovery, that discovery remained unfinished in early 2018 because Defendants asserted privileges over a large portion of the documents and information requested by Plaintiffs. In March of 2018, the President issued another Presidential Memorandum revoking his 2017 Presidential Memorandum and any other directives involving transgender military service. Defs.' Notice, 2018 Presidential Memorandum, ECF No. 95-1, 1. The 2018 memorandum ordered that "[t]he Secretary of Defense, and the Secretary of Homeland Security, with respect to the U.S. Coast Guard, may exercise their authority to implement any appropriate policies concerning military service by transgender individuals." *Id.* The "appropriate policies" had already been developed and proposed to the President in the form of the Mattis Implementation Plan.

In summary form, the Mattis Implementation Plan implements the 2017 Presidential Memorandum banning transgender individuals from serving in the military. Unlike the 2017 memorandum, the Mattis Implementation Plan purports not to ban all transgender individuals from serving in the military. But, as the Court has previously explained, "the plan effectively implements such a ban by targeting proxies of transgender status, such as 'gender dysphoria' and 'gender transition,' and by requiring all service members to serve 'in their biological sex.'" *Doe 2 v. Trump*, 315 F. Supp. 3d 474, 482 (D.D.C. 2018).

Following the development of the Mattis Implementation Plan, Defendants asked that this Court dissolve its preliminary injunction as the implementation plan represented a new policy which did not harm Plaintiffs. *See generally* Defs.' Mot. to Dissolve the Preliminary Injunction, ECF No. 116. The Court denied Defendants' motion to dissolve the preliminary injunction. *Doe 2*, 315 F. Supp. 3d at 496-98. The Court found that, although the Mattis Implementation Plan was longer and more detailed, it was not materially different from the 2017 Presidential Memorandum that preceded it in that it effectively prevents military service by transgender individuals. *Id.* at 496-97. Most relevantly, the Mattis Implementation Plan prohibits military service by those with "gender dysphoria" and those who have undergone or require "gender transition," both of which function as euphemisms for transgender status. *Id.* at 482-83. The plan does allow transgender individuals to serve in the military if they do so in their biological sex. But, given that, by definition, transgender individuals do not identify or live in accord with their biological sex, the Court concluded that "[t]olerating a person with a certain characteristic only on the condition that they renounce that characteristic is the same as not tolerating them at all." *Id.* at 495. Because the Mattis Implementation Plan fundamentally implemented the 2017

Presidential Memorandum banning transgender military service, the Court concluded that the need for the preliminary injunction remained unchanged.[2]

After the Court's denial of Defendants' motion to dissolve the preliminary injunction, the parties continued with discovery. The parties' discovery has been consistently plagued by disputes and delays. Plaintiffs completed briefing their motion to compel discovery and Defendants their motions for protective orders on November 13, 2018. Eight days later, Defendants filed this motion, again attempting to stay the Court's preliminary injunction.

Despite the lack of material changes to the factual record, Defendants are again attempting to rid themselves of the Court's preliminary injunction. And, the Court cannot help but question why Defendants have, again, decided to challenge the Court's preliminary injunction at this point in the litigation. The preliminary injunction has been in place for more than a year. Yet, Defendants present no evidence that the Court's preliminary injunction maintaining the status quo of allowing transgender individuals to serve in the military has harmed military readiness. Accordingly, the Court fails to understand why Defendants' need for relief from the Court's preliminary injunction has suddenly become urgent, requiring an expedited ruling. The only apparent justification for Defendants' choice to bring this motion at this time is that Defendants have recently filed a petition for a writ of certiorari in the Supreme Court, asking the Supreme Court to review this Court's preliminary injunction before the D.C. Circuit has had the opportunity to issue a judgment. *See generally* Defs.' Notice of Filing Pet. for Writ of Cert. before Judgment, ECF No. 184. But, that petition would seem to have no bearing on Defendants' decision to file this motion, which is, after all, their third bite at the apple in this

---

[2] In a separate Opinion issued that same day, the Court dissolved the preliminary injunction only as to President Trump and dismissed him as a party from the suit. *See Doe 2 v. Trump*, 319 F. Supp. 3d 539, 540 (D.D.C. 2018).

Court. If Defendants are eager to rid themselves of the Court's preliminary injunction,
Defendants should note that motions such as this one serve to slow litigation and only increase
the time which Defendants must wait for the Court's final decision on the merits.

## II.    Legal Standard

Upon careful consideration of Defendants' arguments, the Court concludes that a stay of
the Court's preliminary injunction is not warranted.  "In the D.C. Circuit, a court assesses four
factors when considering a motion to stay an injunction pending appeal: (1) the moving party's
likelihood of success on the merits of its appeal, (2) whether the moving party will suffer
irreparable injury, (3) whether issuance of the stay would substantially harm other parties in the
proceeding, and (4) the public interest." *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12
(D.D.C. 2014) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841,
843 (D.C. Cir. 1977)).  The Court concludes that none of these factors justifies staying the
Court's preliminary injunction.  Accordingly, Defendants' motion is DENIED.

## III.    Likelihood of Success on the Merits

The Court begins with the main focus of Defendants' motion: that they are likely to
succeed on the merits of their appeal. Defendants have two main arguments as to why they are
likely to succeed on appeal. First, Defendants argue that Plaintiffs' constitutional challenges lack
merit. Second, Defendants contend that the nationwide scope of the Court's preliminary
injunction is improper. The Court concludes that neither argument is persuasive.

### A.  Constitutional Merit of Plaintiffs' Claims

First, Defendants claim that they are likely to succeed on the merits of their appeal
because Plaintiffs' constitutional challenges lack merit. Specifically, Defendants contend that the

Mattis Implementation Plan turns on a medical condition, gender dysphoria, and its treatment, gender transition, not on any suspect classification such as transgender status or gender. Accordingly, Defendants argue that rational basis review applies, and the policy satisfies that deferential review because it reflects the military's reasoned judgment. *See* Defs.' Mot., ECF No. 183, 5.

Unsurprisingly, the Court does not agree with Defendants that Plaintiffs' constitutional challenges lack merit. As the Court has previously found, the Mattis Implementation Plan, like the 2017 Presidential Memorandum which preceded it, functionally prevents transgender individuals from serving in the military. *See Doe 2*, 315 F. Supp. 3d at 492-96. Because the Mattis Implementation Plan functions as a class-wide ban based on a protected status, the Court's initial conclusion that Plaintiffs are likely to succeed on their Fifth Amendment claims remains unchanged by the development of the Mattis Implementation Plan. *See Doe 1*, 275 F. Supp. 3d at 208-211 (explaining that the ban discriminates on the basis of transgender status, which is likely a quasi-suspect classification, and gender, which is subject to intermediate scrutiny).

The Court concludes for three reasons that the Mattis Implementation Plan does not change the Court's initial assessment that Plaintiffs are likely to succeed on their constitutional claims. First, the 2017 Presidential Memorandum ordered that a plan to implement a policy prohibiting transgender military service be submitted by February 2018. Second, in the months following the issuance of the 2017 Presidential Memorandum, Department of Defense officials repeatedly stated that they were preparing such an implementation plan based on the President's policy directive. And third, the Mattis Implementation Plan was provided to the President in February 2018, and it in fact prohibits transgender military service.

The 2017 Presidential Memorandum directed the Department of Defense to submit, by February 2018, a plan to *implement* the President's policy directive banning transgender individuals from serving in the military. The 2017 Presidential Memorandum ordered the Secretary of Defense to prepare an "implementation plan" that was circumscribed to suggestions about how to "implement a policy under which transgender accession is *prohibited*, and discharge of transgender service members is *authorized*." *Doe 1*, 275 F. Supp. 3d at 195; *see also* 2017 Presidential Memorandum, ECF No. 34-1 (instructing the Secretaries of Defense and Homeland Security to "submit to [the President] a plan for implementing both the general policy … and the specific directives set forth in … this memorandum"). The memorandum did not ask for the submission of a new policy on transgender service. And the memorandum did not ask for an independent reexamination of whether or not transgender military service should be permitted. *See Karnoski v. Trump*, No. C17-1297, 2018 WL 1784464, at \*6 (W.D. Wash. Apr. 13, 2018) ("The 2017 Memorandum did not direct Secretary Mattis to determine *whether* or not the directives should be implemented, but instead ordered the directives to be implemented by specific dates and requested a plan for *how* to do so." (emphasis in original)). The 2017 Presidential Memorandum simply asked the Department of Defense to submit an implementation plan for carrying out a predetermined objective—banning transgender individuals from serving or joining the military.

Second, the actions and statements of Secretary Mattis, and the Department of Defense generally, preceding the Mattis Implementation Plan indicate that the plan was being developed to *implement* President Trump's 2017 policy directives, not to examine, question, or possibly amend those directives. On August 29, 2017, Secretary Mattis issued a statement on "Military Service by Transgender Individuals." Milgroom Decl., ECF No. 128, Ex U. It is clear from the

title of the statement that it pertained to service by transgender individuals, not just those with gender dysphoria or those who had undergone or planned to undergo gender transition. In the statement, Secretary Mattis made clear that the Department of Defense had "received the [2017] Presidential Memorandum" and would "carry out the president's policy direction." *Id.* He further stated that he would establish a panel of experts not to decide whether or not transgender individuals should be permitted to serve, but instead simply "to provide advice and recommendations on the *implementation of the president's direction*." *Id.* (emphasis added). Following the panel report and consultation with the Department of Homeland Security, Secretary Mattis indicated that he would "provide [his] advice to the president concerning *implementation of his policy direction*." *Id.* (emphasis added); *see also Doe 1*, 2017 WL 6553389, at *2 (noting that "the Secretary's August 29, 2017 statement makes clear that his actions are being undertaken to 'carry out the president's policy direction'").

Secretary Mattis made similar statements in a September 14, 2017 memorandum entitled, "Military Service by Transgender Individuals – Interim Guidance." Milgroom Decl., ECF No. 128, Ex W. Again, by its very name, this memorandum concerned transgender military service, not just service by those with gender dysphoria or those who had undergone or planned to undergo gender transition. In the memorandum, Secretary Mattis again stated that he would present the President with a "plan *to implement the policy and directives* in the [2017] Presidential Memorandum." *Id.* at 1 (emphasis added). The Interim Guidance also explained that the Department of Defense would "*carry out the President's policy and directives*" and would "*comply with the [2017] Presidential Memorandum*." *Id.* (emphasis added). A separate document issued that same day directing the implementation process stated that Secretary Mattis had convened a panel to "develop[ ] an Implementation Plan on military service by transgender

individuals, *to effect the policy and directives of the [2017] Presidential Memorandum.*"
Milgroom Decl., ECF No. 128, Ex. X, at 1 (emphasis added). That document further
acknowledged that the Department was required to "return to the longstanding policy and
practice on military service by transgender individuals that was in place prior to June 2016," that
is, the general prohibition on transgender military service. *Id.* at 2. Because the Department had
been "direct[ed]" by the 2017 Presidential Memorandum to prohibit accession by transgender
individuals, Secretary Mattis asked the panel of experts merely to recommend "guidelines"
which would "reflect currently accepted medical terminology." *Id.*

Third, and most importantly, the Mattis Implementation Plan in fact prohibits transgender
military service—just as was ordered in the 2017 Presidential Memorandum. While the plan
takes a slightly less direct approach to accomplishing this goal than the 2017 Presidential
Memorandum, the result is the same. Instead of expressly banning all transgender individuals
from military service as did the 2017 memorandum, the Mattis Implementation Plan works by
absolutely disqualifying individuals who require or have undergone gender transition, generally
disqualifying individuals with a history or diagnosis of gender dysphoria, and, to the extent that
there are any individuals who identify as "transgender" but do not fall under the first two
categories, only allowing them to serve "in their biological sex." This means that openly
transgender persons are generally not allowed to serve in conformance with their gender identity.
*See Karnoski*, 2018 WL 1784464, at *6 ("Requiring transgender people to serve in their
'biological sex' does not constitute 'open' service in any meaningful way, and cannot reasonably
be considered an 'exception' to the Ban. Rather, it would force transgender service members to
suppress the very characteristic that defines them as transgender in the first place.").

For the reasons discussed above, the Court's original analysis concluding that Plaintiffs are entitled to a preliminary injunction as they are likely to succeed on the merits of their constitutional claims remains unchanged by the Mattis Implementation Plan. As the Court has previously explained, the ban on military service by transgender individuals likely violates Plaintiffs' Fifth Amendment rights based on a number of factors, "including the sheer breadth of the exclusion …, the unusual circumstances surrounding the President's announcement of [the exclusion], the fact that the reasons given for [the exclusion] do not appear to be supported by any facts, and the recent rejection of those reasons by the military itself." *Doe 1*, 275 F. Supp. 3d at 176. Accordingly, the Court is not persuaded by Defendants' claim that they are likely to succeed on the merits of their appeal because Plaintiffs' constitutional challenges lack merit.

## B. Nationwide Scope of the Preliminary Injunction

The Court next turns to Defendants' second argument as to why they are likely to succeed on the merits of their appeal—the nationwide scope of the preliminary injunction is improper. Defendants argue that the scope of the Court's nationwide preliminary injunction transgresses both equitable principles and Article III standing principles by granting broader relief than is necessary to redress Plaintiffs' injuries. For the reasons discussed below, neither argument convinces the Court that a more limited injunction is appropriate given the circumstances of this case.

In *National Mining Association v. United States Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998), the D.C. Circuit upheld the use of systemwide injunctions when the circumstances warrant them. The D.C. Circuit explained that "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that the application to the individual petitioners is proscribed.'" *Nat'l Mining*

*Ass'n*, 145 F.3d at 1409 (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). The Court went on to explain that in circumstances where a plaintiff is injured by a rule of broad applicability, "'a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)). Here, Plaintiffs were injured by a rule of broad applicability, so the Court acted properly in granting systemwide relief, even if that relief has the consequence of protecting the rights of other transgender individuals not before the Court.

In addition to the D.C. Circuit, the Supreme Court has also explained that "if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 333 (2010)). Here, the arguments and the evidence have shown that Plaintiffs are likely to succeed on the merits of their claim that Defendants' plan is unconstitutional on its face. Accordingly, a preliminary injunction prohibiting its enforcement "across the board" is proper. *Id.* In other words, under Defendants' plan, transgender individuals are barred from military service based on their inclusion in a certain class, regardless of whether or not a particular transgender individual exhibits combat-readiness, thus creating a "systemwide impact." *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977). In these circumstances, a "systemwide remedy" is the appropriate remedy. *Id.*

Accordingly, there is support from both the D.C. Circuit and the Supreme Court for systemwide injunctions when appropriate. And, these systemwide remedies play an important role in modern litigation. The D.C. Circuit has explained that systemwide injunctions can prevent

a "flood of duplicative litigation" by allowing similarly situated non-party individuals to benefit from an injunction rather than filing separate actions for similar relief. *Nat'l Mining Assoc.*, 145 F.3d at 1409. Contrary to Defendants' argument, nationwide injunctions do not "deprive[] other courts … of [offering] different perspectives on important questions." Defs.' Mot., ECF No. 183, 10. Other courts are not bound by this Court's grant of injunctive relief as is shown by the fact that there are multiple challenges to Defendants' plan independently percolating in multiple courts in multiple circuits across the country. *But see United States v. Mendoza*, 464 U.S. 154, 158 (1984) (explaining how nonmutual issue preclusion can limit the development of the law because the decision is "conclusive in a subsequent suit"). The Court also notes that Defendants' argument that nationwide injunctions undercut class actions is unpersuasive as nationwide injunctions are proper, and sometimes necessary, in circumstances where class certification may be impossible. As such, it is not for this Court to question whether or not systemwide injunctions are a modern aberration unmoored to the principles of equity, as Defendants argue. This Court is not persuaded to go out on a legal limb and condemn the use of a remedy that has been sanctioned by the D.C. Circuit as well as the Supreme Court.

Despite the cases discussed above, Defendants argue that the Court's nationwide preliminary injunction violates the rules of equity by granting relief broader than that necessary to prevent harm to Plaintiffs. Defendants cite *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), for the proposition that Plaintiffs cannot seek an injunction to prevent harm to others. Defs.' Mot., ECF No. 183, 9. In *Monsanto*, the district court had granted a nationwide injunction preventing the future planting of genetically altered alfalfa plants. 561 U.S. at 144. The Supreme Court decided that such broad injunctive relief was improper because the plaintiffs had not shown that they, as opposed to other farmers, would be injured if the genetically altered

crops were planted at sufficient distances from the plaintiffs' farms. *Id.* at 163-64. The Court

concluded that the potential injury to other farmers, whose farms may be closer to the genetically

altered crops, could not support the breadth of the injunction. *Id.*

The *Monsanto* case is easily distinguishable from the case before the Court. Here,

Plaintiffs sought to enjoin Defendants' ban on transgender individuals serving in the military on

the grounds that the ban would injure them. The fact that the preliminary injunction also benefits

other transgender individuals who are not a party to this suit does not render the scope of the

preliminary injunction improper. The "scope of injunctive relief is dictated by the extent of the

violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, Plaintiffs have

established a likelihood of success on their claim that Defendants' plan constitutes a systemwide

violation of their rights. Accordingly, the systemwide scope of the Court's preliminary injunction

is appropriate.

Continuing with their argument that systemwide relief is not appropriate, Defendants also

cite *United States Department of Defense v. Meinhold*, 510 U.S. 939 (1993). Defs.' Mot., ECF

No. 183, 1. In *Meinhold,* the Supreme Court stayed a nationwide injunction against another

military policy to the extent that it swept beyond the parties to the case. 510 U.S. at 939. But, the

entirety of the *Meinhold* opinion is four sentences. And, while the Supreme Court did stay the

district court's injunction insofar as it granted relief to persons other than the plaintiff, the Court

provided no reasoning for granting the stay which would apply to this case. *Id.*

Moreover, the facts of *Meinhold*, as explained in greater detail by the Ninth Circuit, lead

the Court to conclude that a stay would be improper here. In *Meinhold*, a gay man challenged his

discharge from the military, and the challenge turned on the particular facts of his case. *See*

*Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1479 (9th Cir. 1994) (discussing the "effect of the

regulation as applied in Meinhold's case"). The plaintiff had been discharged from the military

after he stated on television that he was gay. He sued the Department of Defense, arguing that it

was unlawful to dismiss him based on his statement alone without any evidence that he had

actually engaged in homosexual conduct. *Id.* at 1437. Because the plaintiff "sought only to have

his discharge voided and to be reinstated," an injunction applying only to him was sufficient. *Id.*

at 1480.

That is not the case here. Plaintiffs are clearly making a facial challenge to the Mattis

Implementation Plan. Plaintiffs argue that Defendants' plan is constitutionally infirm regardless

of how it is applied. Accordingly, an injunction as applied to only Plaintiffs would not provide

Plaintiffs with effective relief.

In fact, a nationwide preliminary injunction is the only way to address fully Plaintiffs'

constitutional injury. As will be discussed further below, if the Mattis Implementation Plan goes

into effect, Plaintiffs will be injured even if the plan remains enjoined as to them and they are

permitted to continue their service. *See Infra* Part V. For, if the plan goes into effect with its

application enjoined only as to Plaintiffs, Plaintiffs would be singled out as an inherently inferior

class of service members, allowed to continue serving only by the Court's limited order and

despite the claimed vociferous objections of the military itself. Accordingly, an injunction

limited to Plaintiffs would not address the core class-based injury that the ban inflicts on

Plaintiffs, nor would it afford them complete relief. *See Madsen v. Women's Health Ctr., Inc.*,

512 U.S. 753, 765 (1994) (explaining that equitable principles support an injunction "necessary

to provide complete relief to the plaintiff" (quoting *Califano*, 442 U.S. at 702)).

Moving on from their equitable arguments, Defendants also argue that the Court's

injunction is improper because it infringes on standing principles by affording relief which is not

necessary to prevent injury to the Plaintiffs. Defendants do not argue that Plaintiffs lack standing for an injunction as applied to them. Instead, Defendants argue that Plaintiffs' standing in this case does not entitle them to a systemwide injunction. Defendants primarily rely on three cases for the proposition that Plaintiffs' standing in this suit does not warrant a systemwide injunction. But, the Court concludes that Defendants' reliance on these three cases is misplaced.

First, Defendants cite *Lewis v. Casey*, 518 U.S. 343 (1996), for the proposition that an injunction is invalid if it affords relief that is unnecessary to prevent cognizable injury to the plaintiff himself. Defs.' Mot., ECF No. 183, 6-7. In *Casey*, the district court granted injunctive relief mandating detailed, systemwide changes to the Arizona Department of Corrections' prison law libraries and legal assistance programs. The Supreme Court concluded that the district court had erred in granting such broad relief. *Casey*, 518 U.S. at 346-49. Defendants use *Casey* to argue that this Court has also erred by granting broad, systemwide relief.

But, the Court finds that *Casey* is easily distinguishable from this case. In *Casey*, the district court found actual injury on the part of only one plaintiff and the cause of that injury was one facility's failure to provide special legal services in light of that plaintiff's illiteracy. *Id.* at 358. Despite this limited injury, the district court ordered sweeping, systemwide changes to all facilities controlled by the Arizona Department of Corrections. *Id.* at 347. In reviewing the scope of the injunctive relief, the Court asked: "[w]as that inadequacy widespread enough to justify systemwide relief?" *Id.* at 359. The Court concluded that the inadequacy was not widespread enough as the district court had made no finding that, in general, "in Arizona prisons illiterate prisoners cannot obtain the minimal help necessary to file particular claims that they wish to bring before the courts." *Id.* at 360.

If this Court were to ask itself the question posed in *Casey*—"[w]as that [claimed violation] widespread enough to justify systemwide relief?"— the answer is clearly yes. *Id.* at 359. This is not a case where one transgender individual was prevented from serving in the military based on the decision of a military person of a higher rank or a single superior officer. Instead, the Court is presented with a systemwide policy banning nearly all transgender individuals from serving in the military in any capacity. As the Supreme Court has explained, "only if there has been a systemwide impact may there be a systemwide remedy." *Brinkman*, 433 U.S. at 420. Given the systemwide impact of Defendants' plan, a systemwide remedy in the form of the Court's nationwide preliminary injunction is appropriate.

Defendants next cite two Supreme Court cases for the principle that "where a plaintiff faces actual or imminent injury at the outset of a suit but that injury is subsequently redressed or otherwise becomes moot, the plaintiff no longer can seek injunctive relief to redress alleged harms to anyone else." Defs.' Mot., ECF No. 183, 7. In *Alvarez v. Smith*, 558 U.S. 87 (2009), the Court held that the plaintiffs could no longer seek declaratory or injunctive relief against the State's procedure for seizing vehicles and money after the State had returned some of the property and the plaintiffs forfeited their claim to the rest of it. 588 U.S. at 92-93. After all claims had been settled, the plaintiffs could not continue to dispute the lawfulness of the State's procedure because "the dispute [was] no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* at 93. Similarly, in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court held that a plaintiff lacked standing to enjoin certain Forest Service regulations after the parties had settled their dispute regarding the application of those regulations to the specific project that had caused the plaintiff's injuries. 555 U.S. at 494-97. The Court concluded that once the plaintiff had settled the claim which caused his specific harm, that

plaintiff no longer had standing to challenge the basis for the original disputed action. *Id.* at 496-97.

Based on these two cases, Defendants argue that Plaintiffs' only injury, being banned from military service, has been remedied by the Court's preliminary injunction barring implementation of the challenged policy. Because Plaintiffs' injury has been relieved, Defendants contend that Plaintiffs lack standing to support a nationwide preliminary injunction.

The Court is far from convinced by Defendants' argument. In both *Alvarez* and *Summers*, the plaintiffs lost standing once they had permanently settled their original disputes, thus providing a remedy for their claimed injuries. That is not the case here. Defendants do not claim that they have decided to permit Plaintiffs to serve in the military as transgender service members. Accordingly, unlike in *Alvarez* and *Summers*, Plaintiffs' claimed injury has not been permanently remedied. Plaintiffs have received a temporary reprieve from their injury, but only because the Court granted Plaintiffs' motion for a preliminary injunction in this case. And, Defendants have been unceasing in their attempts to lift this Court's preliminary injunction so that they can move forward with the Mattis Implementation Plan.

Moreover, Defendants' argument is circular. Defendants contend that Plaintiffs lack standing because they are no longer being injured due to the Court's preliminary injunction. Accordingly, the preliminary injunction should be lifted. At which point, Plaintiffs will again face a cognizable injury, have standing, and be entitled to a preliminary injunction. That Plaintiffs are not being harmed so long as the Court's preliminary injunction is in place, of course, does not deprive Plaintiffs of their standing. To assess Plaintiffs' standing, the Court considers whether Plaintiffs would be harmed if the preliminary injunction were lifted and Defendants' plan allowed to go into effect. And, the Court has already determined that such a

sequence of events would harm Plaintiffs. *See Doe 2*, 315 F. Supp. 3d at 485-92. Accordingly, Plaintiffs have standing to support the Court's preliminary injunction.

The Court stresses that Plaintiffs' standing supports not only a preliminary injunction as to Plaintiffs, but also a systemwide preliminary injunction. If the Court were to stay the nationwide scope of its preliminary injunction, Plaintiffs would be injured even if they were permitted to continue serving in the military. Defendants' plan injures Plaintiffs not just by prohibiting their military service, but, as importantly, it also injures Plaintiffs by stigmatizing them as an inferior class of service member whose military service is not condoned by the military and is only begrudgingly permitted by force of court order. Staying the nationwide scope of the Court's preliminary injunction would sanction the stigma created by the ban, thus injuring Plaintiffs even if the preliminary injunction were still in effect as to them. *See Infra* Part V. Accordingly, the class-based injury that Defendants' plan inflicts on Plaintiffs gives Plaintiffs standing to support a systemwide preliminary injunction.

The Court finds that Defendants have not shown a likelihood that they will succeed on the merits of their appeal. Plaintiffs' constitutional challenges have merit as the Mattis Implementation Plan functions as a ban on transgender individuals serving in the military. Additionally, the systemwide scope of the Court's preliminary injunction is proper as the alleged violation is also systemwide. Accordingly, this factor does not weigh in favor of staying the Court's preliminary injunction.

## IV. Irreparable Harm

Defendants also argue that they will be irreparably harmed if the Court's preliminary injunction remains in place. Specifically, Defendants argue that the Court's nationwide injunction forces the Department of Defense to maintain a policy of allowing military service by

transgender individuals that it has determined poses "substantial risks" and threatens to "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Defs.' Mot., ECF No. 138, 10-11 (quoting Memorandum for the President, ECF No. 96-1, 2).

Defendants previously made the same argument to the Court when asking the Court to dissolve its preliminary injunction. Defendants have provided no new support for their conclusory statements, and there have been no changes to the factual record. The Court finds the lack of support especially concerning given that the preliminary injunction has been in place for over a year. If the preliminary injunction were causing the military irreparable harm, the Court assumes that Defendants would have presented the Court with evidence of such harm by now.

For many of the reasons that have previously been given, the Court is not convinced that Defendants will be irreparably harmed in the absence of a stay. Defendants fail to acknowledge the considerable amount of time they spent preparing for the safe and orderly accession and retention of transgender individuals in the military. The directive from the Secretary of Defense requiring the military to prepare to begin allowing the accession and retention of transgender individuals was issued on June 30, 2016—nearly two and a half years ago. For more than a year preceding the summer of 2017, it was the policy and intention of the military that transgender individuals would openly serve in the military. Moreover, this Court issued its preliminary injunction over one year ago, and since then transgender individuals have been permitted to openly serve in the military.

Additionally, Plaintiffs have previously provided the Court with evidence of the considerable work done by the military to ensure that openly transgender individuals would be able to serve successfully in the military. Plaintiffs previously submitted the declaration of Dr.

20

George Richard Brown, who was part of the military's training program for the implementation of its policy allowing transgender individuals to openly serve. Dr. Brown stated that he "trained approximately 250 medical personnel working in Military Entrance Processing Stations (MEPS) throughout the military." Decl. of George Richard Brown, MD, DFAPA, ECF No. 74-1, ¶ 5. Plaintiffs also submitted the declaration of former Secretary of the Navy Raymond Edwin Mabus, Jr., who stated that nearly two years ago "the Services had already completed almost all of the necessary preparation for lifting the accession ban." *See* Decl. of Raymond Edwin Mabus, Jr., ECF No. 74-2, ¶ 3. The record also shows that the Acting Under Secretary of Defense for Personnel and Readiness, Peter Levine, published an "implementation handbook" in 2016 entitled "Transgender Service in the U.S. Military." Decl. of Raymond Edwin Mabus, Jr., ECF No. 13-10, Ex. F. That document is a lengthy, exhaustive "handbook [] designed to assist our transgender Service members in their gender transition, help commanders with their duties and responsibilities, and help all Service members understand new policies enabling the open service of transgender Service members." *Id.* at 8.

It is also important to note that, under the Court's preliminary injunction, while transgender individuals are permitted to serve in the military, they are "subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention." Decl. of Raymond Edwin Mabus, Jr., ECF No. 13-10, Ex. C. Only those transgender individuals who meet the combat-readiness standards that all non-transgender service members must meet will be permitted to serve in the military. Accordingly, the Court's preliminary injunction simply prohibits the military from refusing to allow an otherwise combat-ready individual to serve based on that individual's transgender status.

Considering the amount of forethought, research, and planning that went into preparing for the accession and retention of transgender individuals, the Court concludes that Defendants will not face irreparable harm by following a plan that was developed by the military itself. The apparent lack of harm that Defendants have faced from the Court's preliminary injunction maintaining the status quo over the last year buttresses the Court's conclusion that Defendants are unlikely to face irreparable harm if the status quo continues until the Court has reached a final decision on the merits.

In fact, the Court finds that Defendants could potentially face greater harm if the stay was granted. Prior to the 2017 Presidential Memorandum, the military intended to allow transgender individuals to serve in the military. And, under the Court's preliminary injunction, transgender individuals have been openly serving in the militarily for the past year. If the Court's preliminary injunction was stayed, Defendants would likely move forward with their plan to prohibit transgender individuals from serving in the military. But, if Defendants' plan were later found unconstitutional on the merits, the military would be forced, again, to allow transgender individuals to serve. Such volatility and instability in the makeup of the military cannot benefit Defendants. The Court finds that the need for security and stasis in the composition of the military is especially salient given that our country is facing an extended period of war and requires the service of a great number of men and women who will volunteer to make the sacrifices required to serve their country.

Finally, Defendants argue that "this case and others involving constitutional challenges to [the Department of Defense's] new policy illustrate the distinct harms to the Government from nationwide injunctions." Defs.' Mot., ECF No. 183, 11. Defendants complain that they are currently subject to four different nationwide preliminary injunctions, meaning that even if this

Court were to stay its preliminary injunction, Defendants would have to continue their legal battle in three other district courts. *See Karnoski v. Trump*, No. 18-35347 (Western District of Washington*); Stockman v. Trump*, No. 18-56539 (Central District of California); *Stone v. Trump*, No. 17-2459 (District of Maryland). The Court interprets this deluge of nationwide preliminary injunctions differently than Defendants. Rather than proving that nationwide injunctions irreparably harm Defendants, the fact that multiple courts have independently determined that Plaintiffs are entitled to a preliminary injunction only makes the Court more confident in its original assessment that a nationwide preliminary injunction is proper and warranted in these circumstances.

In sum, having carefully considered all of the evidence before it, the Court is not persuaded that Defendants will be irreparably harmed by the Court's preliminary injunction maintaining the status quo, pending a decision on the merits of this case.

## V.      Harm to Plaintiffs

Defendants make no new argument regarding whether or not Plaintiffs would be harmed by staying the Court's preliminary injunction. The only mention of harm to Plaintiffs in Defendants' motion states: "[g]iven this severe harm to the federal government—which far outweighs Plaintiffs' speculative claims of injury—this Court should stay the injunction in its entirety." Defs.' Mot., ECF No. 183, 11. Defendants' cursory assessment that Plaintiffs' harm is "speculative" and outweighed by Defendants' harm is not persuasive to the Court.

As the Court has previously explained, if the Mattis Implementation Plan were allowed to go into effect, "individuals who require or have undergone gender transition would be absolutely disqualified from military service, individuals with a history or diagnosis of gender dysphoria would be largely disqualified from military service, and, to the extent that there are any

individuals who identify as 'transgender' but do not fall under the first two categories, they would be allowed [to] serve, but only 'in their biological sex' (which means that openly transgender persons would generally not be allowed to serve in conformance with their identity)." *Doe 2*, 315 F. Supp. 3d at 486. Accordingly, Plaintiffs, who include current service members with diagnoses of gender dysphoria who have either transitioned or have begun to transition, prospective service members who have undergone transition, and a current service member who does not yet have a diagnosis of gender dysphoria, would be harmed by the implementation of this plan.

For purposes of this opinion, the Court can assume that some of the Plaintiffs would fall under the protection of the plan's "grandfather provision" which allows continued service by service members diagnosed with gender dysphoria after the previous administration's policy allowing service by transgender individuals took effect but prior to the implementation of Defendants' plan. But, the Court concludes that even those Plaintiffs who fall under the protection of the grandfather provision would be harmed by the implementation of the plan. The Mattis Implementation Plan singles out transgender service members "from all other service members and marks them as categorically unfit for military service. … It sends the message to their fellow service members and superiors that they cannot function in their respective positions. That they are mentally unstable. That their presence in the military is incompatible with military readiness, unit cohesion, good order, and discipline. In sum, it is an express statement that these individuals' very presence makes the military weaker and less combat-ready." *Id.* at 486.  By singling out and stigmatizing transgender service members as inherently different and inferior, the Mattis Implementation Plan harms even those transgender service members who may be allowed to continue serving their country. *See Lawrence v. Texas*, 539 U.S. 558, 574 (2003) ("If

protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons.").

For this same reason, Plaintiffs would be harmed if the Court were to stay the nationwide scope of the preliminary injunction but leave the injunction in effect only as to Plaintiffs. Defendants' plan stigmatizes transgender service members as an inferior class of service member. If the plan goes into effect, this stigmatic injury would harm Plaintiffs even if they were permitted to continue serving their country.

Accordingly, the Court finds that Plaintiffs would face a grave harm if the Court stayed its preliminary injunction.

## VI. Public Interest

Finally, Defendants argue that "[e]very day that these injunctions remain in effect causes harm to the Government and the public." Defs.' Mot., ECF No. 183, 12. Defendants' one-sentence argument about the "public" echoes their argument regarding irreparable harm based on the military's need for combat-readiness. That argument has already been rejected above. *See Supra* Part IV.

The Court concludes that the public interest favors preliminary injunctive relief in this case. Without supporting evidence, Defendants' bare assertion that the Court's injunction poses a threat to military readiness is insufficient to overcome the public interest in ensuring that the government does not engage in unconstitutional and discriminatory conduct. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (noting that "enforcement of an unconstitutional law is always contrary to the public interest"). After all, "it must be remembered that all Plaintiffs seek during this litigation is to serve their nation with honor and dignity, volunteering to face

extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them." *Doe 1*, 2017 WL 6553389 at *3.

Absent corroborating evidence, the Court is not prepared to find that allowing Plaintiffs to voluntarily serve and defend their county, while this country faces a prolonged period of warfare, is against the public interest.

## VII.    Conclusion

The Court finds that Defendants do not have a likelihood of success of the merits of their appeal, that Defendants do not face irreparable harm, that Plaintiffs would be harmed by staying the Court's preliminary injunction, and that public interest does not favor a stay. Accordingly, Defendants' motion for a stay of this Court's preliminary injunction is DENIED.

The Court acknowledges that much of this discussion is repetitive of points made in prior opinions considering and reconsidering Plaintiffs' preliminary injunction. But, Defendants have indicated that they also intend to file for a stay of the Court's preliminary injunction with the D.C. Circuit and that they will furnish the Circuit Court with this Court's ruling. *See* Defs.' Mot., ECF No. 183, 12. Accordingly, the Court provided a fulsome discussion of the issues to aid the Circuit Court in its impending review.

**SO ORDERED.**

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge